**HILL, FARRER & BURRILL LLP**
Kevin H. Brogan (Bar No. 089427)
kbrogan@hillfarrer.com
Dean E. Dennis (Bar No. 112616)
ddennis@hillfarrer.com
Stephen J. Tomasulo (Bar No. 181013)
stomasulo@hillfarrer.com
One California Plaza
300 S. Grand Avenue, 37th Floor
Los Angeles, California 90071-3147
Telephone: 213.620.0460
Fax: 213.624.4840

Attorneys for Plaintiffs/Counter-Defendants
3500 SEPULVEDA, LLC and 13th & CREST ASSOCIATES, LLC, and Counter-Defendant
6220 SPRING ASSOCIATES, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 3500 SEPULVEDA, LLC, a Delaware limited liability company; and 13th & CREST ASSOCIATES, LLC, a California limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> RREEF AMERICA REIT II CORPORATION BBB, a Maryland corporation; MACY'S WEST STORES, INC; and Does 1-25, inclusive, <br><br> Defendants. | Case No. 2:17-cv-08537 AFM <br><br> The Honorable Alexander F. MacKinnon <br><br> **PLAINTIFFS' OPPOSITION BRIEF RE: ADMISSIBILITY OF OPINION OF APPRAISER BRADFORD THOMPSON** <br><br> Date Action Filed: October 11, 2017 |
| RREEF AMERICA REIT II CORPORATION BBB, a Maryland corporation <br><br> Counter-Claimant, <br><br> 3500 SEPULVEDA, LLC, a Delaware limited liability company, et al. <br><br> Counter-Defendants. | |

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................... 5
I.   THE DAUBERT RULES ............................................................................... 6
II.  APPRAISER THOMPSON CONSIDERED THE AVAILABLE FACTS AND DATA ........................................................................................ 8
III. THOMPSON'S METHODOLOGY IS APPROPRIATE GIVEN THE UNIQUE CIRCUMSTANCES HERE ......................................................... 11
IV.  THOMPSON DID NOT VIOLATE USPAP ................................................ 14
CONCLUSION ...................................................................................................... 16

# TABLE OF AUTHORITIES

Page

**Cases**

*C&C Props., Inc. v. Shell Co.*,
  2015 U.S. Dist. LEXIS 127856 .................................................................... 7

*City of Almaty v. Ablyazov*,
  2021 U.S. Dist. LEXIS 214695 .................................................................... 8

*City of San Jose v. Superior Court*,
  12 Cal.3d 447 (1974) ................................................................................... 7

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ......................... 6, 7, 8

*In re Fosamax Prods. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009) .......................................................... 7

*Hangarter v. Provident Life & Accident Ins. Co.*
  373 F.3d 998 (9th Cir. 2004) ....................................................................... 6

*Kilbride Invs. Ltd. v. Cushman & Wakefield of Pa., Inc.*,
  2018 U.S. Dist. LEXIS 72221 ..................................................................... 8

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ......................... 6, 8

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005) ........................................................................ 8

*In re Paoli II*,
  35 F.3d at 742 .............................................................................................. 7

*Royal & Sun All. Ins. PLC v. UPS Supply Chain Sols., Inc.*,
  No. 09-CV-05935, 2011 U.S. Dist. LEXIS 97715, 2011 WL
  3874878 (S.D.N.Y. Aug. 31, 2011) ............................................................. 7

*United States v. 99.66 Acres of Land*
  (9th Cir. 1992) 970 F.2d 651 ..................................................................... 12

*United States v. Alatorre*,
  222 F.3d 1098 (9th Cir. 2000) ..................................................................... 6

# TABLE OF AUTHORITIES
(continued)

Page

*Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 07-CV-05804, 2009 U.S. Dist. LEXIS 30458, 2009 WL 959775 (S.D.N.Y. Apr. 8, 2009) .................................................................. 7

**Statutes**

Evidence Code §816 ............................................................................................ 11

Evidence Code §819 ............................................................................................ 12

Evidence Code §821 ............................................................................................ 12

Fed. R. Evid. 702 ................................................................................................... 6

**HILL, FARRER & BURRILL LLP**
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

**INTRODUCTION**

In this action, plaintiffs 3500 Sepulveda et al. (collectively the owners of the "Hacienda Building") claim that defendants RREEF et al. breached the express terms and the implied covenant of good faith and fair dealing in a settlement agreement by constructing a parking structure that differed significantly from what the Hacienda Building owners had approved in the agreement. The Hacienda Building owners contend that the diversion from the site plan attached to the agreement was so significant that it reduced nearby parking, resulting in diminution in the value of the Hacienda Building. Defendants dispute that their changes were material and claim that the owners were not damaged by the changes.

The Hacienda Building owners submitted the appraisal report of Bradford Thompson, MAI, a California licensed appraiser with over 20 years of experience, including significant litigation appraisal work. Not surprisingly, Thompson could not find any nearby properties where a similar impact to existing parking had occurred and was thus unable to use a "paired sales" analysis to pinpoint the before and after impact of the change.

Because RREEF's project, in particular the occupancy of nearby "Village Shops," was not yet fully tenanted, and COVID-19 has severely limited retail operations, the parking demands from the opening of some 45,000 square feet of additional, nearby retail and restaurant occupancies would create additional uncertainty for the Hacienda Building, which translates into an increased risk to the Hacienda Building of its ability to achieve market rents. In essence, Thompson concluded that the increased risk due to RREEF's changes in the North Deck resulted in a capitalization rate increase of .005, resulting in a diminution in value of approximately $1.9 million.

Defendants contend that Thompson's damage conclusion is unsupported and made in violation of USPAP. They object to his analysis of nearby proximate parking, before and after RREEF's changes to the North Deck, and contend that

some parking spaces hundreds of feet distant from the North Deck should be good enough. RREEF levels numerous challenges to Thompson's appraisal. The gist of these challenges, however, go to the reasons for his opinions, not their admissibility. Thompson used standard appraisal techniques to reach his opinions. RREEF's appraiser, on the other hand, rendered no opinion of value under either scenario. Instead, he quibbled with Thompson's comparable sales, his analysis and his conclusions.

The Hacienda Building Owners' position is that, given this will be a court trial, the court should hear the proposed testimony, and defendants' challenges to it, and reach its own conclusion as to whether the Hacienda Building Owners have been damaged by the claimed breach, and if so, in what amount.

## I.     THE DAUBERT RULES

Rule 702 requires that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The threshold for qualification is low: a minimal foundation of knowledge, skill, and experience suffices. *Hangarter v. Provident Life & Accident Ins. Co*. 373 F.3d 998, 1015-16 (9th Cir. 2004). When faced with a proffer of expert testimony, a district court must determine whether the testimony is both reliable and relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ("*Daubert I*"). The court has broad discretion in assessing both requirements. See *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000).

The reliability requirement ensures "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). The offering party must show by a preponderance of the evidence (1) that the expert is qualified to render the opinion and (2) that the opinion offered has adequate support. *Daubert I*, 509 U.S. at 588-90.

However, "in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009). This is especially true in the context of a bench trial, where "there is no possibility of prejudice, and no need to protect the factfinder from being overawed by 'expert' analysis." *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 07-CV-05804, 2009 U.S. Dist. LEXIS 30458, 2009 WL 959775, at *8 n.4 (S.D.N.Y. Apr. 8, 2009).

As noted in *Royal & Sun All. Ins. PLC v. UPS Supply Chain Sols., Inc.*, No. 09-CV-05935, 2011 U.S. Dist. LEXIS 97715, 2011 WL 3874878, at *2 (S.D.N.Y. Aug. 31, 2011), "When the fact-finder is the court, expert evidence should be quite freely admitted so that the judge may have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions."

In the instant action, one issue is the claimed diminution in value to the Hacienda Building as a result of RREEF's substantial divergence from plans both sides approved in the Settlement Agreement. The change impacted the Hacienda Building which is a part of the Manhattan Village Shopping Center. There is a "fundamental maxim that each parcel of land is unique." *City of San Jose v. Superior Court*, 12 Cal.3d 447, 461 (1974). "Although this rule was created at common law, the very factors giving it vitality in the simple days of its genesis take on added significance in this modern era of development. Simply stated, there are now more characteristics and criteria by which each piece of land differs from every other." Id. at 461-62. *C&C Props., Inc. v. Shell Co.*, 2015 U.S. Dist. LEXIS 127856, *26-27.

In this case, defendant challenges only the reliability of plaintiffs' experts. The reliability requirement of *Daubert* "means that . . . the expert must have 'good grounds' for his or her belief." *In re Paoli II*, 35 F.3d at 742. The test of reliability

is "flexible" and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 141-42 (emphasis omitted). *Kilbride Invs. Ltd. v. Cushman & Wakefield of Pa., Inc.*, 2018 U.S. Dist. LEXIS 72221, *8-10.

As noted in *City of Almaty v. Ablyazov*, 2021 U.S. Dist. LEXIS 214695, *5-6, "Although it establishes a "gatekeeper" function for expert testimony, the *Daubert* test is nonetheless "a liberal" and "permissive" standard of admissibility. *Nimely v. City of New York*, 414 F.3d 381, 395-96 (2d Cir. 2005). Expert testimony should be excluded only "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Restivo*, 846 F.3d at 577 (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009)). Absent this degree of unreliability, any "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id* (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

## II. APPRAISER THOMPSON CONSIDERED THE AVAILABLE FACTS AND DATA

RREEF does not attack the credentials of appraiser Bradford Thompson, but rather one of his conclusions. In essence, Thompson rendered two opinions of value, one based upon the scenario of the North Deck plans attached as Exhibit E, Sheet 6 to the Settlement Agreement (the "Settlement Agreement Site Plan"), which had 632 parking spaces in the Lot F area, and a separate scenario based on the RREEF project as built, with 471 parking spaces in the Lot F area. Under the first scenario assuming the Settlement Agreement Site Plan, Thompson used comparable sales and the income approach to value. Both are recognized in federal and California state courts.

Thompson appraised the Hacienda Building as of October 11, 2021.

Thompson considered various sales of commercial property that he concluded were reasonably comparable to the Hacienda Building, and based upon these sales, he concluded that the indicated value of the Hacienda Building in Scenario 1 based upon the comparable sales approach was $1,020 per square foot, or $19,454,000. Using the income approach, Thompson considered market rent and the current rent obtained from tenants of the Hacienda Building, and applied a capitalization rate to opine on the fair market value of the Hacienda Building based upon the Settlement Agreement Site Plan. He concluded that if RREEF had proceeded with the Settlement Agreement Site Plan, the Net Operating Income would be $875,353.

Thompson concluded that these parking places within the Lot F area would be reasonably proximate to the Hacienda Building. He described "reasonably proximate" as "The way I interpret it was I was -- I observed the property when Lot F was a large surface parking lot between the Hacienda Building and the mall, and that area, large expansive asphalt, seemed to be a -- a reasonably proximate parking field to the subject, and -- both under the settlement agreement and the expansion project. That is -- that's where that parking is located in the former Lot F, open field." Thompson Deposition, page 101/line 18 to 102/line 1. He used a capitalization rate of .045 (4.5%), based upon market derived "cap rates" to reach an indicated value of the Hacienda Building of $19,450,000.[1]

He then analyzed the Hacienda Building based upon the amended plans and the completed construction of the North Deck parking structure and the partially completed build-out of approximately 60,000 square feet of the Village Shops, which are part of both the North Deck structure and the South Deck structure. While existing tenants of the Hacienda Building would still be paying their lease rent, he concluded that the North Deck structure, as built, had less reasonably proximate parking and separated the Hacienda Building from the balance of the shopping center, making it a riskier investment. As a result, a buyer would demand

---

[1] $875,353/.045=$19,452,289

a higher rate of return, and thus a higher capitalization rate to justify the increased risk.

Thompson noted the following impacts of the changed parking:

> "• The reasonably proximate parking has been reduced from 632 spaces to 471 spaces.
>
> • The reasonably proximate parking reduction represents a 25.5% reduction when comparing the as-built environment to the parking identified in the Settlement Agreement.
>
> • Although the North Deck is reasonably proximate, the first level is often congested, or full, requiring parking on the 2nd and/or 3rd levels that is less functional. (See photographs on the following page).
>
> • The parking ratio for the Manhattan Village Project, prior to the Expansion, was reported at approximately 4.1 spaces per 1,000 square feet. Assuming that the subject enjoyed a pro-rata share of reasonably proximate parking at a ratio of 4.1 per 1,000, the as-built reduction of 25.5% will reduce the reasonably proximate parking ratio to 3.05 spaces per 1,000 square feet.
>
> • The construction of the North Deck parking structure creates a physical and visual barrier between the Hacienda Building and the main mall development. To some extent the subject has been transformed from mall pad to perimeter out parcel.
>
> • The expansion of the Village Shops just southeast of the subject has increased demand and reduced supply of reasonably proximate parking spaces. Exhibit A, Thompson Report, page 36.
>
> • From a valuation perspective potential impacts may be revealed in the form of rent reduction, increased vacancy,

rent abatement (especially during the holiday shopping season), reduced contract rental increases, reduced marketability, and lower sale price or property value. It would be difficult to quantify these specific individual negative micro income characteristics from paired data analysis. However, these effects can be quantified on a macro level through the evaluation of an appropriate overall capitalization rate (Ro) in the after or affected condition." Exhibit A, Thompson Report, page 36.

He noted that "the capitalization rate is related to overall risk. Risk can be analyzed by investigating the credit worthiness of tenants, market conditions, stability of the property's income stream, condition and quality of the subject improvements, level of investment in the property…and the property's upside or downside potential." *Id*. He concluded that the capitalization rate that a buyer and seller in the marketplace would demand would increase to .05 (5%) (an increase of .005) because of the increased risk, and therefore the fair market value of the Hacienda Building decreased by $1,916,000.

## III. THOMPSON'S METHODOLOGY IS APPROPRIATE GIVEN THE UNIQUE CIRCUMSTANCES HERE

Defendants argue that Thompson did not use the appropriate methodology to properly opine on the two value scenarios posed by this case. In terms of appraisal approaches, Thompson used the comparable sales and income approaches for the first scenario. Both are recognized under both California law and by the federal courts. see e.g. Evidence Code §816 ("When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the price and other terms and circumstances of any sale or contract to sell and purchase comparable property if the sale or contract was freely made in good faith within a reasonable time before or after the date of valuation. In order to be considered comparable, the sale or contract must have been made sufficiently near in time to

the date of valuation, and the property sold must be located sufficiently near the property being valued, and must be sufficiently alike in respect to character, size, situation, usability, and improvements, to make it clear that the property sold and the property being valued are comparable in value and that the price realized for the property sold may fairly be considered as shedding light on the value of the property being valued.") and Evidence Code §819 ("When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the capitalized value of the reasonable net rental value attributable to the land and existing improvements thereon (as distinguished from the capitalized value of the income or profits attributable to the business conducted thereon).") and *United States v. 99.66 Acres of Land* (9th Cir. 1992) 970 F.2d 651, 655 ("This circuit generally recognizes three appraisal methodologies in ascertaining fair market value: "(1) Comparable sales; (2) the income or capitalization of income; and (3) the reproduction cost at the time of taking, less depreciation.")  See

In addition. Thompson properly took into account the conditions surrounding the Hacienda Building.  See Evidence Code §821 ("When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the nature of the improvements on properties in the general vicinity of the property or property interest being valued and the character of the existing uses being made of such properties.").

Defendants argue that the various capitalization rates found in Thompson's comparable sales do not support his conclusion that the cap rate on the subject property would increase based upon the change in proximate parking to the Hacienda Building.  Excluding an outlier, the capitalization rates Thompson found ranged from 4.55 to 5.05%, with an average of 4.73%.  While Thompson's report also referenced rates found in appraisal sources including Co-Star, Thompson recognized that many of the sales were miles from the subject property and have little bearing on the value of the Hacienda Building, located within the confines of

the Manhattan Village Shopping Center in Manhattan Beach. Some of the rates were based on the sale of stand-alone commercial buildings with nearby parking, some had street parking and some had public parking lots. See e.g. Thompson Report, pages 23-24. As noted previously, Thompson did not find any perfect paired sales which would show the impact of the loss of proximate parking based upon sales of comparable property before and after such a change in condition.

Defendants argue that Thompson's did not consider the various factors influencing his capitalization rate under the alternative scenario. While defendants' appraiser did not expressly form an opinion of fair market value either of Thompson's scenarios, he concludes that Thompson's opinion of value under his first scenario was "not unreasonable at $19,453,000." Dietrich Report, page 8. Thompson outlined, in his report and during his deposition, the reasons he felt that the increased risk because of the changed parking impacted the cap rate.

RREEF contends that Thompson did not take into account either the Northeast Deck or the South Deck in his analysis of parking. But Thompson concluded that neither deck provided reasonably proximate parking to the Hacienda Building:

> "Q   Do you know of a -- of a parking structure at the -- at the mall called the "South Deck"?
> A   Yes. That's south of the CPK Village development.
> Q   And do you consider that to be good proximate parking to the Hacienda Building?
> A   That would seem to be a -- would be considered like a secondary or an overflow parking, not -- not particularly functional in terms of proximate to the Hacienda.
> Q   And do you know of a parking structure called the "North Deck" -- I'm sorry, strike that, the "Northeast Deck"?

13

> A   Yes.  That's north of the Macy's towards Rosecrans, if I'm not mistaken.
> Q   Correct.
> And do you consider that to be within proximate parking?
> A   That -- that seemed to be beyond a reasonable range for functional parking." Thompson Depo, p. 102/lines 2-21.

Contrary to defendants' contentions, Thompson was aware of the Northeast and South Decks, but concluded they did not fit within what he concluded was reasonably proximate parking to the Hacienda Building.

## IV.   THOMPSON DID NOT VIOLATE USPAP.

Defendants contend that Thompson violated USPAP and thus his appraisal should not be considered.  They argue he violated the competency rule, arguing that he failed to perform his assignment by "failing to obtain the specialized parking data" necessary to complete his assignment.  Actually, Thompson considered the parking proposed by the Settlement Agreement Site Plan, which had 632 spaces within the Lot F area, and the parking as actually constructed, 471 spaces within that same area.  He considered that area to constitute the reasonably proximate parking to the Hacienda Building.  As noted above, he was aware of the Northeast Deck and the South Deck, but considered neither reasonably proximate.  Just because he did not follow Defendants' parking consultant's opinion does not invalidate his common-sense approach to the appraisal problem.

Defendants also argue he violated the scope of work rule and USPAP Standard 1-1(a) by not considering the parking studies.  While defendants' parking expert opines that parking over a hundred yards away from the Hacienda Building is good enough, Thompson analyzed the property and concluded that parking in the Lot F area was reasonably proximate to the Hacienda Building, and the structures called the Northeast and South Decks were not.  Just because an expert disagrees

with another expert does not violate USPAP—different opinions can and do conflict. Certainly the court can sort out the wheat from the chaff.

Defendants contend that he omitted an analysis of cap rate and parking ratios from the comparable sales and that he failed to analyze the available comparable sales data to estimate cap rates, which defendants contend contradict his conclusion. But defendants' appraiser found no "paired sales" from which an appraiser could isolate the lack of proximate parking to determine the actual impact of the loss of such parking on the Hacienda Building. Neither appraiser found evidence of a direct correlation between cap rates and parking. Thompson did, however, conclude that the changed parking increased risk and required a high cap rate.

They contend he failed to analyze the terms and conditions of the leases at the Hacienda Building, but his report and testimony shows that he had all the leases and compared them to market rates. In fact, Thompson concluded that the actual lease rental was within three percent of available market rental data. Ex. A, Thompson Report, page 33.

Finally, they argue that Thompson's report did not accurately set forth his opinions because he made misleading assumptions regarding parking conditions. In his report and at his deposition, Thompson clearly stated his opinion of proximate parking and the basis for it.

The gist of defendants' arguments is that they don't like Thompson's conclusions of value. Defendants chose not to have their appraiser render any opinions; rather they hired him just to attack Thompson. That argument, we submit, should go to the weight of the evidence after the court has heard the opinions of the witnesses, and the reasons for their opinions.

//
//
//

15
PLAINTIFFS' OPPOSITION TO BRIEF RE ADMISSIBILITY OF APPRAISER OPINION

## CONCLUSION

The dispute about Thompson's opinions and his methodology should be left to the court after direct and cross-examination. Given this will be a court trial, there is no risk that some unproven but claimed scientific study could fool a jury. Defendants' argument that the Thompson appraisal conclusions should be stricken or excluded should, at this juncture, be rejected in favor of a fully vetted direct and cross examination.

DATED: February 10, 2022           HILL, FARRER & BURRILL LLP

By: */s/ Kevin H. Brogan*
Kevin H. Brogan
Dean E. Dennis
Stephen J. Tomasulo
Attorneys for Plaintiffs and Counter-Defendants 3500 Sepulveda, LLC and 13th & Crest Associates, LLC, and Counter-Defendant 6220 Spring Associates, LLC

HFB 2481946.1 T4501 002