**HILL, FARRER & BURRILL LLP**
Kevin H. Brogan (Bar No. 089427)
kbrogan@hillfarrer.com
Stephen J. Tomasulo (Bar No. 181013)
stomasulo@hillfarrer.com
Jeffrey B. Bell (Bar No. 269648)
jbell@hillfarrer.com
One California Plaza
300 S. Grand Avenue, 37th Floor
Los Angeles, California 90071-3147
Telephone: 213.620.0460
Fax: 213.624.4840

Attorneys for Plaintiffs 3500 SEPULVEDA,
LLC and 13th & CREST ASSOCIATES, LLC
and Counter-Defendants 3500 SEPULVEDA,
LLC, 13th & CREST ASSOCIATES, LLC,
and 6220 SPRING ASSOCIATES, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 3500 SEPULVEDA, LLC, a Delaware limited liability company; and 13th & CREST ASSOCIATES, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>RREEF AMERICA REIT II CORPORATION BBB, a Maryland corporation, et al.<br><br>Defendants. | Case No. 2:17-cv-08537 SB (JPRx)<br><br>**PLAINTIFFS' AND COUNTER-DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>The Hon. Alexander MacKinnon<br><br>Action Filed:  October 11, 2017<br>Trial Date:  February 6, 2023 |
| RREEF AMERICA REIT II CORPORATION BBB, a Maryland corporation<br><br>Counter-Claimant,<br><br>3500 SEPULVEDA, LLC, a Delaware limited liability company, et al.<br><br>Counter-Defendants. | |

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Sidebar (vertical text):* HILL, FARRER & BURRILL LLP / A LIMITED LIABILITY PARTNERSHIP / ATTORNEYS AT LAW / ONE CALIFORNIA PLAZA / 300 S. GRAND AVENUE, 37TH FLOOR / LOS ANGELES, CALIFORNIA 90071-3147

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ......................................................................6

II. FINDINGS OF FACT ..............................................................7

    A.    Parties and Background ....................................................7

    B.    The Settlement Agreement ..............................................8

        1.    Formation and Principal Terms .............................8

        2.    REEF's Material Deviations from the Site Plan......13

    C.    The Entitlement Process:  Planning Commission and City Council Meetings ........................................................19

    D.    The CEQA Litigation ....................................................24

    E.    While the CEQA litigation is Pending, RREEF Advances the Project Forward as soon as Macy's is On Board. .............25

    F.    The Director Writ Litigation ...........................................29

    G.    RREEF's Expert Testimony on Damages .........................35

        1.    Increased Constructions Costs Analysis..................36

        2.    Lost Profits Analysis...........................................37

III. CONCLUSIONS OF LAW .....................................................40

    A.    Contract Interpretation—Material Alterations.................40

    B.    CLAIMS OF Breach ......................................................42

        1.    Breach--Entitlement Period ..................................42

        2.    Breach—CEQA Litigation ...................................44

        3.    Breach—Director Writ Litigation .........................44

    C.    Causation and Damages .................................................45

        1.    Alleged Period 1 Delays: The Entitlement Process......46

        2.    Alleged Period 2 Delays:  The CEQA Litigation......48

        3.    Alleged Period 3 Delays—The Director Writ Litigation ......49

    D.    General Conclusion ......................................................50

IV. ADDITIONAL FINDINGS OF FACT REGARDING TIMELINE OF PLANNING COMMISSION AND CITY COUNCIL HEARINGS......50

    A.    Planning Commission Meetings .....................................50

        1.    Planning Commission Meeting No. 1: June 27, 2012......50

        2.    Planning Commission Meeting No. 2:  October 3, 2012. ......53

        3.    Planning Commission Meeting No. 3:  March 13, 2013......56

        4.    Planning Commission Meeting No. 4:  April 24, 2013......60

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
300 S. GRAND AVENUE, 37TH FLOOR
ONE CALIFORNIA PLAZA
LOS ANGELES, CALIFORNIA 90071-3147

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

5.   Planning Commission Meeting No. 5:  May 22, 2013 ............. 63
6.   Planning Commission Meeting No. 6:  June 26, 2013 ............. 65
7.   Planning Commission Meeting No. 7:  July 24, 2013 ............. 68
B.   City Council Meetings ......................................................................... 71
1.   City Council Meeting No. 1: August 6, 2013 ........................... 71
2.   City Council Meeting No. 2:  September 3, 2013 ................... 73
3.   City Council Meeting No. 3:  September 10, 2013 ................. 76
4.   City Council Meeting No. 4:  September 17, 2013 ................. 85
5.   City Council Meeting No. 5:  October 8, 2013 ....................... 91
6.   City Council Meeting No. 6:  November 12, 2013 ................. 92
7.   City Council Meeting No. 7:  January 14, 2014 ...................... 93
8.   City Council Meeting No. 8:  April 29, 2014 .......................... 94
9.   City Council Meeting No. 9:  May 20, 2014 ........................... 96
10.  City Council Meeting No. 10:  December 2, 2014 ................. 98

**FIRM NAME**
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
OFFICE ADDRESS

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

In accordance with Local Rule 52 and the Court's February 14, 2023 Order [ECF No. 261], Plaintiffs and Counter-Defendants 3500 Sepulveda LLC and 13th & Crest Associates, LLC, and Counter-defendant 6220 Spring Associates, LLC, (collectively, the "Hacienda Parties") submit the below proposed findings of fact and conclusions of law in connection with the bench trial of RREEF America REIT II Corporation BBB's ("RREEF") counterclaims against the Hacienda Parties.

Per the Court's February 14, 2023 Order [ECF No. 261] in which the Court directed the parties to address eight questions in their post-trial briefing, the Court may use the following index to locate Haciendas' responses:

| Question | Citation to Response |
|---|---|
| *What is the correct contractual interpretation of the Settlement Agreement's term, "material alterations to the Site Plan. . . which detrimentally affect the use or operations of the Hacienda Building"?*<br><br>**Short answer**: The phrase "material alteration to the Site Plan that detrimentally affected the Hacienda Building" means any revision to the Settlement Agreement Site plan that reduced the number of parking spaces in Lot F, reduced the number of parking spaces during construction from 240, increased the number of gross leasable area in the core area without a corresponding increase in parking, or changed the layout or configuration of the core parking area or the North Deck. | Fact Nos. 12–18, 22–53; Conclusion Nos. 161–169. |
| Please address (in a time-line form if possible) the timing of objections/presentations by the Hacienda parties as well as objections/presentations made by other individuals and entities, including RREEF's objections/presentations to the planning council and the city council.<br><br>**Short Answer**: See Fact Nos. 60–71, 198–374. | Fact Nos. 60–71, 198–374. |
| *If the Hacienda parties made objections that were permitted by the Settlement Agreement (or if objections were made by others) and, at the same time, if the Hacienda parties made other objections that were not permitted by the Settlement Agreement, can that be a period of improper delay caused by the Hacienda parties?*<br><br>**Short Answer**: No. | Conclusion Nos. 184–187. |

- 4 -

| | |
|---|---|
| *Can delay prior to the signing of RREEF's final agreement with Macy's be attributed to the Hacienda parties? What is the impact of RREEF's earlier letter of intent with Macy's?*<br><br>**Short Answer:** No. RREEF could not even begin the preconstruction process, let alone pull building permits, until Macy's signed the Separate Agreement. RREEF's non-binding 2013 Letter of Intent with Macy's has no relevance on this issue. | Fact Nos. 37, 77; Conclusion Nos. 191–192. |
| *Does the failure of RREEF to provide 240 parking spots during construction as required by the Settlement Agreement (and RREEF's advance notice to the Hacienda parties of this anticipated failure) have an impact on the current issues from the trial?*<br><br>**Short Answer:** Yes. One of the primary reasons the Hacienda Parties entered into the Settlement Agreement was to protect their tenants' short-term parking during construction of the Project. RREEF's advance notice of its anticipated failure to provide the required parking constituted a material deviation to the Settlement Agreement. | Fact Nos. 22–27, 44; Conclusion Nos. 170–177. |
| *If potential witnesses likely have information relevant to a disputed fact issue but neither side calls those witnesses to testify at trial, should that impact resolution of the disputed fact issue?*<br><br>**Short Answer:** RREEF's failure to call a witness from Macy's—a co-party represented by the same counsel—gives rise to the presumption that Macy's testimony on any disputed fact would have been unfavorable to RREEF. *See United States v. Noah*, 475 F.2d 688, 691 (9th Cir. 1973) ("The failure of a party to produce a material witness who could elucidate matters under investigation gives rise to a presumption that the testimony of that witness would be unfavorable to that party if the witness is peculiarly within the party's control.") Similarly, although City employees may not have been particularly within RREEF's control, given that RREEF bears the burden of proof in establishing that the Hacienda Parties' conduct delayed the entitlement process, RREEF's failure to call representative witnesses from the City constitutes a failure of proof. | Conclusion Nos. 190, 192. |
| *What standard should be used to determine whether RREEF's damages claims have been presented with the necessary precision and certainty?*<br><br>**Short Answer:** "Damages must be shown with reasonable certainty and cannot be based on mere speculation and conjecture." *Tzu Chien Chen v. Thomas & Betts Corp.*, No. C- | Conclusion Nos. 183–184. |

- 5-

HILL, FARRER & BURRILL LLP<br>A LIMITED LIABILITY PARTNERSHIP<br>ATTORNEYS AT LAW<br>ONE CALIFORNIA PLAZA<br>300 S. GRAND AVENUE, 37TH FLOOR<br>LOS ANGELES, CALIFORNIA 90071-3147

02-3540 SC, 2005 U.S. Dist. LEXIS 16010, at *15 (N.D. Cal. July 13, 2005).  "Uncertainty as to the *fact of damage*, that is, as to the nature, existence or cause of the damage, is fatal."  *Pet Food Express, Ltd. v. Royal Canin USA, Inc.*, No. C-09-1483 EMC, 2011 U.S. Dist. LEXIS 141281, at *15 (N.D. Cal. Dec. 8, 2011) (emphasis added)).

| | |
|---|---|
| *In his expert report, did Mr. Tregillis opine on the appropriate amount of RREEF's damage claim for increased construction costs, as a standalone claim and without regard to the lost profits claim?* <br><br> **Short Answer:**  No. | Conclusion No. 146. |

# I.
# INTRODUCTION

Trial of RREEF's counterclaims against Counter-Defendants 3500 Sepulveda LLC ("3500 Sepulveda"), 13th & Crest Associates, LLC ("13th and Crest"), and 6220 Spring Associates, LLC, (collectively, the "Hacienda Parties"), commenced on February 6, 2023 in Courtroom # 780 of the above-referenced Court, the Honorable Alexander F. MacKinnon, Magistrate Judge presiding, and proceeding through February 13, 2023.

Michael G. Romey, Greg Swartz, and John C. Heintz of Latham & Watkins LLP appeared on behalf of RREEF.  Kevin H. Brogan, Stephen J. Tomasulo, and Jeffrey B. Bell of Hill, Farrer & Burrill LLP appeared on behalf of the Hacienda Parties.

Trial was held on RREEF's counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief.  RREEF called five witnesses (Joshua Lenhert, Philip Friedl, Patrick Gibson, David Bones, and Mark English), and lodged excerpted transcripts of the depositions of Mark Neumann (September 5, 2018 and September 6, 2018), Sally Stocks, and Philip Pearson.  [ECF No. 255.]

The Hacienda Parties called two witnesses at trial (Mark Neumann and

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1  Christian Tregillis), and designated additional excerpts of depositions of Sally

2  Stocks, Mark Neumann, and Philip Pearson.  [*Id.*]

3      The Court, after considering the pleadings herein, the evidence and testimony

4  presented at trial, the parties' post-trial submissions, and the arguments of counsel,

5  has made findings of fact and conclusions of law as stated below.  Any "finding of

6  fact" more appropriately labeled "conclusion of law" shall be thus deemed a

7  "conclusion of law."  Likewise, any "conclusion of law" more appropriately labeled

8  "finding of fact" shall be deemed a "finding of fact."

9

10

## II.
## FINDINGS OF FACT

11

12  **A.    PARTIES AND BACKGROUND**

13      1.    Defendant and Counter-Claimant RREEF America REIT II

14  Corporation BBB ("RREEF") is a Maryland corporation and is the owner of a

15  portion of the Manhattan Village Shopping Center ("MVSC") generally bounded

16  by Rosecrans Avenue, Sepulveda Boulevard, and Marine Avenue in the City of

17  Manhattan Beach, California.

18      2.    Counter-claimant Macy's West is an Ohio corporation and owner of

19  approximately 1.9 acres of MVSC where a Macy's department store is located.

20      3.    Plaintiff and Counter-Defendant 3500 Sepulveda, a Delaware limited

21  liability company, 13th & Crest, a California limited liability company, and 6220

22  Spring Associates, LLC, a California limited liability company, own, as tenants in

23  common, certain improved real property, within MVSC, located at 3500 N.

24  Sepulveda Boulevard, Manhattan Beach, CA.

25      4.    The deed from which the Hacienda Parties acquired their interest in

26  MVSC contains certain easements over certain areas of MVSC for parking

27  purposes.

28      5.    On or about November 1, 1980, the predecessors in interest to RREEF,

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Macy's and the Hacienda Parties entered into a Construction and Reciprocal Easement Agreement (the "COREA") which contains, inter alia, reciprocal easements in parking areas within MVSC. RREEF and Macy's are designated as "prime parties" under the COREA. Hacienda is not a prime party under the COREA. [TE 21-0008.]

6.      On August 24, 2022, the court issued its Order Re Plaintiffs' Claim Of Unreasonable Burden On Their Easement Rights.

7.      The allowable uses of properties within MVSC, including the Macy's and Hacienda Properties, were governed by a Master Use Agreement (MUP), PC 01-27. [Trial Exhibit ("TE") 3023-0089.]

## B.      THE SETTLEMENT AGREEMENT

### 1.      Formation and Principal Terms

8.      On October 8, 2008, RREEF and the Hacienda Parties entered into a Settlement Agreement that sought to resolve pending issues between the parties. The Settlement Agreement addressed the serious concerns the Hacienda Parties had raised about the potential impact of RREEF's expansion and provided that the Site Plan attached as Exhibit E to the Settlement Agreement ("Site Plan") would be included in the amended application RREEF would submit to the City of Manhattan Beach ("City") to expand the MVS (the "Project"). Hacienda had sought to add restaurant uses to its building in accordance with the existing MUP, PC 01-27, which RREEF opposed. [TE 3033; Reporter's Transcript ("RT") 385:20–386:5.]

9.      In his June 18, 2008 letter to Sally Stocks, Mark Neumann, a principal of both 3500 Sepulveda and 13th and Crest, confirmed Ms. Stocks' statement to him:

> When we first met in person you clearly stated your
> position to us. "You need approval from us to open your

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1    Starbucks and we are going to be a pain until you give us

2    what we need, approval for our proposed expansion.

3    [TE 588-0002.]

4         10.    As the Court has previously ruled, the Settlement Agreement set forth,

5    in pertinent part, the rules for RREEF's application for an amendment of the Master

6    Use Permit and the obligations of the Hacienda Parties and RREEF. The Settlement

7    Agreement attaches the Site Plan as Exhibit E, which was defined as the "Shopping

8    Center Project." [TE 3033-0002.]

9         11.    The Settlement Agreement states, in pertinent part:

10    4.a. 3500 Sepulveda has reviewed and consents to the

11    Shopping Center Project as depicted in the Site Plan

12    attached hereto as Exhibit E; and 3500 Sepulveda will not

13    oppose the City's approval of the Shopping Center

14    Project, except as otherwise provided herein. 3500

15    Sepulveda acknowledges that such Site Plan and the

16    RREEF Application for the Shopping Center Project may

17    be amended from time to time consistent with the

18    obligations provided herein. If such amendments

19    materially affect the Hacienda Building, its tenants,

20    and/or 3500 Sepulveda, RREEF agrees to advise 3500

21    Sepulveda of the amendments.

22

23    *   *   *

24    f.  3500 Sepulveda and RREEF agree to cooperate in

25    good faith with each other in the processing of the

26    Amended RREEF Application, including but not limited

27    to the amended MUP and Environmental Impact Report,

28

- 9-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

for the Shopping Center project and the entitlement process pertaining to such Applications.

g. Except as expressly provided otherwise in this Agreement, and subject to RREEF processing the Amended RREEF Application incorporating the Hacienda Building's use and provision for parking as provided herein, and consistent with the good faith cooperation agreed to herein, RREEF and 3500 Sepulveda acknowledge that 3500 Sepulveda does not waive the right to participate or comment on material alterations to the Site Plan for the Shopping Center Project which detrimentally affect the use or operations of the Hacienda Building.

* * *

5.c.  RREEF may revise those portions of the Site Plan relating to the Parking Decks and the Parking Plan from time to time in its sole and absolute discretion or as required by the City, provided that RREEF shall submit any material revisions to those portions of the Site Plan relating to the North Deck and the Parking Plan to 3500 Sepulveda for its review and approval ten (1 0) business days prior to submitting such revisions to the City. Notwithstanding the foregoing, 3500 Sepulveda's failure to approve material revisions to the North Deck and/or Parking Plan shall not prohibit RREEF from submitting such material revisions to the North Deck and the Parking

- 10-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1    Plan to the City for consideration and approval, nor shall

2    3500 Sepulveda be precluded from objecting to such

3    material revisions it has not approved.

4

5    5.d. 3500 Sepulveda acknowledges that RREEF may elect

6    in its sole and absolute discretion, subject to City

7    approvals, to construct the Parking Decks, the South Deck

8    only, or the North Deck only. If RREEF elects to

9    construct only one of the Parking Decks, 3 500 Sepulveda

10    consents hereby only to RREEF' s construction of the

11    South Deck. Construction of the North Deck only is and

12    shall be considered a material revision to the Parking

13    Plan, and nothing in 3500 Sepulveda's acknowledgement

14    in the first sentence of this subparagraph 5d shall

15    constitute its approval of, or waiver of its right to object

16    to, construction of the North Deck only.

17

18    5e. 3500 Sepulveda understands and acknowledges that

19    during construction of the Shopping Center Project there

20    may be temporary reductions in available parking, which

21    has been addressed to 3500 Sepulveda's satisfaction by

22    RREEF's agreement to implement the measures set forth

23    in Exhibit G attached hereto and incorporated herein by

24    reference.

25

26    5h.  If RREEF pursues the Shopping Center Project,

27    receives approval from the City for the Parking Decks,

28    and proceeds to construct the Parking Decks, the

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

construction of the Parking Decks shall be subject to the additional terms set forth in attached Exhibit G.

[TE 3033 at 0005–0006.]

12.    One of the primary reasons the Hacienda Parties entered into the Settlement Agreement was to protect their tenants' short-term and long-term parking in connection with the Project.  [RT 389:12–390:13; 402:18–403:9 (Neumann).]

13.    The Hacienda Parties were "fearful for our tenants, both parking during construction and parking long term."  [RT 389:8–11 (Neumann).]  By entering into the Settlement Agreement, the Hacienda Parties "were trying to protect [their] tenants and their customers' ability to access their businesses.  That's one of the main reasons we signed the Settlement Agreement."  [RT 453:20–23 (Neumann).]

14.    The site plans attached to the Settlement Agreement depict the "Lot F" area—the surface parking lot between the Hacienda Building and Macy's, before the proposed project (defined in TE 3033-0063)—showing 477 (465+12) parking spaces.  [TE 3033-0039.]  The plans show the parking during construction of the Village Shops [TE 3033 at 0041–0044], and the 632 parking spots available in the same area after completion of the North Parking Deck.  [TE 3033-0045.]

15.    The Settlement Agreement site plans also show the proposed elevations of the North and South Decks, both of which show one-half floor below ground and one-half floor above ground (G+1), with the North Deck being partially below grade with a height of 10'9" above ground level.  [TE 3033-0047.]

16.    The plans also depicted Phase 3, Fry's Departure, with additional parking above and below grade parking in the "Fry's Corner."  [TE 3033-0058.]

17.    The Settlement Agreement also references parking during construction:  "If RREEF pursues the Shopping Center Project, receives approval from the City for the Parking Decks, and proceeds to construct the Parking Decks,

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

the construction of the Parking Decks shall be subject to the additional terms set forth in attached Exhibit G.  [TE 3033-0006.]

    18.    Exhibit G to the Settlement Agreement provided:

        2.    During Stage One construction of the North Deck, there shall be not less than 240 parking spaces available in the area referenced as "Lot F" on the attached Exhibit H.

        3.    During Stage One construction of the North Deck, and during Stage Two construction when reasonable access to parking for tenants, contractors, invitees, patrons and employees of the 3500 Sepulveda Property is impaired, RREEF will provide valet service or undertake other reasonable measures to provide alternative parking during such periods as approved by 3500 Sepulveda and at no cost to 3500 Sepulveda.

[TE 3033.]

### 2.    REEF's Material Deviations from the Site Plan

    19.    Exhibit 1314 illustrates the differences between the parking contained in the Settlement Agreement site compared to various revised site plans over the years, and to what was eventually built.  [TE 1314; RT 460:1–465:16 (Neumann).]

    20.    As described below, after entering the Settlement Agreement, but before beginning the entitlement process, RREEF made numerous revisions to the site plan that it knew would be objectionable to Mr. Neumann and the Hacienda Parties.

    21.    Before the project, there were 477 spaces in Lot F.  [RT 460:11–13 (Neumann); TE 1314 at p. 2.]

    22.    RREEF understood that the Settlement Agreement required 240 spaces

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

during construction.  [RT 744:1–3 (English); RT 392:6–10, RT 401:10–12 (Gibson); TE 1295-0004 ("The Settlement Agreement did not provide for any specific parking plan during construction, other than the minimum 240 spaces to be provided in the North Parking Lot."]  As Neumann testified:  "One condition of the Settlement Agreement is that RREEF would provide us 240 parking spaces within Lot F at all times during construction of the north deck."  [RT 392:6–10 (Neumann).]  This "was intended to benefit Macy's and the Hacienda Building." [RT 401:10–12 (Neumann).]

23.    RREEF also understood that the Settlement Agreement Site Plan called for a G+1 North Deck.  [RT 742:19–743:13 (English).]

24.    On August 3, 2010, RREEF wrote a letter to the Hacienda stating for the first time that RREEF had elected to change the North Deck from G+1 to G+2, a change which it also stated would mean "approximately 100 fewer spaces will be available during the parking deck construction period versus the 240 number stipulated in Exhibit G to the [Settlement Agreement]."  [TE 1007-0002.]

25.    RREEF knew this plan, which included a larger deck and limited parking during construction, was objectionable to Mr. Neumann.  [TE 1007; RT 406:9–408:7, 743:3–13 (Neumann).]

26.    The Hacienda Parties were not able to accept RREEF's request to change the north deck to G+2 or the reduction of parking spaces during construction.  [RT 409:13–411:24 (Neumann).]

27.    In November of 2010, RREEF's revised site plans likewise showed far fewer than 240 parking spaces during construction of the North Deck, a change that RREEF knew was objectionable to Neumann.  [RT 744:1–10 (English); TE 1295-0004 ("The plans we sent to you on November 16th, 2010 show 104 parking spaces available during construction of the North Parking Deck, which is indeed less than the 240 parking spaces stipulated in the Settlement Agreement.")]

28.    On December 6, 2010, Mr. Neumann sent a letter to Mark English of

- 14-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

RREEF noting that certain changes RREEF proposed to the North Deck "appear to be a material change when compared to the plans included in the Settlement Agreement." [TE 1295-0008.]

29. Mr. English responded in letter dated January 5, 2011, recognizing that parking in MVSC would be impacted by the addition of the Village Shops and Macy's expansion and noting that "the circumstances and our plans have changed since the execution of the Settlement Agreement more than two years ago…" [TE 1295-0001.]

30. Mr. English further stated that the "planning process has been long and evolutionary, and we still have a ways to go." [TE 1295-0002.] He acknowledged that the plans were changing at Macy's request, and logically, RREEF should have approached Macy's first, "but we didn't." [TE 1295-0001.]

31. RREEF continued to make material alterations to the site plan as it progressed through the entitlement process between June of 2012 and December of 2016. [*See, e.g.*, TE 1248, 1249, 3029-0181.]

32. On July 23, 2012, Mark Neumann sent a letter to Mark English concerning RREEF's latest site plan. [TE 1241.] In the letter, Neumann compared, side by side, the 2008 Settlement Agreement Site Plan, a tentative August 25, 2011 site plan, and the 2012 site plan English had recently provided to Neumann. [*Id.*] Neumann noted the reduction in parking spaces as well as the increased 33,000 square feet of retail in the Lot F area and stated that this was a material change which the Hacienda Parties could not support. [*Id.*]

33. The June 26, 2012 site plan submitted as part of the first Planning Commission meeting (discussed below) shows the North Deck as G+2 and a total of 354 spaces in Lot F. [RT 463:5–5 (Neumann); TE 1314-0007.]

34. By April 24, 2013, the Site Plan contained 487 spaces in Lot F. [RT 463:19–464:3 (Neumann); TE 1314-0010.]

35. With respect to the April 24, 2013 site plan, RREEF admitted to the

- 15-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
300 S. GRAND AVENUE, 37TH FLOOR
ONE CALIFORNIA PLAZA
LOS ANGELES, CALIFORNIA 90071-3147

City that 3500 Sepulveda was "within its rights under the agreement to object to changes to the site plan." [RT 775:4–9 (English); TE 1302-0002 (fourth bullet point).]

36.    On May 22, 2013, RREEF presented a new site plan at the Planning Commission. [TE 1249.] The North Deck remained at G+2, and there were additional retail buildings in the Lot F area, but a portion of Lot F was in Phase 3, labeled "Not A Part." [TE 1249–0004.]

37.    On November 11, 2013, RREEF and Macy's entered into a non-binding "Letter of Intent" ("LOI") setting forth the proposed business terms of the consolidation and expansion of the Macy's store. [*See* February 21, 2023 Joint Notice of Lodging of Electronic Exhibits and Other Materials (ECF No. 264) at p. 3.] The LOI expressly noted that it "is only a description of the parties' current intent and is not legally binding." Among the proposed terms of the agreement contemplated by the LOI was that Macy's would have a right of approval over "material amendments" to the site plan. "Material amendment" was defined to include, among other things, any change that "adds or reduces the number of parking spaces within any parking areas or parking decks within the shopping cente1· or changes the layout or configuration of any such parking areas or parking decks …." [LOI at p.3]

38.    The November 21, 2014 site plan—which was ultimately approved by the City Council on December 2, 2014—shows 496 spaces in Lot F. [RT 464:4–11; TE 1314 at p. 11; TE 3029 (December 2, 2014 Staff Report) at 0181.]

39.    RREEF continued to make material alterations to the site plan even after the City Council approved it in December of 2014.

40.    As RREEF continued to revise the site plan in 2015, both RREEF and the Hacienda Parties recognized that changes to the parking supply—particularly in Lot F—would constitute a material alteration of the site plan agreed to in the Settlement Agreement. [TE 509 ("Note there are numerous detailed exhibits that

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

are part of the SA and relevant to every aspect of the development, parking,
phasing, etc. … Hacienda was consistently focused on the parking in the core
parking area throughout the entire approval process, both during and after
construction. The chart below illustrates the concern with the revised plan, that it
takes away parking spaces in the key area of the north deck, approximately 98
spaces, and in the parking decks (PD) defined term in the Settlement Agreement,
meaning north deck and south deck only."); RT 173:13–175:15, 178:24–179:24
(Friedl).]

41.    In their July 6, 2016 Separate Agreement regarding the expansion and
consolidation of the Macy's store (discussed further below), RREEF and Macy's
stipulated that a "material change" included, but was not be limited to, "any
amendment that…(iii) adds or reduces the number of parking spaces within any
parking areas or parking decks depicted on the Site Plan, or changes the layout or
configuration of any such parking areas or parking decks, or (iv) changes or
reconfigures any entrances to and exists, and any driveways, drive isles (sic) or ring
road, in a manner that alters vehicular or pedestrian traffic flow." [TE 1313-003.]

42.    The updated site plan endorsed by the Planning Commission Director
in December of 2016 [TE 1314-0013], showed a reduction of nine more spaces in
Lot F, reducing it to 487 spaces. Neumann concluded that there was a loss of 145
spaces in the Lot F area. [RT 465:2–16.]

43.    The final site plan, as constructed, shows 471 spaces in Lot F. [RT
465:12 (Neumann); TE 1314-0017.] That is 161 spaces below the number in the
Settlement Agreement Site Plan. [RT 468:12–20 (Neumann).]

44.    RREEF provided no parking during construction. [RT 456:8–24;
504:15–25 (Neumann).]

45.    Gibson's opinion on whether the Settlement Agreement Site Plan was
materially different from those presented to the Hacienda Parties after the
Settlement Agreement, including the Site Plan as constructed, focused only on the

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

"overall parking supply." Gibson admitted that the amount of parking in each of the garages changed. [RT 265:12–23.]

46.     Gibson's claim that Hacienda is obtaining more parking spaces within 600 feet (the edge between what he calls LOS B or C), is belied by his own studies which showed that the Core Area was marginally parked at parking ratios well below the national averages and significantly less than competitive malls. [TE 740-0007; RT 265–269.]

47.     Gibson admitted that parking 600 feet away from a location is less desirable than 300 feet. [RT 279:3–280:9.]

48.     Gibson's opinion also didn't take into account the number of additional retail square footage that became part of the North Deck, reducing parking and increasing demand. [RT 272:6–18.]

49.     Gibson's opinion was that the design of a building, the site prominence of a building, and connectability to a shopping center did not matter to him. [RT 276:10–25.]

50.     Gibson testified that the third level of parking in the North Deck was required to construct the bridge to Macy's. [RT 273:1–11.]

51.     While Gibson disowned the term "core area" of the shopping center (*see* RT 284:20–23), his own memorandum defined the Core area as "the retail between Carlotta Way on the North and the Macy's Men's store and Parcel 17 shops on the south". [TE 740-0007; RT 284:10–15.] As Gibson's own memorandum stated: "The Hacienda Building owner is also clear in their statements that adequate parking sufficiently close to their building, balanced with adequate supply serving the core retailers, is vital." [TE 740-0007; RT 285:18–24.]

52.     Gibson's memorandum concluded that "the core is marginally served and relies certainly in more peak shopping periods on the disproportionate supply located in the noncore area." [TE 740-0008; RT 286:12–16.]

53.     Gibson further stated that "parking space quantity driven by a 3-plus

- 18-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

ratio needs to be located 300 to 350 feet maximum distance from the primary doors of core retail" and "[i]t should be free of barriers to the pedestrian or shopper." [TE 740 at 0007–0008; RT 283:10–286:18.]

## C.    THE ENTITLEMENT PROCESS:  PLANNING COMMISSION AND CITY COUNCIL MEETINGS

54.    RREEF anticipated a three-year entitlement process, with entitlements expected to be issued by December of 2013, based solely on its experience with a shopping center project in Marina del Rey, California.  [RT 46:24–47:7, 49:6–15, 50:23–51:2.]

55.    The Marina del Rey Project was under the jurisdiction of the City of Los Angeles, not the City of Manhattan Beach.  [RT 98:22–99:9 (Friedl).]

56.    There is no evidence of the size or scope of RREEF's Marina del Rey shopping center.

57.    There is no evidence of the nature of the entitlement process RREEF experienced with the Marina del Rey (other than its claimed three-year length), whether it went through multiple local governmental agencies, whether any reviewing body applied de novo review of proposed entitlements, or whether any conditions of approval were imposed by the local governing body.

58.    There is no evidence of the level of local community involvement in the entitlement process for the Marina del Rey shopping center.

59.    The MVSC was the "largest commercial retail building and site, with 44 acres, in the city." [T. 3024-0006.]  It was "the biggest project that happened in Manhattan Beach in…the last 20 years."  [RT 426:20–427:2, 777:24–778:7.]

60.    The entitlement process comprised seven Planning Commission meetings and ten City Council meetings between June 27, 2012 and December 2,

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
300 S. GRAND AVENUE, 37TH FLOOR
ONE CALIFORNIA PLAZA
LOS ANGELES, CALIFORNIA 90071-3147

2014.[1]

61.    "After conducting duly noticed public hearings on the Project on June 27, 2012, October 3, 2012, March 13, 2013, April 24, 2013, May 22, 2013, June 26, 2013 and July 24, 2013, and requiring changes to the Project, the Planning Commission certified the EIR on June 26, 2013 and approved the Project, as modified by the Commission, on July 24, 2013." [TE 2035-001 (Section 5).]

62.    As shown in the Additional Findings of Fact Regarding Timeline of Planning Commission and City Council Meetings (the "Additional Findings"), the Hacienda Parties' comments played de minimis role in the Planning Commission meetings and were primarily focused on material changes to the plan impacting parking. For example, the substantive portions of the transcripts of the seven Planning Commission meetings—i.e., excluding cover pages, tables, and indices—total 1,378 pages. [*See* TE 3001, 3008, 2134, 3002, 3003, 2007, 3032 & 3004.] And as shown in the Additional Findings below, of the 1,378 substantive pages of Planning Commission transcripts, comments by the Hacienda Parties and related discussion by the Planning Commission and RREEF total approximately 46 pages, or **3.3 percent of the transcripts**. [See Fact Nos. 199, 206, 234, 246, 253, 258, & 269.]

63.    RREEF and the 3500 Sepulveda appealed the Planning Commission's approval, and the City Council separately agreed to review the Project for approval. [*See* TE 2035-001 (Section 6).]

64.    "On September 3, 10, and 17, October 8 and November 12, 2013, the

_____

[1] Per the Court's request for a timeline of objections and presentations by the Hacienda Parties, RREEF, and others during the entitlement process [ECF No. 261], and considering the extensive nature of those hearings and the voluminous transcripts, Staff Reports, and minutes evidencing them, 3500 Sepulveda includes herein a separate section captioned "Additional Facts Regarding Timeline of Planning Commission and City Council Hearings" below which address those hearings in greater detail. For ease of reference, they are being included at the end of these Proposed Findings in Section IV, *infra*.

City Council held duly noticed public hearings *de novo* to consider RREEF's application for an amendment to the existing Master Use Permit, a height variance, and amendment 10 the Master Sign program/sign exceptions. In addition, the Council held duly noticed public meetings on August 6, 2013 and January 14, 2014 to consider the application. Evidence, both written and oral, was presented to the Council. All persons wishing to address the City Council regarding the Project were given an opportunity to do so at the public hearings. Representatives of RREEF and Macy's, residents and local business owners spoke in favor of the Project. Representatives of 3500 Sepulveda LLC and other persons spoke in opposition to the Project on various grounds." [TE 2035 at 0001–0002 (Section 7).]

65.     "On January 14, 2014, the City Council provided another opportunity for representatives of RREEF and 3500 Sepulveda LLC, and all other interested persons, to comment on the Project. After providing that opportunity, the Council adopted a motion to direct staff to draft resolutions for the Council to consider certifying the Environmental Impact Report ("EIR") and approving Phases I and II of the proposed Pro1ect, subject to requiring:  (A) Coordination of Phases I and II to ensure that Macy's is consolidated, (B) Elimination of 10,000 square feet from Phase 1, (C) Redesign of the Phase I "North Parking Structure," (D) Consolidation of Macy's prior to the issuance of building permits for Phase II, (E) Submittal by Macy's of a commitment letter, (F) Installation of the Cedar Way extension to Rosecrans Avenue as part of Phase II, (G) Negotiations in good faith with Fry's so it remains on the site, (H) Provision of a bond or other satisfactory security for traffic improvements, (I) The architectural elements, details, water features, landscaping, hardscaping, and plaza to be similar to the concept renderings, (J) Commissioning of an Oak Avenue traffic study for a cost not to exceed $20,000, (K) Compliance with all of the other conditions that were imposed and previously approved by the Planning Commission."  [TE 2035-0002 (Section 8).]

66.     "In accordance with the Council's motion, RREEF refined and

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

modified the Project and submitted revisions to the Project plans. Such revisions were attached to the May 20, 2014 staff report as Attachment 9 [TE 3028]. The matrix comparing (a) the Project as analyzed by the EIR to (b) the revisions to the plan reflecting the modifications and refinements requested by the Planning Commission and the City Council was attached to the May 20, 2014 staff report [TE 3028] as Attachment 3." [TE 2035-0002 (Section 9).]

67.    "The City Council held a public hearing on April 29, 2014 to review the refinements and modifications to the Project, the April 2014 Analysis, the draft resolutions and the proposed conditions of approval. All persons wishing to address the City Council regarding the Project, including representatives of RREEF and 3500 Sepulveda, were given an opportunity to do so at the public hearing. The City Council invited public comment on, inter alia, the refined and modified Project, the draft resolutions and the draft conditions of approval. The City invited representatives of 3500 Sepulveda to provide comments. Principal Mark Neumann and two attorneys spoke for over thirty minutes and presented two letters and a slide show presentation. Mr. Neumann emphasized that he was trying to protect 3500 Sepulveda's property rights. After the conclusion of the public testimony, the City Council closed the public testimony portion of the public hearing, and continued the hearing to May 20, 2014." [TE 2035 at 0002–0003 (Section 11).]

68.    "On May 20, 2014, the City Council provided another opportunity for the public, including representatives of 3500 Sepulveda, to comment on the draft resolutions and the conditions attached to Resolution 14-0026. After the public provided comments, the Council made a motion to return with resolutions to certify the EIR and to approve the project, subject to all the conditions in the draft resolution and additional conditions." [TE 2035-0003 (Section 12).]

69.    "On December 2, 2014, the City Council provided another opportunity for the public, including representatives of 3500 Sepulveda to comment on the draft resolutions and the conditions attached to Resolution 14-0026. After that

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

opportunity, the City Council adopted Resolution 14-0025, thereby: (1) certifying the Final EIR; (2) making findings in support thereof; and (3) adopting a Mitigation Monitoring and Reporting Program for the Project, as refined and modified." [TE 2035-0003 (Section 13).]

70.     On December 2, 2014, the City Council adopted Resolution Nos. 14-0025 and 14-0026 certifying the EIR and approving the amended MUP (the "Amended MUP"), thus approving the project. [TE 2034, 2035.]

71.     Over the course of the 17 public hearings, the Planning Commission and City Council heard from numerous members of the public, and discussed in depth the myriad issues that one would expect on a project of this size and scope including, among other things, the Macy's consolidation and expansion, project phasing, parking spaces proposed and demand required, light poles on top of parking structures, phasing plans, including connections between phases and entire mall site, appearance of buildings and parking structures, pedestrian and bicycle connections to the Veterans Parkway Greenbelt under Sepulveda, draft conditions of approval, including the number of security cameras, timing of the site-wide improvements, the parking structures and number of spaces, the Rosecrans and Sepulveda dedications, the timing of the Rosecrans left-turn restriction, the number of electric vehicle charging stations, and the Village Drive rear cut-thru diversion improvement Plan, and the Phase III Northwest Corner.  [TE 3001, 3008, 2134, 3002, 3003, 2007, 3032, 3004, 3005, 3006, 3007, 3010, 2138, 2139, 2140, 2141, 2142; see Fact Nos. 198–374.]

72.     At trial, RREEF did not call a single witness from the Planning Commission or City Council.

73.     There is no evidence that, but for alleged delay, the City would have issued entitlements in December of 2013 instead of December of 2014.

74.     There is no evidence that any comments made or materials submitted by the Hacienda Parties to the Planning Commission and City Council caused the

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
300 S. GRAND AVENUE, 37TH FLOOR
ONE CALIFORNIA PLAZA
LOS ANGELES, CALIFORNIA 90071-3147

Planning Commission or City Council to set a hearing they otherwise would not have, or that the time between hearings was delayed because of anything the Hacienda Parties said or did.

75.    During the entitlement process, RREEF never told the Hacienda Parties that RREEF believed certain of their complaints to the Planning Commission and City Council were improper or constituted a breach of the Settlement Agreement. [Tr. 811:20–812:15 (English).]

76.    RREEF acknowledged that it repeatedly changed the site plan during the entitlement process, and so it made the decision to try to "rebalance the agreement" with the Hacienda Parties rather than threaten them. [Tr. 810:11–811:19.]

77.    The Amended MUP contained 56 Conditions of Approval (COAs) that RREEF was to comply with. Among other COAs, the City required that before RREEF could pull a building permit to begin Phase I of the Project, it would have to have written evidence of a binding commitment with Macy's for the consolidation and expansion of the Macy's store. [TE 2035-0024 (¶ c); RT 152:20–153:13, 153:25–154:12.]

78.    The City also approved the North Deck as a G+2, but with the western portion of the second deck set back 90-feet, a condition that RREEF contended would "jeopardize[] the whole project." [TE 2035-0038 (¶ r); TE 2142 (Transcript of December 2, 2014 City Council Hearing), 0014.]

### D.    THE CEQA LITIGATION

79.    On December 23, 2014, the Sensible Citizens of Manhattan Beach filed an action in Los Angeles County Superior Court captioned *Sensible Citizens of Manhattan Beach v. City of Manhattan Beach, et al.*, LASC Case No. BS152854 (the "CEQA Litigation").

80.    Chris Prodromides, Loralie Ogden, and William Featherston were

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

members of Sensible Citizens, among others.  [RT 435:5–13 (Neumann).]

81.     Neither Mark Neumann, Rich Rizika, nor any of the Hacienda Parties were members of Sensible Citizens of Manhattan Beach. [RT 434:23–438:13 (Neumann).]

82.     Mr. Neumann did not fund (directly or indirectly) or otherwise support Sensible Citizens in the CEQA Litigation.  [RT 434:23–438:13 (Neumann).]

83.     None of the Hacienda Parties paid attorney Cory Briggs for his representation of Sensible Citizens of Manhattan Beach in the CEQA Litigation. [*Id.*]

84.     In his discussions with Philip Friedl during the pendency of the CEQA Litigation, Mark Neumann specifically told Mr. Friedl that Cory Briggs did not represent Mr. Neumann in connection with the CEQA Litigation.  [RT 165:21– 166:18 (Friedl); TE 103–0003.]

85.     Philip Friedl admitted that, because the Hacienda Parties were stakeholders who were interested in any changes to the site plan, it made sense to involve them in discussions of potential settlement of the CEQA Litigation.  [RT 163:6–165:5 (Friedl).]

86.     On November 2, 2016, the court in the CEQA Litigation issued an order denying Sensible Citizens' petition for writ of mandate.  [TE 2047.]

**E.     WHILE THE CEQA LITIGATION IS PENDING, RREEF ADVANCES THE PROJECT FORWARD AS SOON AS MACY'S IS ON BOARD.**

87.     RREEF contends that the CEQA Litigation constituted a "cloud on title" that effectively prevented it from pushing the project forward until resolved. As Joshua Lenhert put it:

> The CEQA challenge means we're not approved.  And so
> from my own internal perspective, my investment
> committee will not hear from me until we have not -- will
> not let me spend dollars until we have cleared these

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
300 S. GRAND AVENUE, 37TH FLOOR
ONE CALIFORNIA PLAZA
LOS ANGELES, CALIFORNIA 90071-3147

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1            challenges. And from the perspective of going out to bid

2            and actually constructing something -- we can't construct

3            something that we would potentially have to tear down.

4            Again, I'm a fiduciary, and as an investment manager, I

5            don't think anybody would want their investment

6            manager doing that with their dollars.

7 [Tr. 70:9–71:2 (Lenhert).]

8         88.     RREEF originally estimated that, once it obtained the City's approval

9 of the site plan, it would take a year to develop the approved site plan into

10 preconstruction drawings sufficient to go out to bid for a construction contractor.

11 [RT 48:22–49:5, 51:4–14, 73:20–74–2 (Lenhert).]

12         89.     Project drawings typically advance along the following design

13 progression: (1) a basic site plan or conceptual design, (2) schematic design, (3)

14 design development, and then (4) construction level drawings sufficient to give to a

15 construction contractor and to seek City permit approval. [RT 110:11–111:23

16 (Friedl).]

17         90.     Depending on the size of a project, the process of turning a site plan

18 into full construction level drawings can take months. [RT 197:9–12.]

19         91.     RREEF could not begin the process of developing the project site plan

20 into more advanced level construction drawings until it had a finalized site plan,

21 which required Macy's approval. [RT 199:1–12 (Friedl).]

22         92.     On May 1, 2015, RREEF engaged Jones Lang LaSalle ("JLL") as

23 Development Manager and tasked it with, among other things, finalizing the site

24 plan. [TE 505 (JLL Development Management Agreement); TE 788 (April 18,

25 2016 Investment Committee Memorandum) at 0012 ("Last year, DeAM appointed

26 JLL's Project and Development Services (PDS) to drive this process [of finalizing

27 the site plan]".]

28         93.     In 2015 and early 2016, JLL and RREEF negotiated proposed changes

- 26-

to the site plan with Macy's and the Hacienda Parties. [RT 162:11–165:5 (Friedl); TE 509-0001 (internal RREEF/JLL email stating "I believe this plan (with some tweaking still to go on the village shops buildings) can get all that is needed: an improved village shops area and mall connection, city approval, Macy's approval, and neutral to Hacienda (note if more parking were added to North parking area in a final version it could become a 'concession' to Hacienda and useful in the CEQA settlement agreements)."; TEs 520, 103, 1276.]

94.    In April of 2016—while the CEQA Litigation was pending—RREEF and Macy's were close to finalizing an agreement regarding the expansion and consolidation of Macy's, including an agreed upon site plan. [TE 788 (April 18, 2016 Investment Committee Memorandum) at 0057 (summarizing the Macy's Separate Agreement Structure).]

95.    On April 15, 2016, RREEF finalized the site plan that Macy's ultimately agreed to in the Macy's Separate Agreement. [TE 1313 (Macy's Separate Agreement) at 0035–0038.]

96.    On April 18, 2016—three days after RREEF finalized the site plan that became part of the Macy's Separate Agreement and while the CEQA Litigation was still pending—RREEF's Investment Committee committed $5.5 million to develop the site plan into construction drawings. [TE 788 (April 18, 2016 Investment Committee Memorandum) at 0012; TE 632 (January 17, 2016 Investment Committee Memorandum) at 0012 ("On April 18, 2016, $20.4M was approved for a limited scope that included … the cost to complete construction designs for entire Phase I and II ($5.5M).")]

97.    By April of 2016, RREEF had engaged W.E. O'Neil to perform pre-construction services on the project. [TE 788-0016.]

98.    The $5.5 million of capital RREEF's Investment Committee approved in April of 2016 allowed RREEF to complete construction drawings and to go out to bid on gross maximum price (GMP) pricing for the majority of the project in

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

2016. [TE 632-0017; RT 203:20–204:24 (Friedl).]

99.    RREEF intended to seek the balance of the funding for construction "after construction drawings are complete and tenant demand has been further validated," and that "[t]here will be more clarity [on the CEQA Litigation] before needing to expend significant cost on the elements of the Project affected by CEQA."  [TE 788-0012.]

100.    On July 8, 2016—while the CEQA Litigation was pending—RREEF and Macy's executed the Macy's Separate Agreement for the expansion and consolidation of the Macy's store.  [TE 1313.]

101.    There is no evidence that the Macy's Separate Agreement would have been signed earlier but for the pendency of the CEQA Litigation or any conduct by the Hacienda Parties.

102.    RREEF did not call any witness from Macy's at trial, despite the fact that Macy's is a co-defendant represented by the same counsel.

103.    Under the terms of the Macy's Separate Agreement, the project was re-phased, with construction of the Northeast Deck and the Macy's expansion and consolidation moved from Phase II to Phase I.  [TE 1313 at 0044–0059 (construction schedule); RT 175:9–17 (Friedl).]

104.    On July 26, 2016—while the CEQA Litigation was pending—Peter Cotugno, project executive of RREEF's pre-construction contractor W.E. O'Neil, circulated a construction schedule that included the following:  (1) Wet Utility relocation (which must be done before construction could begin) scheduled for August 29, 2016 to October 26, 2016, and (2) construction of the Northeast Deck beginning November 10, 2016.  [TE 515-0001; RT 207:17–209:23 (Friedl).]

105.    On September 8, 2016—while the CEQA Litigation was pending— Mr. Cotugno circulated an updated project construction schedule that noted, among other things, wet utility relocation had been pushed to January 2, 2017 to accommodate Macy's, and that therefore construction of the Northeast Deck would

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

be pushed to March 13, 2017.  [TE 515-0001.]

106.   In December of 2016, the Planning Director "endorsed" RREEF's updated and revised site plan.  [RT 142:14–21 (Friedl).]

107.   On January 17, 2017, RREEF's investment committee approved $174.4 million for, among other things, the construction of the parking decks and the Macy's expansion.  [TE 632-0012; TE 2174-0013 ("On January 2017, a $174.4M budget was approved that included … construction of three parking decks with integrated mall access, the construction of a 60k SF expansion to Macy's Women's to relocate Macy's Men's store, the re-tenanting of 60k SF Macy's Men's, a façade renovation of the entire mall, the decommissioning/demo of functionally obsolete GLA of 57k and the addition of 71.5k SF of premium outdoor Village Shops and restaurants."]

108.   RREEF's Investment Committee approved the $174.4 million to push the project forward even though it believed Sensible Citizens of Manhattan Beach would file an appeal of the CEQA Litigation by February 23, 2017.  [TE 632-0017 ("While an appeal is likely, DeAM's land use counsel has characterized the suit as having little merit ….").]

## F.   THE DIRECTOR WRIT LITIGATION

109.   On February 2, 2017, 3500 Sepulveda filed a verified petition for writ of mandate (the "Director Writ Litigation"), alleging that after the City Council's approval of the RREEF project on December 2, 2014, on December 20, 2016 the Community Development Department Director of the City of Manhattan Beach provided an "information overview of the Site Plan modifications to the City Council" and requested the City Council "Endorse Manhattan Village Shopping Center Enhancement Project Site Plan."  [TE 2042-0006.]

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

110.   The informal endorsement allegedly violated the Brown Act.  [*Id.*]  In particular, the endorsement materially conflicted with the Conditions of Approval, many of which benefited the Hacienda Building.  [TE 2042-0007.]

111.   The particular issues raised were the endorsement's elimination of "Northbound left turn pockets" [TE 2042:008, ¶36], the elimination of a stairway and elevator on the west side of the parking deck of the North Parking Structure as required by condition 'q' of Section 18.50 of the Master Use Permit Amendment and necessary to provide customer access to the Hacienda Building."  [TE 2042 at 0008–0009, ¶37.]

112.   The endorsement also changed the 90-foot level 2 setback of the North Deck to the Hacienda Building, reducing it to a 44 foot setback.  [*Id.* at ¶38.]  The Endorsement eliminated the City Council's condition "s" of Section 18.50 which required an additional thirty parking spaces shall be provided on the west side of the lower level with pedestrian access to the 3500 Sepulveda Building.  [*Id.* at ¶39.]  The endorsement also eliminated the 10,000 square foot reduction in the Village Shops.  [*Id.* at ¶40.]

113.   After the Director Writ Litigation was filed, the City Council conducted a public hearing, properly addressed the modification [TE 2060], and the Director Writ Litigation was dismissed by 3500 Sepulveda. [TE 2061.]

114.   When asked how the Director Writ Litigation impacted the project, Phil Friedl testified that "It just created more uncertainty.  In terms of our ability to move forward, the -- it was just another -- it was just another roadblock."  [RT 143:14–17 (Friedl).]

115.   When asked by the Court specifically what the Director Writ Litigation did "relevant to the work you were doing or hoping to do," Mr. Friedl admitted he wasn't sure:

> Yeah.  And I'm sorry for my hesitancy. I'm just trying to put my -- think of the time frame. **I don't have a good**

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1    **recollection of exactly that -- that -- you know, how**

2    **that writ lawsuit interplayed with what we were doing**

3    **at the time**.  We did not -- we did not – around that time,

4    we decided to move forward with some of the – some of

5    the work that was not directly related to the entitlement.

6    **But I don't recall the impact.**

7    [RT 143:18–144:1 (emphasis added).]

8         116.   After further questioning by his counsel, Mr. Friedl testified that

9    RREEF could not submit full construction drawings to the City until the updated

10   site plan was approved by the City in September of 2017.  [RT 146:18–148:9.]

11        117.   However, RREEF submitted its plans for Northeast Deck to the City

12   for plan check and permitting on December 27, 2016, two months *before* the

13   Director Writ Litigation was filed.  [TE 527-0001; RT 219:4–7 (Friedl).]

14        118.   There is no evidence that the pendency of the Director Writ Litigation

15   delayed the construction of the Project or in any way impacted or interfered with

16   the City's processing of RREEF's building permit application for the Northeast

17   Deck.

18        119.   To the contrary, on May 17, 2017—while the Director Writ Litigation

19   was pending—the City provided the first round of comments on the Northeast Deck

20   permit application.  [TE 527-0001; RT 219:13–220:11 (Friedl).]

21        120.   On July 17, 2017—while the Director Writ Litigation was pending—

22   the City provided a second round of comments of the Northeast Deck permit

23   application.  [TE 527-0001; RT 219:18–220:11 (Friedl).]

24        121.   The City's second round of comments on the Northeast Deck permit

25   application caused confusion because RREEF believed that the City had given all

26   of its comments on May 17, 2017.  [TE 527-0001; RT 219:18–220:11 (Friedl).]

27        122.   On August 2, 2017—while the Director Writ Litigation was pending—

28   RREEF made its first submission for the Northeast Deck partial grading and

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

- 31-

utilities permits, and paid for expedited review (3 week review time). [TE 527-001.]

123. On August 15, 2017—while the Director Writ Litigation was pending—the City provided the first round of comments on the Northeast Deck partial grading and utilities permit applications. [*Id.*]

124. On August 23, 2017—while the Director Writ Litigation was pending—RREEF made its first resubmission of the full Northeast Deck building permit application (with expedited review paid for), along with its first resubmission of the Northeast Deck partial grading and utilities permit applications. [TE 527-0001.]

125. As of September 20, 2017, RREEF had not yet heard from the City in response to its resubmissions of the full Northeast Deck permit application or the Northeast Deck partial grading and utilities permit applications. [TE 527-0001.]

126. The City's delay in permitting the Northeast Deck was a major source of frustration for RREEF. [RT 221:22–222:4 (Friedl).]

127. On September 29, 2017, Mr. Friedl emailed the Mayor of Manhattan Beach, David Lessor, and City Council member Montgomery, expressing his frustration with City-caused delays:

> I'm sorry for the need to continually bring these concerns
> to you but you should be aware that we were advised this
> week by Macy's that due to our current pad delivery
> schedule they've missed the window for a 2018 holiday
> opening of their expanded store. I'm meeting with Macy's
> real estate executives on Monday in the hopes of
> convincing them to stay the course for a 2018 opening,
> but at this time, we still don't have certainty on when we
> will be able to start construction on the Northeast Parking

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

- 32-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1    Structure and we are not able to convey with certainty a

2    pad delivery date to Macy's.

3

4    We acknowledge that there have been improvements and

5    appreciate that the City has recently undertaken initiatives

6    to assist in expediting the process, but we continue to be

7    challenged with and severely impacted by issues of staff

8    miscommunication, coordination and availability. Again

9    this week, due to last minute changing requirements in the

10    process and a key Wildan plan checker being unavailable,

11    we've had to stand down our grading operation that was

12    all set to start on Monday 10/2. This after months of

13    communications, high level meetings with the Mayor and

14    staff and many discussion about the critical nature of

15    meeting a Macy's schedule. Please help us solve these

16    kinds of unnecessary but very costly delays before we see

17    other critical dates slip!

18    [TE 518 at 0001–0002; RT 221:22–223:15 (Friedl).]

19        128.    The City's Planning Department caused RREEF costly delays.  [RT

20    223:13–15.]

21        129.    In a January 2019 memorandum to its Investment Committee, RREEF

22    stated that the project had incurred $67.6 million in additional future costs due to

23    the following:

24    Due to both external and internal impacts that will be

25    explained further in this memo, the project has incurred

26    $67.6 mm in additional future costs. **The increase in**

27    **costs are attributed to a new signature restaurant**

28    **build-out, owner driven scope changes, the City of**

- 33-

**Manhattan Beach's ("CMB") additional requirements**

**to the project, and additional contingencies**.

[TE 2174-0036 (emphasis added).]

130.    RREEF specifically attributed $29,820,285 in additional costs to
delays caused by the City:

> *City of Manhattan Beach Additional*
>
> *Requirements/Conditions of Approval - $29,820,285*
>
> The cost and schedule impacts directly related to The City
> of Manhattan Beach's additional requirements and their
> extreme interpretations of the Conditions of Approval
> ("COA'') have been detrimental to the execution of the
> project. The 2014 entitlements for MVSC include 56
> COA's that at best can be described as guidelines for the
> redevelopment. CMB has chosen to take the most
> stringent and least commercial interpretation of these
> COA's, resulting in additional costs to the project as well
> as a schedule delay, mostly due to delay in issuance of
> building permits. . . . Speaking of which, another major
> impact to the project has been the CMB's inability to
> process building permits in an organized and timely
> manner. Typically a construction documents will go
> through 2-3 rounds of plan check before a permit is
> issued. CMB routinely takes 3-5 rounds to complete plan
> check, and usually has conflicting comments from
> different department heads. This disorganization and lack
> of internal management has pushed back overall schedule
> by 8 months and has had a $671k architectural and
> engineering delay cost impact on the project so far, with

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1    another $387k allocated for general contractor general

2    conditions delay cost impact.

3    [TE 2174-0039.]

4    131.    In that same memorandum, RREEF noted that "the team is in

5    negotiations with the development manager, JLL Project Development Service, to

6    recoup development fees for budgeting and design errors experienced to date."  [TE

7    2174-0040.]

8    132.    RREEF's January 2019 Investment Committee memorandum does not

9    mention the Hacienda Parties, 3500 Sepulveda, or Mark Neumann, or otherwise

10   attribute delay or increased project costs to them.  [*See* TE 2174 at 0034–0041.]

11

12   **G.    RREEF'S EXPERT TESTIMONY ON DAMAGES**

13   133.    RREEF put on its damages testimony through its expert David Bones.

14   Mr. Bones assumed that the Hacienda Parties breached the Settlement Agreement

15   and delayed RREEF's project and that this resulted in two types of damages: (1)

16   increased construction costs for the Project; and (2) lost profits due to delays in

17   leasing spaces in the mall.  [Tr. 301:16–302:5 (Bones).]

18   134.    The Hacienda Parties put on rebuttal testimony through expert witness

19   Christian Tregillis.  Mr. Tregillis lives near the Manhattan Village Shopping Center

20   and is very familiar with Center and the Project.  [RT 580:8–581:6 (Tregillis).]

21   135.    Mr. Bones assumed three separate periods of delay: (1) January 2015-

22   January 2016 (12 months) due to delays allegedly caused by the Hacienda parties in

23   the entitlement process; (2) January 2016–2017 (12 months) due to delays allegedly

24   caused by a third party CEQA lawsuit; and (3) January to September of 2017 due to

25   delays allegedly caused by a writ filed by the Hacienda Parties.  The total period of

26   alleged delay is 32 months.  [Tr. 306:17–308:2 (Bones).]

27

28

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

136.   Mr. Bones assumed that, absent the delay allegedly caused by the Hacienda Parties, construction on the Project would have begun in January of 2015, but it actually began in September of 2017. [Tr. 308:3–309:7 (Bones).]

137.   In response to the Court's question, Mr. Bones conceded that he did not make any attempt to determine what actual delays should count and what shouldn't count. [RT 327:5–12 (Bones).]

138.   Mr. Bones made no attempt to link any of the Hacienda Parties' actions to the alleged delay he attributed to them, or to separate them from other issues that delayed the Project (e.g., issues with Macy's). [RT 582:13–585:17, 623:8–625:19 (Tregillis).]

139.   Mr. Bones calculated both categories of damages (increased construction costs and lost profits) for each of these three periods. [RT 355:5–15 (Bones).]

**1.    Increased Constructions Costs Analysis**

140.   In calculating construction delay damages, Mr. Bones started with RREEF's actual project expenditures and calculated what they would have been at earlier periods in time if construction costs followed an inflationary index known as the Turner Index. [RT 363:20–364:1; 365:18–23 (Bones).]

141.   Mr. Bones assumed inflation for the Project would track the Turner Index. However, the Turner Index is a national – not local – index. Mr. Bones does not know who prepares the Turner Index, what cities are encompassed in the Turner Index or whether there are size restrictions for the projects that are analyzed to prepare the Turner Index. [RT 364:5–365:4 (Bones).]

142.   Mr. Bones never spoke to any architect, engineer, contractor or subcontractor who was involved with the Project and was not familiar with the bidding process for the Project. He did not ask any of the professionals that worked on the Project if they would have charged less if construction began at an earlier

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

time.  Mr. Bones explained: "I did not speak with those folks on the ground, no." [RT 356:4–357:20 (Bones).]

143.   Mr. Bones acknowledged that the contracts for the Project were guaranteed maximum price contract ("GMP Contracts"), including a contract between RREEF and W.E. O'Neill Construction Company.  Despite several questions from the court, Mr. Bones could not explain whether this GMP contract increased in price due to the passage of time.  [RT 357:21–361:12 (Bones).]

144.   Mr. Bones did no analysis of whether GMP contracts would actually have been less expensive had they been signed earlier.  Once a GMP contract is signed, it should not be impacted by inflation.  [RT 609:2–610:10 (Tregillis).]

145.   There were scope changes and possibly delays after September of 2017 which were not caused by the Hacienda Parties.  [RT 361:17–362:16 (Bones).]

146.   Mr. Tregillis's testimony established that the methodology employed by Mr. Bones was speculative and unreliable.  Mr. Tregillis did not perform an independent calculation relating to alleged increased construction costs.

## 2.    Lost Profits Analysis

147.   In determining RREEF's lost profits from the delays allegedly caused by the Hacienda Parties, Mr. Bones took RREEF's actual net operating income ("NOI") for the shopping center for each year and moved it backwards in time to account for the delay.  For example, for the 12 months attributable to the CEQA litigation, he took the 2020 NOI and moved it back to 2019.  He used projections from an appraisal prepared by a company called Duff & Phelps to do this for future years.  To determine total lost profits, he calculated the difference between the actual financial results and the results when he moved the yearly NOIs back in time.  [RT 331:10–336:4 (Bones).]

148.   Although Mr. Bones relied on the appraisal from Duff & Phelps for financial projections, the appraisal itself was not introduced into evidence and Mr.

- 37-

Bones never spoke to anyone at Duff & Phelps about the appraisal. [RT 375:6–10 (Bones).]

149.  Mr. Bones believed that construction on the Project should have been completed in 2019 but actually was completed in late 2021 or early 2022. Mr. Bones confirmed that average lease rates increased from $2.50 per square foot in 2019 to $2.90 in the fourth quarter of 2021. Leases entered into in 2021 could be more valuable than leases entered into in 2019. [RT 368:1–25 (Bones).]

150.  Mr. Bones did not do a lease by lease analysis of the Manhattan Village Shopping Center in determining lost profits. Mr. Bones is not aware of any space within the shopping center that would be leased if the project were completed in 2019 but is not leased now.  [RT 369:7–16 (Bones).]

151.  The net operating income for the Manhattan Village Shopping Center decreased by about $3.5 million in 2020 as a result of COVID. [RT 371:19–372:9 (Bones).]

152.  If the project had been completed in 2019 and new leases had been signed then, Mr. Bones has no way of knowing how many of those new leases would have defaulted due to COVID.  [RT 372:23–373:6 (Bones).]

153.  Mr. Tregillis opined that it was factually incorrect to assume that RREEF's financial results would have shifted back in time absent the delays allegedly caused by the Hacienda Parties. For example, you cannot take a lease signed in 2020, move it back 32 months and assume the lease rate would have been the same. Attributing one year's NOI to an earlier year is inconsistent with real world facts. [RT 587:10–595:17 (Tregillis).]

154.  RREEF's NOI for the Shopping Center decreased every year from 2016–2020. Advancing those declines to earlier periods in time would have been worse for RREEF, not better. Doing so results in negative damages. [RT 591:7–598:8 (Tregillis).]

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

- 38-

155.   The only positive damages from Mr. Bones' time-shift lost profits analysis came from the future unsupported projections from the Duff & Phelps appraisal.  For the years with actual data, the damages were negative.  [RT 600:17–601:23 (Tregillis).]

156.   Retail has been trending in a negative direction so overly positive projections from Duff & Phelps are highly questionable.  Inadequate parking and competition from online shopping will also be problems with RREEF meeting projections.  [RT 603:19–605:18 (Tregillis).]

157.   Lease rates rose from 2016 to the fourth quarter of 2021 so signing leases in 2021 was better for RREEF than signing eases in 2019.  [RT 592:9–593:16 (Tregillis).]

158.   To determine whether RREEF actually lost profits as the result of delays allegedly caused by the Hacienda Parties, you would need to do a lease by lease analysis.  This would include looking at existing leases to determine whether they would be higher had they been signed earlier and vacant spaces to determine if they would be under lease if the Project had finished earlier.  Mr. Tregillis was unaware of any evidence that there was a single lease that would be more favorable if not for the Hacienda Parties' conduct or a single vacant space that would leased if not for the Hacienda Parties' conduct.  There is no evidence that the Hacienda Parties damaged the current or future performance of the Shopping Center.  [RT 598:11–599:18 (Tregillis).]

159.   RREEF was likely better off signing up tenants in 2021 than 2019 because COVID might have left many of those tenants unable to pay rent.  If RREEF signed a significant number of new leases in 2019, there is no way to know how many of the new tenants would have defaulted due to COVID.  [RT 599:24–600:9, 605:19–607:13 (Tregillis).]

- 39-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

**III.**
**CONCLUSIONS OF LAW**

160.    To establish a breach of contract, RREEF must show (1) the existence of the contract, (2) RREEF's performance or excuse for nonperformance, (3) the Hacienda Parties' breach, and (4) the resulting damages to RREEF.

## A.    CONTRACT INTERPRETATION—MATERIAL ALTERATIONS

161.    The Settlement Agreement permitted the Hacienda Parties to object and to comment on material deviations to the Site Plan for the MVSC Project that detrimentally affect the use or operations of the Hacienda Building.  [TE 3033-005.]  As this Court held, the Settlement Agreement "provides that RREEF could make material changes to the Site Plan and Parking Plan, with the only proviso that if RREEF did make such changes, then Plaintiffs were entitled to notice and to object before the City.  (Agreement Section 5c.)  The rights to notice and to object preserve Plaintiffs' ability to assert their property rights under the law and pursuant to any other legal agreement (such as the COREA)." [March 1, 2022 Order on Interpretation of the Settlement Agreement (ECF No. 193) at p. 9.]

162.    The Settlement Agreement does not define the term "material" or the phrase "material alterations to the Site Plan . . . which detrimentally affect the use or operations of the Hacienda Building."

163.    In interpreting the parties' intent with respect to these terms, the Court may consider extrinsic evidence "if it is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Hayter Trucking, Inc.*, 18 Cal. App. 4th at 15, 22 Cal. Rptr. 2d at 238 (1993).  "Thus, parol evidence may be admitted to explain the meaning of a writing when the meaning urged is one to which the written contract term is reasonably susceptible or when the contract is ambiguous." *Id.*

164.    "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

intention' of the parties" at the time of contracting.  *ASP Properties Group, L.P. v. Fard, Inc.*, 133 Cal. App. 4th 1257, 1269 (2005) (quoting Cal. Civ. Code § 1636).  "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' ... controls judicial interpretation." *Id.* (quoting Cal. Civ. Code § 1638).  "Interpretation of a contract must be fair and reasonable, not leading to absurd conclusions.  The court must avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable." *Id.* (internal citations and quotations omitted).

165.    Among other parol evidence, the Court may also consider "the subsequent acts and conduct of the parties in the execution of the contract in order to determine the intent of those parties." *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 937 (9th Cir. 2002) (citing  Cal. Civ. Proc. Code § 1856(c)).  "The construction given the contract by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the court." *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 937 (9th Cir. 2002) (quoting Warner Constr. Corp. v. City of Los Angeles, 2 Cal.3d 285, 296–97 (1970)).

166.    Accordingly, the Court may consider Mr. Neumann's testimony that one of the primary reasons the Hacienda Parties entered into the Settlement Agreement was to protect their tenants' short-term and long-term parking in connection with the Project.  [Fact Nos. 12–18.]

167.    The Court may also consider the fact that, beginning as early as 2010, and continuing through 2015, RREEF acknowledged that revisions to the core parking area—in particular, the reduction of 240 parking spaces during construction—were material alterations to the Settlement Agreement site plan that entitled the Hacienda Parties to object.  [Fact Nos. 19–40.]

- 41-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1

2

3

4

5

6

7

8

9

10

11

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

168.    The Court may also consider that in July of 2016, RREEF entered into an agreement with Macy's regarding the development of the MVSC in which it was agreed that a "material" change to the site plan would include, among other things, any change that "adds or reduces the number of parking spaces within any parking areas or parking decks depicted on the Site Plan, or changes the layout or configuration of any such parking areas or parking decks, or (iv) changes or reconfigures any entrances to and exists, and any driveways, drive isles (sic) or ring road, in a manner that alters vehicular or pedestrian traffic flow." [TE 1313-0003.] *See Fisher v. Allis-Chalmers Corp. Product Liability Trust*, 95 Cal. App. 4th 1182, 1192 (2002) (looking to other cases to determine how insurer interpreted indemnity provision).

169.    Based on the foregoing, the phrase "material alteration to the Site Plan that detrimentally affected the Hacienda Building" means any revision to the Settlement Agreement Site plan that reduced the number of parking spaces in Lot F, reduced the number of parking spaces during construction from 240, increased the number of gross leasable area in the core area without a corresponding increase in parking, or changed the layout or configuration of the core parking area or the North Deck.

## B.    CLAIMS OF BREACH

### 1.    Breach--Entitlement Period

170.    Throughout the entitlement process, RREEF repeatedly revised the site plan in ways that reduced parking in the core parking area, reduced parking during construction, and changed the layout and configuration of parking in the core area and the North Deck.  Accordingly, the Hacienda Parties were entitled to object.

171.    In particular, RREEF's proposed changes to the Site Plan in August and November of 2010 constituted material alterations to the Site Plan that

1   detrimentally affected the Hacienda Parties, thus permitting the Hacienda Parties to

2   object.

3       172.   The June 26, 2012 site plan RREEF submitted as part of the first

4   Planning Commission meeting shows the North Deck as G+2 and a total of 354

5   spaces in Lot F, thus constituting a material deviation from the Settlement

6   Agreement Site Plan to which the Hacienda Parties were entitled to object.

7       173.   RREEF's revised site plan presented at the May 22, 2013 Planning

8   Commission meeting showed the North Deck at G+2 along with additional retail

9   buildings in the Lot F area without a corresponding increase in parking, thus

10  constituting a material deviation from the Settlement Agreement Site Plan to which

11  the Hacienda Parties were entitled to object.  [TE 1249–0004.]

12      174.   RREEF admitted that the revised site plan submitted in connection

13  with the April 24, 2014 Planning Commission contained revisions to which the

14  Hacienda Parties were entitled to object.  [RT 775:4–9; TE 1302-002 (fourth bullet

15  point).]

16      175.   RREEF's November 21, 2014 site plan shows 496 spaces in Lot F,

17  which constitutes a material alteration to the Settlement Agreement Site Plan to

18  which the Hacienda Parties were entitled to object.

19      176.   The updated site plan endorsed by the Planning Commission Director

20  in December of 2016 [TE 1314 at p. 13], showed a reduction of 9 more spaces in

21  Lot F, reducing it to 487 spaces, thus constituting a material deviation from the

22  Settlement Agreement Site Plan to which the Hacienda Parties were entitled to

23  object.

24      177.   The final site plan, as constructed, shows 487 spaces in Lot F.  This is

25  161 spaces below the number in the Settlement Agreement Site Plan, thus

26  constituting a material deviation from the Settlement Agreement Site Plan that

27  detrimentally affected the Hacienda Parties and permitted objection under the

28  Settlement Agreement.

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

### 2.      Breach—CEQA Litigation

2      178.    RREEF failed to prove that the Hacienda Parties were in any way

3    responsible for the filing or prosecution of the CEQA Litigation.  To the extent they

4    are based on the CEQA Litigation, RREEF's claims for breach of contract and

5    breach of the implied covenant of good faith and fair dealing fail as a matter of law.

6

### 3.      Breach—Director Writ Litigation

7      179.    Under California Civil Code § 47, "[a] privileged publication or

8    broadcast is one made…(b) [i]n any (1) legislative proceeding, (2) judicial

9    proceeding, (3) in any other official proceeding authorized by law, or (4) in the

10   initiation or course of any other proceeding authorized by law and reviewable…."

11   Cal. Civ. Code § 47(b).  The privilege not only covers statements made in judicial

12   proceedings, but also the act of filing a lawsuit itself.  *Asia Investment Co. v.*

13   *Borowski*, 133 Cal. App. 3d 832 (1982) (barring arising from filing of CEQA

14   lawsuit).

15      180.    Although the Ninth Circuit previously ruled in this case that the

16   Litigation Privilege does not apply, it noted the absence of California Supreme

17   Court authority on the question of the litigation privilege's application to contract

18   claims and acknowledged its holding could be negated if California Supreme

19   Court's then-pending ruling in *Olson v. Doe* indicated a different interpretation.

20   *3500 Sepulveda, LLC v. Macy's West Stores, Inc.*, 980 F.3d 1317 (9th Cir. 2020).

21   That ruling subsequently came down in January of this year.  *See Olson v. Doe*, 12

22   Cal.5th 669 (2022).  And while the litigation privilege question was mooted,

23   California's highest court expressly indicated that the privilege not only applies to

24   contract claims, but that any provision said to have waived the privilege must be

25   carefully construed against the party claiming waiver.  *See id.* at 687 ("We note

26   only that the approach we have taken here—carefully construing a clause that

27   would effectively waive claims—is similar to the approach of courts that have

28

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
300 S. GRAND AVENUE, 37TH FLOOR
ONE CALIFORNIA PLAZA
LOS ANGELES, CALIFORNIA 90071-3147

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1   assessed the application of the privilege in the context of a contract said to have

2   waived it.")

3       181.   Nothing in the Settlement Agreement restricts the nature or forum in

4   which the Hacienda Parties could "oppose" or "object to" RREEF's material

5   alterations.  Nor do these provisions demonstrate an intent to waive the litigation

6   privilege.  *Olson*, 12 Cal. 5th at 682; *see Gaunt v. Prudential Ins. Co.* 255

7   Cal.App.2d 18, 23 (1967) ("It is fundamental that the burden of proving estoppel or

8   waiver rests upon the party in whose favor those doctrines are claimed to inure").

9   Considering the direction given by the California Supreme Court in *Olson*, the

10  Court finds that the filing of the Director Writ Litigation was privileged conduct

11  under Civil Code section 47.

12

13  **C.    CAUSATION AND DAMAGES**

14      182.   Even if the Hacienda Parties breached the Settlement Agreement,

15  RREEF failed to prove that construction was delayed, or that the Hacienda Parties

16  were a substantial factor in causing that delay.

17      183.   "It is axiomatic that in order to prove a cause of action for breach of

18  contract the plaintiff must prove a breach by the defendant and the amount of

19  damages caused by the breach."  *Golden Eagle Refinery Co. v. Associated Internat.*

20  *Ins. Co.*, 85 Cal. App. 4th 1300, 1314 (2001).

21      184.   "Damages must be shown with reasonable certainty and cannot be

22  based on mere speculation and conjecture."  *Tzu Chien Chen v. Thomas & Betts*

23  *Corp.*, No. C-02-3540 SC, 2005 U.S. Dist. LEXIS 16010, at *15 (N.D. Cal. July 13,

24  2005).  "Uncertainty as to the *fact of damage*, that is, as to the nature, existence or

25  cause of the damage, is fatal."  *Pet Food Express, Ltd. v. Royal Canin USA, Inc.*,

26  No. C-09-1483 EMC, 2011 U.S. Dist. LEXIS 141281, at *15 (N.D. Cal. Dec. 8,

27  2011) (emphasis added)).

28

185.   If the plaintiff has established the *fact* of damage, the next inquiry is whether plaintiff's breach was the cause of such damages. Under California law, the test for causation in a breach of contract action is "whether the breach was a substantial factor in causing the damages." *US Ecology, Inc. v. State of California*, 129 Cal. App. 4th 887, 909 (2005).

186.   "Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain." *Id.* (quoting *Vu v. California Commerce Club, Inc.*, 58 Cal. App. 4th 229, 233 (1997)).  Except in "concurrent independent cause" cases, the substantial factor test incorporates "but for" causation, meaning that "[c]onduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." *Michaels v. Greenberg Traurig, LLP*, 62 Cal. App. 5th 512, 531 (2021) (quoting California Civil Jury Instruction (CACI) No. 430); *see Tribeca Companies, LLC v. First American Title Ins. Co.*, 239 Cal. App. 4th 1088, 1103 (2015) (noting that the same "substantial factor" test applies in tort and contract claims); *Viner v. Sweet*, 30 Cal.4th 1232, 1240 (distinguishing "concurrent independent cause" cases).

187.   "But for" causation is consistent with the testimony of RREEF's expert witness David Bones, who explained that if there were two concurrent causes for a delay—one a breach by the Hacienda Parties and the other an independent cause of the delay—he would not attribute any damages resulting from the delay to the Hacienda Parties because their breach was not a but-for cause of the delay.  Mr. Bones stated: "If it didn't change when the construction would start, then you wouldn't count that."  [RT 323:17–325:5 (Bones).]

### 1.    Alleged Period 1 Delays: The Entitlement Process

188.   RREEF contends that, in the absence of delays, it would have completed the entitlement process by December of 2013.  RREEF based this estimate solely its experience with another project in Marina del Rey, a

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

development of unknown scope, size, cost, nature, complications, or environmental status in an entirely different municipality. RREEF's contention that it would have obtained entitlements by December of 2013 is speculative, uncertain, lacks foundation, and was not supported by competent evidence. Accordingly, RREEF failed to prove the fact of damage—i.e., that the project was in fact delayed during the entitlement period—with reasonable certainty.

189.  Even if RREEF had established that the entitlement process should have been completed by some earlier date, RREEF failed to prove that the Hacienda Parties' conduct was a substantial factor in causing any delay. RREEF failed to establish that any comments made, or materials submitted by, the Hacienda Parties to the Planning Commission and/or City Council in fact caused the Planning Commission or City Council to set a hearing they otherwise would not have, or that the time between hearings was delayed because of anything the Hacienda Parties said or did.

190.  RREEF did not call a single witness from the Planning Commission or City Council to support its claim that conduct by the Hacienda Parties delayed the entitlement process. "Generally, counsel in a civil trial may comment on the failure of a party to call an available witness whose testimony the party would naturally be expected to produce if favorable to him." *Auto Owners Ins. Co. v. Bass*, 684 F2d 764, 769 (11th Cir. 1982); *see United States v. Noah*, 475 F.2d 688, 691 (9th Cir. 1973) ("The failure of a party to produce a material witness who could elucidate matters under investigation gives rise to a presumption that the testimony of that witness would be unfavorable to that party if the witness is peculiarly within the party's control.") While City employees may not have been particularly within RREEF's control, given that RREEF bears the burden of proof in establishing that the Hacienda Parties' conduct delayed the public meetings, RREEF's failure to call representative witnesses constitutes a failure of proof.

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

**2.      Alleged Period 2 Delays:  The CEQA Litigation**

191.   Even if RREEF had established that the Hacienda Parties were in any way responsible for the filing or prosecution of the CEQA Litigation, RREEF did not prove with reasonable certainty that construction was delayed because of the CEQA Litigation.

192.   By RREEF's own admission, RREEF could not obtain a building permit to begin construction until it gave the City written evidence of a binding commitment with Macy's for the consolidation and expansion of the Macy's store. Macy's did not execute the Macy's Separate Agreement until July 8, 2016.  There is no evidence that Macy's would have entered the Macy's Separate Agreement earlier but for the CEQA Litigation or conduct by the Hacienda Parties.  RREEF's and Macy's LOI, drafted in November of 2013, is non-binding by its own terms and contemplates substantial future negotiations over the potential terms of an agreement.  Moreover, even though Macy's is a co-defendant represented by the same counsel in this action, RREEF did not call any witness from Macy's at trial, which gives rise to a presumption that Macy's testimony on this issue would have been unfavorable to RREEF. *Noah*, 475 F.2d at 691.  Accordingly, RREEF failed to establish with reasonable certainty that the project was delayed prior to July 8, 2016, or that the Hacienda Parties were a substantial factor in any such delay.

193.   RREEF also failed to establish that the CEQA Litigation delayed the project between July 8, 2016 and December 2016, when the CEQA Litigation terminated.

194.   RREEF contends that the CEQA Litigation delayed the project because it was a "cloud on title" that effectively stifled RREEF from pushing the project forward while the case was pending.  But the evidence shows the opposite. By RREEF's own admission, it could not begin the year-long "preconstruction" process of developing the site plan into construction drawings sufficient to go out to bid to contractors until it had an agreed upon site plan with Macy's.  The site plan

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

Macy's agreed to in the Macy's Separate Agreement is dated April 15, 2016.  On April 18, 2016, three days after the Macy's site plan was finalized, RREEF's Investment Committee approved $5.5 million to pay for the development of construction drawings—i.e., the very thing that RREEF contends would not do while the CEQA Litigation remained a "cloud on title."  And with that funding, RREEF spent the rest of 2016 developing construction level plans sufficient to go out to bid and sufficient to file for a building permit by December of 2016.  Nearly all of this work was done in while the CEQA Litigation was pending.  Accordingly, RREEF has failed to prove with reasonable certainty that the CEQA Litigation delayed construction, or that any conduct by the Hacienda Parties was a substantial factor in any such delay.

### 3.   Alleged Period 3 Delays—The Director Writ Litigation

195.   RREEF failed to prove that the Director Writ Litigation bore any relation to the commencement of construction, let alone delayed it.

196.   Mr. Friedl testified that RREEF could not submit full construction drawings to the City until the updated site plan was approved by the City in September of 2017 (thus mooting the Director Writ Litigation).  However, RREEF submitted its plans for Northeast Deck to the City for plan check and permitting on December 27, 2016, two months *before* the Director Writ Litigation was filed.  And the uncontroverted evidence shows that the City Planning Department was actively engaged and providing comments on RREEF's building permit application throughout 2017, all while the Director Writ Litigation was pending.  Indeed, the contemporaneous evidence shows that, far from blaming the Director Writ Litigation, RREEF believed the City's Planning Department was causing costly delays.  There is no evidence that the pendency of the Director Writ Litigation delayed the construction of the project or in any way impacted or interfered with the City's processing of RREEF's building permit application for the Northeast Deck.

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

**D.    GENERAL CONCLUSION**

197.   Based on the foregoing, the Court finds that RREEF has failed to meet its burden of proof on its counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief, and failed to establish any liability on the part of the Hacienda Parties.

**IV.**
**ADDITIONAL FINDINGS OF FACT REGARDING TIMELINE OF**
**PLANNING COMMISSION AND CITY COUNCIL HEARINGS**

**A.    PLANNING COMMISSION MEETINGS**

**1.    Planning Commission Meeting No. 1: June 27, 2012**

198.   The purpose of the June 27, 2012 Planning Commission meeting was "to introduce the project to the Commission and the community, and provide an opportunity for questions and comments." [TE 3014 (6/27/12 Staff Report) at 0003.] Staff recommended "that the Planning Commission accept the presentation, take public comments, and provide comments on the proposed project." [*Id.*]

199.   The Hacienda Parties did not speak or present at the June 27, 2012 Planning Commission meeting.  [*See generally* TE 3001 (6/27/12 PC Meeting Transcript).]

200.   At the outset of the hearing, Planning Commission Director Richard Thompson stated: "I want you to keep in mind, tonight is the first of many meetings and public hearings devoted to this project. No decision will be made tonight. … I think there is some concern that we might be moving too fast on this project, but I want to assure you all the purpose of tonight's meeting is just an introduction of the project, and we want as many people involved in that discussion."  [TE 3001 at 5:1–12.][2]

---

[2] Page citations to Planning Commission hearing transcripts correspond to the Joint Exhibit page numbering on the upper right of the document.

- 50-

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

201.   Laurie Jester, City Planning Manager, then introduced the project and gave high level summary, including discussion of the process to be followed.   [*Id.* at 5:20–19:25.]  Mark English made a presentation on the project on behalf of RREEF and fielded questions from the Planning Commissioners regarding, among other things, project phasing and the Macy's consolidation.  [*Id.* at 20:3– 46:10.] Mark English described the anticipated phasing of the project, noting that the first phase—the "Village Shops"—"if approved, [is] what we'll undertake immediately."  [*Id.* at 33:2–5.]

202.   Mark English described the anticipated Macy's consolidation and expansion which at the time was proposed Phase II of the project:

> The second phase, what we call "Phase 2," we have here an additional 50,000 square feet, which is essentially tacked onto the existing Macy's store. One of the things that we hope is that Macy's will work with us to vacate the existing men's and home store and consolidate the entirety of their store in the -- in the existing main store. This has a number of advantages. It would allow us to update the retail concept on the south side where the men's store is right now, and know that from Macy's, it would make them more efficient. In connection with this, if they agree to do the expansion, they would -- they would build what we called a "northeast deck," which you can see right here. That would serve primarily the Macy's expansion and the Macy's main store.  One of the things I want to mention, too, you can see here there's three pedestrian bridges on the site plan. They all involve Macy's stores. This is something that Macy's has asked

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

- 51-

1    us to do and, we believe, really helps the functionality of

2    the – of the parking decks.

3    [TE 3001 at 35:8–36:5.]

4    203.   Mr. English explained that RREEF intended to begin

5    construction on the Phase I "Village Shops," and noted that Macy's

6    "controlled their destiny" whether to ultimately agree to expand and

7    consolidate per Phase II:

8            So our plan is to develop The Village Shops component

9            as Phase 1.  … And that will include, again, 60,000

10           square feet of new retail space clustered along the main

11           street and around CPK, with two parking decks, the south

12           deck and the north deck. As I mentioned before, our

13           intention is to is to embark upon this development plan,

14           which will take approximately two years upon approval of

15           the Environmental Impact Report and then an appropriate

16           planning period.  … The northeast corner, which is in the

17           -- the upper -- upper part here, is what we're calling Phase

18           2. The reality is Phase 2 and Phase 3 are somewhat

19           interchangeable. Macy's controls their destiny on whether

20           they choose to expand their main store, and so as soon as

21           they're ready to do that, we're willing to work with them

22           and go ahead and do that. We want it to happen as soon as

23           possible.

24   [TE 3001 at 41:6–42:2.]

25           204.   Seven members of the public spoke out with concerns about the

26   project including, among other things, the size and scope of the project, traffic, the

27   parking structure, and crime.  [TE 3015 at pp. 12–13.]

28

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

2.    **Planning Commission Meeting No. 2:  October 3, 2012.**

2

205.    The October 3, 2012 meeting was "an opportunity for the public and

3

Commission to again provide input; no final decisions on the project will occur at

4

tonight's meeting."  [TE 3015-0002 (10/3/12 Staff Report).]

5

206.    The Hacienda Parties did not speak or present at the October 3, 2012

6

Planning Commission meeting.  [*See generally* TE 3008 (10/3/12 PC Meeting

7

Transcript).]

8

207.    Although the Hacienda Parties sent a letter to the Commission dated

9

September 24, 2012 [TE 56], the Commission did not discuss the letter.  [*See*

10

*generally* TE 3008.]

11

208.    Laurie Jester began the meeting by going over the Staff Report and

12

fielding questions from the Planning Commission on how the public hearing

13

process would work.  [TE 3008 (10/3/12 PC Meeting Transcript), 6:20–20:9.]

14

Laurie Jester noted that the City had received extensive comments to the EIR that

15

was published since the first Planning Commission meeting:

16

The Draft Environmental Impact Report was released in

17

June of this year, and we had the public comment period

18

through July 23rd . Now, I - - I want to make it clear that

19

that, really, is a beginning of the process. We received

20

many, many comments, and all of those comments will be

21

responded to individually in the Final Environmental

22

Impact Report, and the consultant is currently in the

23

process of preparing that -- that document, which will

24

have all the response to the comments.

25

[TE 3008 at 8:5–15.]

26

209.    The October 3, 2012 Staff Report noted that 45-day public review and

27

comment period for the Draft EIR was June 7, 2012 to July 23, 2012.  [TE 3015

28

(10/3/12 Staff Report), at 0001.]  Comments on the Draft EIR were received from

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    about 45 residents, agencies, surrounding cities and business owners, other

2    members of the public, and the Planning Commission.  [*Id.* at 0003.]  The

3    comments related to, among other things, concerns over the size of the project,

4    traffic, the parking structures, lighting, crime, hazards (including soil

5    contamination), and visual impacts of the project.  [*Id.* at at 0003–0005.]

6        210.  Mark English then gave a presentation on behalf of RREEF.  [TE 3008

7    at 20:12–97:3.] Mr. English discussed why the Macy's consolidation and expansion

8    is so important to the project.  [*Id.* at 30:24–31:22.]  Mr. English discussed

9    questions regarding project phasing.  [*Id.* at 33:7–41:19.] In discussing Phase I of

10   the project (Village Shops), Mr. English stated: "if the project is approved and

11   we're able to proceed with development, our plan is to begin construction in

12   January of 2014."  [*Id.* at 35:11–13.]

13       211.  Mr. English then addressed objections regarding the parking decks,

14   traffic, and safety issues.  [*Id.* at 43:12–50:20.] Mr. English then "explained the

15   Village Shops south and north decks are ground level plus two (3 levels; the

16   northwest deck is ground level plus two (3 levels); and the northeast deck is ground

17   level plus three ( 4 levels). He pointed out the Hacienda building is 42 feet high and

18   the northwest parking deck would be 26 feet high."  [TE 3016 at 0029 (Minutes of

19   10/3/2012 meeting); *see* TE 3008 at 48:24–60:16.]

20       212.  As noted in the meeting minutes, "Commissioner Ortmann shared his

21   disappointment regarding the connection of Veterans Parkway to the site; he

22   explained it is an opportunity lost for the shopping center; it is rare to have the

23   ability to connect alternative transportation to a site in this manner.  [¶] **Mr.**

24   **English** assured the Planning Commission the applicants would reexamine the

25   Veterans Parkway/site connection."  [TE 3016 at 0031–0032 (Minutes of 10/3/2012

26   meeting).]

27       213.  Pat Gibson of Gibson Transportation then gave a presentation

28   regarding the traffic requirements of the Environmental Impact Report.  [TE 3016

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

at 0032; TE 3008 at 98:4–130:13.] During Mr. Gibson's presentation, the Planning Commissioners asked questions regarding traffic issues, mass transit, pedestrian access, and planning improvements along Cedar Way to Marine Avenue. [TE 3016 at 0032–0033.]

214.    Ten members of the public spoke during the public comment period—including Chris Prodromides—raising concerns about, among other things, the size and scope of the project, traffic issues on the northeast corner, the height of the parking decks, pedestrian access, bicycle access, and losing shoppers during construction. [TE 3016 at 0033–0037.]

215.    Commissioner Ortmann stated his confusion that RREEF was contending they did not want a cookie cutter mall, but that all the renderings they were showing were cookie cutter. [TE 3008 at 169:9–171:17.]

216.    After public hearing was closed, the Commissioners began discussion. Commissioner Gross stated "I think that was a good start, but it was -- it was -- it wasn't very satisfactory to me . So please keep working on that and - - and give us your vision." [*Id.* at 172:20–24.] Commissioner Ortmann noted that the northwest corner presents a unique opportunity, but that "I just don't see it yet, and it would be an absolute shame for that -- that gateway, for that experience, not to be - - not to be sacrosanct in your -- in your design." [*Id.* at 173:12–174:12.] Commissioner Conway shared the exact same concerns as Commissioner Ortmann, and felt that the proposed project was missing critical opportunities. [*Id.* at 174:22–177:18.]

217.    Commissioner Paralusz then expressed her concerns with the project, including the missed opportunity on the northwest corner, the aesthetics of the parking garage, pedestrian access, notice to the Senior Villas, and potential charging stations for electric vehicles. [*Id.* at 178:3–185:1.]

218.    Commissioner Gross expressed his concern that RREEF did not have the Oak Street residents' support, and that "otherwise, they're going to slow your projection down and should." [*Id.* at 185:4–20.]

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

219.  Chairperson Andreani complained that "I don't see much of a difference between tonight's presentation about what you're planning and what we -- what we heard on the 27th of - - of June. So, many of those same problems still exist." [*Id.* at 186:18–22.]

220.  Chairperson Andreani echoed a number of concerns, including the northwest corner, the need for another traffic study, soil hazards, pedestrian access, and the equivalency program. [*Id.* at 188:9–190:7.]

221.  Commissioner Ortmann raised a concern about the soil mitigation issue and requested that a presentation be made on that issue. [*Id.* at 190:8–23.]

222.  Richard Thompson, Community Development Director, noted that the reason the plans hadn't changed much from the first meeting was that RREEF wanted to hear what the Planning Commission had to say and finish responding to comments received so far. [*Id.* at 199:20–200:4.]

223.  In response to Commissioners' questions about when to schedule the next meeting, Director Thomson noted it's up to RREEF, and that once the final EIR report comes in and RREEF gathers additional information, another meeting can be planned. [*Id.* at 202:16–203:5.]

**3.    Planning Commission Meeting No. 3:  March 13, 2013**

224.  At the outset of the hearing, Planning Director Thompson noted that the Staff Report was "slim" that night because "at this time, the project has not changed formally." [TE 2134 (3/13/13 PC Meeting Transcript), 4:10–5:2.]  "We really didn't provide you with any new information in terms of site plans, and things like that. That will be presented to you tonight and, also, to the public." [*Id.*, 5:3–6.]

225.  Laurie Jester explained to the Commission that RREEF had been working with the community to address concerns raised, and therefore "this is still a work-in-progress" and is "not finalized." [*Id.* at 5:19–6:15.]  Laurie Jester noted that "tonight, RREEF would really just like the opportunity to give you an update, a

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
300 S. GRAND AVENUE, 37TH FLOOR
ONE CALIFORNIA PLAZA
LOS ANGELES, CALIFORNIA 90071-3147

status, let you know where they are with the project." [*Id.* at 6:9–11.]

226.    At the March 13, 2013 Planning Commission meeting, "RREEF presented a number of options for the south parking structure in Phase I-Village Shops to address the concerns raised by the public, Planning Commission and staff through the public process." [TE 3017 (4/24/13 Staff Report) at 0003.]   "A representative from Murex Environmental provided a presentation on the soils, methane and hazards on the site. RREEF, their architect and their parking consultant presented more details on the proposed pedestrian, bicycle, and transit plans, and other design options for the site." [*Id.*]

227.    "A number of residents spoke at the meeting and the public and Commission discussed a number of concerns as addressed in the attached minutes (Attachment B).  The concerns continued to focus on the Size-Regional Draw, Traffic, Mobility (Bicycles, Pedestrians, Transit), Parking structures, North West corner design, Lighting, Crime, Hazardous soils, and Construction impacts." [TE 3017 at 0003.]  "The public *and Commission* indicated that they felt the Center was overparked, using the peak December parking demand, and too much of a 'Car-centric' design. Veterans Parkway connection was continued to be emphasized as a key element and an opportunity to provide a dynamic connection and entry to the site." [*Id.* (emphasis added).]

228.    In response to a question by Commissioner Conway regarding whether the other property owners (Macy's and Hacienda) were on board with the project, Mr. English stated:

>    We're -- we've been negotiating with both parties for
>    four-plus years, I'd say five-plus years at this point, and I
>    do believe we're going to get there.
>
>    Part of the difficulty in negotiating with both those parties
>    is that, you know, where the "rubber hits the road" is the

- 57-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

site plan, and as you've seen tonight, those two parties have very loud voices in how the site plan looks, but we've got other people that we need to consider.

And, frankly, you know, Macy's and -- and the owners of the Hacienda building have probably reviewed an excess of 50 separate site plans, each of them, and we think we're narrowing in on just telling them, "This is it," but we're having a hard time nailing a final site plan down.

We've -- we've had agreements in the past, and then the site plans changed, and that's simply -it's -- it's sort of like we're starting out with a wide funnel five years ago, and we're starting to get towards the point where we can have an agreement with them.

But -- but, realistically, until we can get a site plan that, you know, we feel is going to pass muster for everybody, it's impossible to, you know, sign an agreement.

[TE 2134 at 81:18–82:18.]

229.    "In general the public and Commission seemed to feel the project was heading in the right direction with the new design of the South parking structure in Phase I- Village Shops; lower and more elongated north to south with buildings in front between the parking structure and Sepulveda Boulevard." [TE 3017 at 0003.]

230.    The idea that the northwest corner (i.e., the Fry's corner) may not be addressed through this process, and may need to be addressed at future hearings, was first discussed at the March 13, 2013 Planning Commission hearing. [TE 2134 at 6:22–7:8; 68:7–69:19; 78:5–80:19.]

- 58-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

231.    The City anticipated that the Final EIR would not be available until about a month because "[t]here have just been a lot more public comments than we anticipated." [*Id.* at 8:1–3.]

232.    During the hearing, "the Commission asked for a Phasing Plan, more information on parking numbers per Phase and a map of walking distances to the Mall." [TE 3017-0003; TE 2134 at 111:23–112:23.]

233.    Six members of the public spoke, including Mark Neumann. [TE 3017 at 0055–0056.]

234.    Of the 193 substantive pages of the March 13, 2013 transcript hearing transcript, Mr. Neumann's comments, and the Commission's subsequent discussion of them, account for ten (10) total pages. [TE 2134 (3/13/13 PC Meeting Transcript), 123:20–133:11.]

235.    Mark Neumann stated that "he signed the application but a settlement agreement was for a much less dense project including two, not three, level parking structures." Mr. Neumann "commended RREEF for doing a good job in getting their proposal together but still has concerns that traffic issues at the corner of Rosecrans may not be addressed if the corner parcel is not part of the current plan to be approved." "One of his concerns besides being too dense is the potential loss of surface parking spaces near his property. He recommended showing plans that are at a more detailed scale and concluded by urging the Commission to look at the project from the perspective of residents." [TE 3017-0055.]

236.    The other five members of the public—including Chris Prodromides—expressed concerns regarding, among other things, the parking decks, traffic, lighting, crime, soil contamination, and Fry's departure. [*Id.* at 0055–0056.]

237.    Towards the end of the hearing, Commissioner Conway emphasized the significant amount of work remaining to be done, urging that "it's worth taking a big deep breath and continuing to -- to work through, you know, what the community wants" because "we are looking at development patterns that will be

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

with us for the next 40, 50 , 60 years." [TE 2134 at 151:16– 152:5.]  In particular, Commissioner Conway raised concerns over the parking plan and current design of the garages [*Id.* at 151:11–157:22], going so far as to say that "the parking strategy is still very fundamentally flawed." [*Id.* at 155:8–9.]  Commissioner Ortmann echoed Commissioner Conway's concerns, noting that "the parking is a big issue, and it's not resolved yet." [*Id.* at 172:2–9.]

238.  Commission Ortmann also expressed significant concern about the northwest corner, noting that "to continue to feel like it is being treated as a design afterthought troubles me. It troubles me a lot." [*Id.* at 172:10–25.] Commissioner Ortmann stated: "I -- I think there are a number of issues on the -- on the table still that are unresolved, and it -- and it feels like things -- some of these – the changes that we saw tonight are kind of nibbling around the margins and -- and don't feel as, perhaps, as substantive as I would have liked to have seen." [*Id.* at 174:3–8.]

239.  Chairperson Andreani likewise raised concerns over parking, stating "I also believe that the parking issue is unresolved . . . ." [*Id.* at 175:22–25.]

240.  The Commissioners ended the hearing by setting another hearing for April 24, 2013 for further public input.  [TE 3017-0058.]

**4.    Planning Commission Meeting No. 4:  April 24, 2013**

241.  The Final EIR was distributed for public review on April 2, 2013.  [TE 3017 (4/24/13 Staff Report) at 0001 ("The Final EIR is complete and was distributed for public review on April 2, 2013.").]

242.  Chairperson Conway began the April 24, 2013 meeting by noting that "Tonight, we're having a public hearing, but we are not formally taking any action."  [TE 3002 (4/24/14 PC Meeting Transcript), 4:14–15.]

243.  The Staff Report for the April 24, 2013 meeting identified the following key issues for discussion: (1) parking spaces proposed and demand required, (2) light poles on top of parking structures, (3) phasing plans, including connections between phases and entire mall site, (4) appearance of buildings and

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
300 S. GRAND AVENUE, 37TH FLOOR
ONE CALIFORNIA PLAZA
LOS ANGELES, CALIFORNIA 90071-3147

parking structures, (5) pedestrian and bicycle connections to the Veterans Parkway Greenbelt under Sepulveda, (6) draft conditions of approval, including the number of security cameras, timing of the site-wide improvements, the parking structures and number of spaces, the Rosecrans and Sepulveda dedications, the timing of the Rosecrans left-turn restriction, the number of electric vehicle charging stations, and the Village Drive rear cut-thru diversion improvement Plan, and (7) the Phase III Northwest Corner.  [TE 3017 at 0003–0006.]

244.   Because of the late hour, the Planning Commission was only able to discuss the first item identified above—parking.  [TE 3018 (5/22/14 Staff Report) at 0004.]

245.   Planning Commission Staff summarized the April 24, 2013 meeting as follows:

> At the last meeting in April 2013, RREEF presented more
> details on Phases I and II of the project and the timing of
> development, the revised design of the south parking
> structure in Phase I-Village Shops and architectural
> details and examples to enhance the parking structures,
> parking deck lighting, Veterans parkway connection and
> "dog park", parking supply, ratios, comparisons to other
> centers and industrial standards and relationship to "core"
> commercial areas, walking distances to the Mall and
> comments from the other property owners on the site. The
> applicant also noted concerns about the draft conditions,
> specifically street dedications and improvements and the
> standards, timing and sign-off procedures for the
> conditions in general. A Macy's representative discussed
> Macy's need to grow as a highly productive and desirable
> store, and their parking needs. The City's EIR consultant,

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1    Matrix Environmental, provided an overview of the EIR

2    process and the Draft and Final EIR which has been out

3    of public review for a number of weeks. A representative

4    from Gibson Transportation, the City's traffic consultant

5    on the EIR, provided a presentation on traffic, parking,

6    and pedestrian, bike, and transit improvements. Peak

7    parking supply and demand and options to reduce the

8    parking were discussed, as well as traffic thresholds for

9    determining significant impacts.

10

11    A number of residents spoke at the meeting and the public

12    and Commission discussed a number of concerns as

13    addressed in the attached minutes (Attachment B). The

14    concerns continued to focus on the Traffic and Parking,

15    Mobility (Bicycles, Pedestrians, Transit), Parking

16    structures, Phase III -North West corner design and

17    timing, Phasing, and Lighting, as well as the adequacy of

18    the EIR. In general the public and Commission seemed to

19    feel the project was heading in the right direction with the

20    new design of the South parking structure in Phase I-

21    Village Shops; lower and more elongated north to south

22    with buildings in front between the parking structure and

23    Sepulveda Boulevard.

24    [TE 3018 at 0003–0004.]

25    246.    The Hacienda Parties did not speak or present at the April 24, 2013

26    Planning Commission meeting.  [*See generally* TE 3002.]

27    247.    Nine members of the public spoke at the hearing—including Chris

28    Prodromides—and raised concerns that, among other things, (1) the EIR is not valid

- 62-

1   and has not met its legal burden, (2) the EIR doesn't adequately address issues
2   raised by the Oak Avenue residents, (3) the proposed plan will cause the center to
3   lose its identity, (4) RREEF should not be able to piecemeal the project, (5) the
4   Northwest corner had been withdrawn, and (6) parking and traffic had not been
5   adequately addressed.  [TE 3018 at 0152–0153.]

6   248.   At the end of the hearing, the Planning Commission scheduled a
7   further hearing for public comment on May 22, 2014.  [TE 3002 at 207:1–20.]

8   **5.      Planning Commission Meeting No. 5:  May 22, 2013**

9   249.   The Staff Report for the May 22, 2013 meeting identified the
10   following key issues for discussion: (1) parking spaces proposed and demand
11   required, (2) light poles on top of parking structures, (3) phasing plans, including
12   connections between phases and entire mall site, (4) appearance of buildings and
13   parking structures, (5) pedestrian and bicycle connections to the Veterans Parkway
14   Greenbelt under Sepulveda, (6) draft conditions of approval, including the number
15   of security cameras, timing of the site-wide improvements, the parking structures
16   and number of spaces, the Rosecrans and Sepulveda dedications, the timing of the
17   Rosecrans left-turn restriction, the number of electric vehicle charging stations, and
18   the Village Drive rear cut-thru diversion improvement Plan, and (7) the Phase III
19   Northwest Corner.  [TE 3018 (5/22/13 Staff Report) at 0004–0007.]

20   250.   Planning Commission Staff summarized the May 22, 2013 meeting as
21   follows:

22          At the last public hearing in May 2013, the public hearing
23          was held at the beginning of the meeting to provide an
24          opportunity for more extensive public comments. The
25          City's EIR traffic consultant then provided a
26          comprehensive presentation on traffic and parking,
27          followed by the applicants presentation, which included
28          details from their lighting consultant on the parking

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

- 63-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

structure lighting. The public hearing was re-opened and more audience participation was provided, as well as a wrap-up by the applicant. The Planning Commission then discussed the proposed project. The comments from the public as well as the Commission are included in the attached minutes. (Attachment D) **Some Commissioner [*sic*] felt that there were still some items that need further development. Specifically, the Commission discussed questions about parking lot lighting, the parking garages, including the scale, design and need for the number of spaces, bike/pedestrian access, cut-through traffic/traffic intrusion into neighborhood, specifically the Tree Section, installation of mature trees, need for street dedications, Phase III timing, and architectural design and style**. **The Commission was also concerned with public outreach, specifically, expressing their desire to publish notices above and beyond what is legally required.** In general, the Commission was satisfied that the project plans have been developed in a way to mitigate potential negative impacts to the surrounding neighborhoods, as the applicant has worked with the neighbors and re-designed and refined the project, and it is at the point where the Commission needs to make a decision on the applications.

[TE 2086 (6/27/13 Staff Report), at 0003 (emphasis added).]

251.    Mark Neumann spoke at the meeting.  Planning Commission staff summarized his comments as follows:

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1    Mark Neumann, 3208 Laurel Avenue and representative

2    for the owners of the Hacienda Building. He is concerned

3    that the center's tenants have no idea what is planned. He

4    is concerned about parking during construction. He

5    reiterated that they have an agreement with RREEF for a

6    2-story parking structure at the north end of the Village

7    Shops, across Cedar Way from his building, but G+2 is

8    actually three stories. He believes that incorporation of

9    the Northwest corner parcel as soon as possible is really

10    important to residents.

11    [TE 2086-0106.]

12    252.   Thirteen other members of the public spoke at the meeting both for

13    and against the project, including Chris Prodromides.  Among the concerns raised

14    were traffic, parking and the parking decks, problems with the EIR, RREEF's

15    relationship to Deutsche Bank, construction staging, and uncertainty regarding the

16    northwest corner.  [TE 2086 at 0106–0107.]

17    253.   Of the 212 substantive pages of the May 22, 2013 hearing transcript,

18    Mr. Neumann's comments, and the Commission's discussion of them, account for

19    five (5) total pages.  [TE 3003 (5/22/13 PC Meeting Transcript), 19:9–22:3,

20    143:16–145:25.]

21    **6.   Planning Commission Meeting No. 6:  June 26, 2013**

22    254.   Planning Commission Staff summarized the June 26, 2013 meeting as

23    follows:

24    At the last public hearing on June 26, 2013, the public

25    hearing was held at the beginning of the meeting to

26    provide an opportunity for more extensive public

27    comments. Staff, the City's Economic Consultants and

28    the Applicant then made presentations, with the applicant

- 65-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1    focusing on ten conditions that they had the most concern

2    with. The public hearing was re-opened and more

3    audience participation was provided, as well as a wrap-up

4    by the applicant. The Planning Commission then

5    discussed the proposed project. The comments from the

6    public as well as the Commission are included in the draft

7    minutes. (Attachment C) The Commissioners provided a

8    number of comments on the draft conditions which staff

9    incorporated into the revised draft that is included as

10   Attachment A. The Commission directed staff and the

11   applicant to work together to try to come to a consensus

12   on the conditions where there were disagreements. The

13   Commission certified the Final EIR, adopted the

14   Mitigation Monitoring Program for the EIR and continued

15   the public hearing to tonight's meeting.

16   [TE 3019 (7/24/13 Staff Report) at 0003.]

17        255.   Twenty (20) members of the public spoke at the June 26, 2013

18   meeting—including Mark Neumann and Chris Prodromides—both for and against

19   the project.  [TE 3019 at 0059–0062 (Minutes of 6/26/13 meeting).]

20        256.   Planning Commission Staff summarized Mr. Neumann's comments as

21   follows:

22        Mark Neumann, 15-year City resident and Hacienda

23        Building (3500 Sepulveda Boulevard) owner expressed

24        concern about public noticing for this hearing. He

25        believes that the existing uses for his commercial building

26        on the project site will be more restricted compared to his

27        existing entitlement as there will be a new cap on bank

28        and medical offices. He wants to see the project built but

- 66-

has further concerns: he wants to see a detailed

construction parking plan; compatibility of a dog park

adjacent to his building where there are high quality

offices; concerned with a condition proposed by Staff that

would delay installing some parking spaces near his

building to Phase 2 instead of Phase 1 as he thinks those

spaces are needed for Phase 1. Mr. Neumann concluded

by noting that the settlement agreement between the

Hacienda Building and Mall owners, in which he agreed

to, calls for 2, not 3-story parking decks, is a private

document and questioned why it has been made a part of

the public staff report.

[TE 3019 at 0061 (Minutes of 6/26/13 meeting).]

257.   As part of his comments, Mr. Neumann requested that the Planning Commission approve the project that night: "I've got one last thing. I'd prefer we did it tonight and just got this thing done, because it's been seven years for these poor guys." [TE 2007 (6/26/13 PC Meeting Transcript), 207:14–17.]

258.   Of the 272 substantive pages of the June 26, 2013 hearing transcript, Mr. Neumann's comments, and the Commission's discussion of them, account for approximately 16 total pages. [TE 2007 (6/26/13 PC Meeting Transcript), 17:2–22:12, 77:14–78:21, 89:23–91:9, 203:24–210:18.]

259.   Other members of the public raised concerns about, among other things, (1) parking, including the ratio and flow, (2) the scale of the proposed new center, (3) public awareness of the project, and (4) traffic. [TE 3019 at 0059–0061.]

260.   Commissioner Paralusz specifically noted the importance of the public comments from Ms. Wallace and Ms. Proromides:

I want to thank -- No. 1, I want to thank the

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1    public, especially -- I mean, there's still quite a
2    few people here. We've had a lot of new faces. We've
3    had a lot of repeat folks who have come, residents, who
4    have been interested in this project from the beginning,
5    especially Ms. Wallace and Mr. Prodromides. I mean, you
6    have very vested interests, especially, you know, living in
7    the village and also living on Oak Street.

8    [TE 2007 at 237:16–25.]

9         261.   Toward the end of the meeting, the Planning Commission adopted PC
10    13-09, certifying the Final Environmental Impact Report.  [*Id.* at 230:21–231:20;
11    *see* TE 3020-001 (8/6/13 City Council Staff Report background summary).] The
12    Planning Commission then moved to continue the public hearing to July 24, 2013
13    to address the Master Use Permit and conditions thereof.  [TE 2007 at 275:14–20.]

14         **7.    Planning Commission Meeting No. 7:  July 24, 2013**

15         262.   Per the July 24, 2013 Staff Report, the purpose of the July 24, 2013
16    meeting was "to present the final project concept plans, the Master Land Use
17    Applications (Master Use Permit Amendment and Variance) and the draft
18    conditions of approval to the Commission and the community, and provide an
19    opportunity for questions, discussion and comments, and take final action."  [TE
20    3019 (7/24/13 Staff Report) at 0005.]  "Staff recommends that that Planning
21    Commission accept a brief introduction from staff, take public comments, accept
22    Staffs presentation, then the applicants presentation, discuss and take action on the
23    applications by adopting the attached draft Resolution, Attachment A."  [*Id.*]

24         263.   Regarding the draft Conditions of Approval, the Staff Report noted
25    that "Planning staff, the City Attorney, and other Departments have spent many
26    hours in the past several weeks meeting with the Developer and their team to refine
27    the draft conditions of approval to try to reach agreement on all of the conditions.
28    Staff and the applicant agree on most of the conditions, however a number could

- 68-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

not be resolved to both parties satisfaction. The applicant will present information at the meeting that highlights their key concerns on the draft conditions of approval in the Resolution." [TE 3019-0004.]

264.   After discussion by the Commissioners, Mark English gave a presentation covering "three provisions in the draft Resolution that the applicant does not agree to (that are detailed in a letter to the Commission), including; Signage (condition 11), EV (Electric Vehicle) Charging (condition 38), and land uses and square footages (condition 18)." [TE 3021-0110 (Minutes of 7/24/13 meeting).]

265.   Nine members of the public spoke at the meeting, including Richard Rizika and Mark Neumann. [*Id.* at at 0113–0114.]

266.   City Staff summarized Mr. Rizika's comments as follows:

> Richard Rizika, 844 18th Street, with Mark Neumann is a managing member of the Hacienda Building, 3500 Sepulveda Boulevard, representing eight additional families which have financial interest in that building. He stated that he believes that the approval of the Final EIR at the prior meeting has diminished the rights of the existing land owners, and has increased the entitlement of RREEF. He is against a dog park next to 3500 Sepulveda which has a restaurant and professional offices. He has no issue with increasing parking to accommodate an expansion of uses. He requests that the Planning Commission not approve the plan until the issues have been resolved, including the dog park and the rights diminishment issue.

[TE 3021-0114; *see* TE 3032 (7/24/13 PC Meeting Transcript), 78:9–82:6.]

267.   City Staff summarized Mr. Neumann's comments as follows:

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
300 S. GRAND AVENUE, 37TH FLOOR
ONE CALIFORNIA PLAZA
LOS ANGELES, CALIFORNIA 90071-3147

Mark Neumann, owner of the Hacienda Building, thanked the Commission and believes that the rights of the owners of 3500 Sepulveda Boulevard are being diminished while RREEF's are being expanded. He stated that their appeal of the Final EIR action was a decision not taken lightly but did not because he felt he had to protect the interests of the investors. Regarding parking, he feels that the only time it is bad is during the holiday season, and overall he is not against the center's expansion. He noted that their site has a mortgage banker and he wonders if this would be classified and regulated as a "bank" in the Master Use Permit.

[TE 3021-0114; *see* TE 3032 at 82:12–84:21, 85:24–88:15, 90:1–92:14, 94:16–97:2.]

268.    The other 7 members of the public raised concerns about, among other things, the size and scope of the project, the lack of surface parking, signage, EV charging stations, land use issues, a proposed dog park, and traffic and congestion. [TE 3021 at 0113–0114.]

269.    Of the 154 substantive pages of the July 24, 2013 transcript hearing transcript, comments by Messrs. Neumann and Rizika, and the Commission's and RREEF's subsequent discussion of them, account for approximately fifteen (15) total pages.  [TE 3032 at 78:9–82:6, 82:12–84:21, 85:24–88:15, 90:1–92:14, 94:16–97:2.]

270.    After public comment and further discussion, the Planning Commission went through a lengthy and thorough review the draft Resolution section by section.  [TE 3021 at 0115–0124.]  Before voting on the draft Resolution, Commissioner Paralusz noted that the project had come a long way and was "a much different project" than what was presented to the Commission at the

- 70-

first meeting in June:

> And I really -- I agree with Commissioner Gross that this
> project has come a very long way. If someone looked
> back at the tape from the very first meeting that we had on
> this last year, and the concept, and the different concerns
> that the Commissioners shared and the public shared
> versus where we are today, this is a much different
> project. It is a much improved project. And it is as a result
> of that partnership amongst all the different stakeholders
> involved.

[TE 3032 at 151:14–21.]

271.   At the conclusion of the meeting, the Planning Commission approved Resolution No. PC 13-10, approving the Master Use Permit and Heigh Variance and sending the matter to the City Council.  [TE 3032 at 153:24–154:22; *see* TE 3020-0001 (8/6/13 City Council Staff Report background summary).]

272.   Commissioner Ortmann voted against approving the resolution, noting "I still have way too many issues with the project that I think I've articulated a number of times that make it difficult for me to support it at this time."  [TE 3032 at 154:17–20.]

273.   RREEF, Hacienda and the City Council all appealed the Planning Commission's approval of the project to the City Council.  [TE 2035-0001 (Section 6); RT 426:4–13 (Neumann); RT 671:8–16 (English).]

**B.    CITY COUNCIL MEETINGS**

**1.    City Council Meeting No. 1: August 6, 2013**

274.   The August 16, 2013 Staff Report summarized how the project had arrived before the City Council:

> At the joint meeting of the City Council and Planning
> Commission on April 30, 2013, staff requested

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1    authorization from the City Council to have the Council

2    act as the final decision-making body on the application.

3    The City Council requested that the item be placed on a

4    regular meeting agenda for consideration and action. On

5    May 21, 2013 the City Council discussed the item and

6    requested that the Project come before them to be the final

7    decision maker.

8    [TE 3020 (8/6/13 CC Staff Report) at 0002.]

9    275.   The August 6, 2013 City Council meeting was brief, and was used to

10   set two future meeting dates in September:

11   We've discussed with the applicant, and they do concur

12   with that process. You do -- we are suggesting a couple of

13   dates, because we had seven planning commission public

14   hearings. We're thinking it will take two public hearings

15   to get through the Council 1 so that would be public

16   hearings on the Environmental Impact Report, as well as

17   the project itself, the master use permit and the variance,

18   so we're suggesting that you  "Due to the magnitude of

19   this Project and community wide interest, staff

20   recommends, with the Applicant's concurrence, that after

21   the Planning Commission competes its review, that public

22   hearings be scheduled before the City Council.

23   [TE 3004 (8/6/13 CC Meeting Transcript), 5:18–6:4.]

24   276.   City Manager Carmany and Mayor Lessor noted that, given the size of

25   the project and its importance to the community, there may need to be more than

26   two meetings:

27   CITY MANGER CARMANY – I'm not convinced two

28   meetings is going to be enough. The planning commission

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   did some really heavy lifting on this to get it to you.

2   There's a large segment of this community that is waiting

3   for it to get –

4   COUNCIL MEMBER D'ERRICO: And Mr. City

5   Manager, you have said that before, as important as this

6   issue is, some residents feel, and especially if there's

7   some

8   sense that it's coming to Council - -

9   CITY MANAGER CARMANY: Yep.

10  COUNCIL MEMBER D'ERRICO – they're going to be

11  sitting and wait - -

12  CITY MANAGER CARMANY: And we need to respect

13  that.

14  [TE 3004 at 9:12–20.]

15      **2.      City Council Meeting No. 2:  September 3, 2013**

16      277.    The September 3, 2013 Staff Report described the purpose of that

17  night's meeting:

18          Tonight's meeting will provide presentations from a

19          number of parties in order for the Council and the public

20          to have a thorough overview and understanding of the

21          project. The Mayor will open the public hearing. Staff

22          will provide an overview of the Project. The City's

23          Economic consultant will provide an economic and

24          market summary presentation, followed by the City's

25          EIR traffic consultants' presentation on traffic and

26          parking. RREEF will then provide a presentation on the

27          Project. After the presentations and questions, Staff

28          anticipates that there will be an opportunity for public

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1   comment and input. The EIR consultant will be available

2   to answer any questions on CEQA and the EIR.

3   [TE 3021 (9/3/13 CC Staff Report) at 0002.]

4       278.   The Staff Report noted that Staff noticed two further hearings

5   (September 10 and 17) to provide for further public comments.  [TE 3021 at 0002–

6   0003.]

7       279.   Two "public comment letters" were attached to the Staff Report.  [TE

8   3021 at 0106–0107.]

9       280.   City Manager David Carmany provided a brief overview and

10  introduction of the meeting.  [TE 3005 (9/3/13 CC Meeting Transcript) at 0004–

11  0007.]

12      281.   Community Development Director Richard Thompson provided

13  background of Project [TE 3005 at 0008–0019], including RREEF's appeal of the

14  Planning Commission's approval of the project [*id.* at 9:16–10:6] and concerns with

15  the Project's parking structures [*id.* at 16:24–17:6].

16      282.   The City's economic advisor, Larry Kosmont, spoke about the

17  economic report [TE 3005 at 0019–0030] and the importance of Macy's

18  commitment to the Project [*id.* at 28:2–10].

19      283.   City traffic expert Pat Gibson testified on the traffic report.  [TE 3005

20  at 0031–0042.]

21      284.   Prior to Mr. Gibson's formal testimony, Mr. Thompson briefly

22  discussed the importance of traffic issues as related to the project:

23          You know, traffic was such an

24          important part in this project. That's why you'll find

25          this to be really poignant. It kind of puts everything

26          together, and it was, seemed to be the main discussion

27          whenever we had a public hearing with the residents, as

28          well as everybody else.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

[TE 3005 at 30:3–8.]

285.  Mr. Gibson provided a summary of the EIR, discussed various parking and traffic issues, and discussed the major questions posed by the Planning Commission and the general public.  [TE 3005 at 0031–0042.]

286.  Mark English from RREEF provided testimony of RREEF's positions on the Project.  [TE 3005 at 0042–0071.]

287.  Mayor Lesser posed questions to Mr. Thompson regarding Phase 3 of the project, underground parking, and the feasibility of a hotel at the site location. [TE 3005 at 0073–0075.]

288.  Councilmember Powell posed questions to Mr. Thompson regarding traffic and parking, height variance, environmental sustainability certifications for the Project, parking structure and landscaping issues, underground parking, and soil contamination issues.  [TE 3005 at 0075–0085.]

289.  Councilmember Powell posed questions to Mr. Kosmont regarding the impact of the mall taking away business from other parts of the City and the "saturation point" of the mall.  [TE 3005 at 0085–0088.]

290.  Councilmember Burton testified as to complexity of the issues and the need for further presentations:

> Council, I want to point out it is a little
> unrealistic that we're going to have a couple of hours
> tonight, a couple of hours the following Tuesday, maybe
> a couple of hours on the 17th, and people are going to
> expect a decision. This may take a lot longer. Those
> are just the facts. Until we feel like we're fully
> informed and ready to make a decision, I don't think we
> can. And when I hear statements like, "Well, I had a
> two-hour presentation, but I was asked to trim it down
> to 14 minutes," I understand this is an overview. I

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
300 S. GRAND AVENUE, 37TH FLOOR
ONE CALIFORNIA PLAZA
LOS ANGELES, CALIFORNIA 90071-3147

1         think that has value. But at some point in time, we

2         need to have all of the details and an opportunity to

3         ask good, relevant questions once we've absorbed all of

4         the information.

5 [TE 3005 at 92:7–20.]

6      291.   Mayor Pro Tem Howorth posed questions to Mr. English, Mr.

7 Thompson, and Mr. Kosmont regarding access to the mall via walkways and

8 parking ramps, energy consumption and "green" alternatives, Macy's participation

9 in the planning process, and whether the banks located at the mall own their

10 respective properties.  [TE 3005 at 0094–0098.]

11      292.   Macy's Real Estate Department representative Kelvin Peyton briefly

12 testified regarding the Project.  [TE 3005 at 0100–0103.]

13      293.   Questions and comments were made by numerous members of the

14 general public, during which concerns were expressed regarding various issues,

15 including Mr. English's testimony from earlier that evening, RREEF's commitment

16 to the community, the public's ability to speak on the Project, the height variance,

17 whether the new mall will meet the needs of City residents, traffic, the EIR,

18 parking, lighting, and impacts on the youth.  [TE 3005 at 0098–0120.]

19     **3.**     **City Council Meeting No. 3:  September 10, 2013**

20      294.   The September 10, 2013 Staff Report provided a review of the

21 previous meeting (held September 3, 2013):

22         At the September 3rd meeting a number of presentations

23         were provided in order for the City Council and the

24         public to have a thorough overview, background and

25         understanding of the project. There was also an

26         opportunity for questions and input from the public. The

27         Mayor opened the public hearing and Staff provided an

28         overview of the Project. The City's Economic consultant

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
300 S. GRAND AVENUE, 37TH FLOOR
ONE CALIFORNIA PLAZA
LOS ANGELES, CALIFORNIA 90071-3147

- 76-

1    then provided an economic and market summary

2    presentation, followed by the City's EIR traffic

3    consultants' presentation on traffic and parking. RREEF

4    then provide a presentation on the Project. All of the

5    presentations are posted on the City's website.

6    http://www. citymb.info/Index.aspx?page=2129. The EIR

7    consultant was also available to respond to any questions

8    on CEQA and the EIR. After the presentations and

9    questions from the Council, public comments and input

10   was received, and Staff and the consultants responded the

11   Councils questions. There were also a number of

12   comments on the project from the public during

13   Audience Participation at the beginning of the meeting.

14

15   A variety of opinions were expressed by the public at the

16   meeting, with people speaking both in support and with

17   concerns about the project. A number of people indicated

18   that they feel the Mall needs to be updated and refreshed

19   in order to stay competitive and provide the quality of

20   stores, amenities, and shopping experience that the

21   community desires. Others expressed concerns with

22   density, size, traffic, parking, crime, economics, building

23   heights, and RREEF's future in the project.

24   [TE 3022 (9/10/13 CC Staff Report) at 0002.]

25       295.  The September 10, 2013 Staff Report described the purpose of that

26   night's meeting:

27   Tonight's meeting will provide an opportunity for public

28   input and Council questions and discussion. The Mayor

- 77-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1    will open the public hearing. Staff will provide an

2    introduction, then would recommend opening up the

3    public comments. RREEF will then provide a presentation

4    on the Project, as well as the 3500 Sepulveda

5    representative if they desire. The City's EIR Traffic

6    Consultant and El R/CEQA Consultant will be available

7    to answer any questions on Traffic, CEQA and the EIR.

8

9    Staff has noticed a continued public hearing on September

10    17th to provide a third opportunity for members of the

11    public to comment on the Project, Council discussion and

12    deliberation after the close of the public hearing, and

13    potentially Council action thereafter. Future meetings

14    may be scheduled if the Council so desires.

15  [TE 3022 at 0003.]

16    296.    Attached to the Staff Report was a letter from RREEF, dated

17  September 5, 2013 (after the second City Council meeting held September 3) which

18  discussed RREEF's appeal of Planning Commission Resolution No. PC 13-10

19  (specifically, Condition of Approval No. 11 regarding RREEF's proposed Master

20  Sign Program for the Project).  [TE 3022 at 0025–0046.]

21    297.    Two "public comment letters" were attached to the Staff Report.  [TE

22  3022 at 0045–0046.]

23    298.    City Manager Carmany provided a brief overview and introduction of

24  meeting.  [TE 3006 (9/10/13 CC Meeting Transcript) at 0004.]

25    299.    Mr. Thompson provided the format of the meeting.  [TE 3006 at 0004–

26  0006.]

27    300.    Questions and comments were made by numerous members of the

28  general public, during which concerns were expressed regarding various issues,

- 78-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

including the impact on the community, RREEF's ever-evolving site plans, road widening, impact on traffic, various appeals and lawsuits, traffic, the speed with which the Project was being pushed, parking, Fry's, the EIR review, the uncertainty of Phase 3, and the appeals of RREEF and 3500 Sepulveda. [TE 3006 at 0006–0028.]

301.    One of the residents who testified in opposition to the Project, Chris Prodromides, expressed various concerns regarding traffic, parking, and Macy's wavering commitment:

> Our concerns, mostly, were the parking garages at first, because there's two large decks that will be directly across the street from us, and we are very concerned about the noise, about light coming out at night, and we have residents who have second-story buildings, and they are afraid that the headlights and lights from the parking structures would actually go right into their houses.
>
> One of my neighbors feels strongly about that, and so we've been very vocal with RREEF about, about the parking structures, and we've been trying to push them away from the neighbors, get them more on Rosecrans, more of where the skyscrapers are in the parts of Manhattan Beach.
>
> A bigger issue, three phases. Phases 1, 2, and 3. One is where the two structures come in and the center rebuilt where the center of the mall is right now. Again, we don't like the parking structures, but Phase 2, Macy's, Macy's is supposed to expand their building, move out of

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

- 79-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

their rental area and expand the building they do own, **but Macy's has not signed off on this**.

We feel strongly that, that Macy's will make a commitment once Phase 1 is actually in progress under construction, at that point, Macy's will then come to the table and negotiate the long-term lease they have, and come to the table and make this happen. **So you may not want to start this project and not have Macy's really on board.** I wouldn't ask a construction critic in my own house, and remodel my, my kitchen without the whole plan sorted out. I don't feel comfortable, as a resident, that not being completed.

[TE 3006 at 15:18–16:6, 16:22–17:14 (emphasis added).]

302.   Mayor Lesser closed public comment portion of the meeting and recognized that no one from the Hacienda Parties had chosen to speak on the Project.  [TE 3006 at 0028.]

303.   Mayor Lesser posed questions to City Attorney Quinn Barrow and Mr. Thompson regarding how to proceed with future meetings in light of the appeals of RREEF and 3500 Sepulveda.  [TE 3006 at 0029–0030.]

304.   Councilmember Burton expressed serious concerns with the Council's lack of review of relevant documents and testimony:

We didn't have the actual testimony. For instance, RREEF made three different appearances over three meetings and gave a full briefing.

At our first meeting, I believe the traffic engineer said, "I have a two-hour briefing, but staff wants me to give 14

- 80-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1    minutes." I need to have that full briefed meeting. I

2    requested copies of the minutes, and here I have other

3    requests.

4

5    I would like a copy of the draft EIR. I think we should all

6    have copies of that, and the final EIR to review. I've

7    reviewed the final EIR twice, but I haven't seen the draft

8    EIR.

9

10   I'd like copies of the Settlement Agreement between

11   RREEF and 3500 Sepulveda. I would like copies of the

12   construction operation and reciprocal easement

13   agreement dated November 1st, 1980. The foundational

14   documents. I'd like copies of the grant deed and grant of

15   easements with covenants running with the land dated

16   November 1st, 1980. Again, foundational documents. I'd

17   like a briefing from our staff regarding the original

18   village agreement. As I understand it, this mall was part

19   of an entire development agreement with the hotel, the

20   homes, everything. ***I want, I want to start from the***

21   ***beginning, so I fully understand what's going on.*** I

22   want a briefing from the city attorney regarding the rights

23   of all three property owners, and the rights of the City.

24

25   Here's my expectations for this hearing. A full and

26   complete briefing from the author of the draft and final

27   EIR, including comments received. A full and complete

28   briefing from the traffic engineer. In other words, not the

- 81-

1    14 minutes. I want the two hours.

2

3    A full and complete briefing regarding hazardous waste

4    liability and current indemnification agreements. A full

5    and complete briefing from RREEF.

6

7    A full and complete briefing from Macy's, the other

8    property owner, a full and complete briefing from 3500

9    Sepulveda. I would also like to see Fry's here, and Apple.

10

11    ***In other words, I want all the information, and I got to***

12    ***tell you, when staff first came to us, and the city***

13    ***manager and the community development director, it***

14    ***was two meetings only during your general regular***

15    ***meetings, and it was almost the expectation that we***

16    ***were going to make a decision after that. That is***

17    ***impossible. Right now, if I was to ask any one of us,***

18    ***what are the traffic remediation measures right now,***

19    ***describe them all. We wouldn't have a clue. It's their***

20    ***obligation, the applicants and our staff to fully inform***

21    ***us, and that way you, you can have meaningful public***

22    ***comment. We're asking for public comment when the***

23    ***public hasn't been informed, and that's just not***

24    ***acceptable.***

25    [TE 3006 at 30:18–32:22, 44:10–13 (emphasis added).]

26        305.   Councilmember Powell posed questions to Mr. Thompson regarding

27    his review of the EIR.  [TE 3006 at 0039–0040.]

28        306.   Mayor Pro Tem Howorth posed questions to the City Council

- 82-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

regarding "mechanics" of reviewing all of the materials referenced above by
Councilmember Burton.  [TE 3006 at 0040.]

307.   Councilmember D'Errico posed series of questions regarding the
Project:

> One simply this is a three-phase project,
>
> so I would like a clearer understanding of why it is a
> three-phase project. Why it's going to take six or
> seven or eight or ten years to complete, whatever the
> timing is. Why the phases are in the order that they
> are in. We have heard enough from residents why. Isn't
> Phase 3 really Phase 1? I would like to understand
> that.
>
> The second thing is, ***I would like to understand
> and, maybe this goes back to, to Council Member
> Burton's
> request for Macy's to participate. Yes, there was a
> representative here at the last meeting. Are they
> legally bound? Are they part of it? What's the
> guarantee?*** One of our residents said tonight, what's
> the guarantee Macy's is in. And, and the resident said
> something to the effect of, "would I start the kitchen
> remodeling if I didn't know the rest was going to get
> done." So I need to know that.
>
> I also want to know is
> the developer, ***is RREEF contractually legally bound to
> do Phases 2 and 3, and if not, what is our guarantee?***

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  Is there money being held aside? What is happening to

2  ensure that Phases 2 and 3 are going to happen.

3

4  And then, maybe, this is going to get

5  addressed. I haven't noticed. ***Why haven't we heard***

6  ***from 3500 Sepulveda yet at our meeting?*** But it looks

7  like we are going to hear from them in an up-coming

8  meeting.

9  [TE 3006 at 40:4–20, 40:23–41:2, 42:1–5 (emphasis added).]

10      308.   Councilmember D'Errico joined in Councilmember Burton's concerns

11  regarding the speed with which the City Council was reviewing the project:

12  I would say, I'd like to see this in, in some

13  comprehensive form. And that's, that's, my fundamental

14  concern. I understand why we took this, sort of, I'll

15  say, kicked it upstream from the planning commission to

16  us, but, but, as a result we've taken on an extremely

17  important responsibility, and I think that was, in my

18  mind, that was what I was hearing from Council Member

19  Burton, ***the concern that, that, you know, this is not***

20  ***something that we should rubberstamp***.

21  [TE 3006 at 43:10–18 (emphasis added); *see id.* at 45:19–46:6.]

22      309.   Councilmember Powell posed questions to Mr. Thompson regarding

23  various issues, including hesitation to approve project and concern that "certain

24  rights are being taken away from 3500 Sepulveda, LLC." [TE 3006 at 52:16–53:3.]

25      310.   Councilmember Powell also expressed concerns with: on-site alcohol

26  sales, "permitted uses" under the Municipal Code, parking, traffic, Macy's

27  participation, and other factors that could derail the project. [TE 3006 at 0055–

28  0062.]

- 84-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

311.    Mayor Lesser posed questions to Mr. Thompson regarding the Council's input on two different general plan goals, whether Council should approve all three phases at once or if it can approve phase-by-phase, and traffic and parking concerns from the public.  [TE 3006 at 0062–0067.]

312.    Councilmember Burton posed questions to Mr. Thompson and City Attorney Barrow regarding the appeals of RREEF and 3500 Sepulveda, the fact that Macy's had not formally appealed the project, and the rights of property owners. [TE 3006 at 0067–0070.]

313.    Mayor Pro Tem Howorth expressed concerns to Mr. English regarding Macy's commitment to the project.  [TE 3006 at 74:9–17.]

314.    Mr. English provided a brief presentation on behalf of RREEF, which was interposed with various questions from Councilmembers [TE 3006 at 0080–0115], and which included a brief discussion of Macy's involvement in the Project [*id.* at 0088–0089.]

315.    Michael Birtch, RREEF's signage consultant, testified as to signage issues.  [TE 3006 at 0115–0123.]

316.    Councilmember Burton mentioned that he wanted to hear from 3500 Sepulveda, whom Mayor Lesser acknowledged had not yet appeared before the Council.  [TE 3006 at 0133–0134.]

**4.    City Council Meeting No. 4:  September 17, 2013**

317.    The September 17, 2013 Staff Report provided a review of the previous meeting (held September 10, 2013):

> At the September 10th, meeting the Mayor opened the
> public hearing. Staff then provided an introduction and
> the meeting was opened up to public comments. There
> were also a number of public comments on the project
> during the audience participation portion of the meeting,
> prior to the public hearing. The 3500 Sepulveda

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

Boulevard representative was invited to make a presentation but indicated that they would defer their presentation until the September 17th meeting. Staff responded to a number of questions from the Council . RREEF then responded to questions raised during the public comments, responded to Council questions, then provided a presentation on their appeal of the restaurant square footage cap and their sign consultant then provided a presentation on the Sign Program and Exceptions. The City's EIR Traffic Consultant and EIR/CEQA Consultant were available to respond to questions on Traffic, CEQA and the EIR.

RREEF's complete presentation from September 10th and the late attachments received after distribution of the Council packet are posted on the City's website, along with all of the project information. The website has a separate page devoted exclusively to the Mall that includes all of the Planning Commission background including agendas, reports, attachments, minutes, and presentations as well as the videos of all the meetings for the Council to view. The Draft and Final El R's are also posted on the website at: http://www.citymb.info/lndex.aspx?page=2129.

A variety of opinions were expressed  by the public at the meeting, with people speaking both in support and with concerns about the project. A number of people indicated

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

1    that they feel the Mall needs to be updated and refreshed
2    in order to stay competitive and provide the quality of
3    stores, amenities, and shopping experience that the
4    community desires. Others expressed concerns with and
5    had questions on the density, size, General Plan
6    consistency, traffic, neighborhood traffic impacts,
7    construction impacts, parking and parking structures,
8    crime, impacts on City services, soil and hazard
9    conditions, economics, shuttle and transit service, City
10   parking lot access, building and light heights, alcohol
11   sales, phasing and timing, the development agreement,
12   commitment of property owners and tenants, and
13   RREEF's future in the project.
14
15   The City Council had a number of questions on many of
16   the items addressed above, asked for hard copies of the
17   Draft and Final EIR and briefings from the EIR
18   consultant and number of the technical consultants,
19   including traffic and soils/hazards at the September 17th
20   meeting. They also invited the 3500 Sepulveda
21   representative to present his appeal and any other
22   information. The Council was provided with hard copies
23   of all the Planning Commission Minutes, the appeal
24   letters, RREEF's powerpoint presentation and late
25   attachments.
26
27   The Council also asked for background on the
28   Development Agreement. The Development Agreement

- 87-

Application was submitted in 2012 in order to request a longer term for the project approval and to assist with the consolidation of Macy's Men's into the main Macy's store. Kosmont and Associates and staff, along with a Council subcommittee met on a number of occasions to discuss these goals. The applicant decided that there was no need for the development agreement, inasmuch as the proposed phasing plan and the term of the Master Use Permit would address any entitlement issue and therefore the application was withdrawn. Staff also felt that conditions of approval would ensure appropriate community benefits would be acquired.

Staff has noticed this continued public hearing on September 17th to provide a third opportunity for members of the public to comment on the Project, presentations from the project technical team, Council discussion and deliberation after the close of the public hearing, and further Council direction. Future meetings may be scheduled at the direction of the Council.

[TE 3023 (9/17/13 CC Staff Report) at 0002–0003.]

318. The Staff Report described the purpose of that night's meeting:

Tonight's meeting will provide an opportunity for presentations from the EIR consultants and other technical staff, public input and Council questions and discussion. Similar to September 10th, the Mayor will open the continued public hearing, Staff will provide an

- 88-

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

introduction, presentations will be provided by the Environmental Impact Report (EIR) consultants, the applicants/appellants (RREEFE and 3500 Sepulveda) will provide presentations, the Council will receive public testimony, then discuss, and provide comments and direction. Questions from the Council to the EIR and technical consultants, staff and the applicants following each presentation would be appropriate. Future meetings will be scheduled if the Council so desires.

[TE 3023 at 0004].

319.   Attached to the Staff Report were RREEF's nine "white papers" regarding the Master Land Use Application [TE 3023 at 0103–0118], a letter from the Briggs Law Corporation [*id.* at 0153–0154], and the CV and report of Gabriel Elliot [*id.* at 0123–0125, 0127–0152].

320.   Two "public comment letters" were attached to the Staff Report.  [TE 3023 at 0119, 0155–0156.]

321.   Mr. Thompson provided the format of the meeting.  [TE 3007 (9/17/13 CC Meeting Transcript) at 0004–0007.]

322.   Stephanie Eyestone-Jones, the City's EIR consultant, testified regarding the EIR process.  [TE 3007 at 0007–0022.]

323.   Jeremy Squire, the City's environmental engineer consultant, testified regarding various environmental hazards (e.g., ground water, soil contamination, etc.).  [TE 3007 at 0022–0047.]

324.   Mr. Gibson and Eric Zandvliet, the City's traffic engineer, provided testimony on the traffic report and parking issues, which prompted questions from Mayor Lessor, Mayor Pro Tem Howorth, and Councilmembers Powell and D'Errico.  [TE 3007 at 0048–0110.]

325.   Mr. Kosmont provided testimony on the economic report, which

- 89-

1  prompted questions from Councilmembers Burton and D'Errico.  [TE 3007 at

2  0110–0124.]

3      326.   Mark Neumann, for the first time, addressed the City Council and

4  provided a brief overview of his testimony, a brief history of the mall, a brief

5  discussion on the Settlement Agreement, a brief discussion on the differences in

6  RREEF's plans over the course of the Project, and his request that the City deny the

7  EIR certification.  [TE 3007 at 0134–0163.]

8      327.   Cory Briggs briefly testified regarding 3500 Sepulveda's appeal and

9  the prior speakers at the meeting.  [TE 3007 at 0157–0163.]

10     328.   Questions and comments were made by numerous members of the

11 general public, during which concerns were expressed regarding various issues,

12 including: the petition of City residents expressing their opposition to the current

13 plans, safety, and traffic, parking. [TE 3007 at 0163–0177.]  Resident Mark

14 Craigsman discussed the residents' petition:

15         Three days ago, a group of residents drafted a

16         petition to spread awareness and get feedback on

17         the plans. In 72 hours, I just looked before I got up

18         here, over 510 residents signed on to express their

19         opposition to the current plans, with the majority

20         of the comments stating that the oppositions were

21         the parking structures, concerns for safety and

22         traffic.

23 [TE 3007 at 164:3–9.]

24     329.   Mr. English briefly testified in response to issues raised at meeting.

25 [TE 3007 at 0177–0179, 0181–0182.]

26     330.   RREEF's attorney, Peter Gutierrez, followed-up on Mr. English's

27 testimony and criticized the testimony of Mr. Briggs.  [TE 3007 at 0179–0181.]

28     331.   Before closing the meeting, Mayor Lesser brief addressed Mr.

- 90-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

Neumann's testimony:

> First, I think it is important, and imperative to
> clarify the nature of the parties, and that is, perhaps,
> a legal issue. Certainly, the legal issues that were
> raised by the 3500 Sepulveda LLC appellant, would be
> helpful to know about. I'd welcome some general
> comment on the role of the City when there are private
> parties in dispute on a project. Ultimately, I want to
> understand what our discretion is, and any advice, where
> our judgment entered into it, what legal considerations
> apply.

[TE 3007 at 181:20–182:4.]

332.    In September of 2013, a petition opposing RREEF's project was signed by over one hundred residents and filed with the City Council during the entitlement process.  [RT 98:7–21.]  The petition was started by Mark Krigsman who was opposed to the project.  [RT 435:14–436:9.]  The petition [TE 1108], was signed by over 1000 people.  [RT 437:5–13.]

**5.    City Council Meeting No. 5:  October 8, 2013**

333.    On October 8, 2013, the City Council conducted its fourth public hearing on RREEF's project.  The Staff Report was admitted at TE 3024.  There were numerous public comments, ranging from those in favor of the project to those opposed.   Some residents opposed the size and scope of the expansion and to the four parking decks. [RT 3010 at 0009:19–22.]  Others opposed traffic, overdevelopment, and valet parking.  [TE 3010 at 0014:1–10; 3010-0031.]  A number of residents supported the project.  Vicky Neumann spoke about Phase 3, the Fry's Corner [TE 3010at 0027:20], and Mark Neuman spoke about his appeal of the project, the expansion, RREEF, the construction parking, the parking fields and Macy's.  [TE 3010 at 0065–0075.]  Mark English spoke at length. [TE 3010 at

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

0078–0107; TE 3010 at 0110–0118.]  The City Council and staff then discussed various aspects of the project.  [TE 3010 at 0118–0169.]  The City's economic consultant Kosmont discussed aspects of the project.  [TE 3010 at 0169–0182, 0200–0207.]  Gibson discussed his traffic study.  [TE 3010 at 0183–0191.]  The Council then decided it wanted a matrix of the issues involved in the project.  [TE 3010 at 0216–219.]

### 6.    City Council Meeting No. 6:  November 12, 2013

334.    The City Council again met on November 12, 2013 to consider the expansion of the MVSC.  Because of the varied concerns raised by numerous members of the public as well as members of the City Council, staff prepared a matrix of key issues.  [TE 2138:4; TE 3025 (Matrix at p. 6).]

335.    English testified: "to put shovel in the ground, need to work back about a year" [TE 2138 at 089:7–9], and "so there's a lot of planning, detailed design, construction drawings, and then you're got to go through a permitting process.  So in order to put yourself In position there, really what your target date is mid-2016.  That's when you make the go, no-go decision."  [TE 2138 at 89:14–19.]

336.    Councilmember Howorth stated: "I can't imagine that I'm going to have a harder or more important decision as a Council member if I serve one term or two terms."  [TE 2138 at 154:11–13.]  She further stated:  "There's a lot of things that need to be fleshed out."  [Id. at 156:1–2.]  Councilman Powell stated: "When I'm told you got to make a decision today, that it can't wait a month or two, I'm very suspect."  [Id. at 159:21–23.]  Councilman Burton said he felt like he is being rushed.  [Id. at 163.]

337.    RREEF's representative English declared "We've been at this for six years, and we fell a lot of pressure to do something or just back off and say we're going to deal what we've got."  [Id. at 191:15–18.]  He stated: "We're not going to negotiate.  We're not going to change the plan."  [Id. at 191:24–25.]  After further discussion, Larry Kosmont, the City's economic consultant, stated: "if I

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

heard the Council's comments as you went around the dais, it's circulation, mass parking design, construction parking plan, phasing commitment, put option and phasing final.  I think these are all clearly issues that deserve back-and-forth discussion sooner than later."  [*Id.* at 196:1–6.]

### 7.    City Council Meeting No. 7:  January 14, 2014

338.    The City Council met again on January 14, 2014 to consider the project.  City staff had a number of recommendations for revisions to the project. [TE 2139 (Transcript of 1/14/14 City Council Hearing) at pp. 9–24.]

339.    Planning Director Jester stated:  "What we heard from the Council and from the community was that there were concerns with the scale of the project.  So in order to address that, we felt it was appropriate to suggest to either eliminate some square footage or transfer it to the next phase."  [*Id.* at 33:2–7.]

340.    She further stated: "But if you look at the south deck and look at the north deck, we think that there are a lot of opportunities to design that north deck to minimize the visual impacts and—and have a much better design."  [*Id.* at 33:13–15.]

341.    English said that it had been a "cumbersome process" [*id.* at 45:23], and "we've talked all along its been our presumption that prior to being issued a building permit for Phase 2 for the Macy's consolidation that we will have initiated the consolidation process with Macy's.  And that will be a form process from which there's no going back.  and our anticipation of that hasn't changed.  As a practical matter, we can't get to the process of building permits without having spent at least a year designing those buildings with Macy's, which won't happen until there's a formal commitment to consolidate Macy's."  [*Id.* at 59:7–18.]

342.    English said that RREEF has "to pull the trigger on that consolidation by July of 2016."  [*Id.* at 69:7–8.]

343.    Mayor Powell stated that RREEF's response was "mostly a rejection of practically every item, except for a couple."  [*Id.* at 70:16–21.] English

- 93-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

responded that the staff's recommendations "don't work for us." [*Id.* at 79:16.]

344.    Again, there were numerous public comments, a presentation of 1,300 signatures on a petition opposing RREEF's proposal [*id.* at128:6–7], and comments by the council members.  A motion was proposed that would prevent RREEF doing only Phase 1, and not Phase 2.   [*Id.* at p. 282.]

**8.    City Council Meeting No. 8:  April 29, 2014**

345.    In the staff report for the April 29, 2014 City Council meeting, the City Council listed the following as issues that needed to be addressed in connection with the Project (many of which clearly have nothing to do with the Hacienda Parties):

a.    Approve Phases 1 and 2 only and tie them together so that both have to be done.

b.    Require 10,000 square feet to be eliminated from Phase 1.

c.    Redesign the Phase 1 North parking structure similar to the Phase 1 South parking structure.

d.    Require Macy's to consolidate prior to issuing permits for Phase 2 with approval  contingent upon Macy's providing a commitment letter that they will, in fact, consolidate.

e.    Cedar Way must connect to Rosecrans Avenue with Phase 2.

f.    Negotiate in good faith with Fry's to try keep them on the site.

g.    Provide a bond and not a letter of credit for all of the site amenities (traffic-related items).

h.    The architectural elements, details, water features, landscaping, hardscaping, and plaza should be similar to the concept renderings.

i.    Oak Avenue traffic study funded by the developer for a cost not to exceed $20,000.

j.    All of the other conditions that were imposed and previously approved by the Planning Commission to be included in the Resolution.

- 94-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

[TE 3027-0003.]

346.    City Council staff then discussed the 10 issues above.  [TE 3027 at 1–
48.]  Planning Manager Laurie Jester noted that these conditions include
requirement that Macy's submit commitment letter, security deposit and plan
check.  [*Id.* at 22–23.]

347.    City expert Larry Kosmont gave a presentation and fielded questions.
[*Id.* at 34-87.]  Kosmont expressed the following concerns about Macy's:
(1) Macy's commitment is key to the deal as Macy's can override expansion of the
mall [*id.* at 49]; (2) Macy's is incentivized to consolidate but this is not guaranteed
[*id.* at 52]; and (3) under the COREA, Macy's can block anything.  [*Id.* at 83.]

348.    Mayor Pro Tem Powell noted that she does not know if Macy's
agreement existed.  [*Id.* at 59.]  She also notes that all 56 Conditions Of Approval
from the Planning Commission are part of the resolution being considered.  [*Id.* at
162.]

349.    Neumann and Briggs were invited to speak [*id.* at 107–151] and
Neumann was given 10 minutes.  [*Id.* at 107.]  Neumann discussed parking issues,
the size of garages and parking ratios.  [*Id.* at 113-122.]  Neumann also discussed
parking during construction [*id.* at 122–23] and traffic.  [*Id.* at 131–33].

350.    RREEF representative Mark English acknowledged that a commitment
from Macy's was required before building permits can issue for Phase 1 and that
negotiations with Macy's had been "torturous."  [*Id.* at 176.]

351.    Council member Burton was still considering ideas like removing
North Deck and replacing with open space.  [*Id.* at 188–89.]  Burton is also
concerned about ensuring the earthquake safety of parking structures and what that
would entail.  [*Id.* at 206.]

352.    The remainder of the hearing was public comment with 18 speakers,
including Lauralee Ogden and Chris Prodromides, and panel discussion regarding
the procedures going forward and scheduling the next hearing.  Public comments

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   address wide array of issues including traffic, parking, safety, crime, and the size of
2   the mall.  [*Id.* at 206–247.]

3       **9.     City Council Meeting No. 9:  May 20, 2014**

4       353.   In the staff report for the May 20, 2014 City Council hearing, the city
5   council reiterates the 10 issues from the April 20, 2014 Staff Report:

6           a.     Approve Phases 1 and 2 only and tie them together so that both
7   have to be done.

8           b.     Require 10,000 square feet to be eliminated from Phase 1.

9           c.     Redesign the Phase 1 North parking structure similar to the
10  Phase 1 South parking structure.

11          d.     Require Macy's to consolidate prior to issuing permits for Phase
12  2 with approval  contingent upon Macy's providing a commitment letter that they
13  will, in fact, consolidate.

14          e.     Cedar Way must connect to Rosecrans Avenue with Phase 2.

15          f.     Negotiate in good faith with Fry's to try keep them on the site.

16          g.     Provide a bond and not a letter of credit for all of the site
17  amenities (traffic-related items).

18          h.     The architectural elements, details, water features, landscaping,
19  hardscaping, and plaza should be similar to the concept renderings.

20          i.     Oak Avenue traffic study funded by the developer for a cost not
21  to exceed $20,000.

22          j.     All of the other conditions that were imposed and previously
23  approved by the Planning Commission to be included in the Resolution.
24  [TE 3028 (Staff Report for the May 20, 2014 City Council Hearing), at 0005.]

25      354.   The purpose of the hearing was to consider the draft CEQA Resolution
26  and Draft Project Resolution and to certify the Final EIR and adopt a resolution to
27  approve MUP. [TE 2141 at pp. 1, 14.]

28      355.   The staff discussed issues to be addressed and procedures [*Id.* at 1–21]

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

and Neumann and Dveirin gave a presentation. [*Id*. at 21–30.] Neumann raised general issues regarding Settlement Agreement with RREEF, height of garages and the issue of diminished parking in Lot F. Dveirin raised the issue of loss of parking spots in Lot F under the current plan and noted that project as planned is different from Settlement Agreement plans and the Hacienda Parties want more parking restored to Lot F area. [*Id*. at 25-28, 84-85, 211-212.]

356.    Mr. English gave a presentation in which he discussed the project as a whole; he did not focus on any particular issues raised by the Hacienda Parties. [*Id*. at 31–39.] English says: "We've undertaken a number of modifications to that project as a result of comments from 3500 Sepulveda, Macy's, the Planning Commission, the City Council and members of the public both in private conversations, as well as in public testimony." [*Id*. at 31:22–32:2.]

357.    English further explained: "This project has been about finding a balance between a number of different competing, sometimes, objectives. We have aesthetics. We have the village feel. We have function. This is about public space, as well as shopping and retail and parking." [*Id*. at 32:16–20.]

358.    The City Council heard public comment from 22 people who addressed a wide array of issues including traffic, parking, safety, crime, and the size of the mall. [*Id*. at 40–63.] The Staff discussed concerns about not having a commitment from Macy's, the need for a traffic study for Oak Ave and Cedar, the existing 56 Conditions of Approval. [*Id*. at 68–73.]

359.    English said he had a confidential Letter of Intent with Macy's but would not provide it to City. [*Id*. at 75-76.] English explained that if the project was not approved as is, RREEF was unlikely to continue with the project. [*Id*. at 134–35.]

360.    Council member Burton raised the idea of an election to see if people want North Deck and South Deck. [*Id*. at 140.] He also questioned Gibson about parking and traffic and expresses concerns about downgrading Cedar Way. [*Id*. at

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

146–160.] Mr. Burton is still concerned about whether Phase 3 should be included in present approval, whether parking garages could be moved to better locations and whether, if Phase 1 is approved, Phase 2 will ever get done. [*Id*. at 190–97.]

361. The then staff discussed concerns about Macy's. Kosmont noted that the lack of Macy's commitment had "always been the giant in the room when it comes to this revitalization." [*Id*. at 200.] Burton wanted to get rid of the North Deck but English said Macy's would not agree to that. [*Id*. at 231.] Council Member D'Errico was frustrated that Macy's had not appeared in proceedings and did not want to vote without a Macy's guarantee. [*Id*. at 244.] Neumann stated that he would like RREEF to do Macy's first. [*Id*. at 297.]

362. Councilmember Powell made motion to approve the project with stairwell and elevator on west side of the north deck, a requirement that RREEF and 3500 negotiate in good faith, and a reduction in parking to G+1. English explained that RREEF could not agree to that proposal because if parking is reduced to G+1, the parking will be inadequate or the Village Shops will have to be reduced. [*Id*. at 302–304.]

363. Councilmember Powell's motion passed 3-2 even though English said RREEF did not agreement. City attorney Barrow said this will be coming back with a resolution and CEQA resolution. [*Id*. at 312.]

**10.    City Council Meeting No. 10:  December 2, 2014**

364. In the December 2, 2014 Staff Report, the City Council noted: "The draft resolutions were brought back to the City Council on May 20, 2014, and all the property owners and the public were provided an opportunity to comment. The Council requested additional conditions and RREEF has been reviewing its options since that meeting." [TE 3029 (December 2, 2014 City Council Staff Report), at 0002.] On May 20, 2014, the City Council approved the resolution with the following conditions added: (1) Stairway and elevator on west side of North Deck; (2) North Deck is a G+2; and (3) in addition to approving Phase I and II, approve

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
300 S. GRAND AVENUE, 37TH FLOOR
ONE CALIFORNIA PLAZA
LOS ANGELES, CALIFORNIA 90071-3147

Phase III.  [*Id.* at 0003.]

365.   The City Council noted that RREEF had concerns about revisions.  [*Id.* at 3-6.]  In particular, "RREEF has indicated that it is unable to reduce the North Parking Structure due to parking demand in the 'core area' which serves the existing Mall and the proposed out door plaza and Phases I and II.  [*Id.* at 0005.]  The Council also notes that RREEF agreed to provide a redacted Macy's agreement when it is executed.  [*Id.* at 0005.]

366.   In the December 2, 2014 hearing, Planning Manager Jester noted that since the last meeting in May, the City Council had reached out to RREEF many times.  RREEF had changed its management team and explored their different options before providing its written response in November (approximately six months after May meeting).  [TE 2142 (Transcript of December 2, 2014 City Council Hearing), 0004–0005.]

367.   Ms. Jester discussed the various options available to the City Council, including "Option B" which, among other things, had the North Deck at G+2 but with a 90-foot set back on the western portion of the second deck.  [TE 2142 at 0008:11–20.]  RREEF Representative Joe Saunders explained that RREEF agreed with most of conditions of Option B, but could not agree to "the further reduction of any parking or anything to deck two" as the set back "jeopardizes the whole project."  [*Id.* at 0014.]

368.   Neumann spoke, focusing on the Settlement Agreement and RREEF's responses to City Council's conditions from the May meeting.  Neumann said that RREEF should do the Macy's consolidation first because that is only way to guarantee it gets done.  He also discussed parking ratios, parking during construction [TE 2142 at 0030–0042.]  Council noted that it is not the City's concern if RREEF breached a private agreement (i.e., the Settlement Agreement) with 3500; 3500 has legal recourse for breach.  [*Id.* at 0048–0049.]

369.   The City Council then discussed the issue that, if RREEF reduces

- 99-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

parking as suggested by the Council, RREEF would fall below their parking ratio. RREEF could address this by adding parking in the culvert but there is no way around having parking garages. [*Id*. at 0055–0056.]

370.    Council member Lesser asked Saunders why it took RREEF so long to respond to the May meeting.  Saunders responded that RREEF had a new management team and needed to reevaluate the project.  He also explained that Macy's "looks at every single thing down to the angle of which way parking fields face."  [*Id*. at 0061–0062.]  Council member D'Errico raised questions about Macy's commitment [*id.* at 0071–0074], and Saunders responded that RREEF would not sign an agreement with City delineating the narrow/unlikely circumstances that would prevent it from adding 50,000 SF to Macy's home store. [*Id*. at 0074–0075.]  Saunders also said there was no guarantee Phase III would get done.  [*Id*. at 0077.]

371.    The Council then allowed public comment, at which 16 people spoke and addressed a wide array of issues ranging from traffic, parking, safety, crime, and the size of the mall.  [*Id* at 0089–0118.]

372.    Councilmember D'Errico explained that the most important issues were the Macy's consolidation and Fry's corner, and stated: "And I don't feel comfortable I have either here."  He further stated:  "I'm uncomfortable with the deal that I have in front of me, to say yes to it as is."  [*Id.* at 0128.]  Councilmember Burton also expressed concerns with the lack of Macy's involvement: "Now, when I asked Mr. English on the record he said, Macy's won't do it.  I'm sure if I asked Joe on the record, he probably would say, Macy's won't do it.  So here's why this negotiation's gone south the whole time, Macy's has never been at the table. We've never talked to them.  We've never negotiated with them."  [*Id*. at 0142.]

373.    Councilmember Burton then discussed why RREEF or Macy's might back out [*id*. at 0143], at which point the council discussed having Macy's sign a written commitment.  [*Id*. at 0159.]  Council member Howorth opined that the City

- 100-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

should ensure construction parking plan is beneficial to the Hacienda Parties. [*Id.* at 0160.]

374.   The council approved the EIR by a 3-2 vote. [*Id.* at 0162–63.] Council members Burton and D'Errico wanted additional time to deal with issues such as Macy's, but ultimately the "Option B" resolution was approved 3-2, with the revised 90-foot set back included. [*Id.* at 0184.] The council noted that the two major changes were not approving Phase III and going back to the January motion with respect to parking so it is G+2, but with the second deck set back 90 feet on the west side. [*Id.* at 0185, 0189.]

Dated: _____        _____
                             HONORABLE ALEXANDER F. MACKINNON
                             U.S. MAGISTRATE JUDGE

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA
300 S. GRAND AVENUE, 37TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3147

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW