# EXHIBIT A

1  LATHAM & WATKINS LLP
       Michael G. Romey (Bar No. 137993)
2        *michael.romey@lw.com*
       Sarah F. Mitchell (Bar No. 308467)
3        *sarah.mitchell@lw.com*
       Greg Swartz (Bar No. 308071)
4        *greg.swartz@lw.com*
   355 South Grand Avenue, Suite 100
5  Los Angeles, California 90071-1560
   Telephone: (213) 485-1234
6  Facsimile: (213) 891-8763

7  Attorneys for Defendant and Counterclaimant
   RREEF America REIT II Corporation BBB
8  and Defendant Macy's West Stores, Inc.

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11

12 | 3500 SEPULVEDA, LLC, a Delaware    | CASE NO. 2:17-cv-08537-AFM
   | limited liability company, 13TH &
13 | CREST ASSOCIATES, LLC, a           | The Honorable Alexander F.
   | California limited liability company | MacKinnon

14                Plaintiffs,           **RREEF AMERICA REIT II
                                        CORPORATION BBB'S
15     v.                              PROPOSED FINDINGS OF FACT
                                        AND CONCLUSIONS OF LAW**
16 RREEF AMERICA REIT II
   CORPORATION BBB, a Maryland         Action Filed:  October 11, 2017
17 corporation; MACY'S WEST STORES,
   INC. and DOES 1–25, inclusive,      Trial Date:  February 6, 2023
18
                 Defendants.
19
   RREEF AMERICA REIT II
20 CORPORATION BBB, a Maryland
   corporation
21
                 Counterclaimant
22
       v.
23
   3500 SEPULVEDA, LLC, a Delaware
24 limited liability company; 13TH &
   CREST ASSOCIATES, LLC, a
25 California limited liability company;
   6220 SPRING ASSOCIATES, LLC, a
26 California limited liability company,
27
                 Counterdefendants.
28

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**TABLE OF CONTENTS**

I.    INTRODUCTORY ARGUMENT ..................................................................viii

      A.    The Settlement Agreement Is a Valid, Enforceable
            Contract.................................................................................viii

      B.    The Hacienda Parties Breached the Settlement
            Agreement's Terms and Implied Covenant of Good Faith
            and Fair Dealing ..................................................................viii

      C.    RREEF Experienced Harm as a Result of the Years of
            Delay to the Project................................................................xii

      D.    The Hacienda Parties' Breaches Were Substantial Factors
            in the Project Delays That Damaged RREEF ....................xiii

      E.    RREEF Established Its Damages with Reasonable
            Certainty.................................................................................xvi

II.   PROPOSED FINDINGS OF FACT ..............................................................1

      A.    The Parties...............................................................................1

            i.     RREEF .........................................................................1

            ii.    The Hacienda Parties .................................................1

            iii.   Macy's .........................................................................1

      B.    The Settlement Agreement.......................................................2

            i.     Background..................................................................2

            ii.    Settlement Agreement's Key Terms...........................4

            iii.   RREEF Performed Under the Settlement
                   Agreement...................................................................5

      C.    The Entitlements Phase ...........................................................7

            i.     June 27, 2012 Planning Commission Meeting .........8

            ii.    October 3, 2012 Planning Commission Meeting.......9

            iii.   March 13, 2013 Planning Commission Meeting .....10

            iv.    April 24, 2013 Planning Commission Meeting .......11

            v.     May 22, 2013 Planning Commission Meeting .......12

            vi.    June 26, 2013 Planning Commission Meeting .......13

vii. The Hacienda Parties' Appeal of the Planning Commission's Certification and Approval of the EIR ................................................................................. 14

viii. July 24, 2013 Planning Commission Meeting ......................... 15

ix. August 6, 2013 City Council Meeting ..................................... 17

x. September 3, 2013 City Council Meeting ............................... 18

xi. September 10, 2013 City Council Meeting ............................. 19

xii. September 17, 2013 City Council Meeting ............................. 22

xiii. October 8, 2013 City Council Meeting ................................... 26

xiv. November 12, 2013 City Council Meeting ............................. 29

xv. January 14, 2014 City Council Meeting ................................. 33

xvi. April 29, 2014 City Council Meeting ..................................... 37

xvii. May 20, 2014 City Council Meeting ...................................... 41

xviii. December 2, 2014 City Council Meeting ............................... 45

D. The CEQA Litigation ...................................................................... 47

E. The Director's Writ Litigation ......................................................... 56

F. RREEF's Monetary Harm ................................................................ 59

i. Cost Escalation Damages ........................................................ 60

ii. Lost Profits Damages .............................................................. 61

G. The Impact of Uncalled Witnesses ................................................. 64

III. PROPOSED CONCLUSIONS OF LAW ..................................................... 65

A. The Hacienda Parties Breached the Settlement Agreement ........................................................................................ 65

i. RREEF Established That the Settlement Agreement Was a Valid Contract ............................................ 65

ii. RREEF Performed Under the Settlement Agreement ................................................................................ 66

iii. The Hacienda Parties Breached the Settlement Agreement ................................................................................ 67

iv. The Hacienda Parties' Breaches of Contract Were a "Substantial Factor" in Causing the Delays That Damaged RREEF .............................................................. 72

v.    Analysis of Materiality in the Settlement
Agreement and Project .................................................. 93

B.    The Hacienda Parties Breached the Covenant of Good
Faith and Fair Dealing ......................................................... 96

i.    The Hacienda Parties Improperly Interfered with
RREEF's Right to Non-Opposition to the Project ................. 97

ii.    The Hacienda Parties' Breaches of the Covenant of
Good Faith and Fair Dealing Were a "Substantial
Factor" in Causing the Delays That Damaged
RREEF ........................................................................ 98

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*3500 Sepulveda, LLC v. Macy's W. Stores, Inc.*,
    980 F.3d 1317 (9th Cir. 2020)..................................................................6, 67

*In re 3M Combat Arms Earplug Prods. Liability Litig.*,
    2021 WL 4963457 (N.D. Fl. Oct. 13, 2021) ......................................................90

*Acree v. Gen. Motors Acceptance Corp.*,
    92 Cal. App. 4th 385 (2001) ................................................................................89

*Agam v. Gavra*,
    236 Cal. App. 4th 91 (2015) ................................................................................72

*Agarwal v. Buchanan*,
    2017 WL 5125752 (C.D. Cal. June 22, 2017)....................................................94

*Alpha GRP, Inc. v. Subaru of Am., Inc.*,
    No. CV182133MWFMRWX, 2018 WL 5986989 (C.D. Cal.
    June 8, 2018) ........................................................................................................65

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*,
    7 Cal. 4th 503 (1994)...........................................................................................87

*Asahi Kasei Pharma Corp. v. Actelion Ltd.*,
    222 Cal. App. 4th 945 (2013) ..............................................................................92

*Aspect Sys., Inc. v. Lam Research Corp.*,
    404 F. App'x 136 (9th Cir. 2010).........................................................................92

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*,
    226 Cal. App. 3d 442 (1990) ........................................................................87, 88

*Britz Fertilizers, Inc. v. Bayer Corp.*,
    665 F. Supp. 2d 1142 (E.D. Cal. Oct. 16, 2009) ....................................72, 73, 83

*Brown v. Goldstein*,
    34 Cal. App. 5th 418 (2019).........................................................................93, 94

*Bruckman v. Parliament Escrow Corp.*,
    190 Cal. App. 3d 1051 (1987) ......................................................................73, 83

Burnett & Doty Dev. Co. v. Phillips,
    84 Cal. App. 3d 384 (1978) ................................................................88

Cal. Lettuce Growers v. Union Sugar Co.,
    45 Cal. 2d 474 (1955) ........................................................................89

City of Colton v. Am. Promotional Events, Inc.,
    No. EDCV 09-1864 PSG, 2010 WL 5392761,
    at *6 (C.D. Cal. Dec. 21, 2010) .........................................................68

Clark v. Homecomings Fin., LLC,
    2009 WL 350660 (S.D. Cal. Feb. 11, 2009) .......................................98

Colaco v. Cavotec SA,
    25 Cal. App. 5th 1172 (2018) ............................................................67

Ely v. Bottini,
    179 Cal. App. 2d 287 (1960) .............................................................88

Equal Employment Opp. Comm'n. v. New Prime, Inc.,
    2015 WL 8757318 (W.D. Mo. Dec. 14, 2015) ...................................90

Foley v. Interactive Data Corp.,
    47 Cal. 3d 654 (1988) ........................................................................98

GHK Associates v. Mayer Grp., Inc.,
    224 Cal. App. 3d 856 (1990) .............................................................89

Guntert v. City of Stockton,
    55 Cal. App. 3d 131 (1976) ...............................................................91

Kean v. C.I.R.,
    469 F.2d 1183 (9th Cir. 1972) ...........................................................64

In re Kelly,
    499 B.R. 844 (S.D. Cal. Sept. 17, 2013) ......................................73, 83

Kiewit Power Constructors Co. v. City of Los Angeles by & through
    Dep't of Water & Power,
    813 F. App'x 261 (9th Cir. 2020) ......................................................96

LaSalle Nat. Bank v. Mass. Bay Ins. Co.,
    1997 WL 211220 (N.D. Ill. Apr. 22, 1997) ......................................90

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

*Mitchell v. Gonzales*,
  54 Cal.3d 1041 (1991)......................................................................73, 83

*ML Direct, Inc. v. TIG Specialty Ins. Co.*,
  79 Cal. App. 4th 137 (2000)...................................................................94

*Nomadix, Inc. v. Guest-Tek Interactive Ent. LTD*,
  CV1608033ABFFMX, 2017 WL 7275391 (C.D. Cal. Nov. 30,
  2017)........................................................................................................67

*Orozco v. WPV San Jose, LLC*,
  36 Cal. App. 5th 375 (2019)...................................................................91

*Pet Food Exp. Ltd. v. Royal Canin USA, Inc.*,
  2011 WL 6140874 (N.D. Cal. Dec. 8, 2011) .............................89, 92

*Rankine v. Roller Bearing Co. of America, Inc.*,
  No. 12–CV–2065–MMA (BLM), 2013 WL 5944248 (S.D. Cal.
  Nov. 5, 2013)...........................................................................................66

*RealPro, Inc. v. Smith Residual Co., LLC*,
  203 Cal. App. 4th 1215 (2012)...............................................................94

*Rosenfeld v. JPMorgan Chase Bank, N.A.*,
  732 F. Supp. 2d 952 (N.D. Cal. 2010)...................................................96

*Rutherford v. Owens-Illinois, Inc.*,
  16 Cal.4th 953 (1997).............................................................................73

*Samish v. U.S.*,
  223 F.2d 358 (9th Cir. 1955)..................................................................64

*Sanchez-Corea v. Bank of Am.*,
  38 Cal. 3d 892 (1985).......................................................................92, 93

*Save the Hill Grp. v. City of Livermore*,
  76 Cal. App. 5th 1092 (2002).................................................................80

*Stop Syar Expansion v. County of Napa*,
  63 Cal. App. 5th 444 (2021)...................................................................80

*Underwriters Lab'ys Inc. v. N.L.R.B.*,
  147 F.3d 1048 (9th Cir. 1998)................................................................64

*US Ecology, Inc. v. State of California,*
   129 Cal. App. 4th 887 (2005) ........................................................................72

*Wilkens v. Edwards,*
   2016 WL 1271663 (D. Or. Mar. 29, 2016) ....................................................90

*Workplace Technologies Research, Inc. v. Project Management Institute, Inc.,*
   2021 WL 4895977 (S.D. Cal. Oct. 20, 2021) ................................................88

**STATUTES**

Cal. Civ. Code
   § 1641 ..............................................................................................................68
   § 3300 ................................................................................................................2

Cal. Code Regs. Title 14, § 15105 ..........................................................................9

Cal. Pub. Res. Code
   § 21177 ......................................................................................................49, 80

**TREATISES**

1 Witkin, Summary of Cal. Law, Contracts § 904 (10th ed. 2005) .......................89

1 Witkin, Summary of Cal. Law, Contracts § 824 (10th ed. 2005) .......................98

23 Cal. Jur. 3d Damages § 26 ...............................................................................89

AICPA, <u>Attaining Reasonable Certainty in Economic Damages Calculations</u> (2015) ..................................................................................90, 92

**OTHER AUTHORITIES**

California Civil Jury Instructions (2022)
   No. 303 ............................................................................................................65
   No. 325 ............................................................................................................96
   No. 430 ......................................................................................................73, 83

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

vii

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

Pursuant to the Court's instruction in its February 14, 2023 Minute Order (ECF No. 261), Counterclaimant RREEF America REIT II Corporation BBB ("RREEF") hereby lodges its proposed findings of fact and conclusions of law.  In addition, RREEF also submits the following introductory argument section for the Court's consideration:

## I.    INTRODUCTORY ARGUMENT

There is no serious dispute about most of the elements of RREEF's claims for breach of contract and breach of the covenant of good faith and fair dealing against 3500 Sepulveda, LLC, 13th & Crest Associates, LLC, and 6220 Spring Associates, LLC (the "Hacienda Parties").

### A.    The Settlement Agreement Is a Valid, Enforceable Contract

First, no party contested the validity of the settlement agreement entered into between the parties on October 8, 2008 (the "Settlement Agreement").  Nor did any party dispute the core framework of the heavily negotiated Settlement Agreement, which the parties and their counsel carefully reviewed before signing: neighboring landowners agreeing to a ceasefire to allow each other to proceed with their respective projects.

### B.    The Hacienda Parties Breached the Settlement Agreement's Terms and Implied Covenant of Good Faith and Fair Dealing

Second, there is no reasonable dispute that the Hacienda Parties breached the Settlement Agreement's terms and its implied covenant of good faith and fair dealing.  The Settlement Agreement carefully limited the Hacienda Parties' right to object to RREEF's proposed renovation and expansion (the "Project") of the Manhattan Village Shopping Center (the "Shopping Center").   The Hacienda Parties could do two things in connection with the approval process of the Project with the City of Manhattan Beach (the "City"):  (a) comment on material changes to the Project's site plan that would have detrimental effects on the "use or operation of the Hacienda Building;" or (b) object to material changes to the North Deck or

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

Parking Plan.   Separately, the Settlement Agreement also created various cooperation obligations, including requiring the Hacienda Parties to cooperate in "good faith" in the processing of RREEF's Project application and the Project's environmental preview process.  The trial record demonstrated that the Hacienda Parties repeatedly went far outside of the limits created by the Settlement Agreement and did not comply with their obligations to cooperate in good faith.

During the entitlements phase, the Hacienda Parties waged a no holds barred campaign against RREEF and its Project.  At City Council of the City of Manhattan Beach (the "City Council") meetings, the Hacienda Parties and their retained CEQA lawyer objected to nearly every aspect of the Project, and RREEF's commitment to the same.  The objections were far reaching and included criticisms and complaints related to:

- traffic conditions;
- potential soil hazards;
- air quality;
- greenhouse gas impacts;
- crime;
- RREEF's corporate size and "out-of-town" employees;
- RREEF's previous projects; and
- countless other topics.

They did not try to limit or tie their comments to specific material and/or detrimental changes between the Settlement Agreement's site plans and the proposed Project. And, they did not act in "good faith" with regard to securing approval for the Project and its environmental impact report ("EIR").  Instead, they asserted every possible attack in a prolonged and concerted effort to derail the Project's approvals and create a framework for litigation to challenge the Project's EIR.

This broad-based attack is not surprising given the Hacienda Parties' principal Mark Neumann's testimony regarding his own improper understanding of the

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

Settlement Agreement.  According to Mr. Neumann, so long as there was a single material and/or detrimental change to the 2008 Project Plans, the Hacienda Parties could oppose any aspect of the Project on *any possible grounds*.  For this reason, the record reflects no attempt by the Hacienda Parties to carefully limit their opposition based on the confines of the Settlement Agreement.  Instead, in their minds, nothing was off limits in the Hacienda Parties' scorched earth opposition campaign.

Outside of their own comments at public meetings before the City of Manhattan Beach Planning Commission and City Council, the Hacienda Parties organized, encouraged, and facilitated third party opposition against the Project. From ordering yard signs denouncing the Project, to securing a website to host opposition content, to submitting editorials against the Project to newspapers, to organizing opposition rallies, to strategizing with members of the public in how to lobby Councilmembers, the Hacienda Parties worked with numerous members of the public to oppose the Project.

The Hacienda Parties' opposition efforts did not end when the City approved the Project.  Instead, the Hacienda Parties played a substantial role in laying the groundwork for, and coordinating with the plaintiffs in, a two-years long CEQA lawsuit against the Project (the "CEQA Litigation").  The Hacienda Parties' support of a CEQA lawsuit against the Project was both opposition outside the bounds of the Settlement Agreement's specific limits and a violation of the Hacienda Parties' obligations to cooperate in good faith with RREEF with regard to environmental review of the Project.

Any meaningful CEQA lawsuit requires two things: (1) a CEQA litigator and (2) an administrative record of comments criticizing the EIR's analysis for a project. The Hacienda Parties provided both.  The Hacienda Parties' CEQA lawyer, Cory Briggs – who opposed through written comments and oral testimony nearly every aspect of the Project EIR's environmental analysis during the City's consideration of the Project – became the lawyer who brought the CEQA Litigation against the

RREEF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

City and RREEF.  In addition, in that CEQA Litigation, Mr. Briggs echoed the very same criticisms that the Hacienda Parties and he leveled against the Project's EIR during the City Council proceedings.

The Hacienda Parties also interfered with the settlement of the CEQA Litigation.  Mr. Briggs made clear that the CEQA Litigation would not settle without Mark Neumann's approval.  And, it didn't.  Mr. Neumann swayed the CEQA Litigation plaintiffs against any settlement with RREEF.  Instead, RREEF was forced to litigate the CEQA Litigation through a trial court decision.

Finally, even after RREEF overcame the CEQA Litigation, the Hacienda Parties continued their opposition campaign.  The Hacienda Parties challenged, in court, the City's Director of Community Development's ability to approve refinements to the approved Project (the "Director's Writ Litigation").  Again, this lawsuit was not based on any alleged material changes between the Settlement Agreement's site plans and the proposed Project.  Indeed, Mr. Neumann testified that the Hacienda Parties brought the suit over a change in *nine parking spaces*.  In reality, the Director's Writ Litigation was merely an attempt to further delay commencement of the Project by any means necessary.

There is also no reasonable argument that the Hacienda Parties' breaches were excused by some non-performance by RREEF.  The Hacienda Parties conceded at trial that, after signing the Settlement Agreement, RREEF did not oppose the Hacienda Parties' plan to add a restaurant to their building.  Moreover, although the Hacienda Parties tried to point to an obligation for RREEF to maintain 240 parking spaces during construction of the North Deck as a potential breach, that argument fails on both the facts and law.  As the Ninth Circuit ruled, RREEF was not contractually obligated to provide 240 parking spaces because it did not construct the North Deck in two phases.  And, any argument that RREEF's decision to construct the North Deck in one phase was a breach of the covenant of good faith and fair dealing also fails, because RREEF took proactive steps to mitigate the

impact of construction on parking, including construction phasing, circulation improvements, and other measures.  On top of all of this, as a matter of law, a latter breach of an entirely separate contractual obligation cannot retroactively cure a prior breach of contract.  Thus, there is no genuine argument that a failure by RREEF to perform under the Settlement Agreement allowed the Hacienda Parties to breach the Settlement Agreement as they did.

## C.    **RREEF Experienced Harm as a Result of the Years of Delay to the Project**

<u>Third</u>, it is not in dispute that RREEF's Project was, in fact, delayed for years as a result of the various phases of opposition brought against the Project.  The trial record establishes that RREEF anticipated receiving approval of the Project in late 2013 and beginning construction in earnest by early 2015.  In reality, RREEF did not start construction of the Project until September 2017.  This years-long delay was a result of the extremely protracted entitlements process, the forced halting of the Project due to uncertainty created by the CEQA Litigation, and the months of extra effort to have the Project re-approved by both the City Planning Commission and City Council to moot the Director's Writ Litigation.

There is also no serious dispute that RREEF was harmed as a result of the delay to the start of its Project.  RREEF's expert, David Bones, using extensive records from RREEF and outside advisors Duff & Phelps LLC, quantified the amount of increased construction costs and lost profits RREEF suffered as it waited for the delays to end.

The Hacienda Parties' expert, Christian Tregillis, waived his hand at these careful calculations, arguing that RREEF actually *benefitted* from being delayed for years.  As the Court said, this position is "counterintuitive."  More than that, though, it is also entirely baseless.  Mr. Tregillis has, without evidence, merely manipulated key inputs, such as the Shopping Center's residual value, to get a "negative

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

xii

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

damages" number.  This is not a serious demonstration that RREEF somehow suffered no harm from years of delay.

In short, there is no real dispute that the Hacienda Parties breached the Settlement Agreement in opposing the Project, that there was a delay caused by opposition to the Project, and that this delay caused RREEF real and substantial harm.

*    *    *

There are only two questions of substance that must still be answered at this point:  (1) To what extent were the Hacienda Parties' breaches of the Settlement Agreement a "substantial factor" in causing delays to the Project?; and (2) How should the quantum of harm RREEF suffered be calculated?

### D.    The Hacienda Parties' Breaches Were Substantial Factors in the Project Delays That Damaged RREEF

As to the first question, it is important to consider the legal standard defining a "substantial factor."  A "substantial factor" is something that is "more than a slight, trivial, negligible, or theoretical factor in producing a particular result." Courts have repeatedly cautioned not to place too much weight on the term "substantial."  Moreover, courts have similarly made clear that "substantial factor" causation does not require the defendant to be the sole cause, meaning that a defendant may be a "substantial factor" even when multiple causes contribute to a particular event.  Further, the "substantial factor" standard encompasses independent concurrent causes, meaning a defendant can be a "substantial factor" even where another, separate cause would have independently caused the same result.  Based on this legal framework, the evidence demonstrates that the Hacienda Parties were a substantial factor in causing delays to the Project.

At the entitlements phase, the Hacienda Parties were the most vocal, broad-based, and detailed critics of the Project.  No one else hired a CEQA lawyer to

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

xiii

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

1   threaten the City with litigation. No one else retained experts to submit reports to

2   challenge the City's EIR and its environmental analysis.

3       The trial record reflects the impacts of this aggressive opposition. The City

4   Council grew concerned about the legal risks constantly trotted out by the Hacienda

5   Parties and their attorney, adding meetings to the schedule to try to address the

6   Hacienda Parties' barrage of criticisms and mitigate potential legal exposure.

7   Indeed, the Hacienda Parties' rancor was so severe that the City Council added a

8   condition of approval requiring "good faith negotiation" between RREEF and the

9   Hacienda Parties. That condition, until it was ultimately removed after additional

10   delay, rendered the Project unable to proceed. No other commenter generated so

11   much concern or such a sharp reaction from the City.

12       The Hacienda Parties were also crucial to the commencement of the CEQA

13   Litigation. Whether or not they were actual members of the Sensible Citizens of

14   Manhattan Beach ("SCMB"), and whether or not they admit that they actively

15   assisted SCMB (both questions which the Court must assess by considering the

16   totality of the circumstances and the credibility of the witnesses at trial and in

17   designated deposition testimony), they nevertheless were a substantial factor in the

18   lawsuit and the delays it caused. They provided the CEQA litigator to attack the

19   EIR. They worked to create an extensive administrative record, supplemented by

20   expert reports, criticizing the EIR. These two ingredients were essential to the filing

21   of the CEQA Litigation, and the Hacienda Parties' knew—or recklessly disregarded

22   the knowledge—that their actions would lead to a lawsuit and further delay. If this

23   is not a "substantial factor," then it is hard to know what would be.

24       The Hacienda Parties also inhibited the early settlement of the CEQA

25   Litigation, influencing the plaintiffs in the CEQA Litigation to reject settlement

26   attempts. Indeed, Mr. Briggs informed RREEF that a settlement of the CEQA

27   Litigation was unlikely unless RREEF could garner the Hacienda Parties' approval.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

xiv

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

1  In this manner, the Hacienda Parties were far from a "trivial" factor in it taking two

2  years to resolve the CEQA Litigation.

3  Finally, only the Hacienda Parties challenged the Director of Community

4  Development's authority to approve refinements to the Project's plans.  And, even

5  when RREEF submitted the refinements to the City Planning Commission for

6  approval to moot the Hacienda Parties' lawsuit, the Hacienda Parties further

7  delayed the process by appealing the City Planning Commission's approval to the

8  City Council.  This forced yet another layer of approvals to occur, adding months

9  of additional delay.  In this sense, no other person or entity was a factor (much less

10  a substantial factor) in causing the delays stemming from the Director's Writ

11  Litigation.

12  Thus, at every phase of opposition RREEF faced, the Hacienda Parties played

13  a key role and constituted a "substantial factor" in the delays flowing from such

14  opposition.

15  The Hacienda Parties have tried to distract from their record of opposition and

16  resulting delay by pointing to a red herring:  Macy's.  According to the Hacienda

17  Parties, Macy's was the limiting factor for the Project, preventing progress until the

18  final agreement between RREEF and Macy's was signed in July 2016.  But, this

19  gets the facts exactly backwards.  The delay in receiving Macy's final agreement to

20  the Project was just another symptom of the opposition campaign waged by the

21  Hacienda Parties.  RREEF and Macy's had reached agreement on the fundamental

22  terms of their agreement as of 2013.  But, there was no reason to finalize their

23  agreement until RREEF had confidence it could move forward with the Project.

24  The Project was in a constant state of flux for years—and may not have even

25  happened—due to both the entitlements process and RREEF's attempts to appease

26  the Hacienda Parties and the CEQA Litigation plaintiffs during the pendency of the

27  CEQA Litigation.  Only once the uncertainty around the Project had been

28

1  sufficiently resolved did it make any sense for RREEF and Macy's to execute a

2  final agreement regarding the Project.

3       **E.    RREEF Established Its Damages with Reasonable Certainty**

4       The second question is what is the amount of identifiable harm that RREEF

5  suffered from the delays caused by the Hacienda Parties?  Mr. Bones has offered a

6  detailed expert opinion providing calculations of construction cost escalation

7  damages and lost profits damages with the requisite "reasonable certainty."  As case

8  law and treatises make clear, contract damages need not be calculated with

9  mathematical precision.  Rather, they must merely reflect a reasonable basis of

10  computation.  Mr. Bones's use of inflation-tracking indices is a widely-accepted

11  method of measuring the impacts of inflation.  Similarly, Mr. Bones's use of

12  RREEF's actual financial results, coupled with the use of a profits projection

13  prepared for use by sophisticated financial institutions, is a well-supported

14  methodology to identify lost profits.  This is all the more true given Mr. Bones's

15  testing of the projected profits against RREEF's actual results, which demonstrated

16  that the projections Mr. Bones based his lost profits calculations on were

17  *understated*.  And, on top of all of this, Mr. Bones repeatedly made conservative

18  choices that lowered RREEF's overall damages.  Accordingly, RREEF has

19  established with "reasonable certainty" that it suffered $19,166,000 in cost

20  escalation damages and $5,675,000 in lost profits damages.

21                      *      *      *

22       With these final two questions answered, the result is clear.  The Hacienda

23  Parties must be held accountable for their repeated breaches of the Settlement

24  Agreement and its attendant implied covenant of good faith and fair dealing.  Rather

25  than living up to their bargain, once the Hacienda Parties got the restaurant space

26  they desired, they launched their years-long campaign to stop RREEF's Project at

27  all costs.  In so doing, the Hacienda Parties caused RREEF millions of dollars in

28

1  damages.  A judgment in favor of RREEF will address the promises the Hacienda

2  Parties made but did not keep.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

xvii

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

## II.    PROPOSED FINDINGS OF FACT

### A.    The Parties

#### i.    *RREEF*

1. Counter-Claimant RREEF America REIT II Corporation BBB ("RREEF") is an investment fund, and specifically a private REIT, that owns a portfolio of real estate assets. Tr. 29:1-2, 30:9-17.[1] RREEF's investors include unions, public and private pension funds, corporations, and a few individuals. Tr. 30:18-24. Approximately 90% of RREEF's investors are U.S.-based. *Id.* RREEF's assets include residential, retail, industrial, and office properties. Tr. 31:5-9. Amongst RREEF's owned assets is the Manhattan Village Shopping Center (the "Shopping Center"). Tr. 31:10-12.

#### ii.    *The Hacienda Parties*

2. The Counter-Defendant Hacienda Parties consist of three limited liability companies (3500 Sepulveda, LLC, 13th & Crest Associates, LLC, and 6220 Spring Associates, LLC), whose principals are Mark Neumann and Richard Rizika. Tr. 53:10-16; *see also* ECF No. 246 (Joint Statement of Stipulated Facts) ¶¶ 2-6.

3. The Hacienda Parties jointly own, as tenants in common, a single asset – an approximately 20,000 square foot building located on a 0.7 acre parcel at 3500 Sepulveda Boulevard (the "Hacienda Building"). ECF No. 246 ¶ 2-6. The Hacienda Building is an outparcel building within the larger Shopping Center. Tr. 53:1-9.

#### iii.    *Macy's*

4. Macy's West Stores, Inc. ("Macy's") owns a building and lot within the Shopping Center. TE 1313 at 0001, 0032-0034; Tr. 53:6-9, 86:3-9. Prior to RREEF's renovation and expansion of the Shopping Center, Macy's was also one of RREEF's tenants, renting a space for a home goods and men's store within the Shopping Center. Tr. 86:12-25.

---

[1] References to "Tr." shall refer to the Reporter's Transcript of Trial Proceedings for the trial held between February 6, 2023 and February 13, 2023.

5.     Macy's is a "prime party" under the Construction and Operation Reciprocal Easement Agreement (the "COREA"), which applies to the Shopping Center.  Tr. 834:23-835:3.  As a result, Macy's had approval rights over things like redevelopment of the Shopping Center.  *Id.*

**B.     The Settlement Agreement**

i.     *Background*

6.     In 2004, RREEF purchased the Shopping Center.  TE 632 at 0012.

7.     RREEF valued several aspects of the Shopping Center, including its location, ability to draw customers from across the region, and its combination of both a retail mall and a "community center" featuring grocers and other services.  Tr. 34:20-35:7.

8.     Moreover, RREEF valued the possibility of redeveloping and upgrading significant portions of the Shopping Center with a focus on boosting sales, improving the volume of shoppers, and increasing rents.  Tr. 35:7-11; *see also* TE 632 at 0019.  This was particularly true given the state of the Shopping Center at RREEF's purchase, as the Shopping Center was outdated and had significant deferred maintenance to address.  Tr. 35:12-22.

9.     On November 7, 2006, RREEF began the process to expand, upgrade, and redevelop the Shopping Center (the "Project") by submitting an application to receive various land use entitlements required by the City.  TE 2035 at 0001.  The application sought, among other things, to (i) construct new retail and restaurant gross leasable area and three parking structures; (ii) reconfigure existing surface parking areas; and (iii) install signs to identify and advertise the businesses within the Shopping Center.  *Id.*

10.     The Hacienda Parties raised various concerns regarding RREEF's proposed project at the Shopping Center.  TE 3033 at 0002.

11.    Separately, the Hacienda Parties were interested in signing a restaurant as a tenant for the Hacienda Building, which was tenanted at the time by medical and office uses. *See* Tr. 471:10-23, 473:8-13.

12.    However, the Master Use Permit governing the Shopping Center (including the Hacienda Building) limited the total square footage of restaurant use within the center. Tr. 55:4-18. Thus, to the extent the Hacienda Building converted some of its existing medical or office space to restaurant uses, RREEF would be entitled to less of such uses. *See* Tr. 56:10-18. This was not a trivial limitation, as restaurant use is typically some the highest grossing use within the Shopping Center, with restaurants typically paying the highest rents – often close to double the rent of office use. Tr. 56:1-9.

13.    RREEF disputed whether the Hacienda Parties' could add restaurant a use to the Hacienda Building. TE 3033 at 0001.

14.    Given that the Hacienda Parties had raised objections to RREEF's proposed Project and RREEF's concerns regarding the Hacienda Parties' efforts to incorporate restaurant use in the Hacienda Building, as well as RREEF's and the Hacienda Parties' desire to resolve other disputes (including regarding "common area maintenance" payments owed by the Hacienda Parties), on October 8, 2008, RREEF and the Hacienda Parties entered into the Settlement Agreement (the "Settlement Agreement"). TE 3033 at 0001. The parties were represented by counsel in negotiation of the agreement and reviewed the agreement carefully before the parties signed it. Tr. 399:14-400:1.

15.    RREEF agreed that it would not object to the Hacienda Parties' application to incorporate restaurant space (the "Hacienda Building Application"), to cooperate in good faith with the processing of the Hacienda Building Application, and to release related claims against the Hacienda Parties. TE 3033 at 0003-0005, 0011 (Sections 1, 2, 4(f), and 11).

16.     In exchange, the Hacienda Parties consented to the Project as depicted in the plans attached to the Settlement Agreement and agreed (1) to not oppose the City's approval of the Project, except as otherwise provided in the Settlement Agreement; (2) to cooperate in good faith with RREEF in the processing of its requests to the City for entitlements and the environmental review required to proceed with the Project; and (3) to release related claims against RREEF.  TE 3033 at 0004-0006, 0011-0012 (Sections  4(a), 4(e), 4(f), 12).

17.     The Project plans attached to the Settlement Agreement included the "2008 Site Plan" and "2008 Parking Plan" (collectively the "2008 Project Plans"). *Id.* at 0037-0079 (Exhibit E), 0080-0081 (Exhibit G).

18.     From RREEF's perspective, the key benefit of the Settlement Agreement was to be able to advance the application process for its Project with assurances that it could "go arm in arm with a neighboring party who would support [RREEF's] application to the City."   Tr. 56:22-57:7; *see also* Tr. 59:2-14 ("[JOSHUA LENHERT]:  We were looking to eliminate a potential objection and turn a negative into a positive.").

### ii.     *Settlement Agreement's Key Terms*

19.     In Section 4(a) of the Settlement Agreement, the Hacienda Parties consented to the Project as depicted in the 2008 Project Plans and promised to "not oppose the City's approval of the Shopping Center Project, except as otherwise provided herein."  TE 3033 at 0004.

20.     The only provisions that could "provide[]" "otherwise" are Sections 4(g) and 5(c) of the Settlement Agreement.  Section 4(g) explained that the Hacienda Parties did not "waive the right to participate or comment on material alterations to the [2008] Site Plan … which detrimentally affect the use or operations of the Hacienda Building."   TE 3033 at 0005.   Section 5(c) provided that the Hacienda Parties could object to "material revisions to those portions of the [2008]

1  Site Plan relating to the North Deck and the [2008] Parking Plan" that RREEF

2  submitted "to the City for consideration and approval." *Id.* at 0005.

3      21.    The Settlement Agreement further required that, if the Hacienda

4  Parties' rights under Section 4(g) or 5(c) were triggered (that is, if RREEF made

5  "material alterations to the [2008] Site Plan … which detrimentally affect the use or

6  operations of the Hacienda Building" or "material revisions to the North Deck and/or

7  [2008] Parking Plan"), then the subject matter of the Hacienda Parties' comments

8  and/or objections before the City were limited to the changes that triggered their

9  right to comment and/or object (that is, "comment[s] *on* material [and detrimental]

10  alterations to the [2008] Site Plan" or "object[ions] *to* such material revisions" to the

11  North Deck or 2008 Parking Plan).  TE 3033 at 0005 (Sections 4(g) and 5(c))

12  (emphasis added).

13      22.    Sections 4(e) and 4(f) of the Settlement Agreement obligated the parties

14  to "cooperate in good faith with each other in the processing of the Amended RREEF

15  Application, including but not limited to the MUP Amendment and Environmental

16  Impact Report, for the Shopping Center Project and the entitlement process

17  pertaining to such Applications," and to "cooperate in good faith with each other in

18  the processing of applications for approvals from the City for improvements to [] the

19  Shopping Center … within the scope of this Agreement."  TE 3033 at 0004-0005.

20  Moreover, each party, at the other party's request, was required to "write a letter of

21  support to the City" regarding their respective project applications.  *Id.* at 0005

22  (Section 4(f)).

23      iii.    ***RREEF Performed Under the Settlement Agreement***[2]

24      23.    Following the execution of the Settlement Agreement, RREEF

25  performed its obligations under the Settlement Agreement.  In particular, RREEF

---

[2] This section, as well as Section III.A.2, *infra*, addresses the Court's fifth question from the February 14, 2023 Minute Order (Dkt. No. 261) (the "February 14, 2023 Minute Order") ("Does the failure of RREEF to provide 240 parking spots during construction as required by the Settlement Agreement (and RREEF's advance

1  met its obligation not to object to the Hacienda Parties' conversion of a portion of
2  the Hacienda Building's ground floor to restaurant use.  TE 101 at 0013 (RFA 13);
3  Tr. 474:18-22.

4      24.    The Hacienda Parties suggested at trial that RREEF breached the
5  Settlement Agreement through RREEF's alleged conduct during the construction of
6  the Project.    Tr. 22:21-23:18.    Specifically, they argued that RREEF failed to
7  maintain a sufficient number of parking spaces proximate to their building during
8  construction of the North Deck.  *Id.* at 23:6-8.

9      25.    The Settlement Agreement states that "[d]uring ***Stage One***
10  ***construction*** of the North Deck, there shall be not less than 240 parking spaces
11  available in the area referenced as 'Lot F' on the attached Exhibit H."  TE 3033 at
12  0080 (Exhibit G) (emphasis added).    This provision reflects the fact that the
13  Settlement Agreement contemplated that RREEF could build the North Deck in
14  either one or two stages.  *Id.* at 0006 (Section 5(a)).  To the extent RREEF built the
15  North Deck in two stages, during the first stage,  RREEF agreed to maintain 240
16  parking spaces in the "Lot F" area until the first portion of the North Deck was built.
17  *Id.* at 0080.

18      26.    RREEF opted not to build the North Deck in two phases.  Instead,
19  RREEF built the North Deck in a single phase, which allowed the deck to be
20  constructed at a faster rate, reducing the impact on the Hacienda Building and the
21  need to maintain additional parking spaces.  TE 1007 at 0002.

22      27.    The Ninth Circuit has already held in this case that "b[e]cause the
23  Settlement Agreement does not *require* construction of the North Deck in stages,
24  and Exhibit G provides for 240 parking spaces during Stage One, RREEF has not
25  expressly breached the Agreement by constructing the North Deck without
26
27

28  notice to the Hacienda parties of this anticipated failure) have an impact on the
current issues from the trial?").

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

maintaining any parking spaces in Lot F." *3500 Sepulveda, LLC v. Macy's W. Stores, Inc.*, 980 F.3d 1317, 1325 (9th Cir. 2020) (emphasis in original).

28.    RREEF also mitigated any potential impact to the Hacienda Parties during the substantially shorter period of construction of the North Deck by prioritizing circulation improvements in the portions of the Shopping Center closest to the Hacienda Building to the benefit of the Hacienda Parties and their tenants, among other measures.  TE 28 at 0015-0016; Tr. 175:9-16.

29.    Moreover, RREEF reorganized the overall Project construction sequence so that the Northeast and South Decks would be built before the North Deck, ensuring that there would be additional parking availability for Hacienda Building customers during the construction of the North Deck.  TE 28 at 0016, 0022-0023.  The extension of Cedar Way to Rosecrans Avenue also improved access and circulation, further limiting parking demand in the former-Lot F area.  *Id.* at 0011-0012.

### C.    **The Entitlements Phase**[3]

30.    Before constructing the Project, RREEF was required to obtain municipal approvals from the City, including (1) an amendment to the existing Master Use Permit for the Shopping Center issued under the City's Municipal Code ("MUP Amendment"), and (2) certification of an accompanying Environmental Impact Report ("EIR"), required by the California Environmental Quality Act ("CEQA").  Tr. 42:18-43:22, 411:25-412:25, 662:12-663:22.

31.    The MUP Amendment process requires an applicant to submit plans and other documentation about the proposed project to the City.  Tr. 46:8-23, 411:25-412:25.  The Planning Commission of the City of Manhattan Beach (the "Planning

---

[3] This section addresses the Court's second question from the February 14, 2023 Minute Order ("Please address (in a time-line form if possible) the timing of objections/presentations by the Hacienda parties as well as objections/presentations made by other individuals and entities, including RREEF's objections/presentations to the planning council and the city council.").  A summary of this section in time-line form is attached hereto as Appendix A.

Commission") then receives public comments and holds public meetings to decide whether to approve the MUP Amendment, and its decision may be appealed to the City Council of the City of Manhattan Beach (the "City Council"). *Id.*

32.    The EIR process entails a thorough review of the proposed project to analyze potential environmental impacts and mitigation measures. Tr. 42:18-43:22, 259:17-260:22. The City circulates a Draft EIR to the public, evaluates and responds to public comments (including through public meetings), and prepares a Final EIR for certification. Tr. 259:17-260:22. The EIR certification is judicially reviewable in state court. *See* TE 2036 at 0003.

33.    RREEF estimated that it would obtain entitlements for the Project by December 2013, with pre-construction work occurring in 2014 and construction on the Project commencing in January 2015. Tr. 46:24-47:20, 51:4-15.

34.    On June 16, 2012, the draft EIR was prepared and circulated by the City for public comment, which closed on July 17, 2012. TE 2131 at 0006.

35.    At the outset of the entitlements process, RREEF needed approvals from the Planning Commission.

i.    ***June 27, 2012 Planning Commission Meeting***

36.    The first public meeting on the Project was held on June 27, 2012 before the Planning Commission. TE 3001; TE 3014; TE 3015 at 0007.

a.    RREEF's Oral Comments at Meeting

37.    At the June 27, 2012 meeting, RREEF presented on the opportunities and advantages of its proposed Project, including keeping retail revenue within the City, increasing nearby property values, improving circulation and access, and promoting the creation of green spaces. TE 3015 at 0007-0008. RREEF also answered various questions from the Planning Commission about tax revenue, the Fry's electronics store, the possibility of opening an independent theater, and other topics. *Id.*

1

b.   Public Oral Comments at Meeting

2   38.   Seven members of the public who were not affiliated with the parties

3   spoke at the meeting both in favor of and objecting to aspects of the Project.  TE

4   3015 at 0012-0013.  The people raising objections discussed traffic, potential for

5   increased crime, lighting, and the need to preserve the small-town feel of the City.

6   *Id.*

7

ii.   ***October 3, 2012 Planning Commission Meeting***

8   39.   The second public meeting on the Project was held on October 3, 2012

9   before the Planning Commission.  TE 3008; TE 3016.

10

a.   The Hacienda Parties' Pre-Meeting Written Comments

11   40.   On September 24, 2012, the Hacienda Parties wrote a letter to Laurie

12   Jester (the City of Manhattan Beach Planning Manager) expressing their concerns

13   with the Project, including alleged land use impacts on the Hacienda Building,

14   impacts on existing easements, and parking.  TE 3015 at 0017-0021.  The letter was

15   included in the October 3, 2012 staff report provided by City staff to the Planning

16   Commission.  *Id.*

17

b.   Public Pre-Meeting Written Comments

18   41.   The staff report indicates that in advance of the October 3, 2012

19   meeting, forty-five residents, agencies, surrounding Cities, business owners, and

20   other members of the public submitted written comments on the Draft EIR for the

21   Project.  TE 3015 at 0003.  CEQA Guidelines require that a Draft EIR be made

22   subject to public review and comment for not less than 30 days nor longer than 60

23   days (except in unusual circumstances).  Cal. Code Regs. Tit. 14, § 15105.

24   42.   The City categorized the Draft EIR comments into general subjects:

25   "Size-Regional Draw," "Traffic, Mobility (Bicycles, Pedestrians, Transit) and

26   Parking structures," "Lighting," "Crime," "Hazards," and "Miscellaneous."   TE

27   3015 at 0003-0004.

28

c.     RREEF's Oral Comments at Meeting

43.    At the October 3, 2012 meeting, Mark English, RREEF's representative, presented on the opportunities and advantages of the Project.  TE 3016 at 0028-0029.  In addition, Mr. English discussed phasing of construction and the types of retail expected to be added.  *Id.*  He also addressed previously raised concerns, including crime, lighting, traffic, parking, and circulation.  *Id.*  Mr. English answered various questions from the Planning Commission, including inquiries about the mock-up of the northwest corner of the Shopping Center, design of the parking structures (*e.g.*, the challenges of placing parking underground given the Shopping Center's status as a former Chevron tank farm), circulation and connections to Veterans Parkway, and accessibility for bicycles.  *Id.* at 0029-0032.

d.     Public Oral Comments at Meeting

44.    Ten members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project.  TE 3016 at 0033-0037.  The people raising objections discussed construction, rodents, attraction of visitors from outside of the City, parking, safety, design of the parking garages, the height of certain buildings, and soil hazards.  *Id.* at 0033-0037.

iii.    ***March 13, 2013 Planning Commission Meeting***

45.    The third public meeting on the Project was held on March 13, 2013 before the Planning Commission.  TE 57; TE 2134; TE 2155; TE 3016.

a.     RREEF's Oral Comments at Meeting

46.    At the March 13, 2013 meeting, RREEF presented on soil hazards, site layout, Shopping Center tenants, bike and pedestrian plans, parking and circulation, and parking structure design concepts.    TE 3017 at 0051-0053.    RREEF's representatives also answered various questions from the Planning Commission following the presentation.  *Id.*  A RREEF employee also spoke in favor of the Project during the public comments period of the meeting.  *Id.* at 0056.

b.    The Hacienda Parties' Oral Comments at Meeting

47.    Mr. Neumann appeared before the Planning Commission on behalf of the Hacienda Parties and opposed the Project, including by criticizing the potential for traffic on Rosecrans Avenue, parking, and the density of the Project. TE 57 at 0002-0008; TE 2134 at 0123-0129; Transcript of Deposition of Mark Neumann ("Neumann Dep. Tr.") at 74:20-75:8.

c.    Public Oral Comments at Meeting

48.    Four members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. TE 3017 at 0055-0056. The people raising objections discussed traffic, the parking structures, and the potential loss of the Fry's store. *Id.*

d.    Post-Meeting Events

49.    In March 2013, the City completed and published Volume I of the Final EIR. *See* TE 2128; TE 2131 at 0006.

iv.    ***April 24, 2013 Planning Commission Meeting***

50.    The fourth public meeting on the Project was held on April 24, 2013 before the Planning Commission. TE 2156; TE 3002; TE 3017.

a.    The Hacienda Parties' Pre-Meeting Written Comments

51.    On April 17, 2013, Mr. Neumann and Mr. Rizika sent a letter to Richard Thompson, the Director of Community Development for the City of Manhattan Beach, in which the Hacienda Parties wrote that they were "not in support of the current plans to expand the Mall." TE 58 at 0001; Neumann Dep. Tr. at 78:2-8, 78:17-23. The Hacienda Parties also wrote that "[i]f [RREEF] develop[s] the site as proposed they stand to make millions while leaving the residents with a traffic nightmare." *Id.* at 0002; Neumann Dep. Tr. at 83:6-84:1.

b.    Public Pre-Meeting Written Comments

52.    The staff report indicates that in advance of the April 24, 2013 meeting, two members of the public who were not affiliated with the parties submitted written

comments raising objections about traffic and tree preservation.  TE 3017 at 0075-0076.

### c.    RREEF's Oral Comments at Meeting

53.    At the April 24, 2013 meeting, RREEF presented on the overall site plan, phasing of the Project, the design of the parking decks, loading and unloading logistics, Veteran's Parkway, and related topics.  TE 3018 at 0148-0150.  RREEF also answered various questions from the Planning Commission.  *Id.* at 0150.

### d.    Public Oral Comments at Meeting

54.    Nine members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project.  TE 3018 at 0152-0153.  The people raising objections discussed perceived inadequacies in the EIR due to a lack of specific enough plans, traffic, the loss of local identity, and parking.  *Id.*

### v.    *May 22, 2013 Planning Commission Meeting*

55.    The fifth public meeting on the Project was held on May 22, 2013 before the Planning Commission.  TE 59; TE 2086 at 0105; TE 2157; TE 3003; TE 3018.

### a.    RREEF's Oral Comments at Meeting

56.    At the May 22, 2013 meeting, Mark English, on behalf of RREEF, presented on parking and lighting and presented two letters of support from Macy's for the parking dispersion for the Project and the direction of the Project.  TE 2086 at 0109-0110; *see also* TE 1249.

### b.    The Hacienda Parties' Oral Comments at Meeting

57.    Mr. Neumann, "represent[ing] the owners of the Hacienda Building," spoke at the meeting and opposed the Project.  TE 59 at 0002-0008; TE 3003 at 0019:9-0022:4, 0143:16-0145:25; Neumann Dep. Tr. at 86:2-13.  Mr. Neumann stated, among other things, that the Planning Commission should give RREEF "a quarter" or "10 percent" "of what they were asking for."  TE 3003 at 0144:4-7.  Mr.

1    Neumann also criticized parking in connection with the Project; in particular, he
2    voiced concerns about the G+2 North Deck plan. TE 2086 at 0106. He also noted
3    that if the Project Plans were "good plan[s], it would be done in two or three years."
4    TE 3003 at 0144:16-19.

5                        c.    Public Oral Comments at Meeting

6    58.    Thirteen members of the public who were not affiliated with the parties
7    spoke at the meeting both in favor of and objecting to aspects of the Project. TE
8    2086 at 0106-0107, 0111. The people raising objections discussed traffic, parking,
9    pollution, the EIR, crime and safety, and construction staging. *Id.*

10                  vi.    ***June 26, 2013 Planning Commission Meeting***

11    59.    The sixth public meeting on the Project was held on June 26, 2013
12    before the Planning Commission. TE 61; TE 2007; TE 2086; TE 2158.

13                        a.    The Hacienda Parties' Pre-Meeting Written Comments

14    60.    Prior to the meeting, Mr. Neumann sent an email to the Planning
15    Commission stating that the Planning Commission did not properly notice the
16    meeting and asked them to further delay the meeting in order to rectify the notice
17    issue. TE 2086 at 0286.

18                        b.    Public Pre-Meeting Written Comments

19    61.    The staff report indicates that in advance of the June 26, 2013 meeting,
20    seven members of the public submitted written comments both in favor of and
21    objecting to aspects of the Project. TE 2086 at 0259-0289. The people raising
22    objections discussed concerns about visibility due to the development, safety and
23    crime concerns, the median break on Rosecrans Avenue, traffic, and parking. TE
24    1067; TE 2086 at 0259-0260.

25                        c.    RREEF's Oral Comments at Meeting

26    62.    At the June 26, 2013 meeting, Mark English, on behalf of RREEF,
27    presented on RREEF's disagreement with certain proposed conditions of approval
28    for the project. TE 3019 at 0064-0065. Following Mr. English, Mr. Neumann spoke

1    regarding the conditions of approval, and agreed with Mr. English as to certain issues

2    regarding the conditions of approval, including: (1) a condition of approval to delay

3    installing 50 parking spaces in Phase 3 rather than Phase 2; (2) a condition of

4    approval regarding a ramp, which Mr. Neumann suggested should be constructed

5    concurrent with theater demolition; and (3) ensuring that all existing uses are

6    "grandfathered in." *Id.* at 0066.

7          d.  The Hacienda Parties' Oral Comments at Meeting

8       63.  Mr. Neumann spoke at the meeting and opposed the Project.  TE 61 at

9    0002-0007, 0014-0016; TE 3019 at 0060; Neumann Dep. Tr. at 94:1-4.   Mr.

10    Neumann noted that he owned 3500 Sepulveda.   TE 2007 at 0017:19-22.   Mr.

11    Neumann questioned the Project's parking plan, the planned timing for installation

12    of parking, the height of the planned parking garages, the phasing of the Project, and

13    the planned location of a dog park as part of the Project.  *Id.* at 0018:23-0022:12.

14          e.  Public Oral Comments at Meeting

15       64.  Nineteen members of the public who were not affiliated with the parties

16    spoke at the meeting both in favor of and objecting to aspects of the Project.   TE

17    3019 at 0060-0062, 0066.  The people raising objections discussed parking, traffic,

18    and the Project's size.  *Id.*

19          f.  Planning Commission Actions at Meeting

20       65.  On June 26, 2013, the Final EIR was certified by the Planning

21    Commission.  TE 3021 at 0004.

22        vii. ***The Hacienda Parties' Appeal of the Planning Commission's***

23          ***Certification and Approval of the EIR***

24       66.  On July 9, 2013, Mr. Neumann, on behalf of 3500 Sepulveda, LLC,

25    provided notice to the City of Manhattan Beach of the Hacienda Parties' appeal of

26    the Planning Commission's certification and approval of the EIR.  TE 62.

27       67.  On that same day, Mr. Neumann emailed Mr. Thompson and Ms.

28    Jester, explaining the reasons for appealing the certification and approval of the EIR.

TE 3021 at 0103-0104.  As Mr. Neumann explained, the Hacienda Parties appealed the Planning Commission's certification of the EIR on the grounds that "[t]he Environmental Impact Report does not comply with the requirements of the California Environmental Quality Act and other Laws."  TE 63 at 0003; TE 3021 at 0105.

68.    On July 10, 2013, Mr. Neumann sent an email to each member of the Planning Commission and the City Council, with the subject line "Appeal of Manhattan Village Mall EIR" setting out the basis for the Hacienda Parties' appeal of the Project.  TE 85 at 0005-0027.

### viii.   *July 24, 2013 Planning Commission Meeting*

69.    The seventh public meeting on the Project was held on July 24, 2013 before the Planning Commission.  TE 2159; TE 3019; TE 3032.

### a.    RREEF's Pre-Meeting Written Comments

70.    RREEF wrote a letter to the Planning Commission in advance of the meeting, outlining its concerns regarding certain conditions of approval and proposing modifications to address those concerns.  TE 3019 at 0255-0265.

### b.    The Hacienda Parties' Pre-Meeting Written Comments

71.    On July 23, 2013, the Hacienda Parties sent a letter to the Planning Commission stating that they were opposed to the proposed Project due to its impact on the flexibility of potential uses at the Hacienda Building.  TE 2008 at 0002-0007.

72.    On July 24, 2013, Mr. Neumann and Mr. Rizika, on behalf of the Hacienda Parties, wrote the Planning Commission urging the Planning Commission not to approve the EIR, the MUP Amendment, and any other approvals related to the Project because approval of the EIR "would violate the California Environmental Quality Act, the Planning and Zoning Law, and your agency's own ordinances and policies."  TE 64.  As an example, the Hacienda Parties noted that the EIR did not "adequately analyze all environmental measures" and asserted that the mitigation measures in the EIR were "insufficient."  *Id.*

1                 c.     <u>Public Pre-Meeting Written Comments</u>

2       73.     The staff report indicates that in advance of the July 24, 2013 meeting,

3 seventy-eight members of the public who were not affiliated with the parties

4 submitted written comments both in favor of and objecting to aspects of the Project.

5 TE 3019 at 0252-0341. The person raising objections discussed variances for the

6 height of the parking structures, lighting, and signage. *Id.* at 0252.

7                 d.     <u>RREEF's Oral Comments at Meeting</u>

8       74.     At the July 24, 2013 meeting, Mark English, on behalf of RREEF,

9 discussed conditions of the draft Resolution that RREEF did not agree to, including

10 signage, EV charging, and land uses and square footage. TE 3021 at 0110. Michael

11 Burch, RREEF's signage consultant, discussed RREEF's updated sign program for

12 the Project. *Id.*

13                 e.     <u>The Hacienda Parties' Oral Comments at Meeting</u>

14       75.     Mr. Neumann and Mr. Rizika, identifying themselves as "managing

15 members" of 3500 Sepulveda, TE 3032 at 0078, spoke at the meeting and opposed

16 the Project, including by discussing their appeal of the Final EIR, their perceived

17 diminished rights under the Project, parking, and the proposed dog park. TE 3021

18 at 0114.

19                 f.     <u>Public Oral Comments at Meeting</u>

20       76.     Seven members of the public who were not affiliated with the parties

21 spoke at the meeting both in favor of and objecting to aspects of the Project. TE

22 3021 at 0113-0014. The people raising objections discussed signage, parking

23 structures, and traffic. *Id.*

24                 g.     <u>Planning Commission Actions at Meeting</u>

25       77.     At the July 24, 2013 meeting, the Planning Commission approved

26 Planning Commission Resolutions NOS. PC 13-10 and 13-09, which approved the

27 MUP Amendment, EIR, and the overall Project, subject to sixty-four conditions of

28 approval. TE 3021 at 0012-0049.

h.    Post-Meeting Events

78.    As of August 5, 2013, the Hacienda Parties had retained Cory Briggs, an attorney who specialized in CEQA litigation.  TE 86; Tr. at 667:13-19.  The Hacienda Parties were the only people to hire an attorney to oppose the Planning Commission's EIR certification and Project approval. *See* TE 2138.

ix.    ***August 6, 2013 City Council Meeting***

79.    The eighth public meeting on the Project was held on August 6, 2013 before the City Council.  TE 3004.

a.    The Hacienda Parties' Pre-Meeting Written Comments

80.    On August 6, 2013, the Briggs Law Corporation (Mr. Briggs's law firm), on behalf of the Hacienda Parties, wrote the City, appealing the certification of the EIR and approval of the MUP.  TE 65.

81.    The Briggs Law Corporation's letter contended that the approvals "violate[d] the California Environmental Quality Act, the Planning and Zoning Law, and your agency's own ordinances and policies."  TE 65.  As an example, the letter noted that the EIR did not "adequately analyze all environmental measures" and identified the mitigation measures in the EIR as "insufficient." *Id*.

b.    Public Oral Comments at Meeting

82.    At the August 6, 2013 meeting, three members of the public who were not affiliated with the parties spoke at the meeting objecting to aspects of the Project. TE 3004 at 0013:22-0016:7.  They discussed the lack of communication between the community and RREEF and financial impacts to the City. *Id.*

c.    City Council Comments and Actions at Meeting

83.    At the August 6, 2013 City Council meeting, City Staff provided a report on the Project. *See* TE 3004 at 0004:6-0006:5.  The City Council also officially called the Project up for review under its authority to review Planning Commission decisions. *Id*. at 0022:4-11.

84.    At the City Council meeting, City Staff said they expected the approval process to take two public meetings.  TE 3004 at 0005:18-0006:4.  The City Council scheduled three meeting dates to consider the Project.  *Id.* at 0022:4-18; *see* TE 3021 at 0001.

### d.    Post-Meeting Events

85.    On August 9, 2013, RREEF appealed two out of the sixty-four conditions of approval imposed by the Planning Commission.  TE 3021 at 0093.  Specifically, RREEF appealed a condition of approval that delayed approval of the Master Sign Program, which RREEF represented was an integral component of the Project, and the imposition of maximum square footages (*i.e.*, caps) on several approved land uses at the Shopping Center.  *Id.*

### x.    *September 3, 2013 City Council Meeting*

86.    The ninth public meeting on the Project was held on September 3, 2013 before the City Council.  *See* TE 3005.

### a.    Public Pre-Meeting Written Comments

87.    The staff report indicates that in advance of the September 3, 2013 City Council meeting, three members of the public who were not affiliated with the parties submitted written comments both in favor of and objecting to aspects of the Project. TE 3021 at 0106-0107, 0233-0234.  The people raising objections discussed their preference for below-ground parking structures rather than above ground parking structures, traffic, noise and light pollution, and parking.  TE 3021 at 0107, 0233-0234.

### a.    RREEF's and Macy's Oral Comments at Meeting

88.    At the September 3, 2013 meeting, RREEF communicated to the City Council that its appeal of the Project had nothing to do with the CEQA process.  TE 3005 at 0070:19-0071:3.  RREEF further presented on the importance of the project, incorporation of Planning Commission and public input into the Project, details of the proposed Project, efforts to minimize the parking deck footprints, phasing,

Project benefits to the City, and the completeness of the EIR. *Id.* at 0042:24-0071:23.

89.    A representative for Macy's, Kelvin Peyton, also came before the City Council, expressed support for the Project, and asked the City Council to approve the Project. TE 3005 at 0100:8-0103:24.

### b.    The Hacienda Parties' Oral Comments at Meeting

90.    The Hacienda Parties were offered a chance to speak at the meeting. TE 3005 at 0094:6-11.  They did not speak or present at the meeting. *See id.*; Tr. 678:18-22.

### c.    Public Oral Comments at Meeting

91.    Eight members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. *See* TE 3005 at 0099:19-100:6, 0104:1-117:5.  The people raising objections discussed traffic, the scope of the project, the proposed height variance, the traffic study, the density of the Project, lighting, and employee parking. *Id.*

### xi.    *September 10, 2013 City Council Meeting*

92.    The tenth public meeting on the Project was held on September 10, 2013 before the City Council. *See* TE 3006.

### a.    RREEF's Pre-Meeting Written Comments

93.    On September 5, 2013, RREEF sent the City Council a letter regarding RREEF's appeal of the master sign program. TE 3022 at 0025-0044.  In the letter, RREEF explained that the proposed sign program was an important component of the Project as signs attract new tenants and visitors to the Shopping Center. *Id.* RREEF also explained that the Planning Commission did not reject the master sign program, but instead did not approve the program and deferred action on it to a future, separate meeting. *Id.* at 0025.  RREEF's appeal requested that the City approve the master sign program concurrently with the Project and not defer approval until a later date. *Id.* at 0025-0026.

b.    The Hacienda Parties' Pre-Meeting Written Comments

94.    On September 5, 2013, Mr. Neumann emailed a City Councilmember a list of his concerns about the Project.  TE 87 0001, 0005.  Among Mr. Neumann's concerns were traffic/parking, Project phasing, and site density.  *Id.* at 0005.

c.    Public Pre-Meeting Written Comments

95.    The staff report indicates that in advance of the September 10, 2013 meeting, two members of the public who were not affiliated with the parties submitted written comments both in favor of and objecting to aspects of the Project.  TE 3022 at 0045-0046.  The person raising objections to the Project discussed the height of the parking structures and traffic.  *Id.* at 0046.

d.    RREEF's Oral Comments at Meeting

96.    At the September 10, 2013 meeting, RREEF discussed the tenants in the mall, the phasing of the Project, that Macy's was involved and committed to the Project, the purpose of each phase of the Project, and the public outreach RREEF had conducted in relation to the Project.  TE 3006 at 0075:21-0115:14.

97.    RREEF also presented on its appeal of the two conditions of approval and noted that RREEF fully supported sixty-two of the sixty-four conditions of approval.  TE 3006 at 0112:14-19.

98.    RREEF stated that the first condition it appealed dealt with land uses and specific caps on permitted land uses.  TE 3006 at 0112:21-0113:4.  Specifically, RREEF was requesting additional square footage that could be used for restaurant space—109,000 square feet allocated to restaurants rather than 89,000.  *Id.* at 0112:21-114:23.  RREEF told the City Council that the EIR analyzed the additional 20,000 square feet in requested restaurant square footage allocation and that it would have no additional impacts on the EIR.  *Id.* at 0114:10-23.

99.    The second part of RREEF's appeal addressed Project signage.  TE 3006 at 0115:2-14.  RREEF had Mr. Burch present on the importance of the master sign program.  *Id.* at 0115:15-0123:22.  Mr. Burch noted that, due to the increase in

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

the gross leasable area under the Project, the Shopping Center would need increased signage space to appropriately identify all of the tenants in the Shopping Center. *Id.* at 0116:15-23. Thus, in their appeal, RREEF requested that the total square footage of signage permitted for the Shopping Center be increased from about 6,800 square feet to 9,500 square feet, along with some individualized requests including allowing larger signs for non-department store anchor signs, tenant wall signs on parking structures, project banners on light polls, and City gateway signage. *Id.* at 0116:10-0118:20. RREEF also noted that there was no disagreement between RREEF and City staff on the signage program, and in fact, they were in "exact agreement" on it. *Id.* at 0109:15-21-0110:22.

### e.    The Hacienda Parties' Oral Comments at Meeting

100.    The Hacienda Parties were offered an opportunity to speak at the meeting. TE 3006 at 0028:7-22. The Hacienda Parties indicated that they did not wish to speak at the meeting. *Id.*; Tr. 680:20-681:25.

### f.    Public Oral Comments at Meeting

101.    Twelve members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. TE 3006 at 0009:7-0028:6. The people raising objections discussed concerns regarding the size of the Project, traffic, the appeals process, crime, parking, and that the City was being rushed into the decision. *Id.*

### g.    City Council Comments at Meeting

102.    At the September 10, 2013 meeting, City Councilmember Burton made clear that, before having a presentation on the final EIR made by City staff, he would like to hear from the Hacienda Parties because they were the party that appealed the EIR, and they had declined to speak at that meeting. TE 3006 at 0028:7-22, 0133:25-0134:7.

103.    At the September 10, 2013 meeting, when asked by Mayor Lesser for the City staff's views on RREEF's appeal, City staff responded that "staff is in

support of the sign program" proposed by RREEF as part of its appeal.  TE 3006 at 0135:23-0136:23.

### h.    Post-Meeting Events

104.    On September 16, 2013, Mr. Neumann sent an email to members of the public asking them to sign a petition hosted on www.change.org against the Project. TE 89 at 0002.  Mr. Neumann also testified that he personally signed the petition. Tr. 435:14-436:1.

### xii.    *September 17, 2013 City Council Meeting*

105.    The eleventh public meeting on the Project was held on September 17, 2013 before the City Council.  *See* TE 3007.

### a.    RREEF's Pre-Meeting Written Comments

106.    Prior to the meeting, on September 11, 2013, RREEF sent City staff a copy of several "white papers" covering discrete, Project-related topics and requested that those white papers be included in the materials being distributed to the City Council for its review prior to the September 17, 2013 meeting.  TE 3023 at 0102-0118.  The white papers covered topics such as "Parking Deck Aesthetics and Efficiencies," "Project Lighting Impacts and Mitigation," "Rationale for Above Ground Parking Structure," and "Site Environmental Conditions and Project Mitigation."  *Id.* at 0103.

### b.    The Hacienda Parties' Pre-Meeting Written Comments

107.    During the afternoon of September 17, 2013 (the day of the eleventh public meeting on the Project), Mr. Briggs of the Briggs Law Corporation, on behalf of the Hacienda Parties, sent the City Council a letter opposing the EIR, which attached a report from a purported expert criticizing the EIR.  TE 66 at 0001; TE 3023 at 0121 (showing documents were emailed from Briggs Law Corporation to Ms. Jester at 1:13 p.m. on September 17, 2013), 0127-0154.

108.    In the letter, Mr. Briggs criticized some of the technical aspects of the EIR.  TE 3023 at 0153-0154.  Specifically, he contended that (i) his clients believed

RREEF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  an alternative to the Project as proposed would be better for the City; (ii) the EIR did

2  not analyze a reasonable range of alternatives; (iii) that the City could not certify the

3  EIR in compliance with CEQA; (iv) the traffic analysis prepared by the City was

4  convoluted; and (v) there were problems with the mitigation measures "from a legal

5  perspective." *Id.*

6      109.  Mr. Briggs's letter also attacked the adequacy of the City's traffic

7  analysis in the EIR with specificity.  TE 3023 at 0153-0154.  The twenty-six-page

8  report prepared by the Hacienda Parties' purported expert, Gabriel Elliot, included

9  thirty-five comments which criticized and pointed out alleged deficiencies in the

10  EIR's traffic analysis.  *See id.* at 0127-0152.

11      110.  The Hacienda Parties had multiple opportunities to comment on the

12  environmental analysis in the EIR before September 17, 2013, including during the

13  Planning Commission meetings discussing the EIR and the prior meetings before

14  the City Council.  TE 3024 at 0004.  Indeed, the City staff and the Mayor invited the

15  Hacienda Parties to speak at the September 3rd and September 10th meetings.  *Id.*

16  Despite these opportunities, the Hacienda Parties waited until the last planned

17  meeting of the three September meetings initially scheduled in August 2013 to

18  present written and oral comments.  *Id.*

19                  c.    Public Pre-Meeting Written Comments

20      111.  The staff report indicates that in advance of the September 17, 2013

21  meeting, two members of the public who were not affiliated with the parties

22  submitted written comments raising objections to the parking structures, the scale of

23  the Project, the character of the mall, and traffic.  TE 3023 at 0019, 0155.

24                  d.    RREEF's Oral Comments at Meeting

25      112.  At the September 17, 2013 meeting, RREEF presented the City Council

26  with 450 letters that RREEF had collected in support of the Project.  TE 3007 at

27  0182:5-10.

28

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

e.    The Hacienda Parties' Oral Comments at Meeting

113.    The Hacienda Parties spoke at the meeting and opposed the Project. *See* Tr. at 682:12-18.  Mr. Briggs and Mr. Neumann both spoke against the Project on behalf of the Hacienda Parties.  TE 3007 at 0134:13-0154:25, 0158:5-0163:19.

114.    Mr. Neumann's statements opposing the Project included, among other things, comparing the Project to a 133,000 square foot Wal-Mart Superstore and characterizing RREEF as out-of-towners who did not care about the City of Manhattan Beach and were likely to leave once the Project was approved.  TE 3007 at 0144:5-20; Tr. at 682:25-685:10.

115.    Mr. Neumann also gave a twenty-six-slide presentation at the September 17, 2013 City Council meeting in opposition to the Project.  TE 68; Tr. 489:19-22.    The presentation from Mr. Neumann covered numerous topics, including:  (i) that the proposed site plan violated the Grant Deed, TE 68 at 0003; (ii) the history of the Settlement Agreement and RREEF's purported denial of the Hacienda Parties use of their property in 2007, *id.* at 0005; (iii) that the three phases of construction would hurt existing retailers and reduce sales tax collection during construction, *id.* at 0009; and (iv) alternative plans for the Project that were created by the previous owner of the Shopping Center, including plans by the previous owner to build a hotel on the property, *id.* at 0010-0016. *See also* TE 3007 at 0134:13-0154:25.

116.    Mr. Neumann's presentation on a potential project featuring a hotel would be referenced several times by the City Council and City staff at various times in the administrative process.  *See, e.g.*, TE 72 at 0163:23-0164:7 (Mayor Lesser, on October 8, 2013, asking about the "feasibility of a hotel" which is something "the former owner, did explore in concept"); TE 3025 at 0011 (matrix in the November 12, 2013 staff report summarizing key issues prepared by City Staff noting a key issue from City Council is whether a hotel is feasible).

117.   Mr. Briggs spoke in opposition to the Project on behalf of the Hacienda Parties, stating: (i) the EIR postponed mitigation and analysis of impacts, which was "illegal under CEQA," TE 3007 at 0158:5-12; (ii) there were a number of inadequate analyses in the EIR, *id.* at 0158:13-21; (iii) there was a "conflict of interest" issue with the soil engineer who analyzed soil for the EIR, which could expose the City to liability, *id.* at 0159:8-22, 0160:18-0161:4; (iv) the EIR didn't "crunch[] numbers" which "ma[de] [the City's] CEQA document deficient," *id.* at 0163:8-10; and (v) the City Council should deny certification of the EIR, deny the Project, and revisit a smaller project because the EIR analysis was defective, *id.* at 0163:11-18.

### f.    Public Oral Comments at Meeting

118.   Six members of the public who were not affiliated with the parties spoke at the meeting objecting to aspects of the Project. TE 3007 at 0163:22-0177:3. The people raising objections discussed traffic, light poles, grading, the fact that the plans were not customized to the City, the size of the Project, crime, and parking. *Id.*

### g.    City Council Comments and Actions at Meeting

119.   The City Council decided to schedule an additional meeting for October 8, 2013. TE 3007 at 0131:3-0132:9.

120.   When discussing what he wanted covered at the next meeting, Mayor Lesser noted that he needed to know more about the "legal issues that were raised by the [Hacienda Parties]." TE 3007 at 0182:22-24.

121.   Councilmember Powell was concerned about the "legal issue as to … whether there's a conflict of interest," which was raised by Mr. Briggs during the meeting, TE 3007 at 0159:15-22, and that he thought "we need to resolve those [issues] before we could certify the EIR," *id.* at 0185:23-0186:2.

122.   Councilmember Powell instructed City staff to collect information and respond to the soil engineer conflict of interest issue raised by Mr. Briggs at the September 17, 2013 meeting. TE 3007 at 0186:3-23.

123.   In addition to the meeting running late and the need to collect additional information, Councilmember Burton mentioned that he had not yet read the "challenge document to that traffic study," which had been submitted just hours earlier.  TE 3007 at 0099:21-0100:4.

xiii.   *October 8, 2013 City Council Meeting*

124.   The twelfth public meeting on the Project was held on October 8, 2013 before the City Council.  *See* TE 72.

a.   The Hacienda Parties' Pre-Meeting Written Comments

125.   On October 8, 2013 (the day of the twelfth public meeting on the Project), Mr. Briggs, on behalf of the Hacienda Parties, sent a nine-page letter to the City Council in opposition to certification of the EIR and the Project as a whole.  TE 70.

126.   In his October 8 letter, Mr. Briggs criticized some of the technical aspects of the EIR and made legal arguments as to why the EIR was deficient.  TE 70 at 0001-0009.  Specifically, the letter asserted that the EIR "d[id] not comply with CEQA's mandates" and set out specific "CEQA violations" regarding:  (i) the EIR's baseline; (ii) the EIR's findings; (iii) the EIR's aesthetic impact analysis; (iv) the EIR's air quality analysis, including specific alleged defects regarding inconsistent information, incomplete analysis, and inadequate mitigation measures; (v) the EIR's greenhouse gases emissions analysis; (vi) the EIR's analysis of hazards and hazardous materials; (vii) the EIR's analysis of noise; (viii) the EIR's analysis of traffic and transportation; (ix) the EIR's analysis of water supply and quality; (x) the EIR's analysis of cumulative impacts; (xi) the EIR's inadequate analysis of reasonable alternatives; (xii) the EIR's inadequate project description and analysis; and (xiii) that required findings for the MUP had not been made.  *Id.*

127.   Concurrently with the October 8, 2013 letter, the Hacienda Parties submitted an expert report from traffic engineer Daniel Smith of Smith Engineering & Management, which provided "technical comments" on the EIR.  TE 70 at 0011.

Mr. Smith alleged that the EIR failed to disclose the full impact of the Project and that it was deficient, and the analysis was based on stale data. *Id*. at 0011-0016.

### b.    Public Pre-Meeting Written Comments

128.   The staff report indicates that, in advance of the October 8, 2013 meeting, five members of the public who were not affiliated with the parties submitted written comments both in favor of and objecting to aspects of the Project. TE 3024 at 0398-0399, 0403-0405, 0422.   The people raising objections discussed the scale of the Project, parking structures, parking, and traffic. *Id.*   One comment specifically recommended to the City Council that it "give another close listen to the testimony offered at [the September 17, 2013] hearing from Cory Briggs, the attorney representing the 3500 Sepulveda building owners," because Mr. "Briggs' experienced, respectful and pointed comments deserve th[e] [City C]ouncil's undivided attention and direct response." *Id.* at 0422.

### c.    RREEF's Oral Comments at Meeting

129.   At the October 8, 2013 City Council meeting, RREEF presented about the Project.   TE 72 at 0078:9-0118:16.   RREEF's presentation before the City Council touched on the phases of the Project, the goals of the Project, roadway and traffic improvements, the size and scope of the Project, security, traffic, consistency with what the Hacienda Parties agreed to, and that the Settlement Agreement was a private agreement and was not what the City Council was being asked to decide on. *Id.*

### d.    The Hacienda Parties' Oral Comments at Meeting

130.   Mr. Neumann and Mr. Briggs spoke at the meeting and opposed the Project.   TE 72 at 0060:13-0065:7, 0065:12-0075:18.

131.   Mr. Neumann gave a presentation and requested that the City Council grant the Hacienda Parties' appeal, deny the EIR certification, send the Project back to the Planning Commission, and reduce the size and impact of the Project.   TE 71 at 0002.   The presentation focused on four issues regarding the EIR:   traffic

1    (including the inadequacy of the traffic study), construction parking, the impact on

2    utilities, and project alternatives.  *Id.* at 0003-0008; *see also* TE 72 at 0065:12-

3    0075:18.

4        132.   At the meeting, Mr. Briggs noted that he had another traffic expert (Mr.

5    Smith) look at the EIR's traffic analysis and that the expert concluded the analysis

6    was deficient.  TE 72 at 0062:18-0063:7.  The Hacienda Parties were the only people

7    to hire traffic experts to submit technical analyses and opinions in opposition to the

8    Project.  Tr. at 699:1-17, 704:10-12.

9        133.   Mr. Briggs also questioned whether the City Council was "closing the

10   public hearing" after the meeting, because "as the appellant, we have the burden of

11   proof if God forbid we end up having to go to court, and we need to be given an

12   opportunity to see all evidence that is submitted and respond to it."  TE 72 at 0063:8-

13   19.

14       134.   When asked by Mayor Lesser why Mr. Briggs had only submitted the

15   letters at that point in time and not at the Planning Commission, he responded that

16   he had not been hired until recently.  TE 72 at 0064:13-0065:7.

17                    e.    Public Oral Comments at Meeting

18       135.   Thirty-three members of the public who were not affiliated with the

19   parties spoke at the meeting both in favor of and objecting to aspects of the Project.

20   TE 72 at 0008:21-0058:7.  The people raising objections discussed the size and scope

21   of the Project, crime, the traffic study, traffic, height variance, and the design of the

22   parking structures.  *Id.*

23                    f.    City Council Comments at Meeting

24       136.   City Councilmember Powell had reservations about whether the City

25   Council should approve the Project that night without any agreement between the

26   Hacienda Parties and RREEF, because RREEF and the Hacienda Parties resolving

27   their dispute would likely change the Project plans.  TE 72 at 0116:22-0117:9,

28

0156:19-20 (Councilmember Powell stating, "I want to see the parties get together and come up with an agreement").

137.   Councilmember D'Errico agreed with Councilmember Powell and expressed that he would feel more comfortable approving the Project if RREEF and the Hacienda Parties were in agreement about the Project plan.  TE 72 at 0133:14-20.

### g.   Post-Meeting Events

138.   On November 11, 2013, RREEF entered into a letter of intent with Macy's, establishing the fundamental proposed terms and conditions for an agreement between RREEF and Macy's regarding the Project.  *See* Macy's Letter of Intent ("Macy's LOI") at 1.[4]   RREEF was confident throughout the entire entitlements process that it would be able to get Macy's to sign a final agreement. Tr. at 734:13-16.

### xiv.   *November 12, 2013 City Council Meeting*

139.   The thirteenth public meeting on the Project was held on November 12, 2013 before the City Council.  *See* TE 73.

### a.   RREEF's Pre-Meeting Written Comments

140.   On November 1, 2013, RREEF submitted a letter to City staff to summarize RREEF's proposed modification to the Site Plan – made in response to comments from the City Council, the Hacienda Parties, City staff, and the public – and to the conditions of approval.   TE 3025 at 0013-0019.   The proposed modifications to the Site Plan included moving the open-air Village Shops north by fifty-five feet and moving up the creation of the Cedar Way connection to Rosecrans Avenue in the construction phasing.  *Id.* at 0013-0014.  The proposed modifications to the conditions of approval included a request to remove certain maximum square

---

[4] The Macy's LOI was not a trial exhibit, but at the Court's request in its February 14, 2023 Minute Order, the parties lodged a copy of the Macy's LOI with the Court on February 21, 2023.

footage limitations on specific types of land uses and adjust other limitations on land uses, particularly banks and medical and dental offices. *Id.* at 0014.

                            b.      <u>The Hacienda Parties' Pre-Meeting Written Comments</u>

141.  On November 5, 2013, Mr. Neumann responded in an email to RREEF's November 1 letter, stating that RREEF's revisions "surprised" the Hacienda Parties and commenting on those revisions. TE 3025 at 0060.

                            c.      <u>RREEF's and Macy's Oral Comments at Meeting</u>

142.  At the November 12, 2013 meeting, RREEF discussed the Project before the City Council. TE 73 at 0048:19-0100:19. RREEF presented on, among other things, RREEF's efforts to respond to and incorporate the City Council's comments along with the City Council's request that RREEF work with the Hacienda Parties, modifications to the Site Plan to find a middle-ground acceptable to everybody involved, the history of the Project, the parking decks, Project phasing, internal improvements to the Shopping Center, the Macy's consolidation and expansion, and the master sign program. *Id.*

143.  Mr. Peyton, on behalf of Macy's, also appeared before the City Council and asked the City Council to approve the Project and reiterated that Macy's fully supported the Project. TE 73 at 0101:2-0105:21. Mr. Peyton specifically noted: "We've come to business terms with RREEF. We're ready to make this deal. At this point, we're just waiting on City Council to approve it." *Id.* at 0105:4-7. Mr. Peyton also answered questions from the City Council and allayed concerns about Macy's support for the Project. *Id.* at 0108:8-22.

                            d.      <u>The Hacienda Parties' Oral Comments at Meeting</u>

144.  Mr. Neumann, on behalf of the Hacienda Parties, spoke at the meeting and opposed the Project. TE 73 at 0110:22-0131:22.

145.  Mr. Neumann's sixteen-slide presentation opposed the Project, asked the City Council to approve the Hacienda Parties' appeal of the EIR and send the Project back to the Planning Commission, and raised a number of issues with the

Project.   TE 73 at 0131:14-17; TE 74 at 0016; Tr. 510:17-511:11, 515:2-516:3, 517:12-518:12.   Mr. Neumann also proposed an alternative site plan to the City Council that had only one parking garage and no South or North Decks.   TE 73 at 0128:16-25 (Mr. Neumann presenting to City Council a plan in which RREEF would "build one garage," "a bigger garage," by Macy's in the Northeast corner); TE 74 at 0012-0014; Tr. 519:20-521:25.

### e.    Public Oral Comments at Meeting

146.   Ten members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project.   TE 73 at 0132:16-0149:18.  The people raising objections to the Project discussed potential disruptions, Mr. Neumann's opposition to the Project, the lack of a construction parking plan, deed restrictions, the need for additional traffic studies, security, lighting, and the scope and size of the Project.  *Id.*

### f.    City Council Comments and Actions at Meeting

147.   At the November 12, 2013 City Council meeting, City staff recommended that the City Council close the public meeting so they could respond to the late comments – including the late comments from the Hacienda Parties – and finalize the EIR.  TE 73 at 0028:3-14, 0039:20-25, 0171:17-0174:1.

148.   Councilmember Powell noted that he was in favor of tweaking the current plan so there would be just one parking structure on the northeast side.  TE 73 at 0177:7-10.  Councilmember Powell's comment was consistent with the plan Mr. Neumann proposed earlier in the meeting that featured one parking garage in the Northeast corner.  *Id.* at 0128:16-25 (Mr. Neumann presenting the City Council with a plan in which there would be "one garage," "a bigger garage," by Macy's in the Northeast corner); TE 74 at 0012-0016; Tr. 518:15-521:25.  In later meetings, other City Council members referred back to Mr. Neumann's proposed plan.  TE 2141 at 0183:8-0189:24 (Councilmember Burton asking at the May 20, 2014 meeting about the site plans from the previous owner showing one parking garage

located in the Northeast corner and without the North Deck and South Deck), 0238:4-22 (Councilmember Burton at the May 20, 2014 meeting, questioning the North and South Decks based on his understanding that parking could all be put in the Northeast corner).

149.   Councilmember Powell also noted that he wanted to see the Hacienda Parties and RREEF get together because the Project could get tied up if the two parties litigated.  TE 73 at 0161:13-20.  He continued that, to approve the Project, he would need the Hacienda Parties and RREEF to "get their differences resolved." *Id.* at 0163:6-14.  Later in the meeting he reiterated that one of the "most important" things to him was "to have the two parties get together and resolve their issues so that despite our best efforts, this doesn't get tied up in court for a long time, which would benefit nobody." *Id.* at 0178:2-8.

150.   Councilmember Burton also asked City staff to prepare a response to the presentation given by Mr. Neumann and stated that he would also like to hear more on the EIR "because there was some compelling testimony given by … Mr. Neumann's attorney on the [EIR]."   TE 73 at 0151:6-20, 0204:7-13. Councilmember Burton further queried whether the "one garage" plan presented by Mr. Neumann was a possibility.  *Id.* at 0152:1-20.

151.   Councilmember Burton flagged that he would like to have a "complete record" where the issues that were raised at the meeting were responded to.  TE 73 at 0179:2-9.  Councilmember D'Errico also agreed that he would like to have another meeting to address the issues that were raised at the meeting.  *Id.* at 0179:11-16.

152.   Councilmember Burton further noted that, while there were a number of appeals pending, the one he needed "additional evidence" on was the appeal of the EIR.  TE 73 at 0197:21-0198:10.

153.   Mayor Lesser expressed concerns about the tactics of the Hacienda Parties.  TE 73 at 0168:16-22.  In particular, Mayor Lesser noted that the Hacienda Parties "had an opportunity to participate at the Planning Commission level and

ha[ve] withheld [their] comments until this point, which makes it very difficult to move the project forward ever, because it's a constantly changing sort of series of objectives, even though I share some of the concerns that Mr. Neumann has raised." *Id.* Mayor Lesser also specifically requested that City staff work to provide greater clarity on where construction workers would park during construction because "[t]here was reference made by Mr. Neumann about the construction workers." *Id.* at 0208:13-17.

xv.    ***January 14, 2014 City Council Meeting***

154.    The fourteenth public meeting on the Project was held on January 14, 2014 before the City Council. *See* TE 2139.

a.    The Hacienda Parties' Pre-Meeting Written Comments

155.    On January 10, 2014, Mark Neumann, on behalf of 3500 Sepulveda, wrote a letter to the City Council stating that the Project was "**Not Approved** by the owners of 3500 Sepulveda." TE 75 at 0005 (emphasis in original); *see also* TE 3026 at 0063 (January 10 letter included in City staff report).

b.    RREEF's Oral Comments at Meeting

156.    At the January 14, 2014 meeting, Mark English, on behalf of RREEF, spoke in favor of the Project. TE 2139 at 0044:17-0098:14. Mr. English discussed, among other things, the difficulties of making substantial changes to the Project plans, the parking ratio, the goal of beginning construction in 2015, and responses to questions about Macy's consolidation. *See id.*

c.    The Hacienda Parties' Oral Comments at Meeting

157.    Both Mr. Briggs and Mr. Neumann spoke at the meeting and opposed the Project on behalf of the Hacienda Parties. TE 2139 at 0101:6-0112:16, 0112:20-0115:24.

158.    Mr. Neumann opposed the Project on the grounds of the proposed parking ratio, that the current site plans were misleading, that RREEF had negotiated in a threatening manner, that RREEF and the Hacienda Parties had a bad site plan

from the start that had not gotten better, that there were still unanswered questions about the Project, and that the meeting was not properly noticed.  TE 2139 at 0101:6-0112:8.

159.   Mr. Briggs asserted that the January 14, 2014 meeting was not properly noticed.  TE 2139 at 0112:24-0113:21.  He also asked the City Council to deny certification of the EIR because approving the EIR could "expose[] you to litigation over the EIR."  *Id.* at 0114:11-0115:22.

### d.    Public Oral Comments at Meeting

160.   Six members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project.  *See* TE 2139 at 0117:7-0133:8.  The people raising objections discussed the safety of the Project, the cinema, maintaining the small-town atmosphere of the Shopping Center, the phases of construction, Macy's consolidation, the Settlement Agreement, the size of the project, and traffic flow.  *Id.*  One person who raised objections noted that she had "nothing new" and "besides, Mr. Neumann said everything so eloquently for us."  *Id.* at 0121:25-0122:2.

### e.    City Council Comments and Actions at Meeting

161.   At the January 14, 2014 meeting, City staff prepared and presented a matrix to the City Council summarizing the Project's key issues.  *See* TE 3026 at 0008-0020.  The key issues raised involved:  (i) the Project Site Plan; (ii) phasing and timing; (iii) entitlements and CEQA; and (iv) miscellaneous comments, such as building height variances and prior railroad right of ways.  *Id.*

162.   During the meeting, the City Councilmembers discussed the threat of CEQA litigation.  Tr. at 712:18-713:13.  Councilmember Burton stated that he understood there was a threat of CEQA litigation.  TE 2139 at 0193:22-25, 0213:2-13 (Councilmember Burton stating "I think we may have a threat of EIR/CEQA litigation, which would tie this all up"), 0250:20-0251:5 (Councilmember Burton

1    proposes sending the Project back down to the Planning Commission as it would

2    "solve[] any threat of having a CEQA action").

3       163.   Mayor Pro Tem Powell expressed concerns about "late" comments to

4    the EIR, and Ms. Jester explained that the Planning Department was still in the

5    process of reviewing these late comments.  TE 2139 at 0021:6-0023:18.

6               f.    Post-Meeting Events

7       164.   On February 13, 2014, Mr. Neumann emailed a "Myth and Fact" sheet

8    to community members Neil Boyer and Marc Krigsman.  TE 94 at 0003; *see also*

9    TE 96.  On March 27, 2014, Mr. Neumann also provided a version of this "Myth

10    and Fact" sheet to Mr. Rizika for him to "use, or giv[e] to [his] neighbors when

11    talking to them."  TE 96.  The "Myth and Fact" sheet made various criticisms of the

12    Project and RREEF, such as declaring that "[t]he overwhelming complaint is that

13    the mall is expanding too much in such a small amount of space," "[a]dding 300

14    parking spaces for this large expansion will add more traffic," and "[t]he developer

15    is a REIT and is obligated to its shareholders to make money–in this case through

16    the rent it receives.  WHAT IS GOOD FOR THE CITY MAY NOT BE GOOD FOR

17    THE DEVELOPER."  TE 96 at 0005-0006.

18       165.   On March 25, 2014, Mr. Neumann asked Mr. Krigsman to make sure

19    Chris Prodromides attended the April meeting on the Project before the City

20    Council.  TE 95 at 0001.  Mr. Prodromides (who later became an officer of Sensible

21    Citizens of Manhattan Beach ("SCMB") – the organization that brought a CEQA

22    lawsuit against the Project) was a Manhattan Beach resident who had "strong

23    passions" about the Project.  Tr. 130:14-22; Neumann Dep. Tr. 239:4-6.

24       166.   In April 2014, Mr. Neumann worked with Mr. Krigsman and Colin

25    Williams to set up a website opposing the Project, www.90266mall.com.  TE 98 at

26    0001-0005; Tr. 550:15-18.

27       167.   On approximately April 7, 2014, in collaboration with Mr. Krigsman,

28    Mr. Neumann ordered lawn signs with language opposing the Project ("No Mall / 3

1  Story Garages / Get the Facts / 90266 MALL.com") to give to community members

2  who "were concerned about" the Project—Mr. Neumann also placed signs around

3  the Hacienda Building, which he recognized "some people didn't like."  TE 97;

4  Neumann Dep. Tr. 241:10-243:13.   Mr. Krigsman also distributed lawn signs.

5  Neumann Dep. Tr. at 245:9-16.

6      168.   On April 28, 2014, Loralie Ogden (who also later became an officer of

7  SCMB) emailed Mr. Neumann stating that she "LOVED" his letter to the editor and

8  asked him to send her some talking points for the upcoming City Council meeting.

9  TE 99; Tr. 130:14-22.  Mr. Neumann had at least one letter to the editor opposing

10  the Project published.  TE 100.

11      169.   On April 28, 2014, Mr. Neumann was blind copied on an email from

12  Ms. Ogden to David Lesser, a City Councilmember, in which Ms. Ogden opposed

13  the size of the Project, among other things.  TE 111.

14      170.   In April 2014, the City published Volume II of the Final EIR.  TE 2131.

15  Volume II of the EIR became necessary because of late EIR comments – including

16  the Hacienda Parties' comments – that came in after the EIR public comment period

17  closed. Tr. 241:9-20, 250:2-16.   The City, in an abundance of caution, formally

18  responded to all of those comments in Volume II of the EIR.  Tr. 241:9-20; *see also*

19  TE 2131 at 0006 (Volume II of the EIR stating that it was "not required by CEQA").

20      171.   In Volume II of the Final EIR, the City received and responded to

21  thirty-four late comments on the EIR.  *See* TE 2131 at 0027-0028.  Of those thirty-

22  four late comments, twelve were attributable to the Hacienda Parties or their tenants.

23  *See id.* at 0028 (Letter Nos. 3, 4, 12-17, 24, 28, 29, 34).   Responses to the 34 late

24  comments spanned 152 pages.   *See id.* at 0029-0180.  Of the 152 pages used to

25  respond to late comments, 117 pages (over 75%) were required to respond to late

26  comments attributable to the Hacienda Parties or their tenants.   *Id.* at 0033-0088,

27  0105-0124, 0131-0132, 0137-0169, 0175-0180.

28

xvi.   *April 29, 2014 City Council Meeting*

172.   The fifteenth public meeting on the Project was held on April 29, 2014 before the City council.  *See* TE 2140.

a.   Macy's Pre-Meeting Written Comments

173.   On April 29, 2014, Kelvin Peyton wrote to the City Council on behalf of Macy's, stating that "Macy's wholeheartedly supports this [P]roject."  TE 3027 at 0585.

b.   The Hacienda Parties' Pre-Meeting Written Comments

174.   On April 28, 2014, Cory Briggs submitted a letter from Mr. Smith of Smith Engineering & Management (the traffic engineer who submitted a report alongside Mr. Briggs's October 8, 2013 letter), which argued that the EIR was "inadequate and unsuitable for certification" and that the City's responses to comments were "evasive."  TE 3027 at 0599-0603.

175.   On April 29, 2014, Mark Neumann, on behalf of the Hacienda Parties, emailed a letter to the City Council.  TE 3027 at 0586-0591.  The letter stated that the Hacienda Parties opposed the Project and requested that the City Council "deny the Project."  *Id.* at 0588.

176.   On April 29, 2014, Brant H. Dveirin, an attorney acting on behalf of the Hacienda Parties, emailed and hand delivered a letter to the City Council.  TE 3027 at 0592-0594.  Mr. Dveirin stated that the Hacienda Parties opposed the Project and requested that the City Council "deny the Project."  *Id.* at 0592.

c.   RREEF's Oral Comments at Meeting

177.   At the April 29, 2014 meeting, Mark English, on behalf of REEF, made a presentation in support of the Project.  TE 2140 at 0172:1-0207:21.  Mr. English discussed the benefits of a step-back for the North Deck, architectural enhancements to the Project's parking garages, the Macy's consolidation, and the open spaces in the mall – including the large central plaza.  *See id.*  Mr. English also stated that

1  RREEF accepted and agreed to all of the conditions of approval proposed by the

2  City's staff.  *Id.* at 0173:18-0174:22.

3                    d.    The Hacienda Parties' Oral Comments at Meeting

4      178.  Mr. Briggs, Mr. Neumann, and Mr. Dveirin, on behalf of the Hacienda

5  Parties, spoke in opposition to the Project.  *See* TE 2140 at 0110:19-0143:8, 0143:9-

6  0146:11, 0146:15-0150:23, 0151:16-0159:12.

7      179.  Mr. Neumann gave a seventy-one-page presentation on behalf of 3500

8  Sepulveda.  TE 79; TE 2140 at 0110:19-0143:8, 0146:15-0150:23; Tr. at 522:24-

9  523:10.  Mr. Neumann opposed the Project on multiple grounds including:  (i)

10  parking; (ii) who Patrick Gibson (the City's EIR traffic and parking expert) worked

11  for; (iii) the purported negative fiscal implications of the Project; (iv) RREEF's

12  purported abandonment of a project in Sunnyvale, California; (v) technical problems

13  with the EIR; and (vi) various unanswered questions or "broken promises" by

14  RREEF.  TE 79 at 0002-0070.

15      180.  Mr. Dveirin opposed the Project based on potential impacts to the

16  Hacienda Parties' "discretion" to use the Hacienda Building for certain uses.  TE

17  2140 at 0144:4-25.  He also asked that the City "not approve [the Project] tonight,

18  because we need you to help us negotiate an agreement with RREEF[.]"  *Id.* at

19  0146:5-11.

20      181.  Mr. Briggs also spoke in opposition to the Project, including: (i) stating

21  that approving the Project would be a "very, very big mistake," TE 2140 at 0151:16-

22  20; (ii) explaining that the purported "approval" of the Project in January was

23  "illegal," *id.* at 0152:3-0153:4; (iii) asserting that the Project's traffic study deferred

24  mitigation, which was "illegal under CEQA," *id.* at 0153:21-0154:3; (iv) describing

25  a letter from his traffic expert, Mr. Smith, stating that the City's "traffic expert is

26  misinforming you," *id.* at 0154:4-23; (v) stating the traffic report was "unacceptable

27  under CEQA," *id.* at 0154:16-23; (vi) arguing the City Council "might be furthering

28  some conflicts of interest" and the City's independent contractors might be violating

1  California law, which would be "an issue in court," *id.* at 0157:23-0158:21; and (vii)
2  claiming that the City Council could not be "sued as a city or as an individual for
3  denying a permit," *id.* at 0159:6-12.

4    182.   At this meeting, Mr. Briggs also explained that he "get[s] brought into
5  these cases towards the end when it looks like a city's not going to do the right
6  thing," and that he needed to be "frank" and "go overboard" to raise issues and make
7  sure that the record was clear for future litigation.  TE 2140 at 0247:14-0248:6.

8                    e.    Public Oral Comments at Meeting

9    183.   Sixteen members of the public who were not affiliated with the parties
10  spoke at the meeting both in favor of and objecting to aspects of the Project.  TE
11  2140 at 0212:15-0245:12.   The people raising objections discussed the City's
12  village-like atmosphere, the parking garages, the EIR's traffic analysis, traffic, and
13  crime.  TE 2140 at 0212:15-0245:12.  One member of the public highlighted Mr.
14  Neumann's comments on fiscal impacts to the City, noting "that was a very good
15  point brought up by Mr. Neumann.  A lot of his points were good and very thought
16  out." *Id.* at 0217:19-25.  Another member of the public stated that he agreed with
17  Mr. Neumann's assertion that the EIR's traffic analysis was incomplete and needed
18  to be resolved. *Id.* at 0220:2-7.

19                    f.    City Council Comments and Actions at Meeting

20    184.   The City Staff recommended that this be the final meeting regarding
21  the Project.  TE 3027 at 0001.  They recommended that the City Council adopt
22  Resolution No. RES 14-0025, certifying the Final EIR, and adopt Resolution No.
23  RES 14-0026 to approve the MUP Amendment. *Id.*

24    185.   At the April 29, 2014 meeting, Mayor Pro Tem Powell expressed
25  frustration with the Hacienda Parties' practice of submitting documents at "the
26  eleventh hour" which was hindering the City Council's ability to respond to public
27  comments and questioned whether their practice of "wait[ing] until the last minute"
28  was "a legal strategy."  TE 2140 at 0163:5-17.  Councilmember Burton stated that it

was "completely unrealistic" for the City Council to make a decision on the EIR, including the Hacienda Parties' late comments:  "Look at all that material, how complex it is. We just got it on Wednesday." *Id.* at 0007:6-9.

186.    Councilmember Lesser also acknowledged that the Hacienda Parties "ha[ve] every interest in delaying the project and raising issues and raising doubts and delaying action by the Council." TE 2140 at 0166:10-17.  Similarly, Mayor Pro Tem Powell pointed out that, despite being provided opportunities to air grievances about the Project, the Hacienda Parties withheld their comments until a later date. *Id.* at 162:24-163:4 ("[During] at least two meetings when our former Mayor asked if you wanted to do a presentation, you or your attorneys, and you had declined.  You were given the opportunity.").

187.    Mayor Pro Tem Powell stated that the City spent considerable time responding to the Hacienda Parties' late comments, despite the Hacienda Parties' repeated assertions that their criticisms were unanswered:  "The next item I want to talk about is that the City did not respond to any of [the Hacienda Parties'] EIR requests.  If you go to Page 95 of the staff report, there are about six requests by you, one by your attorney, and there's reams of pages of answers and how those are referenced to the EIR.  So I'm not sure where that's coming from."  TE 2140 at 0162:17-23.

188.    Mayor Howorth further recognized that Mr. Briggs, on behalf of the Hacienda Parties, was threatening CEQA litigation.  TE 2140 at 0170:5-8 (Mayor Howorth noting "Mr. Briggs, you said something about persuading a judge … maybe it's a threat").

189.    City Attorney Barrow stated that, "[t]he issues that Mr. Briggs has raised … [t]hey're without merit."  TE 2140 at 0270:22-24.  Mr. Barrow offered to respond to the issues during the meeting, but Mayor Howorth noted that it was nearly midnight and opted to address these comments at a subsequent meeting.  *Id.* at 0270:22-0271:6.

190.    Councilmember Lesser also stated that, while some of the issues raised by the Hacienda Parties might be questions "that members of the public might ask," others "rais[ed] significant questions about the independent contractors;" and as a result, Councilmember Lesser wanted to give the independent contractors "an opportunity to respond." TE 2140 at 0267:24-0268:5.  Councilmember Lesser then suggested that the City Council carry the meeting over to another date to give City staff an opportunity to respond to the allegations made by the Hacienda Parties.  *Id.* at   0267:24-0268:21,   0268:25-0269:4.       Councilmember   Burton   supported Councilmember Lesser's suggestion to continue the meeting.  *Id.* at 0269:22-0270:10.

191.    The City Council decided to continue the meeting to May 20, 2014 with instructions to City staff that they prepare responses to comments made at the April 29 meeting, particularly those raised by the Hacienda Parties' attorneys.  TE 2140 at 0282:19-0286:17, 0294:22-0298:21.

### g.    Post-Meeting Events

192.    On April 30, 2014, Mr. Neumann continued his collaboration with Ms. Ogden and asked her to "write a letter to the editor of the beach reporter." TE 114 at 0001.  Ms. Ogden agreed to write the letter, noting:  "Ill get u a draft but would like to reference some of briggs' revelations re the faulty eir.  Can u get me a list? (*sic*)" *Id.*

193.    On May 16, 2014, Mr. Neumann emailed various members of the public, including Ms. Ogden, Mr. Boyer, and Mr. Krigsman, and invited them to a meeting at his house for "residents opposed to the current design of the [Project]" to "rally residents before [the May 20, 2014] City Council Meeting." TE 116 at 0001-0002; Neumann Dep. Tr. at 301:2-303:3.

### xvii.    *May 20, 2014 City Council Meeting*

194.    The sixteenth public meeting on the Project was held on May 20, 2014 before the City Council.  *See* TE 2141.

a.    RREEF's Pre-Meeting Written Comments

195.    On May 14, 2014, RREEF sent a letter to the City Council to support the Project and "address many of the misleading factual assertions" made about the Project.  TE 3028 at 0262-0276.

196.    On May 14, 2014, RREEF's attorneys submitted a letter to the City Council addressing legal issues raised during the April 29, 2014, meeting.  TE 3028 at 0298-0306.

b.    The Hacienda Parties' Pre-Meeting Written Comments

197.    On May 19, 2014, Mike Simms, a tenant at the Hacienda Building, wrote to the City Council and "encourage[d] [RREEF] to forge an amicable solution with [the Hacienda Parties]."  TE 3028 at 0310.

198.    On May 20, 2014, Mr. Neumann's late wife, Vicki Neumann, emailed a document called "Manhattan Village Mall Expansion Unanswered Questions," to the City Council.  TE 3028 at 0312-0314.  This document contained twenty-seven questions criticizing the Project and the City Council's approval process for the Project. *Id.*

199.    On May 20, 2014, Brant Dveirin, on behalf of the Hacienda Parties, emailed and hand delivered a letter to the City Council requesting revisions to the MUP Amendment and stating that the Hacienda Parties "remain in opposition" to the Project.  TE 3028 at 0316-0370.

c.    RREEF's Oral Comments at Meeting

200.    At the May 20, 2014 meeting, Mark English, on behalf of RREEF, presented information and answered questions in support of the Project.  TE 2141 at 0031:12-0039:13;  0075:8-0081:8;  0129:20-0136:18;  0140:22-0143:16;  0179:1-0191:10; 0215:5-0217:4.  Mr. English stated that RREEF complied with ten items requested by the City Council at the January 14, 2014 meeting. *Id.* at 0032:11-15. Mr. English also spoke about the scale of the project, parking structures, Macy's, and RREEF's commitment to completing the project. *See id.* at 0032:11-0039:10,

0075:8-0076:5.  Mr. English further stated that RREEF would not be able to proceed with the Project if the City Council voted to impose additional conditions of approval.  *See id.* at 0291:10-24, 0293:2-7, 0303:20-0304:13.

d.    The Hacienda Parties' Oral Comments at Meeting

201.   Mr. Neumann, Mr. Briggs, and Mr. Dveirin, on behalf of the Hacienda Parties, spoke at the meeting and opposed the Project and the EIR.  TE 3029 at 0195-0196.  Mr. Briggs made clear that, in addition to representing the Hacienda Parties, he was simultaneously representing an organization called "Sensible Citizens of Manhattan Beach" (previously defined as SCMB) and provided the same testimony on behalf of both the Hacienda Parties and SCMB.  TE 2141 at 0048:4-9.  SCMB, represented by Mr. Briggs, ultimately brought a CEQA lawsuit against the City following the entitlements process.  TE 2036; Tr. 67:16-22.

202.   Mr. Neumann's opposition before the City Council included:  (i) reading an opposition letter from one of his tenants; (ii) noting his meeting with all of the Councilmembers, except for one, to explain in detail his opposition presentations; (iii) asserting that the resolutions submitted that would approve the Project were flawed; (iv) alleging the City required the Hacienda Parties to enter into the Settlement Agreement with RREEF; and (v) requesting that the City Council deny the EIR and ask staff to provide an accurate, updated EIR.  TE 2141 at 0021:11-0026:1.

203.   Mr. Neumann continued that he wanted the City Council to "[h]old up this project" or send RREEF to negotiate with the Hacienda Parties.  TE 2141 at 0213:21-0214:2.

204.   Mr. Briggs alleged that his clients' due process rights were being violated and alleged that two City Councilmembers were biased and should be recused from voting on the Project.  TE 2141 at 0048:4-0049:21.

205.   Mr. Dveirin, on behalf of the Hacienda Parties, requested that two conditions of approval be added to the Project:  (i) that RREEF build a stairwell and

elevator in the North Deck facing the Hacienda Building; and (ii) "the parties in good faith negotiate to add 150 spaces … in a new lot adjacent to [the Hacienda Building]." TE 2141 at 0026:2-0030:4.

### e.    Public Oral Comments at Meeting

206.    Twenty-one members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. *See* TE 2141 at 0040:20-0061:20; TE 3029 at 0195-0197.    The people raising objections discussed crime in parking structures, traffic, preserving the City's small-town charm, purported flaws in the process of approving the Project, congestion, and pollution. *Id.*

### f.    City Council Comments and Actions at Meeting

207.    Councilmember Powell stated that his "biggest concern is that we have two property owners that have a dispute" and that he was concerned litigation between the two parties would halt the Project if it was approved.    TE 2141 at 0227:8-23.

208.    Councilmember Powell emphasized this concern multiple times and stated that he needed to see the two parties work out their differences, which meant that it was not something that could be decided on the night of the City Council meeting.    TE 2141 at 0272:4-11, 0228:4-8.    Councilmember Powell subsequently proposed a condition of approval requiring RREEF and the Hacienda Parties to negotiate in good faith. *See id.* at 0299:9-16; *see also* TE 3029 at 0207.

209.    Councilmember Lesser expressed that the disagreement between the "property owners involved at this site" was a challenge that made it difficult to come to the best solution for the Project.  TE 2141 at 0247:5-10.

210.    Councilmember Burton also stated concerns about the Hacienda Parties.  TE 2141 at 0232:11-24.

211.    At the meeting, the City Council ultimately approved the Project, but with five conditions of approval in addition to conditions proposed by staff,

1  including a requirement that RREEF and the Hacienda parties negotiate in good
2  faith. *See* TE 3029 at 0207.

3     212.   Those additional conditions imposed by the City Council made the
4  Project infeasible from RREEF's perspective.  Tr. 723:8-22, 728:23-729:14.  In
5  particular, RREEF felt the condition to negotiate in good faith was unworkable
6  because it was vague and RREEF did not know how it could demonstrate
7  compliance with it. Tr. 723:8-18, 728:23-729:14.

8            g.      Post-Meeting Events

9     213.   After the May 20, 2014 meeting, RREEF determined that it could not
10  proceed with the Project at that time, despite the fact that there had been sixteen
11  meetings.  Tr. at 729:15-730:3.  The general consensus at RREEF was that they
12  needed to pause work on the Project to let things cool off for a period of time with
13  the hope that the passage of time might create another opportunity to get the Project
14  approved. *Id.*

15    214.   Moreover, following the May 20, 2014 meeting, RREEF reviewed and
16  considered the additional conditions requested by the City Council and the extent to
17  which they could accommodate at least some of the conditions.  TE 3029 at 0002,
18  0004-0006.

19    215.   No City meetings on the Project were held until December 2, 2014.

20            xviii.  ***December 2, 2014 City Council Meeting***

21    216.   The seventeenth and final public meeting on the Project was held on
22  December 2, 2014 before the City Council.  *See* TE 2142.

23            a.      Macy's Pre-Meeting Written Comments

24    217.   On December 1, 2014, Kelvin Peyton, on behalf of Macy's, wrote to
25  the City Council again "express[ing] [Macy's] full support of the proposed
26  expansion and improvement plan[.]"  TE 3029 at 0242.

27
28

b.  The Hacienda Parties' Pre-Meeting Written Comments

218.   On December 1, 2014, Brant Dveirin, on behalf of the Hacienda Parties, emailed and hand delivered a letter to the City Council requesting revisions to the MUP Amendment and stating that the Hacienda Parties "remain[] in opposition" to the Project.  TE 3029 at 0275-0277.

219.   On December 2, 2014, Mr. Dveirin, on behalf of 3500 Sepulveda, LLC, emailed and hand delivered an additional letter to the City Council requesting revisions to the MUP Amendment and stating that "the hearing tonight should be continued."  TE 3029 at 0284-0285.  Mr. Dveirin also attached a redline version of Resolution No. 14-0026, which included approximately two dozen revisions to the proposed Resolution.  *Id.* at 0286-0321.

220.   On December 2, 2014, Cory Briggs, on behalf of the Hacienda Parties, wrote a letter to the City Council urging the Council "not to approve" the Project, and asserting that the City Council violated the Brown Act and CEQA.  TE 3029 at 0243-0244.

c.  Public Pre-Meeting Written Comments

221.   On December 2, 2014, two members of the public who were not affiliated with the parties wrote to Ms. Jester requesting additional time to consider the Project.  TE 3029 at 0282.

d.  RREEF's Oral Comments at Meeting

222.   At the December 2, 2014 meeting, Joe Saunders and Amber Richane presented on behalf of RREEF in support of the Project.  TE 2142 at 0012:11-0022:17, 0024:3-0026:15.  Among other things, they presented animated visuals of the Project and discussed RREEF's commitment to the Shopping Center.  *Id.*

e.  The Hacienda Parties' Oral Comments at Meeting

223.   Mr. Neumann, Mr. Dveirin, and Mr. Briggs opposed the Project on behalf of the Hacienda Parties.  *See* TE 2142 at 0027:10-0030:23, 0030:25-0044:12.

1    Mr. Neumann gave a seventy-two-slide presentation opposing the Project.  TE 82;

2    Tr. 541:22-542:15.

3                    f.    Public Oral Comments at Meeting

4        224.    Fifteen members of the public who were not affiliated with the parties

5    spoke at the meeting both in favor of and objecting to aspects of the Project.  *See* TE

6    2142 at 0090:5-0119:4.  The people objecting to the Project discussed the parking

7    structures, traffic, Macy's, and phasing of construction, and also requested additional

8    notice so that they could continue expressing their opinions about the Project.  *See*

9    *id.*

10                    g.    City Council Actions at Meeting

11       225.    During this meeting, the City Council certified the Project's EIR and

12   approved Resolution No. 14-0026, which effectively approved the Project.  TE 2035;

13   TE 2142 at 0160:15-0163:5, 0177:17-0178:22, 0184:4-8;  Tr. 151:17-152:2.

14   Resolution No. 14-0026 did not include a requirement for RREEF to negotiate with

15   the Hacienda Parties as a condition of approval.  TE 2035.

16   **D.    The CEQA Litigation**

17       226.    Less than four weeks after the Project's EIR was certified by the City

18   Council, on December 23, 2014, Cory Briggs, on behalf of SCMB, filed a writ of

19   mandate seeking a judicial reversal of the City's EIR certification, which was styled

20   as *Sensible Citizens of Manhattan Beach v. City of Manhattan Beach* (Los Angeles

21   County Superior Court Case No. BS152854) (the "CEQA Litigation").  TE 2036;

22   Tr. 68:4-8.

23       227.    Officers/key members of SCMB included Loralie Ogden, Chris

24   Prodromides, and William Fetherston.  Tr. 118:25-119:4, 130:14-22, 169:10-16.

25       228.  The Hacienda Parties supported the CEQA Litigation by:  (i)

26   collaborating with SCMB (the "CEQA Plaintiff"), including by connecting SCMB

27   with a CEQA attorney; (ii) providing the factual record on which the CEQA

28

1   Litigation was based; and (iii) creating roadblocks to a settlement of the CEQA

2   Litigation.

3       229.   As previewed above, the Hacienda Parties directly collaborated with

4   SCMB officers, developing and executing a strategy to oppose the Project.

5       230.   On March 24, 2014, Mr. Neumann asked Mr. Krigsman to make sure

6   Mr. Prodromides (an eventual officer of SCMB) attended the April meeting on the

7   Project before the City Council.  TE 95 at 0001; Tr. 130:14-22.

8       231.   On April 28, 2014, Loralie Ogden (an eventual officer of SCMB)

9   emailed Mr. Neumann stating that she "LOVED" one of his letters to the editor and

10  asked him to send her some talking points for the upcoming City Council meeting

11  so they could "be on the same page." TE 99 at 0001; Tr. 130:14-22.

12      232.   On April 28, 2014, Mr. Neumann was blind copied on an email from

13  Ms. Ogden to David Lesser, a City Councilmember, in which Ms. Ogden opposed

14  the size of the Project.  TE 111; Neumann Dep. Tr. 292:10-22.

15      233.   On April 30, 2014, Mr. Neumann asked Ms. Ogden to "write a letter to

16  the editor of the beach reporter."  TE 114 at 0001.  Ms. Ogden agreed to write the

17  letter, noting:  "I'll get u a draft but would like to reference some of briggs'

18  revelations re the faulty eir.  Can u get me a list? (*sic*)"  *Id.*

19      234.   On November 12, 2014, Loralie Ogden emailed Mark Neumann and

20  his late wife, Vicki Neumann, stating "I will do what I can to help."  TE 2179 at

21  0001.  Ms. Ogden further wrote that she desired to keep this partnership secret:  "I

22  need to protect our collaboration … Where can we go from here without showing

23  our hand???"  *Id.*

24      235.   On December 14, 2014, just weeks before the CEQA Litigation was

25  filed, Mark Neumann provided Ms. Ogden with the contact information for his

26  attorney, Cory Briggs, who would later represent SCMB in the filing and prosecuting

27  of the CEQA Litigation.  TE 109.

28

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

236.   Also on December 14, 2014, Ms. Ogden sent Mark Neumann a draft email to Mr. Briggs.  TE 108.  In the draft email she described herself as "one of the 'good guys' in this mall battle."  *Id.*

237.   At trial, Mr. Neumann initially denied, but later admitted, that he provided assistance to SCMB in connection with the CEQA Litigation.

> THE COURT: Did you coordinate with [SCMB] in terms of their [CEQA] [L]awsuit?
>
> THE WITNESS: No.

Tr. 564:17-24.

> THE COURT: … [Y]ou didn't provide any assistance to [SCMB] in terms of their either opposition to the project or the lawsuit?
>
> THE WITNESS: I may have misunderstood …

Tr. 565:6-10.

> THE COURT: Are you saying you didn't provide any assistance to [SCMB] with regard to their environmental lawsuit against the project?
>
> THE WITNESS: They would -- occasionally I would speak to some people.

Tr. 565:14-19.

238.   In their sworn discovery responses, the Hacienda Parties admitted that the lawyer for the CEQA Plaintiff, Cory Briggs, continued to represent the Hacienda Parties in connection with the CEQA Litigation.  TE 101 at 0007-0011.

239.   Beyond overt collaboration with the CEQA Plaintiff, the Hacienda Parties created the majority of the public record on which the CEQA Litigation relied.  As discussed in more detail below, a CEQA litigant may only pursue EIR criticisms that were actually presented during the administrative process surrounding a project.  Cal. Pub. Res. Code § 21177(a).

240.   The CEQA Litigation alleged that the EIR:  (i) "Fail[ed] to Adequately Analyze and Mitigate the Project's Hazardous-Materials Impacts"; (ii) "Fail[ed] to Adequately Analyze the Projects Traffic Impacts"; (iii) "Fail[ed] to Adequately Mitigate the Project's Traffic Impacts"; and (iv) "Should Have Been Recirculated." TE 2079 at 0002.  Each of these criticisms of the EIR was based on evidence and argument provided by the Hacienda Parties during the entitlements phase.

241.   Before the City Council, the Hacienda Parties' lawyer, Mr. Briggs, challenged the adequacy of the hazardous materials study due to the fact that Murex, an outside consultant, "prepared this [hazards assessment report] for RREEF, not for the City.  TE 3007 at 0158:22-0159:14; *see also* TE 2140 at 0155:18-19 (Mr. Briggs raising the same issue at another City Council meeting).  Months later Mr. Briggs repeated this same argument in the CEQA Litigation: "The major problem with the [hazards assessment] report is that it was '[p]repared on Behalf of RREEF America … and not on behalf of the City."  TE 2079 at 0012.

242.   Before the City Council, the Hacienda Parties submitted the expert report of Daniel Smith, a traffic engineer, who broadly criticized the EIR.  TE 2131 at 0296-0301.   Among other criticisms, Mr. Smith wrote that the "wholesale deduction of Fry's trips from future Project trip generation is an unreasonable assumption … because:  1) it eliminates the portion of Fry's trip generation that is attracted from existing passerby traffic that will actually remain on the street system bounding the Project site after Fry's is removed, and 2) it also eliminates the portion of Fry's trip generation that also calls at other uses within the Manhattan Village Shopping Center on the same trip that they shop at Fry's."  *Id.* at 0297.  Months later, Cory Briggs—now representing SCMB—relied on this exact quote to support these same technical arguments in the CEQA Litigation.  TE 2079 at 0014.

243.   The CEQA Litigation relied on the Hacienda Parties' traffic engineer to make further unique technical arguments.  TE 2079 at 0015 (CEQA Plaintiff quoting Daniel Smith to argue "'that up to 40 percent of all trips attracted to

Electronic Superstores are attracted from existing passerby traffic.' [quoting TE 2131 at 0297].''); TE 2079 at 0015 (CEQA Plaintiff quoting Daniel Smith to argue that '''passerby trips will remain on the bounding streets even when Fry's disappears, and therefore they should not be deducted from the gross trip generation of the proposed Project.    In this instance, the EIR's [traffic impact study] has inappropriately deducted 150 Frys [sic] passer-by trips from the gross trip generation of the Project in the weekday pm peak hour and 173 such trips in the Saturday peak hour.' [quoting TE 2131 at 0298].''); TE 2079 at 0015 (CEQA Plaintiff quoting Daniel Smith to argue that "without the foregoing errors in the traffic analysis, 'the ultimate net new trip generation of the Project … would be +205 instead of -16 in the weekday pm peak hour and +301 instead of +31 in the Saturday peak hour.' [quoting TE 2131 at 0297-0298].''); TE 2079 at 0017 (CEQA Plaintiff quoting Daniel Smith to argue that the EIR failed to consider:  (i) '''the busiest traffic weekday … Friday'''; (ii) that Friday '''traffic is 19.2 percent above weekday average'''; (iii) that '''peak hour traffic at intersections in the immediate vicinity of the Project site will be over 19 percent heavier than analyzed'''; (iv) that '''December traffic at shopping centers is 40.3 percent greater than in November … [and] 41.8 percent more than in an average month'''; (v) that '''traffic generated by the Project on all 31 days of December would be greater on weekdays than the weekday pm peak hour traffic as analyzed in the [traffic study]'''; and (vi) that '''there would be about 79 days per year when the peak hour traffic at intersections in close proximity to the Project would be significantly heavier and traffic impacts consequently greater than in the scenarios analyzed in the EIR.' [quoting TE 2131 at 0299-0300]'').

244.   Before the City Council, the Hacienda Parties also submitted the expert report of Gabriel Elliot.  TE 2131 at 0210-0238.  Like Daniel Smith's report, Gabriel Elliot's report broadly criticized the EIR.  *See id.*  Among other criticisms, Mr. Elliot wrote that the EIR failed to consider potential "[f]ast-food restaurants with drive-through windows and coffee shops [which] are destinations for morning commuters

and as such, may impact morning commute traffic," and "[w]ithout a concise list of tenants, it is unsafe to assume that morning peak traffic will not be impacted."  TE 2131 at 0213.  Months later, Cory Briggs—this time representing SCMB—relied on this exact quote to support the CEQA Litigation.  TE 2079 at 0016.

245.  Before the City Council, Mr. Briggs also challenged the thoroughness of the traffic impact study on "Oak Avenue."  TE 2140 at 0028:17-0029:7.  Months later, he repeated this argument in the CEQA Litigation:  "Another flaw in the EIR's traffic analysis is its failure to adequately address traffic impacts on Oak Avenue despite widespread concern regarding the impact."  TE 2079 at 0017.

246.  Before the City Council, Mr. Briggs challenged the deferred mitigation measures:  "You are deferring your mitigation, which means you recognize that there's an impact, but you're not going to study it until much later. That's illegal under CEQA.  If there are impacts, you've got to study them now.  You've got to have the mitigation now."  TE 2140 at 0153:21-0154:3.  Months later, Mr. Briggs repeated this argument in the CEQA Litigation, alleging that the City "illegally defer[ed] construction-related traffic mitigation."  TE 2079 at 0021.

247.  Before the City Council, Mr. Briggs challenged the City's procedures and claimed that the City "need[ed] to be recirculating this EIR" because it "include[ed] new information, [and] is taking more evidence."  TE 2142 at 0028:8-16.  Months later, he repeated this argument in the CEQA Litigation, alleging that "[t]he EIR should have been recirculated."  TE 2079 at 0025.

248.  As discussed in more detail below, Mr. Briggs claimed that SCMB satisfied CEQA's exhaustion requirement for each of these issues:  (i) hazardous materials, TE 2079 at 0011 n.4; (ii) traffic impacts, *id.* at 0014 n.5; (iii) mitigation, *id.* at 0019 n. 6; and (iv) recirculation of the EIR, *id.* at 0019 n.6.  *See also infra* Section III.A.iv.a.2 (discussing CEQA exhaustion requirements).  Each of these issues was raised by the Hacienda Parties at the administrative level.  *See supra* Section II.C.

249.   While the CEQA Litigation was pending, the Hacienda Parties became involved in settlement discussions with RREEF and SCMB.  TE 103 at 0001-0003; TE 105 at 0001-0002; Tr. 120:14-121:6.

250.   In December of 2015 or January of 2016, Joe Saunders, a representative of RREEF, and Philip Friedl, a representative of Jones Lang LaSalle ("JLL"), RREEF's external project manager, met with Mr. Briggs.  Tr. 105:12-14, 120:1-19, 121:7-12, 122:10-16.  Among other issues, RREEF's representatives and Mr. Briggs discussed a refined site plan, and Mr. Briggs "indicated that he thought it was a good site plan."  Tr. 122:23-123:5.  When the parties discussed the next steps towards resolving the CEQA Litigation, Cory Briggs told RREEF's representatives that they should meet with Mr. Neumann and that Mr. Briggs would facilitate that introduction.  Tr. 122:3-9.  Mr. Briggs further stated that RREEF could not settle the CEQA Litigation unless Mr. Neumann agreed to the site plan.  Tr. 124:19-22.

251.   On January 18, 2016, Mr. Briggs sent an email to Mr. Friedl and Peter Gutierrez, a lawyer for RREEF, confirming Mr. Neumann's role in the settlement negotiations.  TE 102 at 0003.  The email also asked whether there were "new drawings to show Mark [Neumann]" and, if there were, that Mr. Briggs would attempt to persuade Mr. Neumann to attend a meeting with RREEF.  *Id.*

252.   The next day, on January 19, 2016, Mr. Briggs sent Mr. Gutierrez a "list of issues" that Mark Neumann wanted to have addressed at the upcoming settlement meeting.  TE 102 at 0001.  Mr. Briggs asked whether this list from Mark Neumann "make[s] a meeting futile."  *Id.*

253.   Around January 25, 2016, RREEF's representatives met with Mr. Neumann.  Tr. 123:16-18, 125:3-17; TE 103 at 0003.  During this meeting, Mr. Saunders and Mr. Friedl showed Mr. Neumann revised site plans.  Tr. 125:18-126:14.  Mr. Friedl testified that all his meetings with Mr. Neumann went in a similar fashion: Mr. Neumann would point something out in a site plan that he did not agree with, RREEF's representatives would address Mr. Neumann's concern, and Mr.

1  Neumann would immediately move on to another issue.  Tr. 125:21-126:14.  As Mr.

2  Friedl characterized it, it was like "playing whack-a-mole."  Tr. 126:10-14.

3       254.    Around February 12, 2016, RREEF sent Mr. Neumann a settlement

4  term sheet for a resolution of the CEQA Litigation.  TE 103 at 0002.  The settlement

5  terms included benefits to the Hacienda Parties, even though the Hacienda Parties

6  were not named plaintiffs to the CEQA Litigation.  *Id.* at 0003.  RREEF included

7  these benefits for the Hacienda Parties because RREEF believed that in order to

8  settle the CEQA Litigation, it needed to address Mr. Neumann's issues.  Tr. 128:12-

9  18.

10      255.    On February 17, 2016, representatives from RREEF – including Phil

11  Friedl – met with Mr. Neumann at the JLL office in El Segundo.  Tr. 128:21-129:6.

12  At the meeting, Mr. Neumann requested that RREEF change the proposed

13  construction schedule to commence with Phase 3 (the northwest or "Fry's" corner)

14  even though RREEF had not yet received entitlements for Phase 3 from the City.

15  Tr. 129:7-130:7.  During this meeting, Mr. Neumann used scissors to cut and move

16  paper representing buildings to show how he wanted the layout of the site plans.  Tr.

17  128:21-130:11.

18      256.    On March 7, 2016, Cory Briggs emailed Mr. Gutierrez and wrote that

19  SCMB was "as [he] expected, being loyal and deferential to Mark [Neumann]," and

20  that "a settlement without [Mr. Neumann's] blessing will be unlikely."  TE 104.

21      257.    On April 29, 2016, when discussing Mr. Neumann's role in the

22  settlement negotiations, Cory Briggs wrote that "the obstacle we anticipated is

23  tougher than I thought."  TE 107 at 0007.

24      258.    When RREEF was unable to reach an agreement with Mr. Neumann to

25  settle the case, RREEF began engaging with officers of SCMB.  Tr. 130:8-22.

26      259.    In Summer 2016, Mr. Friedl met with SCMB officer Chris

27  Prodromides.  Tr. 130:12-131:2.  During this meeting, Mr. Friedl showed revised

28  site plans to Mr. Prodromides that had been shared with Mr. Briggs and Mr.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

Neumann.  Tr. 131:3-132:5.  Mr. Prodromides stated that he was "supportive" and "liked what [RREEF was] doing."  Tr. 132:1-5.  Mr. Prodromides also stated that Mr. Friedl should meet with other members of SCMB.  Tr. 132:1-12.

260.    Shortly after his meeting with Mr. Prodromides, Mr. Friedl called and met with Loralie Ogden, another SCMB officer.  Tr. 132:18-133:6.  During the in-person meeting, Ms. Ogden seemed to agree with the changes reflected in the revised site plan for the Project.  Tr. 134:4-19.

261.    However, Ms. Ogden showed a concern about parking in front of the Hacienda Building.  Tr. 134:14-19.  Ms. Ogden's focus on one particular area of the Shopping Center in front of the Hacienda Building, rather than the Shopping Center as a whole, seemed "odd" to Mr. Friedl.  Tr. 134:20-25.

262.    Following the meetings with Mr. Prodromides and Ms. Ogden, RREEF and SCMB participated in a mandatory settlement conference.  Tr. 135:1-18.  During the mandatory settlement conference, SCMB's lawyer, Mr. Briggs, took a phone call with Mr. Neumann.  Tr. 171:23-172:2.

263.    On July 8, 2016, RREEF and Macy's entered into the "Separate Agreement Regarding Expansion and Redevelopment of Shopping Center."  TE 1313 at 0001.  Prior to that time, although RREEF and Macy's had a detailed Letter of Intent, they could not sign a final agreement because the site plans were too fluid and the "final site plan was going to be an exhibit" to the agreement between RREEF and Macy's.  Tr. 734:17-735:5, 837:14-838:15; *see also* Macy's LOI.

264.    Ultimately, RREEF was unable to achieve an out-of-court resolution of the CEQA Litigation.  Tr. 75:11-13.  Instead, RREEF took the action to trial, where it prevailed on the merits on November 2, 2016.  TE 2047 at 0001-0002, 0019-0020.

265.    While the CEQA Litigation was pending, the Project was at a standstill.  Tr. 67:19-22, 70:9-71:13.

266.    In general, after "conceptual" site plans are approved, a developer must generate several iterations of more refined site plans until it has plans detailed

1   enough for a contractor to actually build the desired project.  Tr. 110:11-111:17.

2   Each iteration of refined site plans must be approved by the City Planning

3   Department.  Tr. 111:24-112:14.

4       267.   By at least the third quarter of 2015, RREEF had refined site plans

5   ready to submit to the City.  Tr. 119:15-17.  However, while the CEQA Litigation

6   was pending, RREEF could not submit any of its refined site plans to the City.  Tr.

7   119:5-22.

8       268.   Separate from the impact of the CEQA Litigation on receiving

9   approvals, RREEF also had internal roadblocks caused by the litigation.  Tr. 832:11-

10  834:9.  In particular, due to risks associated with the CEQA Litigation, RREEF's

11  internal investment committee did not approve funding for the full Project until after

12  the CEQA Litigation was resolved.  *Id*.

13      269.   However, RREEF was able to do some work that was separate from the

14  Project entitlements embroiled in litigation.  Tr. 827:8-830:13.  For example,

15  RREEF worked on "refreshing" the interior of the mall and renovating the Coco's

16  building.  Tr. 71:18-72:19, 830:24-13.  As Joshua Lenhert, senior portfolio manager

17  at RREEF in charge of the Shopping Center, testified: "The redevelopment at large

18  was still in question.  It did contain some things that didn't require an EIR process,

19  and so this was our effort to sort of mitigate the delays and perform some of the

20  work, refreshing the interior mall.  Taking down the obsolete buildings, doing facade

21  renovations that are not – that are not – that are not structural but typically

22  architectural."  Tr. 830:7-13.

23      **E.    The Director's Writ Litigation**

24      270.   Within weeks of RREEF and the City prevailing on the merits in the

25  CEQA Litigation, RREEF moved forward with the Project.  RREEF submitted

26  refined plans to the City of Manhattan Beach Director of Community Development

27  (the "Director"), and the Director approved those plans in December 2016, pursuant

28

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

1   to the authority provided in the MUP.  TE 2042 at 0007 (¶ 31); TE 3012 at 0001; Tr.

2   76:20-77:5.

3          271.   After the Director approved the Project's refined site plans, the

4   Hacienda Parties took administrative action by attempting to appeal the Director's

5   decision.  TE 2042 at 0011 (¶¶ 45-46).  However, the City informed the Hacienda

6   Parties that there was no procedure for appealing this decision.  *Id.*; Tr. 445:5-25.

7          272.   On February 2, 2017, 3500 Sepulveda, LLC filed a writ in Los Angeles

8   Superior Court, seeking to vacate the Director's approval of the refined plan and stop

9   the Project from proceeding ("Director's Writ Litigation").  *See* TE 2042.

10         273.   When asked what prompted the Hacienda Parties to file the Director's

11  Writ Litigation, Mr. Neumann explained:

12            Q.  So what prompted the Hacienda [P]artes to file the writ of
              mandate case regarding the MUP?
13

14            A.  We were surprised to see a new site plan proposed for the
              shopping center.  And our concern wasn't the overall center.  We
15            were focused on the parking adjacent to our building.  We're
              trying to protect the parking for our tenants and their customers
16            in Lot F.

17

18            And – and in Lot F, there was a reduction – if I remember right,
              it was a reduction of nine spaces from what was approved
19            previously, and a new site plan was produced.

20  Tr. 442:11-20; *see also*  Tr. 444:7-12 ("Q.  What were the changes between this site

21  plan, Exhibit 1263, in 2016 and the Settlement Agreement site plan as it was material

22  to the Hacienda parties?   A. There was a further reduction in the Lot F parking. I

23  believe the number was nine more spaces were taken out of Lot F.")

24         274.   There is no evidence in the record suggesting that anyone other than the

25  Hacienda Parties challenged the Director's authority to approve the refined site

26  plans.

27         275.   Rather than litigate the City's procedures and the Director's authority,

28  RREEF felt that it should simply submit an application to the Planning Commission

(rather than the Director) to approve a further amended Master Use Permit capturing RREEF's desired changes in its refined site plan.  TE 3012 at 0001-0002; Tr. 79:12-80:13, 144:15-23.

276.   The Planning Commission held a public meeting on the application on June 14, 2017, and adopted a resolution approving the amended Master Use Permit. TE 3012 at 0002.  During this hearing, Commissioner Morton asked Mr. Neumann if his "efforts to invalidate the original plan … [are] really more of an effort to extract concessions … by using [the Director's Writ] lawsuit as leverage."  TE 2178 at 2:16:05.  Commissioner Morton also described the Hacienda Parties' opposition as "more of a fundamental disagreement … [and] an effort to disqualify the project or go back to 2014 than it is really a principled stand on the -- the certain nuances of the elevator or the parking."  *Id.* at 2:24:10.

277.   However, the Hacienda Parties appealed the Planning Commission's decision, requiring the City Council to review and approve the amended Mater Use Permit.  TE 3012 at 0002.

278.   The City Council held a meeting on the amended Master Use Permit on August 15, 2017.  TE 3012 at 0001.  And, in September 2017, the City Council approved the amended Master Use Permit.  Tr. 81:11-15.

279.   Ultimately, the approvals by the Planning Commission and City Council had the effect of mooting the lawsuit.  Tr. 81:2-10, 144:11-145:23.

280.   While the Director's Writ Litigation was pending, RREEF was stalled in its ability to advance the construction of the Project.  Tr. 79:12-80:6, 146:19-147:16.  In particular, while RREEF's application for an amended Master Use Permit to the City Planning Commission and then City Council was in process, it could not "submit full construction drawings to the City for review."  Tr. 147:25-148:9. Moreover, RREEF itself had concerns about the risk of advancing the Project until the Hacienda Parties' challenge was resolved.  Tr. 79:12-22.

281.   Once the Director's Writ Litigation was resolved, RREEF was finally able to begin construction on the Project in September 2017.  Tr. 51:16-20.

## F.   RREEF's Monetary Harm

282.   As a result of the delay in the start of the construction of the Project from the originally anticipated date of January 2015 to the actual start of construction in September 2017, RREEF experienced monetary harm.  *See* TE 2067 at 0011; TE 2111 at 0007-0015.  As Mr. Lenhert summarized, "[t]he delays, the construction cost increases, the slow leasing[] coming out of the construction [] really hampered this property's performance."  Tr. 37:12-23.  Specifically, Mr. Lenhert described the Shopping Center as "if not the worst, one of the worst-performing retail assets in our portfolio."  *Id.*

283.   RREEF's damages expert, David Bones, identified three periods during which RREEF experienced harm stemming from delays to the Project:  The first delay period (June 2012 – December 2014) encompasses the delay RREEF experienced during the entitlements phase.  TE 2067 at 0008; Tr. 306:18-307:5.  The second delay period (December 2014 – December 2016) encompasses the delay RREEF experienced during the CEQA Litigation.  TE 2067 at 0009; Tr. 307:15-21.  The third delay period (February 2017 – September 2017) encompasses the delay RREEF experienced during the Director's Writ Litigation.  TE 2067 at 0009-0010; Tr. 307:22-308:2.

284.   Mr. Bones assumed that the Project would have taken some time to obtain entitlements in the normal course and that pre-construction work would have taken approximately a year.  Tr. 306:17-307:21.  To reflect these assumptions, Mr. Bones only estimated damages for a total of twelve months during each of the first and second delay periods, rather than the entirety of those periods.  *Id.*  Thus, in total, the delay periods span thirty-two months.  Tr. 308:12-16, 308:25-309:7.

285.   Mr. Bones calculated RREEF's monetary harm in two primary categories: cost escalation and lost profits.  TE 2067 at 0011-0022; TE 2111 at 0008-0015.

i.   *Cost Escalation Damages*

286.   Mr. Bones's cost escalation category reflects the additional amount of money RREEF had to expend as a result of rising construction costs during the period the Project was delayed, including for materials, labor, and other factors.  TE 2067 at 0018-0022; Tr. 309:8-14.

287.   Mr. Bones calculated RREEF's cost escalation damages by first examining a total of seventy draws (*i.e.*, payments) RREEF made related to construction costs incurred between October 2015 and September 2021.  TE 2111 at 0012.  From this pool of costs, Mr. Bones analyzed only the hard costs, leaving soft costs and leasing costs out of his escalation analysis.  *Id.*; Tr. 310:7-22.  Hard costs consist of direct construction costs, such as building materials, utility relocation, and signage.  Tr. 310:12-16.  Soft costs consist of expenditures such as architectural and engineering fees, legal expenses, and permits.  Tr. 310:17-19.  Finally, leasing costs include items like tenant improvements and leasing commissions.  Tr. 310:20-22.

288.   Mr. Bones testified that, if he had decided to include soft costs and leasing costs in his analysis, the overall damages estimate would have been higher, with an estimated increase of around $5 million.  Tr. 311:8-312:6.

289.   Mr. Bones also did not analyze cost escalation relating to hard costs incurred by RREEF after September 2021, as such costs were incurred after Mr. Bones ran his analysis.  Tr. 312:17-22.

290.   After isolating the "hard costs," Mr. Bones then used inflation data from the Turner Building Cost Index ("Turner Index") and Engineering News Record Construction Cost Index ("ENR Index") to "de-escalate" RREEF's hard costs to the level of costs they would have been at without the delay.  TE 2111 at 0061-0065; Tr. 312:23-319:23.

291.   Although Mr. Bones initially used both the Turner Index and ENR Index, he concluded that the Turner Index is the more appropriate index for this case, given that it is an "output index" that measures not only labor rates and material prices, but also things like productivity and the competitive condition of the marketplace.  TE 2067 at 0019; Tr. 312:23-313:15, 313:25-314:5.

292.   Mr. Bones also testified that his methodology can be used to estimate damages for some period less than the total amount of any of the three delay periods he identified.  Tr. 320:12-321:24.  Thus, Mr. Bones provided a per-month figure for cost escalation damages for each delay period.  *Id.*

293.   Mr. Bones's calculated the following cost escalation damages using the Turner Index:

| __Delay Period__ | __Total Cost Escalation Damages by Period__ | __Monthly Cost Escalation Damages by Period__ |
|---|---|---|
| Delay Period #1: Entitlement Period Delays | $7,587,000 | $632,250 |
| Delay Period #2: CEQA Litigation Delays | $7,163,000 | $596,917 |
| Delay Period #3: Director's Writ Litigation Delays | $4,416,000 | $552,000 |
| Total Cost Escalation (All Delay Periods) | $19,166,000 | N/A |

TE 2111 at 0013; Tr. 320:1-18; *see also* David Bones's Trial Demonstrative.

ii.   ***Lost Profits Damages***

294.   Mr. Bones's second damages category, lost profits, reflects the additional profits that RREEF would have enjoyed without the delays to its Project. TE 2067 at 0012-0014; Tr. 327:15-329:18.

295.   Generally, RREEF expected a number of economic benefits to flow from the completion of the Project, including building an additional 130,000 square

feet of retail space it could lease out to new tenants, improving the quality of the Shopping Center from an A- to B class space to an A or A+ class space – thereby commanding higher rents – and enjoying an increased residual value or exit valuation for the Shopping Center. TE 632 at 0014-0015, 0019; Tr. 329:19-331:9.

296.   To determine the lost profits damages RREEF experienced as a result of delays to the Project, Mr. Bones starting by looking at RREEF's actual financial data coupled with projections included in an appraisal prepared by Duff & Phelps LLC ("Duff & Phelps").   Tr. 338:4-17.   Specifically, Mr. Bones used RREEF's actual financial results from 2016 through August 2021. *Id.*  Mr. Bones then used the first eight months of 2021 to annualize an estimate for the remainder of the 2021 year, and used projections starting in January 2022.  TE 2111 at 0008-0009; Tr. 338:4-17.

297.   In addition, after his lost profits analysis performed around October 2021 (which produced the damages figures presented at trial) and before trial, Mr. Bones compared his partial, annualized 2021 financial results and the projections in the Duff & Phelps appraisal against RREEF's actual results for 2021 and 2022.  Tr. 348:10-349:8.  Mr. Bones concluded that RREEF's actual results were higher than the partial, annualized 2021 financial results and the Duff & Phelps's projections. Tr. 349:9-13.

298.   Both Mr. Bones and Christian Tregillis, the Hacienda Parties' damages expert, agreed that using RREEF's actual financial results for 2021 and 2022, rather than projections, would have resulted in higher damages for RREEF.  Tr. 349:9-13; Tr. 647:16-20 ("THE COURT:  So what's the impact if you were to plug in actual NOI as opposed to projections in the model?  [MR. TREGILLIS]:  The damages would be bigger for these two years.  If you – if you just did that and used everything the same in Mr. Bones's analysis, the damages would be bigger.").

299.   To assess RREEF's lost profits, Mr. Bones utilized a framework that shifted back RREEF's actual/forecasted net operating income ("NOI") and

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

discounted the NOI to the appropriate time period.  TE 2111 at 0008, 0050-0057;
Tr. 335:10-336:18.  This methodology reflects the "time value of money" and the
impact of RREEF missing out on its anticipated economic benefits until a later date
in time.  TE 2067 at 0013.

300.  Mr. Bones also calculated capital outlay mitigation, which reflects the
fact that RREEF made certain capital expenditures later in time than it otherwise
would have without the delays.  TE 2111 at 0007, 0050-0057; Tr. 340:10-343:1.
Specifically, Mr. Bones assumed that RREEF would have been able to reallocate
100% of the monies it otherwise would have expended on the Project to other
investments as it waited for the delays to resolve.  Tr. 341:11-342:1.

301.  Mr. Bones's lost profit damages analysis also allows for a "per-month"
calculation, to the extent only a portion of a delay period is attributed to the Hacienda
Parties.  Tr. 336:19-337:6

302.  Taking the impact of the delayed NOI and deducting the benefit of the
capital outlay mitigation, Mr. Bones determined the following lost profit damages:

| **Delay Period** | **Total Lost Profits Damages by Period** | **Monthly Lost Profits Damages by Period** |
| --- | --- | --- |
| Delay Period #1:  Entitlement Period Delays | $1,959,000 | $163,250 |
| Delay Period #2: CEQA Litigation Delays | $1,965,000 | $163,750 |
| Delay Period #3: Director's Writ Litigation Delays | $1,751,000 | $218,875 |
| Total Lost Profits (All Delay Periods) | $5,675,000 | N/A |

TE 2111 at 0010; Tr. 343:2-16.

1

## G.    The Impact of Uncalled Witnesses[5]

2      303.    "[W]hen a party fails to call a witness who may reasonably be assumed

3   to be favorably disposed to the party, an adverse inference may be drawn regarding

4   any factual question on which the witness is likely to have knowledge."

5   *Underwriters Lab'ys Inc. v. N.L.R.B.*, 147 F.3d 1048, 1054 (9th Cir. 1998) (citation

6   omitted).

7      304.    However, "[w]here a potential witness is equally available to both

8   parties, no inference should be drawn from the failure of a party to call such witness."

9   *Kean v. C.I.R.*, 469 F.2d 1183, 1187 (9th Cir. 1972) (citation omitted).    "The

10   determination of the question of equal availability depends upon all the facts and

11   circumstances bearing upon the witness's relation to the parties and not merely upon

12   his physical presence at trial or accessability [*sic*] for service of a subpoena. The

13   potential witness must be equally available both legally and practically."  *Id.* at 1188

14   (witness was not equally available to both parties where witness had been

15   petitioner's employee for many years); *see Samish v. U.S.*, 223 F.2d 358, 365 (9th

16   Cir. 1955) (secretary of defendant was not equally available to prosecution because

17   of secretary's long relationship with and loyalty to defendant).

18      305.  Mr. Briggs, the attorney for the Hacienda Parties during the

19   entitlements process before the City and counsel for SCMB in the CEQA Litigation,

20   was likely to have relevant information, particularly regarding the Hacienda Parties'

21   role in the CEQA Litigation.

22      306.   In addition, Mr. Briggs was, at minimum, practically unavailable to

23   RREEF.  As the Hacienda Parties' counsel, it is likely that Mr. Briggs would have

24   "continued to see events through [their] eyes" in a manner that rendered him

25   practically unavailable to RREEF.  *See Samish*, 223 F.2d at 365.

26   _____

27   [5] This section addresses the sixth question in the Court's February 14, 2023 Minute
    Order ("If potential witnesses likely have information relevant to a disputed fact
28   issue but neither side calls those witnesses to testify at trial, should that impact
    resolution of the disputed fact issue?").

307.   Mr. Briggs was not called to testify at trial, even though he appeared as a witness on the Hacienda Parties' witness list.  *See* ECF No. 238 (Plaintiffs'/Cross-Defendants' Witness List).

308.   Accordingly, the Court draws an inference that Mr. Briggs's testimony would have been unfavorable to the Hacienda Parties, as follows:  (i) Mr. Neumann had was a substantial factor in the filing of the CEQA Litigation; (ii) Mr. Briggs acted on behalf of both the Hacienda Parties and SCMB in connection with the CEQA Litigation; (iii) Mr. Briggs communicated with RREEF on behalf of the Hacienda Parties with regard to potential settlement of the CEQA Litigation; (iv) the Hacienda Parties instructed Mr. Briggs not to settle the CEQA Litigation without their consent; and (v) RREEF was unable to reach an early settlementent with SCMB to resolve the CEQA Litigation due primarily to the Hacienda Parties' objections.

## III.   PROPOSED CONCLUSIONS OF LAW

### A.   The Hacienda Parties Breached the Settlement Agreement

309.   RREEF established that the Hacienda Parties breached the Settlement Agreement by opposing RREEF's Project.

310.   "Under California law, the elements of a viable breach of contract claim are:  (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damages to plaintiff as a result of the breach."  *Alpha GRP, Inc. v. Subaru of Am., Inc.*, No. CV182133MWFMRWX, 2018 WL 5986989, at *10 (C.D. Cal. June 8, 2018) (internal citation and quotation omitted); *see also* California Civil Jury Instructions (2022) 303 (Breach of Contract – Essential Factual Elements).

#### i.   *RREEF Established That the Settlement Agreement Was a Valid Contract*

311.   The parties do not dispute that the Settlement Agreement is a valid, binding contract. *See* ECF No. 246 ¶ 8 ("On or about October 8, 2008, the Hacienda Parties and RREEF America entered into the 'Settlement Agreement'[.]").

ii.    ***RREEF Performed Under the Settlement Agreement***

312.    RREEF supported the Hacienda Building Application, the City approved it, and the Hacienda Parties admit that RREEF fully kept its promises and complied with the Settlement Agreement on this point.  TE 101 at 0013 (RFA 13). Accordingly, RREEF performed under the Settlement Agreement.

313.    The Hacienda Parties argue that their obligations under the Settlement Agreement were excused by RREEF's alleged "failure to comply with the Settlement Agreement during construction"—i.e., beginning no earlier than commencement of construction in September 2017, *after* the Hacienda Parties' breaches of the Settlement Agreement that are the subject of RREEF's counterclaims.  *See* ECF No. 238 at 2:19-20; Tr. 51:16-20.  As discussed in Section II.B.iii, *supra*, RREEF complied with its obligations during construction.  The Ninth Circuit already held that RREEF's construction activities did not breach the terms of Settlement Agreement, *3500 Sepulveda*, 980 F.3d at 1323-25, 1328, and the fact that RREEF's re-phasing of the Project mitigated potential harm to the Hacienda Parties resulting from the temporary reduction of parking in the former Lot F area (by expediting the construction of the Northeast and South Decks, completing circulation improvements, and taking other measures, as requested by the Hacienda Parties) (TE 28 at 0012-0013, 0014-0016, 0022-0023; Tr. 175:9-15) demonstrates that RREEF's construction activities did not violate the covenant of good faith and fair dealing either.

314.    And, even if it were true that RREEF's activities during construction constituted a breach of the Settlement Agreement, a court is not "empowered to retroactively excuse nonperformance."  *Rankine v. Roller Bearing Co. of America, Inc.*, No. 12–CV–2065–MMA (BLM), 2013 WL 5944248, at *4 (S.D. Cal. Nov. 5, 2013) *aff'd sub nom. Rakine v. Does, 1-10*, 628 F. App'x 494 (9th Cir. 2015).

315.    Further, "[w]here the covenants of the respective parties are to be performed at different times they are held to be independent and the breach by one

1    party of his covenant does not excuse the performance by the other of his covenant."

2    *Nomadix, Inc. v. Guest-Tek Interactive Ent. LTD*, CV1608033ABFFMX, 2017 WL

3    7275391, at *5 (C.D. Cal. Nov. 30, 2017) (citation omitted); *see also Colaco v.*

4    *Cavotec SA*, 25 Cal. App. 5th 1172, 1183 (2018) ("[W]here covenants of a contract

5    are to be performed at different times, they are independent").

6        316.    Project construction occurred after the Hacienda Parties' breaches, and

7    thus RREEF's conduct during construction could not excuse the Hacienda Parties'

8    breaches as a matter of law.    *See supra* ¶ 313.    Relatedly, the Hacienda Parties'

9    obligations under the Settlement Agreement in connection with City entitlements

10   were independent of RREEF's construction-related obligations, because they

11   necessarily occurred at different times.    Therefore, any alleged nonperformance by

12   RREEF could not serve as an "excuse" for the Hacienda Parties' nonperformance.

13       iii.    ***The Hacienda Parties Breached the Settlement Agreement***

14       317.    As described in Section II.B, *supra*, the Settlement Agreement required

15   the Hacienda Parties to support RREEF's Project and not to oppose it, except under

16   narrow, limited circumstances.    Specifically, the Hacienda Parties reserved only the

17   right to make objections to the Project before the City during the approval process,

18   and only if (1) there were "material alterations" to the Site Plan and such material

19   alterations "detrimentally affect the use or operations of the Hacienda Building," or

20   (2) RREEF submitted to the City "material" revisions to the "portions of the Site

21   Plan relating to the North Deck and the Parking Plan."    TE 3033 at 0005 (Settlement

22   Agreement Sections 4(g) and 5(c)).

23       318.    The Hacienda Parties agreed to limit the subject matter of any

24   opposition before the City to (1) "material alterations to the Site Plan … which

25   detrimentally affect the use or operations of the Hacienda Building" and (2)

26   "material revisions to the North Deck and/or Parking Plan."    TE 3033 at 0005

27   (Settlement Agreement Sections 4(g) and 5(c)).

28

319.   Mr. Neumann testified to his belief that, once any material change was made to the 2008 Project Plans, nothing precluded the Hacienda Parties from opposing the Project on any grounds.   Neumann Dep. Tr. 169:10-17.   This interpretation, however, would read out the specific limitations set out in Sections 4(g) and 5(c) of the Settlement Agreement, which is not a permissible interpretation of the contract.  *See City of Colton v. Am. Promotional Events, Inc.*, No. EDCV 09-1864 PSG, 2010 WL 5392761, at *6 (C.D. Cal. Dec. 21, 2010) ("Under California law, contracts are interpreted as to give meaning to each word and phrase of the contract."); Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").

320.   As documented more thoroughly in the Proposed Findings of Fact at Sections II.C-E, *supra*, the Hacienda Parties' years-long opposition to the Project exceeded the limited conditions under which the Hacienda Parties could oppose the Project under the Settlement Agreement.

321.   In the entitlements phase of the Project, members of the Hacienda Parties appeared at eleven meetings before the Planning Commission and City Council to oppose the Project.  *See generally supra* Section II.C (outlining Hacienda Parties' opposition during the City administrative approval process).   Because RREEF did not make any material alterations to the 2008 Project Plans, all of the Hacienda Parties' objections to the Project before the Planning Commission and City Council breached the Settlement Agreement by violating the requirement to "not oppose the City's approval of the Shopping Center Project."  TE 3033 at 0004.

322.   In any event, nearly all of the Hacienda Parties' objections were unrelated to *any* changes to the project vis-à-vis the 2008 Project Plans.   For example, objections to the EIR were categorically *not* related to changes to the 2008 Project Plans, as the environmental impact of the 2008 Project Plans and later iterations of the plans would have been virtually the same, meaning the EIRs would

1   have been the same, too.  Tr. 246:2-19, 247:7-18.  This includes the October 8, 2013

2   letters from Mr. Briggs and Mr. Smith on behalf of the Hacienda Parties criticizing

3   numerous aspects of the EIR.  *See* TE 70.  As Mr. Gibson made clear at trial, the

4   primary complaints in those letters were untethered to the site plans, meaning those

5   objections would have been the same whether the EIR considered the 2008 Project

6   Plans or later iterations of the plans.  Tr. 256:11-20, 258:3-6, 258:19-259:4.  Thus,

7   even if RREEF had made material alterations to the 2008 Project Plans, which could

8   permit the Hacienda Parties to oppose *those alterations* (if material and/or

9   detrimental), much of the Hacienda Parties' opposition would still constitute

10  breaches of the Settlement Agreement.

11      323.  Beyond breaching the Settlement Agreement's limitations on

12  opposition, the Hacienda Parties' extensive challenges to the EIR also breached their

13  duties of good faith cooperation with regard to the processing of the Project and its

14  EIR imposed by Sections 4(e) and 4(f) of the Settlement Agreement.  TE 3033 at

15  0004-0005.

16      324.  Mr. Neumann's circulation of a petition against the Project in

17  September 2013 constitutes improper opposition to the Project in the form of

18  fomenting dissatisfaction and encouraging others to oppose the Project.  TE 89 at

19  0002.

20      325.  Similarly, Mr. Neumann's September 17, 2013 City Council meeting

21  comments (and those like them) comparing the Project to a 133,000 square foot Wal-

22  Mart Superstore and categorizing RREEF as out-of-towners who did not care about

23  the City of Manhattan Beach and were likely to leave once the Project was approved

24  was aimed at fomenting opposition and raising concern among City Council

25  members, constituting improper opposition to the Project.  TE 3007 at 0144:5-20;

26  Tr. 682:25-685:10.

27      326.  Mr. Neumann's March 2014 email chain coordinating opposition with

28  Mr. Krigsman and Neil Boyer, including plans to encourage additional community

members to oppose the Project, aimed to promote objections to the Project and therefore constitutes improper opposition to the Project. TE 94 at 0001-0002.

327. On approximately April 7, 2014, Mr. Neumann ordered lawn signs with language opposing the Project ("No Mall / 3 Story Garages / Get the Facts / 90266 MALL.com") for community members to display—he also placed a number of the signs around the Hacienda Building, which he recognized "some people didn't like." TE 97 at 0001-0002; Neumann Dep. Tr. at 241:10-243:13. The Hacienda Parties therefore improperly opposed the Project not only by purchasing and displaying these signs, but by encouraging third parties to also oppose the Project.

328. In April 2014, Mr. Neumann discussed with Mr. Krigsman and Mr. Williams the prospect of setting up a website to oppose the Project, which constitutes opposition to the Project. TE 98 at 0001-0006; Tr. 550:15-20.

329. At an April 29, 2014 City Council meeting, Mr. Neumann made a PowerPoint presentation, in which he alluded to alleged legal problems involving an unrelated development in Sunnyvale, California, which was never completed. TE 79 at 0028-0031; Tr. 530:21-532:24. Mr. Neumann raised this point in order to suggest that the same issues could impact the Project, thereby improperly opposing the Project by attempting to tie it to an allegedly unsuccessful, abandoned project. *Id.*

330. On May 17, 2014, in advance of the May 20, 2014 City Council meeting, Mr. Neumann hosted a rally for Manhattan Beach residents to oppose the Project. TE 116 at 0001-0002; Neumann Dep. Tr. at 301:2-303:3. Mr. Neumann improperly opposed the Project by fomenting opposition in an attempt to interfere with the entitlements process.

331. At the December 2, 2014 City Council meeting, Mr. Neumann improperly opposed the Project by characterizing RREEF's funding of the Project as "German money," encouraging the City Council to demand more from RREEF in the approval process. 2142 at 0034:10-11.

332.  As addressed in Section III.A.iv.a.2, *infra*, the Hacienda Parties supported SCMB in the CEQA Litigation, which also breached the Settlement Agreement's limitations on opposition.  The Hacienda Parties collaborated with SCMB officers and introduced one of the SCMB officers to a CEQA lawyer that also represented the Hacienda Parties.  TE 108;  TE 109; TE 2179.  The Hacienda Parties provided the factual record, including expert reports, on which the CEQA litigation was based.  *Compare*, TE 2079 (CEQA Plaintiff legal arguments), *with* TE 2131 at 0296-0301 (same arguments made by Hacienda Parties' traffic engineer).  And when the CEQA Litigation was pending, the Hacienda Parties inserted themselves into settlement negotiations and acted as a roadblock to a successful early settlement.  TE 104 (SCMB lawyer writing "a settlement without [Mr. Neumann's] blessing will be unlikely" because SCMB was "being loyal and deferential to Mark [Neumann]"); TE 107; Tr. 128:12-18.  Moreover, The focus of the CEQA Litigation was on the EIR, which SCMB alleged was insufficient.  TE 2036 at 0004-0006.  Because the EIR would have been virtually the same under the 2008 Project Plans or later iterations of the plans, the CEQA Litigation was not an objection to any alterations of the 2008 Project Plans.  Tr. 256:11-20, 258:3-6, 258:21-259:4.  Accordingly, even if RREEF had made material and/or detrimental alterations to the 2008 Project Plans, the Hacienda Parties breached the Settlement by supporting the CEQA Litigation, which reflected criticisms of the EIR, not objections to a purported material and/or detrimental change to the 2008 Project Plans.

333.  The Hacienda Parties also opposed the Project by filing the Director's Writ Litigation, which sought to overturn the Director's approval of the Project.  TE 2042; *see also* Tr. 442:11-20.  Because the Director's Writ Litigation was not directed at any material alterations to the 2008 Project Plans (the lawsuit was premised upon a change in nine parking spaces, *see* Tr. 444:7-12) and the purpose of the lawsuit was to undo and prevent approval of the Project, in direct contravention of their obligation under the Settlement Agreement *not* to oppose

1   approval, the Director's Writ Litigation reflects another breach of the Settlement

2   Agreement. TE 3033 at 0004.

3          iv.   ***The Hacienda Parties' Breaches of Contract Were a***
               ***"Substantial Factor" in Causing the Delays That Damaged***

4               ***RREEF***

5          334.   RREEF has established with reasonable certainty that the Hacienda

6   Parties' breaches of contract resulted in $19,166,000 in cost escalation damages and

7   $5,675,000 in lost profits damages to RREEF.

8               a.   RREEF Established That the Hacienda Parties Were a

9                    "Substantial Factor" in Causing Delays to the Project

10                   That Resulted in Damages to RREEF

11         335.   In a breach of contract case, the plaintiff must establish that the

12  defendants' breach was a proximate cause of the plaintiff's damages. Cal. Civ. Code

13  § 3300 ("For the breach of an obligation arising from contract, the measure of

14  damages, except where otherwise expressly provided by this Code, is the amount

15  which will compensate the party aggrieved for all the detriment ***proximately caused***

16  ***thereby***, or which, in the ordinary course of things, would be likely to result

17  therefrom") (emphasis added). The test for proximate causation in an action

18  involving a breach of a contract is whether the defendant's "breach was a

19  '***substantial factor***' in causing the damage." *Britz Fertilizers, Inc. v. Bayer Corp.*,

20  665 F. Supp. 2d 1142, 1167-68 (E.D. Cal. Oct. 16, 2009) (emphasis added) (citations

21  omitted); *see also US Ecology, Inc. v. State of California*, 129 Cal. App. 4th 887,

22  909 (2005) ("A proximate cause of loss or damage is something that is a substantial

23  factor in bringing about that loss or damage."); *Agam v. Gavra*, 236 Cal. App. 4th

24  91, 107-08 (2015) (breaching party's refusal to participate in partnership's

25  construction project and allow construction to move forward was a "substantial

26  factor" in harm experienced by other partner). A "substantial factor" is "something

27  which is more than a slight, trivial, negligible, or theoretical factor in producing a

28  particular result." *Britz Fertilizers*, 665 F. Supp. 2d at 1168 (citations omitted). As

1   the California Supreme Court articulated, "[u]ndue emphasis should not be placed
2   on the term 'substantial.'" *Rutherford v. Owens-Illinois, Inc.*, 16 Cal.4th 953, 969
3   (1997).

4       336.   In addition, a defendant's breach of contract need not be the sole cause
5   of the damages experienced by the plaintiff. *Bruckman v. Parliament Escrow Corp.*,
6   190 Cal. App. 3d 1051, 1063 (1987) (a defendant generally must "pay damages
7   equivalent to the total harm suffered" even though "the plaintiff's total injury may
8   have been the result of many factors in addition to the defendant's tort or breach of
9   contract") (citations omitted); *see also Britz Fertilizers*, 665 F. Supp. 2d at 1168
10  ("For a breach to be a substantial factor in causing the damages, it need not be the
11  'sole' or exclusive cause of the damages."); Judicial Council of California Civil Jury
12  Instructions (2022) No. 430 ("A substantial factor in causing harm is a factor that a
13  reasonable person would consider to have contributed to the harm.  It must be more
14  than a remote or trivial factor.  It does not have to be the only cause of the harm.").

15      337.   Further, the substantial factor test also allows for a defendant to be a
16  proximate cause of an event, even where there are other independent concurrent
17  causes.  *See Rutherford*, 16 Cal.4th at 969 (holding that the "substantial factor
18  standard" "subsumes the 'but for' test while reaching beyond it to satisfactorily
19  address other situations, such as those involving independent or concurrent causes
20  in fact").  Thus, "[i]n those few situations, where there are concurrent [independent]
21  causes, our law provides one cannot escape responsibility for his negligence on the
22  ground that identical harm would have occurred without it.  The proper rule for such
23  situations is that the defendant's conduct is a cause of the event because it is a
24  material element and a substantial factor in bringing it about." *Mitchell v. Gonzales*,
25  54 Cal.3d 1041, 1049 (1991) (citations omitted); *see also In re Kelly*, 499 B.R. 844,
26  861 (S.D. Cal. Sept. 17, 2013) ("[I]f two forces are actively operating … and each
27  of itself is sufficient to bring about harm to another, the actor's negligence may be

28

found to be a substantial factor in bringing it about.") (citation and internal quotations omitted).

338.  The Hacienda Parties were a "substantial factor" in causing the delays to the commencement of the Project – and resulting harm – RREEF experienced in the entitlements phase, during the CEQA Litigation, and during the Director's Writ Litigation.

339.  As an initial matter, Mr. Neumann conceded at his September 2018 deposition that he delayed the construction of the Project.  Specifically, he testified: "Had [RREEF] considered me a partner in the project and a good neighbor and been neighborly to me, we wouldn't be sitting here today.  ***This thing would have been built years ago.***"  Neumann Dep. Tr. at 171:13-16 (emphasis added).

340.  Beyond Mr. Neumann's direct testimony regarding the Hacienda Parties' role in delaying the construction of the Project, the evidence presented at trial demonstrated that the Hacienda Parties' breaches of their contractual obligations under the Settlement Agreement were more than a "slight, trivial, negligible, or theoretical factor" in causing the delays to the construction of the Project that harmed RREEF.

> (1)  *The Hacienda Parties Were a "Substantial Factor" in Causing the Project Delays During the Entitlements Phase*

341.  The Hacienda Parties' opposition to the Project during the entitlements phase was a substantial factor in causing delays to the commencement of construction of the Project, and therefore, the harm stemming from those delays.

342.  Before RREEF could legally commence construction of the Project, the City had to approve the Project's EIR and entitlements. Tr. 42:12-43:22, 45:7-46:23. In addition, aside from the legal need for City approvals, RREEF's internal investment committee would not approve substantial funding for the Project unless and until RREEF obtained the necessary entitlements. Tr. 63:19-64:8. Accordingly,

any delays in receiving City approvals directly delayed the commencement of the Project.

343.    The Hacienda Parties spoke publicly against the Project four times at the Planning Commission and seven times at the City Council, each time raising multiple grounds of opposition to the Project.  TE 72 at 0065:12-0075:18; TE 73 at 0111:8-0131:22; TE 2007 at 0017:2-0022:12; TE 2134 at 0123:20-0128:18; TE 2139 at 0101:6-0112:8; TE 2140 at 0110:19-0143:8; TE 2141 at 0085-0087:1, 0206:3-0214:17; TE 2142 at 0030:24-0044:17; TE 3003 at 0019:9-0022:4; TE 3007 at 0134:13-0154:25; TE 3032 at 0082-0084:21.

344.    At both the Planning Commission and the City Council, Mr. Neumann's opposition to the Project, on behalf of the Hacienda Parties, was not limited to material and/or detrimental changes to Settlement Agreement's 2008 Project Plans.  Rather, Mr. Neumann alleged a variety of defects with the Project, including impacts to air quality, soil risks, problems with traffic, the need to decrease the size of the Project, and his desire for alternative projects, such as pursuing a project with a hotel or a project with the only parking structure to be built northeast of Macy's.  TE 68 at 0013-0015; TE 73 at 0128:16-25; TE 74 at 0012-0014; TE 3007 at 0148:10-0151:9, 0158:13-0159:14; Tr. 518:13-521:25.

345.    Mr. Neumann also made attacks on RREEF itself, including criticizing RREEF for bringing employees based in other cities or states to meetings in Manhattan Beach and pointing to a project in Sunnyvale, California as evidence that RREEF would abandon the Project and the City.  Tr. 530:21-532:24, 542:24-544:10.

346.    Mr. Neumann also retained Cory Briggs, an attorney who specialized in CEQA litigation, to represent the Hacienda Parties at the City Council.  TE 86; Tr. 667:13-19.  As with Mr. Neumann's comments, Mr. Brigg's opposition to the Project was not limited to any changes to the 2008 Project Plans.  Instead, Mr. Briggs's comments broadly challenged the Project.  *See* TE 66; TE 70; TE 72 at

0062:13-0065:7; TE 2131 at 0208-0238; TE 2139 at 0112:20-0115:22; TE 2140 at 0151:2-0159:12; TE 2141 at 0048:4-0049:21; TE 3007 at 0157:21-0163:19.

347.   Beyond Mr. Neumann's and Mr. Briggs's opposition at meetings before the City, Mr. Neumann also helped to organize community opposition against the Project.  Among other things, this included securing a website containing content opposing the Project, ordering and distributing lawn signs opposing the Project, helping community members prepare news articles and speeches in opposition to the Project, and organizing rallies to oppose the Project.  TE 89, 94, 97, 98, 99, 114, 116, 117.

348.   The Hacienda Parties' opposition had a clear impact on the City Council's decision to elongate the entitlements process, thereby causing delays to the Project.

349.   First, the City Council wanted to ensure it processed and responded to every comment and public input before moving forward with a vote on the Project and the EIR.  *See, e.g.*, TE 73 at 0178:22-0179:9 (Councilmember Burton noting he wanted a "complete record")*.*  The Hacienda Parties, recognizing this City priority, strategically delayed submitting their highly-technical and legal comments in opposition to the Project until the eleventh hour.  *See, e.g.*, *id.* at 0168:16-22 (Mayor Lesser stating that the Hacienda Parties "ha[ve] withheld [their] comments until this point, which makes it very difficult to move the project forward ever, because it's a constantly changing sort of series of objectives"); TE 2140 at 0162:24-0163:17 (Mayor Pro Tem Powell stating that the City gets documents from the Hacienda Parties at the "eleventh hour"); TE 3023 at 0121, 0153-0154 (September 17, 2013 letter from Briggs Law Corporation was sent to City Council the same afternoon of the meeting).

350.   The Hacienda Parties' tactics made it difficult for the City Council to fully respond to everything they brought up at meetings.  TE 73 at 0168:16-22; TE 2140 at 0162:24-0163:17 (Mayor Pro Tem Powell criticizing the Hacienda Parties'

1  "eleventh hour" submissions because "we can't [respond] if you wait until the last

2  minute").

3      351.  For example, on April 29, 2014, the City Council continued its meeting

4  until May 20, 2014 to give City staff an opportunity to respond to comments brought

5  up by the Hacienda Parties at the April 29, 2014, meeting.  TE 2140 at 0267:24-

6  0268:9 (Councilmember Lesser suggesting that they continue the meeting to give

7  City staff an opportunity to respond to "issues that Mr. Briggs and Mr. Neumann

8  raised"), 0285:23-0286:15 (Councilmember Burton requesting that City staff

9  prepare written responses to allegations from Mr. Briggs), 0298:2-5 (continuing the

10  meeting so City staff could respond to two issues raised by the Hacienda Parties and

11  additional "comments made by the [Hacienda Parties'] attorneys today").

12      352.  Second, the City Council was concerned with the threat of CEQA

13  litigation posed by the Hacienda Parties and would regularly say as much at City

14  Council meetings.  TE 2139 at 0193:22-25 (Councilmember Burton stating he

15  understood the threat of CEQA litigation here), 0213:2-13 (Councilmember Burton

16  stating "I think we may have a threat of EIR/CEQA litigation which would tie this

17  all up"), 0250:20-0251:5 (Councilmember Burton proposing to send the Project back

18  to the Planning Commission as it would "solve[] any threat of having a CEQA

19  action"); Tr. 712:18-713:13 (Mr. English testifying that the City Councilmembers

20  regularly brought up the threat of CEQA litigation).

21      353.  The Hacienda Parties stoked the City Council's concern about CEQA

22  litigation by attacking the adequacy of the EIR, submitting multiple expert reports

23  criticizing the sufficiency of the EIR, arguing the EIR was illegal under CEQA, and

24  stating that the EIR could expose the City Council to litigation over the EIR.  *See*,

25  *e.g.*, TE 70 at 0001-0009 (October 8, 2013, letter from Briggs Law Corporation

26  stating the EIR "d[id] not comply with CEQA's mandates" and setting out specific

27  "CEQA violations" within the EIR); TE 2139 at 0114:18-0115:19 (Mr. Briggs

28  telling the City Council to deny certification of the EIR because approving it could

"expose[] you to litigation"); TE 2140 at 0153:21-0154:3 (Mr. Briggs telling the City Council that the EIR's traffic study deferred mitigation, which was "illegal under CEQA"), 0247:14-0248:6 (Mr. Briggs explaining that he "get[s] brought into these cases toward the end when it looks like a city's not going to do the right thing," and that he needed to "go overboard" when raising issues to make sure that the record is clear for future litigation); TE 3007 at 0158:5-12 (Mr. Briggs arguing that the EIR postponed mitigation and analysis of impacts, which was "illegal under CEQA"), 0163:11-18 (Mr. Briggs joining in Mr. Neumann's request and urging the City Council to "deny certification of the EIR, deny the project, … and revisit[] a smaller project" because the EIR analysis was "defective"). In the Final EIR, the City devoted more than 100 pages responding to the Hacienda Parties' numerous late written comments even though responding to the Hacienda Parties' late comments was "not required under CEQA." TE 2131 at 0027-0028, 0033-0088, 0105-0124, 0137-0169, 0175-0180.

354. Third, the City Council did not want to approve the Project while there was an ongoing dispute between the Hacienda Parties and RREEF. TE 72 at 0116:22-0117:9, 0133:14-20 (Councilmember D'Errico expressing that he would feel "much more comfortable approving a plan that all the owners [proposed] together"), 0156:19-20 (Councilmember Powell stating, "I want to see the parties get together and come up with an agreement"); TE 73 at 0161:13-20 (Councilmember Powell stating he "want[s] to see the parties get together" because "if there's litigation and this is tied up in the courts, the project's not going to be moving"), 0163:6-14 (Councilmember Powell stating that "the only way that [he] could approve the project" is if the Hacienda Parties and RREEF "g[o]t their differences resolved"), 0178:2-8 (Councilmember Powell stating that the "most important" thing to him was "to have the two parties get together and resolve their issues so … this doesn't get tied up in court for a long time").

355.   The City Council's desire to have the parties come to an agreement was so significant that they went so far as to impose a condition on the Project in May 2014 requiring the parties to negotiate in good faith, which RREEF viewed as unworkable and which delayed final approval of the Project until December 2014.  Tr. 723:8-22, 728:23-730:3 (Mr. English testifying that the condition requiring RREEF to negotiate in good faith with the Hacienda Parties was unworkable and therefore RREEF could not proceed with the Project).

356.   Thus, the Hacienda Parties were a "substantial factor" in delaying the City's approval of the EIR and related entitlements, which delayed RREEF's ability to commence the Project.  The Hacienda Parties therefore proximately caused the damages flowing from that delay.

> (2)   *The Hacienda Parties Were a "Substantial Factor" in Causing the Project Delays During the CEQA Litigation*

357.   The Hacienda Parties were also a substantial factor in the filing and prosecution of the CEQA Litigation, which further delayed the Project.

358.   As noted, the Hacienda Parties retained Cory Briggs, a plaintiffs' lawyer for CEQA litigants, during the entitlement phase.  TE 86; Tr. 667:13-19.

359.   Mr. Briggs, while retained by the Hacienda Parties, raised specific technical EIR criticisms to create an administrative record legally mandated by the exhaustion requirements imposed by CEQA, which allowed SCMB to file the CEQA Litigation and raise the same issues based upon that record.

360.   In his testimony, Mr. Neumann purported to disavow his connections to SCMB because the CEQA Litigation was based on the "public record."  Tr. 564:25-565:5 ("Once [SCMB] filed [the CEQA Litigation], I don't -- I -- I don't think I gave them anything.  I think everything they had was in the public record.").  However, under California law, a CEQA lawsuit would not have been possible "unless the alleged grounds for noncompliance … were presented to [the City of

Manhattan Beach] orally or in writing" prior to the City's determination.  Cal. Pub. Res. Code § 21177.  In actions challenging an EIR, the alleged grounds for non-compliance can be presented by "any person," even if this person does not later become the actual CEQA litigant.  *Id.* § 21177(a).  This principle, referred to as issue exhaustion, limited SCMB in its litigation to issues actually raised in the administrative proceedings.  But SCMB could draw on comments made by any person during the administrative proceedings, including comments made by the Hacienda Parties and their attorneys.  Moreover, SCMB could not rely on issues that were generically or vaguely raised, the "exact issue" must have been presented during the administrative process.  *See Save the Hill Grp. v. City of Livermore*, 76 Cal. App. 5th 1092, 1105 (2002) (citations omitted); *Stop Syar Expansion v. County of Napa*, 63 Cal. App. 5th 444, 453, 460 (2021) ("[G]eneric objections do not satisfy the exhaustion requirement.").

361.   The Hacienda Parties exhausted issues for SCMB, and those issues were later raised by SCMB in the CEQA Litigation.  Mr. Briggs even referenced the issue exhaustion requirement in testimony to the City Council when he said he needed to "go overboard" to preserve issues for future litigation.  TE 2140 at 0247:15-0248:6 (Mr. Briggs telling the City Council "in order for me to prevail in court, I have to come in here and lay every card on the table … because if, heaven forbid, there's a lawsuit, [the City's] very able lawyers are going to say that they had no idea that the issue that we give to the judge is the issue that we were litigating.").

362.   Moreover, prior to the filing of the CEQA Litigation, Mr. Neumann provided Mr. Briggs's email address to Ms. Ogden (an eventual SCMB officer).  TE 109.  SCMB was represented in the CEQA Litigation by Mr. Briggs.  TE 2079 at 0001.

363.   In addition, Mr. Briggs explained that Mr. Neumann prevented SCMB from settling the CEQA Litigation in mid-2016.  TE 104 (Cory Briggs email stating "a settlement without [Mr. Neumann's] blessing will be unlikely"); Tr. 124:19-22

("Mr. Briggs had said … we would not get a settlement unless Mr. Neumann agreed to the site plan.").

364.    RREEF could not move forward with construction of the Project in earnest during the pendency of the CEQA Litigation.  Tr. 67:16-22, 119:11-22.

365.    As an initial matter, RREEF could not get its refined site plans (which it ultimately needed to commence construction) approved by the City while the CEQA Litigation was pending.  Tr. 119:5-22.

366.    Separately, RREEF's own fiduciary duties prevented it from making significant investments in the Project while the CEQA Litigation was pending.  Tr. 70:9-71:17.  Although RREEF was able to mitigate damages to some degree by performing work unaffected by the CEQA Litigation, due to the risks associated with the CEQA Litigation, RREEF's internal investment committee did not approve funding for the full Project until after the CEQA Litigation was resolved.  Tr. 829:24-830:13, 832:11-834:9.

367.    Thus, the Hacienda Parties were a "substantial factor" in the filing and continued prosecution of the CEQA Litigation which delayed RREEF's ability to commence the Project.  The Hacienda Parties therefore proximately caused the damages stemming from the CEQA Litigation delays.

> (3)    *The Hacienda Parties Were a "Substantial Factor" in Causing the Project Delays During the Director's Writ Litigation*

368.    Finally, the Hacienda Parties were a substantial factor in the delays caused by challenging the Director's approval authority, including through the Director's Writ Litigation, and by opposing the additional administrative proceedings stemming from the Director's Writ Litigation.

369.    Specifically, 3500 Sepulveda, LLC filed a lawsuit on February 2, 2017 challenging the authority of the City's Community Development Director to approve certain refinements to the Project's plans submitted by RREEF.  TE 2042 at 0001-

0002, 0007-0011.  Mr. Neumann asserted that the Hacienda Parties pursued the Director's Writ Litigation as a result of a "reduction of nine [parking] spaces" in connection with the refined site plans.  Tr. 442:11-20.

370.  To moot the lawsuit, RREEF initially obtained the Planning Commission's approval of an amended Master Use Permit.  TE 3012 at 0002. However, the Hacienda Parties appealed the Planning Commission's approval, forcing RREEF to seek further approval from the City Council.  *Id.*

371.  RREEF finally received approval for the amended Master Use Permit in September 2017.  Tr. 80:7-81:15.

372.  As with the CEQA Litigation, RREEF could not begin construction work on the Project while the Director's Writ Litigation was pending.  Tr. 79:12-80:6.

373.  First, RREEF could not receive final review of its construction drawings until the amended Master Use Permit was actually approved.  Tr. 146:18-148:9.

374.  Second, RREEF was internally unwilling to bear the risk of advancing the Project and ultimately having its approvals overturned in court as a result of the Director's Writ Litigation.  Tr. 79:12-80:6.

375.  Thus, the Hacienda Parties were a "substantial factor" in bringing the Director's Writ Litigation which further delayed RREEF's ability to commence the Project.  The Hacienda Parties, therefore, proximately caused the damages stemming from the Director's Writ Litigation.

> *(4)    Opposition from Other Members of the Public During the Entitlements Phase Did Not Negate the*

*Hacienda Parties' Status as a "Substantial Factor" in the Delays Stemming from That Period*[6]

376.    Even though other members of the public objected to aspects of the Project, the Hacienda Parties still constituted a "substantial factor" in the delays to the Project during the entitlements phase.  As an initial matter, the Hacienda Parties did not need not be the "sole" cause of RREEF's delays to constitute a "substantial factor" for causation purposes.  *Britz Fertilizers*, 665 F. Supp. 2d at 1168; *see also Bruckman*, 190 Cal. App. 3d at 1063 (a defendant generally must "pay damages equivalent to the total harm suffered" even though "the plaintiff's total injury may have been the result of many factors in addition to the defendant's tort or breach of contract") (citation omitted); Judicial Council of California Civil Jury Instructions (2022) No. 430 ("A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm.  It must be more than a remote or trivial factor.  It does not have to be the only cause of the harm.").  Indeed, the Hacienda Parties could still be held liable even to the extent there was an independent, concurrent cause of delays to the Project.  *See Mitchell*, 54 Cal.3d at 1049; *In re Kelly*, 499 B.R. at 861.

---

[6] This section addresses, in part, the Court's third question raised in its February 14, 2023 Minute Order ("If the Hacienda parties made objections that were permitted by the Settlement Agreement (or if objections were made by others) and, at the same time, if the Hacienda parties made other objections that were not permitted by the Settlement Agreement, can that be a period of improper delay *caused* by the Hacienda Parties?").  The Court has also asked whether the Hacienda Parties could still be liable for Project delays if they asserted "permitted" objections to the Project.  As an initial matter, given the lack of material and/or detrimental changes to the 2008 Project Plans, there were no permitted objections the Hacienda Parties could raise.  *See supra* Section III.A.iii and III.A.v.  Even if material and/or detrimental changes existed, however, objections regarding those changes could not immunize the Hacienda Parties from liability.  As noted in Section II.C., *supra*, much of the delay at the entitlements phrase revolved around the Hacienda Parties' threat of CEQA litigation.  These threats were completely divorced from any changes to the 2008 Project Plans.  Moreover, interpreting the Settlement Agreement to allow the Hacienda Parties to object to the Project on any and all grounds so long as they included one "permitted" objection would defeat the purpose of the Settlement Agreement, which narrowly limited both parties' objections to the other's respective project.

377.   In addition, the Hacienda Parties were the most significant opponents of the Project.  For example, the Hacienda Parties hired each lawyer who spoke against the Project before the City Council.  TE 86; TE 3029 at 0195-0196.  Indeed, Cory Briggs, one of the lawyers hired by the Hacienda Parties, specialized in CEQA litigation.  Tr. 667:13-19.

378.   The Hacienda Parties were also the only people who hired experts to challenge specific aspects of the EIR.  Tr. 697:23-699:17, 704:10-12.

379.   Moreover, the Hacienda Parties were the only people who submitted detailed letters making legal and technical arguments as to why the City could be liable under CEQA.  *See* TE 66; TE 70.

380.   The Hacienda Parties' opposition to the Project differed from that of other members of the public.  *See* Tr. 741:8-742:6.  The detailed and technical nature of the Hacienda Parties' opposition resulted in delays to the Project even though opposition from lay-people may have touched on some similar subjects.  *Id.*

381.   Traffic is one example.   Government entities regularly receive comments about traffic during the entitlement process.  *See* Tr. 741:8-742:6.  This was the case for the Project, as members of the public generically objected that the Project would cause more traffic.  TE 3006 at 0013:12-23; Tr. 704:4-9.   The Hacienda Parties also objected on traffic grounds, but their objections were more detailed, technical, and extensive than the public's comments on traffic issues.  Tr. 741:8-742:6.

382.   The Hacienda Parties hired two experts to submit detailed reports criticizing the traffic section of the EIR.  TE 70 at 0011-0016; TE 3023 at 0127-0152.  The Hacienda Parties' attorney then leveraged those reports into letters and presentations before the City Council attacking the legal propriety of the EIR under CEQA.  TE 66; TE 70; TE 72 at 0062:18-0063:7; TE 3007 at 0158:5-12.  Mr. Neumann also leveraged the Hacienda Parties' attorney's legal arguments and their

1    experts' detailed critique of the EIR to argue before the City Council that the Project

2    should be denied.  *See* TE 72 at 0066:15-0067:21.

3        383.   The opposition from the Hacienda Parties, as well as their attorneys and

4    experts, was more detailed and difficult to respond to than general comments from

5    the public.  Tr. 260:23-261:17, 741:8-742:6; *see* TE 2131 at 0027-0028, 0033-0088,

6    0105-0124, 0137-0169, 0175-0180 (City devoting more than 100 pages to responses

7    to Hacienda Parties' comments).  Thus, it took more time to respond to the Hacienda

8    Parties' opposition comments on the Project.  *Id.*

9        384.   The Hacienda Parties' detailed opposition to the Project also provided

10   fodder for other members of the public, who simply repeated issues raised by the

11   Hacienda Parties.  *See*, *e.g.*, TE 2139 at 0121:24-0122:2 (member of the public

12   stating "Mr. Neumann said everything so eloquently for us"); TE 2140 at 0220:2-7

13   (member of the public "agree[ing] with Mr. Neumann that the traffic analysis is

14   incomplete and really needs to be resolved before you approve the EIR or anything

15   else"); TE 3027 at 0365 (member of the public submitting a written comment to

16   "give another close listen to the  testimony offered at [the September 17, 2013

17   meeting] from Cory Briggs, the attorney representing the [Hacienda Parties]" as

18   "Cory Briggs' experienced, respectful and pointed comments deserve this council's

19   undivided attention and direct response").

20       385.   The Hacienda Parties also encouraged and organized third-party

21   opposition to the Project.  *See*, *e.g.*, TE 89 at 0002 (Mr. Neumann circulating a

22   petition opposing the Project); TE 94 at 0001-0002 (Mr. Neumann coordinating

23   opposition activities and messages with members of the public); TE 97 (Mr.

24   Neumann ordering lawn signs opposing the Project); TE 98 (Mr. Neumann

25   coordinating with members of the public to create a website opposing the Project);

26   TE 116 (Mr. Neumann hosting a community meeting for residents opposed to the

27   Project at his home).

28

386.   Thus, even if the Hacienda Parties and some members of the public opposed the Project on certain similar grounds, the Hacienda Parties were still a substantial factor in developing the complex, detailed, and wide-ranging opposition that led to delays of the Project during the entitlements phase.

> *(5)   The Temporary Lack of a Final Agreement Between Macy's and REEF Does Not Negate the Hacienda Parties' Status as a "Substantial Factor" in the Delays Preceding That Agreement*[7]

387.   Because Macy's was a "prime party" under the COREA, it had approval rights regarding the Project.  Tr. 834:22-835:3.  As a result, the City's resolution approving the Project stated that "[p]rior to the issuance of the first building permit for Phase 1, RREEF shall provide written evidence of a commitment binding on RREEF and Macy's to consolidate its Macy's Men's operation."  TE 2035 at 0024.

388.   RREEF and Macy's were in fundamental agreement about the core Project and signed the Macy's LOI in November 2013 to "negotiate in good faith" in pursuit of Macy's final approval of the Project.  Macy's LOI at 1.

389.   In addition to the fact RREEF and Macy's entered into an LOI in 2013, Macy's supported the Project throughout the entitlements process, and RREEF was confident it would have Macy's support for the Project.  TE 3005 at 0100:8-0103:24; TE 3027 at 0585; TE 3029 at 0242; Tr. 734:13-16.

390.   RREEF formally received Macy's approval for the Project in July 2016.  TE 1313.  That approval included a set of site plans, which were necessary for Macy's to approve the Project.  *Id.* at 0035-38; Tr. 837:22-838:15.  RREEF did not seek Macy's formal agreement earlier in the development of the Project because the Hacienda Parties continued to request changes to the plans, which meant that

---

[7] This Section addresses the Court's fourth question raised in its February 14, 2023 Minute Order ("Can delay prior to the signing of RREEF's final agreement with Macy's be attributed to the Hacienda Parties?  What is the impact of RREEF's earlier letter of intent with Macy's?").

RREEF did not have a final set of plans to which Macy's could formally agree earlier than 2016.  Tr. 837:22-838:15.

391.   Accordingly, the fact that RREEF did not have Macy's did not enter into a final agreement regarding the Project until July 2016 does not mean that the Hacienda Parties were not a substantial factor in the delay to the Project up until that point.  To the contrary, the Hacienda Parties' numerous objections and requests for changes to the plans made it imprudent for RREEF to seek a final agreement with Macy's any earlier, as RREEF would have needed to repeatedly seek re-approval after each change to the plans.  In addition, there was no need to finalize a formal agreement with Macy's until uncertainty regarding the Project as a whole had sufficiently cleared.  That finally occurred around mid-2016, when RREEF felt it had finally adequately analyzed the risks of the CEQA Litigation.  Tr. 832:11-833:13.  In this regard, the lack of a Macy's final agreement was not a cause of delay to the Project, but another symptom of the Hacienda Parties' delay of the Project.

392.   Additionally, as discussed  in Section II.D, *supra*, the CEQA Litigation was still pending in July 2016, when the final agreement with Macy's was signed.  Thus, the delays from the CEQA Litigation prevented RREEF from moving forward with construction on the Project even after the agreement with Macy's was complete.

b.   <u>RREEF's Damages Were Reasonably Foreseeable</u>

393.   In general, contract damages are "limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time."  *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515 (1994).  However, this rule "does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach."  *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442, 458 (1990).  Instead, this rule merely requires that "the consequence for which compensation is sought, must be such as the parties may be reasonably supposed, *in*

*the light of all the facts known, or which should have been known to them*, to have considered as likely to follow, in the ordinary course of things, from a breach." *Ely v. Bottini*, 179 Cal. App. 2d 287, 294 (1960) (citations omitted) (emphasis in original).  In assessing foreseeability, courts may consider the "education, training, and information" available to the defendant. *Brandon & Tibbs*, 226 Cal. App. 3d at 458.

394.    The cost escalation and lost profits experienced by RREEF as a result of the delays to the Project were foreseeable consequences of the Hacienda Parties' breach of their promises to limit their opposition to the Project. *See, e.g., Ely*, 179 Cal. App. 2d at 292-95 (contractor that delayed building was liable for rain damage that resulted from delay because it was foreseeable that delay would push project into rainy season); *Burnett & Doty Dev. Co. v. Phillips*, 84 Cal. App. 3d 384, 390 (1978) (awarding lost profits damages where breach of contract caused developer to temporarily stop building houses, finding that such losses were a foreseeable result of delays of construction caused by breach).

395.    The finding of foreseeability of RREEF's damages is further bolstered by the fact that Mr. Neumann, one of the principals of the Hacienda Parties, testified that he is knowledgeable about construction and development in California.  Tr. 474:23-475:3; *see* Tr. 378:22-381:1 (Mr. Neumann describing his training in construction management and his personal involvement in development projects, including sixty hotels).

c.    <u>RREEF Established Its Damages with Reasonable Certainty[8]</u>

396.    Under California law, a plaintiff must establish the amount of damages stemming from a breach of contract with "reasonable certainty." *Workplace*

---

[8] This section addresses the seventh question posed in the Court's February 14, 2023 Minute Order ("What standard should be used to determine whether RREEF's damages claims have been presented with the necessary precision and certainty?").

1  *Technologies Research, Inc. v. Project Management Institute, Inc.*, 2021 WL

2  4895977, at *16 (S.D. Cal. Oct. 20, 2021) (citations omitted); *Pet Food Exp. Ltd. v.*

3  *Royal Canin USA, Inc.*, 2011 WL 6140874, at *5 (N.D. Cal. Dec. 8, 2011) (amount

4  of damages must be established with "reasonable certainty … mathematical

5  precision is not required") (citations omitted); *Acree v. Gen. Motors Acceptance*

6  *Corp.*, 92 Cal. App. 4th 385, 396, 398 (2001) (holding, in case involving breach of

7  implied covenant of good faith and fair dealing, that damages need not be calculated

8  with "absolute certainty" and that law requires "only that some reasonable basis of

9  computation be used, and the result reached can be a reasonable approximation").

10  In other words, "[w]here the *fact* of damages is certain, the amount of damages need

11  not be calculated with absolute certainty.  The law requires only that some

12  reasonable basis of computation of damages be used, and the damages may be

13  computed even if the result reached is an approximation." *GHK Associates v. Mayer*

14  *Grp., Inc.*, 224 Cal. App. 3d 856, 873 (1990) (citations omitted); *see also Cal.*

15  *Lettuce Growers v. Union Sugar Co.*, 45 Cal. 2d 474, 487 (1955) ("[T]he fact that

16  the amount of damage may not be susceptible of exact proof or may be uncertain,

17  contingent or difficult of ascertainment does not bar recovery.").

18       397.  In addition to case law, this standard has been affirmed by various

19  treatises and experts.  *See, e.g.* 23 Cal. Jur. 3d Damages § 26 ("[D]amages must be

20  ascertained with some degree of reasonable certainty"); 1 Witkin, Summary 11th

21  Contracts § 904 (2022) ("[T]he injured party may recover for the profits or benefits

22  that he or she would have obtained by performance if the injured party can establish

23  them with reasonable certainty.").  And the Hacienda Parties' expert, Mr. Tregillis,

24  co-authored an article regarding damages calculations, which explains: "Courts'

25  articulation of what reasonable certainty means appears to recognize that the profits

26  that form the basis for an economic damages calculation need not be certain in order

27  to adduce a calculation of damages that has a reasonable basis."  AICPA, <u>Attaining</u>

28

Reasonable Certainty in Economic Damages Calculations (2015) ("AICPA, Attaining Reasonable Certainty"), at *7.

398.  Mr. Bones's calculations of cost escalation damages and lost profits damages achieved the requisite "reasonable certainty" and reflect a "reasonable basis of computation."

399.  With regard to cost escalation damages, the use of inflation indexes to account for the impact of rising costs is a widely-accepted practice. *See, e.g., In re 3M Combat Arms Earplug Prods. Liability Litig.*, 2021 WL 4963457, at *3 (N.D. Fl. Oct. 13, 2021) (rejecting challenge to use of Employer Cost Index to measure impact of inflation); *Wilkens v. Edwards*, 2016 WL 1271663, at *2 (D. Or. Mar. 29, 2016) (court utilized Consumer Price Index to account for inflation with regard to expert fees); *Equal Employment Opp. Comm'n. v. New Prime, Inc.*, 2015 WL 8757318, at *4 (W.D. Mo. Dec. 14, 2015) (overruling objection to Special Master's use of Consumer Price Index to account for inflation); *LaSalle Nat. Bank v. Mass. Bay Ins. Co.*, 1997 WL 211220, *3 (N.D. Ill. Apr. 22, 1997) (overruling objection to damages expert's use of inflation index for construction costs).

400.  In addition, Mr. Tregillis, the Hacienda Parties' damages expert, did not object to either the general methodology of using inflation indexes to determine increases in the actual hard costs RREEF expended on construction or Mr. Bones's selection of the Turner Index or ENR Index to supply the inflation data. *See* TE 1213 at 0034-0036.

401.  Mr. Tregillis did argue that the use of a quarterly index may have improperly increased Mr. Bones's cost escalation damages due to the fact the damages period was only thirty-two, rather than thirty-three, months (reflecting slightly less than eleven full quarters). *Id.* at 0035; Tr. 618:6-15.  However, Mr. Tregillis testified that this allegedly improper increase might be around a 3% impact on cost escalation damages, meaning approximately $575,000 out of Mr. Bones $19.1 million total cost escalation damages estimate.  Tr. 618:21-619:4.

402.    However, any potential improper increase due to the application of a quarterly index to a partial quarter is outweighed by other conservative choices in Mr. Bones's cost escalation damages calculation, including the exclusion of the entirety of soft and leasing costs and the exclusion of hard costs incurred after September 2021.[9]

403.    Mr. Bones's lost profits damages are also "reasonably certain."  In general, "[t]he occurrence and extent of lost profits may be ascertained with reasonable certainty from the working experience of the business, from its past volume and from other data reflecting probable future volume."  *Guntert v. City of Stockton*, 55 Cal. App. 3d 131, 143 (1976).

404.    To assess lost profits, Mr. Bones relied on a combination of RREEF's actual financial information for the Shopping Center from 2016 through late-2021 and projections taken from an appraisal prepared by Duff & Phelps.  Tr. 338:4-17.

405.    The use of historical financial information is well-recognized as an accepted foundation for lost profits damages.  *See, e.g., Orozco v. WPV San Jose, LLC*, 36 Cal. App. 5th 375, 398 (2019) ("Historical data, such as past business volume, supply an acceptable basis for ascertaining lost future profits.") (citations

---

[9] Paragraphs 400 - 402 respond to the Court's eighth question in the February 14, 2023 Minute Order ("In his expert report, did Mr. Tregillis opine on the appropriate amount of RREEF's damage claim for increased construction costs, as a standalone claim and without regard to the lost profits claim?").  Mr. Tregillis did not provide any alternative calculation to Mr. Bones's cost escalation damages.  At most, Mr. Tregillis has demonstrated that it is possible to artificially review the residual value of the Shopping Center to create "negative lost profits" that outweigh Mr. Bones's cost escalation damages.  Tr. 610:11-611:14.  However, this argument fails for several reasons.  For example, Mr. Tregillis's manipulation of the residual value is not based on any data or calculation.  Mr. Tregillis has simply stated that he does not believe the projections of the Shopping Center's performance, despite the fact that he did not actually review the appraisal in which those projections appeared.  614:9-615:21, 644:3-22.  Second, Mr. Tregillis has opined that Mr. Bones's calculation of lost profits was improper and that he should have used a "lease-by-lease" analysis.  Tr. 598:11-21.  However, Mr. Tregillis also used Mr. Bones's lost profits methodology (with a manipulated residual value) to attempt to overwhelm Mr. Bones's cost escalation damages.  TE 1213 at 0036.  Mr. Tregillis cannot both claim that a damages methodology is unreliable and should have been fundamentally changed, but also use that same damages methodology to try to eliminate other damages for which he has no significant criticism.

1   omitted); *Aspect Sys., Inc. v. Lam Research Corp.*, 404 F. App'x 136, 139 (9th Cir.

2   2010) (upholding lost profits damages based on evidence of historical revenue); *Pet*

3   *Food Exp. Ltd.*, 2011 WL 6140874, at *9 ("[T]he bulk of the evidence presented as

4   to [plaintiff's] future damages was based on [plaintiff's] own past experience with

5   [defendant's] products, which is an accepted basis under California law.").

6       406.   In addition, courts regularly allow projections to establish lost profits,

7   so long as they are reasonably reliable.  *See Sanchez-Corea v. Bank of Am.*, 38 Cal.

8   3d 892, 907 (1985); *Asahi Kasei Pharma Corp. v. Actelion Ltd.*, 222 Cal. App. 4th

9   945, 947 (2013) (upholding lost profits award based on projection of financial

10  performance); AICPA, <u>Attaining Reasonable Certainty</u>, at *31 ("[D]amages experts

11  regularly rely on management-provided assumptions and information when

12  providing various services, including litigation services.").

13      407.   As Mr. Bones explained, the reliability of the Duff & Phelps projections

14  was bolstered by the fact that it was prepared "in the ordinary course of business and

15  not for the purpose of litigation" and due to the fact that it was an appraisal designed

16  to be used by "sophisticated institutions, like lenders, to determine their collateral

17  base and risk."  Tr. 374:14-375:2; *see also* Tr. 601:24-602:1 ("THE COURT:  So

18  Duff & Phelps created this as -- to provide advice to potential investors?  [MR.

19  TREGILLIS]:  That's right."); AICPA, <u>Attaining Reasonable Certainty in Economic</u>

20  <u>Damages Calculations</u>, at *31 ("[C]ourts appear to prefer that experts … [u]se

21  management-supplied projections that are prepared in the normal course of business,

22  as opposed to projections that are prepared solely for litigation purposes.").

23      408.   Although Mr. Tregillis contested the reliability of the projections in the

24  Duff & Phelps appraisal, he did not actually review the appraisal.  Tr. 644:3-22.

25      409.   Moreover, Mr. Bones tested the reliability of the Duff & Phelps

26  projections by comparing actual late-2021 and 2022 financial data with the

27  projections from Duff & Phelps.  He determined that the Duff & Phelps projections

28  were understated, which indicates that his projections were conservative.  Tr.

348:10-349:8: *see also Sanchez-Corea*, 38 Cal. 3d at 907 ("This projection was a three-year profit projection, and the reliability of the information and the conservative nature of these estimates was confirmed by the subsequent experience of [plaintiff] itself and the earnings of other companies.").

410.   The reasonable certainty of Mr. Bones's lost profits calculation is further bolstered by conservative choices in his approach.  For example, Mr. Bones assumed that 100% of capital that would have otherwise been spent on the Project earlier in time was redeployed to other investments.   Tr. 341:11-342:1, 352:11-353:10.   In addition, Mr. Bones fully shifted back the impacts of the COVID-19 pandemic, thereby reducing RREEF's lost profits.  Tr. 352:11-353:10, 636:23-637:3 ("Q. And we just talked about the fact that moving COVID-related expenses backwards actually lowered damages; right?   [MR. TREGILLIS:] … [T]hat's right.").

411.   Accordingly, RREEF has established its damages with reasonable certainty using reasonable bases of computation.

v.   ***Analysis of Materiality in the Settlement Agreement and Project[10]***

412.   In California,

> The goal of contractual interpretation is to determine and give effect to the mutual intention of the parties.  Thus, a court's paramount consideration is the parties' objective intent when they entered into the contract.  A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.  If a contract is capable of two constructions courts are bound to give such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect.  In sum, courts must give a reasonable and commonsense interpretation of a contract consistent with the parties' apparent intent.

---

[10] This section addresses the first question in the Court's February 14, 2023 Minute Order ("What is the correct contractual interpretation of the Settlement Agreement's term, 'material alterations to the Site Plan … which detrimentally affect the use or operations of the Hacienda Building'?).

1    *Brown v. Goldstein*, 34 Cal. App. 5th 418, 437 (2019) (cleaned up).

2        413.   Under California law, "the mutual intention of the parties at the time

3    the contract is formed governs interpretation.   Such intent is to be inferred, if

4    possible, solely from the written provisions of the contract." *RealPro, Inc. v. Smith*

5    *Residual Co., LLC*, 203 Cal. App. 4th 1215, 1221 (2012) (citations omitted); *see also*

6    *Agarwal v. Buchanan*, 2017 WL 5125752, at *3 (C.D. Cal. June 22, 2017) ("A

7    contract must be interpreted to achieve the parties' intent and to give reasonable

8    meaning to all of its parts.").

9        414.   "Words used in a certain sense in one part of a contract are deemed to

10   have been used in the same sense elsewhere." *See ML Direct, Inc. v. TIG Specialty*

11   *Ins. Co.*, 79 Cal. App. 4th 137, 142 (2000).

12       415.   The Settlement Agreement does not directly define the term "material."

13   TE 3033.  The sole example of a "material alteration" in the Settlement Agreement

14   is that "[c]onstruction of the North Deck only is and shall be considered a material

15   revision to the Parking Plan."  *See* TE 3033 at 0006 (Section 5(d)).

16       416.   The Settlement Agreement's sole example of a "material alteration"

17   indicates that the Settlement Agreement defined materiality to mean a change of

18   substantial significance to the Shopping Center (such as not constructing one of the

19   parking decks).   This interpretation is reasonable in light of the fact that making

20   refinements to site and parking plans is common in major development projects.  Tr.

21   61:14-21, 476:5-13 ("[MR. NEUMANN]: As a real estate professional, I would be

22   crazy to say that that site plan was not going to change a little bit, and things would

23   be modified."); *see also* ECF No. 63, ¶ 125 (neither Party disputing that "[m]aking

24   refinements to early site plans and parking plans, like the plans included in the 2008

25   Settlement Agreement, is common in development projects").

26       417.   This definition of materiality contemplating significant changes is also

27   consistent with the purpose of the Settlement Agreement—to broadly prevent

28   opposition to the Project in the interest of expediting its approval process.   The

parties entered into the Settlement Agreement "to fully compromise, settle, and resolve any and all claims and disputes between and among" RREEF and the Hacienda Parties regarding the Project. *See* TE 3033 at 0002.

418.    RREEF's parking expert, Patrick Gibson, concluded that there were no material changes to the 2008 Project Plans as compared to later plans. Tr. 263:20-264:14. In comparing later iterations of the site plans with the illustrative plans from the Settlement Agreement, he opined that there were no meaningful changes in land use, floor area, parking supply, parking ratio, or distribution of parking garages. Tr. 264:15-265:23. Because the parking ratio, parking supply, and distribution of parking remained virtually the same in the various iterations of the site plans, the "operation of the [S]hopping [C]enter … [was] virtually the same between the two site plans, and … the transportation, access, circulation, and parking … [were] not materially different." Tr. 267:21-269:2. Accordingly, the later iterations of the plans did not materially impact the Hacienda Building, including with regard to access to reasonable parking. *Id.*

419.    In addition, Mr. Gibson opined that many of the non-material changes that RREEF made to the site plans actually benefitted the Hacienda Parties. For example, later plans provided more parking spots within 600 feet of the Hacienda Building than would have been provided in the 2008 Project Plans. Tr. 268:11-269:2.

420.    The Hacienda Parties did not offer any expert testimony regarding the materiality of changes between the 2008 Project Plans and any other set of site plans.

421.    Consistent with Mr. Gibson's analysis, and based on the narrow meaning of "material" in the Settlement Agreement (*i.e.*, changes must be major, akin to not building a parking deck at all, in order to be deemed "material"), the changes RREEF made to the Project plans during the entitlements phase did not constitute material alterations.

**B.**     **The Hacienda Parties Breached the Covenant of Good Faith and Fair Dealing**

422.    RREEF has established that the Hacienda Parties' opposition activities breached the covenant of good faith and fair dealing implied by the Settlement Agreement.

423.    The Settlement Agreement required the parties to "cooperate in good faith" with respect to RREEF's amended MUP and EIR, applications for approvals for improvements to the Shopping Center or Hacienda Building, and memorialized the parties' agreement to write letters of support to the City in connection with such applications.  TE 3033 at 0004-0005 (Sections 4(e)-(h).

424.    Additionally, "the California Supreme Court recognizes that the implied covenant of good faith and fair dealing applies in all contracts." *Kiewit Power Constructors Co. v. City of Los Angeles by & through Dep't of Water & Power*, 813 F. App'x 261, 264 (9th Cir. 2020)

425.    "In California, the factual elements necessary to establish a breach of the covenant of good faith and fair dealing are: (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010) (citations omitted); *see also* California Civil Jury Instructions (2022) 325 (Implied Covenant of Good Faith and Fair Dealing).

426.    As already described in Section III.A.i-ii, *supra*, the first three elements required to establish breach of the covenant of good faith and fair dealing are met. Namely, the parties entered into a contract, RREEF fulfilled its obligations under the contract, and the parties' obligations under the Settlement Agreement were independent, meaning there were no conditions precedent to the Hacienda Parties'

1  obligations.   To the extent RREEF had any conditions precedent to the Hacienda

2  Parties' obligation not to oppose the Project, RREEF satisfied those conditions

3  before the Hacienda Parties' began their opposition.

4          i.    ***The Hacienda Parties Improperly Interfered with RREEF's***

5                ***Right to Non-Opposition to the Project***

6          427.   RREEF's primary benefit under the Settlement Agreement was that the

7  Hacienda Parties would not oppose the Project. TE 3033; *see also* Tr. 56:22-57:7.

8  The Hacienda Parties interfered with that right by opposing the Project beyond their

9  limited ability to do so under the Settlement Agreement, as described more

10  thoroughly in Sections II.C-E, *supra*, which  deprived RREEF of the foundational

11  benefit of the Settlement Agreement.

12         428.   Even if some of the Hacienda Parties' conduct described in Sections

13  II.C-E, *supra*, did not breach the Settlement Agreement's literal terms, that conduct

14  did breach the implied covenant of good faith and fair dealing.

15         429.   For example, the Hacienda Parties engaged in extensive efforts to

16  encourage third parties to oppose the Project.  This included, among other things,

17  ordering and distributing opposition signs, securing an opposition website,

18  organizing rallies, and engaging in other tactics to create public opposition to the

19  Project in addition to the Hacienda Parties' direct opposition.  TE 97; TE 98; TE

20  116; Tr. 550:15-20; Neumann Dep. Tr. 241:10-243:13, 301:2-302:3.

21         430.   The Hacienda Parties' collaboration with Loralie Ogden to oppose the

22  Project is a particularly stark example of these efforts.  This collaboration included

23  working on opposition talking points together, coordinating efforts to send

24  opposition materials to the City Council, and strategizing to influence the City to

25  delay approving the Project.  TE 99; TE 111; TE 2179 at 0001.  In addition, Ms.

26  Ogden ultimately worked with Mr. Neumann to hire Cory Briggs (the Hacienda

27  Parties' lawyer) to represent SCMB in the CEQA Litigation.  TE 108; TE 109.

28

RREEF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

431.   Moreover, at various times during the entitlements phase, the Hacienda Parties made negative comments about RREEF's motives, connections to Germany, and history of other projects, including a prior project in Sunnyvale, California.  TE 79 at 0028-0031; TE 2142 at 0034:8-11; TE 96 at 0005-0006; TE 3007 at 0144:5-20; Tr. 530:21-532:24, 682:25-685:10.  Even to the extent that this was not direct opposition to the Project, these repeated comments were made in an effort to decrease the likelihood the Project would be approved, thereby subverting one of the key premises of the Settlement Agreement.

432.   In this manner, the Hacienda Parties' fomentation of third-party opposition to the Project, assistance of third parties in commencing litigation, and general attacks on RREEF itself all breached the implied covenant of good faith and fair dealing.

ii.   ***The Hacienda Parties' Breaches of the Covenant of Good Faith and Fair Dealing Were a "Substantial Factor" in Causing the Delays That Damaged RREEF***

433.   Damages with regard to breaches of the duty of good faith and fair dealing are assessed in the same manner as damages arising from a breach of contract.  *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 684 (1988) ("As a contract concept, breach of the duty [of good faith and fair dealing] [leads] to imposition of contract damages determined by the nature of the breach and standard contract principles."); *see also Clark v. Homecomings Fin., LLC*, 2009 WL 350660, at *3 (S.D. Cal. Feb. 11, 2009) ("[A] plaintiff may recover contract damages for a breach of the covenant of good faith and fair dealing."); 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 824 (except in limited circumstances, "[b]reach of the covenant of good faith and fair dealing gives rise to a contract action").

434.   As addressed more thoroughly in Sections II.C-E and III.A.iv, *supra*, the Hacienda Parties' opposition to the Project was a substantial factor in delaying RREEF's ability to begin construction, which in turn caused RREEF to suffer harm in the form of escalated construction costs and lost profits.

1

2   Dated: _____          _____

3                                    The Honorable Alexander F. MacKinnon
                                     United States Magistrate Judge
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX A

# 2012 (June to December)



*June 16, 2012*
Draft EIR released for public comment

*June 27, 2012*
First Planning Commission Meeting
- RREEF presents on the Project
- 7 members of the public speak both in favor of and in objection to the Project

*September 24, 2012*
The Hacienda Parties write a letter to the City Planning Manager expressing concerns about the Project

*October 3, 2012*
Second Planning Commission Meeting
- RREEF presents on the Project
- 10 members of the public speak both in favor of and in objection to the Project
- As of October 3, 2012, 45 residents, agencies, surrounding cities, business owners, and other members of the public commented on Draft EIR

*July 17, 2012*
Draft EIR public comment period is closed

. . .   June       July       August       September       October       November       December
2012

1

# 2013 (January to May)



**March 13, 2013**
Third Planning Commission Meeting
- Mr. Neumann, on behalf of the Hacienda Parties, speaks in opposition to the Project
- RREEF presents on the Project
- 4 members of the public speak both in favor of and in objection to the Project

**April 24, 2013**
Fourth Planning Commission Meeting
- 2 members of the public submit written comments raising objections to the Project
- RREEF presents on the Project
- 9 members of the public speak both in favor of and in objection to the Project

**May 22, 2013**
Fifth Planning Commission Meeting
- Mr. Neumann, on behalf of the owners of the Hacienda Buildings, speaks in opposition to Project
- RREEF presents on the Project
- Macy's submits two letters in support of the Project
- 13 members of the public speak both in favor of and in objection to the Project

**March 2013**
Final EIR (Volume I) Published

**April 17, 2013**
The Hacienda Parties send an opposition letter to the Director of Community Development

January   February   March   April   May   …

2013

2

# 2013 (June to August)

*June 26, 2013*
Sixth Planning Commission Meeting
- Mr. Neumann emails Planning Commission asking them to delay hearing
- 7 member of the public submit written comments both in support of and objection to the Project
- Planning Commission certifies Final EIR
- RREEF presents on issues with the conditions of approval; Mr. Neumann joins RREEF's concerns regarding conditions of approval
- 19 members of the public speak both in favor of and in objection to the Project

*July 9, 2013*
The Hacienda Parties appeal the certification of the EIR

*July 24, 2013*
Seventh Planning Commission Meeting
- The Hacienda Parties send two opposition letters to Planning Commission on July 23 and 24, 2013
- RREEF writes letter to Planning Commission regarding conditions of approval
- 78 members of the public submit written comments both in support of and in objection to the Project
- Mr. Neumann and Mr. Rizika, on behalf of the Hacienda Parties, speak in opposition to the Project
- RREEF presents on conditions of approval it does not agree with
- 7 members of the public speak both in favor of and in objection to the Project

*August 6, 2013*
First City Council Meeting
- Briggs Law Corporation, on behalf of the Hacienda Parties, writes letter to City appealing MUP and EIR certification
- City Council moves to call the Project up for review
- 2 members of the public object to the Project
- City Council schedules 3 hearings to consider the Project

*August 9, 2013*
RREEF appeals two conditions of approval:
(i) Master Sign Program and (ii) caps on land usage

June          July          August

2013

3

# 2013 (September)

*September 3, 2013*
Second City Council Meeting
- 3 members of the public submit written comments both in support of and objecting to the Project
- Hacienda Parties do not speak about their appeal despite being offered chance to do so
- RREEF presents on the Project; clarifies RREEF's appeal does not involve CEQA process
- Macy's representative appears and expresses support for the Project
- 8 members of the public speak both in favor of and in objection to the Project

*September 10, 2013*
Third City Council Meeting
- 2 members of the public submit written comments both in support of and objecting to the Project
- Hacienda Parties do not speak about their appeal despite being offered chance to do so
- RREEF presents on the Project and its appeal of the two conditions of approval
- 12 members of the public speak both in favor of and in objection to the Project

*September 17, 2013*
Fourth City Council Meeting
- Briggs Law Corporation sends letter opposing EIR and attaching expert report criticizing EIR
- 2 members of the public submit written comments objecting to Project
- Mr. Neumann and Mr. Briggs, on behalf of the Hacienda Parties, speak in opposition to the Project
- RREEF presents the City Council with 450 letters it collected in support of the Project
- 5 members of the public spoke in objection to the Project
- City Council shows concerns about legal issues raised by Mr. Briggs

*September 5, 2013*
- Neumann emails a City Councilmember in opposition to the Project
- RREEF sends letter to the City explaining its appeal of the Master Sign Program

September
2013

4

# 2013 (October to December)

**October 8, 2013**
Fifth City Council Meeting
- Mr. Briggs sends a second letter criticizing technical aspects of the EIR and submits a second expert report attacking the traffic analysis in the EIR
- 5 members of the public submit written comments both in support of and objecting to the Project
- Mr. Neumann and Mr. Briggs, on behalf of the Hacienda Parties, speak in opposition to the Project
- RREEF presents on the Project
- 33 members of the public speak both in favor of and in objection to the Project
- City Council expresses concern about approving the Project without an agreement between RREEF and the Hacienda Parties

**November 11, 2013**
Macy's and RREEF enter into a letter of intent

**November 12, 2013**
Sixth City Council Meeting
- On November 1, 2013, RREEF submits letter to City staff summarizing proposed modifications to Site Plan and conditions of approval including proposed modification to the condition capping certain land uses
- Mr. Neumann, on behalf of the Hacienda Parties, speaks in opposition to the Project
- RREEF presents on the Project
- Macy's appears before the City and reiterates its support for the Project
- 10 members of the public speak both in favor of and in objection to the Project
- City Council requests that City staff prepare responses to Mr. Neumann and Mr. Briggs's opposition

October          November          December

2013

# 2014

**January 14, 2014**
Seventh City Council Meeting
- Mr. Briggs and Mr. Neumann, on behalf of the Hacienda Parties, speak in opposition to the Project
- RREEF presents on the Project
- 6 members of the public speak both in favor of and in objection to the Project

**April 2014**
Final EIR (Volume II) is published
- The City received 34 late comments on the EIR
- Of the 34 late comments, 12 are attributable to the Hacienda Parties or their tenants
- The City responds to each late comment, which takes 152 pages
- Of the 152 pages of responses from the City, 117 pages are spent responding to comments from the Hacienda Parties or their tenants

**April 29, 2014**
Eighth City Council Meeting
- Mr. Briggs submits a letter from traffic engineer arguing the EIR is inadequate
- The Hacienda Parties send a letter to the City Council opposing the Project
- Mr. Dveirin, on behalf of the Hacienda Parties, sends a letter to City Council opposing the Project
- Macy's submits a letter in support of the Project
- Mr. Neumann, Mr. Briggs, and Mr. Dveirin, on behalf of the Hacienda Parties, speak in opposition to the Project
- RREEF presents on the Project
- 14 members of the public speak both in favor of and in objection to the Project
- City Council votes to carry meeting over to May 20, 2014, to give City staff adequate time to respond to issues raised by the Hacienda Parties

**May 20, 2014**
Ninth City Council Meeting
- The Hacienda Parties send letters to the City Council in opposition to the Project
- RREEF and RREEF's attorneys send letters to City Council in support of the Project
- Mr. Neumann, Mr. Briggs, and Mr. Dveirin, on behalf of the Hacienda Parties, speak in opposition to the Project
- RREEF presents on the Project
- 20 members of the public speak both in favor of and in objection to the Project
- The City Council notes one of their main concerns is the dispute between RREEF and the Hacienda Parties
- City Council approves the Project with five conditions of approval that make the Project unworkable for RREEF, including one requiring the Hacienda Parties and RREEF to negotiate in good faith

**December 2, 2014**
Tenth City Council Meeting
- Mr. Dveirin and Mr. Briggs, on behalf of the Hacienda Parties, send letters to the City opposing the Project
- Macy's sends a letter to the City Council expressing its support for the Project
- 2 members of the public write to the City Council requesting more time to consider the Project
- Mr. Neumann and Mr. Dveirin, on behalf of the Hacienda Parties, speak in opposition to the Project
- Mr. Briggs, on behalf of the Hacienda Parties and SCMB, speaks in opposition to the Project
- RREEF presents on the Project
- 15 members of the public speak both in favor of and in objection to the Project
- City Council certifies the Project's EIR, which effectively approves the Project

| January | February | March | April | May | June | July | August | September | October | November | December |

2014