1  LATHAM & WATKINS LLP
       Michael G. Romey (Bar No. 137993)
2        *michael.romey@lw.com*
       Sarah F. Mitchell (Bar No. 308467)
3        *sarah.mitchell@lw.com*
       Greg Swartz (Bar No. 308071)
4        *greg.swartz@lw.com*
   355 South Grand Avenue, Suite 100
5  Los Angeles, California 90071-1560
   Telephone: (213) 485-1234
6  Facsimile: (213) 891-8763

7  Attorneys for Defendant and Counterclaimant
   RREEF America REIT II Corporation BBB
8  and Defendant Macy's West Stores, Inc.

9             **UNITED STATES DISTRICT COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

11

12  3500 SEPULVEDA, LLC, a Delaware        | CASE NO. 2:17-cv-08537-AFM
    limited liability company, 13TH &
13  CREST ASSOCIATES, LLC, a                 The Honorable Alexander F.
    California limited liability company      MacKinnon

14            Plaintiffs,                    **RREEF AMERICA REIT II**
                                            **CORPORATION BBB'S**
15      v.                                  **REBUTTAL TO THE HACIENDA**
                                            **PARTIES' PROPOSED FINDINGS**
16  RREEF AMERICA REIT II                   **OF FACT AND CONCLUSIONS OF**
    CORPORATION BBB, a Maryland             **LAW**
17  corporation; MACY'S WEST STORES,
    INC. and DOES 1–25, inclusive,         Action Filed:  October 11, 2017
18
              Defendants.                   Trial Date:  February 6, 2023
19
    RREEF AMERICA REIT II
20  CORPORATION BBB, a Maryland
    corporation
21
              Counterclaimant
22
        v.
23
    3500 SEPULVEDA, LLC, a Delaware
24  limited liability company; 13TH &
    CREST ASSOCIATES, LLC, a
25  California limited liability company;
    6220 SPRING ASSOCIATES, LLC, a
26  California limited liability company,
27
              Counterdefendants.
28

# **TABLE OF CONTENTS**

I.      RREEF'S REBUTTAL INTRODUCTION/ARGUMENT ..........................3

II.     THE HACIENDA PARTIES' ANSWERS TO THE COURT'S EIGHT QUESTIONS AND RREEF'S REBUTTAL ...................................8

III.    THE HACIENDA PARTIES' PROPOSED FINDING OF FACT AND RREEF'S REBUTTALS ...........................................................11

    A.      Parties and Background ...........................................................11

    B.      The Settlement Agreement .....................................................12

        1.      Formation and Principal Terms ....................................12

        2.      RREEF's Material Deviations from the Site Plan ..................18

    C.      The Entitlement Process:  Planning Commission and City Council Meetings ...................................................................34

    D.      The CEQA Litigation ............................................................46

    E.      While the CEQA Litigation is Pending, RREEF Advances the Project Forward as soon as Macy's is On Board. ......................................................................................50

    F.      The Director Writ Litigation ..................................................57

    G.      RREEF's Expert Testimony on Damages .................................65

        1.      Increased Constructions Costs Analysis...................................67

        2.      Lost Profits Analysis .................................................71

IV.     THE HACIENDA PARTIES'S PROPOSED CONCLUSIONS OF LAW AND RREEF'S REBUTTALS ........................................79

    A.      Contract Interpretation—Material Alterations .................................79

    B.      Claims of Breach....................................................................90

        1.      Breach—Entitlement Period .........................................90

        2.      Breach—CEQA Litigation ..........................................93

        3.      Breach—Director Writ Litigation .................................93

    C.      Causation and Damages.........................................................97

        1.      Alleged Period 1 Delays:  The Entitlement Process..............101

        2.      Alleged Period 2 Delays:  The CEQA Litigation..................106

        3.      Alleged Period 3 Delays:  The Director Writ

Litigation.................................................................................112

D.  General Conclusion...........................................................114

V.  THE HACIENDA PARTIES' ADDITIONAL FINDINGS OF FACT REGARDING TIMELINE OF PLANNING COMMISSION AND CITY COUNCIL HEARINGS AND RREEF'S REBUTTALS........................................................115

A.  Planning Commission Meetings........................................115

1.  Planning Commission Meeting No. 1:  June 27, 2012................................................................................117

2.  Planning Commission Meeting No. 2:  October 3, 2012................................................................................117

3.  Planning Commission Meeting No. 3:  March 13, 2013................................................................................122

4.  Planning Commission Meeting No. 4:  April 24, 2013................................................................................125

5.  Planning Commission Meeting No. 5:  May 22, 2013................................................................................128

6.  Planning Commission Meeting No. 6:  June 26, 2013................................................................................129

7.  Planning Commission Meeting No. 7:  July 24, 2013................................................................................132

B.  City Council Meetings.......................................................135

1.  City Council Meeting No. 1:  August 6, 2013..................135

2.  City Council Meeting No. 2:  September 3, 2013..............136

3.  City Council Meeting No. 3:  September 10, 2013.............139

4.  City Council Meeting No. 4:  September 17, 2013.............146

5.  City Council Meeting No. 5:  October 8, 2013..................151

6.  City Council Meeting No. 6:  November 12, 2013.............152

7.  City Council Meeting No. 7:  January 14, 2014.................154

8.  City Council Meeting No. 8:  April 29, 2014....................156

9.  City Council Meeting No. 9:  May 20, 2014.....................159

10.  City Council Meeting No. 10:  December 2, 2014.............162

## I.    RREEF'S REBUTTAL INTRODUCTION/ARGUMENT

The Hacienda Parties attempt to deflect liability for their breaches of the Settlement Agreement by advancing three defective contentions: (1) all of the Hacienda Parties' objections, opposition activity, and litigation against the Project was permitted because RREEF "materially deviated" from the Settlement Agreement site plans; (2) RREEF introduced "no evidence" the Hacienda Parties delayed the start of the Project, because Macy's was the real cause of delay; and (3) RREEF did not establish its damages with reasonable certainty.  Plaintiffs' Post-Trial Brief ("HP Brief") at 4-11.  Each of these three purported defenses fails.

The Hacienda Parties' first contention that they were permitted to oppose the Project as they did is two-fold:  1) *any* "material" change to the site plans in the Settlement Agreement allowed for *any* opposition; and 2) RREEF's communications prior to the entitlement hearings that it might not provide for 240 spaces during construction of the North Deck (because it planned to construct it all in one stage) allowed for *any* opposition.  Neither portion of this contention has merit.

The Hacienda Parties assert that a "material alteration" means:

> "any revision" to the site plans that "reduced the number of parking spaces in Lot F, reduced the number of parking spaces during construction from 240, increased the number of gross leasable area in the core area without a corresponding increase in parking, or changed the layout or configuration of the core parking area or the North Deck."

HP FFCL ¶ 169.  Their proposed definition includes no qualifications regarding the magnitude, scope, or size of the change necessary to be considered "material."  Instead, they assert that *any revision* to the site plans touching on any of these subject areas was a "material alteration."  This is not a plausible reading of the Settlement Agreement.  It all but reads out the term "material."  It even contradicts Mr. Neumann's own testimony that, as a real estate professional, he would "be crazy" to think the site plans would not change at all, indicating he knew and accepted that the Settlement Agreement's site plans were going to evolve.  And, it ignores the sole

1   example of a material change in the Settlement Agreement – not building an entire
2   parking deck.

3       But this focus on "materiality" is to a large extent misplaced, as it ignores the
4   elephant in the room.  There is simply no dispute – and the Hacienda Parties do not
5   attempt to create one – that they opposed major aspects of the Project that were
6   wholly unrelated to any alleged "material" changes they might have been allowed to
7   object to and that were, in fact, always present in the site plans that they approved.
8   And it is this opposition, in particular, that resulted in the delays suffered by RREEF.

9       The Hacienda Parties' interpretation of the contract – that *any* material change
10  allows for *any* opposition – ignores its plain language, namely that opposition to the
11  Project be limited to either (a) "commenting on" material changes to the Project's
12  site plan that would have detrimental effects to the use or operation of the Hacienda
13  building; or (b) "objecting to" material changes to the North Deck or Parking plan.
14  Under the Hacienda Parties' faulty interpretation, these limits simply do not exist.
15  Indeed, it makes any "material" change the equivalent of voiding the agreement and
16  excusing all of the Hacienda Parties' obligations to not oppose the Project, a reading
17  that is contrary to its terms and intention, as already determined by this Court.  *See*
18  ECF No. 193 at 13-14.

19      The second part of the Hacienda Parties' argument that they could oppose all
20  aspects of the Project is based on RREEF's plan to change the construction staging
21  for the North Deck, thereby impacting the amount of parking available during its
22  construction.  But the Ninth Circuit has already ruled that RREEF had no contractual
23  obligation to provide 240 parking spaces.  And there is no evidence of bad faith.
24  RREEF communicated that building the North Deck in one phase would drastically
25  shorten the time that parking might be impacted, thereby helping the Hacienda
26  Parties.   RREEF  also  made  clear  its  intent  to  provide  valet  parking  during
27  construction.  And, RREEF re-sequenced construction to ensure there would be two
28  other parking decks in operation before working on the North Deck, as well as

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

4

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

ensuring that circulation improvements would be complete to make that parking convenient. Thus, there is no argument that purported "240 space requirement" somehow excused the Hacienda Parties' performance.

The Hacienda Parties' second contention is that there is no evidence that the Hacienda Parties' vigorous opposition delayed the Project. In large part, the Hacienda Parties' theory is that Macy's, not the Hacienda Parties, caused the delays. This position ignores the evidentiary record demonstrating that Macy's publicly and consistently stated its full support for the Project. From submitting letters of support for the Project to the City Council, to appearing at four meetings (as early as September 3, 2013) of the City Council to express Macy's unqualified support, to signing a Letter of Intent with RREEF setting forth the key deal points regarding the Project in November 2013, Macy's repeatedly stated its approval of and support for the Project. Indeed, on November 12, 2013, a Macy's representative told the City Council: "We've come to business terms with RREEF. We're ready to make this deal. At this point, we're just waiting on City Council to approve it." The Hacienda Parties also ignore the evidence demonstrating that the timing of the execution of the formal agreement between Macy's and RREEF was not the result of some dispute between Macy's and RREEF, but merely a result of the uncertainty swirling around the Project due to the CEQA Litigation and because of site plan and construction sequence changes stemming from RREEF's efforts to settle with the Hacienda Parties and SCMB.

Beyond improperly blaming Macy's for delays to the Project, the Hacienda Parties have also ignored the compelling evidence of their own conduct that caused delays. The Hacienda Parties sweepingly contend that RREEF "failed to introduce *any* evidence that either the Planning Commission or City Council delayed anything because of the Hacienda Parties." HP Brief at 6 (emphasis added). This is a remarkable statement. As detailed in RREEF's FFCL and herein, the City Councilmembers repeatedly made clear in their public discourse that they needed

1  more time and/or meetings to consider and address the comments, allegations, and
2  threats raised by the Hacienda Parties and their attorney, Cory Briggs.

3    The Hacienda Parties similarly downplay the evidence of their role in the
4  CEQA Litigation, improperly claiming that there is "no evidence that [they] played
5  any role in Sensible Citizens' decision to pursue the CEQA lawsuit or in financing
6  that lawsuit." HP Brief at 8.  To the contrary, the record establishes that the Hacienda
7  Parties were instrumental in creating the factual record upon which the CEQA
8  Litigation was based.  And, indeed, Mr. Neumann collaborated with eventual
9  officers of SCMB during the entitlements phase to jointly develop and execute a
10 campaign of opposition against the Project as a prelude to the CEQA Litigation.
11 Moreover, Mr. Neumann introduced the Hacienda Parties' attorney, Mr. Briggs, to
12 an eventual officer of SCMB shortly before the CEQA Litigation was filed.  And, it
13 was Mr. Briggs who filed and litigated the CEQA Litigation on SCMB's behalf.  It
14 is beyond dispute that the Hacienda Parties knew, or were recklessly indifferent to
15 the fact, that their actions would result in litigation that would defeat or delay the
16 Project.  Indeed, the Court can and should find that was precisely the intent.

17   Once the CEQA Litigation was actually filed, the Hacienda Parties continued
18 to be intimately involved.  Mr. Neumann admitted that he spoke with members of
19 SCMB regarding the CEQA Litigation.  And, written communications from Mr.
20 Briggs confirm that settlement of the CEQA Litigation with SCMB was "unlikely"
21 unless Mr. Neumann approved of the settlement because SCMB was "loyal" to him.
22 Thus, Mr. Neumann's continued interference with the settlement of the CEQA
23 Litigation made an early settlement impossible, causing the litigation to stretch to
24 two years before it was ultimately resolved.  Tellingly, the Hacienda Parties chose
25 not to call Mr. Briggs, who was on their witness list, to rebut this evidence.

26   The Hacienda Parties contend that "[t]here is no evidence that the pendency
27 of the Director Writ Litigation delayed the construction of the project or in any way
28 impacted or interfered with the City's processing of RREEF's building permit

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

6

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

application for the Northeast Deck." HP Brief at 10. Again, this is incorrect. Mr. Friedl testified regarding the City's plan check process and the fact that, before issuing building permits, the City had to check that RREEF's proposed construction drawings were consistent with the approved Master Use Permit and site plan. But, due to the Hacienda Parties' lawsuit, RREEF had to submit a new amendment to the Master Use Permit for approval by the Planning Commission, and – due to the Hacienda Parties' additional challenge – the City Council. While RREEF trudged through that process in response to the Hacienda Parties' lawsuit, the City could not issue final building permits because it could not confirm that RREEF's construction drawings were consistent with a final, approved Master Use Permit.

Relatedly, the Hacienda Parties ignore the scope of the "substantial factor" test, suggesting it is identical to "but for" causation. This neglects case law making clear that "substantial factor" causation reaches past "but for" causation to address situations of concurrent causes. The Hacienda Parties cannot escape liability for their wrongdoing that tied up the issuance of building permits and cast doubts about the Project even if another cause would have independently delayed the Project.

Finally, the Hacienda Parties argue that RREEF did not establish its damages with "reasonable certainty." Again, the evidence does not support this assertion. The Hacienda Parties and Mr. Tregillis had no significant criticisms of Mr. Bones's calculation of construction cost escalation damages. And, with regard to lost profits, their criticisms revolved almost entirely around the argument that the projections in a Duff & Phelps appraisal were optimistic. But, Mr. Bones tested that criticism against RREEF's actual performance in late-2021 and 2022 and determined just the opposite – the projections were actually understated and conservative. The Hacienda Parties offered no response to this fact at trial. Instead, they simply continued to contend that RREEF was better offer delaying the project for nearly three years than if it had been allowed to proceed in 2015.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

7

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

## II.   THE HACIENDA PARTIES' ANSWERS TO THE COURT'S EIGHT QUESTIONS AND RREEF'S REBUTTAL

**Question 1:** *What is the correct contractual interpretation of the Settlement Agreement's term, "material alterations to the Site Plan. . . which detrimentally affect the use or operations of the Hacienda Building"?*

**Hacienda Parties' Short Answer:** The phrase "material alteration to the Site Plan that detrimentally affected the Hacienda Building" means any revision to the Settlement Agreement Site plan that reduced the number of parking spaces in Lot F, reduced the number of parking spaces during construction from 240, increased the number of gross leasable area in the core area without a corresponding increase in parking, or changed the layout or configuration of the core parking area or the North Deck.  Citing Fact Nos. 12–18, 22–53; Conclusion Nos. 161–169.)

**Rebuttal:**  RREEF'S FFCL ¶¶ 412-421; RREEF's Rebuttal to ¶ 169, herein.

**Question 2:** *Please address (in a time-line form if possible) the timing of objections/presentations by the Hacienda parties as well as objections/presentations made by other individuals and entities, including RREEF's objections/presentations to the planning council and the city council.*

**Hacienda Parties' Short Answer:** *See* Fact Nos. 60–71, 198–374.

**Rebuttal:**  RREEF'S FFCL ¶¶ 30-225, Appendix A; RREEF's Rebuttal to ¶¶ 60-71, 198-374, herein.

**Question 3:** *If the Hacienda parties made objections that were permitted by the Settlement Agreement (or if objections were made by others) and, at the same time, if the Hacienda parties made other objections that were not permitted by the Settlement Agreement, can that be a period of improper delay caused by the Hacienda parties?*

**Hacienda Parties' Short Answer:**  No.  (Citing Conclusion Nos. 184–187.)

1    **Rebuttal:** RREEF's FFCL at p. 83 n.6, ¶¶ 334-340 (discussing legal standard

2    for causation), 341-392 (applying legal standard); RREEF's Rebuttal to ¶¶ 185-187,

3    herein.

4

5    **Question 4:** *Can delay prior to the signing of RREEF's final agreement with*

6    *Macy's be attributed to the Hacienda parties? What is the impact of RREEF's*

7    *earlier letter of intent with Macy's?*

8    **Hacienda Parties' Short Answer:** No. RREEF could not even begin the

9    preconstruction process, let alone pull building permits, until Macy's signed the

10   Separate Agreement. RREEF's non-binding 2013 Letter of Intent with Macy's has

11   no relevance on this issue. (Citing Fact Nos. 37, 77; Conclusion Nos. 191–192.)

12   **Rebuttal:** RREEF's FFCL ¶¶ 387-392; RREEF's Rebuttal to ¶¶ 91, 192,

13   herein.

14

15   **Question 5:** *Does the failure of RREEF to provide 240 parking spots during*

16   *construction as required by the Settlement Agreement (and RREEF's advance notice*

17   *to the Hacienda parties of this anticipated failure) have an impact on the current*

18   *issues from the trial?*

19   **Hacienda Parties' Short Answer:** Yes. One of the primary reasons the

20   Hacienda Parties entered into the Settlement Agreement was to protect their tenants'

21   short-term parking during construction of the Project. RREEF's advance notice of

22   its anticipated failure to provide the required parking constituted a material deviation

23   to the Settlement Agreement. (Citing Fact Nos. 22–27, 44; Conclusion Nos. 170–

24   177.)

25   **Rebuttal:** RREEF'S FFCL ¶¶ 23-29, 312-316; RREEF's Rebuttal to ¶¶ 17-

26   18, 21, 27, 29, herein.

27

28

**Question 6:** *If potential witnesses likely have information relevant to a disputed fact issue but neither side calls those witnesses to testify at trial, should that impact resolution of the disputed fact issue?*

**Hacienda Parties' Short Answer:**  RREEF's failure to call a witness from Macy's—a co-party represented by the same counsel—gives rise to the presumption that Macy's testimony on any disputed fact would have been unfavorable to RREEF. *See United States v. Noah*, 475 F.2d 688, 691 (9th Cir. 1973) ("The failure of a party to produce a material witness who could elucidate matters under investigation gives rise to a presumption that the testimony of that witness would be unfavorable to that party if the witness is peculiarly within the party's control.")  Similarly, although City employees may not have been particularly within RREEF's control, given that RREEF bears the burden of proof in establishing that the Hacienda Parties' conduct delayed the entitlement process, RREEF's failure to call representative witnesses from the City constitutes a failure of proof.  (Citing Conclusion Nos. 190, 192.)

**Rebuttal:**    RREEF's FFCL ¶¶ 303-308; RREEF's Rebuttal to ¶¶ 84 (discussing Mr. Briggs), 190 (discussing City staff), 192 (discussing Macy's), herein.

**Question 7:** *What standard should be used to determine whether RREEF's damages claims have been presented with the necessary precision and certainty?*

**Hacienda Parties' Short Answer:**    "Damages must be shown with reasonable certainty and cannot be based on mere speculation and conjecture." *Tzu Chien Chen v. Thomas & Betts Corp.*, No. C-02-3540 SC, 2005 U.S. Dist. LEXIS 16010, at *15 (N.D. Cal. July 13, 2005).  "Uncertainty as to the *fact of damage*, that is, as to the nature, existence or cause of the damage, is fatal." *Pet Food Express, Ltd. v. Royal Canin USA, Inc.*, No. C-09-1483 EMC, 2011 U.S. Dist. LEXIS 141281, at *15 (N.D. Cal. Dec. 8, 2011) (emphasis added)).  (Citing Conclusion Nos. 183–184.)

1    **Rebuttal:**     RREEF FFCL ¶¶ 396-411; RREEF's Rebuttal to ¶¶ 183-184,
2    herein.

3

4    **Question 8:** *In his expert report, did Mr. Tregillis opine on the appropriate*
5    *amount of RREEF's damage claim for increased construction costs, as a standalone*
6    *claim and without regard to the lost profits claim?*

7    **Hacienda Parties' Short Answer:**  No.  (Citing Conclusion No. 146.)

8    **Rebuttal:**  RREEF's FFCL ¶¶ 400-402; RREEF's Rebuttal to ¶ 146, herein.

9    **III.   THE HACIENDA PARTIES' PROPOSED FINDING OF FACT AND**
        **RREEF'S REBUTTALS**
10

11   **A.    PARTIES AND BACKGROUND**

12       1.    Defendant    and    Counter-Claimant    RREEF    America    REIT    II
13   Corporation BBB ("RREEF") is a Maryland corporation and is the owner of a
14   portion of the Manhattan Village Shopping Center ("MVSC") generally bounded by
15   Rosecrans Avenue, Sepulveda Boulevard, and Marine Avenue in the City of
16   Manhattan Beach, California.

17       **Rebuttal to ¶ 1**:  No disagreement.

18       2.    Counter-claimant Macy's West is an Ohio corporation and owner of
19   approximately 1.9 acres of MVSC where a Macy's department store is located.

20       **Rebuttal to ¶ 2**:  No disagreement.

21       3.    Plaintiff and Counter-Defendant 3500 Sepulveda, a Delaware limited
22   liability company, 13th & Crest, a California limited liability company, and 6220
23   Spring Associates, LLC, a California limited liability company, own, as tenants in
24   common, certain improved real property, within MVSC, located at 3500 N.
25   Sepulveda Boulevard, Manhattan Beach, CA.

26       **Rebuttal to ¶ 3**:  No disagreement.

27       4.    The deed from which the Hacienda Parties acquired their interest in
28   MVSC contains certain easements over certain areas of MVSC for parking purposes.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

11

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

**Rebuttal to ¶ 4**:  No disagreement.

5.    On or about November 1, 1980, the predecessors in interest to RREEF, Macy's and the Hacienda Parties entered into a Construction and Reciprocal Easement Agreement (the "COREA") which contains, inter alia, reciprocal easements in parking areas within MVSC. RREEF and Macy's are designated as "prime parties" under the COREA.  Hacienda is not a prime party under the COREA. [TE 21-0008.]

**Rebuttal to ¶ 5**:  No disagreement.

6.    On August 24, 2022, the court issued its Order Re Plaintiffs' Claim Of Unreasonable Burden On Their Easement Rights.

**Rebuttal to ¶ 6**:  No disagreement.

7.    The allowable uses of properties within MVSC, including the Macy's and Hacienda Properties, were governed by a Master Use Agreement (MUP), PC 01-27.  [Trial Exhibit ("TE") 3023-0089.]

**Rebuttal to ¶ 7**:  No disagreement.

**B.    THE SETTLEMENT AGREEMENT**

**1.    Formation and Principal Terms**

8.    On October 8, 2008, RREEF and the Hacienda Parties entered into a Settlement Agreement that sought to resolve pending issues between the parties. The Settlement Agreement addressed the serious concerns the Hacienda Parties had raised about the potential impact of RREEF's expansion and provided that the Site Plan attached as Exhibit E to the Settlement Agreement ("Site Plan") would be included in the amended application RREEF would submit to the City of Manhattan Beach ("City") to expand the MVS (the "Project").  Hacienda had sought to add restaurant uses to its building in accordance with the existing MUP, PC 01-27, which RREEF opposed.  [TE 3033; Reporter's Transcript ("RT") 385:20–386:5.]

**Rebuttal to ¶ 8**: The Hacienda Parties did not enter into the Settlement Agreement simply to address "serious concerns" arising out of RREEF's

1    expansion of the Shopping Center, including issues regarding parking.[1]  The
2    Hacienda Parties wanted RREEF not to oppose the conversion of the
3    Hacienda Building's ground floor to restaurant use.  TE 3033 at 0001-0002.
4    As the recitals to the Settlement Agreement make clear, non-opposition was
5    the Hacienda Parties' consideration for entering into the Settlement
6    Agreement.  *Id.*  RREEF lived up to this bargain and did not oppose the
7    conversion. TE 101 at 0013 (RFA 13); Tr. 474:18-22.  This was a significant
8    sacrifice on RREEF's part, as the Hacienda Parties' conversion of their
9    ground floor to restaurant use limited the amount of space that RREEF could
10   use for restaurant use, and restaurant tenants often pay the highest rents of any
11   tenant—as high as double the rent of office use.  Tr. 56:1-18.  To this day,
12   RREEF is turning down lucrative restaurant tenants because the Shopping
13   Center is out of square footage to allocate to restaurant space.  Tr. 56:10-21.

14        9.    In his June 18, 2008 letter to Sally Stocks, Mark Neumann, a principal
15   of both 3500 Sepulveda and 13th and Crest, confirmed Ms. Stocks' statement to him:

16        When we first met in person you clearly stated your
17        position to us. "You need approval from us to open your
         Starbucks and we are going to be a pain until you give us
18        what we need, approval for our proposed expansion.

19        [TE 588-0002.]

20   **Rebuttal to ¶ 9**:  The Hacienda Parties have offered no corroborating
21   evidence to support the claim that Ms. Stocks or anyone at RREEF ever made
22   this statement.  This assertion is based solely upon Mr. Neumann's own
23   assertions.

24        10.   As the Court has previously ruled, the Settlement Agreement set forth,
25   in pertinent part, the rules for RREEF's application for an amendment of the Master
26   Use Permit and the obligations of the Hacienda Parties and RREEF. The Settlement

27
28
---
[1] Capitalized terms not otherwise defined herein shall have the same meaning as *RREEF America REIT II Corporation BBB's Proposed Findings of Fact and Conclusions of Law* (ECF No. 275-1) ("RREEF's FFCL").

Agreement attaches the Site Plan as Exhibit E, which was defined as the "Shopping Center Project." [TE 3033-0002.]

**Rebuttal to ¶ 10:** No disagreement.

11.   The Settlement Agreement states, in pertinent part:

> 4.a. 3500 Sepulveda has reviewed and consents to the Shopping Center Project as depicted in the Site Plan attached hereto as Exhibit E; and 3500 Sepulveda will not oppose the City's approval of the Shopping Center Project, except as otherwise provided herein. 3500 Sepulveda acknowledges that such Site Plan and the RREEF Application for the Shopping Center Project may be amended from time to time consistent with the obligations provided herein. If such amendments materially affect the Hacienda Building, its tenants, and/or 3500 Sepulveda, RREEF agrees to advise 3500 Sepulveda of the amendments.

> * * *

> f.  3500 Sepulveda and RREEF agree to cooperate in good faith with each other in the processing of the Amended RREEF Application, including but not limited to the amended MUP and Environmental Impact Report, for the Shopping Center project and the entitlement process pertaining to such Applications.

> g.  Except as expressly provided otherwise in this Agreement, and subject to RREEF processing the Amended RREEF Application incorporating the Hacienda Building's use and provision for parking as provided herein, and consistent with the good faith cooperation agreed to herein, RREEF and 3500 Sepulveda acknowledge that 3500 Sepulveda does not waive the right to participate or comment on material alterations to the Site Plan for the Shopping Center Project which detrimentally affect the use or operations of the Hacienda Building.

> * * *

> 5.c.  RREEF may revise those portions of the Site Plan relating to the Parking Decks and the Parking Plan from time to time in its sole and absolute discretion or as required by the City, provided that RREEF shall submit any material revisions to those portions of the Site Plan relating to the North Deck and the Parking Plan to 3500 Sepulveda for its review and approval ten (1 0) business days prior to submitting such revisions to the City. Notwithstanding the foregoing, 3500 Sepulveda's failure to approve material revisions to the North Deck and/or Parking Plan shall not prohibit RREEF from submitting

such material revisions to the North Deck and the Parking Plan to the City for consideration and approval, nor shall 3500 Sepulveda be precluded from objecting to such material revisions it has not approved.

5.d. 3500 Sepulveda acknowledges that RREEF may elect in its sole and absolute discretion, subject to City approvals, to construct the Parking Decks, the South Deck only, or the North Deck only. If RREEF elects to construct only one of the Parking Decks, 3 500 Sepulveda consents hereby only to RREEF's construction of the South Deck. Construction of the North Deck only is and shall be considered a material revision to the Parking Plan, and nothing in 3500 Sepulveda's acknowledgement in the first sentence of this subparagraph 5d shall constitute its approval of, or waiver of its right to object to, construction of the North Deck only.

5e. 3500 Sepulveda understands and acknowledges that during construction of the Shopping Center Project there may be temporary reductions in available parking, which has been addressed to 3500 Sepulveda's satisfaction by RREEF's agreement to implement the measures set forth in Exhibit G attached hereto and incorporated herein by reference.

5h.  If RREEF pursues the Shopping Center Project, receives approval from the City for the Parking Decks, and proceeds to construct the Parking Decks, the construction of the Parking Decks shall be subject to the additional terms set forth in attached Exhibit G.

[TE 3033 at 0005–0006.]

**Rebuttal to ¶ 11**: The section labeled 4(f) by the Hacienda Parties above is actually section 4(e).  TE 3033 at 0004.

12.  One of the primary reasons the Hacienda Parties entered into the Settlement Agreement was to protect their tenants' short-term and long-term parking in connection with the Project.  [RT 389:12–390:13; 402:18–403:9 (Neumann).]

**Rebuttal to ¶ 12:**  *See infra*, Rebuttal to ¶¶ 12-13.

13.  The Hacienda Parties were "fearful for our tenants, both parking during construction and parking long term."  [RT 389:8–11 (Neumann).]  By entering into the Settlement Agreement, the Hacienda Parties "were trying to protect [their]

1  tenants and their customers' ability to access their businesses.  That's one of the
2  main reasons we signed the Settlement Agreement."  [RT 453:20–23 (Neumann).]

3      **Rebuttal to ¶¶ 12-13**:  As discussed previously, the Hacienda Parties did not
4      enter into the Settlement Agreement simply to address "serious concerns"
5      regarding parking, but also to facilitate their desire to convert part of the
6      Hacienda Building into restaurant space.  *See supra,* Rebuttal to ¶ 8.

7      14.    The site plans attached to the Settlement Agreement depict the "Lot F"
8  area—the surface parking lot between the Hacienda Building and Macy's, before the
9  proposed project (defined in TE 3033-0063)—showing 477 (465+12) parking
10  spaces.  [TE 3033-0039.]  The plans show the parking during construction of the
11  Village Shops [TE 3033 at 0041–0044], and the 632 parking spots available in the
12  same area after completion of the North Parking Deck.  [TE 3033-0045.]

13      **Rebuttal to ¶ 14**:  No disagreement.

14      15.    The Settlement Agreement site plans also show the proposed elevations
15  of the North and South Decks, both of which show one-half floor below ground and
16  one-half floor above ground (G+1), with the North Deck being partially below grade
17  with a height of 10'9" above ground level.  [TE 3033-0047.]

18      **Rebuttal to ¶ 15**:  The Settlement Agreement site plans depict the North
19      Parking Deck with two floors.  The first floor is depicted as partially below
20      ground.  TE 3033 at 0047.

21      16.    The plans also depicted Phase 3, Fry's Departure, with additional
22  parking above and below grade parking in the "Fry's Corner."  [TE 3033-0058.]

23      **Rebuttal to ¶ 16**:  No disagreement.

24      17.    The Settlement Agreement also references parking during construction:
25  "If RREEF pursues the Shopping Center Project, receives approval from the City for
26  the Parking Decks, and proceeds to construct the Parking Decks, the construction of
27  the Parking Decks shall be subject to the additional terms set forth in attached
28  Exhibit G.  [TE 3033-0006.]

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

16

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

**Rebuttal to ¶ 17:**  See *infra*, Rebuttal to ¶¶ 17-18.

18.    Exhibit G to the Settlement Agreement provided:

> 2.    During Stage One construction of the North Deck, there shall be not less than 240 parking spaces available in the area referenced as "Lot F" on the attached Exhibit H.
>
> 3.    During Stage One construction of the North Deck, and during Stage Two construction when reasonable access to parking for tenants, contractors, invitees, patrons and employees of the 3500 Sepulveda Property is impaired, RREEF will provide valet service or undertake other reasonable measures to provide alternative parking during such periods as approved by 3500 Sepulveda and at no cost to 3500 Sepulveda.
>
> [TE 3033.]

**Rebuttal to ¶¶ 17-18**:  To the extent that Paragraphs 17 and 18 are offered to suggest that RREEF anticipatorily breached the Settlement Agreement, that claim is unfounded.  As an initial matter, the Settlement Agreement makes explicit that "[t]he North Deck *may* be constructed in two stages – Stage One and Stage Two – as depicted on the Site Plan and in substantial conformity with that certain parking plan attached hereto as Exhibit F."  TE 3033 at 0005 (Section 5(a)) (emphasis added).  With respect to paragraph 2 of Exhibit G, *id.* at 0080, the Ninth Circuit has already held that RREEF could not breach that provision, as the Settlement Agreement did not require RREEF to build the North Deck in two stages, *3500 Sepulveda, LLC v. Macy's W. Stores, Inc.*, 980 F.3d 1317, 1325 (9th Cir. 2020).  Further, the Hacienda Parties have not presented any evidence that RREEF anticipatorily breached the third paragraph of Exhibit G.  In fact, RREEF expressed to the Hacienda Parties its intent to provide valet during the construction of the North Deck to further alleviate any potential parking impact on the Hacienda Building.  TE 1295 at 0004.

## 2.    RREEF's Material Deviations from the Site Plan

19.    Exhibit 1314 illustrates the differences between the parking contained in the Settlement Agreement site compared to various revised site plans over the years, and to what was eventually built.  [TE 1314; RT 460:1–465:16 (Neumann).]

**Rebuttal to ¶ 19**:  No disagreement.

20.    As described below, after entering the Settlement Agreement, but before beginning the entitlement process, RREEF made numerous revisions to the site plan that it knew would be objectionable to Mr. Neumann and the Hacienda Parties.

**Rebuttal to ¶ 20**:  Assuming that RREEF was in fact aware that the Hacienda Parties would object to some of its changes to the illustrative site plans, that does not mean that RREEF thought those changes were material or that the Hacienda Parties had any reasonable position for thinking so.  Rather, this merely reflects a recognition of the fact that the Hacienda Parties were opposed to *any* changes to the site plans, regardless of materiality.  As RREEF presented at trial, the Hacienda Parties continuously "move[d] the goalposts" in negotiations with RREEF, indicating that the Hacienda Parties intended to continue objecting regardless of how many concessions RREEF made in an attempt to appease them.  Tr. 707:10-16; Pearson Dep. Tr. 29:2-11; Stocks Dep. Tr. 70:7-21.

21.    Before the project, there were 477 spaces in Lot F.  [RT 460:11–13 (Neumann); TE 1314 at p. 2.]

**Rebuttal to ¶ 21**:  No disagreement.

22.    RREEF understood that the Settlement Agreement required 240 spaces during construction.  [RT 744:1–3 (English); RT 392:6–10, RT 401:10–12 (Gibson); TE 1295-0004 ("The Settlement Agreement did not provide for any specific parking plan during construction, other than the minimum 240 spaces to be provided in the North Parking Lot.")]  As Neumann testified:  "One condition of the Settlement

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

18

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

Agreement is that RREEF would provide us 240 parking spaces within Lot F at all times during construction of the north deck." [RT 392:6–10 (Neumann).] This "was intended to benefit Macy's and the Hacienda Building." [RT 401:10–12 (Neumann).]

**Rebuttal to ¶ 22**: The Settlement Agreement *only* required RREEF to provide interim parking in the event that it chose to build the North Deck in two stages. TE 3033 at 0080 ("During **Stage One** construction of the North Deck, there shall not be less than 240 parking spaces available in the area referenced as 'Lot F'") (emphasis added). The Settlement Agreement makes explicit that "The North Deck *may* be constructed in two stages – Stage One and Stage Two – as depicted on the Site Plan and in substantial conformity with that certain parking plan attached hereto as Exhibit F." TE 3033 at 0005 (Section 5(a)) (emphasis added). RREEF ultimately chose to construct the North Deck in one stage, such that it was not obligated to provide 240 parking spaces in the former Lot F area during the construction of the North Deck. *3500 Sepulveda*, 980 F.3d at 1325. As RREEF explained to the Hacienda Parties as early as 2010, the one-stage plan to build the North Deck reduced the amount of construction time, which reduced the need for interim parking. TE 1007 at 0002.

23.    RREEF also understood that the Settlement Agreement Site Plan called for a G+1 North Deck. [RT 742:19–743:13 (English).]

**Rebuttal to ¶ 23**: While the site plans attached to the Settlement Agreement depicted a G+1 North Deck, making refinements to site and parking plans is common in major developments. Tr. 61:14-21. Indeed, Mr. Neumann recognized this fact, stating at trial that "[a]s a real estate professional, I would be crazy to say that that site plan was not going to change a little bit, and things would be modified." Tr. 476:5-13. Accordingly, while the illustrative site

1  plans attached the Settlement Agreement envisioned a G+1 North Deck, this

2  was not set in stone.

3      24.    On August 3, 2010, RREEF wrote a letter to the Hacienda stating for

4  the first time that RREEF had elected to change the North Deck from G+1 to G+2,

5  a change which it also stated would mean "approximately 100 fewer spaces will be

6  available during the parking deck construction period versus the 240 number

7  stipulated in Exhibit G to the [Settlement Agreement]."  [TE 1007-0002.]

8      **Rebuttal to ¶ 24:**  The parking reduction cited in Paragraph 24 was not the

9      result of changing the North Deck from a G+1 to a G+2 structure.  Rather, the

10     August 3, 2010 letter clearly states that the reduction in parking spaces was

11     the result of reprasing the construction of the North Deck to be built in one

12     stage instead of two.  TE 1007 at 0002.  As RREEF explained, the single stage

13     approach vastly reduced the amount of time in which the North Deck would

14     be under construction, thereby limiting the amount of time in which parking

15     would be reduced in the former Lot F area.  *Id.*  The Project construction was

16     ultimately resequenced to build the Northeast and South Decks before the

17     North Deck, which was done to ensure there would be adequate parking for

18     all tenants, including the Hacienda Parties, during the construction of the

19     North Deck.  TE 28 at 0016, 0022-0023.

20     25.    RREEF knew this plan, which included a larger deck and limited

21  parking during construction, was objectionable to Mr. Neumann.  [TE 1007; RT

22  406:9–408:7, 743:3–13 (Neumann).]

23     **Rebuttal to ¶ 25**:  Assuming that RREEF was in fact aware that the Hacienda

24     Parties would object to some of its changes to the illustrative site plans, that

25     does not mean that RREEF thought those changes were material or that the

26     Hacienda Parties had any reasonable position for thinking so.  Rather, this

27     merely reflects a recognition of the fact that the Hacienda Parties were

28     opposed to *any* changes to the site plans, regardless of materiality.  As RREEF

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

20

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1   presented at trial, the Hacienda Parties continued to "move the goalposts" in
2   negotiations with RREEF, indicating that the Hacienda Parties intended to
3   continue objecting regardless of how many concessions RREEF made in an
4   attempt to appease them.  Tr. 707:10-16; Pearson Dep. Tr. 29:2-11; Stocks
5   Dep. Tr. 70:7-21.

6       26.    The Hacienda Parties were not able to accept RREEF's request to
7   change the north deck to G+2 or the reduction of parking spaces during construction.
8   [RT 409:13–411:24 (Neumann).]

9       **Rebuttal to ¶ 26**:  The Hacienda Parties have offered no evidence that they
10  "were not able to accept" the North Deck as a G+2 structure.  Indeed, later
11  correspondence from Mr. Neumann indicated that he did, in fact, "tentatively
12  approve[]" a G+2 deck.    TE 1241.    Additionally, it is misleading to
13  characterize RREEF's notification of its intention to build the North Deck as
14  a G+2 structure as a "request" that the Hacienda Parties could "accept."
15  RREEF was not obligated to build the North Deck as a G+1 structure and the
16  change to a G+2 structure was not material.  TE 28 at 0020-0021.  Moreover,
17  even if the shift to a G+2 North Deck were a material alteration (it was not),
18  that would not give the Hacienda Parties the right not to *allow* the structure to
19  be built; it would just allow them to *oppose* that aspect of the Project without
20  running afoul of the Settlement Agreement.

21      27.    In November of 2010, RREEF's revised site plans likewise showed far
22  fewer than 240 parking spaces during construction of the North Deck, a change that
23  RREEF knew was objectionable to Neumann.  [RT 744:1–10 (English); TE 1295-
24  0004 ("The plans we sent to you on November 16th, 2010 show 104 parking spaces
25  available during construction of the North Parking Deck, which is indeed less than
26  the 240 parking spaces stipulated in the Settlement Agreement."]

27      **Rebuttal to ¶ 27**:  Assuming that RREEF was in fact aware that the Hacienda
28  Parties would object to some of its changes to the illustrative site plans, that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

21

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

does not mean that RREEF thought those changes were material or that the Hacienda Parties had any reasonable position for thinking so. Rather, this merely reflects a recognition of the fact that the Hacienda Parties were opposed to *any* changes to the site plans, regardless of materiality. As RREEF presented at trial, the Hacienda Parties continued to "move the goalposts" in negotiations with RREEF, indicating that the Hacienda Parties intended to continue objecting regardless of how many concessions RREEF made in an attempt to appease them. Tr. 707:10-16; Pearson Dep. Tr. 29:2-11; Stocks Dep. Tr. 70:7-21; *see supra,* Rebuttal to ¶ 20. To the extent the Hacienda Parties argue that RREEF anticipatorily breached the Settlement Agreement by not providing 240 spaces in the North Deck during construction, the 9th Circuit has already held that RREEF could not breach that provision, as the Settlement Agreement did not require RREEF to build the North Deck in two stages, and RREEF opted to build the North Deck in one stage, thereby rendering the 240-space requirement inapplicable. *3500 Sepulveda, LLC*, 980 F.3d at 1325. *See supra*, Rebuttal to ¶ 17-18.

28. On December 6, 2010, Mr. Neumann sent a letter to Mark English of RREEF noting that certain changes RREEF proposed to the North Deck "appear to be a material change when compared to the plans included in the Settlement Agreement." [TE 1295-0008.]

**Rebuttal to ¶ 28**: No disagreement that Mr. Neumann sent the letter, but Mr. Neumann's subjective understanding of materiality in December 2010 has no bearing on the interpretation of that term in the 2008 Settlement Agreement. *See infra,* Rebuttal to ¶¶ 163-167.

29. Mr. English responded in letter dated January 5, 2011, recognizing that parking in MVSC would be impacted by the addition of the Village Shops and Macy's expansion and noting that "the circumstances and our plans have changed

1  since the execution of the Settlement Agreement more than two years ago…" [TE
2  1295-0001.]

3  **Rebuttal to ¶ 29**:  Mr. English's letter also contextualized the changes and
4  explained how many of them actually benefited the Hacienda Parties.  TE
5  1295 at 0001.  These positive changes include "net improvements to the
6  overall site plan which benefit all parties affected by the redevelopment." *Id.*
7  at 0009.  RREEF noted that the South Deck construction had been re-
8  sequenced and would now be available during construction of the North Deck
9  (thereby providing more parking to Hacienda Building customers, as well as
10  patrons of other stores in the Shopping Center) and that RREEF intended to
11  provide valet during the construction of the North Deck to further alleviate
12  any potential parking impact on the Hacienda Building.  *Id.* at 0004-0005.
13  The Northeast Deck was also sequenced to be built before the North Deck,
14  providing additional parking, and RREEF made internal circulation
15  improvements in the Shopping Center that benefitted the Hacienda Building.
16  TE 28 at 0015-0016.

17  30.    Mr. English further stated that the "planning process has been long and
18  evolutionary, and we still have a ways to go." [TE 1295-0002.]  He acknowledged
19  that the plans were changing at Macy's request, and logically, RREEF should have
20  approached Macy's first, "but we didn't." [TE 1295-0001.]

21  **Rebuttal to ¶ 30**:  The exhibit cited by the Hacienda Parties included in
22  Paragraph 30 does not include a statement from RREEF saying "but we
23  didn't."  TE 1295.  Assuming that the Hacienda Parties intended to cite the
24  trial transcript for this proposition, the language they have cited reflects the
25  Hacienda Parties' counsel's characterization of Trial Exhibit 1295, not the
26  actual words Mr. English used in Trial Exhibit 1295.  *See* Tr. 448:22-24.
27  Additionally, for the sake of clarity, RREEF stated that seeking Macy's input

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

23

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

and approval was a step that "logically would have happened prior to the Settlement Agreement[.]" TE 1295 at 0001.

31.    RREEF continued to make material alterations to the site plan as it progressed through the entitlement process between June of 2012 and December of 2016.  [*See, e.g.*, TE 1248, 1249, 3029-0181.]

**Rebuttal to ¶ 31**:  The changes that RREEF made to the 2008 illustrative site plans were not material.  As discussed in RREEF's Rebuttal to Paragraph 169, *infra*, materiality under the Settlement Agreement means a change of substantial significance.  *See also* RREEF'S FFCL ¶¶ 412-21.  None of the site plan iterations contained material alterations to the site plan which detrimentally affected the use or operation of the Hacienda Building or material changes to the parking plan, primarily because the number of garages stayed the same and the amount of parking available to Hacienda Building visitors within a reasonable distance of the building increased.  TE 28 at 0014-0016; Tr. 263:20-264:1, 267:19-269:2.

32.    On July 23, 2012, Mark Neumann sent a letter to Mark English concerning RREEF's latest site plan.  [TE 1241.]  In the letter, Neumann compared, side by side, the 2008 Settlement Agreement Site Plan, a tentative August 25, 2011 site plan, and the 2012 site plan English had recently provided to Neumann.  [*Id.*]  Neumann noted the reduction in parking spaces as well as the increased 33,000 square feet of retail in the Lot F area and stated that this was a material change which the Hacienda Parties could not support.  [*Id.*]

**Rebuttal to ¶ 32**:  As the images on Mr. Neumann's July 23, 2012 letter make clear, Mr. Neumann tentatively agreed to a site plan that included the North Deck as a G+2 structure.  TE 1241.

33.    The June 26, 2012 site plan submitted as part of the first Planning Commission meeting (discussed below) shows the North Deck as G+2 and a total of 354 spaces in Lot F.  [RT 463:5–5 (Neumann); TE 1314-0007.]

1    **Rebuttal to ¶ 33**:  The correct citation is TE 1314 at 0008.

2    34.    By April 24, 2013, the Site Plan contained 487 spaces in Lot F.  [RT

3    463:19–464:3 (Neumann); TE 1314-0010.]

4    **Rebuttal to ¶ 34**:  The increase in spaces provided in the former Lot F

5    between the June 26, 2012 and April 24, 2013 site plans demonstrates that

6    RREEF was improving parking immediately proximate to the Hacienda

7    Building by increasing the number of spaces in the North Deck.  TE 1314 at

8    0008, 0010.

9    35.    With respect to the April 24, 2013 site plan, RREEF admitted to the

10   City that 3500 Sepulveda was "within its rights under the agreement to object to

11   changes to the site plan."  [RT 775:4–9 (English); TE 1302-0002 (fourth bullet

12   point).]

13   **Rebuttal to ¶ 35**:  As an initial matter, the letter in question was sent from

14   Mr. English to Richard Thompson, the Director of Community Development

15   of the City of Manhattan Beach at that time.  TE 1302 at 0002.  Mr. English

16   used the letter to correct statements made against the Project by the Hacienda

17   Parties.  *Id.*  In the fourth bullet, Mr. English was clarifying that the Hacienda

18   Parties did not have any form of "approval" rights over changes to the Project,

19   but that they could potentially object to changes under the Settlement

20   Agreement's terms.  *Id.*  However, the Hacienda Parties did not have a blanket

21   right to object to *all* aspects of the Project—only those aspects that reflected

22   "material alterations to the [2008] Site Plan … which detrimentally affect the

23   use or operations of the Hacienda Building" or "material revisions to the North

24   Deck and/or [2008] Parking Plan."  TE 3033 at 0005.

25   36.    On May 22, 2013, RREEF presented a new site plan at the Planning

26   Commission.  [TE 1249.]  The North Deck remained at G+2, and there were

27   additional retail buildings in the Lot F area, but a portion of Lot F was in Phase 3,

28   labeled "Not A Part."  [TE 1249–0004.]

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

25

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1  **Rebuttal to ¶ 36**: No disagreement.

2       37.    On November 11, 2013, RREEF and Macy's entered into a non-binding

3  "Letter of Intent" ("LOI") setting forth the proposed business terms of the

4  consolidation and expansion of the Macy's store.  [*See* February 21, 2023 Joint

5  Notice of Lodging of Electronic Exhibits and Other Materials (ECF No. 264) at p.

6  3.] The LOI expressly noted that it "is only a description of the parties' current intent

7  and is not legally binding."   Among the proposed terms of the agreement

8  contemplated by the LOI was that Macy's would have a right of approval over

9  "material amendments" to the site plan.   "Material amendment" was defined to

10  include, among other things, any change that "adds or reduces the number of parking

11  spaces within any parking areas or parking decks within the shopping center· or

12  changes the layout or configuration of any such parking areas or parking decks …."

13  [LOI at p.3]

14       **Rebuttal to ¶ 37**:  To the extent this fact is included to suggest that the Macy's

15       LOI[2] has any bearing on the meaning of "material" in the Settlement

16       Agreement—a completely separate agreement between different parties

17       drafted nearly a decade apart—it does not. *See infra,* Rebuttal to ¶¶ 163-168.

18       38.    The November 21, 2014 site plan—which was ultimately approved by

19  the City Council on December 2, 2014—shows 496 spaces in Lot F.  [RT 464:4–11;

20  TE 1314 at p. 11; TE 3029 (December 2, 2014 Staff Report) at 0181.]

21       **Rebuttal to ¶ 38**:  No disagreement.

22       39.    RREEF continued to make material alterations to the site plan even

23  after the City Council approved it in December of 2014.

24       **Rebuttal to ¶ 39**:  The changes that RREEF made to the 2008 illustrative site

25       plans were not material.  As discussed in RREEF's Rebuttal to Paragraph 169,

26       *infra*, materiality under the Settlement Agreement means a change of

27

28  [2] The Letter of Intent between RRREF and Macy's (the "Macy's LOI") was not a
trial exhibit, but at the Court's request in its February 14, 2023 Minute Order, the
parties lodged a copy of the Macy's LOI with the Court on February 21, 2023.

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1   substantial significance.  *See also* RREEF'S FFCL ¶¶ 412-21.  None of the
2   site plan iterations contained material alterations to the site plan which
3   detrimentally affected the use or operation of the Hacienda Building or
4   material changes to the parking plan, primarily because the number of garages
5   stayed the same and the amount of parking available to Hacienda Building
6   visitors within a reasonable distance of the building increased.  TE 28 at 0014-
7   0016; Tr. 263:20-264:1, 267:19-269:2.   Moreover, when asked on two
8   separate occasions during direct examination what "material changes" were
9   made to the 2016 site plan as compared to the Settlement Agreement site plan,
10  Mr. Neumann pointed only to a decrease in 9 parking spaces:

11          Q. So what prompted the Hacienda parties to file the writ
12          of mandate case regarding the MUP?

13          [MR. NEUMANN.]  … [I]n Lot F, there was a reduction
14          -- if I remember right, it was a reduction of nine spaces. …

15  Tr. 442:11-20.

16          Q. What were the changes between this site plan, Exhibit
17          1263, in 2016 and the Settlement Agreement site plan as it
18          was material to the Hacienda [P]arties?

19          [MR. NEUMANN.] There was a further reduction in the
20          Lot F parking.  I believe the number was nine more spaces
21          were taken out of Lot F, which would benefit our tenants
            and customers.

22  Tr. 444:7-12.

23          40.    As RREEF continued to revise the site plan in 2015, both RREEF and
24  the Hacienda Parties recognized that changes to the parking supply—particularly in
25  Lot F—would constitute a material alteration of the site plan agreed to in the
26  Settlement Agreement.  [TE 509 ("Note there are numerous detailed exhibits that
27  are part of the SA and relevant to every aspect of the development, parking, phasing,
28  etc. … Hacienda was consistently focused on the parking in the core parking area

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

27

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

throughout the entire approval process, both during and after construction. The chart below illustrates the concern with the revised plan, that it takes away parking spaces in the key area of the north deck, approximately 98 spaces, and in the parking decks (PD) defined term in the Settlement Agreement, meaning north deck and south deck only."); RT 173:13–175:15, 178:24–179:24 (Friedl).]

**Rebuttal to ¶ 40**: RREEF recognized that reducing parking in the North Deck would be of concern to the Hacienda Parties, but it did not state that the changes were "material." TE 509. As discussed in RREEF's Rebuttal to Paragraph 169, *infra*, materiality under the Settlement Agreement means a change of substantial significance. *See also* RREEF'S FFCL ¶¶ 412-21. None of the site plan iterations contained material alterations to the site plan which detrimentally affected the use or operation of the Hacienda Building or material changes to the parking plan, primarily because the number of garages stayed the same and the amount of parking available to Hacienda Building visitors within a reasonable distance of the building increased. TE 28 at 0014-0016; Tr. 263:20-264:1, 267:19-269:2. Additionally, though RREEF did not agree that the North Deck required as much parking as the Hacienda Parties claimed, RREEF wanted to ensure adequate parking distribution in the Shopping Center and believed that the plan discussed in Trial Exhibit 509 provided an insufficient number of spaces in the North Deck. Ultimately, the former Lot F area (which contains the North Deck) included 471 spaces, more than the 402 spaces envisioned by the plan specified in Trial Exhibit 509. *See infra,* Rebuttal to ¶ 43.

41. In their July 6, 2016 Separate Agreement regarding the expansion and consolidation of the Macy's store (discussed further below), RREEF and Macy's stipulated that a "material change" included, but was not be limited to, "any amendment that…(iii) adds or reduces the number of parking spaces within any parking areas or parking decks depicted on the Site Plan, or changes the layout or

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

28

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

configuration of any such parking areas or parking decks, or (iv) changes or reconfigures any entrances to and exists, and any driveways, drive isles (sic) or ring road, in a manner that alters vehicular or pedestrian traffic flow." [TE 1313-003.]

**Rebuttal to ¶ 41**: To the extent this fact is included to suggest that the Macy's LOI has any bearing on the meaning of "material" in the Settlement Agreement—a completely separate agreement between different parties drafted nearly a decade apart—it does not. See *infra,* Rebuttal to ¶¶163-168.

42.    The updated site plan endorsed by the Planning Commission Director in December of 2016 [TE 1314-0013], showed a reduction of nine more spaces in Lot F, reducing it to 487 spaces.  Neumann concluded that there was a loss of 145 spaces in the Lot F area.  [RT 465:2–16.]

**Rebuttal to ¶ 42**:  At trial, Mr. Neumann twice stated that the reduction of these nine spaces was material, Tr. 442:11-20, 444:7-12, and was the "largest concern" leading the Hacienda Parties to file the Director's Writ Litigation, Tr. 464:24-465:6.

43.    The final site plan, as constructed, shows 471 spaces in Lot F.  [RT 465:12 (Neumann); TE 1314-0017.]  That is 161 spaces below the number in the Settlement Agreement Site Plan.  [RT 468:12–20 (Neumann).]

**Rebuttal to ¶ 43**:  In addition to the North Deck and former Lot F area, the as-constructed site plan provides more than 1,000 other spaces in reasonable proximity to the Hacienda Building, including in the Northeast and South Decks and the parking culvert adjacent to the Hacienda Building.  TE 1314 at 0017.

44.    RREEF provided no parking during construction.  [RT 456:8–24; 504:15–25 (Neumann).]

**Rebuttal to ¶ 44**:  RREEF re-sequenced the construction plans to build the South and Northeast Decks before the North Deck, such that there were several hundred parking spaces proximate to the Hacienda Building during

1    the entire period of construction of the North Deck.  TE 28 at 0016.  RREEF

2    also made internal circulation improvements to the Shopping Center that

3    benefitted the Hacienda Building.  *Id.* at 0015-0016.  Additionally, RREEF

4    opted to build the North Deck in one stage, reducing the amount of time that

5    the former Lot-F area would be without parking.  TE 1007 at 0002.  Finally,

6    RREEF expressed its intent to provide valet parking during construction of

7    the North Deck to further alleviate any potential harm to the Hacienda

8    Building.  TE 1295 at 0004-0005.

9        45.    Gibson's opinion on whether the Settlement Agreement Site Plan was

10   materially different from those presented to the Hacienda Parties after the Settlement

11   Agreement, including the Site Plan as constructed, focused only on the "overall

12   parking supply."  Gibson admitted that the amount of parking in each of the garages

13   changed.  [RT 265:12–23.]

14       **Rebuttal to ¶ 45**:  Beyond "overall parking supply," Mr. Gibson also clearly

15       stated that the "distribution of parking garages" was very similar between

16       various iterations of the site plans, indicating that distribution was included in

17       his analysis of materiality.  Tr. 265:12-23.  Though the amount of parking in

18       each garage "changed a little bit," it did not change in a way that would impact

19       the overall distribution of parking throughout the center, nor the overall

20       parking supply, and there were therefore no material changes to parking.  *Id.*

21       265:12-266:7

22       46.    Gibson's claim that Hacienda is obtaining more parking spaces within

23   600 feet (the edge between what he calls LOS B or C), is belied by his own studies

24   which showed that the Core Area was marginally parked at parking ratios well below

25   the national averages and significantly less than competitive malls.  [TE 740-0007;

26   RT 265–269.]

27       **Rebuttal to ¶ 46**:  During the point in time when the email cited in Paragraph

28       46 was written, a City Planning Commissioner had suggested that there was

"too much" parking in the Shopping Center and advocated that RREEF not put "any new parking in the surface parking lots on the Sepulveda side of the center." Tr. 280:25-281:6. Both RREEF and the Hacienda Parties agreed this would be detrimental to the Shopping Center, as it would negatively impact parking distribution by not including enough parking in the northern portion of the Shopping Center. Tr. 281:7-12. During this period, the parties referred to an area in the northern part of the Shopping Center including the North and Northeast Decks as the "CORE" parking area. *Id.* While Mr. Gibson noted that the parking ratio is smaller than some other malls, he did not state that 4.1 spaces per thousand square feet was the incorrect metric for the Shopping Center, based on his shared parking analysis that analyzed the Shopping Center specifically. Tr. 283:17-21.

47.    Gibson admitted that parking 600 feet away from a location is less desirable than 300 feet. [RT 279:3–280:9.]

**Rebuttal to ¶ 47**: Mr. Gibson made clear that both 300 and 600 feet distances are "[n]ot unacceptable to national standards of retail parking." Tr. 279:17-23.

48.    Gibson's opinion also didn't take into account the number of additional retail square footage that became part of the North Deck, reducing parking and increasing demand. [RT 272:6–18.]

**Rebuttal to ¶ 48**: The trial testimony cited by the Hacienda Parties does not indicate that Mr. Gibson failed to consider additional retail square footage in his analysis. *See* Tr. 272:6-18 (Mr. Gibson discussing the configuration of the Project's parking decks and buildings). Mr. Gibson considered the addition of retail square footage in his analysis of parking availability and determined that the Hacienda Building's parking needs were adequately served. *See* TE 28. With respect to the 10,000 square footage in gross leasable area added to Macy's as compared to the 2008 Project Plans, Mr. Gibson noted that there

1  was a reduction of gross leasable area elsewhere in the Shopping Center,

2  resulting in net decrease in Gross Leasable Area and, accordingly, a decrease

3  in parking demand. *Id.* at 0018-0019. Mr. Gibson also specifically analyzed

4  the parking available in the northern portion of the Shopping Center in

5  response to Mr. Neumann's complaints about the addition of gross leasable

6  area to the that portion of the mall, and found that later iterations of the site

7  plans added *more* parking reasonably proximate to the Hacienda Building

8  than did the 2008 Project Plans. *Id.* at 0020.

9      49.    Gibson's opinion was that the design of a building, the site prominence

10  of a building, and connectability to a shopping center did not matter to him. [RT

11  276:10–25.]

12      **Rebuttal to ¶ 49**: At trial, Mr. Gibson stated that site prominence and design

13  generally are not relevant to a traffic study, which instead looks at the size of

14  a facility, the number of spaces, and the number of expected customers. Tr.

15  276:10-25. Mr. Gibson also stated that if two structures had a significantly

16  different number of levels (*e.g.*, a one-story and five-story structure), that

17  would impact the traffic study. *Id.*

18      50.    Gibson testified that the third level of parking in the North Deck was

19  required to construct the bridge to Macy's. [RT 273:1–11.]

20      **Rebuttal to ¶ 50**: Mr. Gibson did not state that a third level of parking was

21  required with respect to the North Deck. Tr. 273:10-16. Mr. Gibson discussed

22  the North*east* Deck and noted that building a pedestrian bridge would require

23  a third level, but did not say that the North Deck required a third level to

24  construct a bridge to Macy's. *Id.* In fact, RREEF could have built the bridge

25  from the North Deck to Macy's with a G+1 structure. Tr. 738:21-739:2.

26  Additionally, the third level of parking of the North Deck is actually the

27  second level above ground, as the first level is at grade. TE 28 at 0020-0021

28  (noting that the G+2 North Deck includes only "two above grade stories").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

32

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

51.    While Gibson disowned the term "core area" of the shopping center (*see* RT 284:20–23), his own memorandum defined the Core area as "the retail between Carlotta Way on the North and the Macy's Men's store and Parcel 17 shops on the south". [TE 740-0007; RT 284:10–15.]    As Gibson's own memorandum stated: "The Hacienda Building owner is also clear in their statements that adequate parking sufficiently close to their building, balanced with adequate supply serving the core retailers, is vital." [TE 740-0007; RT 285:18–24.]

**Rebuttal to ¶ 51:** *See infra,* Rebuttal to ¶¶ 51-53.

52.    Gibson's memorandum concluded that "the core is marginally served and relies certainly in more peak shopping periods on the disproportionate supply located in the noncore area." [TE 740-0008; RT 286:12–16.]

**Rebuttal to ¶ 52:** *See infra,* Rebuttal to ¶¶ 51-53.

53.    Gibson further stated that "parking space quantity driven by a 3-plus ratio needs to be located 300 to 350 feet maximum distance from the primary doors of core retail" and "[i]t should be free of barriers to the pedestrian or shopper." [TE 740 at 0007–0008; RT 283:10–286:18.]

**Rebuttal to ¶¶ 51-53**:  During the point in time when Trial Exhibit 740 was written, a City Planning Commissioner had suggested that there was "too much" parking in the Shopping Center and advocated that RREEF not put "any new parking in the surface parking lots on the Sepulveda side of the center." Tr. 280:25-281:6.  Both RREEF and the Hacienda Parties agreed this would be detrimental to the Shopping Center, as it would negatively impact parking distribution by not including enough parking in the northern portion of the Shopping Center.  Tr. 281:7-12.  During this period, the parties referred to an area in the northern portion of the Shopping Center including the North and Northeast Decks as the "CORE" parking area.  *Id.*  As the Hacienda Parties admit, Mr. Gibson "disowned" the term "core area" and explained at trial that "there isn't a core area that I recognize from a parking distribution

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

33

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    standpoint," and that the "core area" is "not something I ever recognized as a
2    technical term."  HP FFCL ¶ 51; Tr. 280:20-281:12.

3    In any event, RREEF provided more than sufficient parking for the
4    Hacienda Building.  As an initial matter, the Northeast and South Decks
5    reduce the potential demand that Macy's and Village Shop patrons might
6    otherwise put on the North Deck, as customers from those businesses are able
7    to conveniently park in those other decks, thereby leaving more spaces in the
8    North Deck for customers of the Hacienda Building.  TE 28 at 0015, 0020,
9    0021.  Additionally, the North, Northeast, and South Decks, as well as the
10   parking culvert, are all fewer than 500 feet away from the Hacienda Building
11   (well within an acceptable walking range), TE 28 at 0011, those decks
12   collectively provide hundreds of parking spaces to patrons of the Shopping
13   Center, TE 1314 at 0017, and by the Hacienda Parties' admission, the
14   Hacienda Building requires only 80 spaces at a 4.1 per thousand square feet
15   parking ratio, Tr. 401:21-402:2.

16   **C.**   **THE ENTITLEMENT PROCESS:  PLANNING COMMISSION AND**
17   **CITY COUNCIL MEETINGS**

18   54.    RREEF anticipated a three-year entitlement process, with entitlements
19   expected to be issued by December of 2013, based solely on its experience with a
20   shopping center project in Marina del Rey, California.  [RT 46:24–47:7, 49:6–15,
21   50:23–51:2.]

22   **Rebuttal to ¶ 54**:  The record reflects that RREEF's anticipated three-
23   year entitlement process was based on more than its experience in Marina del Rey.
24   Mr. Lenhert testified that the planned three-year entitlement process, was
25   based on RREEF's value add group's "prior experience and their work in
26   Southern California," which included their experience in Marina del Rey.  Tr.
27   49:10-15, 50:23-51:2.  RREEF's value add group specialized in ground-up
28   development, repositioning, or enhancing RREEF's portfolio of properties

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

34

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

across the United States.  Tr. 660:25-661:14.  Mr. English testified that RREEF had experience developing projects in Southern California outside of the Marina del Rey project, including office properties from Orange County to the Inland Empire.  Tr. 661:15-24.  *See also infra,* Rebuttal to ¶ 188 (discussing the relevance of RREEF's project timelines).

55.    The Marina del Rey Project was under the jurisdiction of the City of Los Angeles, not the City of Manhattan Beach.  [RT 98:22–99:9 (Friedl).]

**Rebuttal to ¶ 55**:  No disagreement.

56.    There is no evidence of the size or scope of RREEF's Marina del Rey shopping center.

**Rebuttal to ¶ 56**:  No disagreement.

57.    There is no evidence of the nature of the entitlement process RREEF experienced with the Marina del Rey (other than its claimed three-year length), whether it went through multiple local governmental agencies, whether any reviewing body applied de novo review of proposed entitlements, or whether any conditions of approval were imposed by the local governing body.

**Rebuttal to ¶ 57**:  No disagreement.

58.    There is no evidence of the level of local community involvement in the entitlement process for the Marina del Rey shopping center.

**Rebuttal to ¶ 58**:  No disagreement.

59.    The MVSC was the "largest commercial retail building and site, with 44 acres, in the city." [T. 3024-0006.]  It was "the biggest project that happened in Manhattan Beach in…the last 20 years."  [RT 426:20–427:2, 777:24–778:7.]

**Rebuttal to ¶ 59**:  No disagreement.

60.    The entitlement process comprised seven Planning Commission meetings and ten City Council meetings between June 27, 2012 and December 2, 2014.

**Rebuttal to ¶ 60:**  No disagreement that the meetings during the entitlement

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

35

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

process included seven Planning Commission meetings and ten City Council meetings, although the "entitlement process" as a whole is broader and more extensive than just public meetings, including with respect to the preparation and circulation of an EIR.  *See, e.g.,* RREEF's FFCL ¶¶ 30-32; Tr. 42:18-44:20 (explaining that the entitlements process started before the first Planning Commission meeting).

61.    "After conducting duly noticed public hearings on the Project on June 27, 2012, October 3, 2012, March 13, 2013, April 24, 2013, May 22, 2013, June 26, 2013 and July 24, 2013, and requiring changes to the Project, the Planning Commission certified the EIR on June 26, 2013 and approved the Project, as modified by the Commission, on July 24, 2013." [TE 2035-001 (Section 5).]

**Rebuttal to ¶ 61:**  No disagreement.

62.    As shown in the Additional Findings of Fact Regarding Timeline of Planning Commission and City Council Meetings (the "Additional Findings"), the Hacienda Parties' comments played de minimis role in the Planning Commission meetings and were primarily focused on material changes to the plan impacting parking.  For example, the substantive portions of the transcripts of the seven Planning Commission meetings—i.e., excluding cover pages, tables, and indices—total 1,378 pages.  [*See* TE  3001, 3008, 2134, 3002, 3003, 2007, 3032 & 3004.] And as shown in the Additional Findings below, of the 1,378 substantive pages of Planning Commission transcripts, comments by the Hacienda Parties and related discussion by the Planning Commission and RREEF total approximately 46 pages, or **3.3 percent of the transcripts**.  [See Fact Nos. 199, 206, 234, 246, 253, 258, & 269.]

**Rebuttal to ¶ 62**:  The Hacienda Parties' opposition before the City Council was substantial and strategic.  As discussed in more detail below, the Hacienda Parties declined to speak at the first three City Council meetings, despite being explicitly invited to comment at the September 3, 2013 and September 10,

2013 meetings.  TE 3004; TE 3005 at 0094:6-11; TE 3006 at 0028:7-22.  Even still, the Hacienda Parties spoke for approximately 24.3% of all transcript pages from the public and party comment portions of all ten City Council meetings.  *See* TE 72; TE 73; TE 2139; TE 2140; TE 2141; TE 2142; TE 3004; TE 3005; TE 3006; TE 3007.[3]  When removing the first three City Council meetings at which the Hacienda Parties didn't speak, the Hacienda Parties spoke for approximately 28.8% of all transcript pages from the public and party comment phases of the remaining seven City Council meetings.  *See* TE 72; TE 73; TE 2139; TE 2140; TE 2141; TE 2142; TE 3007.[4]

After not speaking during the first three City Council meetings, the Hacienda Parties started opposing the Project at the fourth City Council meeting, TE 3007, and continued to ramp up their opposition as the City Council moved closer to voting on the Project.  For instance, at the eighth City Council meeting, which took place on April 29, 2014, the Hacienda Parties spoke for approximately 51.3% of all transcript pages from the public and party comment phase of that meeting.  TE 2140.[5]  At that same meeting, which City Staff had recommended be the final meeting regarding the Project, TE 3027 at 0001, Mayor Pro Tem Powell expressed frustration with the Hacienda Parties' practice of submitting documents at "the eleventh hour" which was

---

[3] This value was derived by calculating the number of transcript pages during which the Hacienda Parties spoke at the City Council meetings (235) and dividing that by the number of pages from the public and party comment portions of the City Council meetings (966).  To err on the side of conservativism, portions of the transcript that involved Councilmembers asking questions of the public or the parties were included in the divisor.

[4] This value was derived using the same dividend (235) as explained in fn.3, *supra*, but the divisor (817) excludes the transcript pages from the public and party comment portions of the first three City Council meetings, during which the Hacienda Parties declined to speak at all.

[5] This value was derived by calculating the number of pages during which the Hacienda Parties spoke at the April 29, 2014 City Council meeting (77) and dividing that by the number of pages from the public and party comment portions of that meeting (150).  To err on the side of conservativism, portions of the transcript that involved Councilmembers asking questions of the public or the parties were included in the divisor.

1  hindering the City Council's ability to respond to public comments and he
2  questioned whether the Hacienda Parties' practice of "wait[ing] until the last
3  minute" was "a legal strategy," TE 2140 at 0163:5-17. Councilmember
4  Burton similarly stated that it was "completely unrealistic" for the City
5  Council to make a decision on the EIR based on the late comments the City
6  had received. *Id.* at 0007:6-9. Moreover, Councilmember Lesser wanted to
7  give the City Staff an opportunity to respond to the "significant questions" the
8  Hacienda Parties had raised about the City's independent contractors. TE
9  2140 at 0267:24-0269:4. And, in that vein, Councilmember Lesser suggested
10 carrying the meeting over to another date to provide time to respond. *Id.*
11 0267:24-0269:4. Councilmember Burton support Councilmember Lesser's
12 suggestion of continuing the meeting. *Id.* at 0269:22-0270:10. And Mayor
13 Howorth recognized that Mr. Briggs made a "threat" about CEQA litigation
14 against the City on behalf of the Hacienda Parties. *Id.* at 170:5-8. She opted
15 to have the City Attorney respond to the issues raised by Mr. Briggs at a
16 subsequent meeting. *Id.* at 0270:22-0271:6.

17      The Hacienda Parties' decision to withhold the vast majority of their
18 comments on the EIR until September 17, 2013, contributed to delay and was
19 not in good faith. Rather than participate and comment on the Project and the
20 EIR meaningfully at the Planning Commission in 2012 or early 2013, the
21 Hacienda Parties withheld the vast majority of their comments and criticisms
22 until the last initially scheduled City Council meeting on September 17, 2013
23 and the City Council meetings thereafter. *See* TE 3024 at 0004; *see also*
24 RREEF's FFCL ¶¶ 66-225. This was a consistent tactic employed by the
25 Hacienda Parties that caused delay. *See* RREEF's FFCL ¶¶ 349-351. As City
26 staff observed in the September 17, 2013 staff report:

27          Representatives of [the Hacienda Parties] have had
28          numerous opportunities to provide comments, including
            during the public review and comment period, the seven

Planning Commission hearings, and the prior public hearings before the City Council. Indeed, both staff and the Mayor specifically invited such representatives to speak at the September 3rd and September 10th public hearings. Despite these many opportunities for comment, [the Hacienda Parties] decided to wait until the last public hearing [before the City Council] on September 17th to present written and oral comments. Due to the volume of late comments, a comprehensive Response to Late Comments document is in the process of being prepared and will be presented to the City Council at a later date."

TE 3024 at 0004.

63.    RREEF and the 3500 Sepulveda appealed the Planning Commission's approval, and the City Council separately agreed to review the Project for approval. [*See* TE 2035-001 (Section 6).]

**Rebuttal to ¶ 63**:  On August 6, 2013, the City Council officially called up the Project for review under its authority to review Planning Commission decisions.  TE 3004 at 0022:4-11.

64.    "On September 3, 10, and 17, October 8 and November 12, 2013, the City Council held duly noticed public hearings *de novo* to consider RREEF's application for an amendment to the existing Master Use Permit, a height variance, and amendment 10 the Master Sign program/sign exceptions. In addition, the Council held duly noticed public meetings on August 6, 2013 and January 14, 2014 to consider the application. Evidence, both written and oral, was presented to the Council. All persons wishing to address the City Council regarding the Project were given an opportunity to do so at the public hearings. Representatives of RREEF and Macy's, residents and local business owners spoke in favor of the Project. Representatives of 3500 Sepulveda LLC and other persons spoke in opposition to the Project on various grounds."  [TE 2035 at 0001–0002 (Section 7).]

**Rebuttal to ¶ 64:**  No disagreement, but *see also* RREEF's FFCL ¶¶ 79-171 (discussing these meetings in additional detail).

65.    "On January 14, 2014, the City Council provided another opportunity for representatives of RREEF and 3500 Sepulveda LLC, and all other interested

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

39

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

persons, to comment on the Project. After providing that opportunity, the Council adopted a motion to direct staff to draft resolutions for the Council to consider certifying the Environmental Impact Report ("EIR") and approving Phases I and II of the proposed Pro1ect, subject to requiring:  (A) Coordination of Phases I and II to ensure that Macy's is consolidated, (B) Elimination of 10,000 square feet from Phase 1, (C) Redesign of the Phase I "North Parking Structure," (D) Consolidation of Macy's prior to the issuance of building permits for Phase II, (E) Submittal by Macy's of a commitment letter, (F) Installation of the Cedar Way extension to Rosecrans Avenue as part of Phase II, (G) Negotiations in good faith with Fry's so it remains on the site, (H) Provision of a bond or other satisfactory security for traffic improvements, (I) The architectural elements, details, water features, landscaping, hardscaping, and plaza to be similar to the concept renderings, (J) Commissioning of an Oak Avenue traffic study for a cost not to exceed $20,000, (K) Compliance with all of the other conditions that were imposed and previously approved by the Planning Commission."  [TE 2035-0002 (Section 8).]

**Rebuttal to ¶ 65**:  No disagreement, but *see also* RREEF's FFCL ¶¶ 154-71 (discussing the January 14, 2014, meeting in additional detail).

66.    "In accordance with the Council's motion, RREEF refined and modified the Project and submitted revisions to the Project plans. Such revisions were attached to the May 20, 2014 staff report as Attachment 9 [TE 3028]. The matrix comparing (a) the Project as analyzed by the EIR to (b) the revisions to the plan reflecting the modifications and refinements requested by the Planning Commission and the City Council was attached to the May 20, 2014 staff report [TE 3028] as Attachment 3." [TE 2035-0002 (Section 9).]

**Rebuttal to ¶ 66**:  No disagreement.

67.    "The City Council held a public hearing on April 29, 2014 to review the refinements and modifications to the Project, the April 2014 Analysis, the draft resolutions and the proposed conditions of approval. All persons wishing to address

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

40

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

the City Council regarding the Project, including representatives of RREEF and 3500 Sepulveda, were given an opportunity to do so at the public hearing. The City Council invited public comment on, inter alia, the refined and modified Project, the draft resolutions and the draft conditions of approval. The City invited representatives of 3500 Sepulveda to provide comments. Principal Mark Neumann and two attorneys spoke for over thirty minutes and presented two letters and a slide show presentation. Mr. Neumann emphasized that he was trying to protect 3500 Sepulveda's property rights. After the conclusion of the public testimony, the City Council closed the public testimony portion of the public hearing, and continued the hearing to May 20, 2014." [TE 2035 at 0002–0003 (Section 11).]

**Rebuttal to ¶ 67**:  No disagreement, but *see also* RREEF's FFCL ¶¶ 172-93 (discussing the April 29, 2014, meeting in additional detail).

68.    "On May 20, 2014, the City Council provided another opportunity for the public, including representatives of 3500 Sepulveda, to comment on the draft resolutions and the conditions attached to Resolution 14-0026. After the public provided comments, the Council made a motion to return with resolutions to certify the EIR and to approve the project, subject to all the conditions in the draft resolution and additional conditions." [TE 2035-0003 (Section 12).]

**Rebuttal to ¶ 68**:  No disagreement, but *see also* RREEF's FFCL ¶¶ 194-215 (discussing the May 20, 2014, meeting in additional detail).

69.    "On December 2, 2014, the City Council provided another opportunity for the public, including representatives of 3500 Sepulveda to comment on the draft resolutions and the conditions attached to Resolution 14-0026. After that opportunity, the City Council adopted Resolution 14-0025, thereby: (1) certifying the Final EIR; (2) making findings in support thereof; and (3) adopting a Mitigation Monitoring and Reporting Program for the Project, as refined and modified."  [TE 2035-0003 (Section 13).]

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

41

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

**Rebuttal to ¶ 69**:  No disagreement, but *see also* RREEF's FFCL ¶¶ 216-25 (discussing the December 2, 2014, meeting in additional detail).

70.    On December 2, 2014, the City Council adopted Resolution Nos. 14-0025 and 14-0026 certifying the EIR and approving the amended MUP (the "Amended MUP"), thus approving the project. [TE 2034, 2035.]

**Rebuttal to ¶ 70**:  Resolution 14-0026 approved the amended MUP and explicitly found that:  "[t]he proposed location of the use and the proposed conditions under which it would be operated or maintained … will not be detrimental to properties or improvements in the vicinity[.]" TE 2035 at 0007. Moreover, Resolution 14-0026 found that the amended MUP "confers benefits to 3500 Sepulveda."  TE 2035 at 0019.

71.    Over the course of the 17 public hearings, the Planning Commission and City Council heard from numerous members of the public, and discussed in depth the myriad issues that one would expect on a project of this size and scope including, among other things, the Macy's consolidation and expansion, project phasing, parking spaces proposed and demand required, light poles on top of parking structures, phasing plans, including connections between phases and entire mall site, appearance of buildings and parking structures, pedestrian and bicycle connections to the Veterans Parkway Greenbelt under Sepulveda, draft conditions of approval, including the number of security cameras, timing of the site-wide improvements, the parking structures and number of spaces, the Rosecrans and Sepulveda dedications, the timing of the Rosecrans left-turn restriction, the number of electric vehicle charging stations, and the Village Drive rear cut-thru diversion improvement Plan, and the Phase III Northwest Corner.  [TE 3001, 3008, 2134, 3002, 3003, 2007, 3032, 3004, 3005, 3006, 3007, 3010, 2138, 2139, 2140, 2141, 2142; see Fact Nos. 198–374.]

**Rebuttal to ¶ 71**:  The Hacienda Parties' opposition to the Project differed from that of other members of the public in terms of detail and extent.  *See* Tr.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

42

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

741:8-742:6. For example, the Hacienda Parties hired an attorney specializing in CEQA litigation to attack the legal and technical adequacy of the EIR and to threaten the City Council with litigation. TE 86; TE 3029 at 0195-0196; TE 2139 at 0114:18-0115:19. The Hacienda Parties were also the only people who hired two experts and had multiple expert reports created to challenge specific aspects of the EIR. Tr. 697:23-699:17, 704:10-12. The Hacienda Parties were also the only people before the City Council who submitted detailed letters making legal and technical arguments as to why the City would be liable under CEQA and threatened the City with CEQA litigation. *See* TE 66; TE 70; TE 2139 at 0114:18-0115:19; TE 2140 at 0247:14-0248:6. The Hacienda Parties were also the only people to make lengthy presentations before the City Council in opposition to the Project. *See* TE 68 (twenty-six slide presentation); TE 79 (seventy-one page presentation); TE 82 (seventy-two slide presentation). The Hacienda Parties were also the only people to appeal the Planning Commission's certification of the EIR and the MUP amendment in its entirety. *See* TE 62; TE 65. The Hacienda Parties, as well as their attorneys and experts, were the only party to submit detailed, technically difficult comments at the City Council stage that took more time and effort to respond to than typical comments on the Project from the public. Tr. 260:23-261:17, 741:8-742:6; *see* TE 2131 at 0027-0028, 0033-0088, 0105-0124, 0137-0169, 0175-0180 (City devoting more than 100 pages of responses in Volume II of the EIR to the Hacienda Parties' comments); *see also* RREEF's FFCL ¶¶ 377-386 (comparing the Hacienda Parties' public comments to other comments).

72.    At trial, RREEF did not call a single witness from the Planning Commission or City Council.

**Rebuttal to ¶ 72**: No disagreement.

73.    There is no evidence that, but for alleged delay, the City would have

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

43

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

issued entitlements in December of 2013 instead of December of 2014.

**Rebuttal to ¶ 73**: The contemporaneous evidence demonstrates that RREEF's estimated timeline was generally on track until the Hacienda Parties ramped up their opposition to the Project before the City Council in September 2013. *See infra*, Rebuttal to ¶ 188 (discussing RREEF's timeline and delays).

74.    There is no evidence that any comments made or materials submitted by the Hacienda Parties to the Planning Commission and City Council caused the Planning Commission or City Council to set a hearing they otherwise would not have, or that the time between hearings was delayed because of anything the Hacienda Parties said or did.

**Rebuttal to ¶ 74**:  RREEF introduced significant evidence that the Hacienda Parties' actions were a substantial factor in causing the City Council to prolong the entitlements process.  *See infra*, Rebuttal to ¶ 189 (describing the delays caused by the Hacienda Parties during the entitlements process); *see also* RREEF's FFCL ¶¶ 341-356 (discussing delays caused by the Hacienda Parties during the entitlements phase).

75.    During the entitlement process, RREEF never told the Hacienda Parties that RREEF believed certain of their complaints to the Planning Commission and City Council were improper or constituted a breach of the Settlement Agreement. [Tr. 811:20–812:15 (English).]

**Rebuttal to ¶ 75**:  The record reflects that RREEF did tell the Hacienda Parties that they believed their complaints to the City Council and Planning Commission were out of bounds under the Settlement Agreement:

> [THE COURT:] In any of your meetings with the Hacienda parties, and including in particular Mr. Neumann, did you or anybody from RREEF say to Mr. Neumann, the objections and advocacy you're making in front of the City Council and in front of the Planning Commission, basically you're out of bounds under our Settlement Agreement?
>
> [MR. ENGLISH]: We did.

1    Tr. at 810:18-24.

2    76.    RREEF acknowledged that it repeatedly changed the site plan during
3    the entitlement process, and so it made the decision to try to "rebalance the
4    agreement" with the Hacienda Parties rather than threaten them.  [Tr. 810:11–
5    811:19.]

6    **Rebuttal to ¶ 76**:  RREEF acknowledged that the site plans were "changing"
7          and rather than being threatening, RREEF's approach was to be "pragmatic
8          and just try to accommodate everybody to the maximum extent as possible."
9          Tr. 811:6-19.

10    77.    The Amended MUP contained 56 Conditions of Approval (COAs) that
11    RREEF was to comply with.  Among other COAs, the City required that before
12    RREEF could pull a building permit to begin Phase I of the Project, it would have
13    to have written evidence of a binding commitment with Macy's for the consolidation
14    and expansion of the Macy's store.  [TE 2035-0024 (¶ c); RT 152:20–153:13,
15    153:25–154:12.]

16    **Rebuttal to ¶ 77**:  No disagreement.

17    78.    The City also approved the North Deck as a G+2, but with the western
18    portion of the second deck set back 90-feet, a condition that RREEF contended
19    would "jeopardize[] the whole project." [TE 2035-0038 (¶ r); TE 2142 (Transcript
20    of December 2, 2014 City Council Hearing), 0014.]

21    **Rebuttal to ¶ 78**:  The record does not reflect that RREEF felt setting back
22          the second level of the North Deck 90-feet would "jeopardize[] the whole
23          project."  Mr. Saunders was stating to the City Council on December 2, 2014
24          that RREEF was "in full agreement with each and every one of the twelve
25          conditions from January" and was "in agreement with most of the ones from
26          May," except for "one" requiring a "further reduction of parking" to the North
27          Deck.  TE 2142 at 0014:16-23.  As stated by Ms. Jester, the 90-foot setback
28          was one of the twelve conditions from January, which RREEF "full[y]

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

45

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    agree[d]." *See id*. at 0008:11-20, 0014:16-23.  Mr. Saunders clarified that a

2    "further reduction" of parking in the North Deck would jeopardize the Project,

3    referring to the May 20, 2014 condition requiring that the North Deck be

4    reduced from G+2 to G+1.  TE 2142 at 0014:16-23; *see also* TE 3029 at 0004-

5    0005 (RREEF explaining it could not reduce the North Deck to G+1 due to

6    the corresponding reduction in parking, and the Hacienda Parties stating that

7    this reduction would "hurt[] the small businesses on its property").

8    **D.    THE CEQA LITIGATION**

9        79.    On December 23, 2014, the Sensible Citizens of Manhattan Beach filed

10   an action in Los Angeles County Superior Court captioned *Sensible Citizens of*

11   *Manhattan Beach v. City of Manhattan Beach, et al.*, LASC Case No. BS152854

12   (the "CEQA Litigation").

13   **Rebuttal to ¶ 79**:  No disagreement.

14       80.    Chris Prodromides, Loralie Ogden, and William Featherston were

15   members of Sensible Citizens, among others.  [RT 435:5–13 (Neumann).]

16   **Rebuttal to ¶ 80**:  No disagreement that Chris Prodromides, Loralie Ogden,

17   and William Featherston were associated with SCMB.  There is also evidence

18   suggesting that Mr. Neumann was associated with SCMB. *See infra,* Rebuttal

19   to ¶ 81.

20       81.    Neither Mark Neumann, Rich Rizika, nor any of the Hacienda Parties

21   were members of Sensible Citizens of Manhattan Beach.  [RT  434:23–438:13

22   (Neumann).]

23   **Rebuttal to ¶ 81**:  While Mr. Neumann testified he was not a "member,"

24   there is evidence establishing that Mr. Neumann had close ties to SCMB.  For

25   example, Mr. Neumann requested that Mr. Prodromides attend a City Council

26   meeting about the Project.  TE 95 at 0001.  Mr. Neumann asked Ms. Ogden

27   to "write a letter to the editor" opposing the Project.  TE 114 at 0001.  Ms.

28   Ogden acknowledged that her "collaboration" with Mr. Neumann should be

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

46

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1  kept secret.  TE 2179 at 0001.  At his deposition, Mr. Neumann could not

2  recall how many times he spoke with other SCMB members.  Neumann Dep.

3  Tr. 255:25-257:11.  And Mr. Neumann supplied Ms. Ogden with the contact

4  information for his attorney, Cory Briggs, who would later represent SCMB

5  in the CEQA Litigation.  TE 109; *see also* RREEF'S FFCL ¶¶ 229-236

6  (providing additional examples of Mr. Neumann's ties to SCMB).

7      82.    Mr. Neumann did not fund (directly or indirectly) or otherwise support

8  Sensible Citizens in the CEQA Litigation.  [RT 434:23–438:13 (Neumann).]

9      **Rebuttal to ¶ 82**:  There is ample evidence in the record that the Hacienda

10  Parties supported the Sensible Citizens in the CEQA Litigation.  *See*

11  RREEF'S FFCL ¶¶ 228-248.

12      83.    None of the Hacienda Parties paid attorney Cory Briggs for his

13  representation of Sensible Citizens of Manhattan Beach in the CEQA Litigation.

14  [*Id.*]

15      **Rebuttal to ¶ 83**:  Even if the Hacienda Parties did not pay Mr. Briggs for his

16  representation of *SCMB*, the record reflects that Mr. Briggs continued to

17  represent *the Hacienda Parties* in connection with the CEQA Litigation.  TE

18  101 at 0007-0011 ("Admit that Cory J. Briggs had no attorney-client

19  relationship with [Mark Neumann, 3500 Sepulveda, 13 & Crest, 6220 Spring,

20  and Richard Rizika] in connection with the SCMB Lawsuits.  RESPONSE:

21  … Deny.") ("Admit that Cory J. Briggs had no attorney-client relationship

22  with [Mark Neumann, 3500 Sepulveda, 13 & Crest, 6220 Spring, and Richard

23  Rizika] during the period extending from December 23, 2014 to October 11,

24  2017.  RESPONSE: … Deny").  And during the May 20, 2014 City Council

25  meeting, Cory Briggs stated that his comments were made on behalf of both

26  the Hacienda Parties and SCMB.  TE 2141 at 0048:4-9.

27      84.    In his discussions with Philip Friedl during the pendency of the CEQA

28  Litigation, Mark Neumann specifically told Mr. Friedl that Cory Briggs did not

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

47

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1  represent Mr. Neumann in connection with the CEQA Litigation.  [RT 165:21–

2  166:18 (Friedl); TE 103–0003.]

3      **Rebuttal to ¶ 84**:  No disagreement that while the CEQA Litigation was

4  pending, Mr. Neumann emailed Mr. Freidl and stated "Cory Briggs doesn't

5  represent us *anymore*."  TE 103 at 0003 (emphasis added).  However, this

6  email was sent after the CEQA Litigation was pending for more than one year.

7  *Compare* TE 2036 (CEQA Lawsuit filed December 2014), *with* TE 103

8  (Neumann representation made February 2016).

9      As noted above, *see* Rebuttal to ¶ 83, *supra*, the Hacienda Parties

10  admitted in sworn discovery responses that Cory Briggs represented them in

11  connection with the CEQA Litigation, and continued to represent through

12  October 2017.

13      Further undermining the credibility of Mr. Neumann's statement is that,

14  during Mr. Neumann's deposition, his counsel asserted attorney-client

15  privilege over his conversations with Mr. Briggs about the CEQA Litigation.

16  *See, e.g.*, Neumann Dep. Tr. 269:8-12 (Q. Did Mr. Briggs ever ask for your

17  consent to the [CEQA Litigation] settlement?  [Hacienda Parties' Attorney]:

18  That seeks attorney/client communications.  I'll instruct you not to answer."),

19  269:14-19 ("Q.  Did Mr. Briggs ever discuss … your views that were

20  expressed in [TE 104]?  [Hacienda Parties' Attorney]: Objection. That seeks

21  attorney/client communications. I will instruct you not to answer."), 277:15-

22  23 ("Q. So … you don't know why Mr. Briggs would say that [SCMB] would

23  defer to you? … [Hacienda Parties' Attorney]:  I'm also going to interpose a

24  belated objection for seeking attorney/client privileged communications."),

25  278:20-279:4 ("Q. Was there absolutely no basis for [Mr. Briggs] to say these

26  things [about SCMB deferring to Mr. Neumann], is that your testimony?

27  [Hacienda Parties' Attorney]: Seeks attorney/client communication.").

28      Further undermining the credibility of Mr. Neumann's statement is the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

48

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

fact that Mr. Briggs called Mr. Neumann during the mandatory settlement conference for the CEQA Litigation. *See* Tr. 171:23-172:2; Neumann Dep. Tr. 281:5-8 ("Q.  Do you remember Mr. Briggs calling you from the [mandatory settlement conference]?  A.  I remember Mr. Briggs calling me from some meeting.").  When Mr. Neumann was questioned about this phone call during his deposition, the Hacienda Parties' attorney instructed him not to answer.  Neumann Dep. Tr. 281:14-18 ("Q.  What did [Mr. Briggs] discuss with you about the CEQA [Litigation] settlement?  [Hacienda Parties' Attorney]:  Also calls for attorney/client communications. And I will instruct you not to answer.").

Finally, given that Mr. Briggs was not called to testify at trial even though he "may reasonably be assumed to be favorably disposed to  the [Hacienda Parties], an adverse inference may be drawn regarding any factual question on which the witness is likely to have knowledge." *Underwriters Lab'ys Inc. v. N.L.R.B.*, 147 F.3d 1048, 1054 (9th Cir. 1998) (citation omitted).  The Court is therefore permitted to infer that Mr. Briggs continued to represent Mr. Neumann in connection with the CEQA Litigation.  *See also* RREEF'S FFCL ¶¶ 303-307 (identifying additional adverse inferences the Court may draw).

85.    Philip Friedl admitted that, because the Hacienda Parties were stakeholders who were interested in any changes to the site plan, it made sense to involve them in discussions of potential settlement of the CEQA Litigation.  [RT 163:6–165:5 (Friedl).]

**Rebuttal to ¶ 85**: Mr. Friedl testified that the Hacienda Parties were involved in discussions of potential settlement of the CEQA Litigation because SCMB's attorney, Mr. Briggs, told RREEF that the litigation could not be settled without agreement by Mr. Neumann.  Tr. 124:19-22 (Friedl) ("Mr. Briggs had said that , in essence, we would not get a settlement unless Mr.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

49

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    Neumann agreed."). Mr. Briggs's emails to RREEF also demonstrate that Mr.

2    Neumann's agreement was necessary to resolving the CEQA Lawsuit. TE

3    102 at 0001 (Mr. Briggs sending RREEF a list of Mr. Neumann's issues

4    asking if Mr. Neumann's issues would make a meeting "futile"); TE 104 (Mr.

5    Briggs stating that SCMB was "as [he] expected, being loyal and deferential

6    to Mark [Neumann]" and that "a settlement without [Mr. Neumann's] blessing

7    will be unlikely."); *see also* RREEF'S FFCL ¶¶ 249-262 (describing Mr.

8    Neumann's influence on RREEF's settlement attempts).

9        86.    On November 2, 2016, the court in the CEQA Litigation issued an order

10    denying Sensible Citizens' petition for writ of mandate. [TE 2047.]

11    **Rebuttal to ¶ 86**: No disagreement.

12    **E.    WHILE THE CEQA LITIGATION IS PENDING, RREEF ADVANCES**

13    **THE PROJECT FORWARD AS SOON AS MACY'S IS ON BOARD.**

14        87.    RREEF contends that the CEQA Litigation constituted a "cloud on

15    title" that effectively prevented it from pushing the project forward until resolved.

16    As Joshua Lenhert put it:

17        The CEQA challenge means we're not approved. And so
18        from my own internal perspective, my investment
        committee will not hear from me until we have not -- will
19        not let me spend dollars until we have cleared these
        challenges. And from the perspective of going out to bid
20        and actually constructing something -- we can't construct
        something that we would potentially have to tear down.
21        Again, I'm a fiduciary, and as an investment manager, I
        don't think anybody would want their investment manager
22        doing that with their dollars.

23    [Tr. 70:9–71:2 (Lenhert).]

24    **Rebuttal to ¶ 87**: No disagreement.

25        88.    RREEF originally estimated that, once it obtained the City's approval

26    of the site plan, it would take a year to develop the approved site plan into

27    preconstruction drawings sufficient to go out to bid for a construction contractor.

28    [RT 48:22–49:5, 51:4–14, 73:20–74–2 (Lenhert).]

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    **Rebuttal to ¶ 88**:  Mr. Lenhert explained that "from entitlement" it typically

2    takes "six to 12 months" to get preconstruction drawings that are suitable to

3    provide to a contract for bidding.  Tr. 48:22-49:1.  He also noted that RREEF

4    would typically start construction within a year of receiving entitlements.  Tr.

5    73:20-74:2.

6    89.    Project drawings typically advance along the following design

7    progression: (1) a basic site plan or conceptual design, (2) schematic design, (3)

8    design development, and then (4) construction level drawings sufficient to give to a

9    construction contractor and to seek City permit approval.  [RT 110:11–111:23

10   (Friedl).]

11   **Rebuttal to ¶ 89**:  No disagreement.

12   90.    Depending on the size of a project, the process of turning a site plan

13   into full construction level drawings can take months.  [RT 197:9–12.]

14   **Rebuttal to ¶ 90**:  No disagreement.

15   91.    RREEF could not begin the process of developing the project site plan

16   into more advanced level construction drawings until it had a finalized site plan,

17   which required Macy's approval.  [RT 199:1–12 (Friedl).]

18   **Rebuttal to ¶ 91**:  RREEF could, and did, develop the project site plans into

19   more advanced drawings prior to Macy's approval.  Tr. 115:14-18 (Friedl)

20   ("[W]e had a pretty good idea of what our refined site plan would be within a

21   couple of months.").  However, RREEF could not proceed to construction

22   drawings and construction until it had sufficient certainty that expending

23   resources would be consistent with its fiduciary duties to its investors.  Tr.

24   70:25-71:2.  Regarding Macy's, RREEF did not sign a final agreement until

25   after it had attempted to address the Hacienda Parties' and SCMB's requests

26   during CEQA Litigation settlement negotiations.  Tr. 120:20-121:5, 122:1-9,

27   731:10-21, 837:8-838:15.  And the record evidence demonstrates that Macy's

28   was consistently in favor of the Project and never posed a threat to stopping

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

51

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1   or delaying the Project. *See, e.g.*, TE 73 at 0048:19-0100:19, 0101:2-0105:21,

2   108:8-22; TE 2086 at 0109-0110; TE 2149; TE 3005 at 0070:19-0071:3,

3   0100:8-0103:24; TE 3006 at 0075:21-0115:14; TE 3027 at 0585; TE 3029 at

4   0242; RT 731:2-21, 734:13-16, 837:14-838:15; Macy's LOI; *see also infra*,

5   Rebuttal to ¶ 192.

6       92.    On May 1, 2015, RREEF engaged Jones Lang LaSalle ("JLL") as

7   Development Manager and tasked it with, among other things, finalizing the site

8   plan. [TE 505 (JLL Development Management Agreement); TE 788 (April 18, 2016

9   Investment Committee Memorandum) at 0012 ("Last year, DeAM appointed JLL's

10  Project and Development Services (PDS) to drive this process [of finalizing the site

11  plan]".]

12      **Rebuttal to ¶ 92**:  No disagreement.

13      93.    In 2015 and early 2016, JLL and RREEF negotiated proposed changes

14  to the site plan with Macy's and the Hacienda Parties.  [RT 162:11–165:5 (Friedl);

15  TE 509-0001 (internal RREEF/JLL email stating "I believe this plan (with some

16  tweaking still to go on the village shops buildings) can get all that is needed: an

17  improved village shops area and mall connection, city approval, Macy's approval,

18  and neutral to Hacienda (note if more parking were added to North parking area in

19  a final version it could become a 'concession' to Hacienda and useful in the CEQA

20  settlement agreements)."; TEs 520, 103, 1276.]

21      **Rebuttal to ¶ 93**:  No disagreement.

22      94.    In April of 2016—while the CEQA Litigation was pending—RREEF

23  and Macy's were close to finalizing an agreement regarding the expansion and

24  consolidation of Macy's, including an agreed upon site plan.  [TE 788 (April 18,

25  2016 Investment Committee Memorandum) at 0057 (summarizing the Macy's

26  Separate Agreement Structure).]

27      **Rebuttal to ¶ 94**:  RREEF and Macy's had been "close to finalizing an

28  agreement regarding the expansion and consolidation of Macy's" since the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

52

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1  entitlements phase. Tr. 734:17-735:5. As discussed in the Rebuttal to
2  Pargraph 192, *infra*, there was no business purpose for finalizing this
3  agreement earlier.

4  95.    On April 15, 2016, RREEF finalized the site plan that Macy's
5  ultimately agreed to in the Macy's Separate Agreement. [TE 1313 (Macy's Separate
6  Agreement) at 0035–0038.]

7  **Rebuttal to ¶ 95**: No disagreement as written. However, April 2016 was not
8  when the site plans were ready for City approval. RREEF had refined site
9  plans ready to submit to the City during the third quarter of 2015, but was
10  unable to submit them until late 2016, after the CEQA Litigation had
11  concluded. Tr. 119:5-22.

12  96.    On April 18, 2016—three days after RREEF finalized the site plan that
13  became part of the Macy's Separate Agreement and while the CEQA Litigation was
14  still pending—RREEF's Investment Committee committed $5.5 million to develop
15  the site plan into construction drawings. [TE 788 (April 18, 2016 Investment
16  Committee Memorandum) at 0012; TE 632 (January 17, 2016 Investment
17  Committee Memorandum) at 0012 ("On April 18, 2016, $20.4M was approved for
18  a limited scope that included … the cost to complete construction designs for entire
19  Phase I and II ($5.5M).")]

20  **Rebuttal to ¶ 96**: No disagreement, but *see also infra*, Rebuttal to ¶¶ 193-
21  194 (discussing the rationale and legal impact of RREEF's decision to commit
22  funding).

23  97.    By April of 2016, RREEF had engaged W.E. O'Neil to perform pre-
24  construction services on the project. [TE 788-0016.]

25  **Rebuttal to ¶ 97**: No disagreement.

26  98.    The $5.5 million of capital RREEF's Investment Committee approved
27  in April of 2016 allowed RREEF to complete construction drawings and to go out
28  to bid on gross maximum price (GMP) pricing for the majority of the project in 2016.

[TE 632-0017; RT 203:20–204:24 (Friedl).]

**Rebuttal to ¶ 98**:  No disagreement, but *see also infra*, Rebuttal to ¶¶ 193-
194 (discussing the rationale and legal impact of RREEF's decision to commit
funding).

99.     RREEF intended to seek the balance of the funding for construction
"after construction drawings are complete and tenant demand has been further
validated," and that "[t]here will be more clarity [on the CEQA Litigation] before
needing to expend significant cost on the elements of the Project affected by CEQA."
[TE 788-0012.]

**Rebuttal to ¶ 99**:  No disagreement, but *see also infra*, Rebuttal to ¶¶ 193-
194.

100.   On July 8, 2016—while the CEQA Litigation was pending—RREEF
and Macy's executed the Macy's Separate Agreement for the expansion and
consolidation of the Macy's store.  [TE 1313.]

**Rebuttal to ¶ 100**:  No disagreement.

101.   There is no evidence that the Macy's Separate Agreement would have
been signed earlier but for the pendency of the CEQA Litigation or any conduct by
the Hacienda Parties.

**Rebuttal to ¶ 101**:  The record evidence demonstrates that Macy's would
have entered into the Separate Agreement earlier had the Project not been
delayed by the CEQA Litigation, the settlement negotiations with the
Hacienda Parties and SCMB, and had the City been able to approve site plans
earlier.  *See, e.g.*, TE 73 at 0048:19-0100:19, 0101:2-0105:21, 108:8-22; TE
2086 at 0109-0110; TE 2149; TE 3005 at 0070:19-0071:3, 0100:8-0103:24;
TE 3006 at 0075:21-0115:14; TE 3027 at 0585; TE 3029 at 0242; RT 731:2-
21, 734:13-16, 837:14-838:15; Macy's LOI; *see also infra*, Rebuttal to ¶ 192
(describing Macy's role).

102.   RREEF did not call any witness from Macy's at trial, despite the fact

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

54

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

that Macy's is a co-defendant represented by the same counsel.

**Rebuttal to ¶ 102**:  *See infra,* Rebuttal to ¶ 192.  In addition, while Macy's was a co-defendant on the Hacienda Parties' claims, Macy's did not assert any of the counterclaims against the Hacienda Parties that were the subject of the trial.

103.   Under the terms of the Macy's Separate Agreement, the project was re-phased, with construction of the Northeast Deck and the Macy's expansion and consolidation moved from Phase II to Phase I.  [TE 1313 at 0044–0059 (construction schedule); RT 175:9–17 (Friedl).]

**Rebuttal to ¶ 103**:  No disagreement that the Project was re-sequenced to commence with the construction of the Northeast Deck.  However, the re-sequencing decision happened in the third quarter of 2015.  Tr. 119:11-19 ([W]e had refined our site plan including phasing … in Q3 of 2015.").

104.   On July 26, 2016—while the CEQA Litigation was pending—Peter Cotugno, project executive of RREEF's pre-construction contractor W.E. O'Neil, circulated a construction schedule that included the following:  (1) Wet Utility relocation (which must be done before construction could begin) scheduled for August 29, 2016 to October 26, 2016, and (2) construction of the Northeast Deck beginning November 10, 2016.  [TE 515-0001; RT 207:17–209:23 (Friedl).]

**Rebuttal to ¶ 104**:  The email in Trial Exhibit 515 was not sent on July 26, 2016.  Instead, Mr. Cotugno's first email is dated September 5, 2016.  It references a "7/26 update," but that update is not actually attached to TE 515.  TE 515 at 0002.  In the subsequent email, from September 8, 2016, Mr. Contugno says "[a]ttached is the schedule update based on my review with Dave, Mark and Ricardo today," although the schedule is not attached to TE 515.  *Id.* at 0001.  Mr. Cotugno did however provide a "summary of the revisions" in his email.  *Id.* at 0001-0002.  In addition, Mr. Friedl testified that this schedule ultimately changed.  Tr. 226:3-22.

1    105.    On September 8, 2016—while the CEQA Litigation was pending—Mr.
2    Cotugno circulated an updated project construction schedule that noted, among other
3    things, wet utility relocation had been pushed to January 2, 2017 to accommodate
4    Macy's, and that therefore construction of the Northeast Deck would be pushed to
5    March 13, 2017.  [TE 515-0001.]

6        **Rebuttal to ¶ 105**:  The wet utility relocation was pushed "until after holidays
7        for Macy's."  TE 515 at 0001; *see* Tr. 210:19-211:1.  There is no evidence in
8        the record suggesting that this schedule would have been pushed if RREEF
9        had been allowed to proceed with the Project earlier, rather than having the
10       elongated entitlements process and CEQA Litigation push the start of the
11       Project into the holidays.

12   106.    In December of 2016, the Planning Director "endorsed" RREEF's
13   updated and revised site plan.  [RT 142:14–21 (Friedl).]

14       **Rebuttal to ¶ 106**:  The Planning Director did not endorse the revised site
15       plans.  The Planning Director administratively approved the refined site plans
16       and the *City Council* subsequently endorsed the plans.  TE 2178 at 35:55.

17   107.    On January 17, 2017, RREEF's investment committee approved $174.4
18   million for, among other things, the construction of the parking decks and the
19   Macy's expansion.  [TE 632-0012; TE 2174-0013 ("On January 2017, a $174.4M
20   budget was approved that included … construction of three parking decks with
21   integrated mall access, the construction of a 60k SF expansion to Macy's Women's
22   to relocate Macy's Men's store, the re-tenanting of 60k SF Macy's Men's, a façade
23   renovation of the entire mall, the decommissioning/demo of functionally obsolete
24   GLA of 57k and the addition of 71.5k SF of premium outdoor Village Shops and
25   restaurants."]

26       **Rebuttal to ¶ 107**:  No disagreement.

27   108.    RREEF's Investment Committee approved the $174.4 million to push
28   the project forward even though it believed Sensible Citizens of Manhattan Beach

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

56

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1   would file an appeal of the CEQA Litigation by February 23, 2017.  [TE 632-0017
2   ("While an appeal is likely, DeAM's land use counsel has characterized the suit as
3   having little merit ….").]

4       **Rebuttal to ¶ 108**:  RREEF analyzed the risk of a potential appeal and
5       believed that any appeal would have "little merit" and therefore was willing
6       to approve additional funding for the Project at that time.  TE 632 at 0017.  In
7       particular, RREEF noted the fact that "an injunction to halt construction after
8       a judge's ruling has endorsed an EIR is extremely rare."  *Id.*

9   **F.     THE DIRECTOR WRIT LITIGATION**

10      109.   On February 2, 2017, 3500 Sepulveda filed a verified petition for writ
11  of mandate (the "Director Writ Litigation"), alleging that after the City Council's
12  approval of the RREEF project on December 2, 2014, on December 20, 2016 the
13  Community Development Department Director of the City of Manhattan Beach
14  provided an "information overview of the Site Plan modifications to the City
15  Council" and requested the City Council "Endorse Manhattan Village Shopping
16  Center Enhancement Project Site Plan."  [TE 2042-0006.]

17      **Rebuttal to ¶ 109**:  The Director's Writ Litigation sought to vacate the
18      Community Development Department Director's approval of the refined plan
19      and stop the Project from proceeding.  *See* TE 2042.  However, Mr. Neumann
20      testified that the reason the Hacienda Parties brought the Director's Writ
21      Litigation was because the site plan approved in December 2016 had nine
22      fewer parking spaces as compared to the site plan approved in December 2014
23      by the City Council.  Tr. 442:11-20, 444:7-12.

24      110.   The informal endorsement allegedly violated the Brown Act.  [*Id.*]  In
25  particular, the endorsement materially conflicted with the Conditions of Approval,
26  many of which benefited the Hacienda Building.  [TE 2042-0007.]

27
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

57

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    **Rebuttal to ¶ 110**:  No disagreement that the Hacienda Parties raised these

2    arguments.  RREEF does not agree with any implication that these arguments

3    had merit.

4    111.  The particular issues raised were the endorsement's elimination of

5    "Northbound left turn pockets" [TE 2042:008, ¶36], the elimination of a stairway

6    and elevator on the west side of the parking deck of the North Parking Structure as

7    required by condition 'q' of Section 18.50 of the Master Use Permit Amendment

8    and necessary to provide customer access to the Hacienda Building."  [TE 2042 at

9    0008–0009, ¶37.]

10    **Rebuttal to ¶ 111**:  *See infra,* Rebuttal to ¶¶ 111-112.

11    112.  The endorsement also changed the 90-foot level 2 setback of the North

12    Deck to the Hacienda Building, reducing it to a 44 foot setback.  [*Id.* at ¶38.]  The

13    Endorsement eliminated the City Council's condition "s" of Section 18.50 which

14    required an additional thirty parking spaces shall be provided on the west side of the

15    lower level with pedestrian access to the 3500 Sepulveda Building.  [*Id.* at ¶39.]  The

16    endorsement also eliminated the 10,000 square foot reduction in the Village Shops.

17    [*Id.* at ¶40.]

18    **Rebuttal to ¶¶ 111-112**:  According to Mr. Neumann's testimony, the real

19    reason that the Hacienda Parties filed the Director's Writ Litigation was

20    because of a nine space reduction in the parking spaces available in Lot F.

21    Any other reason for filing the Director's Writ is a pretext.  RT 442:11-20

22    ("Q.  So what prompted the Hacienda [P]arties to file the [Director's Writ

23    Litigation]?  A. … "[I]n Lot F, there was a … reduction of nine spaces.").

24    113.  After the Director Writ Litigation was filed, the City Council conducted

25    a public hearing, properly addressed the modification [TE 2060], and the Director

26    Writ Litigation was dismissed by 3500 Sepulveda. [TE 2061.]

27    **Rebuttal to ¶ 113**:  As discussed in RREEF's FFCL Paragraphs 276-279,

28    RREEF was only required to seek approval from the Planning Commission.

1    But, due to the Hacienda Parties' further appeal of the Planning Commission's

2    approval, RREEF had to also obtain approval from the City Council,

3    extending the process by about three more months.

4    114.   When asked how the Director Writ Litigation impacted the project, Phil

5  Friedl testified that "It just created more uncertainty.  In terms of our ability to move

6  forward, the -- it was just another -- it was just another roadblock."  [RT 143:14–17

7  (Friedl).]

8    **Rebuttal to ¶ 114**:  No disagreement.

9    115.   When asked by the Court specifically what the Director Writ Litigation

10  did "relevant to the work you were doing or hoping to do," Mr. Friedl admitted he

11  wasn't sure:

> 12  Yeah.  And I'm sorry for my hesitancy. I'm just trying to
> 13  put my -- think of the time frame. I don't have a good
> recollection of exactly that -- that -- you know, how that
> 14  writ lawsuit interplayed with what we were doing at the
> time.  We did not -- we did not – around that time, we
> 15  decided to move forward with some of the – some of the
> work that was not directly related to the entitlement. But I
> 16  don't recall the impact.

17  [RT 143:18–144:1 (emphasis added).]

18    **Rebuttal to ¶ 115**:  While Mr. Friedl did not recall the specifics, he testified

19  that RREEF was able to work on items that were not impacted by RREEF's

20  need for entitlements.

> 21  Yeah.  And I'm sorry for my hesitancy. I'm just trying to
> 22  put my -- think of the time frame. I don't have a good
> recollection of exactly that -- that -- you know, how that
> writ lawsuit interplayed with what we were doing at the
> 23  time.  We did not -- we did not – around that time, **we
> 24  decided to move forward with some of the – some of the
> work that was not directly related to the entitlement**.
> 25  But I don't recall the impact.

26  RT 143:18–144:2 (emphasis added).  Mr. Lenhert testified that this included

27  "refreshing" the interior of the mall, renovating the CoCo's building, and

28  doing non-structural façade renovations.  Tr. 71:18-72:19, 830:7-13.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

59

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

116. After further questioning by his counsel, Mr. Friedl testified that RREEF could not submit full construction drawings to the City until the updated site plan was approved by the City in September of 2017. [RT 146:18–148:9.]

**Rebuttal to ¶ 116**: Mr. Friedl testified that, while the Director's Writ Litigation was pending, the City was unable to provide final approval of RREEF's construction plans because the Planning Director's approval of the site plan had been challenged by the Hacienda Parties. Tr. 147:8-12 ("So when you submit your plans -- your actual construction plans for permit, you know, they're checking that against what has been approved by the planning department. So at that point, we did not have -- or at least the planning department's approval was being challenged."). Before the Director's Writ Litigation was filed, RREEF could (and did) submit construction drawings to the City. TE 527 at 0001; Tr. 219:4:7 (Friedl).

117. However, RREEF submitted its plans for Northeast Deck to the City for plan check and permitting on December 27, 2016, two months *before* the Director Writ Litigation was filed. [TE 527-0001; RT 219:4–7 (Friedl).]

**Rebuttal to ¶ 117**: Before the Director's Writ Litigation was filed, RREEF proceeded through the construction process on a normal schedule. This included submitting construction drawings for the Northeast Deck. However, when 3500 Sepulveda filed the Director's Writ Litigation, RREEF decided to go through Planning Commission and City Council approval again, rather than litigate the merits through a time-consuming lawsuit. TE 3012 at 0001-0002; Tr. 79:12-80:13, 144:15-23; *see* RREEF's FFCL ¶¶ 270-281.

118. There is no evidence that the pendency of the Director Writ Litigation delayed the construction of the Project or in any way impacted or interfered with the City's processing of RREEF's building permit application for the Northeast Deck.

**Rebuttal to ¶ 118**: The evidence demonstrates that Director's Writ Litigation delayed the Project because RREEF was forced to choose between: (a)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

60

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    fighting the lawsuit; or (b) returning to the Planning Commission and City

2    Council to seek approvals that were only necessary because of the Director's

3    Writ Litigation. TE 3012 at 0001-0002; Tr. 79:12-80:13, 144:15-23. Before

4    the City had approved the amended MUP, RREEF was unable to receive final

5    permits and begin construction. Tr. 79:12-80:6, 146:19-147:16; Tr. 147:25-

6    148:9. However, shortly after the Director's Writ Litigation was resolved,

7    RREEF was able to begin construction. Tr. 51:16-20.

8    119.   To the contrary, on May 17, 2017—while the Director Writ Litigation

9    was pending—the City provided the first round of comments on the Northeast Deck

10   permit application. [TE 527-0001; RT 219:13–220:11 (Friedl).]

11   **Rebuttal to ¶ 119**:  No disagreement.

12   120.   On July 17, 2017—while the Director Writ Litigation was pending—

13   the City provided a second round of comments of the Northeast Deck permit

14   application. [TE 527-0001; RT 219:18–220:11 (Friedl).]

15   **Rebuttal to ¶ 120**:  No disagreement.

16   121.   The City's second round of comments on the Northeast Deck permit

17   application caused confusion because RREEF believed that the City had given all of

18   its comments on May 17, 2017. [TE 527-0001; RT 219:18–220:11 (Friedl).]

19   **Rebuttal to ¶ 121**:  No disagreement.

20   122.   On August 2, 2017—while the Director Writ Litigation was pending—

21   RREEF made its first submission for the Northeast Deck partial grading and utilities

22   permits, and paid for expedited review (3 week review time). [TE 527-001.]

23   **Rebuttal to ¶ 122**:  No disagreement.

24   123.   On August 15, 2017—while the Director Writ Litigation was

25   pending—the City provided the first round of comments on the Northeast Deck

26   partial grading and utilities permit applications. [*Id.*]

27   **Rebuttal to ¶ 123**:  No disagreement.

28   124.   On August 23, 2017—while the Director Writ Litigation was

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

61

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1  pending—RREEF made its first resubmission of the full Northeast Deck building

2  permit application (with expedited review paid for), along with its first resubmission

3  of the Northeast Deck partial grading and utilities permit applications.  [TE 527-

4  0001.]

5    **Rebuttal to ¶ 124**:  No disagreement.

6    125.   As of September 20, 2017, RREEF had not yet heard from the City in

7  response to its resubmissions of the full Northeast Deck permit application or the

8  Northeast Deck partial grading and utilities permit applications.  [TE 527-0001.]

9    **Rebuttal to ¶ 125**:  No disagreement.

10    126.   The City's delay in permitting the Northeast Deck was a major source

11  of frustration for RREEF.  [RT 221:22–222:4 (Friedl).]

12    **Rebuttal to ¶ 126**:  *See infra,* Rebuttal to ¶¶ 195-196 (discussing legal effect

13    of city-caused delays).

14    127.   On September 29, 2017, Mr. Friedl emailed the Mayor of Manhattan

15  Beach, David Lessor, and City Council member Montgomery, expressing his

16  frustration with City-caused delays:

17    I'm sorry for the need to continually bring these concerns
18    to you but you should be aware that we were advised this
      week by Macy's that due to our current pad delivery
19    schedule they've missed the window for a 2018 holiday
      opening of their expanded store. I'm meeting with Macy's
20    real estate executives on Monday in the hopes of
      convincing them to stay the course for a 2018 opening, but
21    at this time, we still don't have certainty on when we will
      be able to start construction on the Northeast Parking
22    Structure and we are not able to convey with certainty a
      pad delivery date to Macy's.

23    We acknowledge that there have been improvements and
24    appreciate that the City has recently undertaken initiatives
      to assist in expediting the process, but we continue to be
25    challenged with and severely impacted by issues of staff
      miscommunication, coordination and availability. Again
26    this week, due to last minute changing requirements in the
      process and a key Wildan plan checker being unavailable,
27    we've had to stand down our grading operation that was
      all set to start on Monday 10/2. This after months of
28    communications, high level meetings with the Mayor and
      staff and many discussion about the critical nature of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

62

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

> meeting a Macy's schedule. Please help us solve these kinds of unnecessary but very costly delays before we see other critical dates slip!

[TE 518 at 0001–0002; RT 221:22–223:15 (Friedl).]

**Rebuttal to ¶ 127:**  No disagreement.

128.  The City's Planning Department caused RREEF costly delays.  [RT 223:13–15.]

**Rebuttal to ¶ 128:**  *See infra,* Rebuttal to ¶¶ 195-196 (discussing legal effect of city-caused delays).

129.  In a January 2019 memorandum to its Investment Committee, RREEF stated that the project had incurred $67.6 million in additional future costs due to the following:

> Due to both external and internal impacts that will be explained further in this memo, the project has incurred $67.6 mm in additional future costs. **The increase in costs are attributed to a new signature restaurant build-out, owner driven scope changes, the City of Manhattan Beach's ("CMB") additional requirements to the project, and additional contingencies**.

[TE 2174-0036 (emphasis added).]

**Rebuttal to ¶ 129:**  No disagreement.  However, based upon Mr. Bones's analysis, the cost of the scope changes would have been less if incurred earlier. *See* RREEF'S FFCL ¶¶ 286-293 (discussing cost escalation).

130.  RREEF specifically attributed $29,820,285 in additional costs to delays caused by the City:

> *City of Manhattan Beach Additional Requirements/Conditions of Approval - $29,820,285*
> The cost and schedule impacts directly related to The City of Manhattan Beach's additional requirements and their extreme interpretations of the Conditions of Approval ("COA'') have been detrimental to the execution of the project. The 2014 entitlements for MVSC include 56 COA's that at best can be described as guidelines for the redevelopment. CMB has chosen to take the most stringent and least commercial interpretation of these COA's, resulting in additional costs to the project as well as a schedule delay, mostly due to delay in issuance of building

permits. . . . Speaking of which, another major impact to the project has been the CMB's inability to process building permits in an organized and timely manner. Typically a construction documents will go through 2-3 rounds of plan check before a permit is issued. CMB routinely takes 3-5 rounds to complete plan check, and usually has conflicting comments from different department heads. This disorganization and lack of internal management has pushed back overall schedule by 8 months and has had a $671k architectural and engineering delay cost impact on the project so far, with another $387k allocated for general contractor general conditions delay cost impact.

[TE 2174-0039.]

**Rebuttal to ¶ 130:**  No disagreement.  However, based upon Mr. Bones's analysis, the cost of the additional requirements/conditions of approval would have been less if incurred earlier.  *See* RREEF'S FFCL ¶¶ 286-293 (discussing cost escalation).

131.  In that same memorandum, RREEF noted that "the team is in negotiations with the development manager, JLL Project Development Service, to recoup development fees for budgeting and design errors experienced to date."  [TE 2174-0040.]

**Rebuttal to ¶ 131:**  No disagreement.  However, based upon Mr. Bones's analysis, the cost of the budgeting and design errors would have been less if incurred earlier.  *See* RREEF's FFCL ¶¶ 286-293 (discussing cost escalation); *see also* Rebuttal to ¶¶ 185, 186, 187 (under substantial factor causation, a defendant need not be the sole cause of damages experienced by a plaintiff).

132.  RREEF's January 2019 Investment Committee memorandum does not mention the Hacienda Parties, 3500 Sepulveda, or Mark Neumann, or otherwise attribute delay or increased project costs to them.  [*See* TE 2174 at 0034–0041.]

**Rebuttal to ¶ 132:**  The January 2019 Investment Committee memorandum (which is an exhibit to an August 5, 2019 memorandum) focuses on "$67.6 mm in additional future costs" that were anticipated at that time (*i.e.*, after the Project had been under construction for over one year).  TE 2174 at 0035.  The

1  memorandum does not have a retrospective focus on the entitlements phase,

2  the CEQA Litigation or the Director Writ Litigation.  *Id.*.  Thus, it is

3  unsurprising that the Hacienda Parties are not mentioned.  In addition, given

4  the forward-looking nature of the memorandum, it is not surprising that the

5  memorandum does not arbitrarily asses the impacts of construction cost

6  escalation in a hypothetical world in which the Project began years earlier.

7  And based upon Mr. Bones's analysis, the cost of the work contemplated in

8  this January 2019 memorandum would have been less if incurred earlier.  *See*

9  RREEF's FFCL ¶¶ 286-293 (discussing cost escalation).

10 **G.    RREEF'S EXPERT TESTIMONY ON DAMAGES**

11 133.    RREEF put on its damages testimony through its expert David Bones.

12 Mr. Bones assumed that the Hacienda Parties breached the Settlement Agreement

13 and delayed RREEF's project and that this resulted in two types of damages: (1)

14 increased construction costs for the Project; and (2) lost profits due to delays in

15 leasing spaces in the mall.  [Tr. 301:16–302:5 (Bones).]

16 **Rebuttal to ¶ 133:**  Mr. Bones acknowledged that he was not offering any

17 opinions on "liability regarding who caused which delays." Tr. 302:19-303:1.

18 However, "it is well established that experts on damages can assume

19 causation."  *Indect USA Corp. v. Park Assist, LLC*, 2021 WL 4311002, at *3

20 (S.D. Cal. Sept. 22, 2021); *see also Siqueiros v. Gen. Motors LLC*, 2022 WL

21 74182, at *10 (N.D. Cal. Jan. 7, 2022) (holding that damages experts are

22 "entitled to *assume* liability in order to model the damages") (emphasis in

23 original); *Orthofix Inc. v. Gordon*, 2016 WL 1273160, at *3 (C.D. Ill. Mar. 1,

24 2016) ("It is entirely appropriate for a damages expert to assume liability for

25 the purposes of his or her opinion.  To hold otherwise would be illogical.")

26 (citation omitted); *Gaedeke Holdings VII, Ltd. v. Baker*, 2015 WL 11570978,

27 at *3 (W.D. Okla. Nov. 30, 2015) ("Proof of causation often comes from fact

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

65

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

witnesses, and it is appropriate for expert witnesses to assume causation will be established and then proceed to calculate the damages.").

134.   The Hacienda Parties put on rebuttal testimony through expert witness Christian Tregillis.  Mr. Tregillis lives near the Manhattan Village Shopping Center and is very familiar with Center and the Project.  [RT 580:8–581:6 (Tregillis).]

**Rebuttal to ¶ 134:**  Mr. Tregillis is familiar with the Shopping Center and the Project through his "personal" visits to the Shopping Center over time, including to eat and shop.  Tr. 580:8-581:6.

135.   Mr. Bones assumed three separate periods of delay: (1) January 2015-January 2016 (12 months) due to delays allegedly caused by the Hacienda parties in the entitlement process; (2) January 2016–2017 (12 months) due to delays allegedly caused by a third party CEQA lawsuit; and (3) January to September of 2017 due to delays allegedly caused by a writ filed by the Hacienda Parties.  The total period of alleged delay is 32 months.  [Tr. 306:17–308:2 (Bones).]

**Rebuttal to ¶ 135:**  Mr. Bones identified three delay periods that do not match the periods proposed by the Hacienda Parties.  The first delay period (June 2012 – December 2014) encompasses the delay RREEF experienced during the entitlements phase. TE 2067 at 0008; Tr. 306:18-307:5. The second delay period (December 2014 – December 2016) encompasses the delay RREEF experienced during the CEQA Litigation.  TE 2067 at 0009; Tr. 307:15-21. The third delay period (February 2017 – September 2017) encompasses the delay RREEF experienced during the Director's Writ Litigation.  TE 2067 at 0009-0010; Tr. 307:22-308:2.  However, Mr. Bones assumed that the Project would have taken some time to obtain entitlements in the normal course and that pre-construction work would have taken approximately a year.  Tr. 306:17-307:21.  To reflect these assumptions, Mr. Bones only estimated damages for a total of twelve months during each of the first and second delay

1    periods, rather than the entirety of those periods. *Id.* Thus, in total, the delay

2    periods span thirty-two months. Tr. 308:12-16, 308:25-309:7.

3    136. Mr. Bones assumed that, absent the delay allegedly caused by the

4    Hacienda Parties, construction on the Project would have begun in January of 2015,

5    but it actually began in September of 2017. [Tr. 308:3–309:7 (Bones).]

6    **Rebuttal to ¶ 136:** No disagreement.

7    137. In response to the Court's question, Mr. Bones conceded that he did not

8    make any attempt to determine what actual delays should count and what shouldn't

9    count. [RT 327:5–12 (Bones).]

10    **Rebuttal to ¶ 137:** *See infra,* Rebuttal to ¶¶ 137-138.

11    138. Mr. Bones made no attempt to link any of the Hacienda Parties' actions

12    to the alleged delay he attributed to them, or to separate them from other issues that

13    delayed the Project (e.g., issues with Macy's). [RT 582:13–585:17, 623:8–625:19

14    (Tregillis).]

15    **Rebuttal to ¶¶ 137-138:** Mr. Bones did not determine "who's at fault for

16    which delays," because he assumed that the Hacienda Parties caused the

17    delays. Tr. 302:19-303:1, 327:5-12. As previously discussed, it is well-

18    established that damages experts may assume causation. *See supra*, Rebuttal

19    to ¶ 133 (citing *Siqueiros*, 2022 WL 74182, at \*10; *Indect USA Corp.*, 2021

20    WL 4311002, at \*3; *Orthofix Inc.*, 2016 WL 1273160, at \*3; *Gaedeke*

21    *Holdings VII, Ltd.*, 2015 WL 11570978, at \*3).

22    139. Mr. Bones calculated both categories of damages (increased

23    construction costs and lost profits) for each of these three periods. [RT 355:5–15

24    (Bones).]

25    **Rebuttal to ¶ 139:** No disagreement.

26    **1.    Increased Constructions Costs Analysis**

27    140. In calculating construction delay damages, Mr. Bones started with

28    RREEF's actual project expenditures and calculated what they would have been at

1   earlier periods in time if construction costs followed an inflationary index known as

2   the Turner Index.  [RT 363:20–364:1; 365:18–23 (Bones).]

3   **Rebuttal to ¶ 140:**  Mr. Bones did not analyze RREEF's full "project

4   expenditures."  Instead, he only analyzed RREEF's hard costs spent on

5   construction (meaning the direct costs of construction, such as building

6   materials, utility relocation, and signage).  TE 2111 at 0012; Tr. 310:7-22.  If

7   Mr. Bones had included other elements of RREEF's project expenditures,

8   such as soft costs and leasing costs, Mr. Bones estimated that RREEF's

9   damages would have increased by approximately $5 million.  Tr. 311:8-312:6.

10  In addition, beyond the Turner Index, Mr. Bones separately used the

11  Engineering News Record Construction Cost Index ("ENR Index") to

12  determine the impacts of inflation on RREEF's project expenditures.  TE 2111

13  at 0061-0065; Tr. 312:23-319:23.

14  141.  Mr. Bones assumed inflation for the Project would track the Turner

15  Index.  However, the Turner Index is a national – not local – index.  Mr. Bones does

16  not know who prepares the Turner Index, what cities are encompassed in the Turner

17  Index or whether there are size restrictions for the projects that are analyzed to

18  prepare the Turner Index.  [RT 364:5–365:4 (Bones).]

19  **Rebuttal to ¶ 141:**  As previously discussed, Mr. Bones analyzed

20  construction cost escalation damages using both the Turner Index and ENR

21  Index.  TE 2111 at 0061-0065; Tr. 312:23-319:23.  However, he determined

22  that the Turner Index was more appropriate for this case, because it is an

23  "output index" that measures not only labor rates and material prices, but also

24  things like productivity and the competitive condition of the marketplace.  TE

25  2067 at 0019; Tr. 312:23-313:15, 313:25-314:5.  At trial, in responding to

26  questioning on cross-examination, Mr. Bones testified that, with regard to the

27  Turner Index, he could look up information like the cities included in the index

28  or the minimum and maximum size parameters of the index, but that he did

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

68

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    not specifically remember that information while testifying.  Tr. 364:5-16.  In

2    addition, Mr. Bones acknowledged that he was estimating the inflationary

3    increases based on a national average, but that Los Angeles is "one of the most

4    expensive markets to build in."  Tr. 366:3-10.

5    142.  Mr. Bones never spoke to any architect, engineer, contractor or

6    subcontractor who was involved with the Project and was not familiar with the

7    bidding process for the Project.  He did not ask any of the professionals that worked

8    on the Project if they would have charged less if construction began at an earlier

9    time.  Mr. Bones explained: "I did not speak with those folks on the ground, no."

10   [RT 356:4–357:20 (Bones).]

11   **Rebuttal to ¶ 142:**  Mr. Bones did speak with representatives Jones Lang

12   LaSalle ("JLL"), RREEF's construction and leasing manager, regarding

13   "what they were seeing as it relates to construction costs, inflation, escalation

14   issues, on the ground, the general leasing environment of what had changed

15   kind of pre- and post-COVID in terms of getting better context about the

16   demand for the space and lease rates, those types of things."  Tr. 305:24-

17   306:16.

18   143.  Mr. Bones acknowledged that the contracts for the Project were

19   guaranteed maximum price contract ("GMP Contracts"), including a contract

20   between RREEF and W.E. O'Neill Construction Company.  Despite several

21   questions from the court, Mr. Bones could not explain whether this GMP contract

22   increased in price due to the passage of time.  [RT 357:21–361:12 (Bones).]

23   **Rebuttal to ¶ 143:**  *See infra,* Rebuttal to ¶¶ 143-144.

24   144.  Mr. Bones did no analysis of whether GMP contracts would actually

25   have been less expensive had they been signed earlier.  Once a GMP contract is

26   signed, it should not be impacted by inflation.  [RT 609:2–610:10 (Tregillis).]

27   **Rebuttal to ¶¶ 143-144:**  As Mr. Bones explained, a GMP Contract is not a

28   "fixed price" contract; rather it sets a cap on certain aspects of a construction

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

69

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    project.   Tr. 375:11-22; *see also* Tr. 620:3-24 (Mr. Tregillis concurring).

2    Within that cap, the price a developer could pay to a contractor can fluctuate.

3    Tr. 620:19-621:5.  In addition, there were numerous exclusions for aspects of

4    the Project that, as a result of the exclusions, were not covered by guaranteed

5    maximum pricing. TE 633 at 0123-0129; Tr. 621:24-623:7.  In addition, when

6    analyzing RREEF's payments for construction, Mr. Bones found no evidence

7    that RREEF had actually hit a cap established by a GMP Contract, Tr. 375:11-

8    376:7, meaning that the existence of any GMP Contract cap can logically have

9    had no impact on the cost escalation damages analysis.

10    145.   There were scope changes and possibly delays after September of 2017

11   which were not caused by the Hacienda Parties.  [RT 361:17–362:16 (Bones).]

12    **Rebuttal to ¶ 145:**  As to scope changes, the Hacienda Parties presented no

13    evidence that those changes were not equally impacted by inflationary effects

14    as compared to the original scope of the Project.  In other words, there is no

15    evidence in the record that scope changes implemented after September 2017

16    would have cost the same or more if they had been implemented before

17    September 2017, indicating that RREEF experienced damage in the form of

18    construction cost escalation with regard to such scope changes as a result of

19    delays to the start of the Project.  In addition, with regard to delays after

20    September 2017, Mr. Bones testified that there "may have been other" delays

21    that occurred, but not any "significant delays." Tr. 361:17-362:6.

22    146.   Mr. Tregillis's testimony established that the methodology employed

23   by Mr. Bones was speculative and unreliable.  Mr. Tregillis did not perform an

24   independent calculation relating to alleged increased construction costs.

25    **Rebuttal to ¶ 146:**  Mr. Tregillis leveled no significant criticisms against Mr.

26    Bones's construction cost escalation methodology.  *See* TE 1213 at 0034-

27    0036.  Mr. Tregillis did argue that Mr. Bones's use of a quarterly index may

28    have improperly increased Mr. Bones's cost escalation damages due to the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

70

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

fact the damages period was only thirty-two, rather than thirty-three, months (reflecting slightly less than eleven full quarters). *Id.* at 0035; Tr. 618:6-15. However, Mr. Tregillis testified that this allegedly improper increase might be around a 3% impact on cost escalation damages, meaning approximately $575,000 out of Mr. Bones's $19.1 million total cost escalation damages estimate. Tr. 618:21-619:4. This alleged 3% impact is outweighed by other conservative choices in Mr. Bones's cost escalation damages calculation, including the exclusion of soft and leasing costs and exclusion of hard costs incurred by RREEF after September 2021. Tr. 311:8-312:6, 312:17-22. Mr. Tregillis did not offer any independent calculation of increased construction costs stemming from delays to the start of the Project, nor did he deny that delays resulted in increased construction costs. The record does not support any purported finding that Mr. Bones's cost escalation damages methodology was "speculative" or "unreliable."

## 2.    Lost Profits Analysis

147.    In determining RREEF's lost profits from the delays allegedly caused by the Hacienda Parties, Mr. Bones took RREEF's actual net operating income ("NOI") for the shopping center for each year and moved it backwards in time to account for the delay. For example, for the 12 months attributable to the CEQA litigation, he took the 2020 NOI and moved it back to 2019. He used projections from an appraisal prepared by a company called Duff & Phelps to do this for future years. To determine total lost profits, he calculated the difference between the actual financial results and the results when he moved the yearly NOIs back in time. [RT 331:10–336:4 (Bones).]

**Rebuttal to ¶ 147:** With regard to the Mr. Bones's data use, Mr. Bones used RREEF's actual financial results from 2016 through August 2021. Tr. 338:4-17. He then used the first eight months of 2021 to annualize an estimate for the remainder of the 2021 year, and used projections starting in January 2022.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

71

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1   TE 2111 at 0008-0009; Tr. 338:4-17.  Mr. Bones's methodology also took

2   into account capital outlay mitigation, and the fact that RREEF made certain

3   capital expenditures later in time than it otherwise would have without the

4   delays.  TE 2111 at 0007, 0050-0057; Tr. 340:10-343:1.  Specifically, Mr.

5   Bones assumed that RREEF would have been able to reallocate 100% of the

6   monies it otherwise would have expended on the Project to other investments

7   as it waited for the delays to the Project to resolve.  Tr. 341:11-342:1.

8      148.   Although Mr. Bones relied on the appraisal from Duff & Phelps for

9   financial projections, the appraisal itself was not introduced into evidence and Mr.

10  Bones never spoke to anyone at Duff & Phelps about the appraisal.  [RT 375:6–10

11  (Bones).]

12     **Rebuttal to ¶ 148:**  Mr. Bones tested the reliability of the Duff & Phelps

13     projections by comparing actual late-2021 and 2022 financial data from

14     RREEF with the projections.   He determined that the Duff & Phelps

15     projections were understated, which indicates that the projections were

16     conservative.  Tr. 348:10-349:8.  Indeed, both Mr. Bones and Mr. Tregillis

17     acknowledged that, if Mr. Bones had used RREEF's actual financial results

18     from 2021 and 2022, rather than projections, RREEF's damages would have

19     been higher.  Tr. 349:9-13; Tr. 647:16-20.  Moreover, the reliability of the

20     Duff & Phelps projections is bolstered by the fact that it was prepared "in the

21     ordinary course of business and not for the purpose of litigation" and due to

22     the fact that it was an appraisal designed to be used by "sophisticated

23     institutions, like lenders, to determine their collateral base and risk."  Tr.

24     374:14-375:2; *see also* Tr. 601:24-602:1  ("THE COURT: So Duff & Phelps

25     created this as – to provide advice to potential investors?  [MR. TREGILLIS]:

26     That's right.").  In addition, although the Duff & Phelps appraisal containing

27     the projections was available to the Hacienda Parties' counsel, the Hacienda

28     Parties' expert, Mr. Tregillis, never reviewed the appraisal.  Tr. 644:3-22.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

72

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1      149.   Mr. Bones believed that construction on the Project should have been

2  completed in 2019 but actually was completed in late 2021 or early 2022.  Mr. Bones

3  confirmed that average lease rates increased from $2.50 per square foot in 2019 to

4  $2.90 in the fourth quarter of 2021.  Leases entered into in 2021 could be more

5  valuable than leases entered into in 2019. [RT 368:1–25 (Bones).]

6      **Rebuttal to ¶ 149:**  *See infra,* Rebuttal to ¶¶ 149-150.

7      150.   Mr. Bones did not do a lease by lease analysis of the Manhattan Village

8  Shopping Center in determining lost profits.  Mr. Bones is not aware of any space

9  within the shopping center that would be leased if the project were completed in

10  2019 but is not leased now.   [RT 369:7–16 (Bones).]

11      **Rebuttal to ¶¶ 149-150:**  Mr. Bones agreed that the average Los Angeles

12  County rent per square foot per month in 2019 was about $2.50 and the

13  average Los Angeles County rent per square foot per month in the second

14  quarter of 2021 was closer to $2.90 per square foot. Tr. 368:4-18. Mr. Bones

15  also stated that he had not "made that specific of an opinion" as to whether

16  any specific space at the Shopping Center would have been currently leased

17  if the Project finished in 2019 but is not currently leased now. Tr. 369:11-16.

18  However, the overall goals of the Project included adding 130,000 square feet

19  of new retail space to the Shopping Center to lease out to new tenants, all of

20  such rent was missed out on while the Project was delayed. TE 632 at 0014-

21  0015, 0019; Tr. 329:19-331:9, 643:14-17.  In addition, the Project also aimed

22  to increase the overall Shopping Center from an A-/B class center to an A/A+

23  center, thereby substantially increasing rents across the Shopping Center.  TE

24  632 at 0019; TE 788 at 0013; Tr. 329:19-331:9.   Indeed, as Mr. Bones

25  testified, the goal was to improve the Shopping Center to move its leases from

26  around $30 per square foot pear year (*i.e.*, $2.50 per square foot per month) to

27  around $50 to $60 per square foot (*i.e.*, $4.17 or $5 per square foot per month),

28  so "that functional operational shift is mountains compared to" the minor

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

73

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1   annual increases in rent.   Tr. 369:17-370:7; *see also* TE 632 at 0045

2   (comparable rents for improved mall targeted between $50 and $72 per square

3   foot per year).   Thus, RREEF also suffered damages by being denied the

4   ability to charge $20 to $30 per square foot more while the Project was

5   delayed.

6   151.   The net operating income for the Manhattan Village Shopping Center

7   decreased by about $3.5 million in 2020 as a result of COVID.  [RT 371:19–372:9

8   (Bones).]

9   **Rebuttal to ¶ 151:**  *See infra,* Rebuttal to ¶¶ 151-152.

10  152.   If the project had been completed in 2019 and new leases had been

11  signed then, Mr. Bones has no way of knowing how many of those new leases would

12  have defaulted due to COVID.   [RT 372:23–373:6 (Bones).]

13  **Rebuttal to ¶¶ 151-152:**  Mr. Bones conservatively accounted for the impacts

14  of COVID by shifting back RREEF's actual, impacted NOI from 2020 to

15  2019.  Tr. 334:4-335:6, 349:14-350:10.  This wholesale shifting back of the

16  impacts of COVID into 2019 had the impact of lowering Mr. Bones's estimate

17  of RREEF's damages.  Tr. 350:7-10, 352:11-353:10, 636:23-637:3 ("Q. And

18  we just talked about the fact that moving COVID-related expenses backwards

19  actually lowered damages; right?  [Mr. Tregillis:] … [T]hat's right.").

20  With regard to the potential impact on the rate of defaults if the Project

21  had been completed in 2019, Mr. Bones explained that, if the Project had been

22  completed in 2019, there would have been more leases, higher lease rates, and

23  the potential for some additional rent abatement.  Tr. 373:1-11.  Mr. Bones

24  further noted that the record reflected that lease defaults were not a major issue

25  at the Shopping Center during the COVID pandemic.  *Id.* ("But it was

26  interesting to me in the Duff & Phelps appraisal that they were specifically

27  talking about the fact that tenants hadn't defaulted."); *see also id.* 371: 9-18

28  ("So overall, it had actually been pretty stable with those tenants [at the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

74

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    Shopping Center] in COVID."). Mr. Tregillis admitted that he did not

2    determine whether any retailer would have been evicted if it had taken

3    possession of its space in the Shopping Center earlier in time. Tr. 648:8-16.

4    Mr. Tregillis also did not determine if there were any evictions at the Shopping

5    Center whatsoever as a result of COVID. Tr. 648:17-20.

6    153. Mr. Tregillis opined that it was factually incorrect to assume that

7    RREEF's financial results would have shifted back in time absent the delays

8    allegedly caused by the Hacienda Parties. For example, you cannot take a lease

9    signed in 2020, move it back 32 months and assume the lease rate would have been

10   the same. Attributing one year's NOI to an earlier year is inconsistent with real

11   world facts. [RT 587:10–595:17 (Tregillis).]

12   **Rebuttal to ¶ 153:** Damages need only be calculated with "reasonable

13   certainty," based upon a "reasonable basis of computation." *Workplace

14   Technologies Research, Inc. v. Project Management Institute, Inc.*, 2021 WL

15   4895977, at *16-17 (S.D. Cal. Oct. 20, 2021) (citation omitted); *Pet Food Exp.

16   Ltd. v. Royal Canin USA, Inc.*, 2011 WL 6140874, at *5 (N.D. Cal. Dec. 8,

17   2011) (amount of damages must be established with "reasonable certainty …

18   mathematical precision is not required") (citations omitted); *GHK Associates

19   v. Mayer Grp.*, 224 Cal. App. 3d 856, 873 (1990) (citation omitted). Mr.

20   Bones's focused on the overall earnings capacity of the Shopping Center

21   before and after the Project. Tr. 331:10-332:18, 350:11-351:14, 370:13-

22   371:8. By shifting actual and projected earnings back in time, he created a

23   reasonable approximation of the damages RREEF experienced as a result of

24   the impacts of time value of money caused by the delays. Tr. 332:6-16,

25   370:13-23. In addition, he avoided the conjecture and speculation required to

26   create a lease-by-lease analysis, as suggested by Mr. Tregillis. Tr. 350:11-

27   351:6.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

75

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

154.   RREEF's NOI for the Shopping Center decreased every year from 2016–2020.  Advancing those declines to earlier periods in time would have been worse for RREEF, not better.  Doing so results in negative damages.  [RT 591:7–598:8 (Tregillis).]

**Rebuttal to ¶ 155:**  *See infra,* Rebuttal to ¶¶ 154-156.

155.   The only positive damages from Mr. Bones' time-shift lost profits analysis came from the future unsupported projections from the Duff & Phelps appraisal.  For the years with actual data, the damages were negative.  [RT 600:17–601:23 (Tregillis).]

**Rebuttal to ¶ 155:**  *See infra,* Rebuttal to ¶¶ 154- 156.

156.   Retail has been trending in a negative direction so overly positive projections from Duff & Phelps are highly questionable.  Inadequate parking and competition from online shopping will also be problems with RREEF meeting projections.  [RT 603:19–605:18 (Tregillis).]

> **Rebuttal to ¶¶ 154- 156.**  Mr. Tregillis's claim of "negative damages" for the years 2016 to 2020 is highly misleading.  By focusing only on that period, Mr. Tregillis cut off the years in which the mall actually began opening its expanded and improved retail spaces.  In other words, Mr. Tregillis's assertion reduces to the fact that Shopping Center, in its pre-Project state between 2016 and 2020, was in a declining pattern, which is consistent with RREEF's desire to renovate and improve the Shopping Center.  The projections and actual financial results from RREEF from late-2021 and 2022 show rapidly increasing NOI as the revitalized Shopping Center opened, which is again consistent with the goals of the Project.  *See, e.g.*, TE 2111 at 0051, 0053, 0055; Tr. 348:10-349:8.  Mr. Tregillis's characterization of "negative damages" for the 2016-2020 period is also a result of Mr. Bones's conservative decision to incorporate and shift back all of the impacts of COVID, rather than trying to make adjustments to separate out those impacts.

1   Tr. 331:22-332:18 ("[MR. BONES:]  I had the option of creating a …
2   hypothetical world and making adjustments for – you know, excluding
3   impacts from COVID … which would have resulted in more damages.").  In
4   sum, as the Court stated at trial, it is "counterintuitive" to suggest that delaying
5   RREEF's ability to lease out 130,000 square feet of new space and to achieve
6   higher rents was actually a benefit to RREEF.  Tr. 613:21.

7       In addition, the Duff & Phelps appraisal was not "unsupported" or
8   "questionable."  Indeed, as previously discussed, Mr. Bones's testing of the
9   projections contained in the Duff & Phelps appraisal against RREEF's actual
10  financial results demonstrated that the projections were understated and
11  therefore conservative.  Tr. 348:10-349:8.  Moreover, the Duff & Phelps
12  appraisal was a document prepared "in the ordinary course of business and
13  not for the purpose of litigation" and was designed to be used by
14  "sophisticated institutions, like lenders, to determine their collateral base and
15  risk."  Tr. 374:14-375:2; *see also* Tr. 601:24-602:1.  Thus, there is no support
16  for the assumption that RREEF would not meet projections, as the evidence
17  actually demonstrates that RREEF *exceeded* the projections.  Tr. 348:10-
18  349:8. Moreover, although Mr. Tregillis contended that parking could impact
19  the Shopping Center's success, he admitted that he did not quantify any
20  purported financial impact of his perception that the Shopping Center has a
21  "parking problem."  Tr. 650:2-8.

22  157.  Lease rates rose from 2016 to the fourth quarter of 2021 so signing
23  leases in 2021 was better for RREEF than signing eases in 2019.  [RT 592:9–593:16
24  (Tregillis).]

25  **Rebuttal to ¶ 157:**  As previously discussed, the focus on minor increases in
26  Los Angeles County rents between 2016 and 2021 ignores both (a) the loss of
27  revenues from the new space within the Shopping Center that RREEF was
28  delayed in building and renting; and (b) the additional $20 or $30 per square

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

77

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

foot per year that RREEF hoped to increase its rents by as a result of improving the overall quality of the Shopping Center. TE 632 at 0014-0015, 0019; Tr. 329:19-331:9, 369:17-370:7, 643:14-17. Moreover, Mr. Tregillis provided testimony that casts doubt on the assertion that rents rose between 2016 and 2021 at the Shopping Center – particularly Mr. Tregillis's assertion that competition from other nearby retail centers depressed rents at the Shopping Center. Tr. 640:12-643:5. Further, an August 2019 investment committee memorandum indicated that approximately 73% of the new retail space had either executed leases or were in "lease negotiation" or "LOI negotiation." TE 2174 at 0020. Additionally, 94% of the total available retail space was either signed or in active negotiation by August 2019, negating the impact of any rent increases thereafter. *Id.*

158. To determine whether RREEF actually lost profits as the result of delays allegedly caused by the Hacienda Parties, you would need to do a lease by lease analysis. This would include looking at existing leases to determine whether they would be higher had they been signed earlier and vacant spaces to determine if they would be under lease if the Project had finished earlier. Mr. Tregillis was unaware of any evidence that there was a single lease that would be more favorable if not for the Hacienda Parties' conduct or a single vacant space that would leased if not for the Hacienda Parties' conduct. There is no evidence that the Hacienda Parties damaged the current or future performance of the Shopping Center. [RT 598:11–599:18 (Tregillis).]

**Rebuttal to ¶ 158:** As Mr. Bones explained, Mr. Tregillis's proposed "lease-by-lease" damages methodology would require substantial conjecture and speculation as a result of trying to create hypothetical leases. Tr. 350:11-351:6. As Mr. Bones summarized, that proposed methodology creates a "perception of a false level of precision." *Id.* at 350:11-21.

159.    RREEF was likely better off signing up tenants in 2021 than 2019 because COVID might have left many of those tenants unable to pay rent.  If RREEF signed a significant number of new leases in 2019, there is no way to know how many of the new tenants would have defaulted due to COVID.   [RT 599:24–600:9, 605:19–607:13 (Tregillis).]

**Rebuttal to ¶ 159:**  As discussed above, there is no evidence that any tenant at the Shopping Center would have been evicted if it had taken possession of its space in the Shopping Center earlier in time.  *See* Tr. 648:8-16.  In fact, Mr. Tregillis did not determine if there were any evictions at the Shopping Center whatsoever as a result of COVID.  Tr. 648:17-20.  Indeed, the evidence in the record indicates that evictions during COVID were not a significant problem at the Shopping Center.  Tr. 371:9-18 ("[Duff & Phelps] said that the tenant – the vast majority of tenants had been able to fulfill their leases.  I can't remember if it said no or few had defaulted.  There had been some rent abatements, but they didn't expect that going forward.  So overall, it had actually been pretty stable with those tenants in COVID."), 373:1-11.

## IV.    THE HACIENDA PARTIES'S PROPOSED CONCLUSIONS OF LAW AND RREEF'S REBUTTALS

160.    To establish a breach of contract, RREEF must show (1) the existence of the contract, (2) RREEF's performance or excuse for nonperformance, (3) the Hacienda Parties' breach, and (4) the resulting damages to RREEF.

**Rebuttal to ¶ 160**:  No disagreement.

## A.    CONTRACT INTERPRETATION—MATERIAL ALTERATIONS

161.    The Settlement Agreement permitted the Hacienda Parties to object and to comment on material deviations to the Site Plan for the MVSC Project that detrimentally affect the use or operations of the Hacienda Building.  [TE 3033-005.] As this Court held, the Settlement Agreement "provides that RREEF could make material changes to the Site Plan and Parking Plan, with the only proviso that if

1    RREEF did make such changes, then Plaintiffs were entitled to notice and to object

2    before the City. (Agreement Section 5c.) The rights to notice and to object preserve

3    Plaintiffs' ability to assert their property rights under the law and pursuant to any

4    other legal agreement (such as the COREA)." [March 1, 2022 Order on

5    Interpretation of the Settlement Agreement (ECF No. 193) at p. 9.]

6       **Rebuttal to ¶ 161**: The Hacienda Parties cherry pick a general statement from

7       the Court's March 2022 order in an attempt to reframe their obligations under

8       the Settlement Agreement. Specifically, the Hacienda Parties ignore the

9       interpretation of the Settlement Agreement "adopt[ed]" by the Court, which

10      explicitly interpreted the Hacienda Parties' non-opposition obligation as

11      follows: "[i]f either party chose in its sole discretion to pursue materially

12      different project, the promises of non-opposition would not apply, and the

13      other party could object or comment on the changes before the City." ECF

14      No. 193 at 13-14. In other words, if RREEF chose to pursue a materially

15      different Project, the Hacienda Parties "promises of non-opposition would not

16      apply, and [they] could object to or comment ***on the changes*** before the City."

17      *Id.* (emphasis added); *see also* ECF No. 227 at § IV.B at pp. 16-18 (RREEF's

18      Opposition to the Hacienda Parties' Motion for Legal Determination).

19   162.   The Settlement Agreement does not define the term "material" or the

20   phrase "material alterations to the Site Plan . . . which detrimentally affect the use or

21   operations of the Hacienda Building."

22      **Rebuttal to ¶ 162**: While the Settlement Agreement does not explicitly

23      define the term "material," the Settlement Agreement is not silent as to what

24      a "material" change or alteration is. *See* TE 3033 at 0006 (Section 5(d)).

25      Specifically, the Settlement Agreement provides that: "[c]onstruction of the

26      North Deck only is and shall be considered a material revision to the Parking

27      Plan." *See id*.; *see also* RREEF's FFCL ¶ 416.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

80

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

163.   In interpreting the parties' intent with respect to these terms, the Court may consider extrinsic evidence "if it is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Hayter Trucking, Inc.*, 18 Cal. App. 4th at 15, 22 Cal. Rptr. 2d at 238 (1993).  "Thus, parol evidence may be admitted to explain the meaning of a writing when the meaning urged is one to which the written contract term is reasonably susceptible or when the contract is ambiguous." *Id.*

**Rebuttal to ¶ 163**:  *See infra,* Rebuttal to ¶¶ 163-65.

164.   "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties" at the time of contracting. *ASP Properties Group, L.P. v. Fard, Inc.*, 133 Cal. App. 4th 1257, 1269 (2005) (quoting Cal. Civ. Code § 1636).  "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' … controls judicial interpretation." *Id.* (quoting Cal. Civ. Code § 1638). "Interpretation of a contract must be fair and reasonable, not leading to absurd conclusions.  The court must avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable." *Id.* (internal citations and quotations omitted).

**Rebuttal to ¶ 164**:  *See infra,* Rebuttal to ¶¶ 163-65.

165.   Among other parol evidence, the Court may also consider "the subsequent acts and conduct of the parties in the execution of the contract in order to determine the intent of those parties." *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 937 (9th Cir. 2002) (citing  Cal. Civ. Proc. Code § 1856(c)). "The construction given the contract by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the court." *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 937 (9th Cir.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

81

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

2002) (quoting Warner Constr. Corp. v. City of Los Angeles, 2 Cal.3d 285, 296–97 (1970)).

**Rebuttal to ¶¶ 163-165**:  In California, parol evidence may not be used to contradict the terms of a written agreement that is intended to be a final expression of that agreement.  Cal. Civ. Code § 1856(a) ("Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement."); *Alling v. Universal Mfg. Corp.*, 5 Cal. App. 4th 1412, 1433-35 (1992).  However, California's parol evidence rule "does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud."  Cal. Civ. Code § 1856 (g).  Under California law, "the mutual intention of the parties at the time the contract is formed governs interpretation.  Such intent is to be inferred, if possible, solely from the written provisions of the contract."  *RealPro, Inc. v. Smith Residual Co., LLC*, 203 Cal. App. 4th 1215, 1221 (2012) (citations omitted).

"[E]xtrinsic evidence" is inadmissible when it "conflicts with any interpretation to which the instrument is reasonably susceptible."  *Glendale City Emps.' Assn., Inc. v. City of Glendale*, 15 Cal. 3d 328, 340 (1975).  A party's "undisclosed intent or understanding" of an agreement "is irrelevant to [its] interpretation."  *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003).  Further, post hoc evidence is inadmissible to contradict the clear written terms of an integrated agreement.  *See Marek v. Napa Cmty. Redevelopment Agency*, 46 Cal. 3d 1070, 1085 n. 11 (1988).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

82

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

166.     Accordingly, the Court may consider Mr. Neumann's testimony that one of the primary reasons the Hacienda Parties entered into the Settlement Agreement was to protect their tenants' short-term and long-term parking in connection with the Project.  [Fact Nos. 12–18.]

**Rebuttal to ¶ 166**:  As an initial matter, the Court need not consider extrinsic evidence in interpreting the Settlement Agreement's terms, including "material alterations to the Site Plan … which detrimentally affect the use and operations of the Hacienda Building."  TE 3033.  The Settlement Agreement contains an integration clause, making clear that the Settlement Agreement is the "entire agreement between the Parties."  TE 3033 at 0012 (Section 17).  Parol evidence may not be used to contradict the terms of a written agreement that is intended to be a final expression of that agreement.  *See* Cal. Civ. Code § 1856(a); *Alling*, 5 Cal. App. 4th 1412, 1433-35 (1992).

The Settlement Agreement is a final agreement containing an integration clause, and it is unnecessary to use parol evidence to interpret the term "material" as it can be interpreted in the Settlement Agreement "solely from the written provisions of the contract."  *RealPro*, 203 Cal. App. 4th at 1221 (citations omitted).  The Settlement Agreement contains an example of what a material change would be and indicates that the Settlement Agreement defines materiality to mean a change of substantial significance to the Shopping Center (such as not constructing one of the parking decks).  TE 3033 at 0006 (Section 5(d)); *see also* RREEF'S FFCL ¶¶ 415-17.  Therefore, the Court should not consider parol evidence when interpreting the term "material."

To the extent the Court does consider parol evidence, the evidence cited by the Hacienda Parties is irrelevant to the interpretation of the Settlement Agreement.  When considering the mutual intention of the parties, a party's "undisclosed intent or understanding" of an agreement "is irrelevant to [its]

interpretation." *Founding Members of the Newport Beach Country*, 109 Cal. App. 4th at 956. The record does not reflect that Mr. Neumann communicated to RREEF prior to the execution of the Settlement Agreement that one of his primary concerns in entering into the Settlement Agreement was to protect their tenants' parking in connection with the Project. For example, the Settlement Agreement notes that the intent of the Settlement Agreement was to resolve "certain concerns" of the Hacienda Parties regarding the Project, TE 3033 at 0002, yet it does include in its recitals what Mr. Neumann described as the Hacienda Parties "North Star" concern, parking, Tr. 453:20-23. Thus, Mr. Neumann's testimony regarding the reasons for the Hacienda Parties entering into the Settlement Agreement amounts to an "undisclosed intent or understanding" of the Settlement Agreement and, therefore, "is irrelevant to [its] interpretation." *Founding Members of the Newport Beach Country Club*, 109 Cal. App. 4th at 95

167. The Court may also consider the fact that, beginning as early as 2010, and continuing through 2015, RREEF acknowledged that revisions to the core parking area—in particular, the reduction of 240 parking spaces during construction—were material alterations to the Settlement Agreement site plan that entitled the Hacienda Parties to object. [Fact Nos. 19–40.]

**Rebuttal to ¶ 167**: RREEF did not acknowledge that revisions to the "core parking area" were material alterations. Indeed, the Hacienda Parties' support for this assertion consists largely of assertions made by Mr. Neumann himself, not RREEF. For example, HP FFCL Paragraph 28 points to a statement by Mr. Neumann on December 6, 2010 that certain changes "appear to be a material change." HP FFCL ¶ 28. RREEF did not agree with or endorse Mr. Neumann's assertion, nor admit that Mr. Neumann was correct. *See* TE 1295 at 0008-0009.

Moreover, while evidence of the subsequent actions of the parties may be considered when interpreting an agreement, such consideration is "qualified by a restriction that the actions to be considered occur *before* a dispute has arisen." *Heston v. Farmers Ins. Grp.*, 160 Cal. App. 3d 402, 413 (1984) (emphasis added); *see also* CACI 318 (the fact finder can "consider how the parties acted after the contract was created but before any disagreement between the parties arose"). As early as summer 2010 there was a dispute over whether changes were material. *See* TE 1007 at 0003 (RREEF letter to Mark Neumann from August 3, 2010 stating "[w]e believe that the changes to the VSC do not materially negatively affect the Hacienda Building."); TE 1295 at 0001 (RREEF January 5, 2011 letter from Mark English to Neumann stating "[w]e feel that the changes do not have a material adverse impact on Hacienda in particular."). Therefore, any statements or actions by RREEF or the Hacienda Parties after a dispute arose about whether changes were material should not be considered by the Court when interpreting the Settlement Agreement.

168.  The Court may also consider that in July of 2016, RREEF entered into an agreement with Macy's regarding the development of the MVSC in which it agreed that a "material" change to the site plan would include, among other things, any change that "adds or reduces the number of parking spaces within any parking areas or parking decks depicted on the Site Plan, or changes the layout or configuration of any such parking areas or parking decks, or (iv) changes or reconfigures any entrances to and exists, and any driveways, drive isles (sic) or ring road, in a manner that alters vehicular or pedestrian traffic flow." [TE 1313-0003.] *See Fisher v. Allis-Chalmers Corp. Product Liability Trust*, 95 Cal. App. 4th 1182, 1192 (2002) (looking to other cases to determine how insurer interpreted indemnity provision).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

85

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

**Rebuttal to ¶ 168**:  Even if the Court considered parol evidence, the agreement between Macy's and RREEF is irrelevant to interpreting the Settlement Agreement.  The separate agreement between Macy's and RREEF is an agreement entered into by different parties than the Settlement Agreement and almost eight years after the execution of the Settlement Agreement.

When Macy's and RREEF entered into their agreement, the site plans for the Project were essentially finalized, which is why the agreement with Macy's was not finalized until July 2016. Tr. 837:22-838:15.  Whereas, when RREEF and the Hacienda Parties entered into the agreement, they expected the site plan to change.  Tr. 61:14-21, 476:5-13 ("[MR. NEUMANN]: As a real estate professional, I would be crazy to say that that site plan was not going to change a little bit, and things would be modified.").  In addition, Macy's was a prime party and had approval rights over the redevelopment of the shopping center.  Tr. 834:23-835:3.  Thus, the temporal differences and the differences between Macy's and the Hacienda Parties render trying to compare the term "material" in the two agreements unhelpful.

Moreover, considering the definition of material in the Macy's agreement would add to and vary the terms of the Settlement Agreement, and "extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract[.]"  *Pac. Gas & E. Co. v. G. W. Thomas Drayage etc. Co.*, 69 Cal. 2d 33, 39 (1968); *see also EPA Real Est. P'ship v. Kang,* 12 Cal. App. 4th 171, 175 (1992) ("[t]he parol evidence rule generally prohibits the introduction of extrinsic evidence—oral or written—to vary or contradict the terms of an integrated written instrument").

Relatedly, the inclusion of such a comprehensive definition of material in the agreement with Macy's but not the Settlement Agreement contradicts the Hacienda Parties' assertion.  The fact that RREEF included an expansive

1    definition of "material" in its agreement with Macy's, but left out such a

2    definition in its agreement with the Hacienda Parties, suggests that RREEF

3    knew how to create a broad definition of a "material" change, but did not do

4    so with respect to the Settlement Agreement.

5    Finally, the Hacienda Parties cited authority is inapposite. In *Fisher*,

6    the court noted that other courts' interpretations of the same agreement

7    involving the same parties could be relevant. *See Fisher v. allis-Chalmers*

8    *Corp. Prod. Liab. Tr.*, 95 Cal. App. 4th 1182, 1192-93 (2002). What the

9    Hacienda Parties urge the Court to do here is wholly different. The 2016

10   agreement with Macy's is a completely different agreement than the

11   Settlement Agreement. They involve different parties with different rights

12   with respect to the COREA and were executed at very different stages of the

13   Project's site plan drafting process. To assert that the agreement between

14   Macy's and RREEF somehow reflects "the mutual intention of the parties at

15   the time the [Settlement Agreement was] formed" strains credulity. *RealPro,*

16   *Inc.*, 203 Cal. App. 4th at 1221 (citations omitted).

17   *Fisher* also states that "[p]arol evidence of 'subsequent acts and

18   conduct of the parties' may be relevant to contract interpretation because it

19   manifests the mutual intention of the parties about how ***their contract*** should

20   be applied." *Fisher*, 95 Cal. App. 4th at 1192 (citation omitted) (emphasis

21   added). Thus, under *Fisher*, the definition of a term in a wholly different

22   agreement entered into years later and between different parties has no bearing

23   on the "mutual intention" of RREEF and the Hacienda Parties "about how

24   ***their contract*** [the Settlement Agreement] should be applied." *Id.* (emphasis

25   added).

26   169.  Based on the foregoing, the phrase "material alteration to the Site Plan

27   that detrimentally affected the Hacienda Building" means any revision to the

28   Settlement Agreement Site plan that reduced the number of parking spaces in Lot F,

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

reduced the number of parking spaces during construction from 240, increased the number of gross leasable area in the core area without a corresponding increase in parking, or changed the layout or configuration of the core parking area or the North Deck.

**Rebuttal to ¶ 169**:    The Hacienda Parties' interpretation of "material alteration to the Site Plan that detrimentally affected the Hacienda Building" is implausible.

The parties clearly intended that the Hacienda Parties' objections to the Project would be constrained to "material" alterations or changes to the Site Plan, rather than *any* "alteration" or "change" whatsoever.  TE 3033 at 0005. By interpreting the term "material alteration" to essentially mean "*any* revision" to the "core area," the Hacienda Parties all but read out the word "material," which is not permissible under well-established canons of contractual construction.  *See City of Colton v. Am. Promotional Events, Inc.*, No. EDCV 09-1864 PSG, 2010 WL 5392761, at *6 (C.D. Cal. Dec. 21, 2010) ("Under California law, contract are interpreted to give meaning to each word and phrase of the contract."); Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").  In other words, the Hacienda Parties' interpretation impermissibly rewrites the contract.  *See Lyons v. Fire Ins. Exch*., 161 Cal. App. 4th 880, 886 (2008) (noting that adopting a reading that would "remove a necessary element" of the agreement would "result in improperly requiring the clear language of the contract.").

By contrast, the most reliable indication of the intent of the parties at the time of contracting is contained within the Settlement Agreement:  the provision stating that a material change is building only one of the parking decks.  TE 3033 at 0006 (Section 5(f)); *see RealPro, Inc.*, 203 Cal. App. 4th at 1221 (the parties intent is "to be inferred, if possible, solely from the written

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

88

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

provisions of the contract"). The example contradicts the Hacienda Parties' proffered interpretation, since it demonstrates the parties intended "material" to mean a change of substantial significance to the Shopping Center (such as not constructing one of the parking decks) rather than essentially any change to the site plans.

The proffered interpretation is also inconsistent with the Hacienda Parties' testimony at trial about their understanding of the site plans. The Hacienda Parties testified that they expected the Settlement Agreement site plans to change and be modified after the execution of the Settlement Agreements. *See* Tr. 476:5-13 ("[MR. NEUMANN]: As a real estate professional, I would be crazy to say that that site plan was not going to change a little bit, and things would be modified. … And we were never opposed to things being modified"). The Hacienda Parties interpretation of "material" would mean that nearly any change to the site plans would be a material change, rendering the Hacienda Parties' obligation essentially illusory. For example, under the Hacienda Parties' interpretation, the reduction of nine spaces in the Lot F area in December 2016—which formed the premise for the Director's Writ Litigation—was a material change. This is antithetical to the parties understanding of the reality that site plans change, would essentially read "material" (and, as a result, the Hacienda Parties' obligations) out of the Settlement Agreement, and is an attempt to rewrite the Settlement agreement in a way that would justify the Hacienda Parties' opposition to the Project.

Moreover, none of the extrinsic evidence proffered by the Hacienda Parties is admissible, nor necessary, to determine the meaning of "material." The Hacienda Parties' testimony in this case of their purported "North Star" of tenant parking is irrelevant to the interpretation of material as a party's "undisclosed intent or understanding" of an agreement "is irrelevant to [its]

interpretation." *Founding Members of the Newport Beach Country Club,* 109 Cal. App. 4th at 956 (citation omitted); *see* Rebuttal to ¶ 166.  Similarly, for the reasons already discussed, neither the agreement between RREEF and Macy's nor the parties' post-contract actions after a dispute about the meaning of "material" had already arisen are relevant to the interpretation of the Settlement Agreement.  *See supra,* Rebuttal to ¶¶ 166-67.

Furthermore, even if such evidence were admissible, it is outside of the bounds of acceptable parol evidence.  Specifically, extrinsic evidence cannot be used to "add to, detract from, or vary the terms of a written contract." *Pac. Gas & E. Co.*, 69 Cal. 2d 33, 39.  The proffered interpretation of "material" changes the terms of the Settlement Agreement as it would wholly read out the term "material" from the contract because essentially any change to the site plans would fit within the Hacienda Parties interpretation of material.  Thus, the Court should not consider the parol evidence offered by the Hacienda Parties.

**B.    CLAIMS OF BREACH**

**1.    Breach—Entitlement Period**

170.    Throughout the entitlement process, RREEF repeatedly revised the site plan in ways that reduced parking in the core parking area, reduced parking during construction, and changed the layout and configuration of parking in the core area and the North Deck.  Accordingly, the Hacienda Parties were entitled to object.

**Rebuttal to ¶ 170**: *see infra,* Rebuttal to ¶¶ 170-77.

171.    In particular, RREEF's proposed changes to the Site Plan in August and November of 2010 constituted material alterations to the Site Plan that detrimentally affected the Hacienda Parties, thus permitting the Hacienda Parties to object.

**Rebuttal to ¶ 171**: *see infra* Rebuttal to ¶¶ 170-77.

172.    The June 26, 2012 site plan RREEF submitted as part of the first Planning Commission meeting shows the North Deck as G+2 and a total of 354

1    spaces in Lot F, thus constituting a material deviation from the Settlement

2    Agreement Site Plan to which the Hacienda Parties were entitled to object.

3        **Rebuttal to ¶ 172**: *see infra*, Rebuttal to ¶¶ 170-77.

4        173.    RREEF's revised site plan presented at the May 22, 2013 Planning

5    Commission meeting showed the North Deck at G+2 along with additional retail

6    buildings in the Lot F area without a corresponding increase in parking, thus

7    constituting a material deviation from the Settlement Agreement Site Plan to which

8    the Hacienda Parties were entitled to object.  [TE 1249–0004.]

9        **Rebuttal to ¶ 173**: *see infra*, Rebuttal to ¶¶ 170-77.

10       174.    RREEF admitted that the revised site plan submitted in connection with

11   the April 24, 2014 Planning Commission contained revisions to which the Hacienda

12   Parties were entitled to object.  [RT 775:4–9; TE 1302-002 (fourth bullet point).]

13       **Rebuttal to ¶ 174**: The letter cited by the Hacienda Parties here is from April

14       2013, not 2014.  *See also infra,* Rebuttal to ¶¶ 170-77.

15       175.    RREEF's November 21, 2014 site plan shows 496 spaces in Lot F,

16   which constitutes a material alteration to the Settlement Agreement Site Plan to

17   which the Hacienda Parties were entitled to object.

18       **Rebuttal to ¶ 175**: *See infra* Rebuttal to ¶¶ 170-77.

19       176.    The updated site plan endorsed by the Planning Commission Director

20   in December of 2016 [TE 1314 at p. 13], showed a reduction of 9 more spaces in

21   Lot F, reducing it to 487 spaces, thus constituting a material deviation from the

22   Settlement Agreement Site Plan to which the Hacienda Parties were entitled to

23   object.

24       **Rebuttal to ¶ 176**: *See infra* Rebuttal to ¶¶ 170-77.

25       177.    The final site plan, as constructed, shows 487 spaces in Lot F.  This is

26   161 spaces below the number in the Settlement Agreement Site Plan, thus

27   constituting a material deviation from the Settlement Agreement Site Plan that

28

detrimentally affected the Hacienda Parties and permitted objection under the Settlement Agreement.

**Rebuttal to ¶ 170-77**:  The Hacienda Parties' conclusion here that they were entitled to object after certain changes to the site plan is dependent on two improper readings of the contract.  First, as discussed above, they claim there was a material change based on an impermissibly broad definition of the term "material."  *See supra*, Rebuttal to ¶ 169.  It is (and has been) RREEF's contention that no material changes were made to the Site Plan.  *See* FFCL ¶ 321.

Second, even assuming the Court accepts the Hacienda Parties' proffered interpretation of "material," the Hacienda Parties still agreed to limit the subject matter of their opposition before the City to (1) "material alterations to the Site Plan … which detrimentally affect the use or operations of the Hacienda Building" and (2) "material revisions to the North Deck and/or Parking Plan."  TE 3033 at 0005 (Settlement Agreement Sections 4(g) and 5(c)).  Nearly all of the Hacienda Parties' objections were unrelated to *any* changes to the project vis-à-vis the 2008 Project Plans.

For example, objections to the EIR were categorically *not* related to changes to the 2008 Project Plans, as the environmental impact of the 2008 Project Plans and later iterations of the plans would have been virtually the same, meaning the EIRs would have been the same, too.  Tr. 246:2-19, 247:7-18.  This includes the October 8, 2013 letters from Mr. Briggs and Mr. Smith on behalf of the Hacienda Parties criticizing numerous aspects of the EIR.  *See* TE 70.  As Mr. Gibson made clear at trial, the primary complaints in those letters were untethered to the site plans, meaning those objections would have been the same whether the EIR considered the 2008 Project Plans or later iterations of the plans.  Tr. 256:11-20, 258:3-6, 258:21-259:4.

As another example, the Hacienda Parties repeatedly proposed alternative plans to the Project untethered to any changes to the Site Plan. *See* TE 68 at 0010-0016 (September 17, 2013 presentation by Mr. Neumann to the City Council proposing alternative plans for the Project—that were prepared by the previous owner of the Shopping Center—that included a hotel on the property); *see also* TE 3007 at 0134:13-0154:25 (same); TE 73 at 0128:16-25 (Mr. Neumann presenting to City Council on November 12, 2013 a plan in that had only one parking garage and no South or North Deck); TE 74 at 0012-0014 (same); Tr. 519:20-521:25 (same). Thus, even if RREEF had made material alterations to the 2008 Project Plans, which could permit the Hacienda Parties to oppose *those alterations* (if material and/or detrimental), much of the Hacienda Parties' opposition would still constitute breaches of the Settlement Agreement.

## 2.    Breach—CEQA Litigation

178.    RREEF failed to prove that the Hacienda Parties were in any way responsible for the filing or prosecution of the CEQA Litigation. To the extent they are based on the CEQA Litigation, RREEF's claims for breach of contract and breach of the implied covenant of good faith and fair dealing fail as a matter of law.

**Rebuttal to ¶ 178**: RREEF established that the Hacienda Parties were a substantial factor in causing the delay associated with the CEQA Litigation. *See* RREEF's FFCL ¶¶ 226-69, 357-67.

## 3.    Breach—Director Writ Litigation

179.    Under California Civil Code § 47, "[a] privileged publication or broadcast is one made…(b) [i]n any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable…." Cal. Civ. Code § 47(b). The privilege not only covers statements made in judicial proceedings, but also the act of filing a lawsuit itself. *Asia Investment Co. v.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

93

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

*Borowski*, 133 Cal. App. 3d 832 (1982) (barring arising from filing of CEQA lawsuit).

**Rebuttal to ¶ 179**: No disagreement with the limited principle stated in Paragraph 179, but the litigation privilege does not apply to the case at hand. *See infra*, Rebuttal to ¶¶ 180-181.

180.   Although the Ninth Circuit previously ruled in this case that the Litigation Privilege does not apply, it noted the absence of California Supreme Court authority on the question of the litigation privilege's application to contract claims and acknowledged its holding could be negated if California Supreme Court's then-pending ruling in *Olson v. Doe* indicated a different interpretation. *3500 Sepulveda, LLC v. Macy's West Stores, Inc.*, 980 F.3d 1317 (9th Cir. 2020).   That ruling subsequently came down in January of this year. *See Olson v. Doe*, 12 Cal. 5th 669 (2022). And while the litigation privilege question was mooted, California's highest court expressly indicated that the privilege not only applies to contract claims, but that any provision said to have waived the privilege must be carefully construed against the party claiming waiver. *See id.* at 687 ("We note only that the approach we have taken here—carefully construing a clause that would effectively waive claims—is similar to the approach of courts that have assessed the application of the privilege in the context of a contract said to have waived it.")

**Rebuttal to ¶ 180**: *See infra*, Rebuttal to ¶¶ 180-181.

181.   Nothing in the Settlement Agreement restricts the nature or forum in which the Hacienda Parties could "oppose" or "object to" RREEF's material alterations.   Nor do these provisions demonstrate an intent to waive the litigation privilege. *Olson*, 12 Cal. 5th at 682; *see Gaunt v. Prudential Ins. Co.* 255 Cal.App.2d 18, 23 (1967) ("It is fundamental that the burden of proving estoppel or waiver rests upon the party in whose favor those doctrines are claimed to inure"). Considering the direction given by the California Supreme Court in *Olson*, the Court

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

94

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    finds that the filing of the Director Writ Litigation was privileged conduct under

2    Civil Code section 47.

3    **Rebuttal to ¶¶ 180-181**:  As the Hacienda Parties admit, the Ninth Circuit

4    has already considered whether the litigation privilege should apply to this

5    case and explicitly held that it does not.  *3500 Sepulveda*, 980 F.3d at 1327.

6    The Ninth Circuit's decision to bar the Hacienda Parties from raising the

7    litigation privilege defense is the law of the case, which "generally prohibits

8    a court from considering an issue that has already been decided by … a higher

9    court in the same case."  *Stacy v. Colvin*, 825 F.3d 563, 567 (9th Cir. 2016);

10   *see also United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007) (same).

11   This alone warrants rejection of the Hacienda Parties' litigation privilege

12   defense.

13   The Hacienda Parties also acknowledge that *Olson* did not rule on the

14   issue of whether the litigation privilege applies to cases arising out of contract.

15   *See Olson,* 12 Cal. 5th at 687.  By its own terms, the California Supreme Court

16   declined to change the law on the litigation privilege:  "we need not and do

17   not reach the question [of] the litigation privilege."  *Id.*  The court's decision

18   to pass on this issue is evident in the case law citing *Olson*;  as of March 28,

19   2023, only one case (published or unpublished) has cited *Olson* regarding the

20   litigation privilege.  *See Timothy W. v. Julie W.*, 85 Cal. App. 5th 648, 664,

21   n.5 (2022).  And *Timothy W.* relegates its discussion of *Olson* to a single

22   footnote because "[t]he California Supreme Court granted review on [the

23   litigation privilege] issue in *Olson* … , but ultimately did not reach it."  *Id.*

24   The Court's analysis in  *Timothy W.* is instructive.  It cited pre-*Olson* cases

25   regarding the litigation privilege because *Olson* did not create or change the

26   law on the litigation privilege.  *Id.*

27   California courts have held that the litigation privilege does not bar

28   claims for breach of a settlement agreement where the defendant agreed not

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
LOS ANGELES

95

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

to accuse the plaintiff of wrongdoing, as "one who validly contracts not to speak … waive[s] the protection of the litigation privilege," and to hold otherwise "would frustrate the purpose of the [settlement] agreement." *Wentland v. Wass*, 126 Cal. App. 4th 1484, 1494 (2005); *see also, e.g., Crossroads Invs., L.P. v. Fed. Nat'l Mortg. Assn.*, 13 Cal. App. 5th 757, 787 (2017) ("If one expressly contracts not to engage in certain speech or petition activity and then does so, applying the privilege would frustrate the very purpose of the contract if there was a privilege to breach it."). The clear terms of the Settlement Agreement reflect the Hacienda Parties' waiver of its litigation privilege with respect to opposing the Project (subject to the narrow exceptions contained in Sections 4(g) and 5(c) of the Settlement Agreement). *See* TE 3033 at 0004 (Section 4(a)).

Even if the Court were to reconsider the Ninth Circuit's holding in light of *Olson*, the litigation privilege still should not apply, as *Olson* does not command a different result. The non-disparagement agreement that was the subject of *Olson* was negotiated quickly and without counsel, there was no waiver of future rights, and extrinsic evidence tended to show that the parties did not seek to waive their litigation rights broadly. *See Olson,* 12 Cal. 5th at 679-84. By comparison, the Settlement Agreement was the culmination of a months-long negotiation between sophisticated parties, who were represented by counsel in negotiation of the agreement and who carefully reviewed the agreement with their counsel before signing it. Tr. 399:14-400:1. Moreover, the Hacienda Parties entered into detailed waivers, making clear that they intended to forego future rights, including the ability to oppose the Project at all (subject to the narrow exceptions contained in Sections 4(g) and 5(c) of the Settlement Agreement), which prohibited the Hacienda Parties' involvement in opposing the Project at the entitlements phase and in connection with the CEQA Litigation and Director's Writ Litigation. And, as evidence at trial

1    showed, RREEF's primary reason for entering into the Settlement Agreement

2    (which required RREEF to give up significant benefits as consideration) was

3    to stop the Hacienda Parties from opposing the Project, including and

4    especially through litigation. *See* Tr. 56:22-57:7, 59:2-14; *see also* RREEF's

5    FFCL ¶¶ 18, 427. Accordingly, an independent review of *Olson* and the facts

6    of this case results in the same conclusion reached by the Ninth Circuit: the

7    litigation privilege does not apply.

8           *See also generally* ECF No. 227 at 23-30.

9    **C.    CAUSATION AND DAMAGES**

10          182.   Even if the Hacienda Parties breached the Settlement Agreement,

11   RREEF failed to prove that construction was delayed, or that the Hacienda Parties

12   were a substantial factor in causing that delay.

13          <u>**Rebuttal to ¶ 182:**</u>  *See* RREEF's FFCL ¶¶ 334-386.

14          183.   "It is axiomatic that in order to prove a cause of action for breach of

15   contract the plaintiff must prove a breach by the defendant and the amount of

16   damages caused by the breach." *Golden Eagle Refinery Co. v. Associated Internat.*

17   *Ins. Co.*, 85 Cal. App. 4th 1300, 1314 (2001).

18          <u>**Rebuttal to ¶ 183:**</u>  *See infra,* Rebuttal to ¶¶ 183-184.

19          184.   "Damages must be shown with reasonable certainty and cannot be

20   based on mere speculation and conjecture." *Tzu Chien Chen v. Thomas & Betts*

21   *Corp.*, No. C-02-3540 SC, 2005 U.S. Dist. LEXIS 16010, at *15 (N.D. Cal. July 13,

22   2005). "Uncertainty as to the *fact of damage*, that is, as to the nature, existence or

23   cause of the damage, is fatal." *Pet Food Express, Ltd. v. Royal Canin USA, Inc.*, No.

24   C-09-1483 EMC, 2011 U.S. Dist. LEXIS 141281, at *15 (N.D. Cal. Dec. 8, 2011)

25   (emphasis added)).

26          <u>**Rebuttal to ¶ 183-184:**</u>  As explained more thoroughly in RREEF's FFCL,

27   there is no disagreement that "reasonable certainty" is the correct standard in

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

97

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    terms of demonstrating the amount of damages. *See* RREEF's FFCL ¶¶ 396-
2    397.

3    185.   If the plaintiff has established the *fact* of damage, the next inquiry is
4    whether plaintiff's breach was the cause of such damages. Under California law, the
5    test for causation in a breach of contract action is "whether the breach was a
6    substantial factor in causing the damages." *US Ecology, Inc. v. State of California*,
7    129 Cal. App. 4th 887, 909 (2005).

8    **Rebuttal to ¶ 185:** *See infra,* Rebuttal to ¶¶ 185- 187.

9    186.   "Causation of damages in contract cases, as in tort cases, requires that
10   the damages be proximately caused by the defendant's breach, and that their causal
11   occurrence be at least reasonably certain." *Id.* (quoting *Vu v. California Commerce
12   Club, Inc.*, 58 Cal. App. 4th 229, 233 (1997)).  Except in "concurrent independent
13   cause" cases, the substantial factor test incorporates "but for" causation, meaning
14   that "[c]onduct is not a substantial factor in causing harm if the same harm would
15   have occurred without that conduct." *Michaels v. Greenberg Traurig, LLP*, 62 Cal.
16   App. 5th 512, 531 (2021) (quoting California Civil Jury Instruction (CACI) No.
17   430); *see Tribeca Companies, LLC v. First American Title Ins. Co*., 239 Cal. App.
18   4th 1088, 1103 (2015) (noting that the same "substantial factor" test applies in tort
19   and contract claims); *Viner v. Sweet*, 30 Cal.4th 1232, 1240 (distinguishing
20   "concurrent independent cause" cases).

21   **Rebuttal to ¶ 186:** *See infra,* Rebuttal to ¶¶ 185- 187.

22   187.   "But for" causation is consistent with the testimony of RREEF's expert
23   witness David Bones, who explained that if there were two concurrent causes for a
24   delay—one a breach by the Hacienda Parties and the other an independent cause of
25   the delay—he would not attribute any damages resulting from the delay to the
26   Hacienda Parties because their breach was not a but-for cause of the delay.  Mr.
27   Bones stated: "If it didn't change when the construction would start, then you
28   wouldn't count that."  [RT 323:17–325:5 (Bones).]

RREEF'S REBUTTAL TO HACIENDA PARTIES' PROP. FINDINGS OF FACT AND CONCLS. OF LAW

1    **Rebuttal to ¶¶ 185- 187:**  The test for causation in breach of contract cases

2    is the "substantial factor" standard.  *See* RREEF's FFCL ¶¶ 335-337.  The test

3    is a broad one, with a "substantial factor" being defined as "something which

4    is more than a slight trivial negligible, or theoretical factor in producing a

5    particular result." *Britz Fertilizers, Inc. v. Bayer Corp.*, 665 F. Supp. 2d 1142,

6    1168 (E.D. Cal. 2009).  Moreover, substantial factor causation recognizes that

7    a defendant need not be the sole cause of the damages experienced by the

8    plaintiff. *See, e.g., Bruckman v. Parliament Escrow Corp.*, 190 Cal. App. 3d

9    1051, 1063 (1987) (a defendant generally must "pay damages equivalent to

10   the total harm suffered" even though "the plaintiff's total injury may have

11   been the result of many factors in addition to the defendant's tort or breach of

12   contract").

13         In addition, substantial factor causation is broader than "but for"

14   causation.  As the California Supreme Court explained, the substantial factor

15   standard "subsumes the 'but for' test while reaching beyond it to satisfactorily

16   address other situations, such as those involving independent or concurrent

17   causes in fact." *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 969 (1997)

18   (citation omitted).  Thus, where there are "concurrent [independent] causes"

19   the "proper rule for such situations is that the defendant's conduct is a cause

20   of the event because it is a material element and a substantial factor in bringing

21   it about." *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1049 (1991) (citations

22   omitted); *see also In re Kelly*, 499 B.R. 844, 861 (S.D. Cal. 2013) ("[I]f two

23   forces are actively operating … and each of itself is sufficient to bring about

24   harm of another, the actor's negligence may be found to be a substantial factor

25   in bringing it about.").   The Hacienda Parties' citation to Mr. Bones's

26   testimony to attempt to establish the *legal* standard of causation is inapposite.

27   Mr. Bones was not opining on legal conclusions.  Moreover, the Court, not

28   the experts, must determine the legal framework for causation.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

99

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1   Finally, the evidence shows that the Hacienda Parties were *the most*
2   *significant opponents of the Project*.  *See* RREEF's FFCL ¶¶ 376-386.
3   Among other things, they hired a CEQA lawyer to vigorously oppose the
4   Project.  TE 86, TE 3029 at 0195-0196.   They hired two experts to challenge
5   specific aspects of the EIR.  Tr. 697:23-699:17, 704:10-12; TE 70 at 0011-
6   0016; TE 3023 at 0127-0152.   And, they submitted detailed and technical
7   comments that were more extensive and detailed than that of other opponents'
8   comments, particularly when the Project was pending before City Council.
9   Tr. 741:8-742:6.  For example, as reflected in Volume II of the Final EIR, the
10  City received and responded to thirty-four late comments on the EIR.  *See* TE
11  2131 at 0027-0028.   Of those thirty-four late comments, twelve were
12  attributable to the Hacienda Parties or their tenants. *See id.* at 0028 (Letter
13  Nos. 3, 4, 12-17, 24, 28, 29, 34).  Responses to the thirty-four late comments
14  spanned 152 pages.  *See id.* at 0029-0180.  Of the 152 pages used to respond
15  to late comments, 117 pages (over 75%) were required to respond to late
16  comments attributable to the Hacienda Parties or their tenants.  *Id.* at 0033-
17  0088, 0105-0124, 0131-0132, 0137-0169, 0175-0180.

18       Beyond their direct opposition, they also encouraged and organized
19  third-party opposition to the Project.  *See, e.g.*, TE 89 at 0002 (Mr. Neumann
20  circulating a petition opposing the Project); TE 94 at 0001-0002 (Mr.
21  Neumann coordinating opposition activities and messages with members of
22  the Public); TE 97 at 0001-0002 (Mr. Neumann ordering law signs opposing
23  the Project); TE 98 at 0001-0006 (Mr. Neumann coordinating with members
24  of the public to create a website opposing the Project); TE 116 at 0001-0002
25  (Mr. Neumann hosting a community meeting for residents opposed to the
26  Project at his home).

27
28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

100

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1.    **Alleged Period 1 Delays:  The Entitlement Process**

188.   RREEF contends that, in the absence of delays, it would have completed the entitlement process by December of 2013.   RREEF based this estimate solely its experience with another project in Marina del Rey, a development of unknown scope, size, cost, nature, complications, or environmental status in an entirely different municipality.   RREEF's contention that it would have obtained entitlements by December of 2013 is speculative, uncertain, lacks foundation, and was not supported by competent evidence.  Accordingly, RREEF failed to prove the fact of damage—i.e., that the project was in fact delayed during the entitlement period—with reasonable certainty.

**Rebuttal to ¶ 188:** As an initial matter, the Court, as the trier of fact, must determine, based on the overall record, whether the Project was delayed.  The accuracy of RREEF's Project timeline is not the issue to be decided.

Regardless, RREEF provided competent evidence regarding its estimated Project timeline and the delay of the entitlements period.  Further, Mr. Lenhert, who testified to RREEF's expected timeline, has experience with redeveloping properties.  *See* Tr. 42:3-11 (explaining that his portfolio currently has three active ground-up developments and one active redevelopment).  In addition, the estimate of the time to get entitlements for the Shopping Center was provided by RREEF's "value add group," who had experience in developing properties based on prior work in Southern California. Tr. 49:6-17.  Moreover, contemporaneous evidence suggests that RREEF's estimated timeline was generally on track (or even ahead) until the Hacienda Parties ramped up their opposition to the Project before the City Council in Fall of 2013.  For example, in October 2012, Mr. English explained to the Planning Commission that, if the Project was approved around that time, RREEF planned to begin construction in January 2014.  TE 3008 at 0035:11-13.  In addition, after the Project was appealed by the Hacienda Parties and

the City Council called it up for review at the August 6, 2013 City Council meeting, the City Staff said that they expected the approval process to take two public meetings and the City Council itself scheduled only three meetings dates in September 2013 to consider the Project. TE 3004 at 0005:18-0006:4, 0022:4-18; TE 3021 at 0001. But, at the last of the originally scheduled City Council meetings on September 17, 2013, the City Council determined it should begin scheduling more meetings to learn more about the legal issues raised by the Hacienda Parties, gather information about the alleged conflict of interest raised by the Hacienda Parties' lawyer, Cory Briggs, and review a challenge to the traffic study submitted by the Hacienda Parties' expert retained by Mr. Briggs. TE 3007 at 0099:21-0100:4, 0159:15-22, 0182:22-24, 185:23-186:23. Finally, the ultimate length and burden of the Shopping Center's entitlements process was an extreme outlier, ultimately becoming the longest and most expensive entitlements process in RREEF's history. Tr. 47:18-20.

189. Even if RREEF had established that the entitlement process should have been completed by some earlier date, RREEF failed to prove that the Hacienda Parties' conduct was a substantial factor in causing any delay. RREEF failed to establish that any comments made, or materials submitted by, the Hacienda Parties to the Planning Commission and/or City Council in fact caused the Planning Commission or City Council to set a hearing they otherwise would not have, or that the time between hearings was delayed because of anything the Hacienda Parties said or did.

**Rebuttal to ¶ 189:** RREEF provided significant evidence that the Hacienda Parties' actions were a substantial factor in causing the City Council to prolong the entitlements process. The following are examples of the evidence RREEF has provided demonstrating how the Hacienda Parties were a substantial factor in extending the timeline of the entitlements process.

As already discussed, the Hacienda Parties' and Mr. Briggs's submissions and presentations at the September 17, 2013 City Council meeting were a substantial factor in causing the City Council to schedule another meeting so they could discuss the issues the Hacienda Parties and Mr. Briggs had raised.  TE 3007 at 0099:21-0100:4, 0159:15-22, 0182:22-24, 185:23-186:23.

At the October 8, 2013 City Council meeting, Councilmembers Powell and D'Errico both expressed reservations about approving the Project until RREEF and the Hacienda Parties reached an agreement with each other.  TE 72 at 0116:22-0117:9, 0133:14-20, 0156:19-20.

At the November 12, 2013 City Council meeting, Councilmember Powell again expressed that the "most important" thing to him was to have RREEF and the Hacienda Parites "resolve their issues" so the Project would not be tied up in litigation once it was approved.  TE 73 at 0161:13-20, 163:6-14, 178:2-8.  At the same meeting, Councilmember Burton asked City Staff to work on a response to the presentation given by Mr. Neumann.  TE 73 at 0151:6-20, 0204:7-13.  Councilmember Burton also noted that he needed "additional evidence" regarding the EIR appeal brought by the Hacienda Parties.  TE 73 at 0197:21-0198:10.  Moreover, Mayor Lesser noted that the Hacienda Parties had made it "very difficult to move the project forward ever" because "it's a constantly changing sort of series of objectives."  TE 73 at 0168:16-22.  He also requested that City Staff provide greater clarity on where construction workers would park during Project construction because "[t]here was a reference made by Mr. Neumann about the construction workers."  *Id.* at 0208:13-17.

At the April 29, 2014 meeting, which City Staff recommended be the final meeting regarding the Project, TE 3027 at 0001, Mayor Pro Tem Powell expressed frustration with the Hacienda Parties' practice of submitting

documents at "the eleventh hour" which was hindering the City Council's ability to respond to public comments and he questioned whether the Hacienda Parties' practice of "wait[ing] until the last minute" was "a legal strategy." TE 2140 at 0163:5-17. Councilmember Burton similarly stated that it was "completely unrealistic" for the City Council to make a decision on the EIR based on the late comments the City had received. *Id.* at 0007:6-9. Moreover, Councilmember Lesser wanted to give the City Staff an opportunity to respond to the "significant questions" the Hacienda Parties had raised about the City's independent contractors. TE 2140 at 0267:24-0269:4. And, in that vein, Councilmember Lesser suggested carrying the meeting over to another date to provide time to respond. *Id.* 0267:24-0269:4. Councilmember Burton support Councilmember Lesser's suggestion of continuing the meeting. *Id.* at 0269:22-0270:13. Finally, Mayor Howorth recognized that Mr. Briggs was threatening CEQA litigation against the City on behalf of the Hacienda Parties. *Id.* at 170:5-8. She opted to have the City Attorney respond to the issues raised by Mr. Briggs at a subsequent meeting. *Id.* at 0270:22-0271:6.

At the May 20, 2014 City Council meeting, Councilmember Powell continued to express concerns about the need for REEEF and the Hacienda Parties to work out their disputes. TE 2141 at 0228:4-8, 0272:4-11. Councilmember Lesser echoed Councilmember Powell's concerns about the purported disagreements between RREEF and the Hacienda Parties and Councilmember Burton also raised concerns about the Hacienda Parties. TE 2141 at 0232:11-24, 0247:5-10. As a result of these concerns about the Hacienda Parties, the City Council ultimately imposed a condition of approval on the Project mandating that RREEF negotiate in good faith with the Hacienda Parties. *Id.* at 0299:9-16; TE 3029 at 0207-0208. That condition of approval was highly problematic for RREEF as the vague nature of the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

104

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    condition made it difficult for RREEF to demonstrate compliance. Tr. 723:8-

2    18, 728:23-729:14. These issues were not satisfactorily addressed until

3    December 2014, seven months later, when the Project was finally approved.

4    *See* RREEF's FFCL ¶¶ 213-225.

5    190.   RREEF did not call a single witness from the Planning Commission or

6    City Council to support its claim that conduct by the Hacienda Parties delayed the

7    entitlement process. "Generally, counsel in a civil trial may comment on the failure

8    of a party to call an available witness whose testimony the party would naturally be

9    expected to produce if favorable to him." *Auto Owners Ins. Co. v. Bass*, 684 F2d

10   764, 769 (11th Cir. 1982); *see United States v. Noah*, 475 F.2d 688, 691 (9th Cir.

11   1973) ("The failure of a party to produce a material witness who could elucidate

12   matters under investigation gives rise to a presumption that the testimony of that

13   witness would be unfavorable to that party if the witness is peculiarly within the

14   party's control.") While City employees may not have been particularly within

15   RREEF's control, given that RREEF bears the burden of proof in establishing that

16   the Hacienda Parties' conduct delayed the public meetings, RREEF's failure to call

17   representative witnesses constitutes a failure of proof.

18       **Rebuttal to ¶ 190:** As an initial matter, "[w]here a potential witness is equally

19       available to both parties, no inference should be drawn from the failure of a

20       party to call such witness." *Kean v. C.I.R.*, 469 F.2d 1183, 1187 (9th Cir.

21       1972). The Hacienda Parties have presented no evidence or argument that

22       any members of the Planning Commission or City Council was unavailable to

23       them, making any evidentiary inference improper.

24       Second, there was no reason to call a Planning Commissioner or City

25       Councilmember. The record includes the transcripts of the meetings during

26       which the Project was considered. At those meetings, the Planning

27       Commissioners and City Councilmembers contemporaneously explained

28       their considerations as to the Project. *See Kean*, 469 F.2d at 1188 ("In order

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

105

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

to justify the inference drawn from the failure to call a witness, the testimony of the uncalled witness must not be cumulative or inferior to the evidence already presented.").

Third, it is not clear that any additional information not already part of the public record could have been gleaned from a Planning Commissioner or City Councilmember's testimony due to the mental processes privilege.  In general, in quasi-judicial determinations like the approval of the Project and certification of the EIR, the governmental decision makers cannot be questioned as to the "mental processes or motivation" that led to their actions. *Hornung v. Sup. Ct.*, 81 Cal. App. 4th 1095, 1099 (2000) ("Therefore, the constitutional doctrine of separation of powers precludes the court from inquiring into the mental processes or motivation that underlie the commissioners' actions."); *see also City of Fairfield v. Sup. Ct.*, 14 Cal. 3d 768, 777 (1975) (affirming California's adherence to the rule that the "mental processes" of a governmental decision-maker should not be probed through litigation").  The logic behind the mental processes privilege is sound.  To the extent city councilmembers could be dragged into depositions or haled into court to testify regarding their non-public, internal considerations for every decision they made, these individuals could never actually complete the work of governance.  The inference that the Hacienda Parties seek would incentive countless and disruptive depositions and subpoenas to elected officials.  Thus, given the protections of the mental processes privilege, a Planning Commissioner or City Councilmember likely would not have provided testimony beyond the publicly stated considerations already in evidence.

## 2.    Alleged Period 2 Delays:  The CEQA Litigation

**191.**   Even if RREEF had established that the Hacienda Parties were in any way responsible for the filing or prosecution of the CEQA Litigation, RREEF did

1    not prove with reasonable certainty that construction was delayed because of the

2    CEQA Litigation.

3        **Rebuttal to ¶ 191:** *See* RREF's FFCL ¶¶ 357-367.

4        192.    By RREEF's own admission, RREEF could not obtain a building

5    permit to begin construction until it gave the City written evidence of a binding

6    commitment with Macy's for the consolidation and expansion of the Macy's store.

7    Macy's did not execute the Macy's Separate Agreement until July 8, 2016.  There is

8    no evidence that Macy's would have entered the Macy's Separate Agreement earlier

9    but for the CEQA Litigation or conduct by the Hacienda Parties.  RREEF's and

10    Macy's LOI, drafted in November of 2013, is non-binding by its own terms and

11    contemplates substantial future negotiations over the potential terms of an

12    agreement.  Moreover, even though Macy's is a co-defendant represented by the

13    same counsel in this action, RREEF did not call any witness from Macy's at trial,

14    which gives rise to a presumption that Macy's testimony on this issue would have

15    been unfavorable to RREEF.  *Noah*, 475 F.2d at 691.  Accordingly, RREEF failed

16    to establish with reasonable certainty that the project was delayed prior to July 8,

17    2016, or that the Hacienda Parties were a substantial factor in any such delay.

18        **Rebuttal to ¶ 192:**  The evidentiary record reflects the fact that obtaining a

19        final agreement with Macy's was not a substantial factor in the delays

20        experienced during the CEQA Litigation.  For example, throughout the

21        entitlements process, Macy's expressed its support for the Project.  At the May

22        22, 2013 Planning Commission meeting, Mark English presented two letters

23        from Macy's supporting the Project to the Planning Commission.  TE 2086 at

24        0110.  At the September 3, 2013 City Council meeting, Kelvin Peyton

25        appeared on behalf of Macy's before the City Council and expressed support

26        for the Project and asked the City Council to approve it.  TE 3005 at 0100:8-

27        0103:24.  As of November 11, 2013, Macy's and RREEF had entered into the

28        Macy's LOI establishing the fundamental proposed terms and conditions of a

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

107

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

formal agreement between Macy's and RREEF regarding the project. At the November 12, 2023 City Council meeting, Mr. Peyton again appeared before the City Council to support the Project, explaining: "We've come to business terms with RREEF. We're ready to make this deal. At this point, we're just waiting on City Council to approve it." TE 73 at 0101:2-0105:21. On April 29, 2014, Mr. Peyton submitted a letter to the City Council on behalf of Macy's, stating that "Macy's wholeheartedly supports this [P]roject." TE 3027 at 0585. And, on December 1, 2014, Mr. Peyton, on behalf of Macy's, wrote to the City Council again, "express[ing] [Macy's] full support of the proposed expansion and improvement plan[.]" TE 3029 at 0242. The Hacienda Parties have presented no evidence that Macy's repeated, public support for the Project was somehow false or hid unstated reservations or intentions.

In addition, the record establishes that the delay between the approval of the Project and the execution of the formal agreement between Macy's and RREEF on July 8, 2016 was not a result of some delay caused by Macy's, but was a result of the CEQA Litigation itself. Most significantly, there was no need or purpose to enter into a formal agreement with Macy's while there was significant uncertainty regarding the Project as a whole due to the CEQA Litigation. That uncertainty did not sufficiently clear until around April of 2016, when RREEF felt it had finally adequately analyzed the risks of the CEQA Litigation. Tr. 832:11-833:13. In addition, the formal agreement attached a site plan. TE 1313 at 0035-0038; Tr. 837:22-838:15. It was difficult to finalize a site plan to be attached to the formal agreement while RREEF was working with the Hacienda Parties and SCMB to make changes to the Project to try to settle the CEQA Litigation, as any changes agreed to with the Hacienda Parties and SCMB would need to be incorporated into the site plan. *See* Tr. 837:22-838:15; *see also* 120:14-121:6, 121:24-122:9

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

108

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1   (discussing changes to the site Plan during the CEQA Litigation).  Thus, any

2   delay in entering into the formal Macy's agreement was a symptom of the

3   CEQA Litigation, not a separate cause of delay.

4   Relatedly, RREEF's decision not to call a Macy's witness does not

5   generate any negative inference.    The record demonstrates Macy's

6   unwavering support for the Project.  In addition, Mr. Lenhert testified to the

7   considerations surrounding entering into a formal agreement with Macy's, Tr.

8   837:22-838:15, and Mr. English testified that RREEF recognized that the site

9   plan was too "fluid" for Macy's to sign the final agreement during the

10   entitlements period, Tr. 731:2-21, but that RREEF was nonetheless confident

11   that Macy's would enter a final agreement at the appropriate time, 734:13-

12   735:735:5.  Moreover, the Hacienda Parties have put forward no evidence

13   contradicting Macy's support for the Project or the testimony from Mr.

14   Lenhert and Mr. English about the agreement with Macy's.  Accordingly,

15   putting on a Macy's witness would have been cumulative and unnecessary.

16   *Kean*, 469 F.2d at 1188.

17   **193.**   RREEF also failed to establish that the CEQA Litigation delayed the

18   project between July 8, 2016 and December 2016, when the CEQA Litigation

19   terminated.

20   **Rebuttal to ¶ 193:** *See infra,* Rebuttal to ¶¶ 193-194.

21   **194.**   RREEF contends that the CEQA Litigation delayed the project because

22   it was a "cloud on title" that effectively stifled RREEF from pushing the project

23   forward while the case was pending.  But the evidence shows the opposite.  By

24   RREEF's own admission, it could not begin the year-long "preconstruction" process

25   of developing the site plan into construction drawings sufficient to go out to bid to

26   contractors until it had an agreed upon site plan with Macy's.  The site plan Macy's

27   agreed to in the Macy's Separate Agreement is dated April 15, 2016.  On April 18,

28   2016, three days after the Macy's site plan was finalized, RREEF's Investment

Committee approved $5.5 million to pay for the development of construction drawings—i.e., the very thing that RREEF contends would not do while the CEQA Litigation remained a "cloud on title." And with that funding, RREEF spent the rest of 2016 developing construction level plans sufficient to go out to bid and sufficient to file for a building permit by December of 2016. Nearly all of this work was done in while the CEQA Litigation was pending. Accordingly, RREEF has failed to prove with reasonable certainty that the CEQA Litigation delayed construction, or that any conduct by the Hacienda Parties was a substantial factor in any such delay.

**Rebuttal to ¶¶ 193-194:** As an initial matter, "reasonable certainty" is not the standard of proof for the elements of RREEF's breach claims, including whether the Hacienda Parties caused delays to the Project that harmed RREEF. Rather, the elements of RREEF's claims must be demonstrated by a "preponderance of the evidence." *See Weiner v. Fleischman*, 54 Cal.3d 476, 483 (1991) ("The general rule in [California] is that [i]ssues of fact in civil cases are determined by a preponderance of testimony.") (citations omitted); Cal. Evid. Code § 115 ("Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence."); *see also People v. Burnick*, 14 Cal.3d 306, 310 (1975) ("[A] criminal charge must be proved beyond a reasonable doubt, while an ordinary claim of breach of contract may be established by a preponderance of the evidence."). As discussed previously, "reasonably certainty" only applies to establishing the *amount* of damages flowing from the Hacienda Parties' breaches. *See supra*, Rebuttal to ¶¶ 183-834; RREEF's FFCL ¶¶ 396-397 (discussing the reasonable certainty standard).

Mr. Lenhert explained that, prior to April 2016, RREEF had been trying to more precisely quantify the ongoing risk of the CEQA Litigation before committing more resources to the Project. In particular, RREEF's fiduciary duties to its investors militated against making significant investments in the

1    Project while the Project's future status was unknown.  *See* Tr. 70:9-71:17.

2    But, as of April 2016, RREEF felt more comfortable that the suit "did not have

3    a lot of merit and did not pose a lot of risk for [RREEF] to … proceed at this

4    point with those [construction] drawings."   Tr. 830:14-831:17, 832:18-

5    833:13.    The contemporaneous documentation reflects this analysis.

6    Specifically, the April 18, 2016 investment committee memorandum states

7    under "Timing and Delivery Risk":

> Separately, there is a pending California Environmental
> Quality Act (CEQA) lawsuit that names both the Project
> and the City of Manhattan Beach as parties to the lawsuit
> which could possibly delay construction.  DeAm's land
> use counsel has characterized the suit as having little merit
> but nonetheless has engaged the CEQA lawsuit's
> representatives in order to seek settlement prior to going
> to court.  Settlement seems likely, but [we] can also rely
> on the strength of our argument in trial (October).  There
> will be more clarity before needing to expend significant
> cost on the elements of the Project affected by CEQA.

14    TE 788 at 0017.  Thus, as of April 2016 (almost a year-and-a-half after it had

15    received entitlements from the City for the Project), RREEF had sufficient

16    certainty about the risks of the CEQA Litigation to proceed with approving

17    limited funding of $5.5 million for construction drawings to try to mitigate its

18    substantial delays, but it would not commit significant funding until the

19    CEQA Litigation ended.  *See* TE 632 at 0012.

20         Indeed, the Hacienda Parties have presented a Catch-22.  Because

21    RREEF tried to responsibly move forward with limited portions of the Project

22    once sufficient doubt was removed, the Hacienda Parties now claim that there

23    was no delay to RREEF at all.  But, if RREEF had not moved forward with

24    those portions of the Project on which it was reasonably able to proceed, the

25    Hacienda Parties would certainly claim that RREEF failed to comply with its

26    duty to mitigate.  RREEF cannot be punished for trying to reduce the impact

27    the Hacienda Parties' delays had on its Project.

28

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

In addition, the contemporaneous record confirms the impacts of the CEQA Litigation on RREEF's ability to move forward with and fully fund the Project. Specifically, RREEF did not approve the remaining $154,000,000 for the Project budget (*i.e.*, the vast majority of the budget) until January 2017, after RREEF prevailed in court in the CEQA Litigation on November 2, 2016. TE 632 at 0012; TE 2047 at 0001-0002, 0018-0019 ("The Court therefore DENIES the petition for Writ of Mandate [in the CEQA Litigation]."). The January 17, 2017, investment committee memorandum regarding the approval of full funding specifically noted:

> The [CEQA Litigation] was adjudicated in November 2016 resulting in dismissal of all claims; however, the plaintiff has the right to appeal before February 23rd 2017. While an appeal is likely, DeAM's land use counsel has characterized the suit as having little merit and the courts confirmed that with the details of its ruling. Further, an injunction to halt construction after a judge's ruling has endorsed an EIR is extremely rare.

TE 632 at 0017. Thus, while RREEF tried to mitigate its damages by allocating some funding to the Project as of April 2016, the vast majority of the Project budget and work on the Project could not move forward until after the CEQA Litigation was defeated at the end of 2016.

Finally, RREEF's damages model accounts for the fact that some work moved forward during the CEQA Litigation. Specifically, Mr. Bones only attributed a 12-month delay to the CEQA Litigation period, rather than the two years the CEQA Litigation actually lasted. Tr. 306:17-307:21.

**3.    Alleged Period 3 Delays: The Director Writ Litigation**

195.   RREEF failed to prove that the Director Writ Litigation bore any relation to the commencement of construction, let alone delayed it.

**Rebuttal to ¶ 195:** *See infra,* Rebuttal to ¶¶ 195-196.

196.   Mr. Friedl testified that RREEF could not submit full construction drawings to the City until the updated site plan was approved by the City in

September of 2017 (thus mooting the Director Writ Litigation).  However, RREEF submitted its plans for Northeast Deck to the City for plan check and permitting on December 27, 2016, two months *before* the Director Writ Litigation was filed.  And the uncontroverted evidence shows that the City Planning Department was actively engaged and providing comments on RREEF's building permit application throughout 2017, all while the Director Writ Litigation was pending.  Indeed, the contemporaneous evidence shows that, far from blaming the Director Writ Litigation, RREEF believed the City's Planning Department was causing costly delays.  There is no evidence that the pendency of the Director Writ Litigation delayed the construction of the project or in any way impacted or interfered with the City's processing of RREEF's building permit application for the Northeast Deck.

**Rebuttal to ¶¶ 195-196:**  RREEF presented substantial evidence that the Hacienda Parties were a substantial factor in causing the delays RREEF experienced during the Director's Writ Litigation period.  Mr. Friedl testified regarding the plan check process.  Specifically, to provide final approval for permits, the City's Planning Department must check the proposed plans "against what has been approved." Tr. 147:8-12.  Moreover, the City thought that for RREEF to make the City's approvals "airtight" and to "forestall any other challenges" RREEF could amend the Master Use Permit.  Tr. 147:13-16.  Thus, while RREEF sought the amendment to moot the Director's Writ Litigation, there was no final Master Use Permit against which RREEF's permits could be compared and approved.  Tr. 146:19-148:9.  Beyond the City processes, RREEF itself was concerned about proceeding with construction while the Director's Writ Litigation loomed.  Tr. 79:12-22.

In addition, even to the extent the City's purported delays in processing certain building permits were entirely separate from the Director's Writ Litigation and the Hacienda Parties' conduct as the Hacienda Parties suggest (which the record does not establish—for instance the City had no reason to

LATHAM&WATKINS™
ATTORNEYS AT LAW
LOS ANGELES

113

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

move forward with alacrity on the building permits before it had approved the amended Project and amended MUP), the "substantial factor" test extends to independent concurrent causes. *Rutherford v. Owens-Illinois, Inc.*, 16 Cal.4th 953, 969 (1997) (holding that the "substantial factor standard … subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact"). Specifically, "[i]n those few situations, where there are concurrent [independent] causes, our law provides one cannot escape responsibility for his negligence on the ground that identical harm would have occurred without it.  The proper rule for such situations is that the defendant's conduct is a cause of the event because it is a material element and a substantial factor in bringing it about." *Mitchell v. Gonzales*, 54 Cal.3d 1041, 1049 (1991) (citations omitted); *see also In re Kelly*, 499 B.R. 844, 861 (S.D. Cal. Sept. 17, 2013) ("If two forces are actively operating and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.") (cleaned up).  Thus, because the plan check process could not be completed until the Master Use Permit was amended to respond to the Director's Writ Litigation and because RREEF had reservations from a business perspective in terms of advancing the Project with the Director's Writ Litigation pending, the Hacienda Parties were a substantial contributing factor to the delays that occurred during the Director's Writ Litigation regardless of whether the City would have independently had internal delays preventing completion of the plan check process.

## D.    GENERAL CONCLUSION

197.   Based on the foregoing, the Court finds that RREEF has failed to meet its burden of proof on its counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief, and failed to establish any liability on the part of the Hacienda Parties.

1    **Rebuttal to ¶ 197:**  RREEF has established all elements of its claims.  *See* 
2    RREEF's FFCL at Section III at ¶¶ 309-434.

3    **V.    THE HACIENDA PARTIES' ADDITIONAL FINDINGS OF FACT REGARDING TIMELINE OF PLANNING COMMISSION AND CITY COUNCIL HEARINGS AND RREEF'S REBUTTALS**
4
5

6    **General Rebuttal to ¶¶ 198-374:**  In general, the Hacienda Parties' timeline 
7    presents significant defects.  These defects include (a) excluding significant 
8    facts regarding the Hacienda Parties' opposition to the Project (both in written 
9    and oral form) before the Planning Commission and City Council; (b) 
10   excluding significant facts regarding the Hacienda Parties' attorneys' 
11   opposition to the Project (both in written and oral form) before the City 
12   Council; (c) excluding any discussion regarding the Hacienda Parties' 
13   retained experts' submissions to the City Council challenging the Project's 
14   EIR; (d) excluding significant facts regarding Macy's vocal support for the 
15   Project before the City Council; (e) excluding the City Council's comments 
16   regarding the Hacienda Parties' (and their retained attorneys' and experts') 
17   opposition to the Project and the effect such opposition had on the City 
18   Council; and (f) excluding all information regarding the Hacienda Parties' 
19   opposition efforts outside of formal proceedings, such as circulating an anti-
20   Project petition, having anti-Project editorials published, creating an 
21   opposition website, hosting opposition rallies, collaborating with other Project 
22   opponents (including the future officers of SCMB) and related activities.  
23   RREEF has covered these topics in Section II.C of RREEF's FFCL.  To the 
24   extent more specific rebuttals are appropriate, they are stated below.

25   **A.    PLANNING COMMISSION MEETINGS**

26         **1.    Planning Commission Meeting No. 1:  June 27, 2012**

27         198.   The purpose of the June 27, 2012 Planning Commission meeting was 
28   "to introduce the project to the Commission and the community, and provide an

1    opportunity for questions and comments." [TE 3014 (6/27/12 Staff Report) at 0003.]

2    Staff recommended "that the Planning Commission accept the presentation, take

3    public comments, and provide comments on the proposed project." [*Id.*]

4        199.   The Hacienda Parties did not speak or present at the June 27, 2012

5    Planning Commission meeting.   [*See generally* TE 3001 (6/27/12 PC Meeting

6    Transcript).]

7        200.   At the outset of the hearing, Planning Commission Director Richard

8    Thompson stated: "I want you to keep in mind, tonight is the first of many meetings

9    and public hearings devoted to this project. No decision will be made tonight. … I

10   think there is some concern that we might be moving too fast on this project, but I

11   want to assure you all the purpose of tonight's meeting is just an introduction of the

12   project, and we want as many people involved in that discussion." [TE 3001 at 5:1–

13   12.][6]

14       201.   Laurie Jester, City Planning Manager, then introduced the project and

15   gave high level summary, including discussion of the process to be followed.   [*Id.*

16   at 5:20–19:25.]   Mark English made a presentation on the project on behalf of

17   RREEF and fielded questions from the Planning Commissioners regarding, among

18   other things, project phasing and the Macy's consolidation.   [*Id.* at 20:3– 46:10.]

19   Mark English described the anticipated phasing of the project, noting that the first

20   phase—the "Village Shops"—"if approved, [is] what we'll undertake immediately."

21   [*Id.* at 33:2–5.]

22       202.   Mark English described the anticipated Macy's consolidation and

23   expansion which at the time was proposed Phase II of the project:

24           The second phase, what we call "Phase 2," we have here
             an additional 50,000 square feet, which is essentially
25           tacked onto the existing Macy's store. One of the things
             that we hope is that Macy's will work with us to vacate the
26           existing men's and home store and consolidate the entirety
             of their store in the -- in the existing main store. This has

27

28   [6] Page citations to Planning Commission hearing transcripts correspond to the Joint
     Exhibit page numbering on the upper right of the document.

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

a number of advantages. It would allow us to update the retail concept on the south side where the men's store is right now, and know that from Macy's, it would make them more efficient. In connection with this, if they agree to do the expansion, they would -- they would build what we called a "northeast deck," which you can see right here. That would serve primarily the Macy's expansion and the Macy's main store. One of the things I want to mention, too, you can see here there's three pedestrian bridges on the site plan. They all involve Macy's stores. This is something that Macy's has asked us to do and, we believe, really helps the functionality of the – of the parking decks.

[TE 3001 at 35:8–36:5.]

203.    Mr. English explained that RREEF intended to begin construction on the Phase I "Village Shops," and noted that Macy's "controlled their destiny" whether to ultimately agree to expand and consolidate per Phase II:

So our plan is to develop The Village Shops component as Phase I.  … And that will include, again, 60,000 square feet of new retail space clustered along the main street and around CPK, with two parking decks, the south deck and the north deck. As I mentioned before, our intention is to is to embark upon this development plan, which will take approximately two years upon approval of the Environmental Impact Report and then an appropriate planning period.  … The northeast corner, which is in the -- the upper -- upper part here, is what we're calling Phase 2. The reality is Phase 2 and Phase 3 are somewhat interchangeable. Macy's controls their destiny on whether they choose to expand their main store, and so as soon as they're ready to do that, we're willing to work with them and go ahead and do that. We want it to happen as soon as possible.

[TE 3001 at 41:6–42:2.]

204.    Seven members of the public spoke out with concerns about the project including, among other things, the size and scope of the project, traffic, the parking structure, and crime.  [TE 3015 at pp. 12–13.]

**2.    Planning Commission Meeting No. 2:  October 3, 2012.**

205.    The October 3, 2012 meeting was "an opportunity for the public and Commission to again provide input; no final decisions on the project will occur at tonight's meeting."  [TE 3015-0002 (10/3/12 Staff Report).]

206.   The Hacienda Parties did not speak or present at the October 3, 2012 Planning Commission meeting.   [*See generally* TE 3008 (10/3/12 PC Meeting Transcript).]

207.   Although the Hacienda Parties sent a letter to the Commission dated September 24, 2012 [TE 56], the Commission did not discuss the letter.   [*See generally* TE 3008.]

208.   Laurie Jester began the meeting by going over the Staff Report and fielding questions from the Planning Commission on how the public hearing process would work.  [TE 3008 (10/3/12 PC Meeting Transcript), 6:20–20:9.] Laurie Jester noted that the City had received extensive comments to the EIR that was published since the first Planning Commission meeting:

> The Draft Environmental Impact Report was released in June of this year, and we had the public comment period through July 23rd . Now, I - - I want to make it clear that that, really, is a beginning of the process. We received many, many comments, and all of those comments will be responded to individually in the Final Environmental Impact Report, and the consultant is currently in the process of preparing that -- that document, which will have all the response to the comments.

[TE 3008 at 8:5–15.]

**Rebuttal to ¶ 208**:   The evidence shows that, while City staff received comments on the EIR in spring and summer 2012 and started putting together individual responses to those comments to make the final EIR, the Hacienda Parties engaged a CEQA attorney and environmental experts and submitted substantive comments and critiques on the EIR over a year after the close of the formal comment period and months after the final EIR had been published. *See* TE 66 (September 17, 2013 letter from Briggs Law Corporation); *see also* TE 3024 at 0004 (City staff noting the Hacienda Parties "waited until the last public hearing [before the City Council] on September 17th [2013] to present written and oral comments [on the EIR].").

209.   The October 3, 2012 Staff Report noted that 45-day public review and

comment period for the Draft EIR was June 7, 2012 to July 23, 2012. [TE 3015 (10/3/12 Staff Report), at 0001.] Comments on the Draft EIR were received from about 45 residents, agencies, surrounding cities and business owners, other members of the public, and the Planning Commission. [*Id.* at 0003.] The comments related to, among other things, concerns over the size of the project, traffic, the parking structures, lighting, crime, hazards (including soil contamination), and visual impacts of the project. [*Id.* at at 0003–0005.]

**Rebuttal to ¶ 209**: Of the fourt-five written comments received between June 7, 2012 and July 23, 2012, only one was from the Hacienda Parties. *See* TE 2128 at 000215-000217, 000353-000359, 000492-000494. On July 23, 2012, Mr. Neumann, on behalf of the Hacienda Parties, commented on the draft EIR. TE 2128 at 000492-000494. Mr. Neumann's comment on the draft EIR focused on Mr. Neumann's concern that the zoning of the Hacienda Building was being changed by the application. *Id.* The comment from the Hacienda Parties at the Planning Commission phase stands in stark contrast to their all-out attack on the EIR before the City Council. *See* RREEF's FFCL ¶¶ 105-225.

210.    Mark English then gave a presentation on behalf of RREEF. [TE 3008 at 20:12–97:3.] Mr. English discussed why the Macy's consolidation and expansion is so important to the project. [*Id.* at 30:24–31:22.] Mr. English discussed questions regarding project phasing. [*Id.* at 33:7–41:19.] In discussing Phase I of the project (Village Shops), Mr. English stated: "if the project is approved and we're able to proceed with development, our plan is to begin construction in January of 2014." [*Id.* at 35:11–13.]

**Rebuttal to ¶ 210**: Mr. English's statement to the Planning Commission here confirms that there is contemporaneous evidence that RREEF's estimated timeline of completing the entitlements process by December 2013 was on generally on track (or even ahead) in fall of 2012. TE 3008 at 0035:11-13.

211.    Mr. English then addressed objections regarding the parking decks, traffic, and safety issues.  [*Id.* at 43:12–50:20.] Mr. English then "explained the Village Shops south and north decks are ground level plus two (3 levels; the northwest deck is ground level plus two (3 levels); and the northeast deck is ground level plus three ( 4 levels). He pointed out the Hacienda building is 42 feet high and the northwest parking deck would be 26 feet high."  [TE 3016 at 0029 (Minutes of 10/3/2012 meeting); *see* TE 3008 at 48:24–60:16.]

212.    As noted in the meeting minutes, "Commissioner Ortmann shared his disappointment regarding the connection of Veterans Parkway to the site; he explained it is an opportunity lost for the shopping center; it is rare to have the ability to connect alternative transportation to a site in this manner.  [¶] **Mr. English** assured the Planning Commission the applicants would reexamine the Veterans Parkway/site connection."  [TE 3016 at 0031–0032 (Minutes of 10/3/2012 meeting).]

213.    Pat Gibson of Gibson Transportation then gave a presentation regarding the traffic requirements of the Environmental Impact Report.  [TE 3016 at 0032; TE 3008 at 98:4–130:13.]  During Mr. Gibson's presentation, the Planning Commissioners asked questions regarding traffic issues, mass transit, pedestrian access, and planning improvements along Cedar Way to Marine Avenue.  [TE 3016 at 0032–0033.]

214.    Ten members of the public spoke during the public comment period—including Chris Prodromides—raising concerns about, among other things, the size and scope of the project, traffic issues on the northeast corner, the height of the parking decks, pedestrian access, bicycle access, and losing shoppers during construction.  [TE 3016 at 0033–0037.]

215.  Commissioner Ortmann stated his confusion that RREEF was contending they did not want a cookie cutter mall, but that all the renderings they were showing were cookie cutter.  [TE 3008 at 169:9–171:17.]

216.    After public hearing was closed, the Commissioners began discussion.

Commissioner Gross stated "I think that was a good start, but it was -- it was -- it wasn't very satisfactory to me . So please keep working on that and - - and give us your vision." [*Id.* at 172:20–24.] Commissioner Ortmann noted that the northwest corner presents a unique opportunity, but that "I just don't see it yet, and it would be an absolute shame for that -- that gateway, for that experience, not to be - - not to be sacrosanct in your -- in your design." [*Id.* at 173:12–174:12.] Commissioner Conway shared the exact same concerns as Commissioner Ortmann, and felt that the proposed project was missing critical opportunities. [*Id.* at 174:22–177:18.]

217.    Commissioner Paralusz then expressed her concerns with the project, including the missed opportunity on the northwest corner, the aesthetics of the parking garage, pedestrian access, notice to the Senior Villas, and potential charging stations for electric vehicles. [*Id.* at 178:3–185:1.]

218.    Commissioner Gross expressed his concern that RREEF did not have the Oak Street residents' support, and that "otherwise, they're going to slow your projection down and should." [*Id.* at 185:4–20.]

219.    Chairperson Andreani complained that "I don't see much of a difference between tonight's presentation about what you're planning and what we -- what we heard on the 27th of - - of June. So, many of those same problems still exist." [*Id.* at 186:18–22.]

220.    Chairperson Andreani echoed a number of concerns, including the northwest corner, the need for another traffic study, soil hazards, pedestrian access, and the equivalency program. [*Id.* at 188:9–190:7.]

221.    Commissioner Ortmann raised a concern about the soil mitigation issue and requested that a presentation be made on that issue. [*Id.* at 190:8–23.]

222.    Richard Thompson, Community Development Director, noted that the reason the plans hadn't changed much from the first meeting was that RREEF wanted to hear what the Planning Commission had to say and finish responding to comments received so far. [*Id.* at 199:20–200:4.]

223.   In response to Commissioners' questions about when to schedule the next meeting, Director Thomson noted it's up to RREEF, and that once the final EIR report comes in and RREEF gathers additional information, another meeting can be planned.  [*Id.* at 202:16–203:5.]

### 3.    Planning Commission Meeting No. 3:  March 13, 2013

224.   At the outset of the hearing, Planning Director Thompson noted that the Staff Report was "slim" that night because "at this time, the project has not changed formally." [TE 2134 (3/13/13 PC Meeting Transcript), 4:10–5:2.] "We really didn't provide you with any new information in terms of site plans, and things like that. That will be presented to you tonight and, also, to the public."  [*Id.*, 5:3–6.]

225.   Laurie Jester explained to the Commission that RREEF had been working with the community to address concerns raised, and therefore "this is still a work-in-progress" and is "not finalized." [*Id.* at 5:19–6:15.] Laurie Jester noted that "tonight, RREEF would really just like the opportunity to give you an update, a status, let you know where they are with the project." [*Id.* at 6:9–11.]

226.   At the March 13, 2013 Planning Commission meeting, "RREEF presented a number of options for the south parking structure in Phase I-Village Shops to address the concerns raised by the public, Planning Commission and staff through the public process."  [TE 3017 (4/24/13 Staff Report) at 0003.]   "A representative from Murex Environmental provided a presentation on the soils, methane and hazards on the site. RREEF, their architect and their parking consultant presented more details on the proposed pedestrian, bicycle, and transit plans, and other design options for the site."  [*Id.*]

227.   "A number of residents spoke at the meeting and the public and Commission discussed a number of concerns as addressed in the attached minutes (Attachment B).  The concerns continued to focus on the Size-Regional Draw, Traffic, Mobility (Bicycles, Pedestrians, Transit), Parking structures, North West corner design, Lighting, Crime, Hazardous soils, and Construction impacts."  [TE

3017 at 0003.]  "The public **and Commission** indicated that they felt the Center was overparked, using the peak December parking demand, and too much of a 'Car-centric' design. Veterans Parkway connection was continued to be emphasized as a key element and an opportunity to provide a dynamic connection and entry to the site."  [*Id.* (emphasis added).]

228.   In response to a question by Commissioner Conway regarding whether the other property owners (Macy's and Hacienda) were on board with the project, Mr. English stated:

> We're -- we've been negotiating with both parties for four-plus years, I'd say five-plus years at this point, and I do believe we're going to get there.
>
> Part of the difficulty in negotiating with both those parties is that, you know, where the "rubber hits the road" is the site plan, and as you've seen tonight, those two parties have very loud voices in how the site plan looks, but we've got other people that we need to consider.
>
> And, frankly, you know, Macy's and -- and the owners of the Hacienda building have probably reviewed an excess of 50 separate site plans, each of them, and we think we're narrowing in on just telling them, "This is it," but we're having a hard time nailing a final site plan down.
>
> We've -- we've had agreements in the past, and then the site plans changed, and that's simply -it's -- it's sort of like we're starting out with a wide funnel five years ago, and we're starting to get towards the point where we can have an agreement with them.
>
> But -- but, realistically, until we can get a site plan that, you know, we feel is going to pass muster for everybody, it's impossible to, you know, sign an agreement.

[TE 2134 at 81:18–82:18.]

229.   "In general the public and Commission seemed to feel the project was heading in the right direction with the new design of the South parking structure in Phase I- Village Shops; lower and more elongated north to south with buildings in front between the parking structure and Sepulveda Boulevard."  [TE 3017 at 0003.]

230.   The idea that the northwest corner (i.e., the Fry's corner) may not be addressed through this process, and may need to be addressed at future hearings, was

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

123

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

first discussed at the March 13, 2013 Planning Commission hearing.  [TE 2134 at 6:22–7:8; 68:7–69:19; 78:5–80:19.]

231.   The City anticipated that the Final EIR would not be available until about a month because "[t]here have just been a lot more public comments than we anticipated."  [*Id.* at 8:1–3.]

**Rebuttal to ¶ 231**:  This evidence corroborates that it takes significant amounts of time and effort to respond to comments on an EIR ,TE 2134 at 0008:1-3, and that the Hacienda Parties comments on the EIR would take time for the City staff to prepare adequate responses to.

232.   During the hearing, "the Commission asked for a Phasing Plan, more information on parking numbers per Phase and a map of walking distances to the Mall."  [TE 3017-0003; TE 2134 at 111:23–112:23.]

233.   Six members of the public spoke, including Mark Neumann.  [TE 3017 at 0055–0056.]

234.   Of the 193 substantive pages of the March 13, 2013 transcript hearing transcript, Mr. Neumann's comments, and the Commission's subsequent discussion of them, account for ten (10) total pages.  [TE 2134 (3/13/13 PC Meeting Transcript), 123:20–133:11.]

235.   Mark Neumann stated that "he signed the application but a settlement agreement was for a much less dense project including two, not three, level parking structures."  Mr. Neumann "commended RREEF for doing a good job in getting their proposal together but still has concerns that traffic issues at the corner of Rosecrans may not be addressed if the corner parcel is not part of the current plan to be approved."  "One of his concerns besides being too dense is the potential loss of surface parking spaces near his property. He recommended showing plans that are at a more detailed scale and concluded by urging the Commission to look at the project from the perspective of residents."  [TE 3017-0055.]

236.   The other five members of the public—including Chris Prodromides—

expressed concerns regarding, among other things, the parking decks, traffic, lighting, crime, soil contamination, and Fry's departure. [*Id.* at 0055–0056.]

237. Towards the end of the hearing, Commissioner Conway emphasized the significant amount of work remaining to be done, urging that "it's worth taking a big deep breath and continuing to -- to work through, you know, what the community wants" because "we are looking at development patterns that will be with us for the next 40, 50 , 60 years." [TE 2134 at 151:16– 152:5.] In particular, Commissioner Conway raised concerns over the parking plan and current design of the garages [*Id.* at 151:11–157:22], going so far as to say that "the parking strategy is still very fundamentally flawed." [*Id.* at 155:8–9.] Commissioner Ortmann echoed Commissioner Conway's concerns, noting that "the parking is a big issue, and it's not resolved yet." [*Id.* at 172:2–9.]

238. Commission Ortmann also expressed significant concern about the northwest corner, noting that "to continue to feel like it is being treated as a design afterthought troubles me. It troubles me a lot." [*Id.* at 172:10–25.] Commissioner Ortmann stated: "I -- I think there are a number of issues on the -- on the table still that are unresolved, and it -- and it feels like things -- some of these – the changes that we saw tonight are kind of nibbling around the margins and -- and don't feel as, perhaps, as substantive as I would have liked to have seen." [*Id.* at 174:3–8.]

239. Chairperson Andreani likewise raised concerns over parking, stating "I also believe that the parking issue is unresolved . . . ." [*Id.* at 175:22–25.]

240. The Commissioners ended the hearing by setting another hearing for April 24, 2013 for further public input. [TE 3017-0058.]

### 4.    Planning Commission Meeting No. 4:  April 24, 2013

241. The Final EIR was distributed for public review on April 2, 2013. [TE 3017 (4/24/13 Staff Report) at 0001 ("The Final EIR is complete and was distributed for public review on April 2, 2013.").]

242. Chairperson Conway began the April 24, 2013 meeting by noting that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

125

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1  "Tonight, we're having a public hearing, but we are not formally taking any action."

2  [TE 3002 (4/24/14 PC Meeting Transcript), 4:14–15.]

3      243.   The Staff Report for the April 24, 2013 meeting identified the following

4  key issues for discussion: (1) parking spaces proposed and demand required, (2) light

5  poles on top of parking structures, (3) phasing plans, including connections between

6  phases and entire mall site, (4) appearance of buildings and parking structures, (5)

7  pedestrian and bicycle connections to the Veterans Parkway Greenbelt under

8  Sepulveda, (6) draft conditions of approval, including the number of security

9  cameras, timing of the site-wide improvements, the parking structures and number

10  of spaces, the Rosecrans and Sepulveda dedications, the timing of the Rosecrans left-

11  turn restriction, the number of electric vehicle charging stations, and the Village

12  Drive rear cut-thru diversion improvement Plan, and (7) the Phase III Northwest

13  Corner.  [TE 3017 at 0003–0006.]

14      244.   Because of the late hour, the Planning Commission was only able to

15  discuss the first item identified above—parking.  [TE 3018 (5/22/14 Staff Report) at

16  0004.]

17      245.   Planning Commission Staff summarized the April 24, 2013 meeting as

18  follows:

19          At the last meeting in April 2013, RREEF presented more
            details on Phases I and II of the project and the timing of
20          development, the revised design of the south parking
            structure in Phase I-Village Shops and architectural details
21          and examples to enhance the parking structures, parking
            deck lighting, Veterans parkway connection and "dog
22          park", parking supply, ratios, comparisons to other centers
            and industrial standards and relationship to "core"
23          commercial areas, walking distances to the Mall and
            comments from the other property owners on the site. The
24          applicant also noted concerns about the draft conditions,
            specifically street dedications and improvements and the
25          standards, timing and sign-off procedures for the
            conditions in general. A Macy's representative discussed
26          Macy's need to grow as a highly productive and desirable
            store, and their parking needs. The City's EIR consultant,
27          Matrix Environmental, provided an overview of the EIR
            process and the Draft and Final EIR which has been out of
28          public review for a number of weeks. A representative

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

126

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

from Gibson Transportation, the City's traffic consultant on the EIR, provided a presentation on traffic, parking, and pedestrian, bike, and transit improvements. Peak parking supply and demand and options to reduce the parking were discussed, as well as traffic thresholds for determining significant impacts.

A number of residents spoke at the meeting and the public and Commission discussed a number of concerns as addressed in the attached minutes (Attachment B). The concerns continued to focus on the Traffic and Parking, Mobility (Bicycles, Pedestrians, Transit), Parking structures, Phase III -North West corner design and timing, Phasing, and Lighting, as well as the adequacy of the EIR. In general the public and Commission seemed to feel the project was heading in the right direction with the new design of the South parking structure in Phase I-Village Shops; lower and more elongated north to south with buildings in front between the parking structure and Sepulveda Boulevard.

[TE 3018 at 0003–0004.]

246.   The Hacienda Parties did not speak or present at the April 24, 2013 Planning Commission meeting.  [*See generally* TE 3002.]

**Rebuttal to ¶ 246**:  Although the Hacienda Parties did not speak or present at the April 24, 2013 hearing, on April 17, 2013, they sent a letter to Richard Thompson, the Director of Community Development for the City of Manhattan Beach, making clear that the Hacienda Parties were "not in support of the current plans to expand the Mall." TE 58 at 0001; Neumann Dep. Tr. at 78:2-8, 78:17-23.  The Hacienda Parties also wrote that "[i]f [RREEF] develop[s] the site as proposed they stand to make millions while leaving the residents with a traffic nightmare." *Id.* at 0002; Neumann Dep. Tr. at 83:6-84:1.

247.   Nine members of the public spoke at the hearing—including Chris Prodromides—and raised concerns that, among other things, (1) the EIR is not valid and has not met its legal burden, (2) the EIR doesn't adequately address issues raised by the Oak Avenue residents, (3) the proposed plan will cause the center to lose its identity, (4) RREEF should not be able to piecemeal the project, (5) the Northwest

RREEF'S REBUTTAL TO HACIENDA PARTIES' PROP. FINDINGS OF FACT AND CONCLS. OF LAW

1    corner had been withdrawn, and (6) parking and traffic had not been adequately

2    addressed.  [TE 3018 at 0152–0153.]

3        248.   At the end of the hearing, the Planning Commission scheduled a further

4    hearing for public comment on May 22, 2014.  [TE 3002 at 207:1–20.]

5        **5.**   **Planning Commission Meeting No. 5:  May 22, 2013**

6        249.   The Staff Report for the May 22, 2013 meeting identified the following

7    key issues for discussion: (1) parking spaces proposed and demand required, (2) light

8    poles on top of parking structures, (3) phasing plans, including connections between

9    phases and entire mall site, (4) appearance of buildings and parking structures, (5)

10    pedestrian and bicycle connections to the Veterans Parkway Greenbelt under

11    Sepulveda, (6) draft conditions of approval, including the number of security

12    cameras, timing of the site-wide improvements, the parking structures and number

13    of spaces, the Rosecrans and Sepulveda dedications, the timing of the Rosecrans left-

14    turn restriction, the number of electric vehicle charging stations, and the Village

15    Drive rear cut-thru diversion improvement Plan, and (7) the Phase III Northwest

16    Corner.  [TE 3018 (5/22/13 Staff Report) at 0004–0007.]

17        250.   Planning Commission Staff summarized the May 22, 2013 meeting as

18    follows:

19        At the last public hearing in May 2013, the public hearing
20    was held at the beginning of the meeting to provide an
    opportunity for more extensive public comments. The
21    City's EIR traffic consultant then provided a
    comprehensive presentation on traffic and parking,
22    followed by the applicants presentation, which included
    details from their lighting consultant on the parking
23    structure lighting. The public hearing was re-opened and
    more audience participation was provided, as well as a
24    wrap-up by the applicant. The Planning Commission then
    discussed the proposed project. The comments from the
25    public as well as the Commission are included in the
    attached minutes. (Attachment D) **Some Commissioner**
26    **[*sic*] felt that there were still some items that need**
    **further development. Specifically, the Commission**
27    **discussed questions about parking lot lighting, the**
    **parking garages, including the scale, design and need**
28    **for the number of spaces, bike/pedestrian access, cut-**
    **through traffic/traffic intrusion into neighborhood,**

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

128

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1
2
3
4
5
6
7
8

**specifically the Tree Section, installation of mature trees, need for street dedications, Phase III timing, and architectural design and style**. **The Commission was also concerned with public outreach, specifically, expressing their desire to publish notices above and beyond what is legally required.** In general, the Commission was satisfied that the project plans have been developed in a way to mitigate potential negative impacts to the surrounding neighborhoods, as the applicant has worked with the neighbors and re-designed and refined the project, and it is at the point where the Commission needs to make a decision on the applications.

[TE 2086 (6/27/13 Staff Report), at 0003 (emphasis added).]

9    251.    Mark Neumann spoke at the meeting.    Planning Commission staff

10    summarized his comments as follows:

11
12
13
14
15
16

Mark Neumann, 3208 Laurel Avenue and representative for the owners of the Hacienda Building. He is concerned that the center's tenants have no idea what is planned. He is concerned about parking during construction. He reiterated that they have an agreement with RREEF for a 2-story parking structure at the north end of the Village Shops, across Cedar Way from his building, but G+2 is actually three stories. He believes that incorporation of the Northwest corner parcel as soon as possible is really important to residents.

17    [TE 2086-0106.]

18    252.    Thirteen other members of the public spoke at the meeting both for and

19    against the project, including Chris Prodromides.    Among the concerns raised were

20    traffic, parking and the parking decks, problems with the EIR, RREEF's relationship

21    to Deutsche Bank, construction staging, and uncertainty regarding the northwest

22    corner.  [TE 2086 at 0106–0107.]

23    253.    Of the 212 substantive pages of the May 22, 2013 hearing transcript,

24    Mr. Neumann's comments, and the Commission's discussion of them, account for

25    five (5) total pages.  [TE 3003 (5/22/13 PC Meeting Transcript), 19:9–22:3, 143:16–

26    145:25.]

27    **6.    Planning Commission Meeting No. 6:  June 26, 2013**

28    254.    Planning Commission Staff summarized the June 26, 2013 meeting as

follows:

> At the last public hearing on June 26, 2013, the public hearing was held at the beginning of the meeting to provide an opportunity for more extensive public comments. Staff, the City's Economic Consultants and the Applicant then made presentations, with the applicant focusing on ten conditions that they had the most concern with. The public hearing was re-opened and more audience participation was provided, as well as a wrap-up by the applicant. The Planning Commission then discussed the proposed project. The comments from the public as well as the Commission are included in the draft minutes. (Attachment C) The Commissioners provided a number of comments on the draft conditions which staff incorporated into the revised draft that is included as Attachment A. The Commission directed staff and the applicant to work together to try to come to a consensus on the conditions where there were disagreements. The Commission certified the Final EIR, adopted the Mitigation Monitoring Program for the EIR and continued the public hearing to tonight's meeting.

[TE 3019 (7/24/13 Staff Report) at 0003.]

255. Twenty (20) members of the public spoke at the June 26, 2013 meeting—including Mark Neumann and Chris Prodromides—both for and against the project. [TE 3019 at 0059–0062 (Minutes of 6/26/13 meeting).]

**Rebuttal to ¶ 255**: The approved minutes from the June 26, 2013 Planning Commission meeting note that the Planning Commission "noticed that the speakers [on June 26th] were much more positive towards the project as presented with 15 of the 20 speakers, or 75% being positive." TE 3021 at 0108.

256. Planning Commission Staff summarized Mr. Neumann's comments as follows:

> Mark Neumann, 15-year City resident and Hacienda Building (3500 Sepulveda Boulevard) owner expressed concern about public noticing for this hearing. He believes that the existing uses for his commercial building on the project site will be more restricted compared to his existing entitlement as there will be a new cap on bank and medical offices. He wants to see the project built but has further concerns: he wants to see a detailed construction parking plan; compatibility of a dog park adjacent to his building where there are high quality offices; concerned

with a condition proposed by Staff that would delay installing some parking spaces near his building to Phase 2 instead of Phase 1 as he thinks those spaces are needed for Phase 1. Mr. Neumann concluded by noting that the settlement agreement between the Hacienda Building and Mall owners, in which he agreed to, calls for 2, not 3-story parking decks, is a private document and questioned why it has been made a part of the public staff report.

[TE 3019 at 0061 (Minutes of 6/26/13 meeting).]

257. As part of his comments, Mr. Neumann requested that the Planning Commission approve the project that night: "I've got one last thing. I'd prefer we did it tonight and just got this thing done, because it's been seven years for these poor guys." [TE 2007 (6/26/13 PC Meeting Transcript), 207:14–17.]

**Rebuttal to ¶ 257**: Mr. Neumann stated that that he would "prefer we did it tonight and just got this thing done, because it's been seven years for these guys" and "I'm going on vacation for the next hearing, which is unfortunate…" TE 2007 at 0207:14-18. Moreover, within weeks of Mr. Neumann's statement that he wanted to "g[e]t this thing done," on July 9, 2013, the Hacienda Parties appealed the Project's EIR, the very thing the Hacienda Parties contend Mr. Neumann wanted to get done at the June 26, 2013 meeting. TE 62; TE 63.

258. Of the 272 substantive pages of the June 26, 2013 hearing transcript, Mr. Neumann's comments, and the Commission's discussion of them, account for approximately 16 total pages. [TE 2007 (6/26/13 PC Meeting Transcript), 17:2–22:12, 77:14–78:21, 89:23–91:9, 203:24–210:18.]

259. Other members of the public raised concerns about, among other things, (1) parking, including the ratio and flow, (2) the scale of the proposed new center, (3) public awareness of the project, and (4) traffic. [TE 3019 at 0059–0061.]

260. Commissioner Paralusz specifically noted the importance of the public comments from Ms. Wallace and Ms. Proromides:

I want to thank -- No. 1, I want to thank the

1  public, especially -- I mean, there's still quite a

2  few people here. We've had a lot of new faces. We've had
3  a lot of repeat folks who have come, residents, who have
   been interested in this project from the beginning,
   especially Ms. Wallace and Mr. Prodromides. I mean, you
4  have very vested interests, especially, you know, living in
   the village and also living on Oak Street.
5

[TE 2007 at 237:16–25.]

6

7      261.    Toward the end of the meeting, the Planning Commission adopted PC

8  13-09, certifying the Final Environmental Impact Report.  [*Id.* at 230:21–231:20; *see*

9  TE 3020-001 (8/6/13 City Council Staff Report background summary).]  The

10 Planning Commission then moved to continue the public hearing to July 24, 2013 to

   address the Master Use Permit and conditions thereof.  [TE 2007 at 275:14–20.]

11
       **7.    Planning Commission Meeting No. 7:  July 24, 2013**
12
       262.    Per the July 24, 2013 Staff Report, the purpose of the July 24, 2013
13
   meeting was "to present the final project concept plans, the Master Land Use
14
   Applications (Master Use Permit Amendment and Variance) and the draft conditions
15
   of approval to the Commission and the community, and provide an opportunity for
16
   questions, discussion and comments, and take final action."  [TE 3019 (7/24/13 Staff
17
   Report) at 0005.]  "Staff recommends that that Planning Commission accept a brief
18
   introduction from staff, take public comments, accept Staffs presentation, then the
19
   applicants presentation, discuss and take action on the applications by adopting the
20
   attached draft Resolution, Attachment A."  [*Id.*]
21
       263.    Regarding the draft Conditions of Approval, the Staff Report noted that
22
   "Planning staff, the City Attorney, and other Departments have spent many hours in
23
   the past several weeks meeting with the Developer and their team to refine the draft
24
   conditions of approval to try to reach agreement on all of the conditions. Staff and
25
   the applicant agree on most of the conditions, however a number could not be
26
   resolved to both parties satisfaction. The applicant will present information at the
27
   meeting that highlights their key concerns on the draft conditions of approval in the
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

132

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    Resolution." [TE 3019-0004.]

2    264.    After discussion by the Commissioners, Mark English gave a

3    presentation covering "three provisions in the draft Resolution that the applicant

4    does not agree to (that are detailed in a letter to the Commission), including; Signage

5    (condition 11), EV (Electric Vehicle) Charging (condition 38), and land uses and

6    square footages (condition 18)." [TE 3021-0110 (Minutes of 7/24/13 meeting).]

7    265.    Nine members of the public spoke at the meeting, including Richard

8    Rizika and Mark Neumann. [*Id.* at at 0113–0114.]

9    266.    City Staff summarized Mr. Rizika's comments as follows:

10       Richard Rizika, 844 18th Street, with Mark Neumann is a
         managing member of the Hacienda Building, 3500
11       Sepulveda Boulevard, representing eight additional
         families which have financial interest in that building. He
12       stated that he believes that the approval of the Final EIR at
         the prior meeting has diminished the rights of the existing
13       land owners, and has increased the entitlement of RREEF.
         He is against a dog park next to 3500 Sepulveda which has
14       a restaurant and professional offices. He has no issue with
         increasing parking to accommodate an expansion of uses.
15       He requests that the Planning Commission not approve the
         plan until the issues have been resolved, including the dog
16       park and the rights diminishment issue.

17    [TE 3021-0114; *see* TE 3032 (7/24/13 PC Meeting Transcript), 78:9–82:6.]

18    267.    City Staff summarized Mr. Neumann's comments as follows:

19       Mark Neumann, owner of the Hacienda Building, thanked
         the Commission and believes that the rights of the owners
20       of 3500 Sepulveda Boulevard are being diminished while
         RREEF's are being expanded. He stated that their appeal
21       of the Final EIR action was a decision not taken lightly but
         did not because he felt he had to protect the interests of the
22       investors. Regarding parking, he feels that the only time it
         is bad is during the holiday season, and overall he is not
23       against the center's expansion. He noted that their site has
         a mortgage banker and he wonders if this would be
24       classified and regulated as a "bank" in the Master Use
         Permit.
25

26    [TE 3021-0114; *see* TE 3032 at 82:12–84:21, 85:24–88:15, 90:1–92:14, 94:16–

27    97:2.]

28    268.    The other 7 members of the public raised concerns about, among other

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

133

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    things, the size and scope of the project, the lack of surface parking, signage, EV

2    charging stations, land use issues, a proposed dog park, and traffic and congestion.

3    [TE 3021 at 0113–0114.]

4    269.    Of the 154 substantive pages of the July 24, 2013 transcript hearing

5    transcript, comments by Messrs. Neumann and Rizika, and the Commission's and

6    RREEF's subsequent discussion of them, account for approximately fifteen (15)

7    total pages.  [TE 3032 at 78:9–82:6, 82:12–84:21, 85:24–88:15, 90:1–92:14, 94:16–

8    97:2.]

9    270.    After public comment and further discussion, the Planning Commission

10   went through a lengthy and thorough review the draft Resolution section by section.

11   [TE 3021 at 0115–0124.]  Before voting on the draft Resolution, Commissioner

12   Paralusz noted that the project had come a long way and was "a much different

13   project" than what was presented to the Commission at the first meeting in June:

> And I really -- I agree with Commissioner Gross that this
> project has come a very long way. If someone looked back
> at the tape from the very first meeting that we had on this
> last year, and the concept, and the different concerns that
> the Commissioners shared and the public shared versus
> where we are today, this is a much different project. It is a
> much improved project. And it is as a result of that
> partnership amongst all the different stakeholders
> involved.

19   [TE 3032 at 151:14–21.]

20   271.    At the conclusion of the meeting, the Planning Commission approved

21   Resolution No. PC 13-10, approving the Master Use Permit and Heigh Variance and

22   sending the matter to the City Council.  [TE 3032 at 153:24–154:22; *see* TE 3020-

23   0001 (8/6/13 City Council Staff Report background summary).]

24   272.    Commissioner Ortmann voted against approving the resolution, noting

25   "I still have way too many issues with the project that I think I've articulated a

26   number of times that make it difficult for me to support it at this time."  [TE 3032 at

27   154:17–20.]

28   273.    RREEF, Hacienda and the City Council all appealed the Planning

LATHAM&WATKINS
ATTORNEYS AT LAW
LOS ANGELES

134                    RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1  Commission's approval of the project to the City Council.  [TE 2035-0001 (Section

2  6); RT 426:4–13 (Neumann); RT 671:8–16 (English).]

3  **Rebuttal to ¶ 273**:  The parties' appeals came at different times.  The

4  Hacienda Parties appealed the Project's EIR on July 9, 2013 and the approval

5  of the MUP on August 6, 2013.  TE 62; TE 63; TE 65; TE 85 at 0005-0027.

6  The City Council officially called the Project up for review under its authority

7  to review Planning Commission decisions on August 6, 2013.  TE 3004 at

8  0022:4-11.  RREEF appealed two of the sixty-four conditions of approval

9  imposed by the Planning Commission on August 9, 2013.  TE 3021 at 0093.

10  **B.    CITY COUNCIL MEETINGS**

11  **1.    City Council Meeting No. 1:  August 6, 2013**

12  274.  The August 16, 2013 Staff Report summarized how the project had

13  arrived before the City Council:

14  At the joint meeting of the City Council and Planning

15  Commission on April 30, 2013, staff requested
    authorization from the City Council to have the Council

16  act as the final decision-making body on the application.
    The City Council requested that the item be placed on a

17  regular meeting agenda for consideration and action. On
    May 21, 2013 the City Council discussed the item and

18  requested that the Project come before them to be the final
    decision maker.

19  [TE 3020 (8/6/13 CC Staff Report) at 0002.]

20  **Rebuttal to ¶ 274**:  *See infra*, Rebuttal to ¶¶ 274-76.

21  275.  The August 6, 2013 City Council meeting was brief, and was used to

22  set two future meeting dates in September:

23  We've discussed with the applicant, and they do concur

24  with that process. You do -- we are suggesting a couple of
    dates, because we had seven planning commission public

25  hearings. We're thinking it will take two public hearings
    to get through the Council 1 so that would be public

26  hearings on the Environmental Impact Report, as well as
    the project itself, the master use permit and the variance,

27  so we're suggesting that you  "Due to the magnitude of
    this Project and community wide interest, staff

28  recommends, with the Applicant's concurrence, that after
    the Planning Commission competes its review, that public

hearings be scheduled before the City Council.

[TE 3004 (8/6/13 CC Meeting Transcript), 5:18–6:4.]

**Rebuttal to ¶ 275**:  *See infra,* Rebuttal to ¶¶ 274-276.

276.    City Manager Carmany and Mayor Lessor noted that, given the size of the project and its importance to the community, there may need to be more than two meetings:

> CITY MANGER CARMANY – I'm not convinced two meetings is going to be enough. The planning commission did some really heavy lifting on this to get it to you. There's a large segment of this community that is waiting for it to get –

> COUNCIL MEMBER D'ERRICO: And Mr. City Manager, you have said that before, as important as this issue is, some residents feel, and especially if there's some

> sense that it's coming to Council - -

> CITY MANAGER CARMANY: Yep.

> COUNCIL MEMBER D'ERRICO – they're going to be sitting and wait - -

> CITY MANAGER CARMANY: And we need to respect that.

[TE 3004 at 9:12–20.]

**Rebuttal to ¶¶ 274-276**:  Despite some concerns from the City Council that they may need more public meetings to consider the Project, the City Council still only initially scheduled three meetings in September to consider the Project.  TE 3004 at 0005:18-0006:4.

**2.    City Council Meeting No. 2:  September 3, 2013**

277.    The September 3, 2013 Staff Report described the purpose of that night's meeting:

> Tonight's meeting will provide presentations from a number of parties in order for the Council and the public to have a thorough overview and understanding of the project. The Mayor will open the public hearing. Staff will provide an overview of the Project. The City's Economic consultant will provide an economic and market summary

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

136

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

> presentation, followed by the City's EIR traffic consultants' presentation on traffic and parking. RREEF will then provide a presentation on the Project. After the presentations and questions, Staff anticipates that there will be an opportunity for public comment and input. The EIR consultant will be available to answer any questions on CEQA and the EIR.

[TE 3021 (9/3/13 CC Staff Report) at 0002.]

278. The Staff Report noted that Staff noticed two further hearings (September 10 and 17) to provide for further public comments. [TE 3021 at 0002–0003.]

279. Two "public comment letters" were attached to the Staff Report. [TE 3021 at 0106–0107.]

280. City Manager David Carmany provided a brief overview and introduction of the meeting. [TE 3005 (9/3/13 CC Meeting Transcript) at 0004–0007.]

281. Community Development Director Richard Thompson provided background of Project [TE 3005 at 0008–0019], including RREEF's appeal of the Planning Commission's approval of the project [*id.* at 9:16–10:6] and concerns with the Project's parking structures [*id.* at 16:24–17:6].

282. The City's economic advisor, Larry Kosmont, spoke about the economic report [TE 3005 at 0019–0030] and the importance of Macy's commitment to the Project [*id.* at 28:2–10].

283. City traffic expert Pat Gibson testified on the traffic report. [TE 3005 at 0031–0042.]

284. Prior to Mr. Gibson's formal testimony, Mr. Thompson briefly discussed the importance of traffic issues as related to the project:

> You know, traffic was such an important part in this project. That's why you'll find this to be really poignant. It kind of puts everything together, and it was, seemed to be the main discussion whenever we had a public hearing with the residents, as well as everybody else.

[TE 3005 at 30:3–8.]

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

137

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

285.   Mr. Gibson provided a summary of the EIR, discussed various parking and traffic issues, and discussed the major questions posed by the Planning Commission and the general public.  [TE 3005 at 0031–0042.]

286.   Mark English from RREEF provided testimony of RREEF's positions on the Project.  [TE 3005 at 0042–0071.]

287.   Mayor Lesser posed questions to Mr. Thompson regarding Phase 3 of the project, underground parking, and the feasibility of a hotel at the site location. [TE 3005 at 0073–0075.]

288.   Councilmember Powell posed questions to Mr. Thompson regarding traffic and parking, height variance, environmental sustainability certifications for the Project, parking structure and landscaping issues, underground parking, and soil contamination issues.  [TE 3005 at 0075–0085.]

289.   Councilmember Powell posed questions to Mr. Kosmont regarding the impact of the mall taking away business from other parts of the City and the "saturation point" of the mall.  [TE 3005 at 0085–0088.]

290.   Councilmember Burton testified as to complexity of the issues and the need for further presentations:

> Council, I want to point out it is a little unrealistic that we're going to have a couple of hours tonight, a couple of hours the following Tuesday, maybe a couple of hours on the 17th, and people are going to expect a decision. This may take a lot longer. Those are just the facts. Until we feel like we're fully informed and ready to make a decision, I don't think we can. And when I hear statements like, "Well, I had a two-hour presentation, but I was asked to trim it down to 14 minutes," I understand this is an overview. I think that has value. But at some point in time, we need to have all of the details and an opportunity to ask good, relevant questions once we've absorbed all of the information.

[TE 3005 at 92:7–20.]

291.   Mayor Pro Tem Howorth posed questions to Mr. English, Mr. Thompson, and Mr. Kosmont regarding access to the mall via walkways and parking ramps, energy consumption and "green" alternatives, Macy's participation in the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

RREEF'S REBUTTAL TO HACIENDA PARTIES' PROP. FINDINGS OF FACT AND CONCLS. OF LAW

planning process, and whether the banks located at the mall own their respective properties.  [TE 3005 at 0094–0098.]

292.  Macy's Real Estate Department representative Kelvin Peyton briefly testified regarding the Project.  [TE 3005 at 0100–0103.]

**Rebuttal to ¶ 292**:  Mr. Peyton, on behalf of Macy's, came before the City Council, expressed support for the Project, and asked the City Council to "approve the plan as being proposed by RREEF."  TE 3005 at 0100:8-0103:24

The Hacienda Parties were offered a chance to speak at the meeting. TE 3005 at 0094:6-11.  They did not speak or present at the meeting. *See id.*; Tr. 678:18-22.

293.  Questions and comments were made by numerous members of the general public, during which concerns were expressed regarding various issues, including Mr. English's testimony from earlier that evening, RREEF's commitment to the community, the public's ability to speak on the Project, the height variance, whether the new mall will meet the needs of City residents, traffic, the EIR, parking, lighting, and impacts on the youth.  [TE 3005 at 0098–0120.]

**Rebuttal to ¶ 293**:  The comment on the EIR critiqued the EIR because "[w]e community members that drive Sepulveda know that it is crowded" and building the Project will add more traffic to Sepulveda.  TE 3005 at 0109:2-110:9.

**3.**     **City Council Meeting No. 3:  September 10, 2013**

294.  The September 10, 2013 Staff Report provided a review of the previous meeting (held September 3, 2013):

> At the September 3rd meeting a number of presentations were provided in order for the City Council and the public to have a thorough overview, background and understanding of the project. There was also an opportunity for questions and input from the public. The Mayor opened the public hearing and Staff provided an overview of the Project. The City's Economic consultant then provided an economic and market summary presentation, followed by the City's EIR traffic

consultants' presentation on traffic and parking. RREEF then provide a presentation on the Project. All of the presentations are posted on the City's website. http://www. citymb.info/Index.aspx?page=2129. The EIR consultant was also available to respond to any questions on CEQA and the EIR. After the presentations and questions from the Council, public comments and input was received, and Staff and the consultants responded the Councils questions. There were also a number of comments on the project from the public during Audience Participation at the beginning of the meeting.

A variety of opinions were expressed by the public at the meeting, with people speaking both in support and with concerns about the project. A number of people indicated that they feel the Mall needs to be updated and refreshed in order to stay competitive and provide the quality of stores, amenities, and shopping experience that the community desires. Others expressed concerns with density, size, traffic, parking, crime, economics, building heights, and RREEF's future in the project.

[TE 3022 (9/10/13 CC Staff Report) at 0002.]

295. The September 10, 2013 Staff Report described the purpose of that night's meeting:

Tonight's meeting will provide an opportunity for public input and Council questions and discussion. The Mayor will open the public hearing. Staff will provide an introduction, then would recommend opening up the public comments. RREEF will then provide a presentation on the Project, as well as the 3500 Sepulveda representative if they desire. The City's EIR Traffic Consultant and El R/CEQA Consultant will be available to answer any questions on Traffic, CEQA and the EIR.

Staff has noticed a continued public hearing on September 17th to provide a third opportunity for members of the public to comment on the Project, Council discussion and deliberation after the close of the public hearing, and potentially Council action thereafter. Future meetings may be scheduled if the Council so desires.

[TE 3022 at 0003.]

**Rebuttal to ¶ 295**:  As of the beginning of the September 10, 2013 City Council meeting, the City Council (and City staff) had only scheduled one more meeting on the Project on September 17, 2013.  *See* TE 3022 at 0003, 0005.

296.   Attached to the Staff Report was a letter from RREEF, dated September 5, 2013 (after the second City Council meeting held September 3) which discussed RREEF's appeal of Planning Commission Resolution No. PC 13-10 (specifically, Condition of Approval No. 11 regarding RREEF's proposed Master Sign Program for the Project).  [TE 3022 at 0025–0046.]

297.   Two "public comment letters" were attached to the Staff Report.  [TE 3022 at 0045–0046.]

298.   City Manager Carmany provided a brief overview and introduction of meeting.  [TE 3006 (9/10/13 CC Meeting Transcript) at 0004.]

299.   Mr. Thompson provided the format of the meeting.  [TE 3006 at 0004–0006.]

300.   Questions and comments were made by numerous members of the general public, during which concerns were expressed regarding various issues, including the impact on the community, RREEF's ever-evolving site plans, road widening, impact on traffic, various appeals and lawsuits, traffic, the speed with which the Project was being pushed, parking, Fry's, the EIR review, the uncertainty of Phase 3, and the appeals of RREEF and 3500 Sepulveda.  [TE 3006 at 0006–0028.]

301.   One of the residents who testified in opposition to the Project, Chris Prodromides, expressed various concerns regarding traffic, parking, and Macy's wavering commitment:

> Our concerns, mostly, were the parking garages at first, because there's two large decks that will be directly across the street from us, and we are very concerned about the noise, about light coming out at night, and we have residents who have second-story buildings, and they are afraid that the headlights and lights from the parking structures would actually go right into their houses.
>
> One of my neighbors feels strongly about that, and so we've been very vocal with RREEF about, about the parking structures, and we've been trying to push them away from the neighbors, get them more on Rosecrans, more of where the skyscrapers are in the parts of

1    Manhattan Beach.

2    A bigger issue, three phases. Phases 1, 2, and 3. One is
3    where the two structures come in and the center rebuilt
     where the center of the mall is right now. Again, we don't
     like the parking structures, but  Phase 2, Macy's, Macy's
4    is supposed to expand their building, move out of their
     rental area and expand the building they do own, *but*
5    *Macy's has not signed off on this*.

6    We feel strongly that, that Macy's will make a
     commitment once Phase 1 is actually in progress under
7    construction, at that point, Macy's will then come to the
     table and negotiate the long-term lease they have, and
8    come to the table and make this happen. *So you may not*
     *want to start this project and not have Macy's really on*
9    *board.* I wouldn't ask a construction critic in my own
     house, and remodel my, my kitchen without the whole
10   plan sorted out. I don't feel comfortable, as a resident, that
     not being completed.

11

12   [TE 3006 at 15:18–16:6, 16:22–17:14 (emphasis added).]

13        302.  Mayor Lesser closed public comment portion of the meeting and

14   recognized that no one from the Hacienda Parties had chosen to speak on the Project.

15   [TE 3006 at 0028.]

16        303.  Mayor Lesser posed questions to City Attorney Quinn Barrow and Mr.

17   Thompson regarding how to proceed with future meetings in light of the appeals of

18   RREEF and 3500 Sepulveda.  [TE 3006 at 0029–0030.]

19        304.  Councilmember Burton expressed serious concerns with the Council's

20   lack of review of relevant documents and testimony:

21   We didn't have the actual testimony. For instance, RREEF
     made three different appearances over three meetings and
22   gave a full briefing.

23   At our first meeting, I believe the traffic engineer said, "I
     have a two-hour briefing, but staff wants me to give 14
24   minutes." I need to have that full briefed meeting. I
     requested copies of the minutes, and here I have other
25   requests.

26   I would like a copy of the draft EIR. I think we should all
     have copies of that, and the final EIR to review. I've
27   reviewed the final EIR twice, but I haven't seen the draft
     EIR.

28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

142

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1
2
3
4
5
6
7
8

I'd like copies of the Settlement Agreement between RREEF and 3500 Sepulveda. I would like copies of the construction operation and reciprocal easement agreement dated November 1st, 1980. The foundational documents. I'd like copies of the grant deed and grant of easements with covenants running with the land dated November 1st, 1980. Again, foundational documents. I'd like a briefing from our staff regarding the original village agreement. As I understand it, this mall was part of an entire development agreement with the hotel, the homes, everything. ***I want, I want to start from the beginning, so I fully understand what's going on.*** I want a briefing from the city attorney regarding the rights of all three property owners, and the rights of the City.

9
10
11

Here's my expectations for this hearing. A full and complete briefing from the author of the draft and final EIR, including comments received. A full and complete briefing from the traffic engineer. In other words, not the 14 minutes. I want the two hours.

12
13

A full and complete briefing regarding hazardous waste liability and current indemnification agreements. A full and complete briefing from RREEF.

14
15

A full and complete briefing from Macy's, the other property owner, a full and complete briefing from 3500 Sepulveda. I would also like to see Fry's here, and Apple.

16
17
18
19
20
21
22

In other words, I want all the information, and I got to tell you, when staff first came to us, and the city manager and the community development director, it was two meetings only during your general regular meetings, and it was almost the expectation that we were going to make a decision after that. That is impossible. Right now, if I was to ask any one of us, what are the traffic remediation measures right now, describe them all. We wouldn't have a clue. It's their obligation, the applicants and our staff to fully inform us, and that way you, you can have meaningful public comment. We're asking for public comment when the public hasn't been informed, and that's just not acceptable.

23   [TE 3006 at 30:18–32:22, 44:10–13 (emphasis added).]

24      305.   Councilmember Powell posed questions to Mr. Thompson regarding

25   his review of the EIR.  [TE 3006 at 0039–0040.]

26      306.   Mayor Pro Tem Howorth posed questions to the City Council regarding

27   "mechanics" of reviewing all of the materials referenced above by Councilmember

28   Burton.  [TE 3006 at 0040.]

307. Councilmember D'Errico posed series of questions regarding the Project:

> One simply this is a three-phase project, so I would like a clearer understanding of why it is a three-phase project. Why it's going to take six or seven or eight or ten years to complete, whatever the timing is. Why the phases are in the order that they are in. We have heard enough from residents why. Isn't Phase 3 really Phase 1? I would like to understand that.

> The second thing is, I would like to understand and, maybe this goes back to, to Council Member Burton's request for Macy's to participate. Yes, there was a representative here at the last meeting. Are they legally bound? Are they part of it? What's the

> **guarantee?** One of our residents said tonight, what's the guarantee Macy's is in. And, and the resident said something to the effect of, "would I start the kitchen remodeling if I didn't know the rest was going to get done." So I need to know that.

> I also want to know is the developer, **is RREEF contractually legally bound to do Phases 2 and 3, and if not, what is our guarantee?** Is there money being held aside? What is happening to ensure that Phases 2 and 3 are going to happen.

> And then, maybe, this is going to get addressed. I haven't noticed. **Why haven't we heard from 3500 Sepulveda yet at our meeting?** But it looks like we are going to hear from them in an up-coming meeting.

[TE 3006 at 40:4–20, 40:23–41:2, 42:1–5 (emphasis added).]

**Rebuttal to ¶ 307**:  The City Council had not yet heard from the Hacienda Parties because the Hacienda Parties declined to speak before the City Council despite being invited to do so by Mayor Lesser.  TE 3006 at 0028:10-22.

308. Councilmember D'Errico joined in Councilmember Burton's concerns regarding the speed with which the City Council was reviewing the project:

> I would say, I'd like to see this in, in some comprehensive form. And that's, that's, my fundamental concern. I understand why we took this, sort of, I'll say, kicked it upstream from the planning commission to us, but, but, as a result we've taken on an extremely important responsibility, and I think that was, in my mind, that was what I was hearing from Council Member Burton, **the concern that, that, you know, this is not something that**

RREEF'S REBUTTAL TO HACIENDA PARTIES' PROP. FINDINGS OF FACT AND CONCLS. OF LAW

*we should rubberstamp.*

[TE 3006 at 43:10–18 (emphasis added); *see id.* at 45:19–46:6.]

309.    Councilmember Powell posed questions to Mr. Thompson regarding various issues, including hesitation to approve project and concern that "certain rights are being taken away from 3500 Sepulveda, LLC." [TE 3006 at 52:16–53:3.]

310.    Councilmember Powell also expressed concerns with: on-site alcohol sales, "permitted uses" under the Municipal Code, parking, traffic, Macy's participation, and other factors that could derail the project.  [TE 3006 at 0055–0062.]

311.    Mayor Lesser posed questions to Mr. Thompson regarding the Council's input on two different general plan goals, whether Council should approve all three phases at once or if it can approve phase-by-phase, and traffic and parking concerns from the public.  [TE 3006 at 0062–0067.]

312.    Councilmember Burton posed questions to Mr. Thompson and City Attorney Barrow regarding the appeals of RREEF and 3500 Sepulveda, the fact that Macy's had not formally appealed the project, and the rights of property owners. [TE 3006 at 0067–0070.]

313.    Mayor Pro Tem Howorth expressed concerns to Mr. English regarding Macy's commitment to the project.  [TE 3006 at 74:9–17.]

314.    Mr. English provided a brief presentation on behalf of RREEF, which was interposed with various questions from Councilmembers [TE 3006 at 0080–0115], and which included a brief discussion of Macy's involvement in the Project [*id.* at 0088–0089.]

315.    Michael Birtch, RREEF's signage consultant, testified as to signage issues.  [TE 3006 at 0115–0123.]

316.    Councilmember Burton mentioned that he wanted to hear from 3500 Sepulveda, whom Mayor Lesser acknowledged had not yet appeared before the Council.  [TE 3006 at 0133–0134.]

1    **Rebuttal to ¶ 316**:  Councilmember Burton indicated he wanted to hear from

2    the Hacienda Parties because they were the party that "actually appealed" the

3    EIR and they should "make their case first."   TE 3006 at 0133:25-134:4.

4    Mayor Lesser noted that the Hacienda Parties "ha[d] thus far declined the

5    opportunity to make their case."  *Id.* at 0134:8-13.

6    **4.    City Council Meeting No. 4:  September 17, 2013**

7    317.   The September 17, 2013 Staff Report provided a review of the previous

8    meeting (held September 10, 2013):

9    At the September 10th, meeting the Mayor opened the
     public hearing. Staff then provided an introduction and the
10   meeting was opened up to public comments. There were
     also a number of public comments on the project during
11   the audience participation portion of the meeting, prior to
     the public hearing. The 3500 Sepulveda Boulevard
12   representative was invited to make a presentation but
     indicated that they would defer their presentation until the
13   September 17th meeting. Staff responded to a number of
     questions from the Council . RREEF then responded to
14   questions raised during the public comments, responded to
     Council questions, then provided a presentation on their
15   appeal of the restaurant square footage cap and their sign
     consultant then provided a presentation on the Sign
16   Program and Exceptions. The City's EIR Traffic
     Consultant and EIR/CEQA Consultant were available to
17   respond to questions on Traffic, CEQA and the EIR.

18   RREEF's complete presentation from September 10th and
     the late attachments received after distribution of the
19   Council packet are posted on the City's website, along
     with all of the project information. The website has a
20   separate page devoted exclusively to the Mall that includes
     all of the Planning Commission background including
21   agendas, reports, attachments, minutes, and presentations
     as well as the videos of all the meetings for the Council to
22   view. The Draft and Final El R's are also posted on the
     website                                                at:
23   http://www.citymb.info/lndex.aspx?page=2129.

24   A variety of opinions were expressed by the public at the
     meeting, with people speaking both in support and with
25   concerns about the project. A number of people indicated
     that they feel the Mall needs to be updated and refreshed
26   in order to stay competitive and provide the quality of
     stores, amenities, and shopping experience that the
27   community desires. Others expressed concerns with and
     had questions on the density, size, General Plan
28   consistency, traffic, neighborhood traffic impacts,
     construction impacts, parking and parking structures,

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

crime, impacts on City services, soil and hazard conditions, economics, shuttle and transit service, City parking lot access, building and light heights, alcohol sales, phasing and timing, the development agreement, commitment of property owners and tenants, and RREEF's future in the project.

The City Council had a number of questions on many of the items addressed above, asked for hard copies of the Draft and Final EIR and briefings from the EIR consultant and number of the technical consultants, including traffic and soils/hazards at the September 17th meeting. They also invited the 3500 Sepulveda representative to present his appeal and any other information. The Council was provided with hard copies of all the Planning Commission Minutes, the appeal letters, RREEF's powerpoint presentation and late attachments.

The Council also asked for background on the Development Agreement. The Development Agreement Application was submitted in 2012 in order to request a longer term for the project approval and to assist with the consolidation of Macy's Men's into the main Macy's store. Kosmont and Associates and staff, along with a Council subcommittee met on a

number of occasions to discuss these goals. The applicant decided that there was no need for the development agreement, inasmuch as the proposed phasing plan and the term of the Master Use Permit would address any entitlement issue and therefore the application was withdrawn. Staff also felt that conditions of approval would ensure appropriate community benefits would be acquired.

Staff has noticed this continued public hearing on September 17th to provide a third opportunity for members of the public to comment on the Project, presentations from the project technical team, Council discussion and deliberation after the close of the public hearing, and further Council direction. Future meetings may be scheduled at the direction of the Council.

[TE 3023 (9/17/13 CC Staff Report) at 0002–0003.]

318. The Staff Report described the purpose of that night's meeting:

Tonight's meeting will provide an opportunity for presentations from the EIR consultants and other technical staff, public input and Council questions and discussion. Similar to September 10th, the Mayor will open the continued public hearing, Staff will provide an introduction, presentations will be provided by the Environmental Impact Report (EIR) consultants, the applicants/appellants (RREEFE and 3500 Sepulveda) will

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

147

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

provide presentations, the Council will receive public testimony, then discuss, and provide comments and direction. Questions from the Council to the EIR and technical consultants, staff and the applicants following each presentation would be appropriate. Future meetings will be scheduled if the Council so desires.

[TE 3023 at 0004.]

319.  Attached to the Staff Report were RREEF's nine "white papers" regarding the Master Land Use Application [TE 3023 at 0103–0118], a letter from the Briggs Law Corporation [*id.* at 0153–0154], and the CV and report of Gabriel Elliot [*id.* at 0123–0125, 0127–0152].

320.  Two "public comment letters" were attached to the Staff Report.  [TE 3023 at 0119, 0155–0156.]

321.  Mr. Thompson provided the format of the meeting.  [TE 3007 (9/17/13 CC Meeting Transcript) at 0004–0007.]

322.  Stephanie Eyestone-Jones, the City's EIR consultant, testified regarding the EIR process.  [TE 3007 at 0007–0022.]

323.  Jeremy Squire, the City's environmental engineer consultant, testified regarding various environmental hazards (e.g., ground water, soil contamination, etc.).  [TE 3007 at 0022–0047.]

324.  Mr. Gibson and Eric Zandvliet, the City's traffic engineer, provided testimony on the traffic report and parking issues, which prompted questions from Mayor Lessor, Mayor Pro Tem Howorth, and Councilmembers Powell and D'Errico.  [TE 3007 at 0048–0110.]

325.  Mr. Kosmont provided testimony on the economic report, which prompted questions from Councilmembers Burton and D'Errico.  [TE 3007 at 0110–0124.]

326.  Mark Neumann, for the first time, addressed the City Council and provided a brief overview of his testimony, a brief history of the mall, a brief discussion on the Settlement Agreement, a brief discussion on the differences in RREEF's plans over the course of the Project, and his request that the City deny the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

148

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

EIR certification.  [TE 3007 at 0134–0163.]

**Rebuttal to ¶ 326**:  Concurrent with his testimony, Mr. Neumann also gave a twenty-six slide presentation at the September 17, 2013 City Council meeting. TE 68; Tr. 489:9-12; *see* RREEF's FFCL ¶ 115.

327.   Cory Briggs briefly testified regarding 3500 Sepulveda's appeal and the prior speakers at the meeting.  [TE 3007 at 0157–0163.]

328.   Questions and comments were made by numerous members of the general public, during which concerns were expressed regarding various issues, including: the petition of City residents expressing their opposition to the current plans, safety, and traffic, parking. [TE 3007 at 0163–0177.]   Resident Mark Craigsman discussed the residents' petition:

> Three days ago, a group of residents drafted a petition to spread awareness and get feedback on the plans. In 72 hours, I just looked before I got up here, over 510 residents signed on to express their opposition to the current plans, with the majority of the comments stating that the oppositions were the parking structures, concerns for safety and traffic.

[TE 3007 at 164:3–9.]

**Rebuttal to ¶ 328**:  *See infra*, Rebuttal to ¶ 332 (discussing Mr. Neumann's involvement with the petition).

329.   Mr. English briefly testified in response to issues raised at meeting. [TE 3007 at 0177–0179, 0181–0182.]

330.   RREEF's attorney, Peter Gutierrez, followed-up on Mr. English's testimony and criticized the testimony of Mr. Briggs.  [TE 3007 at 0179–0181.]

331.   Before closing the meeting, Mayor Lesser brief addressed Mr. Neumann's testimony:

> First, I think it is important, and imperative to clarify the nature of the parties, and that is, perhaps, a legal issue. Certainly, the legal issues that were raised by the 3500 Sepulveda LLC appellant, would be helpful to know about. I'd welcome some general comment on the role of the City when there are private parties in dispute on a project. Ultimately, I want to understand what our

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

149

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

discretion is, and any advice, where our judgment entered into it, what legal considerations apply.

[TE 3007 at 181:20–182:4.]

**Rebuttal to ¶ 331**:  Mayor Lesser noted the importance of clearing up the legal issues raised by the Hacienda Parties.  As he was closing public comment on the Project for the September 17, 2013 hearing he "identif[ied] some issues … that [he] want[ed] to have answered" at the next City Council hearing, which shows that the City Council, at least in part, scheduled the next hearing to hear more from City staff on issues raised solely by the Hacienda Parties.  TE 3007 at 0182:11-19.

Immediately after Mayor Lesser's comments, Councilmember Burton requested a copy of the COREA and the grant deed, which Neumann spoke about earlier in that City Council meeting.  TE 3007 at 0137:5-; TE 68 at 0001-0003.  Mr. Neumann alleged that the proposed Site Plan violated the COREA and the Grant Deed.  TE 3007 at 0137:9-11-12, 0141:18-24; TE 68 at 0003.

332.    In September of 2013, a petition opposing RREEF's project was signed by over one hundred residents and filed with the City Council during the entitlement process.  [RT 98:7–21.]  The petition was started by Mark Krigsman who was opposed to the project.  [RT 435:14–436:9.]  The petition [TE 1108], was signed by over 1000 people.  [RT 437:5–13.]

**Rebuttal to ¶ 332**:  Mr. Neumann circulated the petition and encouraged members of the public to sign it if the agreed with Mr. Neumann's "work[] to insure the Manhattan Village mall does not get over built with 4 – Three story parking garages."  TE 89 at 0002; Neumann Dep. Tr. 223:6-224:1, 225:1-16.  Mr. Neumann also testified that he personally signed the petition.  Tr. 435:14-436:1.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

RREEF'S REBUTTAL TO HACIENDA PARTIES' PROP. FINDINGS OF FACT AND CONCLS. OF LAW

In addition, Mr. Neumann worked and collaborated with the creator of the petition, Mr. Krigsman (Tr. 435:14-22), in opposition to the Project throughout the City Council stage of the entitlement process. *See*, *e.g.*, TE 94 at 0001-000 (Mr. Neumann coordinating opposition with Mr. Krigsman, including plans to encourage additional community members to oppose the Project, aimed to promote objections to the Project and therefore constitutes improper opposition to the Project); TE 95 at 0001 (Mr. Neumann asking Mr. Krigsman to make sure Chris Prodromides—another member of the public who opposed the Project and a future officer of SCMB—attended the April meeting on the Project before the City Council); TE 98 at 0001-0005 (Mr. Neumann working with Mr. Krigsman to set up a website opposing the Project); Tr. 550:15-18 (same); TE 97 (Mr. Neumann working with Mr. Krigsman to design and order lawn signs with language opposing the Project to give to community members); Neumann Dep. Tr. 241:10-243:13 (same); TE 116 at 0001-0002 (Mr. Neumann inviting Mr. Krigsman and others to attend a meeting at his house for "residents opposed to the current design of the [Project]" to "rally residents before [the May 20, 2014] City Council Meeting"); Neumann Dep. Tr. at 301:2-303:3 (same).

**5.     City Council Meeting No. 5:  October 8, 2013**

333.   On October 8, 2013, the City Council conducted its fourth public hearing on RREEF's project.  The Staff Report was admitted at TE 3024.  There were numerous public comments, ranging from those in favor of the project to those opposed.   Some residents opposed the size and scope of the expansion and to the four parking decks. [RT 3010 at 0009:19–22.]    Others opposed traffic, overdevelopment, and valet parking.   [TE 3010 at 0014:1–10; 3010-0031.]   A number of residents supported the project.  Vicky Neumann spoke about Phase 3, the Fry's Corner [TE 3010at 0027:20], and Mark Neuman spoke about his appeal of the project, the expansion, RREEF, the construction parking, the parking fields and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    Macy's. [TE 3010 at 0065–0075.]  Mark English spoke at length. [TE 3010 at 0078–
2    0107; TE 3010 at 0110–0118.]  The City Council and staff then discussed various
3    aspects of the project.  [TE 3010 at 0118–0169.]  The City's economic consultant
4    Kosmont discussed aspects of the project.  [TE 3010 at 0169–0182, 0200–0207.]
5    Gibson discussed his traffic study.  [TE 3010 at 0183–0191.]  The Council then
6    decided it wanted a matrix of the issues involved in the project.  [TE 3010 at 0216–
7    219.]

8         **Rebuttal to ¶ 333**:  The Hacienda Parties fail to note the comprehensive letter
9         submitted by Mr. Briggs, on behalf of the Hacienda Parties, to the City
10        Council in opposition to the Project, and specifically, attacking the EIR, prior
11        to the October 8, 2013 City Council meeting.  *See* REEF's FFCL ¶¶ 125-27;
12        TE 70 at 0001-0009.  Concurrently with the letter, Mr. Briggs, on behalf of
13        the Hacienda Parties, also submitted a second expert providing "technical
14        comments" on the EIR and which alleged that the EIR was deficient and based
15        on stale data.  *Id.* at 0011-0016.

16        The Hacienda Parties also fail to note that Mr. Briggs spoke at the
17        meeting in opposition to the Project and that Mr. Neumann gave a lengthy
18        presentation before the City Council.  *See* RREEF's FFCL ¶¶ 130-34; TE 71;
19        TE 72 at 0060:13-0075:18.

20    **6.    City Council Meeting No. 6:  November 12, 2013**

21        334.   The City Council again met on November 12, 2013 to consider the
22    expansion of the MVSC.  Because of the varied concerns raised by numerous
23    members of the public as well as members of the City Council, staff prepared a
24    matrix of key issues.  [TE 2138:4; TE 3025 (Matrix at p. 6).]

25        **Rebuttal to ¶ 334**:  The Hacienda Parties fail to note that Mr. Peyton, on
26        behalf of Macy's, also appeared before the City Council and asked the City
27        Council to approve the Project and reiterated that Macy's fully supported the

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

152

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    Project.  TE 73 at 0101:2-0105:21.[7]  Mr. Peyton specifically noted: "We've

2    come to business terms with RREEF.  We're ready to make this deal.  At this

3    point, we're just waiting on City Council to approve it."  *Id.* at 0105:4-7.

4         The Hacienda Parties also fail to note that Mr. Neumann, on behalf of

5    the Hacienda Parties, spoke and gave a presentation at the meeting in

6    opposition to the Project.  TE 73 at 0110:22-0131:22; *see* TE 74 at 0001-0016.

7         335.   English testified: "to put shovel in the ground, need to work back about

8    a year" [TE 2138 at 089:7–9], and "so there's a lot of planning, detailed design,

9    construction drawings, and then you're got to go through a permitting process.  So

10   in order to put yourself In position there, really what your target date is mid-2016.

11   That's when you make the go, no-go decision."  [TE 2138 at 89:14–19.]

12   **Rebuttal to ¶ 335**:  Mr. English was not talking about the start of the Project

13   as a whole.  Instead, Mayor Lesser had asked about the timing of Phase 2,

14   where Phase 2 was the Macy's portion of the Project at that point in time.  TE

15   73 at 0088:16-0089:1.  Mr. English explained that if construction on the

16   Macy's expansion and parking garage was going to start within "several

17   months of completion of the village shops," then the "detailed design,"

18   "construction drawings" and "permitting process" would need to move

19   forward in mid-2016.  *Id.* at 0089:2-24.

20        336.   Councilmember Howorth stated: "I can't imagine that I'm going to

21   have a harder or more important decision as a Council member if I serve one term

22   or two terms."  [TE 2138 at 154:11–13.]  She further stated: "There's a lot of things

23   that need to be fleshed out."  [*Id.* at 156:1–2.]  Councilman Powell stated: "When

24   I'm told you got to make a decision today, that it can't wait a month or two, I'm very

---

[7] The Hacienda Parties have cited to Trial Exhibit 2138 in support of their timeline entries for the November 12, 2013 City Council meeting.  Trial Exhibit 2138, a copy of the transcript of the November 12, 2013 City Council meeting, was not admitted at trial or stipulated to in *Stipulation to Admit Additional Trial Exhibits* (ECF No. 265).  Trial Exhibit 73 is the admitted version of the November 12, 2013 City Council meeting transcript.  However, Trial Exhibit 73 and Exhibit 2138 are identical and citations to either are interchangeable.

1  suspect." [*Id.* at 159:21–23.] Councilman Burton said he felt like he is being rushed.

2  [*Id.* at 163.]

3       337.   RREEF's representative English declared "We've been at this for six

4  years, and we fell a lot of pressure to do something or just back off and say we're

5  going to deal with what we've got." [*Id.* at 191:15–18.] He stated: "We're not going

6  to negotiate.  We're not going to change the plan." [*Id.* at 191:24–25.] After further

7  discussion, Larry Kosmont, the City's economic consultant, stated: "if I heard the

8  Council's comments as you went around the dais, it's circulation, mass parking

9  design, construction parking plan, phasing commitment, put option and phasing

10 final.  I think these are all clearly issues that deserve back-and-forth discussion

11 sooner than later." [*Id.* at 196:1–6.]

12      **7.     City Council Meeting No. 7:  January 14, 2014**

13      338.   The City Council met again on January 14, 2014 to consider the project.

14 City staff had a number of recommendations for revisions to the project.  [TE 2139

15 (Transcript of 1/14/14 City Council Hearing) at pp. 9–24.]

16      **Rebuttal to ¶ 338**:  The Hacienda Parties fail to note that both Mr. Briggs and

17          Mr. Neumann, on behalf of the Hacienda Parties, both spoke in opposition to

18          the Project at the January 14, 2014 City Council meeting.  TE 2139 at 0101:6-

19          0112:16, 0112:20-0115:24.

20      339.   Planning Director Jester stated:  "What we heard from the Council and

21 from the community was that there were concerns with the scale of the project.  So

22 in order to address that, we felt it was appropriate to suggest to either eliminate some

23 square footage or transfer it to the next phase." [*Id.* at 33:2–7.]

24      340.   She further stated: "But if you look at the south deck and look at the

25 north deck, we think that there are a lot of opportunities to design that north deck to

26 minimize the visual impacts and—and have a much better design." [*Id.* at 33:13–

27 15.]

28      341.   English said that it had been a "cumbersome process" [*id.* at 45:23], and

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

154

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

"we've talked all along its been our presumption that prior to being issued a building permit for Phase 2 for the Macy's consolidation that we will have initiated the consolidation process with Macy's. And that will be a form process from which there's no going back. and our anticipation of that hasn't changed. As a practical matter, we can't get to the process of building permits without having spent at least a year designing those buildings with Macy's, which won't happen until there's a formal commitment to consolidate Macy's." [*Id.* at 59:7–18.]

342.    English said that RREEF has "to pull the trigger on that consolidation by July of 2016." [*Id.* at 69:7–8.]

343.    Mayor Powell stated that RREEF's response was "mostly a rejection of practically every item, except for a couple." [*Id.* at 70:16–21.] English responded that the staff's recommendations "don't work for us." [*Id.* at 79:16.]

344.    Again, there were numerous public comments, a presentation of 1,300 signatures on a petition opposing RREEF's proposal [*id.* at128:6–7], and comments by the council members. A motion was proposed that would prevent RREEF doing only Phase 1, and not Phase 2. [*Id.* at p. 282.]

**Rebuttal to ¶ 344**: In general, the Hacienda Parties have excluded their opposition activities that occurred outside of Planning Commission or City Council meetings from their timeline. The Hacienda Parties' opposition activities after the January 14, 2014 City Council meeting are particularly notable. They included, among other things: (a) Mr. Neumann providing a "Myth and Fact" sheet to members of the community that included numerous criticisms of the Project and RREEF. He expressly told Mr. Rizika to use or give out the sheet when talking to his neighbors. (b) Mr. Neumann setting up a website opposing the Project with the help of Mr. Krigsman and Colin Williams. (c) Mr. Neumann, in collaboration with Mr. Krigsman, ordering lawn signs opposing the Project to give to community members. (d) Mr. Neumann sending talking points to Loralie Ogden to oppose the Project at the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

155

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    upcoming City Council meeting.  *See, e.g.,* RREEF's FFCL ¶¶ 164-169.

2    **8.    City Council Meeting No. 8:  April 29, 2014**

3    345.    In the staff report for the April 29, 2014 City Council meeting, the City

4    Council listed the following as issues that needed to be addressed in connection with

5    the Project (many of which clearly have nothing to do with the Hacienda Parties):

6    a.  Approve Phases 1 and 2 only and tie them together so that both have to be

7        done.

8    b.  Require 10,000 square feet to be eliminated from Phase 1.

9    c.  Redesign the Phase 1 North parking structure similar to the Phase 1 South

10       parking structure.

11   d.  Require Macy's to consolidate prior to issuing permits for Phase 2 with

12       approval  contingent upon Macy's providing a commitment letter that they

13       will, in fact, consolidate.

14   e.  Cedar Way must connect to Rosecrans Avenue with Phase 2.

15   f.  Negotiate in good faith with Fry's to try keep them on the site.

16   g.  Provide a bond and not a letter of credit for all of the site amenities (traffic-

17       related items).

18   h.  The architectural elements, details, water features, landscaping, hardscaping,

19       and plaza should be similar to the concept renderings.

20   i.  Oak Avenue traffic study funded by the developer for a cost not to exceed

21       $20,000.

22   j.  All of the other conditions that were imposed and previously approved by the

23       Planning Commission to be included in the Resolution.

24   [TE 3027-0003.]

25   346.    City Council staff then discussed the 10 issues above.  [TE 3027 at 1–

26   48.] Planning Manager Laurie Jester noted that these conditions include requirement

27   that Macy's submit commitment letter, security deposit and plan check.  [*Id.* at 22–

28   23.]

347.   City expert Larry Kosmont gave a presentation and fielded questions. [*Id.* at 34-87.] Kosmont expressed the following concerns about Macy's: (1) Macy's commitment is key to the deal as Macy's can override expansion of the mall [*id.* at 49]; (2) Macy's is incentivized to consolidate but this is not guaranteed [*id.* at 52]; and (3) under the COREA, Macy's can block anything. [*Id.* at 83.]

348.   Mayor Pro Tem Powell noted that she does not know if Macy's agreement existed. [*Id.* at 59.] She also notes that all 56 Conditions Of Approval from the Planning Commission are part of the resolution being considered. [*Id.* at 162.]

349.   Neumann and Briggs were invited to speak [*id.* at 107–151] and Neumann was given 10 minutes. [*Id.* at 107.] Neumann discussed parking issues, the size of garages and parking ratios. [*Id.* at 113-122.] Neumann also discussed parking during construction [*id.* at 122–23] and traffic. [*Id.* at 131–33.]

**Rebuttal to ¶ 349**: The Hacienda Parties omit numerous opposition activities by the Hacienda Parties before, and at, the April 29, 2014 meeting.

First, on April 28, 2014, Cory Briggs submitted a letter from Mr. Smith of Smith Engineering & Management (the traffic engineer who submitted a report alongside Mr. Briggs's October 8, 2013 letter), which argued that the EIR was "inadequate and unsuitable for certification" and that the City's responses to comments were "evasive." TE 3027 at 0599-0603.

Second, on April 29, 2014, Mark Neumann, on behalf of the Hacienda Parties, emailed a letter to the City Council. TE 3027 at 0586-0591. The letter stated that the Hacienda Parties opposed the Project and requested that the City Council "deny the Project." *Id.* at 0588.

Third, on April 29, 2014, Brant H. Dveirin, an attorney acting on behalf of the Hacienda Parties, emailed and hand delivered a letter to the City Council. TE 3027 at 0592-0594. Mr. Dveirin stated that the Hacienda Parties

opposed the Project and requested that the City Council "deny the Project." *Id.* at 0592.

Fourth, in addition to Mr. Neumann speaking in opposition to the Project, Mr. Briggs and Mr. Dveirin also spoke in opposition to the Project on behalf of the Hacienda Parties at the April 29, 2014 City Council meeting. *See* TE 2140 at 0110:19-0143:8, 0143:9-0146:11, 0146:15-0150:23, 0151:16-0159:12. And while the City Council might have prefaced Mr. Neumann's presentation by giving him ten minutes to speak, *id.* at 0107:22, Mr. Neumann's opposition speech went well beyond that (to almost one hour) and featured a seventy-one slide presentation spanning over thirty-six pages of the transcript from the meeting, *see* TE 79; TE 2140 at 0110:19-0143:8, 0146:15-0150:23; TE 2167 at 2:20:10 to 3:15:17 (showing Mr. Neumann spoke before the City Council for almost an hour).

350. RREEF representative Mark English acknowledged that a commitment from Macy's was required before building permits can issue for Phase 1 and that negotiations with Macy's had been "torturous." [*Id*. at 176].

**Rebuttal to ¶ 350**: Immediately after explaining to the City Council that initial negotiations with Macy's were difficult, Mr. English continued, "[w]here we are today is that we've constituted a Memorandum of Understanding [with Macy's], which covers the important business points with Macy's on the consolidation." TE 2140 at 0176:16-19. Mr. English continued to note that RREEF expected to "fully comply" with the condition being proposed that would require RREEF to provide written evidence of a binding commitment to consolidate Macy's. *Id.* at 0176:5-25.

351. Council member Burton was still considering ideas like removing North Deck and replacing with open space. [*Id*. at 188–89.] Burton is also concerned about ensuring the earthquake safety of parking structures and what that would entail. [*Id*. at 206.]

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

158

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

**Rebuttal to ¶ 351**:  The City Council was simultaneously concerned with the Hacienda Parties' threat of CEQA litigation and other issues raised by the Hacienda Parties, such that the City Council decided to continue the meeting to May, 2014 so City staff could prepare responses to the comments made by the Hacienda Parties at the April 29, 2014 meeting.  TE 2140 at 0162:17-23, 0170:5-8, 267:24-268:5, 0282:19-0286:17, 0294:22-0298:21.

352.   The remainder of the hearing was public comment with 18 speakers, including Lauralee Ogden and Chris Prodromides, and panel discussion regarding the procedures going forward and scheduling the next hearing.  Public comments address wide array of issues including traffic, parking, safety, crime, and the size of the mall.  [*Id.* at 206–247.]

**9.      City Council Meeting No. 9:  May 20, 2014**

353.   In the staff report for the May 20, 2014 City Council hearing, the city council reiterates the 10 issues from the April 20, 2014 Staff Report:

a.  Approve Phases 1 and 2 only and tie them together so that both have to be done.

b.  Require 10,000 square feet to be eliminated from Phase 1.

c.  Redesign the Phase 1 North parking structure similar to the Phase 1 South parking structure.

d.  Require Macy's to consolidate prior to issuing permits for Phase 2 with approval  contingent upon Macy's providing a commitment letter that they will, in fact, consolidate.

e.  Cedar Way must connect to Rosecrans Avenue with Phase 2.

f.  Negotiate in good faith with Fry's to try keep them on the site.

g.  Provide a bond and not a letter of credit for all of the site amenities (traffic-related items).

h.  The architectural elements, details, water features, landscaping, hardscaping, and plaza should be similar to the concept renderings.

i. Oak Avenue traffic study funded by the developer for a cost not to exceed $20,000.

j. All of the other conditions that were imposed and previously approved by the Planning Commission to be included in the Resolution.

[TE 3028 (Staff Report for the May 20, 2014 City Council Hearing), at 0005.]

**Rebuttal to ¶ 353**: The Hacienda Parties leave out opposition activities from the Hacienda Parties that occurred before the May 20, 2014 City Council meeting.

On the morning of May 20, 2014, Mr. Neumann's late wife, Vicki Neumann, emailed a document called "Manhattan Village Mall Expansion Unanswered Questions," to the City Council. TE 3028 at 0312-0314. This document contained twenty-seven questions criticizing the Project and the City Council's approval process for the Project. *Id.*

Also on May 20, 2014, Brant Dveirin, on behalf of the Hacienda Parties, emailed and hand delivered a letter to the City Council requesting revisions to the MUP Amendment and stating that the Hacienda Parties "remain in opposition" to the Project. TE 3028 at 0316-0370.

354.   The purpose of the hearing was to consider the draft CEQA Resolution and Draft Project Resolution and to certify the Final EIR and adopt a resolution to approve MUP. [TE 2141 at pp. 1, 14.]

355.   The staff discussed issues to be addressed and procedures [*Id*. at 1–21] and Neumann and Dveirin gave a presentation. [*Id*. at 21–30.] Neumann raised general issues regarding Settlement Agreement with RREEF, height of garages and the issue of diminished parking in Lot F. Dveirin raised the issue of loss of parking spots in Lot F under the current plan and noted that project as planned is different from Settlement Agreement plans and the Hacienda Parties want more parking restored to Lot F area. [*Id*. at 25-28, 84-85, 211-212.]

**Rebuttal to ¶ 355**:  The Hacienda Parties fail to note that Mr. Briggs also appeared and spoke in opposition to the Project and the EIR at the May 20, 2014 City Council meeting on behalf of the Hacienda Parties.  TE 3029 at 0195-0196.  Mr. Briggs also made clear that, in addition to representing the Hacienda Parties, he was simultaneously representing SCMB and provided the same testimony on behalf of both the Hacienda Parties and SCMB.  TE 2141 at 0048:4-9

356.   Mr. English gave a presentation in which he discussed the project as a whole; he did not focus on any particular issues raised by the Hacienda Parties.  [*Id*. at 31–39.]   English says: "We've undertaken a number of modifications to that project as a result of comments from 3500 Sepulveda, Macy's, the Planning Commission, the City Council and members of the public both in private conversations, as well as in public testimony."  [*Id*. at 31:22–32:2.]

357.   English further explained: "This project has been about finding a balance between a number of different competing, sometimes, objectives.  We have aesthetics.  We have the village feel.  We have function.  This is about public space, as well as shopping and retail and parking."  [*Id.* at 32:16–20.]

358.   The City Council heard public comment from 22 people who addressed a wide array of issues including traffic, parking, safety, crime, and the size of the mall.  [*Id*. at 40–63.]  The Staff discussed concerns about not having a commitment from Macy's, the need for a traffic study for Oak Ave and Cedar, the existing 56 Conditions of Approval.  [*Id*. at 68–73.]

359.   English said he had a confidential Letter of Intent with Macy's but would not provide it to City.  [*Id*. at 75-76.]  English explained that if the project was not approved as is, RREEF was unlikely to continue with the project.  [*Id*. at 134–35.]

360.   Council member Burton raised the idea of an election to see if people want North Deck and South Deck.  [*Id*. at 140.]  He also questioned Gibson about

RREEF'S REBUTTAL TO HACIENDA PARTIES' PROP. FINDINGS OF FACT AND CONCLS. OF LAW

1   parking and traffic and expresses concerns about downgrading Cedar Way.   [*Id*. at
2   146–160.]  Mr. Burton is still concerned about whether Phase 3 should be included
3   in present approval, whether parking garages could be moved to better locations and
4   whether, if Phase 1 is approved, Phase 2 will ever get done.  [*Id*. at 190–97.]

5       361.   The then staff discussed concerns about Macy's.  Kosmont noted that
6   the lack of Macy's commitment had "always been the giant in the room when it
7   comes to this revitalization."  [*Id*. at 200.]  Burton wanted to get rid of the North
8   Deck but English said Macy's would not agree to that. [*Id*. at 231.] Council Member
9   D'Errico was frustrated that Macy's had not appeared in proceedings and did not
10  want to vote without a Macy's guarantee.  [*Id*. at 244.]  Neumann stated that he
11  would like RREEF to do Macy's first.  [*Id*. at 297.]

12      362.   Councilmember Powell made motion to approve the project with
13  stairwell and elevator on west side of the north deck, a requirement that RREEF and
14  3500 negotiate in good faith, and a reduction in parking to G+1.  English explained
15  that RREEF could not agree to that proposal because if parking is reduced to G+1,
16  the parking will be inadequate or the Village Shops will have to be reduced.  [*Id*. at
17  302–304.]

18      363.   Councilmember Powell's motion passed 3-2 even though English said
19  RREEF did not agreement.  City attorney Barrow said this will be coming back with
20  a resolution and CEQA resolution.  [*Id*. at 312.]

21      **Rebuttal to ¶ 363**:  The City Council voted in favor of the Project with five
22      additional conditions of approval, including a requirement that RREEF and
23      the Hacienda Parties negotiate in good faith.  See TE 3029 at 0207.

24  **10.    City Council Meeting No. 10:  December 2, 2014**

25      364.   In the December 2, 2014 Staff Report, the City Council noted: "The
26  draft resolutions were brought back to the City Council on May 20, 2014, and all the
27  property owners and the public were provided an opportunity to comment.  The
28  Council requested additional conditions and RREEF has been reviewing its options

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

162

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    since that meeting." [TE 3029 (December 2, 2014 City Council Staff Report), at

2    0002.]   On May 20, 2014, the City Council approved the resolution with the

3    following conditions added: (1) Stairway and elevator on west side of North Deck;

4    (2) North Deck is a G+2; and (3) in addition to approving Phase I and II, approve

5    Phase III. [*Id.* at 0003.]

6        365.   The City Council noted that RREEF had concerns about revisions. [*Id.*

7    at 3-6.]   In particular, "RREEF has indicated that it is unable to reduce the North

8    Parking Structure due to parking demand in the 'core area' which serves the existing

9    Mall and the proposed out door plaza and Phases I and II. [*Id.* at 0005.] The Council

10    also notes that RREEF agreed to provide a redacted Macy's agreement when it is

11    executed. [*Id.* at 0005.]

12        366.   In the December 2, 2014 hearing, Planning Manager Jester noted that

13    since the last meeting in May, the City Council had reached out to RREEF many

14    times.   RREEF had changed its management team and explored their different

15    options before providing its written response in November (approximately six

16    months after May meeting).   [TE 2142 (Transcript of December 2, 2014 City

17    Council Hearing), 0004–0005.]

18        367.   Ms. Jester discussed the various options available to the City Council,

19    including "Option B" which, among other things, had the North Deck at G+2 but

20    with a 90-foot set back on the western portion of the second deck.   [TE 2142 at

21    0008:11–20.]   RREEF Representative Joe Saunders explained that RREEF agreed

22    with most of conditions of Option B, but could not agree to "the further reduction of

23    any parking or anything to deck two" as the set back "jeopardizes the whole project."

24    [*Id.* at 0014.]

25        **Rebuttal to ¶ 367**:  The record does not reflect that RREEF felt setting back

26    the second level of the North Deck 90-feet would "jeopardize[] the whole

27    project."  Instead, Mr. Saunders' instead stated that what would jeopardize the

28    Project is the "further reduction" of parking to the North Deck, which is a

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

163

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

1    direct reference to the May 20, 2014 condition requiring that the North Deck
2    be reduced from G+2 to G+1.  *See* Rebuttal to ¶ 78.

3    368.   Neumann spoke, focusing on the Settlement Agreement and RREEF's
4    responses to City Council's conditions from the May meeting.  Neumann said that
5    RREEF should do the Macy's consolidation first because that is only way to
6    guarantee it gets done.  He also discussed parking ratios, parking during construction
7    [TE 2142 at 0030–0042.]  Council noted that it is not the City's concern if RREEF
8    breached a private agreement (i.e., the Settlement Agreement) with 3500; 3500 has
9    legal recourse for breach.  [*Id*. at 0048–0049.]

10    **Rebuttal to ¶ 368**:  The City Council did not state that "3500 has legal
11    recourse for breach."  Instead, the City Attorney explained to the City Council:
12    "[The Settlement Agreement is] a private agreement.  If they feel that there's
13    been some type of breach, that's not the City's concern.  I'm sure they have
14    legal recourse if they feel that either party hasn't complied with that
15    Settlement Agreement."  TE 2142 at 0049:13-17.

16    369.   The City Council then discussed the issue that, if RREEF reduces
17    parking as suggested by the Council, RREEF would fall below their parking ratio.
18    RREEF could address this by adding parking in the culvert but there is no way
19    around having parking garages.  [*Id*. at 0055–0056.]

20    370.   Council member Lesser asked Saunders why it took RREEF so long to
21    respond to the May meeting.  Saunders responded that RREEF had a new
22    management team and needed to reevaluate the project.  He also explained that
23    Macy's "looks at every single thing down to the angle of which way parking fields
24    face."  [*Id*. at 0061–0062.]  Council member D'Errico raised questions about Macy's
25    commitment [*id.* at 0071–0074], and Saunders responded that RREEF would not
26    sign an agreement with City delineating the narrow/unlikely circumstances that
27    would prevent it from adding 50,000 SF to Macy's home store.  [*Id*. at 0074–0075.]
28    Saunders also said there was no guarantee Phase III would get done.  [*Id*. at 0077.]

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

164

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW

**Rebuttal to ¶ 370**:  During the discussion of why RREEF had taken time to reconsider the Project, Mayor Lesser asked Mr. Saunders about whether or not RREEF had negotiated with the Hacienda Parties.  TE 2142 at 0063:7-9.  Mr. Saunders responded in the affirmative and emphasized that RREEF was "honoring every single element of [the] Settlement Agreement, unquestionably."  *Id.* at 0063:10-14.

371.  The Council then allowed public comment, at which 16 people spoke and addressed a wide array of issues ranging from traffic, parking, safety, crime, and the size of the mall.  [*Id* at 0089–0118.]

372.  Councilmember D'Errico explained that the most important issues were the Macy's consolidation and Fry's corner, and stated: "And I don't feel comfortable I have either here."  He further stated:  "I'm uncomfortable with the deal that I have in front of me, to say yes to it as is."  [*Id.* at 0128.]  Councilmember Burton also expressed concerns with the lack of Macy's involvement: "Now, when I asked Mr. English on the record he said, Macy's won't do it.  I'm sure if I asked Joe on the record, he probably would say, Macy's won't do it.  So here's why this negotiation's gone south the whole time, Macy's has never been at the table.  We've never talked to them.  We've never negotiated with them."  [*Id.* at 0142.]

373.  Councilmember Burton then discussed why RREEF or Macy's might back out [*id.* at 0143], at which point the council discussed having Macy's sign a written commitment.  [*Id.* at 0159.]  Council member Howorth opined that the City should ensure construction parking plan is beneficial to the Hacienda Parties.  [*Id.* at 0160.]

374.  The council approved the EIR by a 3-2 vote.  [*Id.* at 0162–63.]  Council members Burton and D'Errico wanted additional time to deal with issues such as Macy's, but ultimately the "Option B" resolution was approved 3-2, with the revised 90-foot set back included.  [*Id.* at 0184.]  The council noted that the two major changes were not approving Phase III and going back to the January motion with

1  respect to parking so it is G+2, but with the second deck set back 90 feet on the west

2  side.  [*Id.* at 0185, 0189.]

3

4  Dated: March 28, 2023          LATHAM & WATKINS LLP

5                                 By    */s/ Michael G. Romey*
                                        Michael G. Romey
6                                       *Attorneys for RREEF America REIT II*
                                        *Corporation BBB and Macy's West Stores,*
7                                       *Inc.*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RREEF'S REBUTTAL TO HACIENDA
PARTIES' PROP. FINDINGS OF FACT
AND CONCLS. OF LAW