NO-JS6

1

2

3

4

5

6

7

8

## UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  3500 SEPULVEDA, LLC, a Delaware limited liability company; and 13th & CREST ASSOCIATES, LLC, a California limited liability company, | Case No. 2:17-cv-08537-AFM |
| 12 | |
| 13 | **DECISION WITH FINDINGS OF** |
|    Plaintiff, | **FACT AND CONCLUSIONS OF** |
| 14 | **LAW** |
|    v. | |
| 15 | |
|    RREEF AMERICA REIT II | |
| 16  CORPORATION BBB, a Maryland corporation; MACY'S WEST STORES, INC., et al., | |
| 17 | |
| 18      Defendants. | |
| 19 | |
| 20  RREEF AMERICA REIT II CORPORATION BBB, a Maryland corporation | |
| 21 | |
| 22      Counter-Claimant, | |
| 23  3500 SEPULVEDA, LLC, a Delaware limited liability company; 13th & CREST ASSOCIATES, LLC, a California limited liability company; 6220 SPRING ASSOCIATES, LLC, a California limited liability company, | |
| 24 | |
| 25 | |
| 26 | |
| 27      Counter-Defendants. | |
| 28 | |

## INTRODUCTION

The facts of this case have been set forth in other decisions during this lengthy litigation. *See, e.g., 3500 Sepulveda, LLC v. Macy's W. Stores, Inc.*, 980 F.3d 1317 (9th Cir. 2020). The parties' claims center around a construction project to expand Manhattan Village Shopping Center (the "Shopping Center") in Manhattan Beach, California. The forty-four acre Shopping Center includes multiple parcels of land. Plaintiffs and Counterdefendants 3500 Sepulveda, LLC, 13th & Crest Associates, and 6220 Spring Associates ("the Hacienda Parties") own one parcel and the commercial building located thereon ("the Hacienda Building"). Macy's owns another single parcel of land, and RREEF America REIT II Corporation BBB ("RREEF") owns the remaining parcels. As summarized by the Ninth Circuit:

> In 2006, RREEF applied to the City of Manhattan Beach (the "City") for approval to renovate and expand the Shopping Center. Around the same time, Hacienda was attempting to convert parts of its building from office space to restaurants. RREEF and Hacienda vigorously opposed each other's plans for renovation, and various legal disputes arose.

*3500 Sepulveda, LLC*, 980 F.3d at 1321.

The remaining issues in the case are counterclaims brought by RREEF against the Hacienda Parties. In February 2023, the Court conducted a bench trial on RREEF's counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief. RREEF called as witnesses Joshua Lenhert, Philip Friedl, Patrick Gibson, David Bones, and Mark English, and lodged excerpted transcripts of the depositions of Mark Neumann, Sally Stocks, and Philip Pearson. (ECF 255.) The Hacienda Parties called two witnesses at trial – Mark Neumann and Christian Tregillis – and designated additional excerpts of depositions of Sally Stocks, Mark Neumann, and Philip Pearson. (ECF 255.) The parties filed post-trial briefs, proposed findings of fact and conclusions of law, and rebuttals. (ECF 273 through ECF 278.)

After reviewing the evidence from the trial and considering the parties' filings and arguments, the Court renders its decision and makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

## RELEVANT LEGAL PRINCIPLES/CONCLUSIONS OF LAW

1.      To establish a breach of contract under California law,[2] a plaintiff must show: (1) the existence of a contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) that the plaintiff suffered damages as a result of the breach. *Alpha GRP, Inc. v. Subaru of Am., Inc.*, 2018 WL 5986989, at *10 (C.D. Cal. June 8, 2018); *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008).

2.      In an action for breach of contract, the burden of proof on factual issues is preponderance of the evidence. *See* Cal. Evid. Code § 115. The party with the burden of proof must convince the trier of fact that its version of a fact is more likely to be true than not. *See Weiner v. Fleischman*, 54 Cal. 3d 476, 483 (1991); *Beck Development Co. v. Southern Pacific Transportation Co.,* 44 Cal. App. 4th 1160, 1205 (1996); Cal. Evid. Code § 115.

3.      "Under California law, contract interpretation is a question of law." *Malave v. City of Los Angeles*, 2018 WL 5816095, at *5 (C.D. Cal. Mar. 29, 2018) (quoting *S. California Stroke Rehab Ass'n., Inc., v. Nautilus, Inc.*, 782 F. Supp. 2d 1096, 1110 (S.D. Cal. 2011)). A contract must be interpreted "as to give effect to the mutual intention of the parties as it existed at the time of contracting[.]" Cal. Civ. Code § 1636. Where a contract is reduced to writing, "the intention of the parties is to be ascertained from the writing alone, if possible." Cal. Civ. Code § 1639; *see also RealPro, Inc. v. Smith Residual Co., LLC*, 203 Cal. App. 4th 1215, 1221 (2012) ("the mutual intention of the parties at the time the contract is formed governs

---

[1] Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

[2] There is no dispute that California law applies. *See 3500 Sepulveda, LLC*, 980 F.3d at 1321.

interpretation. Such intent is to be inferred, if possible, solely from the written provisions of the contract.") (citations omitted).

4.    "Under California law, contracts are interpreted as to give meaning to each word and phrase of the contract." *See City of Colton v. Am. Promotional Events, Inc.*, 2010 WL 5392761, at *6 (C.D. Cal. Dec. 21, 2010); *see* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").

5.    The plaintiff must show that its damages were caused by the defendant's breach. *Tribeca Cos. v. First Am. Title Ins. Co.*, 239 Cal. App. 4th 1088, 1103 (2015).

6.    "The test for causation in a breach of contract ... action is whether the breach was a substantial factor in causing the damages." *US Ecology, Inc. v. California*, 129 Cal. App. 4th 887, 909 (2005); *Bruckman v. Parliament Escrow Corp.*, 190 Cal. App. 3d 1051, 1063 (1987) (applying the "substantial factor" test in a breach of contract action); *Great Am. Ins. Co. v. Wexler Ins. Agency, Inc.,* 2000 WL 290380, at *16 (C.D. Cal. Feb. 18, 2000) (same).

7.    Under the substantial factor test, a defendant's conduct is a cause of a plaintiff's injury if: (1) the plaintiff would not have suffered the injury but for the defendant's conduct, or (2) the defendant's conduct was one of multiple causes sufficient to cause the alleged harm. *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1049 (1991) (the "but for" test "should not be used when two 'causes concur to bring about an event and either one of them operating alone could have been sufficient to cause the result'"); *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 969 (1997) ("The substantial factor standard ... subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact"); *Union Pac. R.R. Co. v. Ameron Pole Prod. LLC,* 43 Cal. App. 5th 974, 981 (2019).

8.    A defendant's breach of contract need not be the sole cause of the plaintiff's damages. *See* Judicial Council of California Civil Jury Instructions (CACI)

(2022) No. 430 ("A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm."); *see also Bruckman v. Parliament Escrow Corp.*, 190 Cal. App. 3d 1051, 1063 (1987) (a defendant generally must "pay damages equivalent to the total harm suffered" even though "the plaintiff's total injury may have been the result of many factors in addition to the defendant's tort or breach of contract") (citations omitted); *Britz Fertilizers, Inc. v. Bayer Corp.*, 665 F. Supp. 2d 1142, 1167-1168 (E.D. Cal. Oct. 16, 2009) ("For a breach to be a substantial factor in causing the damages, it need not be the 'sole' or exclusive cause of the damages."). A substantial factor must be more than "negligible or theoretical." *Rutherford.* 16 Cal. 4th at 978.

9. "Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." *Michaels v. Greenberg Traurig, LLP*, 62 Cal. App. 5th 512, 531 (2021) (quoting CACI No. 430). There is an exception to this "but for" requirement: Where there are "concurrent [independent] causes" the "proper rule for such situations is that the defendant's conduct is a cause of the event because it is a material element and a substantial factor in bringing it about." *Mitchell*, 54 Cal. 3d at 1049 (citations omitted).

10. Concurrent independent causes are multiple forces operating at the same time and independently, each of which would have been sufficient by itself to bring about the same harm. *Viner v. Sweet*, 30 Cal. 4th 1232, 1240 (2003); *Major v. R.J. Reynolds Tobacco Co*., 14 Cal. App. 5th 1179, 1198 (2017).

11. Whether or not a defendant's act is a substantial factor in bringing about a plaintiff's injury is a question of fact for the factfinder. *See T.H. v. Novartis Pharmaceuticals Corp*., 4 Cal. 5th 145, 198 (2017).

12. "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment proximately caused

thereby, or which, in the ordinary course of things, would be likely to result therefrom." Cal. Civ. Code § 3300.

13.     "[D]amages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent, ... albeit not with 'mathematical precision.'" *Sargon Enterprises, Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 773-774 (2012) (quoting *Grupe v. Glick*, 26 Cal. 2d 680, 693 (1945)). "[W]here the operation of an established business is prevented or interrupted" by a breach of contract, lost profits damages "are generally recoverable … that their occurrence and extent may be ascertained with reasonable certainty" from, for example, "the past volume of business." *Id.* at 774 (quoting *Grupe*, 26 Cal. 2d at 692). Generally, in the case of an unestablished business, "damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative." *Id.* at 774. "But although generally objectionable for the reason that their estimation is conjectural and speculative, anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability." *Id.* "Where the fact of damages is certain, the amount of damages need not be calculated with absolute certainty." *Id.* (quoting *GHK Assocs v. Mayer Grp., Inc.*, 224 Cal. App. 3d 856, 873 (1990)); *see Ever Win Int'l Corp. v. Prong, Inc.*, 2017 WL 1654063, at *3 (C.D. Cal. Jan. 6, 2017).

## FINDINGS OF FACT

### I.     <u>Background</u>

1.     The Manhattan Village Shopping Center ("the Shopping Center") is an approximately 44-acre shopping center located in the city of Manhattan Beach, California (the "City"). (ECF 246 (Joint Statement of Stipulated Facts), ¶ 1.)

2.     3500 Sepulveda, LLC owns a 0.7-acre parcel within the boundaries of the Shopping Center, on which is located a commercial building (the "Hacienda Building") with approximately 19,617 square feet of gross leasable floor area. (ECF

246, ¶ 2; ECF 183 (Joint Stipulated Facts Re Reasonableness Under the COREA) ¶ 3.)

3.   The Hacienda Building is owned by 3500 Sepulveda, 13th & Crest Associates, and 6220 Spring Associates ("the Hacienda Parties") as tenants in common. (ECF 246, ¶¶ 3, 4; ECF 273-1 (Hacienda Parties' Proposed Findings of Fact & Conclusions of Law) ¶ 3.)

4.   Mark Neumann is the managing member of 3500 Sepulveda and a member of 13th & Crest. (ECF 246, ¶ 6; Reporter's Transcript of Trial Proceedings ("TR") 53.)

5.   Macy's owns one parcel in the Shopping Center on which the Macy's Store is located. (ECF 183, ¶ 4.)

6.   RREEF owns the remaining 21 parcels. (ECF 246, ¶ 7; ECF 273-1 ¶¶ 1, 2; ECF 278 (RREEF's Rebuttal to Hacienda Parties' Proposed Findings of Fact & Conclusions of Law, ¶¶ 1, 2.)

7.   The deed from which the Hacienda Parties acquired their interest in the Shopping Center contains certain easements over certain areas of the Shopping Center for parking purposes. (ECF 273-1, ¶ 4; ECF 278, ¶ 4.)

8.   On or about November 1, 1980, the predecessors in interest to RREEF, Macy's and the Hacienda Parties entered into a Construction and Reciprocal Easement Agreement (the "COREA") which contains, inter alia, reciprocal easements in parking areas within the Shopping Center. RREEF and Macy's are designated as "prime parties" under the COREA. The prime parties have approval rights over redevelopment of the Shopping Center. The Hacienda Parties are not a prime party under the COREA. (Trial Exhibit ("TE") 21-0008; Reporter's Transcript of Trial ("RT") 834-835; ECF 278, ¶ 5.)

9.   The allowable uses of properties within the Shopping Center, including the Macy's and Hacienda Properties, are governed by a Master Use Agreement ("MUP"). (TE 3023-0089; ECF 278, ¶ 7.)

10.     The MUP limited the total square footage of restaurant use within the Shopping Center. (RT 55.)

## II.     The Settlement Agreement

11.     In November 2006, RREEF began the process to expand, upgrade, and redevelop the Shopping Center (the "Project") by submitting an application to receive various land use entitlements required by the City. (TE 2035 at 0001.) The application sought, among other things, to (a) construct new retail and restaurant gross leasable area and three parking structures; (b) reconfigure existing surface parking areas; and (c) install signs to identify and advertise the businesses within the Shopping Center. (TE 2035 at 0001).

12.     The Shopping Center was the largest commercial retail building and site in Manhattan Beach, and the Project was the largest to take place in Manhattan Beach in the last twenty years. (RT 426-427, 777-778; TE 3024 at 0006; ECF 278, ¶ 59.)

13.     The Hacienda Parties raised concerns about the Project's impact on the Hacienda Building. (TE 3033 at 0002.)

14.     At the time, the Hacienda Building was being used as office space, but the Hacienda Parties wanted to convert part of the Building to restaurant use. (RT 471-473.)

15.     RREEF objected to the Hacienda Parties' right to convert part of the Hacienda Building to restaurant use. (TE 3033 at 0001; RT 385-386.)

16.     To resolve their disputes about RREEF's proposed Project and the Hacienda Parties' rights to restaurant use, the parties entered into a Settlement Agreement (or sometimes "Agreement," herein) on October 8, 2008. (ECF 246, ¶ 8; TE 3033; RT 399-400.)

17.     The Project plans attached to the Agreement included a 2008 Site Plan and a 2008 Parking Plan (the "2008 Project Plans" or "the Settlement Agreement Site Plan"). (TE 3033 at 0037-0079 (Exhibit E) & 0080-0081 (Exhibit G).)

18.     Pursuant to the Agreement – relevant portions of which are set forth below – RREEF agreed (a) not to object to the Hacienda Building Application to incorporate restaurant space and (b) to cooperate in good faith with the processing of the hacienda Building Application. In exchange, the Hacienda Parties consented to the Project as depicted in the Project Plans and agreed (a) not oppose the City's Approval of the Project except as otherwise provided in the Agreement and (b) to cooperate in good faith with RREEF in the processing of its applications filed with the City, including RREEF's requests for entitlements and approval of the Environmental Impact Report. (TE 3033 at 0003-0005, 0011.)

19.     Specifically, the Agreement provides:

4.a. 3500 Sepulveda has reviewed and consents to the Shopping Center Project as depicted in the Site Plan attached hereto as Exhibit E; and 3500 Sepulveda will not oppose the City's approval of the Shopping Center Project, except as otherwise provided herein. 3500 Sepulveda acknowledges that such Site Plan and the RREEF Application for the Shopping Center Project may be amended from time to time consistent with the obligations provided herein. If such amendments materially affect the Hacienda Building, its tenants, and/or 3500 Sepulveda, RREEF agrees to advise 3500 Sepulveda of the amendments.

4.e. 3500 Sepulveda and RREEF agree to cooperate in good faith with each other in the processing of the Amended RREEF Application, including but not limited to the amended MUP and Environmental Impact Report, for the Shopping Center project and the entitlement process pertaining to such Applications.

4.f. 3500 Sepulveda and RREEF agree to cooperate in good faith with each other in the processing of applications for approvals from the City for improvements to either the Shopping Center or Hacienda Building within the scope of this Agreement. Consistent with the good faith cooperation agreed to herein, and at either Party's request, 3500 and RREEF agree to write a letter of support to the City for such applications.

4.g. Except as expressly provided otherwise in this Agreement, and subject to RREEF processing the Amended RREEF Application incorporating the Hacienda Building's use and provision for parking as provided herein, and consistent with the good faith cooperation agreed to herein, RREEF and 3500 Sepulveda acknowledge that 3500 Sepulveda does not waive the right to participate or comment on material alterations to the Site Plan for the Shopping Center Project which detrimentally affect the use or operations of the Hacienda Building.

* * * * *

5.c. RREEF may revise those portions of the Site Plan relating to the Parking Decks and the Parking Plan from time to time in its sole and absolute discretion or as required by the City, provided that RREEF shall submit any material revisions to those portions of the Site Plan relating to the North Deck and the Parking Plan to 3500 Sepulveda for its review and approval ten (10) business days prior to submitting such revisions to the City. Notwithstanding the foregoing, 3500 Sepulveda's failure to approve material revisions to the North Deck and/or Parking Plan shall not prohibit RREEF from submitting such material revisions to the North Deck and the Parking Plan to the City for consideration and

approval, nor shall 3500 Sepulveda be precluded from objecting to such material revisions it has not approved.

5.d. 3500 Sepulveda acknowledges that RREEF may elect in its sole and absolute discretion, subject to City approvals, to construct the Parking Decks, the South Deck only, or the North Deck only. If RREEF elects to construct only one of the Parking Decks, 3500 Sepulveda consents hereby only to RREEF' s construction of the South Deck. Construction of the North Deck only is and shall be considered a material revision to the Parking Plan, and nothing in 3500 Sepulveda's acknowledgement in the first sentence of this subparagraph 5d shall constitute its approval of, or waiver of its right to object to, construction of the North Deck only.

5.e. 3500 Sepulveda understands and acknowledges that during construction of the Shopping Center Project there may be temporary reductions in available parking, which has been addressed to 3500 Sepulveda's satisfaction by RREEF's agreement to implement the measures set forth in Exhibit G attached hereto and incorporated herein by reference.

(TE 3033 at 0004-0006.)

20.    The Settlement Agreement Site Plan depicts the "Lot F" area – the surface parking lot between the Hacienda Building and Macy's, before the proposed project – as containing 477 (465+12) parking spaces. The Site Plan shows 632 parking spots (509+42+20+37+12+12) available in the same area after completion of the North Deck. (TE 3033 at 0039-0045, 0063; *see also* TE 1314 at 1-2; RT 292, 460.)

21.    The Settlement Agreement Site Plan depicts the North Deck with two floors (G+1). The first floor is depicted as partially below ground. The North Deck is shown as having a height of 10'9" above ground level. (TE 3033 at 0047.)

22.    The Agreement further provides: "If RREEF pursues the Shopping Center Project, receives approval from the City for the Parking Decks, and proceeds to construct the Parking Decks, the construction of the Parking Decks shall be subject to the additional terms set forth in attached Exhibit G. (TE 3033 at 0006.)

23.    Exhibit G to the Settlement Agreement provides in part:

> 2.    During Stage One construction of the North Deck, there shall be not less than 240 parking spaces available in the area referenced as "Lot F" on the attached Exhibit H.

> 3.    During Stage One construction of the North Deck, and during Stage Two construction when reasonable access to parking for tenants, contractors, invitees, patrons and employees of the 3500 Sepulveda Property is impaired, RREEF will provide valet service or undertake other reasonable measures to provide alternative parking during such periods as approved by 3500 Sepulveda and at no cost to 3500 Sepulveda.

(TE 3033 at 0080.)

24.    As set forth in the Settlement Agreement, the Hacienda Parties agreed to the 2008 Site Plan as it existed, promised not to object, and promised to make good faith efforts to assist RREEF in its Application for an amended MUP and processing the EIR. If, however, RREEF made "material alterations to the [2008] Site Plan … which detrimentally affect the use or operations of the Hacienda Building" or "material revisions to the North Deck and/or [2008] Parking Plan," then the Hacienda

Parties' could comment on and/or object to those material changes. (TE 3033 at 0005 (Sections 4g and 5c); ECF 193 at 13-14.)

25.     The Settlement Agreement itself contemplated changes, and Mr. Neumann clearly understood and expected that some changes would be made to the Site Plan. (RT 476.)

26.     Under Section 4g, the material alteration must be one that detrimentally affects the use or operations of the Hacienda Building. (TE 3033 at 0005.) *See ASP Properties Group, L.P. v. Fard, Inc.*, 133 Cal. App. 4th 1257, 1269 (2005) ("The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' … controls judicial interpretation.") (*quoting* Cal. Civ. Code § 1638); *Patel v. Am. Econ. Ins. Co.*, 2014 WL 1862211, at *5 (N.D. Cal. May 8, 2014) (where term "direct physical loss" was not defined in contract, the court interpreted words in their ordinary and popular sense by relying on dictionary definitions).  Under Section 5c, this is not necessary for material revisions to the North Deck or to the 2008 Parking Plan that the Hacienda Parties did not approve.

27.     While the Settlement Agreement includes one such example (the decision to build only one of the planned parking decks (TE 3033 at 0006 (Section 5d)), the inclusion of an extreme example does not mean anything less would fail to rise to the level of a material alteration justifying objections by the Hacienda Parties.

28.     The Court finds that the words of the Settlement Agreement are not ambiguous, and therefore, it need not turn to extrinsic or parol evidence to interpret the meaning of "material alterations" or "material revisions." *See Han v. Mobil Oil Corp.*, 73 F.3d 872, 877 (9th Cir. 1995) (the determination as to whether a contract is or is not ambiguous is a question of law for the court); *SDR Cap. Mgmt., Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 320 F. Supp. 2d 1043, 1046 (S.D. Cal. 2004) (if a contract is "free from ambiguity, its meaning [is] a question of law to be determined by the court solely from its language.") (citation omitted); *see also RealPro, Inc. v. Smith Residual Co., LLC*, 203 Cal. App. 4th 1215, 1221 (2012) ("the mutual intention

of the parties at the time the contract is formed governs interpretation. Such intent is to be inferred, if possible, solely from the written provisions of the contract.") (citations omitted).

29.     The words used in the Settlement Agreement are given their ordinary and popular meaning. *See Tellis v. Contractors' State License Bd.*, 79 Cal. App. 4th 153, 163 (2000) (the contract did not define the term "material," and, consequently, the court "rel[ied] on the common meaning of the term 'material,' which is defined in the dictionary as 'substantial,' as opposed to trivial.") (citing Webster's Third New Internat. Dict., p. 1392, col. 2; American Heritage Dict. (2d college ed.1982) p. 772, col. 1.) "Material" is defined in the dictionary as "substantial," as opposed to trivial. (Webster's Third New Internat. Dict., p. 1392, col. 2; American Heritage Dict. (2d college ed. 1982) p. 772, col. 1.)

### III.    Changes to the Site Plan by RREEF

30.     On August 3, 2010, RREEF wrote a letter to the Hacienda Parties with revised plans that included a change the North Deck from a G+1 to a G+2. The letter also informed the Hacienda Parties that rather than 240 parking spaces, approximately 100 fewer spaces would be available during the construction of the North Deck. (TE 1007 at 0002.)

31.     Revised site plan shown to Mr. Neumann in November 2010 had 104 parking spaces available during construction of the North Deck, which Mr. English recognized was "less than the 240 parking spaces stipulated in the Settlement Agreement." (TE 1295 at 0004; RT 744.)

32.     On December 6, 2010, Mr. Neumann sent a letter to Mark English of RREEF stating that certain revisions appeared to be "material changes" when compared to the plans included in the Settlement Agreement. (TE 1295 at 0008.)

33.     The June 2012 Site Plan showed the North Deck as G+2 (rather than G+1) and reduced parking to 354 (278 fewer than the 632 parking spots shown in the Settlement Agreement Site Plan). (TE 1314 at 0008.)

34.     The April 24, 2013 Site Plan also showed the North Deck as G+2 and with reduced parking of 492 parking spaces (140 fewer than in the Settlement Agreement Site Plan). (TE 1314 at 7.)

35.     Similarly, the November 2014 Site Plan showed 496 parking spaces (136 fewer than in the Settlement Agreement Site Plan). (RT 464; TE 1314 at 0011; TE 3029 at 0181.)

36.     The final Site Plan, as constructed, provides 487 parking spaces in Lot F – 145 fewer than the Settlement Agreement Site Plan. (TE 1314 at 0017; RT 292, 465.)

37.     RREEF did not build the North Deck in two phases, but rather built it in a single phase. (TE 1007 at 0002.)

38.     RREEF did not maintain the 240 parking spaces in Lot F at all times during construction. *See* TE 10007 at 0002; *3500 Sepulveda, LLC*, 980 F.3d at 1324.

39.     Overall parking in the Shopping Center in both the Settlement Agreement Site Plan and the Site Plan eventually built were both at a ratio of 4.1 parking spaces per thousand square feet of retail space. (RT 247.)

40.     Patrick Gibson, an expert in traffic engineering and parking planning, opined that the changes from the Site Plan  attached to the Settlement Agreement to the later versions of the Site Plan (and in particular, the most recent 2017 Site Plan) were "not material." Mr. Gibson's opinion was based upon comparisons of the mixture of land use, the floor area, the overall parking supply, traffic circulations, and the parking distribution to the Shopping Center as a whole. (RT 262-266.)

41.     Mr. Gibson's comparison of the different site plans and his opinion about the materiality of the changes in those plan, did not assess (a) the desirability/convenience of parking inside or outside of Lot F (so long as the spaces were deemed reasonably close – within 600 feet of the Hacienda Building – as defined by national standards), (b) the desirability/convenience of ground level

parking versus parking in a two or three-level structure, or (c) "sight prominence" or "connectability" of the Hacienda Building. (*See* RT 262-269, 276.)

42.     Mr. Gibson generally agreed that it is less appealing for customers to drive up ramps to park on the third level of a parking structure than to park on the ground level. (RT 248-249.)

43.     Mr. Gibson also agreed that it is less desirable to park 600 feet from a location than it is to park 300 feet from a location. However, he pointed out that under national standards of retail parking, parking 600 feet from a location is "not unacceptable." (RT 279.)

44.     The site plan changes made by RREEF included a significant reduction in parking spaces in Lot F (the most desirable area adjacent to the Hacienda Building). For example, the June 2012 Site Plan reduced parking to 354 (278 fewer than the 632 parking spots shown in the Site Plan to which the Hacienda Parties agreed in the Settlement Agreement). (TE 1314 at 0007-0008.) The same is true of the Site Plan analyzed in the March 2013 Finale EIR. (TE 2128 at 0112.) Similarly, the November 2014 Site Plan showed 496 parking spaces (152 fewer than in the Settlement Agreement Site Plan). (RT 464; TE 1314 at 0011; TE 3029 at 0181.)

45.     Whether or not an "acceptable" number of parking spaces remained within the distance deemed reasonable under national standards or retail parking is not determinative. Such a fact would not render the changes trivial or immaterial because the agreed-upon 2008 Site Plan provided for a specific amount of parking in a specific area.

46.     The revised Site Plan also changed the North Deck from G+1 to G+2, and the concomitant increase in the height of the top deck to 22'0" (and the parapet increased to 26') – significantly increasing the height of the garage adjacent to the Hacienda Building from the version portrayed in the Settlement Agreement Site Plans. (*See* TE 3018 at 0182.)

47.    Finally, the revised Site Plan included a loss of 100 or more of the promised 240 parking spaces during construction, and the addition of one-and-a-half floors on the North Deck. (*See* TE 1295 at 0004; TE 1007 at 0002.)

48.    The Court finds that these changes regarding parking and visibility were substantial and material because they limited the amount of preferential parking and potentially cut off the visibility and accessibility of the Hacienda Building from other parts of the Shopping Center.

49.    Because RREEF made material alterations to the North Deck and the 2008 Parking Plan the Hacienda Parties were allowed to object to those material changes to the Site Plan. For example, the Hacienda Parties could object to changes in the number of parking spaces adjacent to the Hacienda Building and the increased height of the North Deck.[3]

50.    The fact that RREEF made material changes to the Site Plan did not permit the Hacienda Parties to object to any and all aspects of the Project, including those unrelated to the material changes. (*See* TE 3033 at 0005; ECF 193 at 13-14.) Thus, objections to matters beyond the those allowed in Sections 4g and 5c would constitute breaches of the Settlement Agreement.

## IV.    **Proceedings Before the City**

51.    Prior to commencing work on the Project, RREEF was required to obtain municipal approvals from the City, including (a) an amendment to the existing MUP for the Shopping Center ("MUP Amendment"), and (b) certification of an accompanying Environmental Impact Report ("EIR"), required by the California Environmental Quality Act ("CEQA"). (RT 42-43, 411-412, 662-663.)

52.    The MUP Amendment process requires an applicant to submit plans and other documentation about the proposed project to the City. The Planning

---

[3] Contrary to the Hacienda Parties' suggestion, the Site Plan changes made by RREEF did not constitute a breach of the Settlement Agreement. As set forth above, the Agreement provided that RREEF was permitted to make any changes, including material ones, subject to the Hacienda Parties' right to object.

Commission of the City of Manhattan Beach (the "Planning Commission") then receives public comments and holds public meetings to decide whether to approve the MUP Amendment. Its decision may be appealed to the City Council of the City of Manhattan Beach (the "City Council"). (RT 46, 411-412.).

53.    The EIR process entails a thorough review of the proposed project to analyze potential environmental impacts and mitigation measures. The City circulates a Draft EIR to the public, evaluates and responds to public comments (including through public meetings), and prepares a Final EIR for certification. The EIR certification is judicially reviewable in state court.  (RT 42-43, 259-260; *see* TE 2036 at 0003.)

54.    CEQA Guidelines require that a draft EIR be made subject to public review and comment for not less than 30 days nor longer than 60 days (except in unusual circumstances). Cal. Code Regs. Tit. 14, § 15105.

55.    On June 16, 2012, the Draft EIR was prepared and circulated by the City for public comment, which closed on July 17, 2012. (TE 2131 at 0006.)

56.    RREEF estimated it would obtain entitlements for the Project by December 2013, pre-construction work would be completed one year later, and construction would commence in January 2015. These estimates were based upon its prior experience with "their work in Southern California," including with a shopping center project in Marina del Rey, California (which was under the jurisdiction of the City of Los Angeles, not Manhattan Beach). (RT 46-47, 49-51, 98-99.)

57.    While RREEF may have believed that their estimate was realistic, there is no evidence about the average length of time the City of Manhattan Beach took to complete the entitlement or permit process with respect to other projects of the same (or similar) size.

58.    The first public meeting on the Project was held on June 27, 2012 before the Planning Commission. (TE 3001, 3014, 3015 at 0007.)

59.    The site plan submitted as part of the first Planning Commission meeting shows the North Deck as G+2 and a total of 354 spaces in Lot F. (TE 1314 at 0008; RT 463.)

60.    At the June 27, 2012 hearing, the Planning Commissioners considered presentations and asked questions about tax revenue, the Fry's electronics store, the possibility of an independent theater, pedestrian and bicycle access, traffic, lighting, carbon dioxide emissions, and potential impacts to "air, water, emissions, odors, and surface water quality." (TE 3015 at 0007-0012.)

61.    Seven members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. Those individuals raising objections discussed traffic, noise, potential for increased crime, lighting, and the need to preserve the small-town feel of the City. (TE 3015 at 0012-0013.)

62.    The second public meeting on the Project was held on October 3, 2012 before the Planning Commission. (TE 3008, 3016.)

63.    On September 24, 2012 (prior to the meeting), the Hacienda Parties wrote a letter to the City Planning Manager, Laurie Jester. The letter expressed concerns with the Project, including land use impacts on the Hacienda Building, impacts on existing easements, and parking. The letter was included in the October 3, 2021 staff report provide by the City to the Planning Commission. (TE 3015 at 0017-0021.)

64.    The staff report indicates that in advance of the October 3, 2012 meeting, forty-five residents, agencies, surrounding Cities, business owners, and other members of the public submitted written comments on the Draft EIR for the Project. One of those comments was made by Mr. Neumann on behalf of the Hacienda Parties, and it concerned zoning changes. (TE 3015 at 0003; *see* TE 2128 at 000215-000217, 000353-000359, 000492-000494.)

65.     The City categorized the Draft EIR comments into general subjects: "Size-Regional Draw," "Traffic, Mobility (Bicycles, Pedestrians, Transit) and Parking structures," "Lighting," "Crime," "Hazards," and "Miscellaneous." (TE 3015 at 0003-0004.)

66.     At the October 3, 2012 meeting, the Planning Commissioners inquired about the mock-up of the northwest corner of the Shopping Center, the design of the parking structures, including limits on underground parking due to the land's prior use as a Chevron tank farm, circulation of traffic, and bicycle accessibility. (TE 3016 at 0028-0032.)

67.     At the October 3, 2012 meeting, ten members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project.  The individuals objecting raised concerns about construction, rodents, attraction of visitors from outside of the City, parking, safety, design of the parking garages, the height of certain buildings, and soil hazards.  (TE 3016 at 0033-0037.)

68.     The third meeting on the Project was held on March 13, 2013 before the Planning Commission. (TE 57; TE 2134; TE 2155; TE 3016.)

69.     At the March 13, 2013 meeting, RREEF made presentations on soil contamination (Jeremy Squire, an environmental hazards consultant discussed the need to avoid extensive underground construction due to soil contamination, meaning that underground parking structures were not recommended for the site); bicycle/pedestrian elements of the plan; design; traffic circulation and parking (Patrick Gibson). The Planning Commissioners asked questions about the Fry's corner, the possibility of a "cleanup" of the contaminated soil, pedestrian pathways and bicycle access, mitigating traffic on Sepulveda, the potential of another movie theater, lighting, and the allocation of compact parking and electrical vehicle charging. (TE 3017 at 0051-0056.)

70.     Mr. Neumann appeared at the March 13, 2013 meeting on behalf of the Hacienda Parties. He opposed the Project; raised concerns about the potential traffic on Rosecrans Avenue, parking, and the density of the Project; and expressed that the northwest corner was a "key connection" that should be developed first. (TE 3017 at 0055; TE 2134 at 0123-0129.)

71.     Four members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. The individuals who raised objections discussed traffic, the parking structures, and the potential loss of the Fry's store. (TE 3017 at 0055-0056.)

72.     In March 2013, the City completed and published Volume I of the Final EIR. It was distributed for public review on April 2, 2013. (TE 2128; TE 2131 at 0006; TE 3017 at 0001.)

73.     The fourth public meeting on the Project was held on April 24, 2013 before the Planning Commission. (TE 2156; TE 3002; TE 3017.)

74.     On April 17, 2013, Mr. Neumann and Mr. Rizika sent a letter to Richard Thompson, the Director of Community Development for the City of Manhattan Beach, in which the Hacienda Parties wrote that they were "not in support of the current plans to expand the Mall." (TE 58 at 0001; Transcript of Deposition of Mark Neumann ("Neumann Dep.") at 78.)

75.     In response to the Hacienda Parties' letter, Mr. English wrote a letter to Mr. Thompson. Among other things, Mr. English addressed the Settlement Agreement as referred to by the Hacienda Parties. In relevant part, Mr. English wrote: "The Settlement Agreement referred to by [the Hacienda Parties] anticipates changes to the site plan," and requires RREEF to notify the Hacienda Parties of "any material changes to the site plan, and further specifies certain minimum parking amounts during and after construction." (TE 1302 at 0002.) Further, Mr. English stated that the Hacienda Parties are "within its rights under the agreement to object to changes in the site plan, however its approval specifically is not [a] requirement for the

entitlement application to proceed." Mr. English also indicated that "the proposed plan meets the parking requirements of the COREA and the Settlement Agreement." (TE 1302 at 0002.)

76.    Prior to the April 24, 2013 meeting, two members of the public who were not affiliated with the parties submitted written comments objecting to the Project based upon traffic and tree preservation. (TE 3017 at 0075-0076.)

77.    At the April 24, 2013 hearing, Planning Commissioners heard presentations on, and asked questions about project phasing, redesign of the South Deck, parking deck lighting, location of loading docks and deliveries, pedestrian and bicycle access, the possibility of a dog park, bridge connections, employee parking and the use of a shuttle for employees, valet parking, parking ratios, and traffic concerns. (TE 3018 at 0148-0150, 0152.)

78.    The site plan presented at the April 24, 2013 meeting showed 487 spaces in Lot F. (RT 463-464; TE 1314 at 0010.)

79.    Nine members of the public who were not affiliated with the parties spoke at the April 24, 2013 meeting both in favor of and objecting to aspects of the Project. Those objecting raised concerns about apparent inadequacies in the EIR due to a lack of specific enough plans, traffic, the loss of local identity, and parking. (TE 3018 at 0152-0153.)

80.    Tracie Manick, Vice President of Macy's at the Shopping Center spoke at the meeting and told the Commissioners that the Manhattan Beach Macy's store is one of the most productive in the country; high consumer growth was predicted at the location; and urged that parking standards be maintained as proposed by RREEF. (TE 3018 at 0150-0151.)

81.    The fifth public meeting on the Project was held on May 22, 2013 before the Planning Commission. (TE 59; TE 2086 at 0105; TE 2157; TE 3003; TE 3018.)

82.    At the May 22, 2013 meeting, Mark English appeared on behalf of RREEF, addressed issues of parking and lighting, and presented two letters of support from Macy's. (TE 2086 at 0109-0110; *see also* TE 1249.)

83.    Mr. Neumann spoke at the May 22, 2013 meeting and opposed the Project on behalf of the owners of the Hacienda Building. Among the arguments raised by Mr. Neumann, he stated that the Planning Commission should give RREEF "a quarter" or "10 percent" "of what they were asking for." Mr. Neumann also criticized parking, voicing concerns about the G+2 North Deck plan. (TE 59 at 0002-0008; TE 2086 at 0106; TE 3003 at 0019-0022, 0143-0145.)

84.    Thirteen members of the public who were not affiliated with the parties spoke at the May 22, 2013 meeting both in favor of and objecting to aspects of the Project. Those who raised objections discussed traffic, parking, pollution, the EIR, crime and safety, and construction staging. (TE 2086 at 0106-0107, 0111.)

85.    The sixth public meeting on the Project was held on June 26, 2013 before the Planning Commission. (TE 61; TE 2007; TE 2086; TE 2158.)

86.    Prior to the meeting, Mr. Neumann sent an email to the Planning Commission stating that the Planning Commission did not properly notice the meeting and asked them to further delay the meeting in order to rectify the notice issue. (TE 2086 at 0286.)

87.    In advance of the June 26, 2013 meeting, seven members of the public submitted written comments both in favor of and objecting to aspects of the Project. The people raising objections discussed concerns about visibility due to the development, safety and crime concerns, the median break on Rosecrans Avenue, traffic, and parking. (TE 1067; TE 2086 at 0259-0289.)

88.    At the June 26, 2013 meeting, Mark English, on behalf of RREEF, presented on RREEF's disagreement with certain proposed conditions of approval for the project. Following Mr. English, Mr. Neumann spoke regarding the conditions of approval, and agreed with Mr. English as to certain issues regarding the conditions

of approval, including: (1) a condition of approval to delay installing 50 parking spaces in Phase 3 rather than Phase 2; (2) a condition of approval regarding a ramp, which Mr. Neumann suggested should be constructed concurrent with theater demolition; and (3) ensuring that all existing uses are "grandfathered in." (TE 3019 at 0064-0066.)

89.   Mr. Neumann spoke at the June 26, 2013 as the owner of 3500 Sepulveda. Mr. Neumann opposed the Project, raising concerns about the parking plan, the timing for installation of parking, the height of the parking garages, the phasing of the Project, and the planned location of a dog park as part of the Project. (TE 61 at 0002-0007, 0014-0016; TE 2007 at 0017-0022; TE 3019 at 0060.)

90.   Nineteen members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. The people raising objections discussed parking, traffic, and the Project's size. (TE 3019 at 0060-0062, 0066.)

91.   On June 26, 2013, the Final EIR was certified by the Planning Commission. (TE 3021 at 0004.)

92.   On July 9, 2013, Mr. Neumann, on behalf of 3500 Sepulveda, provided notice to the City of the Hacienda Parties' appeal of the Planning Commission's certification and approval of the EIR. (TE 62.)

93.   On that same day, Mr. Neumann sent emails to Mr. Thompson and Ms. Jester, explaining the Hacienda Parties appealed the Planning Commission's certification of the EIR on the grounds that "[t]he Environmental Impact Report does not comply with the requirements of the California Environmental Quality Act and other Laws." (TE 63 at 0003; TE 3021 at 0003, 0103-0105.)

94.   The following day, Mr. Neumann sent an email to each member of the Planning Commission and the City Council, with the subject line "Appeal of Manhattan Village Mall EIR." Mr. Neumann appealed on the ground that the Project as planned "would inappropriately reduce the rights of 3500 Sepulveda property."

Mr. Neumann's email states that the appeal is based upon flaws in the EIR which rendered it out of compliance with the CEQA and an allegation that the EIR is "based on assumptions that inappropriately reduce the rights of 3500 Sepulveda." (TE 85 at 0005-0027.)

95.   The seventh public meeting on the Project was held on July 24, 2013 before the Planning Commission. (TE 2159; TE 3019; TE 3032.)

96.   RREEF wrote a letter to the Planning Commission in advance of the meeting, outlining its concerns regarding certain conditions of approval and proposing modifications to address those concerns. (TE 3019 at 0255-0265.)

97.   On July 23, 2013, the Hacienda Parties sent a letter to the Planning Commission stating that they were opposed to the proposed Project because it improperly deprived the Hacienda Parties of their vested property rights. (TE 2008 at 0002-0007.)

98.   On July 24, 2013, Mr. Neumann and Mr. Rizika, on behalf of the Hacienda Parties, wrote the Planning Commission urging the Planning Commission not to approve the EIR, the MUP Amendment, and any other approvals related to the Project because approval of the EIR "would violate the California Environmental Quality Act, the Planning and Zoning Law, and your agency's own ordinances and policies." As an example, the Hacienda Parties noted that the EIR did not "adequately analyze all environmental measures" and asserted that the mitigation measures in the EIR were "insufficient."  (TE 64.)

99.   In advance of the July 24, 2013 meeting, seventy-eight members of the public who were not affiliated with the parties submitted written comments both in favor of and objecting to aspects of the Project. Those raising objections discussed variances for the height of the parking structures, lighting, and signage. (TE 3019 at 0252-0341.)

100.  At the July 24, 2013 meeting, Mark English, on behalf of RREEF, discussed conditions of the draft Resolution that RREEF did not agree to, including

signage, EV charging, and land uses and square footage. Michael Burch, RREEF's signage consultant, discussed RREEF's updated sign program for the Project. (TE 3021 at 0110.)

101. Mr. Neumann and Mr. Rizika, identifying themselves as "managing members" of 3500 Sepulveda, spoke at the July 24, 2013 meeting and opposed the Project. Among other things, they raised their appeal of the Final EIR, their perceived diminished rights under the Project, parking, and the proposed dog park. (TE 3021 at 0114; TE 3032 at 0078.)

102. Seven members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. Those objecting raised concerns about signage, parking structures, and traffic. (TE 3021 at 0113-0014.)

103. At the July 24, 2013 meeting, the Planning Commission approved the Project, including the MUP Amendment and the EIR, subject to sixty-four conditions of approval. (TE 3021 at 0012-0049; TE 2035 at 00001.)

104. On or before August 5, 2013, the Hacienda Parties retained Cory Briggs, an attorney who specialized in CEQA litigation. On August 6, 2013, Mr. Briggs' law firm, the Briggs Law Corporation, wrote the City on behalf of the Hacienda Parties, appealing the certification of the EIR and approval of the MUP. The appeal contended that the approvals "violate[d] the California Environmental Quality Act, the Planning and Zoning Law, and your agency's own ordinances and policies." As an example, the letter noted that the EIR did not "adequately analyze all environmental measures" and identified the mitigation measures in the EIR as "insufficient." (TE 65; TE 86; RT at 667.)

105. RREEF also appealed the Planning Commission's conditions of approval. (TE 2035 at 0001.)

106. At the August 6, 2013 City Council meeting, City Staff provided a report on the Project, and the City Council officially called the Project up for review under

its authority to review Planning Commission decisions. Laurie Jester, the City Planning Manager, said that she expected the approval process to take two public meetings, and the Council scheduled three meeting dates to consider the Project. (TE 3004 at 0003-0008, 0022; *see* TE 3021 at 0001.)

107.   At the August 6, 2013 meeting, three members of the public who were not affiliated with the parties spoke at the meeting objecting to aspects of the Project. The objections raised included lack of communication between the community and RREEF and financial impacts to the City. (TE 3004 at 0013-0016.)

108.   On August 9, 2013, RREEF appealed two of the sixty-four conditions of approval imposed by the Planning Commission: (1) a condition of approval that delayed approval of the Master Sign Program, which RREEF represented was an integral component of the Project, and (2) the imposition of maximum square footages (i.e., caps) on several approved land uses at the Shopping Center. (TE 3021 at 0093.)

109.   The ninth public meeting on the Project was held on September 3, 2013 before the City Council. (*See* TE 3005.)

110.   In advance of the September 3, 2013 City Council meeting, three members of the public who were not affiliated with the parties submitted written comments both in favor of and objecting to aspects of the Project. Those raising objections discussed their preference for below-ground parking structures rather than above ground parking structures, traffic, noise and light pollution, and parking. (TE 3021 at 0106-0107, 0233-0234.)

111.   A representative for Macy's, Kelvin Peyton, appeared at the September 3, 2013 meeting, expressed support for the Project, and asked the City Council to approve it. (TE 3005 at 0100-0103.)

112.   The Hacienda Parties did not speak or present at the meeting. (TE 3005 at 0094; RT 678.)

113.   Eight members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. Those raising objections discussed traffic, the scope of the project, the proposed height variance, the traffic study, the density of the Project, lighting, and employee parking. (TE 3005 at 0099-0100, 0104-0117.)

114.   The tenth public meeting on the Project was held on September 10, 2013 before the City Council. (*See* TE 3006.)

115.   On September 5, 2013, RREEF sent the City Council a letter regarding RREEF's appeal of the master sign program. The letter asserted that the proposed sign program was an important component of the Project, noted that the Planning Commission did not reject the master sign program, but instead did not approve the program and deferred action on it, and requested that the City approve the master sign program concurrently with the Project and not defer approval until a later date. (TE 3022 at 0025-00441.)

116.   On September 5, 2013, Mr. Neumann emailed a City Councilmember a list of his concerns about the Project. Among Mr. Neumann's concerns were traffic/parking, Project phasing, and site density. (TE 87 at 0001, 0005.)

117.   In advance of the September 10, 2013 meeting, two members of the public who were not affiliated with the parties submitted written comments both in favor of and objecting to aspects of the Project. The person raising objections to the Project discussed the height of the parking structures and traffic. (TE 3022 at 0045-0046.)

118.   At the September 10, 2013 meeting, RREEF discussed numerous issues and presented on its appeal of the two conditions of approval, noting that it fully supported sixty-two of the sixty-four conditions of approval. With regard to the land use caps, RREEF requested additional square footage that could be used for restaurant space – 109,000 square feet allocated to restaurants rather than 89,000. RREEF told the City Council that the EIR analyzed the additional 20,000 square feet

in requested restaurant square footage allocation and that it would have no additional impacts on the EIR. With regard to Project signage, RREEF's representative, Mr. Burch, noted that, due to the increase in the gross leasable area under the Project, the Shopping Center would need increased signage space to appropriately identify all of the tenants in the Shopping Center. RREEF also noted that there was no disagreement between RREEF and City staff on the signage requests. (TE 3006 at 0109-0123.)

119.   When asked by Mayor Lesser for the City staff's views on RREEF's appeal, City staff responded that "staff is in support of the sign program" proposed by RREEF as part of its appeal. (TE 3006 at 0135-0136.)

120.   Twelve members of the public who were not affiliated with the parties spoke at the September 10, 2013 meeting both in favor of and objecting to aspects of the Project. Those objecting raised concerns regarding the size of the Project, traffic, the appeals process, crime, parking, and that the City was being rushed into the decision. (TE 3006 at 0009-0028.)

121.   At the September 10, 2013 meeting, City Councilmember Burton indicated that, before having a presentation on the final EIR made by City staff, he would like to hear from the Hacienda Parties because they were the party that "actually appealed" the EIR. The Hacienda Parties declined to raise any objection or comment. (TE 3006 at 0028, 0133-0134; RT 680-681.)

122.   On September 16, 2013, Mr. Neumann sent an email to members of the public asking them to sign a petition hosted on www.change.org against the Project. Mr. Neumann also personally signed the petition. (TE 89 at 0002; RT 435-436.)

123.   The eleventh public meeting on the Project was held on September 17, 2013 before the City Council. (*See* TE 3007.)

124.   In advance of the September 17, 2013 meeting, two members of the public who were not affiliated with the parties submitted written comments raising

objections to the parking structures, the scale of the Project, the character of the mall, and traffic. (TE 3023 at 0019, 0155.)

125.   On the afternoon of September 17, 2013, Mr. Briggs, on behalf of the Hacienda Parties, sent the City Council a letter opposing the EIR. In the letter, Mr. Briggs contended that (a) his clients believed an alternative to the Project as proposed would be better for the City; (b) the EIR did not analyze a reasonable range of alternatives; (c) the City could not certify the EIR in compliance with CEQA; (d) the traffic analysis prepared by the City was convoluted; and (e) there were problems with the mitigation measures "from a legal perspective." Mr. Briggs's letter also attacked the adequacy of the City's traffic analysis in the EIR with specificity. Attached to the letter was a twenty-six page report from an expert, Gabriel Elliot, criticizing the EIR. The report included thirty-five comments which pointing out alleged deficiencies in the EIR's traffic analysis. (TE 66 at 0001; TE 3023 at 0121, 0127-0154.)

126.   At the meeting, Councilmember Burton mentioned that he had not had time to read the "challenge document to that traffic study" which the Hacienda Parties had submitted hours earlier. (TE 3007 at 0099-0100.)

127.   Mr. Briggs and Mr. Neumann spoke at the September 17, 2013 meeting, opposing the Project on behalf of the Hacienda Parties. (TE 3007 at 0134-0154, 0158-0163; RT 682.)

128.   Mr. Neumann's statements opposing the Project included complaints related to changes in the Site Plan over time. He also made unrelated comments, among them: he compared the Project to a 133,000 square foot Wal-Mart Superstore and he characterized RREEF as out-of-towners who did not care about the City of Manhattan Beach and were likely to leave once the Project was approved. (TE 3007 at 0144:5-20; RT 682-685.)

129.   Mr. Neumann also gave a 26-slide presentation at the September 17, 2013 City Council meeting in opposition to the Project. The presentation covered

30

numerous topics, including assertions that: (a) the proposed site plan violated the COREA and the Grant Deed; (b) RREEF would likely hold the property for ten years and then sell it; (c) RREEF did not care about the community and lived in San Francisco; (d) people would stop coming to the mall because of construction; (e) the electrical transformer supplying the mall was inadequate and it was "irresponsible to place a building on our main electrical transformer that serves your whole mall"; (f) a "refresh" should not include a Wal-Mart Superstore; and (g) earlier plans by a prior owner included a hotel and Mr. Neumann's calculations showed that a hotel would bring the City much more revenue than RREEF's planned project. Mr. Neumann urged the City Council to deny the EIR certification, send the Project back to planning to reduce its size and impact. (TE 3007 at 0134-0163; TE 68 at 0003-0016; RT 489.)

130.   In his opposition on behalf of the Hacienda Parties, Mr. Briggs argued, among other things: (a) the EIR postponed mitigation and analysis of impacts, which was "illegal under CEQA," (b) there were a number of inadequate analyses in the EIR; (c) there was a "conflict of interest" issue with the soil engineer who analyzed soil for the EIR because the report was prepared for RREEF, which could expose the City to liability; (d) the EIR did not "crunch[] numbers" which "ma[de] [the City's] CEQA document deficient"; and (e) the City Council should deny certification of the EIR, deny the Project, and revisit a smaller project because the EIR analysis was defective. (TE 3007 at 0157-0164.)

131.   Six members of the public who were not affiliated with the parties spoke at the meeting objecting to aspects of the Project. Objections were related to traffic, light poles, grading, the fact that the plans were not customized to the City, the size of the Project, crime, and parking. (TE 3007 at 0163-0177.)

132.   At the conclusion of the meeting, Mayor Lessor set out a list of items that needed to be addressed at a future meeting: First, he believed it was imperative to clarify the role of the City when two private parties (RREEF and the Hacienda

Parties) were embroiled in a legal dispute over a private agreement. Councilmember Burton requested copies of the COREA and grant deed. Councilmember Powell was concerned about the legal issue of a conflict of interest which needed to be resolved before they could certify the EIR. (TE 3007 at 0182-0186.)

133.   The City Council scheduled an additional meeting for October 8, 2013. (TE 3007 at 0131-0132.)

134.   The twelfth public meeting on the Project was held on October 8, 2013 before the City Council.  (*See* TE 72.)

135.   On the day of the meeting, Mr. Briggs, acting on behalf of the Hacienda Parties, sent a nine-page letter to the City Council in opposition to certification of the EIR and the Project as a whole. The letter criticized some of the technical aspects of the EIR and made legal arguments as to why the EIR was deficient and failed to "comply with CEQA's mandates." Among other things, the letter challenged the EIR's aesthetic impact analysis, air quality analysis, greenhouse gases emissions analysis, analysis of hazards and hazardous materials, analysis of noise, analysis of water supply and quality, and analysis of "reasonable alternatives." Attached to the letter, the Hacienda Parties submitted an expert report from traffic engineer Daniel Smith of Smith Engineering & Management, which provided "technical comments" on the EIR. According to Mr. Smith's report, the EIR failed to disclose the full impact of the Project, it was deficient, and the analysis was based on stale data. (TE 70 at 0001-0016.)

136.   In advance of the October 8, 2013 meeting, five members of the public who were not affiliated with the parties submitted written comments both in favor of and objecting to aspects of the Project. The people raising objections had concerns about the scale of the Project, parking structures, parking, and traffic. (TE 3024 at 0398-0399, 0403-0405, 0422.)

137.   Mr. Neumann and Mr. Briggs both spoke at the meeting and opposed the Project. (TE 72 at 0060-0075.)

138.   Mr. Neumann gave a presentation and requested that the City Council grant the Hacienda Parties' appeal, deny the EIR certification, send the Project back to the Planning Commission, and reduce the size and impact of the Project. His slide presentation focused on four issues regarding the EIR: traffic (including the inadequacy of the traffic study), construction parking, the impact on utilities, and project alternatives. (TE 71 at 0002-0008; *see also* TE 72 at 0065-0075.)

139.   Mr. Briggs told the Councilmembers that he had a traffic expert (Mr. Smith) review the EIR's traffic analysis and that the expert concluded the analysis was deficient. (TE 72 at 0062-0063.)

140.   Thirty-three members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. Those raising objections discussed the size and scope of the Project, crime, the traffic study, traffic, height variance, and the design of the parking structures. (TE 72 at 0008-0058.)

141.   At the conclusion of the meeting, Councilmember Powell expressed reservations about the City approving the Project without an agreement between the Hacienda Parties and RREEF. Councilmember D'Errico agreed, stating that he would feel more comfortable approving the Project if RREEF and the Hacienda Parties were in agreement about the plan. (TE 72 at 0116-0117, 0133, 0156.)

142.   The thirteenth public meeting on the Project was held on November 12, 2013 before the City Council. (*See* TE 73.)

143.   On November 1, 2013, RREEF submitted a letter to City staff to summarize RREEF's proposed modification to the Site Plan – made in response to comments from the City Council, the Hacienda Parties, City staff, and the public – and to the conditions of approval. (TE 3025 at 0013-0019.)

144.   On November 5, 2013, Mr. Neumann responded in an email to RREEF's November 1 letter, stating that RREEF's revisions "surprised" the Hacienda Parties and commenting on those revisions. (TE 3025 at 0060.)

145.   At the November 12, 2013 meeting, Mr. Peyton appeared on behalf of Macy's. Mr. Peyton asked the City Council to approve the Project and reiterated that Macy's was committed to the Project. Mr. Peyton told the Councilmembers: "We've come to business terms with RREEF. We're ready to make this deal. At this point, we're just waiting on City Council to approve it. … And I'd respectfully ask that you do it sooner [rather] than later…" (TE 73 at 0101-0108.)

146.   Mr. Neumann, on behalf of the Hacienda Parties, spoke at the meeting and opposed the Project. He presented a 16-slide presentation. Mr. Neumann raised numerous concerns about the Project and asked the City Council to approve the Hacienda Parties' appeal of the EIR and send the Project back to the Planning Commission. He also proposed an alternative site plan to the City Council that had only one parking garage on the Northeast corner and no South or North Decks. (TE 73 at 0110-0131; TE 74 at 0012-0016; RT 510-521.)

147.   Councilmember Burton asked City staff to prepare a response to Mr. Neumann's presentation. He said he would like to hear more on the EIR "because there was some compelling testimony given by … Mr. Neumann's attorney on the [EIR]." Councilmember Burton queried whether the "one garage" plan presented by Mr. Neumann was a possibility. While Councilmember Burton observed that there were a number of appeals pending, the one he needed "additional evidence" on was the appeal of the EIR. (TE 73 at 0151-0152, 0197-0198, 0204.)

148.   Councilmember D'Errico also indicated that he would like to have an additional meeting to address the issues that were raised at the meeting. (TE 73 at 0179.)

149.   Mayor Lesser noted that the Hacienda Parties "had an opportunity to participate at the Planning Commission level and ha[ve] withheld [their] comments until this point, which makes it very difficult to move the project forward ever, because it's a constantly changing sort of series of objectives, even though I share

some of the concerns that Mr. Neumann has raised." (TE 73 at 0168; *see also* TE 73 at 0208.)

150.   Ten members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. The individuals raising objections to the Project discussed potential disruptions, Mr. Neumann's opposition to the Project, the lack of a construction parking plan, deed restrictions, the need for additional traffic studies, security, lighting, and the scope and size of the Project. (TE 73 at 0132-0149.)

151.   City staff recommended that the City Council close the public meeting so they could respond to the late comments – including those from the Hacienda Parties – and finalize the EIR. Councilmember Powell noted that he was in favor of tweaking the current plan so there would be just one parking structure on the northeast side, a comment that tracked Mr. Neumann's proposal. Councilmember Powell also observed that the Project could get tied up if the Hacienda Parties and RREEF litigated, and said that in order to approve the Project, he would need the Hacienda Parties and RREEF to "get their differences resolved." Later in the meeting he reiterated that one of the "most important" things to him was "to have the two parties get together and resolve their issues so that despite our best efforts, this doesn't get tied up in court for a long time, which would benefit nobody." (TE 73 at 0028, 0039, 0161-0163, 0171-0174, 0177-0178; TE 74 at 0012-0016; RT 518-521.)

152.   The fourteenth public meeting on the Project was held on January 14, 2014 before the City Council. (*See* TE 2139.)

153.   On January 10, 2014, Mark Neumann, on behalf of 3500 Sepulveda, wrote a letter to the City Council stating that the Project was "**Not Approved** by the owners of 3500 Sepulveda." (TE 75 at 0005 (emphasis in original); *see also* TE 3026 at 0063 (January 10 letter included in City staff report).)

154.   At the January 14, 2014 meeting, Mark English, on behalf of RREEF, spoke in favor of the Project. Among other things, Mr. English discussed the

difficulties of making substantial changes to the Project plans, the parking ratio, the goal of beginning construction in 2015, and responses to questions about Macy's consolidation. (TE 2139 at 0044-0098.)

155. Both Mr. Briggs and Mr. Neumann spoke at the meeting and opposed the Project on behalf of the Hacienda Parties. (TE 2139 at 0101-0115.)

156. Mr. Neumann opposed the Project on numerous grounds, including both permissible objections such as: (1) the proposed plans were "vastly different from the 2008 plans;" (2) the parking deck as proposed was almost twice as tall as the deck in the 2008 plans; and impermissible objections, including: (3) the proposed plans were "misleading" and confusing; (4) it was not clear whether Macy's had signed the deal or not; (5) phase two and three might never happen; (6) RREEF had negotiated in a manner that threatened the residents of the City; and (7) RREEF made a deal to get rid of the movie theater but many residents wished there was a theater in the Shopping Center. (TE 2139 at 0101-0112.)

157. Mr. Briggs objected on the grounds that that the January 14, 2014 meeting was not properly noticed. He asked the City Council to deny certification of the EIR because approving the EIR could "expose[] you to litigation over the EIR." (TE 2139 at 0112-0115.)

158. Six members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. Those raising objections discussed the safety of the Project, the cinema, maintaining the small-town atmosphere of the Shopping Center, the phases of construction, Macy's consolidation, the Settlement Agreement, the size of the project, and traffic flow. (TE 2139 at 0117-0133.)

159. At the January 14, 2014 meeting, City staff prepared and presented a matrix to the City Council summarizing the Project's key issues, which were listed as: (a) the Project Site Plan; (b) phasing and timing; (c) entitlements and CEQA; and

(d) miscellaneous comments, such as building height variances and prior railroad right of ways. (TE 3026 at 0008-0020.)

160. City Councilmembers discussed the threat of CEQA litigation, acknowledged that there were some good points (in particular, the challenge to the traffic study), and expressed concerns that the litigation would "tie up" approval for the Project. (TE 2139 at 0193, 0213, 0250-0251; RT 712-713.)

161. The City Council adopted a motion to direct staff to draft resolutions for the Council to consider certifying the EIR and approving Phases I and II of the Project subject to numerous requirements, including, but not limited to, (a) redesign of the Phase I "North parking Structure," (b) submittal of a Macy's commitment letter; (c) negotiations in good faith with Fry's to remain on the site; and (d) commission of an Oak Avenue traffic study. (TE 2035 at 0002.)

162. On March 25, 2014, Mr. Neumann asked community member Marc Krigsman to make sure Chris Prodromides attended the April meeting on the Project before the City Council. Mr. Prodromides (who later became an officer of Sensible Citizens of Manhattan Beach ("SCMB") – the organization that brought a CEQA lawsuit against the Project) was a Manhattan Beach resident who had "strong passions" about the Project. (TE 95 at 0001; RT 130; Neumann Dep. at 239.)

163. In April 2014, Mr. Neumann worked with Mr. Krigsman and Colin Williams to set up a website opposing the Project, www.90266mall.com. (TE 98 at 0001-0005; RT 550.)

164. On approximately April 7, 2014, in collaboration with Mr. Krigsman, Mr. Neumann ordered lawn signs with language opposing the Project ("No Mall / 3 Story Garages / Get the Facts / 90266 MALL.com") to give to community members who "were concerned about" the Project – Mr. Neumann also placed signs around the Hacienda Building. (TE 97; Neumann Dep. at 241-243.)

165. On April 28, 2014, Loralie Ogden (who later became an officer of SCMB) emailed Mr. Neumann stating that she "loved" his letter to the editor

regarding the Project and asked him to send her some talking points for the upcoming City Council meeting. (TR 99; RT 130.)

166.   In April 2014, the City published Volume II of the Final EIR in order to respond to thirty-four late comments on the original EIR. The Hacienda Parties' appeal of the EIR was considered as a "late" comment letter. A substantial portion of the Responses to Late Comments addressed comments attributable to the Hacienda Parties. (TE 2131 at 0027-0180 (responses to late comments); TE 2131 at 0033-0088, 0105-0124, 0137-0169, 0175-0180 (responses to comments attributable to Hacienda Parties.)

167.   The fifteenth public meeting on the Project was held on April 29, 2014 before the City Council. (TE 2140.)

168.   On April 29, 2014, Kelvin Peyton wrote to the City Council on behalf of Macy's, stating that "Macy's wholeheartedly supports this [P]roject." (TE 3027 at 0585.)

169.   Cory Briggs, on behalf of Hacienda Parties, submitted a letter dated April 28, 2014 from Mr. Smith of Smith Engineering & Management in which Mr. Smith stated that the EIR was "inadequate and unsuitable for certification" and that the City's responses to comments were "evasive." (TE 3027 at 0599-0603.)

170.   On April 29, 2014, Mark Neumann, on behalf of the Hacienda Parties, emailed a letter to the City Council stating that the Hacienda Parties opposed the Project and requested that the City Council "deny the Project." (TE 3027 at 0586-0591.)

171.   On April 29, 2014, Brant H. Dveirin, an attorney at Lewis Brisbois Bisgaard & Smith LLP, acting on behalf of the Hacienda Parties, emailed and hand delivered a letter to the City Council stating that the Hacienda Parties opposed the Project. The letter raised several issues, including sections of the draft Resolution that placed limitations on the Hacienda Building's permitted uses. (TE 3027 at 0592-0594.)

172.   At the April 29, 2014 meeting, Mark English, on behalf of RREEF informed the Councilmembers that RREEF accepted and agreed to all of the conditions of approval proposed by City staff. (TE 2140 at 173-174.)

173.   At the April 29, 2014, Mr. Briggs, Mr. Neumann, and Mr. Dveirin each spoke in opposition to the Project on behalf of the Hacienda Parties. (*See* TE 2140 at 0110-0159.)

174.   Mr. Neumann gave a lengthy presentation on behalf of 3500 Sepulveda. Mr. Neumann opposed the Project on multiple grounds including: (a) parking; (b) who Patrick Gibson (the City's EIR traffic and parking expert) worked for; (c) the purported negative fiscal implications of the Project; (d) RREEF's purported abandonment of a project in Sunnyvale, California; (e) technical problems with the EIR; and (f) various unanswered questions or "broken promises" by RREEF. Mr. Neumann told the Councilmembers that he was trying to protect 3500 Sepulveda's property rights. (TE 79 at 0002-0079; TE 2140 at 0110-0143, 0146-0150; TE 2035 at 0002-0003; RT 522-523.)

175.   Mr. Dveirin opposed the Project based on potential impacts to the Hacienda Parties' "discretion" to use the Hacienda Building for certain uses. He asked that the City "not approve [the Project] tonight, because we need you to help us negotiate an agreement with RREEF[.]" (TE 2140 at 0144-0146.)

176.   Mr. Briggs also spoke in opposition to the Project. Among other things, Mr. Briggs made comments: (a) stating that approving the Project would be a "very, very big mistake"; (b) explaining that the purported "approval" of the Project in January was "illegal"; (c) asserting that the Project's traffic study deferred mitigation, which was "illegal under CEQA"; (d) describing a letter from his traffic expert, Mr. Smith, stating that the City's "traffic expert is misinforming you"; (e) stating the traffic report was "unacceptable under CEQA,"; (f) arguing the City Council "might be furthering some conflicts of interest" and the City's independent contractors might be violating California law, which would be "an issue in court"; and (g) claiming that

the City Council could not be "sued as a city or as an individual for denying a permit." (TE 2140 at 0151-0159.)

177.    Sixteen members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. The people raising objections discussed the City's village-like atmosphere, the parking garages, the EIR's traffic analysis, traffic, and crime. (TE 2140 at 0212:15-0245:12.)

178.    The City Staff recommended that the April 29, 2014 meeting be the final meeting regarding the Project and that the City Council adopt Resolutions certifying the Final EIR and approving the MUP Amendment. (TE 3027 at 0001.)

179.    At the April 29, 2014 meeting, Mayor Pro Tem Powell expressed frustration with the Hacienda Parties' practice of submitting documents at "the eleventh hour," noting that it was hindering the City Council's ability to respond to public comments and questioning whether their practice of "wait[ing] until the last minute" was "a legal strategy." Councilmember Burton stated that it was "completely unrealistic" for the City Council to make a decision on the EIR, including the Hacienda Parties' late comments: "Look at all that material, how complex it is. We just got it on Wednesday." (TE 2140 at 0007, 0162-0163.)

180.    City Attorney Barrow stated that, "[t]he issues that Mr. Briggs has raised … [t]hey're without merit" and offered to respond to the issues during the meeting. However, Mayor Howorth noted that it was nearly midnight and opted to address these comments at a subsequent meeting. (TE 2140 at 0270-0271.)

181.    Recognizing that the Hacienda Parties "rais[ed] significant questions about the independent contractors," Councilmember Lesser wanted to give the independent contractors "an opportunity to respond." Councilmember Lesser suggested that the City Council carry the meeting over to another date to give City staff an opportunity to respond to the allegations made by the Hacienda Parties. Councilmember Burton supported Councilmember Lesser's suggestion to continue the meeting. (TE 2140 at 0267-0270.)

182.   The City Council decided to continue the meeting to May 20, 2014 with instructions to City staff that they prepare responses to comments made at the April 29 meeting, particularly those raised by the Hacienda Parties' attorneys. (TE 2140 at 0267-0271, 0282-0298.)

183.   On May 16, 2014, Mr. Neumann emailed various members of the public, including Ms. Ogden, Mr. Boyer, and Mr. Krigsman, and invited them to a meeting at his house for "residents opposed to the current design of the [Project]" to "rally residents before [the May 20, 2014] City Council Meeting." (TE 116 at 0001-0002; Neumann Dep. at 301-303.)

184.   The sixteenth public meeting on the Project was held on May 20, 2014 before the City Council. (*See* TE 2141.)

185.   On May 20, 2014, Mr. Neumann's wife, Vicki Neumann, emailed a document called "Manhattan Village Mall Expansion Unanswered Questions," to the City Council. This document contained twenty-seven concerns and questions criticizing the Project and the City Council's approval process for the Project. (TE 3028 at 0312-0314.)

186.   On May 20, 2014, Mr. Dveirin, on behalf of the Hacienda Parties, emailed and hand delivered a letter to the City. Attached to the letter were the Settlement Agreement Site Plan and the then-current proposed Site Plan. Mr. Dveirin compared the two plans and argued that the current proposed Site Plan was unsatisfactory because it had 144 fewer parking spaces and because the stairwell and elevator in the North Deck that had faced the Hacienda Building had been removed from the design. The letter requested revisions to the MUP Amendment and stated that if proposed changes were not made, then the Hacienda Parties "remain[ed] in opposition" to the Project (TE 3028 at 0316-0370.)

187.   Mr. Neumann, Mr. Briggs, and Mr. Dveirin, on behalf of the Hacienda Parties, spoke at the meeting and opposed the Project and the EIR. Mr. Briggs made clear that, in addition to representing the Hacienda Parties, he was simultaneously

41

representing an organization called "Sensible Citizens of Manhattan Beach" (previously defined as SCMB) and provided the same testimony on behalf of both the Hacienda Parties and SCMB. SCMB, represented by Mr. Briggs, ultimately brought a CEQA lawsuit against the City following the entitlements process. (TE 2036; TE 2141 at 0048; TE 3029 at 0195-0196; RT 67.)

188.  Mr. Neumann's opposition before the City Council included: (a) reading an opposition letter from one of his tenants; (b) noting his meeting with all of the Councilmembers, except for one, to explain in detail his opposition presentations; (c) asserting that the resolutions submitted that would approve the Project were flawed; (d) alleging that the City had required the Hacienda Parties to enter into the Settlement Agreement with RREEF; and (e) requesting that the City Council deny the EIR and ask staff to provide an accurate, updated EIR. Mr. Neumann requested that the City Council "[h]old up this project" or send RREEF to negotiate with the Hacienda Parties. (TE 2141 at 0021-0026, 0213-0214.)

189.  Among other things, Mr. Briggs argued that his clients' due process rights were being violated and that two City Councilmembers were biased and should be recused from voting on the Project. (TE 2141 at 0048-0049.)

190.  Mr. Dveirin, on behalf of the Hacienda Parties, requested that two conditions of approval be added to the Project: (a) that RREEF build a stairwell and elevator in the North Deck facing the Hacienda Building; and (b) "the parties in good faith negotiate to add 150 spaces … in a new lot adjacent to [the Hacienda Building]." (TE 2141 at 0026-0030.)

191.  Twenty-one members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. The people raising objections discussed crime in parking structures, traffic, preserving the City's small-town charm, purported flaws in the process of approving the Project, congestion, and pollution. (TE 2141 at 0040-0061; TE 3029 at 0195-0197.)

192.   Councilmember Powell stated that his "biggest concern is that we have two property owners that have a dispute" and reiterated several times that he was concerned litigation between the two parties would halt the Project if it was approved. Councilmember Powell stated that he needed to see the two parties work out their differences, which meant that it was not something that could be decided on the night of the City Council meeting. Thus, Councilmember Powell proposed a condition of approval requiring RREEF and the Hacienda Parties to negotiate in good faith. (TE 2141 at 0227, 0272, 0228, 0299; *see also* TE 3029 at 0207.)

193.   Councilmember Lesser expressed that the disagreement between the "property owners involved at this site" was a challenge that made it difficult to come to the best solution for the Project. (TE 2141 at 0247.)

194.   At the May 20, 2014 meeting, the City Council ultimately approved the Project, but with five conditions of approval in addition to conditions proposed by staff, including a requirement that RREEF and the Hacienda parties negotiate in good faith. (*See* TE 3029 at 0207.)

195.   After the May 20, 2014 meeting, RREEF determined that it could not proceed with the Project at that time. In particular, RREEF believed that the additional conditions imposed by the City Council made the Project infeasible. In particular, RREEF considered the condition to negotiate in good faith to be unworkable because it was vague and RREEF did not know how it could demonstrate compliance. Thus, RREEF decided that it needed to pause work on the Project and "review its options." RREEF hoped to "let things cool off" and that the passage of time might create another opportunity to get the Project approved. During this period, the City Council attempted to move the proceedings forward, but RREEF did not respond until November 2014. (RT 723, 728-730; TE 3029 at 0002, 0004-0006.)

196.   The next (seventeenth) meeting on the Project was held on December 2, 2014 before the City Council. (*See* TE 2142.)

197.   On December 1, 2014, Kelvin Peyton, on behalf of Macy's, wrote to the City Council again "express[ing] [Macy's] full support of the proposed expansion and improvement plan[.]" (TE 3029 at 0242.)

198.   On December 2, 2014, Mr. Dveirin, on behalf of 3500 Sepulveda, LLC, emailed and hand delivered an additional letter to the City Council requesting revisions to the MUP Amendment and stating that "the hearing tonight should be continued." Mr. Dveirin also attached a redline version of Resolution No. 14-0026, which included approximately two dozen revisions to the proposed Resolution. (TE 3029 at 0284-0285; TE 3029 at 0286-0321.)

199.   On December 2, 2014, Cory Briggs, on behalf of the Hacienda Parties, wrote a letter to the City Council urging the Council "not to approve" the Project, and asserting that the City Council violated the Brown Act and CEQA. (TE 3029 at 0243-0244.)

200.   On December 2, 2014, two members of the public who were not affiliated with the parties wrote to Ms. Jester requesting additional time to consider the Project. (TE 3029 at 0282.)

201.   At the December 2, 2014 meeting, Mr. Neumann, Mr. Dveirin, and Mr. Briggs opposed the Project on behalf of the Hacienda Parties. Among other things, Mr. Briggs argued that Mayor Powell should be recused for bias and conflict issues and the meeting had not been properly noticed to the public. (*See* TE 2142 at 0027-0044.)

202.   Mr. Neumann gave a seventy-two-slide presentation opposing the Project. Mr. Neumann compared the Lot F parking provided in the Settlement Agreement Plan with the current site plans and complained about inadequate parking. He also raised issues about the integrity of RREEF/Deutsche Bank, doubts about Macy's commitment, the Fry's corner, RREEF's failure to "promote pedestrian access," and the numerous residents and small businesses who were "against this large expansion." (TE 82; RT 541-542.)

203.   Fifteen members of the public who were not affiliated with the parties spoke at the meeting both in favor of and objecting to aspects of the Project. Those objecting to the Project discussed the parking structures, traffic, Macy's, and phasing of construction, and also requested additional notice so that they could continue expressing their opinions about the Project. (See TE 2142 at 0090-0119.)

204.   During this meeting, the City Council certified the Project's EIR and approved Resolution No. 14-0026, which approved the Amended MUP, and therefore approved the Project. Resolution No. 14-0026 did not include a requirement for RREEF to negotiate with the Hacienda Parties as a condition of approval. It did contain 56 conditions of approval. Among others, the City required that before RREEF could obtain a building permit to begin Phase I of the Project, it must have written evidence of a binding commitment with Macy's for the consolidation and expansion of the Macy's store. (TE 2035; TE 2142 at 0160-0163, 0177-0178, 0184; RT 151-154.)

## V.   Hacienda Parties' Breaches During the City Approval Process

205.   As set forth above and under Sections 4g and 5c of the Settlement Agreement, the Hacienda Parties were entitled to, and did, object to material changes in RREEF's various proposed site plans, including the decreases in the number of parking spaces and alteration in the height of the North Deck.

206.   Thus, certain objections made by the Hacienda Parties during the City Approval Process were permissible under the Settlement Agreement. The Hacienda Parties, however, objected to other aspects of the Project. For example, the following comments/objections made by the Hacienda Parties were impermissible under the Settlement Agreement because they did not relate to material alterations of the Site Plan by RREEF detrimentally affecting the Hacienda Building or to material revisions by RREEF of the Parking Plan or North Deck: (a) objections to the EIR made by Mr. Neumann, Mr. Briggs, and Mr. Smith, including alleged errors or concerns related to the soil expert and an alleged conflict of interest; (b) criticisms

45

about RREEF's integrity and care for the community's best interests; (c) doubts about Macy's commitment; (d) criticism about losing the movie theatre and bicycle center; and (e) proposals of alternative plans (such as plans of a prior owner showing a hotel). (*See, e.g.*, TE 66; TE 68 at 0010-0016; TE 70; TE 73 at 0128; TE 74 at 0012-0014; TE 86; TE 2139 at 0114-0115; TE 2140 at 0247-0248; TE 3007 at 0134-0154; TE 3029 at 0195-0196; RT 697-699, 704.) These objections and comments – some of which were not related to any change to the Site Plan (*see* RT 496-504, 514-516, 540, 554-558) – exceeded the scope of permitted objections and constituted breaches of the Settlement Agreement.

207.    RREEF's claim for damages is based upon its assertion that the Hacienda Parties' breaches of the Settlement Agreement caused delay in the completion of the Project. Although the Court finds that the Hacienda Parties breached the Settlement Agreement as a result of certain objections throughout the City approval process, RREEF has not shown that the Hacienda Parties' breaching objections were the proximate cause of any particular period of delay during the City proceedings. In this regard, RREEF has not shown that the City entitlement process would have been completed materially sooner absent the Hacienda Parties' breaches (without regard for their non-breaching objections or for the many objections by non-parties) or how much sooner it would have been completed. RREEF suggests that the delay attributable to the Hacienda Parties during the entitlement process amounted to twelve months. The purported twelve-month delay is based at least in part on an "assumption" by RREEF's damages expert, Mr. Bones. But, as discussed herein, there is insufficient evidence supporting Mr. Bones' assumption that twelve of the approximately thirty months that the Project was pending before the City were the result of the Hacienda Parties' breaches.

208.    The Court has no relevant baseline in the record from which to conclude that the City's process for the Project should have been shorter in duration or how much less time it should have taken. RREEF has not presented evidence about the

average length of time that the City of Manhattan Beach takes to approve commercial retail projects, and RREEF has not presented evidence about the ordinary timing of the process for a like-project in the City of Manhattan Beach. Evidence that RREEF might have "expected" the entitlement phase to take about one year is not probative because the issue is not what RREEF subjectively expected the entitlement process to take. RREEF's Project was the largest commercial property project in the City of Manhattan Beach. Thus, whatever an ordinary or "expected" length of time might be for an average-sized project, RREEF's Project logically would require more time.

209.   The evidence shows that City officials knew that the process for the Project would be lengthy. For example, at the first meeting in June 2012, Planning Commissioner Thompson acknowledged that the Project required "many meetings and public hearings." (TE 3001 at 5-12.) Similarly, at the second meeting in October 2012, Planning Commissioner Jester noted that the City had received extensive comments to the EIR that had been published after the first meeting and said, "I want to make it clear that, really, is a beginning of the process. We received many, many comments, and all of those comments will be responded to individually in the Final Environmental Impact Report…" (TE 3008 at 0008.)

210.   There were many objections and obstacles during the entire City approval process that were not attributable to the Hacienda Parties' impermissible objections. In particular, and as set forth in detail above, at each of the seven meetings from June 2012 to July 2013, the Planning Commission heard from numerous different parties (with no connection to RREEF or the Hacienda Parties) and considered many different concerns – some raised by the Commissioners themselves – including but not limited to: the size of the Project, traffic, lighting, phasing of construction, bicycle and pedestrian access, doubts about Macy's commitment, building aesthetics, the northwest corner, number of parking spaces, a proposed dog park, design/appearance of the parking lots, potential loss of the character of the city, hazardous soils, crime, electric vehicle charging, and the Oak Street residents'

concerns. (*See* TE 3001 (June 27, 2012 hearing transcript); TE 3015 at 0012-0013 (Staff Report summarizing June 27, 2012 hearing); TE 3008 (October 3, 2012 hearing transcript); TE 3015 at 0003-0005; TE 3016 at 0032-0037 (Staff Report summarizing the October 3, 2012 hearing); TE 2134 (March 13, 2013 hearing transcript); TE 3017 at 0003-0006, 0055-0056 (Staff Report summarizing March 13, 2013 hearing and identifying key issues for discussion for April 24, 2013 hearing); TE 3002 (April 24, 2013 hearing transcript); TE 3018 at 0003-0007, 0152-0153 (Staff Report summarizing April 24, 2013 hearing and identifying seven key issues for discussion for May 22, 2013 hearing); TE 2086 at 0003, 0106-0107 (Staff Report summary of May 22, 2013 hearing); TE 3003 (May 22, 2013 hearing transcript); TE 3019 at 0003, 0059-0062 (Staff Report summarizing June 26, 2013 hearing); TE 3019 at 0059-0062 (Minutes of June 26, 2013 meeting); TE 2007 (June 26, 2013 hearing transcript); TE 3032 (July 24, 2013 hearing transcript); TE 3021 at 0113-0114 (summary of July 24, 2013 meeting).)

211.   Recognizing the importance of the Project to the community, the Planning Commission requested that the City appeal its decision approving the Project. (TE 3020 at 0001-002.) The City Council agreed and found that its independent review was warranted. (*See* TE 3004 at 0003-0006.) In addition, both the Hacienda Parties and RREEF appealed the Planning Commission's decision. (*See* TE 62; TE 63; TE 65; TE 85 at 0005-0027; TE 3004 at 0022; TE 3021 at 0093.)

212.   Similar events took place in the time during which the Project was before the City Council (August 6, 2013 to December 2, 2014). As set forth in detail above, the record of the proceedings reveals that the City Councilmembers heard significant concerns about the Project that were independent of, and not attributable to, the improper objections made by the Hacienda Parties. Residents expressed substantial opposition to the size of the project, worrying about complicated issues without easy resolution such as increased traffic, loss of the town's aesthetics, and potential crime. RREEF itself was the proximate cause of at least one significant

period of delay – that is, from May 20, 2014 to December 2, 2014 – during which time it stopped advancing the Project, having decided to "let things cool off." (See RT 729-730.)

213.   Both sides cite statistics comparing the number of pages dedicated to Mr. Neumann's remarks and presentations at various meetings. (*Compare* ECF 273-1, ¶ 62 (calculating that comments by the Hacienda Parties and related discussion constitute only 46 pages of the 1,378 pages of transcript from the seven Planning Commissioner meetings, or 3.3 percent) *with* ECF 278, ¶ 62 (calculating that the Hacienda Parties spoke for approximately 24.3 to 28.8 percent of all transcript pages from the public and party comments portions of the ten City Council meetings).) RREEF also points out that more than 100 pages of the Final EIR concerned comments by the Hacienda Parties. (ECF 275-1, ¶ 353). The Court finds these statistics generally unhelpful. Evidence that Mr. Neumann gave long presentations or spoke for lengthy periods of time is not probative of the level of concern that City officials had (or did not have) regarding his complaints. Likewise, the fact that the Final EIR included 100 pages relating to issues from the Hacienda Parties does not provide a rational basis for determining the length of any delay of City approval caused by those issues.

214.   As the party with the burden of proof, RREEF did not provide persuasive, non-speculative evidence from which the Court can determine the length of any delay in the City approval process that was proximately caused by breaches of the Settlement Agreement by the Hacienda Parties. For instance, RREEF did not offer testimony from the City Council or Planning Commission, and RREEF did not present an expert witness to opine about City approval procedures and the likely effect of the improper objections on the timing of the City's handling and approval of RREEF's application.

215.   While the substantial factor test for causation is a "relatively broad one," the Court cannot resort to guessing, speculation, or other random method of finding

causation. On the evidence before the Court, RREEF has not met its burden of proving that the Hacienda Parties' improper objections by themselves were a substantial factor in causing a twelve-month delay in the approval of the Project by the City Council and/or Planning Commission as urged by RREEF or any other specific, material period of delay in approval by the City.

## VI.   CEQA Litigation

216.   On December 23, 2014, Mr. Briggs, on behalf of SCMB, filed a writ of mandate seeking a judicial reversal of the City's EIR certification. *See Sensible Citizens of Manhattan Beach v. City of Manhattan Beach* (Los Angeles County Superior Court Case No. BS152854) (the "CEQA Litigation"). (TE 2036; RT 68.)

217.   Officers/key members of SCMB included Loralie Ogden, Chris Prodromides, and William Featherston. (RT 118-119, 130, 169, 435.)

218.   SCMB's petition for a writ of mandate was denied on November 2, 2016. Thus, RREEF prevailed on the merits of the CEQA Litigation. (TE 2047 at 0001-0002, 0019-0020.)

219.   In attempting to hold the Hacienda Parties responsible for the CEQA Litigation, RREEF points to the following evidence:

- On March 24, 2014, Mr. Neumann asked Mr. Krigsman to make sure Mr. Prodromides attended the April meeting on the Project before the City Council. (TE 95 at 0001; RT 130.)
- On April 28, 2014, Ms. Ogden emailed Mr. Neumann stating that she "LOVED" one of his letters to the editor and asked him to send her some talking points for the upcoming City Council meeting so they could "be on the same page." (TE 99 at 0001; RT 130.)
- On April 28, 2014, Mr. Neumann was blind copied on an email from Ms. Ogden to David Lesser, a City Councilmember, in which Ms. Ogden opposed the size of the Project. (TE 111.)

- On April 30, 2014, Mr. Neumann asked Ms. Ogden to "write a letter to the editor of the beach reporter." Ms. Ogden agreed to write the letter and asked Mr. Neumann to send her a list of Mr. Briggs' "revelations re the faulty eir." (TE 114 at 0001.)

- On November 12, 2014, Ms. Ogden emailed Mr. Neumann and his late wife, Vicki, stating "I will do what I can to help." Ms. Ogden further wrote: "I need to protect our collaboration … no? Where can we go from here without showing our hand???" (TE 2179 at 0001.)

- On December 14, 2014, Mr. Neumann provided Ms. Ogden with the contact information for his attorney, Mr. Briggs, who would later represent SCMB in the filing and prosecuting of the CEQA Litigation. (TE 109.)

- The claims raised in the CEQA Litigation were similar, and in some cases identical, to the objections raised by the Hacienda Parties during the entitlements phase. (*See, e.g.*, TE 2131 at 0210-0238, 0296-0301; TE 3007 at 0158-0159; TE 2140 at 0155; TE 2079 at 0002, 0012-0017.)

- In December 2015 or January 2016, Joe Saunders, a representative of RREEF, and Philip Friedl, a representative of RREEF's external project manager Jones Lang LaSalle ("JLL"), met with Mr. Briggs in an effort to resolve the CEQA Litigation. Mr. Briggs said that the RREEF representatives should meet with Mr. Neumann and that the CEQA Litigation could not be settled unless Mr. Neumann agreed to the site plan. (RT 124.)

- On January 18, 2016, Mr. Briggs sent an email to Mr. Friedl and Peter Gutierrez, a lawyer for RREEF, asking whether there were "new drawings to show Mark [Neumann]" and, if there were, that Mr. Briggs would attempt to persuade Mr. Neumann to attend a meeting with RREEF. (TE 102 at 0003.)

- The next day, on January 19, 2016, Mr. Briggs sent Mr. Gutierrez a "list of issues" that Mark Neumann wanted to have addressed at the upcoming settlement meeting and asked whether this list "make[s] a meeting futile." (TE 102 at 0001.)

- Around February 12, 2016, RREEF sent Mr. Neumann a settlement term sheet for a resolution of the CEQA Litigation. The settlement terms included benefits to the Hacienda Parties, even though the Hacienda Parties were not named plaintiffs to the CEQA Litigation. RREEF included these benefits for the Hacienda Parties because RREEF believed that in order to settle the CEQA Litigation, it needed to address Mr. Neumann's issues. (TE 103 at 0002-0003; RT 128.)

- On March 7, 2016, Mr. Briggs emailed Mr. Gutierrez and wrote that SCMB was "as [he] expected, being loyal and deferential to Mark [Neumann]," and that "a settlement without [Mr. Neumann's] blessing will be unlikely." (TE 104.)

- In the summer of 2016, RREEF representatives met separately with Mr. Prodromides and Ms. Ogden and shared new site plans in attempt to reach a settlement. Both individuals seemed to be supportive of the revised site plans. (RT 130-135.)

- After the meetings with Mr. Prodromides and Ms. Ogden, RREEF and SCMB participated in a mandatory settlement conference. During the mandatory settlement conference, SCMB's lawyer, Mr. Briggs, took a phone call with Mr. Neumann. (RT 135, 171-172.)

- No settlement agreement was reached in the CEQA Litigation. (RT 75.)

220. According to RREEF, "In their sworn discovery responses, the Hacienda Parties admitted that the lawyer for the CEQA Plaintiff, Cory Briggs, continued to represent the Hacienda Parties in connection with the CEQA Litigation." (ECF 275-1, ¶ 238 (citing TE 101 at 0007-0011).) Review of the

responses, however, shows that the RFAs were denied. It is not clear that these denials may be fairly characterized as admissions. Moreover, even if Briggs represented the Hacienda Parties in connection with the CEQA litigation, that does not mean that he participated in that litigation on behalf of the Hacienda Parties – particularly where it is undisputed that (i) the Hacienda Parties were not parties to the CEQA lawsuit; and (ii) Briggs separately represented the named plaintiff in the CEQA lawsuit, SCMB.

221.   RREEF's evidence shows that the Hacienda Parties and SCMB were communicating and coordinating regarding objections to the Project, and when Mr. Neumann was asked if he "assisted" SCMB in the CEQA Litigation, he responded that he would "occasionally" speak to "some people." (RT 565.)

222.   Neither Mr. Neumann nor Mr. Rizika (nor any other member of the Hacienda Parties) were members of SCMB. (RT 434-438.)

223.   Mr. Neumann did not directly or indirectly fund Mr. Briggs for his work on the CEQA Litigation; nor did he directly or indirectly fund SCMB. (RT 434-438.)

224.   The fact that the plaintiff in the CEQA lawsuit used the same attorney (Mr. Briggs) and relied upon similar arguments to those raised by that attorney on behalf of the Hacienda Parties in separate proceedings does not warrant the conclusion that the CEQA lawsuit was controlled or directed by the Hacienda Parties. While Mr. Neumann may have communicated and coordinated with the SCMB members, RREEF has not shown by a preponderance of the evidence that either Mr. Neumann or any other member of the Hacienda Parties was responsible for filing, controlling, directing, or prosecuting the CEQA Litigation.

225.   Because the CEQA Litigation is not attributable to the Hacienda Parties, it was not a breach of the Settlement Agreement.

### VII.   Director's Writ Litigation

226.   Several weeks after the CEQA Litigation was resolved, RREEF submitted refined plans to the City of Manhattan Beach Director of Community

Development (the "Director") and the Director approved those plans on December 6, 2016. The Director concluded that the updated Site Plan did not require an amendment to the MUP Amendment or any other discretionary entitlements. On December 20, 2016, the Director provided an overview of the Site Plan modifications to the City Council and the City Council endorsed them. The updated site plan endorsed by the Director reduced the spaces in Lot F by nine, for a total of 487 parking spaces. (TE 521 at 0001; TE 1314 at 0013; TE 2178 at 35; TE 2042 at 0007; TE 3012 at 0001-0002; RT 76-77, 79-80, 144, 219.)

227.   The Hacienda Parties attempted to administratively appeal the Director's decision, but the City informed the Hacienda Parties that there was no procedure for appealing that decision. (TE 2042 at 0011, ¶¶ 45-46).

228.   On January 17, 2017, RREEF's investment committee approved $174.4 million for, among other things, the construction of the parking decks and the Macy's expansion. (TE 632 at 0012; TE 2174 at 0013; ECF 278, ¶ 107.)

229.   On February 2, 2017, the Hacienda Parties filed a writ in Los Angeles Superior Court, seeking to vacate the Director's approval and stop the Project from proceeding ("Director's Writ Litigation" or "Writ"). The Hacienda Parties argued that the Director exceeded her authority in endorsing the revised plans because the plans materially conflicted with the Conditions of Approval and consequently RREEF was required to submit a new application; the City's endorsement violated the Brown Act because although it included the item on the agenda, it failed to provide proper notice to the public; and the Hacienda Parties were denied procedural due process. (*See* TE 2042.) While the Writ referred to the Hacienda Parties' objection to parking provided in the revised Site Plan, the Writ also presented other objections that were not permitted under the Settlement Agreement. For example, the Writ alleged errors by the City Council in connection with square footage of the Village Shops, traffic structures on Rosecrans Boulevard, and landscape and aesthetic features. (TE 2042 at 8-11.)

230.   Rather than defend the Director's Writ lawsuit, RREEF submitted an application to the Planning Commission to approve a further amended MUP. (TE 3012 at 0001-0002; RT 79-80, 144.)

231.   The Planning Commission held a public meeting on the application on June 14, 2017, and adopted a resolution approving the Amended MUP. (TE 3012 at 0002.)

232.   The Hacienda Parties appealed the Planning Commission's decision. Consequently, the matter went before the City Council, which held a meeting on the Amended MUP on August 15, 2017. In September 2017, the City Council approved the Amended MUP. (TE 2060; TE 3012 at 0001-0002; RT 81.)

233.   The approvals by the Planning Commission and City Council had the effect of mooting the Director's Writ Litigation. (RT 81, 144-145.) The Hacienda Parties thereafter requested voluntary dismissal of the Writ, and the action was dismissed on October 2, 2017. (TE 2061.)

234.   The Hacienda Parties' filing of the Director's Writ Litigation was not protected by the California litigation privilege. As the Ninth Circuit determined, the litigation privilege (Cal. Civ. Code 47) does not apply to the Hacienda Parties' filing of the Writ challenging the Director's authority to approve RREEF's Project. *See 3500 Sepulveda, LLC.*, 980 F.3d at 1327. The California Supreme Court declined to reach the litigation privilege issue presented in *Olson v. Doe*, 12 Cal.5th 669, 689 (2022). Thus, contrary to the suggestion of the Hacienda Parties, *Olson* does not justify deviating from the Ninth Circuit's determination, which amounts to the law of the case. *See generally Stacy v. Colvin*, 825 F.3d 563, 567 (9th Cir. 2016) (the law of the case doctrine "generally prohibits a court from considering an issue that has already been decided by … a higher court in the same case"). The Court further finds, as discussed above, that Section 4a, 4g, and 5c of the Settlement Agreement clearly prohibit the portions of the Writ that raised objections regarding the City's approval of the Project based on issues other than material alterations to the Site Plan for the

Project which detrimentally affect the use or operations of the Hacienda Building or material revisions by RREEF regarding the Parking Plan or North Deck.

235.   Because it went beyond the permitted objections and because it is not protected by the litigation privilege, the Hacienda Parties' filing and maintaining of the Director's Writ Litigation was a breach of the Settlement Agreement.

236.   Before the Director's Writ Litigation – and with some exceptions due to the CEQA Litigation – the Project was progressing. For example, on May 1, 2015, RREEF engaged Jones Lang LaSalle ("JLL") as Development Manager and tasked it with, among other things, finalizing the site plan. (TE 505 (JLL Development Management Agreement); TE 788 (April 18, 2016 Investment Committee Memorandum) at 0012; ECF 278, ¶ 92.)

237.   Project drawings typically advance along the following design progression: (1) a basic site plan or conceptual design, (2) schematic design, (3) design development, and then (4) construction level drawings sufficient to give to a construction contractor and to seek City permit approval. (RT 110-111; ECF 278, ¶ 89.)

238.   In 2015 and early 2016, JLL and RREEF negotiated proposed changes to the site plan with Macy's and the Hacienda Parties. (RT 162-165; TE 509-0001; TE 520; TE 103; TE 1276; ECF 278, ¶ 93.)

239.   On April 15, 2016, RREEF finalized the site plan that Macy's ultimately agreed to in the Macy's Separate Agreement. (TE 1313 (Macy's Separate Agreement) at 0035-0038; ECF 278, ¶ 95.)

240.   On April 18, 2016 (while the CEQA Litigation was still pending) RREEF's Investment Committee committed $5.5 million to develop the site plan into construction drawings. (TE 788 at 0012; TE 632 at 0012 ("On April 18, 2016, $20.4M was approved for a limited scope that included … the cost to complete construction designs for entire Phase I and II ($5.5M).").)

241.   By April of 2016, RREEF had engaged W.E. O'Neil to perform pre-

construction services on the project. (TE 788 at 0016.; ECF 278, ¶ 97.)

242.   The $5.5 million of capital RREEF's Investment Committee approved in April of 2016 allowed RREEF to complete construction drawings and to go out to bid on gross maximum price (GMP) pricing for the majority of the project in 2016. (TE 632 at 0017; RT 203-204; ECF 278, ¶ 98.)

243.   RREEF's internal investment committee approved construction funding for the full Project after the CEQA litigation was resolved. (RT 79-71, 832-834.)

244.   The Director's Writ Litigation filed by the Hacienda Parties created uncertainty about the validity of the approval of the Project. Because the validity of the Amended MUP approval was no longer certain, RREEF did not feel able to proceed with aspects of the Project that relied upon City approval. (RT 79-80, 143-148.)

245.   Faced with the Hacienda Parties' challenge to the Project's approval in the Writ, RREEF opted to pursue another round of Planning Commission and City Council approval rather than spend time defending against the Director's Writ Litigation. (TE 3012 at 0001-0002; RT 79-80, 143-148.)

246.   While the Director's Writ Litigation was pending and RREEF's renewed application was in process, RREEF was hindered in its ability to advance construction of the Project. In particular, RREEF could not submit full construction drawings to the City for review. Further, without approval of the Amended MUP, the City would not issue permits, and RREEF was precluded from beginning construction. (RT 146-148.)

247.   RREEF had reasonable concerns about proceeding because of the risk presented by the Writ's challenge to the City approval. (RT 79-80.) Accordingly, RREEF limited its work on the Project to items not directly related to the entitlements, such as refreshing the interior of the mall, renovating the Coco's building, and doing non-structural façade renovations. When the Director's Writ

Litigation was dismissed (as rendered moot by RREEF's new approvals) in early October 2017, RREEF began construction. (RT 51, 71-72, 81, 143-148, 830.)

248.   The Court finds the witness testimony and other evidence from RREEF to be credible with regard to the delay caused to RREEF's work on Project by the Director's Writ Litigation. There is direct, persuasive evidence from the party (RREEF) that allegedly was delayed by the Writ Litigation. The Court further finds that the Writ and the uncertainty it created about the validity of the Project's approval was a substantial factor in delaying RREEF work on the Project from February 2017 to early October 2017.

249.   The Hacienda Parties' argument concerning RREEF's actions before the filing of the Writ challenging the approval of the Project is misplaced because RREEF's pre-Writ actions are not probative of whether progress on the Project was hindered by the subsequent filing of the Director's Writ Litigation.

250.   The Hacienda Parties also point out that while the Director's Writ Litigation was pending, the following events occurred in relation to the Northeast Deck permit application that had previously been filed: (a) on May 17, 2017, the City provided the first round of comments on RREEF's Northeast Deck permit application; (b) on July 17, 2017, the City provided a second round of comments on the permit application; (c) on August 2, 2017, RREEF made is first submission for the Northeast Deck partial grading and utilities permits; (d) on August 15, 2017, the City provided the first round of comments on the Northeast Deck partial grading and utilities permit applications; and (e) on August 23, 2017, RREEF made its first resubmission of the full Northeast Deck building permit application and partial grading and utilities permit applications. (TE 527 at 0001; RT 219-220; ECF 278, ¶¶ 119-123.)

251.   The fact that RREEF was able to take some action on some aspects of the Project during the pendency of the Director's Writ Litigation does not undermine the Court's finding that RREEF was reasonably and legitimately hindered from

moving forward with other significant aspects of the Project due to the Hacienda Parties' challenge to the Project's approval via the Writ.

252. The Hacienda Parties point to other factors causing delays in the Project – namely, evidence that delays were due to the City's disorganization, miscommunication, lack of staff availability, and untimely processing of building permits. (*See* TE 2174 at 0039 (internal memorandum stating that "another major impact to the project has been the CMB's [City of Manhattan Beach]'s inability to process building permits in an organized and timely manner."); TE 518 at 0001-0002 (email from RREEF to Mayor and Councilman raising concerns about continued challenges and "costly delays" on Northeast Parking Structure due to issues of City staff "miscommunication, coordination and availability"); RT 221-222 (Mr. Friedl's testimony that City's delay in issuing permit for Northeast Deck was a source of frustration for RREEF).)

253. The existence of separate and independent causes of delay does not alter the Court's conclusion that the Director's Writ Litigation by itself was a substantial factor in delaying construction of the Project for an eight-month period of time. *See Viner v. Sweet*, 30 Cal. 4th 1232, 1239 (2003); *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1049 (1991); *Union Pac. R.R. Co. v. Ameron Pole Prod. LLC*, 43 Cal. App. 5th 974, 981 (2019). Because the Hacienda Parties breached the Settlement Agreement by filing and maintaining the Director's Writ Litigation and because that breach proximately caused specific delay in the Project, the Court finds that the Hacienda Parties are liable for damages incurred due to the Director's Writ Litigation – that is, the eight months from February 2017 through early October 2017.

## VIII. Macy's

254. The Hacienda Parties contend that certain Project delays were due to the absence of an agreement between RREEF and Macy's. (ECF 273-1, 192-194.)

255. On November 11, 2013, RREEF and Macy's entered into a Letter of Intent ("LOI"). The LOI set out the fundamental proposed terms and conditions for

an agreement between RREEF and Macy's regarding the Project. It made clear that it was "only a description of the parties' current intent and is not legally binding." The LOI contemplated that Macy's would have a right of approval over "material amendments" to the site plan. The term "material amendments" is defined with particularity; such a definition is not included in the Settlement Agreement's reference to "material revisions."[4] (ECF 264 at 3 (Macy's LOI, Lodged February 21, 2023).)

256.   On July 8, 2016, RREEF and Macy's entered into the "Separate Agreement Regarding Expansion and Redevelopment of Shopping Center." (TE 1313.)

257.   Macy's consistently supported the Project, and there is nothing to suggest that Macy's had any reason or intent to decline to approve it at an earlier date. For example, prior to the April 2014 publication of Volume II of the Final EIR, Macy's indicated that it "unequivocally supports RREEF's redevelopment plans dated May 14, 2013." (TE 2131 at 0128.)

258.   The Court finds that the reason the final agreement was not signed until July 2016 was because of the fluidity of the site plans prior to that date, and the "final site plan was going to be an exhibit" to the agreement between RREEF and Macy's. (RT 734-735, 837-838; see also TE 73 at 0048-100, 101-105, 108; TE 2086 at 0109-0110; TE 2149; TE 3005 at 0070-007, 0100-0103; TE 3006 at 0075-0115; TE 3027 at 0585; TE 3029 at 0242; RT 731, 734, 837-838; Macy's LOI.) Accordingly, the Court finds that Macy's was not a cause of any delay in the Project.

## IX.   **Damages**

259.   RREEF's expert, David Bones, assumed that the Hacienda Parties caused the delays and testified that RREEF suffered two types of damages as a result

---

[4] The Hacienda Parties include the specific definition found in the LOI: "material amendment" was defined to include, among other things, any change that "adds or reduces the number of parking spaces within any parking areas or parking decks within the shopping center or changes the layout of configuration of any such parking areas or parking decks…"

of delays: (1) escalation of construction costs for the Project; and (2) lost profits due to delays in leasing space in the mall. (TE 2067 at 0011-0022; TE 2111 at 0008-0015; RT 301-302.)

260.   Mr. Bones did not opine as to which specific delay was the result of the Hacienda Parties' actions. (RT 582-585, 623-625.) While the Hacienda Parties complain that Mr. Bones assumed causation, "it is well established that experts on damages can assume causation." *Indect USA Corp. v. Park Assist, LLC*, 2021 WL 4311002, at *3 (S.D. Cal. Sept. 22, 2021); *see also Siqueiros v. Gen. Motors LLC*, 2022 WL 74182, at *10 (N.D. Cal. Jan. 7, 2022) (holding that damages experts are "entitled to *assume* liability in order to model the damages") (emphasis in original); *Orthofix Inc. v. Gordon*, 2016 WL 1273160, at *3 (C.D. Ill. Mar. 1, 2016) ("It is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion. To hold otherwise would be illogical.") (citation omitted).

261.   Mr. Bones identified three periods of delay. The first delay period (June 2012 – December 2014) encompasses the delay RREEF experienced during the City entitlements phase. (TE 2067 at 0008; RT 306-307.) The second delay period (December 2014 – December 2016) encompasses the delay RREEF experienced during the CEQA Litigation. (TE 2067 at 0009; RT 307.) The third delay period (February 2017 – September 2017) encompasses the delay RREEF experienced during the Director's Writ Litigation. (TE 2067 at 0009-0010; RT 307-308.)

262.   Because the Court finds that the Hacienda Parties' breach of the Settlement Agreement via the Director's Writ Litigation was a proximate cause of an eight-month delay in the Project (but not for the other two periods), the Court considers the evidence and calculates damages for the Writ delay only.

### A.  Cost Escalation

263.   Mr. Bones's cost escalation theory reflects the additional amount of money RREEF had to expend as a result of rising construction costs during the eight-month period the Project was delayed, including for materials, labor, and other

factors. (TE 2067 at 0018-0022; RT 301-302, 309.) Mr. Bones's cost-escalation damages are calculated by comparing the actual cost of construction of the Project to the cost "but-for" the delays. (RT 309, 326.)

264.   As discussed below, the Court finds Mr. Bones's testimony, reasoning, and report generally persuasive as to the cost escalation damages due to delay from the Director's Writ Litigation.

265.   Mr. Bones calculated RREEF's cost escalation damages by first examining a total of seventy payments RREEF made related to construction costs incurred between October 2015 and September 2021. From this pool of costs, Mr. Bones analyzed only the hard costs, leaving soft costs and leasing costs out of his escalation analysis and thus reducing the potential scope of damages. (TE 2111 at 0012; RT 303, 310, 312.) Hard costs consist of direct construction costs, such as building materials, utility relocation, and signage. Soft costs consist of expenditures such as architectural and engineering fees, legal expenses, and permits. Leasing costs include items like tenant improvements and leasing commissions. (RT 310.)

266.   Mr. Bones testified that, if he had decided to include soft costs and leasing costs in his analysis, the overall damages calculation would have been higher. (RT 311-312.)

267.   In calculating the cost escalation, Mr. Bones consulted two construction costs indexes – the Turner Building Cost Index ("Turner Index") as well as the Engineering News Record Construction Cost Index ("ENR Index") – to determine the impacts of delay and inflation on RREEF's project expenditures.

268.   The Turner Index is a commercial U.S. construction index that covers over 20 markets. (RT 313.) The ENR Index measures the change in input construction costs, such as labor, steel, cement, and lumber. (RT 313.) Mr. Bones relied on the Turner Index as his primary basis for assessing RREEF's cost escalation damages from the delay caused by the Writ Litigation, although he also calculated escalation damages using the ENR Index. (*See* RT 311, 313 (Bones testimony that

the information and data he relied upon was reliable in assessing "hard" cost escalation); RT 352-353 (Bones testimony that using a national average index is a conservative estimate because the Los Angeles construction market is more expensive).) (RT 366.) Mr. Bones opined that the Turner Index was appropriate because it is an "output index" that measures not only labor rates and material prices, but also things like productivity and the competitive condition of the marketplace. (TE 2067 at 0019; TE 2111 at 0061-0065; RT 312-319, 322.) Both the Turner Index and ENR Index calculations by Mr. Bones were done on a quarterly basis. (RT 313.)

269.   Use of the Turner Index was challenged by RREEF (and its expert), and Mr. Bones was not able to provide complete details about the Turner Index during cross examination. (RT 364-366.)   After assessing all the expert testimony on this issue, the Court finds that the most appropriate approach for assessing the cost escalation is to calculate damages using both the Turner Index and the ENR Index and then to average those two results to arrive at a final amount.

270.   Mr. Bones testified that his methodology can be used to estimate damages for some period less than the total amount of any of the three delay periods, and he provided cost escalation damages for each delay period. (RT 320-321.) Mr. Bones calculated the cost escalation damages for the eight-month Writ period using the two indices: $4,416,000 (Turner) and $3,441,000 (ENR). (TE 2111 at 0013; RT 320, 322.) The average of the results from using two indices is $3,928,500.

271.   The construction contracts for the Project were guaranteed maximum price contracts ("GMP Contracts"), including a contract between RREEF and W.E. O'Neill Construction Company. (RT 357-361.) A GMP Contract is not a "fixed price" contract; rather, it sets a cap on certain aspects of a construction project. Within that cap, the price a developer could pay to a contractor can fluctuate. In addition, there were numerous exclusions for aspects of the Project that, as a result of the exclusions, were not covered by guaranteed maximum pricing. When analyzing RREEF's payments for construction, Mr. Bones found no evidence that RREEF had

actually hit a cap established by a GMP Contract. (RT 620-624; RT 375-376; TE 633 at 0123-0129.)

272.   The Hacienda Parties have failed to undermine the fundamental principles underlying Mr. Bones's opinion on cost escalation damages. In particular, their expert (Mr. Tregillis) did not demonstrate Mr. Bones's cost-escalation approach was an inappropriate or unreasonable approach, especially with respect to the delay caused by the Director's Writ Litigation. Mr. Tregillis did point out that Mr. Bones's use of a quarterly index (for a delay that is not an even quarter of a year) would cause an unintended increase in the cost escalation damages. According to Mr. Tregillis, the effect of a quarterly index would be an 11.1% increase (removing "one [month] out of nine") if only the eight-month Director's Writ Litigation period were at issue. (RT 618-619.) Otherwise, Mr. Tregillis did not provide substantive criticism of Mr. Bones's construction cost escalation methodology. (*See* TE 1213 at 0034-0036; RT 618-619.)

273.   As set about above, the cost escalation damages during the eight-month delay proximately caused by the Director's Writ Litigation (using Mr. Bones's methodology and an average of the Turner and ENR Indices) is $3,928,500. Reducing that amount by 11.1% per Mr. Tregillis's quarterly correction yields $3,496,365 in cost escalation damages. The Court finds that the Hacienda Parties are liable for this amount of damages for their breach of the Settlement Agreement by filing and maintaining the Director's Writ Litigation.

## B. Lost Profits

274.   Mr. Bones's second damages theory – lost profits – reflects what he has calculated as the additional profits that RREEF would have allegedly enjoyed without the delays to the Project. (TE 2067 at 0012-0014; RT 327-329.)

275.   In determining RREEF's lost profits from the delays allegedly caused by the Hacienda Parties, Mr. Bones took RREEF's actual net operating income ("NOI") for the Shopping Center from 2016 through August 2021 and moved it

backwards in time to account for the delay. To do this for future years, he relied on projections from an appraisal prepared by Duff & Phelps. Mr. Bones calculated the difference between the actual financial results and the results when he moved the yearly NOIs back in time. The projections of Duff & Phelps understated RREEF's actual financial results from 2021 and 2022. (TE 2111 at 0007-0009, 0050-0057; RT 331-342, 348-349, 647.)

276.   Mr. Bones did not perform a lease-by-lease analysis of the Shopping Center in determining lost profits. Thus, he was not aware of space within the Shopping Center that would be leased if the project were completed in 2019 but is not leased now. (RT 369.)

277.   The net operating income for the Manhattan Village Shopping Center decreased by about $3.5 million in 2020 as a result of COVID. (RT 371-372.)

278.   If the project had been completed in 2019 and new leases had been signed then, Mr. Bones did not know how many of those new leases would have defaulted due to COVID. (RT 372-373.)

279.   According to Mr. Tregillis, Mr. Bones's methodology was flawed because it was error simply to shift RREEF's financial results back in time without taking into account how real-world events changed over time. For example, Mr. Bones's analysis assumed that RREEF would enjoy the benefit of later-market rent rates years earlier (RT 587-595), but Mr. Tregillis explained that it was not reasonable to take a lease signed in 2020, move it back 32 months and assume the lease rate would have been the same.

280.   In addition, Mr. Tregillis explained that RREEF's net operating income for the Shopping Center decreased every year from 2016-2020. Thus, advancing those actual declines to earlier periods in time should have been worse for RREEF, not better. (RT 591-598.)

281.   Per Mr. Tregillis's testimony, to determine whether RREEF had lost profits as the result of delays allegedly in the Project should include a lease-specific

analysis. This would include looking at existing leases to determine whether they would be higher had they been signed earlier and at vacant spaces to determine if they would be under lease if the Project had finished earlier. Mr. Tregillis was unaware of evidence that there was any lease that would be more favorable but for the Hacienda Parties' conduct or that there was a vacant space that would have been leased if not for the Hacienda Parties' conduct. Thus, according to Mr. Tregillis, there is no basis to conclude that the delay attributed to the Hacienda Parties damaged the current or future performance of the Shopping Center. (RT 598-599.) In addition, if RREEF signed a significant number of new leases in 2019, there is no way to know how many of the new tenants would have defaulted due to COVID. (RT 599-600, 605-607.)

282.   The Court finds Mr. Tregillis's criticism of RREEF's lost profits claim to be persuasive. In light of deficiencies in Mr. Bones's lost-profits analysis and gaps in the evidence from RREEF in support of this claim, the Court finds RREEF's lost profits claim to be unduly speculative and without reasonable certainty or reliability. The Court therefore concludes that RREEF is not entitled to recover lost profits based on delay attributable to the Hacienda Parties as a result of the Writ litigation. *See, e.g., Weber Marking Sys., Inc. v. Woodward*, 2018 WL 6137600, at *5 (C.D. Cal. Sept. 27, 2018) (when a plaintiff seeks damages related to loss of business or profits, "the plaintiff must show the amount of its damages with reasonable certainty and a reasonable degree of accuracy, and the testimony establishing the loss must be free of speculation and conjecture.") (citation omitted)).

283.   RREEF does not allege that the damages that they seek for breach of the implied covenant of good faith and fair dealing are independent of the contract cause of action. Accordingly, this separate claim for breach of the implied covenant "may be disregarded as superfluous." *See Careau & Co. v. Sec. Pac. Bus. Credit, Inc*., 222 Cal. App. 3d 1371, 1395 (1990), *as modified on denial of reh'g* (Oct. 31, 2001); *see*

*also Huviron Co., Ltd v. Cctvstar Inc.*, 2014 WL 12689221, at *3 (C.D. Cal. Nov. 25, 2014).

IT IS THEREFORE ORDERED that RREEF is entitled to judgment in its favor on its breach of contract claim against the Hacienda Parties in the amount of $3,496,365.

IT IS SO ORDERED.

DATED:  6/6/2023

_____
ALEXANDER F. MacKINNON
UNITED STATES MAGISTRATE JUDGE